ORIGINAL

**IN THE UNITED STATE DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 1 6 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

SARAH C. DOZIER, as Administrator of    )
the Estate of KATHRYN JOHNSTON,    )
    )
    Plaintiff,    )
    )
v.    )
    )
    )
CITY OF ATLANTA, a Municipal    )
Corporation of the State of Georgia;    )   **CIVIL ACTION FILE**
GREGG JUNNIER, Individually and in his    )   **NO. 1:08-CV-0007-MHS**
official capacity as a Police Officer of the    )
City of Atlanta;    )
JASON R. SMITH, Individually and in his    )
Official capacity as a Police Officer of the    )
City of Atlanta;    )
ARTHUR TESLER, Individually and in his    )
Official capacity as a Police Officer of the    )
City of Atlanta;    )
SGT. W.T. STALLINGS, Individually and in    )
his official Capacity as a Police Officer of the    )
City of Atlanta;    )
LT. S. GIBBS, Individually and in her official    )
Capacity as a Police Officer of the    )
City of Atlanta;    )
RICHARD PENNINGTON, Individually and    )
in his official capacity as Chief of Police of the    )
City of Atlanta Police Department;    )
Maj. PEARLENE WILLIAMS, Individually    )
And in her official capacity as a Police Officer    )
of the City of Atlanta;    )
ASST. CHIEF DREHER, Individually and in    )
his official capacity as a Police Officer of the    )
City of Atlanta;    )
Maj. E.R. FINLEY, Individually and in his    )
official capacity as a Police Officer of the    )

i

City of Atlanta;  )
MAJOR MATHIS, Individually and in his  )
official capacity as a Police Officer of the  )
City of Atlanta;  )
MAJOR BROOKS, Individually and in his  )
official capacity as a Police Officer of the  )
City of Atlanta  )
DEPUTY CHIEF PETER ANDRESEN,  )
Individually and in his official capacity as a  )
Police Officer of the City of Atlanta; and  )
MAJOR C.J. DAVIS, Individually and in her  )
official capacity as a Police Officer of the  )
City of Atlanta.  )
  )
    Defendants.  )

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 1 6 2009

JAMES N. HATTEN, Clerk
By: _____
            Deputy Clerk

## TABLE OF CONTENTS FOR BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION AND PROCEDURAL SUMMARY** .......................................1

**FACTUAL BACKGROUND** .................................................................................7

*The Neal Street Shooting* ....................................................................................7

*The FBI Investigation and the Guilty Plea Agreements* ...................................13

**LAW AND ANALYSIS** .......................................................................................22

**I. STANDARD OF REVIEW** .............................................................................22

**II. PLAINTIFFS' CONSTITUTIONAL CLAIMS, 42 U.S.C. § 1983.** ..............24

**A. The Fourteenth Amendment Claim** .............................................................26

**B. Defendants Gregg Junnier, Jason R. Smith and Arthur Tesler Pleaded Guilty to Violating Ms. Johnston's Fourth Amendment Rights** ....................26

**C. Liability of the City of Atlanta – *Monell* Liability** ....................................27

1. Plaintiff fails to show that the City of Atlanta has an unconstitutional custom, policy or practice that caused her injuries...............................31

   *A Brief History of APD Narcotics Enforcement Unit*......................34

2. Plaintiff fails to show that the City of Atlanta has unconstitutional and illegal performance targets...................................................42

3. The Eleventh Circuit has Placed Strict Limits on the Circumstances in which Failure to Train can form the Basis of Municipal Liability in a 1983 Claim. ...............................................................47

   a. *APD policy makers had no subjective knowledge of any similar incidents prior to the Neal Street shooting in November 2006*.........49

   b. *Police training policies for the City of Atlanta exceed State requirements*.................................................................53

   c. *Junnier, Smith and Tesler were Adequately Trained*..................... 55

**D. Supervisory Liability**.................................................60

   1. The City of Atlanta properly supervises the actions of its police officers..................................................................60

   2. The City of Atlanta's disciplinary policy did not cause Plaintiff's alleged Constitutional injuries........................................66

**III. STATE LAW CLAIMS AGAINST A MUNICIPAL DEFENDANT ARE BARRED BY THE DOCTRINE OF GOVERNMENTAL IMMUNITY – O.C.G.A. §§ 36-33-1 THROUGH 5**...................................................70

**A. Defendant City of Atlanta is Entitled to Sovereign Immunity**........70

**B. Under Georgia Law there is no Vicarious Liability for Supervisors for Discretionary Acts of Subordinates**...................................72

**IV. RICO CLAIMS**...........................................................74

**V. CONCLUSION**………..…………………………………………………………..75

    **A. The Official Capacity and Fourteenth Amendment Claims**………..75

    **B. City Defendants Are Entitled to Summary Judgment On Plaintiff's
    Fourth Amendment Claims Because There Are No Genuine Issues of
    Material Fact As To The Following**…………………………………..75

    **C. City Defendants Are Entitled to Sumary Judgment on Plaintiff's
    State Law Claims Because There Is no Genuine Issue of Material
    Fact As To The Following**……………………………………………77

    **D. City Defendants Are Entitled to Summary Judgment on Plaintiff's
    RICO Claims Because There Is No Genuine Issue of Material Fact
    As To The Following**……………………………………………..…77

## TABLE OF AUTHORITIES

**Cases**

*Acker v. City of Elberton*, 176 Ga. App. 580 (1985) …………………………………… - 72 -
*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). ………………………………… - 23 -
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)……………………………… - 23 -
*Anderson*, 477 U.S. at 249-50……………………………………………………………… - 23 -
*Avery v. County of Burke*, 660 F.2d at 114……………………………………………………… - 65 -
*Barry v. Lemore*, 670 F.2d 30 (5th Cir. 1982)…………………………………………………… - 65 -
*Baskin v. Parker*, 602 F.2d 1205 (5th Cir. 1979). ……………………………………………… - 64 -
*Beverly v. Morris*, 470 F.2d 1356 (5th Cir. 1976). ……………………………………………… - 64 -
*Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137
    L.Ed.2d 626 (1997)……………………………………………………………………… - 30 -
*Board of the County Commissioners of Bryan County, Oklahoma v. Jill Brown*, 520 U.S. 397,
    407, 117 S.Ct. 1382, 1389. …………………………………………………………… - 27 -
*Brock v. City of Zephyrhills*, 323 Fed. Appx. 925 (C.A. 11th Cir. (Fla.) 2007)……………… - 73 -
*Brooks v. Scheib*, 813 F.2d 1191 (11th Cir. 1987). ……………………………………………… - 49 -
*Brooks v. Scheib*, 813 F.2d at 1193 ……………………………………………………………… - 53 -
*Brown v. City of Union Point*, 52 Ga. App. 212 (1935). ……………………………………… - 72 -
*Canton*, 489 U.S. at 389 ………………………………………………………………………… - 53 -
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)……………………………………… - 23 -
*Celotex*, 477 U.S. at 323 ………………………………………………………………………… - 24 -
*City of Atlanta v. Heard*, 252 Ga.App. 179, 181 (2001) ……………………………………… - 71 -
*City of Canton v. Harris*, 489 U.S. 378, 390 (1989). ………………………………………… - 47 -
*City of Canton v. Harris*, 489 U.S. at 388 …………………………………………………… - 48 -

*City of Canton v. Harris*, 489 U.S. at 393 .................................................................... - 55 -

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). ..................................... - 30 -

*City of Oklahoma City v. Tuttle*, 471 U.S. at 823 ...................................................... - 53 -

*County of Sacramento v. Lewis*, 523 U.S. 833, 845-846, 118 S.Ct. 1708, 104 L.Ed.2d 1043 (1998)....................................................................................................................... - 45 -

*Crowder v. State Parks Dept.*, 228 Ga. 436, 185 S.E. 2d 908 (1971) ...................... - 70 -

*Donaldson v. Department of Transportation*, 262 Ga. 49 ........................................ - 75 -

*Donaldson v. Department of Transportation*, 262 Ga. 49 (1992). ........................... - 72 -

*Donaldson v. Department of Transportation*, 262 Ga. 49, 414 S.E. 2d 638 (1992). ............... - 26 -

*Elarika v. City of East Point*, 204 Ga. App. 731, 733 (1992).................................... - 71 -

*Foster v. Crowder*, 117 Ga. App 568 (1968)............................................................. - 72 -

*Gilbert v. Richardson*, 264 Ga. 744 ......................................................................... - 75 -

*Gilbert v. Richardson*, 264 Ga. 744, 452 S.E. 2d 476, 478 n.4 (1994). ..................... - 26 -, - 72 -

*Goebert v. Lee County*, 510 F.3d 1312 (11th Cir. 2007)............................................ - 61 -

*Gold v. City of Miami*, 121 F.3d 1442 (11th Cir. 1997). ............................................ - 48 -

*Graham v. Conner*, 490 U.S. 386 (1989) .................................................................. - 75 -

*Graham v. Conner*, 490 U.S. 386 (1989). ................................................................. - 26 -

*Graham v. Conner*, 490 U.S. 386, 394 (1989) .......................................................... - 26 -

*Gravitte v. North Carolina Div. of Motor Vehicles*, 35 Fed Appx. 45, C.A. 4 (N.C.) 2002. ... - 46 -

*Gray v. Linahan*, 157 Ga. App. 227, 276 S.E.2d 894 (1981)..................................... - 73 -

*Grech v. Clayton*, 335 F.3d 1326, 1329 (11th Cir. 2003) *(en banc)* (internal quotations omitted).. - 30 -

*Grech*, 335 F.3d at 1329 n. 5 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)) ...................................................................... - 31 -

*Hennessey v. Webb*, 245 Ga. 329, 264 S.E.2d 878 (1980) ....................................... - 73 -

*Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1556-57 (11th Cir. 1989). ........... - 48 -

*Kirkland v. City of Atlanta*, 12 F.3d 220 (11th Cir. 1993)......................................... - 60 -

*Lazenby v. Spaulding County*, 249 Ga. 334, 290 S.E.2d 915..................................... - 73 -

*Massey v. Oklahoma City*, 643 F.Supp. 81 (1986). .................................................. - 74 -

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). ......... - 23 -

*Matthews v. City of Atlanta*, 699 F.Supp. 1552 (N.D.Ga. 1988)................................ - 60 -

*McClaughlin v. City of LaGrange*, 662 F.2d 1385, 1388 (11th Cir. 1981), *cert. denied*, 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed. 2d 856 (1982)........................................................... - 65 -

*Monell* at 694, 98 S.Ct., at 2037-2038 ..................................................................... - 28 -

*Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). ................ - 27 -, - 29 -

*Monell*, 436 U.S. at 690-91...................................................................................... - 30 -

*Monell*, 436 U.S. at 694 ........................................................................................... - 30 -

*Monell*, 436, U.S. at 658 .......................................................................................... - 64 -

*Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473. .......................................................... - 28 -

*Moore v. Miami-Dade County*, 502 F.Supp.2d 1224, 1231 (S.D.Fla. 2007) (citing *Cagle v. Sutherland*, 334 F.3d 1248, 1255 (11th Cir. 2003)................................................... - 53 -

*Moore v. Miami-Dade County*, 502 F.Supp.2d 1224, 1231 (S.D.Fla. 2007) (citing *Cagle v. Sutherland*, 334 F.3d 1248, 1255 (11th Cir. 2003)................................................... - 30 -

*Oklahoma City v. Tuttle*, 471 U.S. 808, 818, and n. 5, 105 S.Ct. 2427, 2433-2434, and n. 5 (plurality opinion)................................................................................................... - 29 -

v

*Oklahoma City v. Tuttle*, 471 U.S. 808, 821, and n. 5, 105 S.Ct. 2427, 2435,  (plurality opinion) - 31 -

*Orpiano v. Johnson*, 632 F.2d 1096 (4th Cir. 1980), *cert. denied*, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed. 2d 361 (1982)........................................................................................................ - 65 -

*Owen v. City of Independence*, 445 U.S. 622, 633, 655, n. 39, 100 S.Ct. 1398, 1406, 1417-1418, n. 39 (1980)............................................................................................................. - 29 -

*Oxford Asset Mgmt. Ltd. v. Jajaris*, 297 F.3d 1182, 1188 (11th Cir. 2002)............................ - 24 -

*Peeples v. City of Atlanta*, 189 Ga. App. 888, 890 (1992). ..................................................... - 71 -

*Pembaur v. Cincinnati*, 475 U.S. 469, 478-480, and nn. 7-8, 106 S.Ct. at 1292, 1297-1299 and nn. 7-8............................................................................................................................ - 29 -

*Polk County v. Dodson*, 454 U.S. 312, 325, 102 S.Ct. 445, 453-454 (1981) ........................... - 29 -

*Popham v. City of Talladega*, 908 F.2d 1561, 1564-65 (11th Cir. 1990)................................. - 48 -

*Reese v. City of Atlanta*, 261 Ga.App. 761, 762 (2003) ........................................................... - 71 -

*Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007)............................................ - 24 -

*Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489 (11th Cir. 1997). ................................ - 30 -

*Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976)................................................................. - 64 -

*Sims*, 537 F.2d at 832............................................................................................................. - 64 -

*Tuttle* , 471 U.S. at 823, 105 S.Ct. at 2436 (opinion of REHNQUIST, J.).............................. - 55 -

*Tuttle, supra* at 471 U.S. at 821, 105 S.Ct. , at 2435 (opinion of REHNQUIST, J.)............... - 54 -

*Vineyard v. County of Murray County*, 990 F.2d 1213, 1212 (11th Cir. 1993). ...................... - 47 -

*Vineyard*, 990 F.2d at 1213 ..................................................................................................... - 47 -

*Wallace v. City of Montgomery*, 956 F. Supp. 965, 977 (M.D. Ala. 1996) (citing *Busby v. City of Orlando*, 931 F.2d 764, 766 (11th Cir. 1991)). ................................................................ - 29 -

*Webster v. City of Houston,* 689 F.2d 1220 (5th Cir. 1982)..................................................... - 64 -

*Wellington v. Daniels*, 717 F.2d 932, 936 (CA4 1983) ............................................................ - 65 -

*West v. Tillman*, 496 F.3d 1321, 1328-29 (11th Cir. 2007) *(per curiam)* ................................ - 42 -

*Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990).......................................................... - 48 -

*Wright,* 919 F.2d at 674 .......................................................................................................... - 48 -

*Young v. City of Augusta, Georgia*, 59 5.3d 1160, 1171-72 (11th Cir. 1995)............................ - 48 -

**Statutes**

42 USC § 1983 ........................................................................................................................ - 4 -

O.C.G.A. § 16-10-20 ............................................................................................................... - 3 -

O.C.G.A. § 36-33-3 .................................................................................................... - 71 -, - 77 -

**O.C.G.A. §§ 36-33-1 THROUGH 5**............................................................................... - 70 -

**Rules**

APD Disciplinary Manual, Chapter 2,
  http://horizon/wd/Chapter2/APDSOP2020DisciplinaryProcess.htm ................................... - 66 -

APD Disciplinary Manual, http://horizon/wd/Chapter2/APDSOP2020DisciplinaryProcess.htm .. - 69 -

APD Field Manual, Chapter 6 ff; http://horizon/wd/Admin_Main/Chapter4FieldOperations.htm - 57 -

APD Work Rules, http://horizon/wd/Chapter2/APDSOP2010WorkRules.htm....................... - 61 -

Fed. R. Civ. P. 56(c). ............................................................................................................. - 23 -

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants the City of Atlanta, Richard Pennington, Chief of Police for the City of Atlanta, Lt. Stacie Gibbs, Maj. Pearlene Williams, Asst. Chief Alan Dreher, Maj. E.R. Finley, Maj. (sic) Mathis, Maj. Brooks, Deputy Chief Peter Andresen and Maj. C.J. Davis (hereinafter "City Defendants"), respectfully move this Court for judgment in their favor on all counts of Plaintiff's Amended Complaint in the above-styled action (the "Complaint"). There are no issues of material fact that will preclude this Court from deciding the case as a matter of law. Furthermore, former APD police officers, Defendants Gregg Junnier, J.R. Smith and Arthur Tesler, admitted that they violated Plaintiff's constitutional rights, their oath of office and the policies of the City of Atlanta Police Department. Accordingly, the City Defendants' Motion for Summary Judgment should be granted. Defendants Gregg Junnier, J.R. Smith, Arthur Tesler and Sgt. W.T. Stallings have separate counsel and are not represented by the Atlanta City Attorney.

### INTRODUCTION AND PROCEDURAL SUMMARY

This action arises from the shooting death of Ms. Kathryn Johnston on November 21, 2006, by police officers with the Atlanta Police Department (APD) Narcotics Unit. The former APD Narcotics officers – Defendants Gregg Junnier,

Jason R. Smith and Arthur Tesler – were executing a "no-knock warrant" at 933 Neal Street, Atlanta, Georgia, to search Ms. Johnston's residence for drugs. J.R. Smith obtained the no-knock search warrant from a state magistrate by making false statements on the affidavit Smith submitted with the judicial request for the search warrant [*Smith* Guilty Plea and Plea Agreement, Statement of Facts, p. 3, *United States v. Jason R. Smith*, U.S.D.C., Northern District of Georgia, Atlanta Division, Criminal No. 1:07-CR-129]. Officers Junnier and Tesler supported Smith's falsification when Smith briefed the other members of Narcotics Team 1 just before the fatal raid on November 21, 2006 [Id., p. 5]. The other members of Narcotics Team One were unaware that Smith, Junnier and Tesler had made false statements in the affidavit to secure the no-knock warrant for 933 Neal Street [FBI Letter and Report, November 3, 2008: Investigative Findings related to the Death of Kathryn Johnston which occurred on November 21, 2006]. Ms. Johnston was killed when the narcotics officers forcefully raided her home.

The shooting incident was investigated by the FBI. During the FBI investigation, former APD officers Gregg Junnier, Jason R. Smith and Arthur Bruce Tesler pleaded guilty to federal charges: Conspiracy to Violate Civil Rights (resulting in the death of Kathryn Johnston) in the United States District Court [*Junnier* Guilty Plea and Plea Agreement, p. 1., *United States v. Gregg Junnier*, U.S.D.C., Northern District of Georgia, Atlanta Division, Criminal No. 1:07-CR-

129; *Smith* Plea Agreement, p. 1; *Tesler* Guilty Plea and Plea Agreement, Statement of Facts, p. 4, *United States v. Arthur B. Tesler*, U.S.D.C., Northern District of Georgia, Atlanta Division, Case No. 1:08-CR-424-JEC].

Jason R. Smith also pleaded guilty in Fulton County Superior Court to the reduced state charges of voluntary manslaughter, violation of oath by public officer, false statements, criminal solicitation, and perjury [*Smith* Plea Agreement, p. 1]. Gregg Junnier pleaded guilty in Fulton County Superior Court to the reduced state charges of voluntary manslaughter, violation of oath by public officer, criminal solicitation; false statements [*Junnier* Plea Agreement, p.1]. Both Junnier and Smith are currently serving federal prison sentences of 150 months.

In addition to the above federal charge, Arthur Bruce Tesler was found guilty of making false statements, O.C.G.A. § 16-10-20, in a state court jury trial and sentenced to four a half years in state prison.[1]

Plaintiff, the niece of Kathryn Johnston, filed this lawsuit on November 21, 2007 in the State Court of Fulton County, before the FBI investigation and report was completed. On December 20, 2007, Defendants removed the action to the United States District Court, Northern District of Georgia, Atlanta Division. The FBI completed its investigation of the incident and tendered its report to the

---

[1] On January 15, 2009, Tesler's state court conviction was reversed [The State of Georgia v. Arthur B. Tesler, Fulton County Superior Court, Indictment No. 07-SC-55954]. The Georgia Court of Appeals held that the state failed to prove venue, but the evidence supported the jury's finding that Tesler's conduct violated O.C.G.A. § 16-10-20 [Tesler v. The State, A-08-A-2190, Court of Appeals Georgia].

Atlanta Police Department on or about November 3, 2008. Plaintiff amended her Complaint on November 19, 2008, adding seven additional Defendants [Doc. No. 35-2].

Plaintiff filed this action pursuant to 42 USC § 1983 and state law. In **Count 1** of her Amended Complaint, Plaintiff alleges violations of the Fourth and Fourteenth Amendment. Plaintiff's federal claims allege that Defendants conducted an illegal search and seizure while using unreasonable and excessive deadly force without justification. Plaintiff also alleges that Ms. Johnston was deprived of her life, liberty and property without due process or equal protection of law [Amended Complaint, ¶ 52].

In **Counts 2 and 6** Plaintiff seeks to hold the City of Atlanta liable for the criminal acts of Defendants Smith, Junnier and Tesler by asserting a claim of *respondeat superior* (Count 6). In Count 2, Plaintiff reasserts the *respondeat superior* theory by alleging that the City of Atlanta had "a persistent and widespread practice" of allowing City of Atlanta police officers: 1) to make unlawful false statements in an effort to procure unlawful search warrants and/or "no-knock" warrants as well as unlawfully detain and arrest citizens; 2) to use unreasonable and deadly force without justification; 3) to violate City of Atlanta Police Department's own policies and procedures; 4) that the department failed to enforce policies, failed to properly train and supervise officers, failed to properly

- 4 -

discipline; 5) the department condoned and ratified the unlawful and illegal activity of police officers; and 6) were "deliberately indifferent to the constitutional rights of citizens" [Id., ¶¶ 9, 56, 57, 58, 59, 60, 61]. Plaintiff further asserts that the "acts, omissions, systemic corruption, policies, and customs" of the City of Atlanta, the City of Atlanta Police Department, were the "driving force" behind the constitutional violations of Ms. Johnston's rights. Plaintiff further contends that Junnier, Smith and Tesler's illegal actions were done to meet APD's "unconstitutional and illegal performance targets" [Id., ¶ 49].

In **Count 3**, Plaintiff alleges that the defendants violated state law. Without specifying which acts each defendant performed, Plaintiff asserts claims of trespass, assault, battery, false imprisonment and intentional infliction of emotional distress [Id., ¶¶ 64, 65].

In **Count 4**, Plaintiff contends that the "Defendants negligently performed ministerial duties as defined by Georgia law when they unlawfully obtained a search and/or "no-knock" warrant with false statements and executed the illegal warrant on the home of Kathryn Johnston, proximately causing her death... and when they failed to supervise and train ... the defendant officers" [Id., ¶¶ 67, 68].

In **Count 5**, Plaintiff asserts several claims under Georgia's RICO statute. Without specifying dates, times or identifying the incident(s), Plaintiff contends

that all named Defendants were involved in some form of racketeering in violation of the RICO statute [Id., ¶ 71].

Defendants contend that Plaintiff's theory of municipal and supervisory liability is flawed. Plaintiff's entire theory of liability, with the exception of the actual constitutional violations admitted by Junnier, Smith and Tesler, is based on the excuses and rationales advanced by Junnier, Smith and Tesler *after* they were caught to justify their criminal behavior. The evidence will show that Junnier, Smith and Tesler not only violated the constitutional rights of Ms. Johnston, but that they also violated their oaths of office under state law and specific time-honored policies of the Atlanta Police Department and the City of Atlanta. The undisputed material facts will confirm what the FBI investigation revealed, *viz.*, that Junnier, Smith and Tesler were engaged in an extortion scheme that sold "extra security and protection" to local businesses and apartment complexes in the high-crime, drug-infested zones they patrolled. Junnier, Smith and Tesler extracted illegal payments for providing security to local businesses while on duty [FBI Report, p. DOZIER-COA 00009]. "The conspirators spent significant time performing these [extra security] services and collecting payment while on-duty, detracting from time available to perform the work needed to follow the Constitution, laws, and proper police procedures to gather and truthfully present the evidence needed for lawful search warrants" [Id.].

City Defendants contend that the criminal acts of the former APD officers, Defendants Junnier, Smith and Tesler, should not be imputed to the City of Atlanta or to the command staff of the Atlanta Police Department. Based on the FBI's findings, "The conspirators tacitly agreed not to report violations of the Constitution, laws, and APD policies to anyone who might take action against the conspirators as a result. They also tacitly agreed to corroborate each other's false statements to prevent detection of these violations if ever questioned about them" [Id., p. 5]. Until the unfortunate shooting of Ms. Kathryn Johnston on November 21, 2006, Junnier, Smith and Tesler kept their extortion scheme and the cash to themselves.[2]

## FACTUAL BACKGROUND

*The Neal Street Shooting*:

November 21, 2006

   2:00 p.m.

APD Officers Gregg Junnier, Jason R. Smith and Arthur Tesler drove a marked APD police car to a set of apartments located at 350 Lanier Street, a "hot spot" where they had recovered illegal drugs in the past [*Junnier* Plea Agreement,

---

[2]Junnier made statements to federal agents that Sgt. Stallings received some of the cash payments from the local businesses. The allegations have not been proven. Stallings pleaded guilty to violating the civil rights of another citizen in an action unrelated to this incident. In January 2008, former APD Officer Daniel Betts pleaded guilty in federal district court to taking payoffs to perform his normal duties as a police officer. Betts took over some of Junnier's local businesses after Junnier entered his guilty plea. Judge Carnes sentenced Betts to three years' probation, including six months of home confinement and 100 hours of community service.

Statement of Facts, ¶ 14]. The apartments were owned by one of Junnier's "clients" [Testimony of Gregg Junnier, May 8, 2008, p. 27, *State of Georgia v. Arthur Tesler*, Superior Court of Fulton County, State of Georgia, Indictment No. 07-SC-55954.] While checking some of the vacant apartments and the wood line adjacent to the apartments, Officer Smith located several plastic baggies that contained marijuana. Officer Smith placed the abandoned drugs in the trunk of the police car [*Smith* Plea Agreement, ¶ 7; *Junnier* Plea Agreement, ¶ 14].

3:30 p.m.

Officer Jason R. Smith received a phone call from a Confidential Reliable Informant ("CRI") that a known drug dealer named Fabian Sheets was dealing drugs outside a store located at 1143 Simpson Road. The three officers drove out to that location and saw Sheets. After a short chase, Sheets was apprehended [*Smith*, ¶ 8; *Junnier*, ¶ 15]. Junnier called for a "K-9" officer with a drug-sniffing dog. Smith planted under a nearby rock some of the marijuana found at 350 Lanier Street. An APD Canine Officer, Connie Carson, was dispatched to the scene and found several plastic baggies which contained marijuana and two hits of crack cocaine in the general area of Sheets' location [Id. *Smith* ¶ 9, *Junnier* ¶ 16]. Since Sheets had a lengthy criminal history, Junnier and Smith told him that he would be charged with possession of all the recovered drugs unless he provided them with information on illegal drug sales. According to Junnier, Smith and Tesler, Sheets

- 8 -

told them that a kilogram of cocaine was being cut up at 933 Neal Street by a black male named "Sam" [Id. *Smith*, ¶ 10, *Junnier*, ¶ 17].  Officers Junnier, Tesler, and Smith drove Sheets to Neal Street where he affirmatively pointed out 933 Neal Street as being the residence containing the kilogram of cocaine [Id.].  Although Sheets has consistently denied that he ever gave the officers any information, all three officers claimed it was Sheets that told them about 933 Neal Street. The FBI investigation did not identify any other logical reason for the officers to have focused on 933 Neal Street [FBI Investigation: Report (Confidential), pp. DOZIER-COA 00002-00005].

   5:00 p.m.

Junnier called a CRI, Alexis White.  Using the information obtained from Sheets, Junnier asked White if he could make a drug purchase for them at 933 Neal Street.  White told Junnier he would make the purchase but he did not have transportation to Neal Street [*Junnier*, ¶ 19].  Officers Junnier, Tesler, and Smith, along with Sheets in the vehicle, drove to the Fulton County Jail. Officer Smith went to the Warrant Room and typed an electronic search warrant affidavit. Officer Smith included in the affidavit several false statements including the fact that "a confidential and reliable informant" was used to make a drug purchase from 933 Neal Street from a person only known as "Sam." Officer Smith has admitted that all the substantive information contained in the affidavit was false.  Officer Smith

- 9 -

also requested a no-knock provision to the search warrant, falsely citing that surveillance cameras were located at 933 Neal Street. Officer Smith swore to the affidavit before Fulton County Magistrate Kim Warden via teleconference. The warrant was issued at 5:53 p.m. Officer Smith returned to the vehicle and announced to Officers Junnier and Tesler that he had obtained a search warrant for the Neal Street location [*Smith* ¶¶ 13, 14; *Junnier* ¶¶ 20, 21, 22].

6:30 p.m.

APD Narcotics Team 1 assembled at an Atlanta Fire Station located at 1048 Simpson Road. The assembled team consisted of APD Officers Junnier, Tesler, Jason R. Smith, Cary Bond, Nathan Lucas, Maurice Guerin, Gary Smith, and Sergeant Wilbert Stallings. Narcotics Team 1 member Holly Buchanan was not present, as she was on leave that day. An operations plan was developed and assignments were given out in anticipation of executing the search warrant at 933 Neal Street. Officer Jason R. Smith gave a briefing to the officers in which he recounted the false statements that were contained in the affidavit as if they were true [Id., *Smith* ¶ 15; *Junnier* ¶ 24].

6:40 p.m.

APD Narcotics Team 1 approached 933 Neal Street and attempted to breach the front door. The team had trouble forcing the burglar bar door covering the wooden front door. Several of the officers then yelled out "Police!" since the

- 10 -

element of surprise was gone. As the front door was opening, the team was fired on by Ms. Johnston. Ms. Johnston shot at least one round from a .38 revolver in the direction of the officers from inside the residence. Officers Junnier, Jason Smith, Bond, Gary Smith, and Lucas returned fire, striking Ms. Johnston a number of times causing her death [Id., *Smith* ¶ 16; *Junnier* ¶ 25]. The GBI was unable to ascertain which officers' rounds actually killed Ms. Johnston. Officers Junnier, Bond, and Gary Smith received injuries as a result of shots and/or ricochets from police weapons. There has been no evidence discovered by the FBI investigation at this time to suggest that anyone other than Officers Junnier, Jason Smith, and Tesler knew the information in the affidavit was false prior to execution of the search warrant [FBI Report, pp. DOZIER-COA 00002-00005].

After the shooting at 933 Neal Street, Officers Junnier, Jason R. Smith, and Tesler immediately began to take several steps to cover up the fact that they had obtained a search warrant based on fabricated evidence. Once the rest of the Narcotics Team "1" cleared the first floor, Jason R. Smith, in the presence of Tesler, planted three of the baggies containing marijuana from 350 Lanier Street on the basement floor of the residence [*Smith*, ¶ 19; *Tesler,* ¶ 37]. The drugs planted by Smith were later discovered by other APD officers and a drug-sniffing dog. Officer Tesler filed an APD Incident Report falsely stating that a purchase of crack cocaine had been made that day at 933 Neal Street [*Tesler*, ¶ 39]. Officers Smith

and Junnier made multiple phone calls to the CRI, Alexis White, whom they had worked with in the past. The officers told White to pretend that Junnier, Smith and Tesler had directed him to purchase the drugs at 933 Neal Street earlier in the day, before they applied for the search warrant [*Smith,* ¶ 20; *Tesler,* ¶ 38].

<u>November 22, 2006: Thursday</u>

The next day, in furtherance of their conspiracy, Officer Smith submitted two bags containing crack cocaine seized to APD Property Management, corroborating Tesler's false Incident Report and falsely indicating that the drugs were bought by an informant from "Sam" at 933 Neal Street on November 21, 2006 [*Smith* ¶¶ 23, 26].   Officer Junnier gave a statement to APD Homicide detectives corroborating Smith's property management report and Tesler's Incident Report [*Junnier,* ¶ 37].

After Officers Smith and Tesler destroyed the remaining marijuana from 350 Lanier Street by throwing the drugs into a storm sewer, they had several conversations and meetings with each other and with the CRI Alexis White about creating a cover story for the fake drug purchase at 933 Neal Street [*Smith,* ¶ 27; *Junnier,* ¶ 39; *Tesler,* ¶¶ 41-47].

<u>November 23, 2006: Friday</u>

Two days after the shooting at Neal Street, Junnier, Smith and Tesler's cover story began to unravel when their informant, Alexis White, abruptly jumped from

- 12 -

an APD vehicle when he was asked to identify the person he purchased the drugs from at 933 Neal Street. Junnier, Smith and Tesler continued to lie and make false statements to the APD's Homicide detectives and to their commander, Lt. Stacie Gibbs.

### November 27, 2006: Monday

Chief Pennington placed all the officers in Narcotics Team 1 on administrative leave.[3] Chief Pennington contacted the FBI and formally requested an investigation of the Neal Street shooting [Deposition of Chief Richard Pennington, p. 370]. The FBI requested the APD's Office of Professional Standards to suspend its investigation until the FBI had completed their investigation [Affidavit of Maj. Lane Hagin, OPS, Exhibit "G"].

*The FBI Investigation and the Guilty Plea Agreements:*

### December 7, 2006

Arthur B. Tesler was interviewed by FBI agents and others concerning the death of Kathryn Johnston. During that interview, Tesler made false statements consistent with the false statements contained in Smith's false search-warrant affidavit, and consistent with the fabricated story that he had concocted earlier with Smith and Junnier [*Tesler*, ¶ 49].

---

[3] In addition to Junnier, J.R. Smith and Tesler, other members of Narcotics Team 1 included officers Guerin, Lucas, Bond, G. Smith, and Buchanan. The team was headed by Sgt. Stallings. All officers in Narcotics Team 1 were placed on administrative leave pending completion of the FBI and OPS investigations. Officer Buchanan was on leave the day of the shooting and was not immediately placed on administrative leave.

<u>December 11, 2006</u>

When questioned by federal agents in a proffer session, Defendant Gregg Junnier admitted his role in the conspiracy rather than giving a false statement pursuant to the cover story he had created the day before with Smith and Co-conspirator Tesler [*Junnier*, ¶ 40]. Gregg Junnier resigned from the Atlanta Police Department immediately after his confession to federal agents.

<u>December 20, 2006</u>

Jason R. Smith met with federal agents in a proffer session and made false statements consistent with the false statements in the search warrant affidavit and consistent with the fabricated account that he had concocted with Junnier and Tesler [*Smith*, ¶ 28]. Unbeknownst to Smith at the time, Junnier was cooperating with the FBI. Initially, Smith told federal agents he never received any formal training on writing warrants; that he was taught to do shortcuts by his teammates; and that he was never in the basement of 933 Neal Street [FBI Report, pp. DOZIER-COA 00109, 00113]. In subsequent interviews, when the cover story began to unravel, Smith changed his story and began cooperating with the FBI.

<u>January 10, 2007</u>

In an interview with federal agents, Jason R. Smith admitted that he made false statements to the Atlanta Police Department on November 22, 2006. Smith also admitted that he made false statements to federal agents in his December 20,

- 14 -

2006 proffer session [*Smith*, ¶ 29]. On April 26, 2007, Jason R. Smith resigned from the Atlanta Police Department.

<u>April 10, 2007</u>

Gregg Junnier entered a Guilty Plea and Plea Agreement in the United States District Court, Northern District of Georgia, Atlanta Division, Criminal No. 1:07-CR-129. In his federal plea, Junnier admitted violating the civil rights of Ms. Kathryn Johnston, resulting in her death.

In his federal plea agreement, Junnier also admitted that while working as a narcotics officer, that he and other officers would make false statements, in the form of sworn affidavits, to state magistrate judges in order to procure search warrants for residences and other locations, where Junnier and the other officers believed illegal drugs would be found [Id., ¶ 3]. In addition to the false statements made to procure the search warrants, Defendant Junnier admitted that he and other officers would also generate false documentation [Id., ¶ 7]. If ever asked about a search warrant executed under a fraudulently procured warrant, Junnier and other officers would make statements consistent with whatever false statements were given to procure the warrant in the first place [Id., ¶ 10]. Junnier further admitted that on or about November 22, 2006, Junnier, Smith and Tesler, before meeting with APD Homicide detectives, met to fabricate a story that would explain the events leading up to the shooting of Kathryn Johnston at 933 Neal Street [Id., ¶

34]. On November 22, 2006, Junnier gave the false story that he and Smith and Tesler had agreed upon to the APD Homicide detectives [Id., ¶ 37]. Junnier, Smith and Tesler continued to meet periodically after the shooting to discuss and perfect the cover story and agreed that each of them would make false statements once they were questioned by law enforcement officials in order to conceal their criminal conduct [Id., ¶ 39].

In addition to the above federal charges, Junnier pleaded guilty in Fulton County Superior Court to the reduced state charges of voluntary manslaughter, violation of oath by public officer, criminal solicitation, and making false statements on a public document [Id., p.1]. Junnier was sentenced to 150 months in prison and is currently serving time at a federal prison in Coleman, Florida.

    May 23, 2007

Jason R. Smith entered a Guilty Plea and Plea Agreement in the United States District Court, Northern District of Georgia, Atlanta Division, Criminal No. 1:07-CR-129. In his federal plea, Jason R. Smith admitted to violating the civil rights of Ms. Kathryn Johnston resulting in her death.

In his federal plea agreement, Smith stipulated to many of the same facts that his co-conspirator Junnier had stipulated to, including the fact that he and other officers would make false statements, in the form of sworn affidavits, to state magistrate judges in order to procure search warrants for residences and other

locations where Smith and the other officers believed illegal drugs would be found [Id., ¶ 3]. Smith specifically admitted that he went inside the jail and drafted an affidavit in support of a search warrant for the residence located at 933 Neal Street. Smith admitted that the affidavit contained several false statements [Id., ¶ 13]. Smith specifically admitted that he presented the aforementioned false affidavit to a magistrate and falsely swore to the truth of the statements contained in the affidavit. Smith admitted that when he, Junnier and Tesler were joined by other APD narcotics officers at a staging area, Smith gave a briefing to the other officers in which he recounted the false statements that were contained in the affidavit as if they were true [Id., ¶ 15]. In addition to the false statements made to the state magistrate, and providing the false information to his colleagues on Narcotics Team 1, Smith admitted that he planted three bags of marijuana in the basement of the house at 933 Neal Street, that he called informant Alexis White and asked him to pretend that the three officers had sent him earlier to purchase the drugs at 933 Neal Street, and that he had purchased crack cocaine there [Id., ¶¶ 19, 20]. Smith further admitted that on or about November 22, 2006, Smith, Junnier and Tesler, before meeting with APD Homicide detectives, met to fabricate a story that would explain the events leading up to the shooting of Kathryn Johnston at 933 Neal Street [Id., ¶ 24]. And, on that same date, Smith and Tesler met at the hospital where Junnier had been taken and agreed on certain false details that would be

- 17 -

used to maintain a "cover story" consistent with the false statements in the affidavit [Id., ¶ 22]. Smith, Junnier and Tesler continued to meet periodically after the shooting to discuss and perfect the cover story and agreed that each of them would make false statements once they were questioned by law enforcement officials in order to conceal their criminal conduct [Id., ¶ 27]. On November 22, 2006, Smith gave a statement to APD Homicide detectives that contained several false statements [Id., ¶ 25].

In addition to the above federal charges, Smith pleaded guilty in Fulton County Superior Court to the reduced state charges of voluntary manslaughter, violation of oath by public officer, criminal solicitation, false statements and perjury. Smith was sentenced to 150 months in prison and is currently serving time at a federal prison in Fairton, NJ.

April 21, 2008

The state court trial of Arthur B. Tesler began in Fulton County Superior Court. Tesler was charged with: Violation of Oath by a Public Officer, O.C.G.A. § 16-10-1; False Statements, O.C.G.A. § 16-10-20; and False Imprisonment under Color of Legal Process, O.C.G.A. § 16-5-42 [*The State of Georgia v. Arthur B. Tesler*, Superior Court of Fulton County, State of Georgia, Indictment No. 07-SC-55954].

<u>May 10, 2008</u>

Arthur Tesler was found guilty of making false statements, O.C.G.A. § 16-1-20 and sentenced to four a half years in state prison.[4]

<u>October 30, 2008</u>

Arthur B. Tesler entered a Guilty Plea and Plea Agreement in the United States District Court, Northern District of Georgia, Atlanta Division, Criminal No. 1:08-CR-1424-JEC. In his federal plea, Tesler admitted to violating the civil rights of Ms. Kathryn Johnston resulting in her death [*Tesler* Guilty Plea and Plea Agreement, p. 1.]

In his federal plea agreement, Tesler admitted many of the same facts that Junnier and Smith admitted. Tesler admitted that on numerous occasions, Tesler, Junnier and Smith falsely swore in search warrant affidavits that they had personal knowledge of the information presented, when in fact the warrant was "traded" or "handed-off" and used information gathered, or purportedly gathered, by other Narcotics Unit officers; that they falsely swore in search warrant affidavits that they had followed proper procedures to corroborate that CRIs had purchased illegal drugs at the particular location to be searched, including falsely swearing that the conspirator officer had searched the CRI before and after the CRI purchased illegal

---

[4] On January 19, 2009, Tesler's conviction was reversed. The Court of Appeals held that the state failed to prove venue [Citations omitted].

drugs, and that he personally observed the CRI make the purchase; falsely swore in search warrant affidavits that they had conducted surveillance at a location and had personally confirmed (or re-confirmed) drug-dealing activity, when in fact they had not actually conducted such surveillance; and that they made false statements in search warrant affidavits and in CRI vouchers, inflating or "padding" the cost of the illegal drugs supposedly purchased by the CRI, in order to generate additional reimbursement payments from APD that could be used as the co-conspirators chose [Id., *Tesler*, ¶¶ 8, 10, 11, 12].

In addition to the above, Tesler revealed the real motive – the driving force behind their illegal activities and unveiled the reason for the secrecy. In his federal plea agreement, Tesler informed the FBI what Junnier and Smith apparently did not. Tesler revealed the following:

> "The conspirators, [Junnier, Smith and Tesler], provided numerous businesses in Atlanta with "security" or "consulting" services in exchange for weekly cash payments. The services consisted primarily of providing more police presence and response by on-duty APD officers than was received by citizens who did not make such payments."

[Id., ¶ 15].

> "The conspirators, including defendant Tesler, normally while on-duty: regularly drove by or parked at the paying businesses, often in a marked patrol car and in police clothing; responded to address alleged criminal activity or to drive away unwanted persons from the paying businesses; or arranged for other officers to do so. This arrangement sometimes included providing the businesses with the cell-phone

- 20 -

> number of a conspirator, which could be called to obtain a police response faster than calling 911 or for matters that otherwise would not receive prompt police attention."

[Id., ¶ 16].

> "The conspirators, including defendant Tesler, would split the cash received, which generally amounted to several hundred dollars a week, among themselves, as well as with other officers who provided services, and with their supervisor for condoning the work."

[Id., ¶ 17].

In his federal plea agreement, Tesler admitted that he, Junnier and Smith concealed the true nature of the payments by either claiming that they were working legitimate, off-duty "extra" jobs for some of the paying businesses in accordance with APD policy or by not notifying APD at all that they were working some of the jobs [Id., ¶ 18]. The FBI investigation revealed that:

> "The conspirators [Junnier, Smith and Tesler] spent significant time performing these services and collecting payment while on-duty, detracting from time available to perform the work needed to follow the Constitution, laws, and proper police procedures to gather and truthfully present the evidence needed for lawful search warrants."

[Id., ¶ 19].

> "The conspirators, [Junnier, Smith, Tesler], would falsify incident reports and other official police documents to be consistent with the false statements used to obtain unlawful search warrants and to engage in other violations of law and policy."

[Id., ¶ 20].

> "The conspirators [Junnier, Smith, Tesler] tacitly agreed not to report violations of the Constitution, laws, and APD policies to anyone who might take action against the conspirators as a result. They also tacitly agreed to corroborate each other's false statements to prevent detection of these violations if ever questioned about them."

[Id., ¶ 21].

Tesler further admitted that he repeatedly violated his oath of office by not reporting any of the violations of the Constitution, laws, and APD policies that he participated in and was aware of to his chain of command, APD's Office of Professional Standards, or otherwise as required by his oath of office and APD policy [Id., ¶ 27]. It is undisputed that none of the City Defendants participated in the no-knock raid on 933 Neal Street. It is undisputed that none of the City Defendants had any knowledge of the false statements Junnier, Smith and Tesler made in the affidavit to secure the Neal Street warrant or any other warrant. It is undisputed that none of the City Defendants participated in or were aware of the extortion scheme and the other illegal activities of officers Junnier, Smith and Tesler.

## LAW AND ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact

exists and that the movant is entitled to judgment as a matter of law.[5]  The court

should view the evidence and any inferences that may be drawn in the light most

favorable to the non-movant.[6]  The party seeking summary judgment must first

identify grounds that show the absence of a genuine issue of material fact.[7]  The

burden then shifts to the non-movant, who must go beyond the pleadings and

present affirmative evidence to show that a genuine issue of material fact does

exist.[8]

A dispute is genuine if the evidence is such that the factual issues may

reasonably be resolved in favor of the nonmoving party.[9]  However, Rule 56 "[b]y

its very terms . . . provides that the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material

fact."[10]  "Where the record taken as a whole could not lead a rational trier of fact to

find for the nonmoving party, there is no genuine issue for trial."[11]  An issue is not

genuine if it is unsupported by evidence or if it is created by evidence that is

"merely colorable" or is "not significantly probative."[12]  Similarly, a fact is not

---

[5] Fed. R. Civ. P. 56(c).
[6] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).
[7] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
[8] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).
[9] *Id.* at 248.
[10] *Id.* (emphasis in original).
[11] *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).
[12] *Anderson*, 477 U.S. at 249-50.

material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case.[13]   Thus, to create a genuine issue of material fact for trial, the party opposing the summary judgment must come forward with specific evidence of every element essential to his case with respect to which (1) he has the burden of proof, and (2) the summary judgment movant has made a plausible showing of the absence of evidence of the necessary element.[14] When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.[15]   "Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."[16]

## II.   PLAINTIFF'S CONSTITUTIONAL CLAIMS, 42 U.S.C. § 1983.

Plaintiff brings this action pursuant to 42 U.S.C. § 1983.  In **Count 1** of her Amended Complaint, Plaintiff alleges violations of the Fourth and Fourteenth Amendments.  Plaintiff's federal claims allege Defendants conducted an illegal search and seizure while using unreasonable and excessive deadly force without justification.  Plaintiff also alleges that Ms. Johnston was deprived of her life,

---

[13] *Id.* at 248.
[14] *Celotex*, 477 U.S. at 323.
[15] *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).
[16] *Oxford Asset Mgmt. Ltd. v. Jajaris*, 297 F.3d 1182, 1188 (11th Cir. 2002).

liberty and property without due process or equal protection of law [Amended Complaint, ¶ 52].

In **Counts 2 and 6**, Plaintiff seeks to hold the City of Atlanta liable for the criminal acts of the former APD officers, Defendants Smith, Junnier and Tesler, by asserting a claim of *respondeat superior* (Count 6). In Count 2, Plaintiff reasserts her modified theory of *respondeat superior* ("*Monell* Liability") by alleging that the "acts, omissions, systemic corruption, policies, and customs of the City of Atlanta, the City of Atlanta Police Department, and its supervisors, including Chief Pennington [and the other defendant officers], of the City of Atlanta Police Department, were the driving force behind the constitutional violations of Ms. Johnston's rights, including but not limited to Defendants Junnier's, Smith's and Tesler's actions of falsifying reports and affidavits in an effort to meet APD's unconstitutional and illegal performance targets, with the foreseeable result that officers would violate citizens' civil rights, including Kathryn Johnston's, in the future" [Id., ¶ 49]. Plaintiff alleges that Defendants were "deliberately indifferent to the constitutional rights of citizens…" [Amended Complaint, ¶ 9].

Plaintiff brings her federal claims against the City of Atlanta and the officers in their individual and official capacities. Since Plaintiff's claims against the individual officers, in their official capacity, are in reality claims against the City

of Atlanta, these claims must fail as a matter of law.[17]   "Suits against public

employees in their official capacities are in reality suits against the state and,

therefore involve sovereign (governmental) immunity."[18] City Defendants will

address the issue of sovereign immunity below.

A.    The Fourteenth Amendment Claim.

Plaintiff's excessive force claims under the Fourteenth Amendment are

subject to dismissal pursuant to the Supreme Court's holding in *Graham v.*

*Conner*, 490 U.S. 386 (1989).  In *Graham*, the Supreme Court held that:

> "all claims that law enforcement have used of excessive
> force. . . in the course of an arrest, investigatory stop, or
> other 'seizure' of a free citizen, should be analyzed under the
> Fourth Amendment and its 'reasonableness' standard,
> rather  than  under  a  'substantive  due  process'  approach."[19]

Based on *Graham*, the allegations based on excessive force during a search

warrant should be analyzed under the Fourth Amendment.

B.    Defendants Gregg Junnier, Jason R. Smith and Arthur
      Tesler Pleaded Guilty to Violating Ms. Johnston's Fourth
      Amendment Rights.

As indicated, *supra*, Defendants Gregg Junnier, J.R. Smith and Arthur Tesler

pleaded guilty to violating the civil rights of Ms. Kathryn Johnston resulting in her

death.   The  issue  in  this  lawsuit  is  whether  the  constitutional  violations  and

---

[17] *Gilbert v. Richardson,* 264 Ga. 744, 452 S.E. 2d 476, 478 n.4 (1994).

[18] *Donaldson v. Department of Transportation*, 262 Ga. 49, 414 S.E. 2d 638 (1992).

[19] *Graham v. Conner*, 490 U.S. 386, 394 (1989).

criminal acts of the three officers should be imputed to the City of Atlanta and/or the APD command staff supervisors – City Defendants Pennington, Dreher, Andresen, Williams, Brooks, Mathis, Finley, Davis and Gibbs. Generally, the fact that a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal or supervisory culpability and causation.[20]

### C.    Liability of the City of Atlanta – *Monell* Liability.

Section 1 of the Ku Klux Klan Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983, provides:

> "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …."

It was not until 1978 that the Supreme Court held that municipalities and other bodies of local government are "persons" within the meaning of the statute[21] [Seventeen years before, in the case of *Monroe v. Pape*, the Court held that the 42nd Congress did not intend to subject a municipal corporation to liability as a "person"

---

[20] *Board of the County Commissioners of Bryan County, Oklahoma v. Jill Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 1389.

[21] *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). Justice Rehnquist and Chief Justice Burger dissented.

within the meaning of 42 U.S.C. § 1983[22]].  Such a body may be sued directly if it is alleged to have caused a constitutional tort through "a policy statement, or ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[23]   Although the Court in *Monell* pointed out that §1983 also authorizes suit "for constitutional deprivations visited pursuant to government 'custom' even though such a custom has not received formal approval through the body's official decision-making channels" at the same time, the Court rejected use of the doctrine of *respondeat superior* and concluded that municipalities could be held liable only when an injury was inflicted by a government's "lawmakers or by those edicts or acts which may fairly be said to represent official policy."[24]

    With some homage to its legislative history and apparently to Justice Rehnquist's and Chief Justice Berger's dissents, *Monell's* rejection of *respondeat superior*, and its insistence that local governments could be held liable only for the results of unconstitutional governmental "policies," arose from the statute's language and the political history of §1983.  The crucial terms of the statute are those that provide for liability when a government "subjects [a person], or causes [that person] to be subjected" to a deprivation of constitutional rights.  Firmly aware that governments can *only* act through natural persons, the Court concluded

---

[22] *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473.
[23] *Monell* at 694, 98 S.Ct., at 2037-2038.
[24] Id., at 694, 98 S.Ct., at 2037-2038.

that these governments should be held responsible when, *and only when*, their official policies cause their employees to violate another person's constitutional rights. Reading the statute's language in the light of its legislative history, the Court found that vicarious liability would be incompatible with the causation requirement set out on the face of §1983.[25] That conclusion, like decisions that have widened the scope of §1983 by recognizing constitutional rights that were unheard of in 1871, has been repeatedly reaffirmed.[26]

Local governments such as the City of Atlanta may be held liable under §1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict the injury…"[27] "A local government may not be sued under §1983 for an injury inflicted solely by its employees or agents.[28] Nor can a municipality be held liable solely because it employs a tortfeasor.[29] The Supreme Court requires "a plaintiff seeking to impose liability on a municipality under

---

[25] Id. at 691, 98 S.Ct. at 2036.

[26] See, e.g. *Owen v. City of Independence*, 445 U.S. 622, 633, 655, n. 39, 100 S.Ct. 1398, 1406, 1417-1418, n. 39 (1980); *Polk County v. Dodson*, 454 U.S. 312, 325, 102 S.Ct. 445, 453-454 (1981); *Oklahoma City v. Tuttle*, 471 U.S. 808, 818, and n. 5, 105 S.Ct. 2427, 2433-2434, and n. 5 (plurality opinion); Id., at 828, 105 S.Ct. at 2438-2439 (BRENNEN, L., concurring in part and concurring in judgment); *Pembaur v. Cincinnati*, 475 U.S. 469, 478-480, and nn. 7-8, 106 S.Ct. at 1292, 1297-1299 and nn. 7-8.

[27] *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978).

[28] Id.

[29] *Wallace v. City of Montgomery*, 956 F. Supp. 965, 977 (M.D. Ala. 1996) (citing *Busby v. City of Orlando*, 931 F.2d 764, 766 (11th Cir. 1991)).

§1983 to identify a municipal 'policy' or 'custom' that caused plaintiff's injury."[30] "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality."[31]  A custom is a practice that is so settled and permanent that it takes on the force of law.[32]  The policy, custom or practice must be "the moving force behind the constitutional violation."[33]  Legal causation is required, not idle speculation.

For liability to attach, at minimum "there must be an affirmative link between the policy and the particular constitutional violation alleged.[34]  In other words, the city's policy must be the "moving force" behind the constitutional violation.[35]  "Further, where a plaintiff seeks to establish that a [city] policy worked a constitutional deprivation through 'custom or practice' in which the [city] was deliberately indifferent to constitutional violations, a plaintiff must show that the [city] had subjective knowledge of a risk of serious harm and consciously disregarded that risk."[36]  "This 'official policy' requirement [is] intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and

---

[30] *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).
[31] *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).
[32] *Monell*, 436 U.S. at 690-91.
[33] *Grech v. Clayton*, 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*) (internal quotations omitted).
[34] *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).
[35] *Monell*, 436 U.S. at 694.
[36] *Moore v. Miami-Dade County*, 502 F.Supp.2d 1224, 1231 (S.D.Fla. 2007) (citing *Cagle v. Sutherland*, 334 F.3d 1248, 1255 (11th Cir. 2003).

thereby make clear that municipal liability is limited to action *for which the municipality is actually responsible.*" [37]

> 1. Plaintiff fails to show that the City of Atlanta has an unconstitutional custom, policy or practice that caused her injuries.

The Supreme Court has covered this ground before on a case in point. In *Oklahoma City v. Tuttle*, the Court held that an "unjustified shooting by a police officer cannot, without more, be thought to result from official policy."[38] In this tragic incident – an unjustified shooting by a police officer – Plaintiff wants to extend and expand the boundaries of *Monell*. The three (3) former police officers who committed this criminal act are now in prison having admitted that their actions violated the U.S. Constitution, violated their state law oath of office and violated APD policy. Plaintiff, the niece of the deceased, seeks further redress by alleging that there is a "widespread practice or custom allowing APD officers to make unlawful false statements ... to procure search warrants ... in an effort to meet APD's unconstitutional and illegal performance targets ..." [Amended Complaint, ¶¶ 49, 56]. Plaintiff further alleges that this "custom and practice" was the "driving force" behind the constitutional violations [Id., ¶ 9]. City Defendants disagree. As the record shows through the former officer's admissions, statements

---

[37] *Grech*, 335 F.3d at 1329 n. 5 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)) (third emphasis added by Eleventh Circuit).

[38] *Oklahoma City v. Tuttle*, 471 U.S. 808, 821, and n. 5, 105 S.Ct. 2427, 2435, (plurality opinion); Id., at 830-831, and n. 5105 S.Ct. , at 2439-2440, n. 5  (BRENNEN, L., concurring in part and concurring in judgment).

made to federal agents and in their testimony in open court, the driving force behind this tragic incident was greed.

Based on their own admissions and the findings of the FBI investigation, Junnier, Smith and Tesler were engaged in an extortion scheme that that sold "extra security and protection" to local business owners in the zones they patrolled while on duty with the APD. They knew it was wrong. They knew they were breaking the law. At Tesler's state court trial Junnier was asked:

> Prosecutor:  But you knew it was wrong, didn't you?
>
> Junnier:    I knew that, you know, putting false statements in the warrant; right.[39]

They hid their "extra job" activities by lying on official APD Incident Reports and purposely misidentifying the locations of their arrests and drug busts [FBI Report, p. DOZIER-COA 00266]. The incident that is the focus of this lawsuit initially developed because Junnier and Smith were "servicing" one of their local business clients at 350 Lanier Street.[40]  Junnier, Smith and Tesler were so busy collecting weekly cash payments for their extra services that they simply did not have the time to follow all the federal, state and APD policies. For them, their oath of office had become secondary to their pecuniary gain. Based on the FBI's

---

[39] Testimony of Gregg Junnier, May 9, 2008, p. 17, *State of Georgia v. Arthur Tesler*, Superior Court of Fulton County, State of Georgia, Indictment No. 07-SC-55954.

[40] Id., Junnier testimony, May 8, 2008, p. 27.

investigation, "[Junnier, Smith and Tesler] spent significant time performing these [extra security] services and collecting payment while on-duty, detracting from time available to perform the work needed to follow the Constitution, laws, and proper police procedures to gather and truthfully present the evidence needed for lawful search warrants" [*Tesler* Plea, Statement of Facts, p. 4]. The record shows that this extortion activity was the driving force that caused Junnier, Smith and Tesler to deprive Ms. Johnston of her constitutionally protected rights, not the inference that performance pressures led them astray. Junnier, Smith and Tesler admitted that they knew they were violating APD policy. That is the reason they kept their activities secret. "The conspirators tacitly agreed **not to report** violations of the Constitution, laws, and APD policies to anyone who might take action against the conspirators as a result. They also tacitly agreed to corroborate each other's false statements to prevent detection of these violations if ever questioned about them" [Id., p. 5].

There was no official or unofficial APD custom or policy that caused Junnier, Smith and Tesler to lie on affidavits to obtain search warrants. The APD has an official written policy that instructs an officer how to obtain a legally valid search warrant. APD's search warrant policy is set forth in the APD Policy Manual, SOP 3020: Search and Seizure, § 4.2.5 [Affidavit of Lt. Stacie Gibbs, Exhibit "A", Attachment 2]. Junnier, Smith and Tesler consciously and

deliberately eschewed APD policy.   Junnier's extortion scheme – the security consulting business that he shared with Smith, Tesler, and sometimes with Sgt. Stallings – consistently and cleverly avoided APD policies and scrutiny.   APD policy was an obstacle to their enterprise.   Had their plans come to light, they would have been terminated.   They needed to keep their activities under the radar and away from their command supervisors.   They needed the one thousand to two thousand extra dollars per week which they split amongst themselves and sometimes with Defendant Stallings [FBI Report, p. DOZIER-COA 00266].   No one above Sgt. Stallings, their day-to-day supervisor, knew about their enterprise. They all had a vested interest to keep their activities secret.   A secret enterprise, only known to a few, is by no means a widespread policy, custom or practice.

A brief history of the APD's narcotics enforcement might help the Court to better understand the nature of the work and the people involved.

*A Brief History of APD Narcotics Enforcement Unit*

The City of Atlanta has been a major drug distribution area for the last several years [FBI Report, p. DOZIER-COA 0009].   Several federal and state agencies work alongside and in partnership with the APD in drug interdiction – HIDTA, DEA, Weed and Seed, etc. [Gibbs Affidavit, ¶ 4].   In January 2006, Lt. Stacie Gibbs was assigned to head the entire Narcotics Enforcement Unit which consisted of Narcotics Teams 1 and 2, Financial Investigations, and two federal

programs that targeted "hot spots" of drug activity in the Atlanta Metro area. Lt. Gibbs reported to Maj. C.J. Davis, who headed the Special Enforcement Section ("SES") of the APD's Criminal Investigations Division ("CID"). The Criminal Investigation Division was headed by Deputy Chief Peter Andresen. Andresen was one of four Deputy Chiefs who reported to Asst. Chief Alan Dreher. Dreher reported to Chief Pennington [See APD Organizational Chart, attached hereto as Exhibit "B"].

In November 2006, there were 21 officers assigned to Narcotics. Narcotics Team 1 consisted of APD officers Gregg Junnier, Jason R. Smith, Arthur Tesler, Cary Bond, Holly Buchanan, Gary Smith, Nathan Lucas and Maurice Guerin. Sgt. Wilbert Stallings was the day-to-day supervisor Narcotics Team 1. Gregg Junnier was the senior member of the team, having started in the unit in October, 1998. Jason R. Smith was reassigned to the unit in June 2005 (after he returned from a tour of duty in Iraq). Arthur Tesler was the rookie on the team, having joined the unit in January 2006.

According to the FBI investigation, the illegal practices were not "widespread" as Plaintiff contends. In determining whether there was a "widespread practice" in the department, the FBI interviewed all APD officers in Narcotics and many APD informants. It reviewed all APD records, log books, time sheets, performance evaluation plans, training records and the actual warrants of

each officer assigned to Narcotics in 2006. For the most part, all the illegal practices were confined to APD Narcotics Team 1. The FBI investigation revealed that a majority of the officers assigned to Narcotics Team 1 (six of the nine assigned officers) participated at some level in falsifying search warrant affidavits, falsifying APD paperwork, improperly using informants and/or working "extra jobs" that violated APD policy [FBI Report, p. DOZIER-COA 00011]. Of the nine (9) officers, including Sgt. Stallings, assigned to Team 1, the FBI investigation found "*no credible evidence*" that "implicated Officers Gary Smith, Lucas or Guerin in any wrongdoing …" [FBI Report, p. DOZIER-COA 00007]. Based on the FBI investigation, the only APD narcotics officers from Team 1 who were involved in some form of falsifying affidavits or search warrants were Junnier, Smith, Tesler and Stallings. The FBI investigation revealed that "these officers were able to freely engage in such activity, in part, because their direct supervisor, Sgt. Wilbert Stallings, participated in these illegal activities as well." [Id.]

Gregg Junnier: Junnier's involvement in falsifying affidavits, warrants and APD vouchers was extensive. From 2003 through 2006, Junnier was one of the most productive narcotics officer in the unit. The other officers looked up to him. According to his supervisors, Junnier was a hard worker, very productive, and "never wanted to stop-even to each lunch" [Gibbs Affidavit, ¶ 10]. Junnier admitted that he fabricated the probable cause on two warrants: 161 Rhodesia

- 36 -

Avenue and another location whose address he could not remember [FBI Report, pp. DOZIER-COA 00005, 00365].   However, the majority of Junnier's false statements consisted of falsely claiming that he observed an informant purchase drugs when he did not, padding APD payment vouchers claiming he paid an informant more than he actually paid that informant, using an unregistered informant, and finally, using a "hand-offs." A "hand-off" consisted of one officer providing the information necessary to establish probable cause to another officer to include in an affidavit for a search warrant. Rather than state in the affidavit that the information was provided by another officer, the officer seeking the warrant would claim first-hand knowledge, making it more likely that the state magistrate would issue the warrant. The FBI determined that other narcotics officers correctly wrote these "third-party" affidavits, but not Junnier and some of the members of Team 1 [FBI Report, p. DOZIER-COA 00006]. The FBI investigation determined that one of the main reasons "hand-offs" were done was so Junnier and his cronies "would not spend all their time in court testifying about drug purchases." "This freed up time for officers to work more cases and work unauthorized 'extra jobs' while on duty" [Id., p. DOZIER-COA 00006].

Jason R. Smith:  J.R. Smith was transferred from the APD's REDDOG unit to Narcotics Team 1 in June 2005.  J.R. Smith admitted his role in the Neal Street shooting and his participation in the fabricated search warrant affidavit at 161

- 37 -

Rhodesia Avenue.   J.R. Smith further corroborated Junnier by admitting his knowledge and participation in "hand-offs," padding vouchers, and failing to supervise informants properly.  J.R. Smith also admitted to using insurance drugs that he planted on suspected drug dealers to encourage them to cooperate with the police [FBI Report, p. DOZIER-COA 00006].  J.R. Smith informed the FBI that he and Cary Bond wanted to do the warrants right but Junnier insisted that they do them his way most of the time [FBI Report, p. DOZIER-COA 00125].

Arthur Tesler:  Tesler was the rookie on Team 1, having been assigned to Narcotics in January 2006.  Prior to Neal Street, Tesler informed the FBI that he had obtained warrants for 2139 Martin Luther King, Jr. Drive, N.W., 1370 Graymont Drive, S.W., and 1981 Martin Luther King, Jr. Drive.  Tesler's admitted misconduct consisted of falsely swearing to a state magistrate judge that he witnessed a controlled drug purchase at each of the locations when, in fact, he did not.  The warrants were hand-offs [FBI Report, p. DOZIER-COA 00007].

Holly Buchanan:  Holly Buchanan was also relatively new to Narcotics having been assigned to Team 1 in late 2004.  Although Junnier stated that Buchanan took "hand-offs," there has been no official confirmation that she did.[41] Buchanan admitted in her deposition that when she first arrived at Narcotics, her

---

[41] The APD's Office of Professional Standards is currently investigating Officers Buchanan, Bond and Burchfield based on information supplied by the FBI.  The OPS began its investigation in May of 2009 after the FBI completed its investigation and returned all the files and information APD had provided to the FBI.

first few warrants were probably done incorrectly because she followed Junnier's instructions to the letter [Deposition of Holly Buchanan, p. 131].

Cary Bond: Bond admitted to the FBI that he padded vouchers and had informants sign blank vouchers in violation of APD policy. Bond obtained a warrant for 674 Alta Place. Bond stated in the affidavit for the warrant that he witnessed Alex White, a CRI, make a drug purchase at that address. White claims he did not make a purchase at that address. White is currently serving time on drug charges in federal prison. The matter is currently under investigation by the APD's Office of Professional Standards.

Sgt. Wilbert Stallings: As the FBI report stated, the above members of Team 1 engaged in these illegal activities because their day-to-day supervisor also participated in the same activities: Stallings encouraged and participated in falsifying search warrant affidavits; Stallings knew that Junnier and other members of his team participated in "hand-off" warrant affidavits; Stallings allowed Junnier and other officers to let informants make drug purchases without being observed by an officer contrary to APD policy; Stallings "padded" and signed the payment vouchers for informants who made undercover purchases of drugs with the knowledge that the vouchers contained inaccurate information; Stallings used an unregistered informant and falsely identified the informant as registered despite APD policy prohibiting use of unregistered informants; Stallings, Junnier, Smith

- 39 -

and Tesler spent time while on duty working "extra jobs" where business owners paid the officers to provide police protection and services; and Stallings not only received a share of the money from the businesses that paid the officers on his team, he continued to allow this activity when other members of the team complained about how much time they were spending on these "extra jobs" and that it was taking them away from performing their regular duties as police officers [FBI Report, pp. DOZIER-COA 00011, 00012].  Stallings admitted to the FBI that he never informed any of his superiors, including Lt. Gibbs, about any of his illegal activities [FBI Report, p. DOZIER-COA 000319].

The "widespread practice" described by Plaintiff, according to the FBI investigation, involved primarily Junnier, Stallings, J.R. Smith and Tesler, who are all currently serving time in federal prison for the criminal acts that Plaintiff contends should be imputed to the City of Atlanta.  Based on the FBI report and investigation, the other officers – Cary Bond, Holly Buchanan and Brad Burchfield (all currently under investigation by the Office of Professional Standards) – had minimal involvement with Junnier's crew.    Although City Defendants acknowledge that that one bad officer is too many, four narcotics officers out of twenty-one assigned to the unit does not a "widespread practice" make.

The illegal practices and criminal acts of Gregg Junnier and the other three officers should not be imputed to the APD especially when specific APD policies

(on truthfulness and how to obtain a search warrant) were violated in conducting those illegal acts. Lying on official documents to state court magistrates to procure search warrants is not only an egregious violation of the police officers' oath of office, it is also a felony in the state of Georgia. Lying is also a direct violation of the APD's official Work Rules and Standard Operating Procedures: "Employees will be truthful in their written and spoken words at all times" [APD Policy Manual, Work Rule 4.1.03]. When Chief Pennington arrived in 2001/2002, he made lying a terminable offense [Pennington Deposition, p. 60].

There has been no showing that the official policymaker of the APD – Chief Richard Pennington – adopted or ratified the illegal actions of the four officers. All APD command staff for the Narcotics Enforcement Unit since 1998 state emphatically that they had no knowledge of any illegal activities or practices within the unit. None required any narcotics officer to violate his oath or APD policy. Any and all misconduct was immediately reported to OPS [See Affidavits of Lt. Stanley Savage, Maj. Marion Brooks, Maj. Ernest Finley, Lt. Robert Browning, (Exhibits "C", "D", "E" and "F" respectively) and Lt. Stacie Gibbs]. In short, the illegal practices and criminal acts of Gregg Junnier, Jason R. Smith, Arthur B. Tesler and Wilbert Stallings were the products of their own devious imaginations and greed. Aside from the independent acts of Junnier, Smith, Tesler and Stallings, Plaintiff has presented no evidence that any of these individual acts

or practices were the "official or unofficial policies" of the City of Atlanta's Police Department. These illegal acts were abominations – and were in direct violation of APD and City of Atlanta policies. To hold the City of Atlanta liable, Plaintiff must show that the City's policies, customs or practices caused her injuries.[42] The illegal acts of Junnier, Smith and Tesler are not policies, customs or practices of the Atlanta Police Department, and these illegal acts should not be imputed to the City of Atlanta.

    2.    Plaintiff fails to show that the City of Atlanta has unconstitutional and illegal performance targets.

Plaintiff contends that "defendants Junnier, Smith and Tesler falsified reports and affidavits in an effort to meet APD's unconstitutional and illegal performance targets, with the foreseeable result that officers would violate citizen's civil rights, including Kathryn Johnston, in the future." Based on Plaintiff's logic, Junnier, Smith and Tesler broke the law [to meet the performance targets] in order to be considered effective police officers. As indicated *supra*, Junnier, Smith and Tesler falsified reports and affidavits to protect and profit from their extortion scheme.

The Atlanta Police Department, as well as the entire City of Atlanta, uses an employee evaluation system - QPAI (Quality Performance Appraisal Initiatives) -

---

[42] *West v. Tillman*, 496 F.3d 1321, 1328-29 (11th Cir. 2007) (*per curiam*).

that evaluates and measures each City employee's performance on a yearly basis. Depending on the unit or area of assignment, the criteria for measuring the performance of narcotics officers in 2006 included three "Critical Job Elements" or components:  1) Departmental Policies and Procedures; 2) Operational Procedures; and 3) Law Enforcement [Gibbs Affidavit, ¶ 11].

City Defendants have been unable to find any case law holding that an employee evaluation system or plan that utilizes performance goals and/or standards is illegal or unconstitutional in the context of law enforcement.  At the APD, most employee evaluation plans contain performance goals – some objective, some subjective.  In the APD Narcotics Enforcement Unit, the employee performance plan is initially developed in a meeting between the Lieutenant in charge of the Narcotics Unit and the field officer.  The goals set forth in the performance evaluation plan are fluid and subjective.  In the past, some of the goals set in the law enforcement section of the performance plan were based on the previous year's "watch average."  The performance goals and standards are not arbitrary or fixed. They vary each year depending on the employee and the Lieutenant in charge [See Affidavits of Maj. Ernest Finley; Lt. Stacie Gibbs; Maj. Robert Browning; and Maj. Marion Brooks].  Regardless of the individual goals and standards, narcotics officers, like all other officers, are required to follow all APD policies, procedures and the law when in the field and report any wrongdoing

to their chain of command or to the Office of Professional Standards.  According to Sgt. Scott Kreher, President of the Police Union, although many officers have told him they believe the APD has a "quota" system, on further inquiry, he has determined that there is no sanction or punishment if the officers do not meet the so-called quota of arrests or citations [Deposition of Sgt. Scott Kreher, p. 33]. According to Sgt. Kreher, for any POST-certified police officer to say that he or she violated his oath of office to meet a target or quota is calumny [Id., pp. 64, 65]. There is no evidence that the APD required Junnier, Smith and Tesler to lie on public documents, violate the U.S. Constitution, their oath of office, and APD policy to meet employee performance goals.  After their extortion scheme was uncovered, after their cover story was exposed, after they violated Ms. Johnston's civil rights, Junnier, Smith and Tesler tried to deflect blame from themselves and implicate the APD and the City.

For some reason, Plaintiff has characterized the APD's employee evaluation system as an "arrest quota."[43] Apparently, this is what Plaintiff implies when she refers to "unconstitutional and illegal performance targets."  Chief Pennington has repeatedly stated that the APD does not have or utilize quotas.  The APD does

---

[43]Plaintiff recently used the term "illegal quotas" in the press and media apparently in an effort to inflame public opinion. Plaintiff's most recent motion in this matter – a Motion to Strike [Doc. No. 95] – castigates the APD for trying "to conceal a system of illegal quotas."  Plaintiff, to date, has offered no legal basis for its characterization of "unconstitutional and illegal quotas."  City Defendants contend that Plaintiff's appeal to the jury of public opinion should not be tolerated.  City Defendants will address the legal issues of Plaintiff's Motion to Strike in their Response.

have an employee evaluation system that utilizes performance goals and standards to measure police performance on a yearly basis [Pennington Depo., pp. 204, 248-49]. Case law supports this type of employee evaluation method and the use of performance goals and standards to measure employee performance. In *County of Sacramento v. Lewis*, the Supreme Court examined a similar system, a so-called "ticket quota system." The Court held that "[T]he police department simply implemented an employment policy for evaluating one component of an officer's performance based on the number of tickets the officer has written versus the shift average. The police department's implementation and application of this policy does not amount to egregious or outrageous executive action necessary to state a substantive due process claim."[44] Another case on point is *Gravitte v. North Carolina Div. of Motor Vehicles*. In *Gravitte,* the Court of Appeals for the Fourth Circuit examined a "ticket-quota policy" adopted by the Department of Motor Vehicles. According to the Court, the employment policy adopted by the DMV was designed to

> …ensure a minimum quantity of work from its law enforcement officers and helped to prevent shirking on the job. An employment policy enacted in pursuit of these goals, goals that would be shared by any reasonable employer, can hardly be deemed "egregious" or "outrageous," even if it impinges on traditional police discretion and imposes more burdensome working conditions on law enforcement officers. The plaintiff's allegation that officers are "pressured or

---

[44] *County of Sacramento v. Lewis*, 523 U.S. 833, 845-846, 118 S.Ct. 1708, 104 L.Ed.2d 1043 (1998).

coerced to violate the law as a result of the ongoing ticket quota scheme" does not alter our conclusion.[45]

...[w]hile it is conceivable that officers might be tempted to fill their quota by issuing citations for borderline or non-existent violations out of laziness, there is no allegation that the numerical quotas are so onerous that it is impossible for a diligent DMV officer to meet without breaking the law.  To be sure, the alleged ticket quota policy makes a law enforcement officer's job more difficult.  We are also sure that is not enough, standing alone, to constitute a substantive due process violation."[46]

Regardless of the terminology – quotas, performance targets, goals and standards – City Defendants have not identified any case law invalidating or declaring to be unconstitutional or illegal the kind of employee performance plans described above.  Plaintiff has neither produced any evidence indicating that the APD's employee evaluation system is illegal or unconstitutional, nor has Plaintiff produced any evidence that the APD employee evaluation system requires officers adhere to "unconstitutional and illegal performance targets." Plaintiff's allegation of "illegal and unconstitutional" quotas is another red herring floated about by Junnier, Smith and Tesler as an excuse for their misconduct.  This Court should not be swayed by these latter day ablutions.

---

[45] *Gravitte v. North Carolina Div. of Motor Vehicles*, 35 Fed Appx. 45, C.A. 4 (N.C.) 2002.
[46] Id.

3.   The Eleventh Circuit has Placed Strict Limits on the Circumstances in which Failure to Train can form the Basis of Municipal Liability in a 1983 Claim: Plaintiff Cannot Meet Those Limits.

Plaintiff alleges in Count 2 of her Amended Complaint "… that defendants failed to properly train the officers …" and that Defendants were "… deliberately indifferent to the constitutional rights of citizens …." [Amended Complaint, ¶¶ 9, 59, 60].

In *Vineyard v. County of Murray County*, the Eleventh Circuit Court of Appeals considered a claim based upon inadequate policies for supervision and discipline, as well as training. The Court decided that the standard of deliberate indifference applied to all three of these claims.[47] Here, Plaintiff must show that the City of Atlanta was deliberately indifferent to the supervision and training of the defendant officers and that this inadequate training and supervision was the moving force behind the alleged injuries of Plaintiff.[48] The proper inquiry is whether the injury sustained by the Plaintiff could have been avoided had the officers been better trained, supervised, and disciplined under a program that is not deficient in identified respects.[49]

In *City of Canton*, the Supreme Court held that the "inadequacy of police training may serve as the basis for Section 1983 liability only where the failure to

---

[47] *Vineyard v. County of Murray County*, 990 F.2d 1213, 1212 (11th Cir. 1993).
[48] *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).
[49] *Vineyard*, 990 F.2d at 1213.

train amount to deliberate indifference to the rights of persons with whom the police come into contact."[50]

To establish a "deliberate indifference" claim, the plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take action.[51] The Eleventh Circuit has repeatedly held that "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train or supervise."[52]   In *Wright*, the Court held that a sheriff's department was not liable for deputy's acts when "no evidence of a history of widespread prior abuse ... put the sheriff on notice of the need for improved training or supervision."[53]   In *Popham*, the Court found no liability for failure to train when no pattern of incidents put the city on notice of a need to train.[54]   More importantly, in *Brooks v. Scheib*, even though there had been ten citizen complaints about police officer Scheib, the Court held that the City did not have any notice of past police misconduct because the plaintiff "never demonstrated that past

---

[50] *City of Canton v. Harris*, 489 U.S. at 388.
[51] *Brown*, 520 U.S., at 397, 117 S.Ct. at 1390-91, 137 L.Ed.2d 626 (1997); *Young v. City of Augusta, Georgia*, 59 5.3d 1160, 1171-72 (11th Cir. 1995); *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990); *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1556-57 (11th Cir. 1989).
[52] *Gold v. City of Miami*, 121 F.3d 1442 (11th Cir. 1997).
[53] *Wright*, 919 F.2d at 674.
[54] *Popham v. City of Talladega*, 908 F.2d 1561, 1564-65 (11th Cir. 1990).

complaints of past police misconduct had any merit."[55]  The Court noted, "Indeed, the number of complaints bears no relation to their validity."[56]

First, Plaintiff must show the City and APD policymakers were aware of a pattern of misconduct based on prior incidents.  Second, Plaintiff must identify the specific training inadequacy and its direct link to the constitutional violations that caused Ms. Johnston's death.

> *a.   APD policy makers had no subjective knowledge of any similar incidents prior to the Neal Street shooting in November 2006.*

The APD's Office of Professional Standards (OPS) accepts and investigates complaints against police officers and conducts administrative reviews of police misconduct.  Complaints against any APD employee will be accepted from any source and at any APD location or precinct.  Generally, the investigation of complaints includes statements from complainants, witnesses, and police department employees involved in the alleged incident; a review of all written reports relevant to the alleged incident; formal interviews with complainants and witnesses; re-interviews, if necessary; and line-ups, drug, alcohol, or other testing as appropriate.[57]  A review of OPS complaint history from 2001 through 2006 does not reveal any prior similar incidents of misconduct of the type that occurred in the

---

[55] *Brooks v. Scheib*, 813 F.2d 1191 (11th Cir. 1987).
[56] Id.
[57] APD Disciplinary Manual, Chapter 2, http://horizon/wd/Chapter2/APDSOP2020DisciplinaryProcess.htm.

Neal Street incident or the facts leading up to that incident [Affidavit of Maj. Lane Hagin, Director of the Office of Professional Standards, Exhibit "G"]. However, City Defendants uncovered two complaints involving search warrants that may be remotely construed as relevant, but certainly not conclusive.

1)      According to the FBI's review of APD and OPS records, Mary McCoy filed a complaint with OPS on May 19, 2003, in which she alleged that drugs were planted during a search warrant of her home on May 15, 2003. OPS investigated the complaint for three months and did not find any evidence of misconduct [FBI Report, pp. DOZIER-COA 00299, 00300].

2)      On March 3, 2005, Alphonso Howard filed a complaint with the Office of Professional Standards alleging that APD officers "burst in [his] door" at 1271 Elizabeth Avenue, Atlanta, Georgia. In Howard's statement to OPS, he complained that the police were looking for narcotics and never showed him the search warrant [See OPS Investigation, Citizen Statement of Alphonso Howard, attached hereto as Exhibit "H"]. The affiant on the "no-knock" search warrant was Gregg Junnier. Junnier stated in the affidavit for the warrant that he and Sgt. Stallings directed a CRI to 1271 Elizabeth Avenue "… as a follow up on a tip that marijuana was being sold at that location" [Id., Junnier Search Warrant, p. 1]. Based on the APD Incident Report filed by Junnier, the search uncovered an AK-47, some plastic bags

used in drug sales and some cocaine residue on a scale. Mr. Howard (a convicted felon) and Ms. Carter were not arrested.

OPS conducted a three-month investigation of Mr. Howard's complaint by interviewing all the APD officers involved, including Junnier and Stallings, Mr. Howard and his girlfriend. OPS investigation did not determine any wrong doing or misconduct on the part of the officers. The search warrant that Mr. Howard claimed was not shown to him was determined to be a valid warrant.

On August 2, 2005, Howard provided the City of Atlanta with *ante litem* notice. Howard's lawyer stated that the claim was based on the fact that: "The police broke down his door and placed Howard and his family under arrest under pretense of a valid warrant. *Said warrant was mistaken as to location and suspect.* Police have admitted the wrong house and suspect" [See Letter from Randall Strozier, attached hereto as Exhibit "I"].

Alphonso Howard filed a lawsuit against the City of Atlanta based on the above incident on December 6, 2006 *after* the Neal Street incident – *Alphonso Howard et al v. the City of Atlanta*, 2006-CV-126639. The lawsuit does not name any individual APD officers as defendants. According to the FBI investigation, Junnier claimed that the 1271 Elizabeth Avenue warrant was "good warrant." Apparently, Junnier's CRI, Alexis

- 51 -

White, was an acquaintance of Mr. Howard [FBI Report, p. DOZIER-COA 00251].

From 2003 through 2006, the APD Narcotics Unit made 7,760 arrests and conducted over 1,298 search warrants.[58]   Other than the two isolated incidents above, the Office of Professional Standards does not have any record of any prior acts of misconduct similar to the acts of Junnier, Smith and Tesler in the Neal Street shooting.[59]  There is no pattern of prior similar incidents in which a citizen's constitutional rights were violated that would give notice to APD policymakers or APD command staff.[60]

If Plaintiff is to show that the City "… condoned and ratified the unlawful and illegal activity" of Junnier, Smith and Tesler, Plaintiff has to show some subjective knowledge on the part of the APD.  "Where a plaintiff seeks to establish that a [city] policy worked a constitutional deprivation through 'custom or practice' in which the [city] was deliberately indifferent to constitutional

---

[58] Gibbs Affidavit, Attachment 1.

[59] On January 8, 2008, Latisha Colbert filed a lawsuit against the City of Atlanta and Chief Pennington alleging that on *November 16, 2006*, Gregg Junnier and other narcotics officers entered her home at 161 Rhodesia Avenue, Atlanta, Georgia on a no-knock warrant.  Junnier admitted to the FBI in December 2006 that the probable cause on the 161 Rhodesia Avenue warrant was fabricated [See *Latisha Colbert and Durie Baker et al. v. City of Atlanta, Mayor Shirley Franklin and the Atlanta Police Department,* U.S.D.C., Northern District of Georgia, Atlanta Division, 1:08-CV-0701-CAP].

[60] Approximately two (2) months prior to the Neal Street incident, Lt. Stacie Gibbs spoke with Investigator Holly Buchanan regarding an incident involving Ms. Francis Thompson.  The warrant was executed on September 20, 2006 at 1430 hours at 1425 Simpson Road, A-102.  The resident of this location was an elderly female named Francis Thompson.  Lt. Gibbs was alerted to the incident due to Ms. Thompson having pointed a plastic weapon at Narcotics Team 1 upon their entry into her residence.  Although the warrant was valid, no drugs were found [Gibbs Affidavit, ¶ 13].

violations, a plaintiff must show that the [city] had subjective knowledge of a risk of serious harm and consciously disregarded that risk."[61] There has been no showing that the City and APD policymakers had subjective knowledge or were aware of a pattern of misconduct based on prior similar incidents. City Defendants contend that the two isolated incidents cited above are not similar to the Neal Street incident, at least, not sufficiently similar to give notice to the policymakers within the APD.

> b. *Police training policies for the City of Atlanta exceed State requirements.*

Plaintiff must come forward with evidence that the Atlanta Police Department's training was inadequate based upon some standard other than Plaintiff's own opinion or the statements by the four officers and that it was foreseeable that the inadequacy in training was likely to result in a violation of constitutional rights. Plaintiff cannot meet this burden. In order to prevail on this prong of the training issue, Plaintiff must show a causal connection between the alleged inadequate training and the alleged violation of Ms. Kathryn Johnston's constitutional rights.[62] In resolving the issue of the city's liability, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will

---

[61] *Moore v. Miami-Dade County*, 502 F.Supp.2d 1224, 1231 (S.D.Fla. 2007) (citing *Cagle v. Sutherland*, 334 F.3d 1248, 1255 (11th Cir. 2003).

[62] *City of Oklahoma City v. Tuttle*, 471 U.S. at 823; *Canton*, 489 U.S. at 389; *Brooks v. Scheib*, 813 F.2d at 1193.

not alone suffice to fasten liability on the City, for the officer's shortcomings may have resulted from factors other than a faulty training program.[63] As indicated above, Junnier, Smith and Tesler were motivated by profit.

Plaintiff argues that Ms. Johnston's death could have or may have been avoided if Junnier, Smith and Tesler had more training or better training. As the courts have held, such a claim could be made about almost any encounter resulting in injury. Even adequately trained officers make mistakes; the fact that they do says little about the training program or the legal basis for holding the City liable.[64] Moreover, for liability to attach in this circumstance, the identified deficiency in a city's training program must be closely related to the ultimate injury. Plaintiff cannot satisfy this burden. Plaintiff must prove that the deficiency in training actually caused Ms. Johnston's injuries. Would the injury have been avoided if the officer had been trained under a program that was not deficient in the identified respect? As the Courts have held, "[T]o adopt a lesser standards of fault and causation would open municipalities to unprecedented liability under §1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the

---

[63] See *Springfield v. Kibbe*, 480 U.S. 257, 268, 107 S.Ct. 1114, 1120 (O'CONNOR, J., dissenting); *Tuttle, supra* at 471 U.S. at 821, 105 S.Ct. , at 2435 (opinion of REHNQUIST, J.).

[64] *City of Canton v. Harris*, 489 U.S. at 391.

city 'could have done' to prevent the unfortunate incident."[65]   Justice White, in

*City of Canton,* stated that "… permitting cases against cities for their 'failure to

train' employees to go forward under §1983 on a lesser standard of fault would

result in *de facto respondeat superior* liability on municipalities – a result the court

firmly rejected in *Monell.*"[66]   "It would also engage the federal courts in an endless

exercise of second-guessing municipal employee training programs.   This is an

exercise we believe federal courts are ill-suited to undertake, as well as one that

would implicate serious questions of federalism."[67]

Notwithstanding the above, Junnier, Smith and Tesler, in spite of their

claims to the contrary, were adequately trained.

c.     *Junnier, Smith and Tesler were Adequately Trained.*

Although the Junnier, Smith and Tesler falsely stated to the federal agents,

that they received "no training" in narcotics, the record shows otherwise [Gibbs

Affidavit, Attachments 3, 4, 5, 6].   All the officers involved in the Neal Street

shooting, indeed all APD police officers, are required by the State of Georgia to be

POST certified before they become police officers licensed to carry a gun and wear

a badge.   Junnier, Smith, Tesler, Stallings, Buchanan, Bond – all the members of

Team '1' were initially trained at the Atlanta Police Academy.

---

[65] *Tuttle* , 471 U.S. at 823, 105 S.Ct. at 2436 (opinion of REHNQUIST, J.).
[66] *City of Canton v. Harris*, 489 U.S. at 393.
[67] Id.; *Rizzo v. Goode*, 423 U.S. 362, 378-380, 96 S.Ct. 598, 607-608, 46 L.Ed.2d 561 (1976).

The curriculum at the Atlanta Police Academy is regulated by the state organization known as Peace Officers Standards and Training (POST) Council. POST sets criteria for the Atlanta Police Academy, determining policy and procedure with respect to lesson plans, the number of students in class and qualifications of the instructors. POST also performs inspections to insure that the Police Academy is using state of the art procedures with respect to training.[68] The Atlanta Police Department's training program exceeds the requirements for officer certification set by the POST.

Recruits at the Academy receive more than 800 hours of training at the Academy and 240 hours of training in the field. Instruction includes the study of the Constitution and criminal procedure, *the constitutional limitations on the use of deadly force,* escalating force, search and seizure, and the mechanics of securing a search warrant. All recruits are trained on the City's written policies which incorporate all the latest constitutional holdings and cases as well as the specifics of how to use the knowledge regarding the use of force and the mechanics of securing a search warrant.[69]

Every police recruit is required to take criminal law and criminal procedure while at the Academy. Officers are instructed on probable cause, what constitutes

---

[68] Exhibit "J": Affidavit of Major Siobhan O'Brien.
[69] APD Field Manual, § 6.1.1 (1) ff; APD Work Rules, Rule 2.50, 2.51;
http://horizon/wd/Chapter2/APDSOP2010WorkRules.htm.

probable cause and its absolute necessity before a citizen is searched or seized.[70] They are instructed on when and how to obtain a search warrant, when they can make an arrest with or without a warrant and how to navigate the "Ladder of Force."[71]

As recruits, City of Atlanta police officers are taught about the role of the Office of Professional Standards (OPS) and the Police Department's system of discipline. They are taught that OPS assumes responsibility for the investigation of serious complaints like excessive force and truthfulness. While at the Academy, each officer is given a copy of the APD Policy Manual and employee work rules and instructed that failure to abide by these rules can result in discipline.[72] The City of Atlanta has an express "Written Directive System" that sets forth the rules, objectives, values, goals and policies of the APD. Rules and policies on the use of deadly force, how to obtain a search warrant, what constitutes probable cause, hot pursuit, crime scenes, bribery, truthfulness, using one's position for personal gain.

There is no dispute that the former APD officers Junnier, Smith and Tesler completed the Atlanta Police Academy successfully and fulfilled the in-service training requirements necessary to maintain their Georgia POST certification. Nor is there any dispute that the City of Atlanta provides training to its police recruits

---

[70] Exhibit "J": O'Brien Affidavit; APD Field Manual, Chapter 6 ff;
http://horizon/wd/Admin_Main/Chapter4FieldOperations.htm.
[71] Id., Exhibit "J": ¶¶ 8, 9.
[72] Id., Exhibit "J": ¶ 11.

and sworn officers in the areas of use of force, disciplinary policies, constitutional law, criminal law/procedure and how to obtain search warrants.

In addition to Academy training and in-service training (40 hours) each year after they complete the Academy, all narcotics officers including Junnier, Smith and Tesler, are required to take the Basic Investigators Course (80 hours) which includes specific training on how to determine probable cause and how to write an affidavit for a search warrant, etc.

APD Officer Gregg Junnier received a total of 1073 hours of training, including 82 hours related to narcotics enforcement and warrants [Gibbs Affidavit, Attachment "3"].

APD Officer J.R. Smith received a total 1359 hours of training, including 122 hours related to narcotics enforcement and warrants [Id., Attachment "4"].

APD Officer Arthur Tesler received a total of 1500 hours of training, including 102 hours related to narcotics enforcement and warrants [Id., Attachment "5"].

APD Officer Sgt. Wilbert Stallings received a total of 1020 hours of training, including 125 hours in supervision and 104 hours related to narcotics enforcement. [Id., Attachment "6"].

Another example of Junnier's duplicity is when he told the FBI that he did not receive any training. However, in his affidavit for the search warrant for 1271

Elizabeth Avenue, SW, Junnier states, "I have attended several training sessions pertaining to the investigation of illegal drug sales and trafficking…" [Junnier Search Warrant, p.1].

Thus, City Defendants have satisfied their burden of proving that the training provided at the Atlanta Police Academy comports with the deliberate indifference standards set forth in *Canton*. The facts set forth above would lead a rational trier of fact to find in favor of the City on the question of the adequacy of the City's training of its police officers in the above areas. Plaintiff, however, contends that training received by Junnier, Smith, Tesler and Stallings was inadequate and this inadequate training was the proximate cause of the constitutional injuries to Ms. Johnston. Plaintiff, again, bases her thesis on the statements made by Junnier, Smith and Tesler after they were exposed and when they sought to reduce the time to be served under the federal indictments.

Plaintiff cannot point to any provision in the City's training policy that could be construed to authorize an officer to lie on a public document or fabricate probable cause to meet a performance goal. Nor is there any evidence that any of the City of Atlanta's training policies caused Junnier, Smith and Tesler to violate Ms. Johnston's civil rights resulting in her death. There is certainly no evidence that the City of Atlanta knew of a need to train the four officers in a particular area and subsequently made a deliberate choice not to train them. The undisputed

evidence shows just the opposite – that the City of Atlanta provided Junnier, Smith, Tesler and Stallings with training sufficient to perform their jobs as police officers and narcotics investigators.  Moreover, the City's officer training policies have withstood numerous judicial challenges within this Circuit.[73]  Inasmuch as Plaintiff has failed to show that Defendant City of Atlanta's training was inadequate for the job, Defendant City of Atlanta is entitled to summary judgment with respect to Plaintiff's inadequate training claims.

### D.    Supervisory Liability

In **Count 2**, the Plaintiff contends the Defendants failed to supervise ... and failed to properly discipline the police officers ... and again that defendants ... condoned and ratified the unlawful and illegal activity of former APD officers Junnier, Smith and Tesler [Amended Complaint, ¶ 61].

### 1.    The City of Atlanta properly supervises the actions of its police officers.

In order to establish that a defendant committed a constitutional violation in his supervisory capacity, a plaintiff must show that the defendant instituted a custom or policy that results in deliberate indifference to constitutional rights or directed his subordinates to act unlawfully or knew the subordinates would act

---

[73] *See e.g., Kirkland v. City of Atlanta,* 12 F.3d 220 (11th Cir. 1993); *Matthews v. City of Atlanta,* 699 F.Supp. 1552 (N.D.Ga. 1988).

unlawfully and failed to stop them from doing so.[74] As more fully set forth above, there was no custom, policy or practice instituted by the policymaker, Chief Pennington at the APD. On the contrary, APD search warrant policy specifically required officers to follow the dictates of the constitution and insure that probable cause was present before seeking warrants through the courts.[75] Further, there were no indications of previous illegal activity that would have placed the policymakers on notice of any constitutional violations by officers not in compliance with APD policy. If there had been other levels and types of supervision would take effect.

The supervision of police officers takes on many forms in the Atlanta Police Department, including the disciplinary and training policies described herein. Supervisors at the Office of Professional Standards and the officer's chain of command are involved in all aspects of the investigation of a complaint against an officer and the recommendation as to the appropriate discipline.[76]

In addition to the oversight and supervision of officers provided by the Officer of Professional Standards, the City provides and requires other supervisory functions. Every police officer is involved in a chain of command structure which starts with a sergeant, then progresses to lieutenant, major, deputy chief and Chief

---

[74] *Goebert v. Lee County*, 510 F.3d 1312 (11th Cir. 2007).
[75] APD Field Manual, § 6.1.1 (1) ff; APD Work Rules, Rule 2.50, 2.51;
http://horizon/wd/Chapter2/APDSOP2010WorkRules.htm.
[76] APD Work Rules, http://horizon/wd/Chapter2/APDSOP2010WorkRules.htm.

of Police.[77]  Just like in the military, sergeants are responsible for the day-to-day supervision of field officers.   City policy requires that every incident report submitted by an officer or an investigator must be reviewed and approved by the immediate supervisor.  Moreover, an employee's supervisor may recommend that the employee attend additional classes at the police academy in order to work in areas which need improvement.  The Atlanta Police Department also maintains an "Early Warning System" whereby supervisors identify employees who have a pattern of behavior that may signal potential problems.[78]

The supervisory chain of command for the City of Atlanta Police Department in November 2006 is set forth in an organizational chart, attached hereto as Exhibit "B."  The Command Staff -- all ranks from Major to Assistant Chief are appointed by the Chief of Police, Richard Pennington.  The Chief of Police is the official policymaker for the Atlanta Police Department [Atlanta City Code, § 98-26].  Defendant Alan Dreher was Chief Pennington's Assistant Chief. Defendant Peter Andresen was the Deputy Chief in charge of the Criminal Investigations Division and reported to Assistant Chief Dreher.  In November 2006, Defendant Major Pearlene Williams was the Chief of Staff to Chief Pennington.  Major Pearlene Williams is no longer employed by the Atlanta Police

---

[77] Id., Rules 2.03, 2.10.
[78] APD Disciplinary Manual, http://horizon/wd/Chapter2/APDSOP2020DisciplinaryProcess.htm.

Department, having resigned in 2009 due to a personal matter. Defendant Major Marion L. Brooks retired from the APD in August 2003. In November 2006, Defendant Major E.R. Finley was assigned to the Field Operations Division, Commander of Zone Three (3). In November 2006, Defendant Major John Mathis was assigned to the Airport Division as the Day Watch Commander. In November 2006, Defendant Major C.J. Davis was the major in charge of the Special Enforcement Section ("SES"). The SES section included the REDDOG Unit, Vice, Homeland Security, HIDTA (a joint DEA/APD drug interdiction program), Licenses and Permits and Narcotics Enforcement. In November 2006, Defendant Lt. Stacie Gibbs was in charge of the Narcotics Enforcement Unit. Lt. Gibbs reported to Major C.J. Davis [See APD Organizational Chart 2005/2006 attached hereto as Exhibit "B"]. In November 2006, as indicated above, Defendant Sgt. Wilbert Stallings was the day-to-day direct supervisor of Narcotics Team 1. Junnier, Smith and Tesler reported directly to Sgt. Wilbert Stallings on a daily basis. Sgt. Stallings reported to Lt. Stacie Gibbs.

Defendants Pearlene Williams, Marion L. Brooks, E.R. Finley, and John Mathis should be dismissed from this lawsuit. In November of 2006, none of these Defendants were in the direct chain of command of officers Junnier, Smith and Tesler. Their duties and responsibilities were unrelated to the Criminal

Investigations Division.   They were not responsible for, nor did they in any way direct or supervise, any of the activities of the offending officers.

As the former Fifth Circuit noted in *Sims v. Adams*, there are "two possible theories under which a supervisor could be held liable under section §1983— personal participation in the activity and breach of a duty imposed by state or local law."[79]   Under the first theory – personal participation – it is undisputed that *none* of the City Defendants personally participated in the incident that is the subject of this lawsuit – the illegal search and shooting of Ms. Kathryn Johnston.   Under the second theory – breach of duty imposed by state or local law – Plaintiff's allegation that the City Defendants violated State law also fails. City Defendants will address all of Plaintiff's state law claims below.

*Monell* was clear on this point: Supervisory officials, like municipalities, may not be held liable under §1983 under the doctrine of *respondeat superior*.[80]   A supervisor may be held liable for acts of subordinates if he fails to perform proper training,[81] or if he persistently fails to discipline subordinates in the face of knowledge of their propensity for improper use of force,[82] or in the face of knowledge of improper conduct,[83] or as *Sims* held if the supervisor has notice of

---

[79] *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976); Holding applies to 11th Cir. prior to 1986.

[80] *Monell*, 436, U.S. at 658; also *Baskin v. Parker*, 602 F.2d 1205 (5th Cir. 1979).

[81] *Beverly v. Morris*, 470 F.2d 1356 (5th Cir. 1976).

[82] *Sims*, 537 F.2d at 832.

[83] See *Webster v. City of Houston*, 689 F.2d 1220 (5th Cir. 1982).

past culpable conduct by his subordinates and fails to prevent a recurrence.[84]  But "[A] failure to supervise gives rise to §1983 liability only in those situations where there is widespread abuse ... [o]nly then may knowledge be imputed to the supervisory personnel."[85]   "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate §1983 liability."[86]  Based on the facts above and the conclusion of the FBI Investigation, none of the City Defendants, the command staff supervisors – Chief Pennington, Assistant Chief Alan Dreher, Deputy Chief Peter Andresen, Major Pearlene Williams, Major E.R. Finley, Major John Mathis, Major Marion Brooks, Major C.J. Davis and Lt. Stacie Gibbs – had any knowledge of Junnier, Smith, Tesler and Sgt. Stallings' illegal activities that led to the improper search and the violation of Ms. Johnston's civil rights.  There was certainly no widespread abuse or pattern of prior similar incidents on record to give any of the supervisors notice or fair warning.   The officers were adequately trained.   None of the supervisors and certainly not the policymaker for the police department ratified or condoned the officers' illegal activities.   As the FBI investigation revealed, Junnier, Smith, Tesler and Stallings kept their money-making scheme to themselves.

---

[84] *Sims*, 537 F.2d at 832.

[85] *Wellington v. Daniels*, 717 F.2d 932, 936 (CA4 1983); *McClaughlin v. City of LaGrange*, 662 F.2d 1385, 1388 (11th Cir. 1981), *cert. denied*, 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed. 2d 856 (1982).

[86] *Barry v. Lemore*, 670 F.2d 30 (5th Cir. 1982); *Avery v. County of Burke,* 660 F.2d at 114; *Orpiano v. Johnson*, 632 F.2d 1096 (4th Cir. 1980), *cert. denied*, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed. 2d 361 (1982).

Finally, Plaintiff's assertions regarding the City's disciplinary polices are simply incorrect. The City of Atlanta's disciplinary policies did not cause the officers to violate Ms. Johnston's civil rights resulting in her death.

> 2.     The City of Atlanta's disciplinary policy did not cause Plaintiff's alleged constitutional injuries.

As stated *supra*, the Office of Professional Standards, OPS, is the unit charged with receiving and investigating complaints against police officers and conducting administrative reviews of police misconduct. Complaints against any police officer are accepted from any citizen at any precinct or other facility in the Atlanta Police Department. Generally, the Office of Professional Standards conducts its investigations of complaints by interviewing and taking statements from complainants, witnesses, and police department employees involved in the alleged incident. It reviews all written reports and other documents relevant to the alleged incident; conducts re-interviews, if necessary; and does line-ups, drug, alcohol, or other testing as appropriate.[87] Based upon OPS's investigative findings, complaints are classified as one of the following: 1) *Exonerated*, indicating that the incident occurred, but that the employee's actions were justified, lawful, proper, and in accordance with Atlanta Police Department employee work rules and training; 2) *Unfounded*, indicating that the complainant admitted to false

---

[87] APD Disciplinary Manual, Chapter 2, http://horizon/wd/Chapter2/APDSOP2020DisciplinaryProcess.htm.

allegations, that the accused employee was not involved in the incident, or that there was no evidence the situation complained of occurred; 3) *Not Sustained*, indicating a lack of sufficient evidence to sustain the complaint, but also a lack of evidence to prove that the officer's conduct was without question lawful and proper; or 4) *Sustained*, indicating that the allegations were supported by sufficient evidence to indicate the employee did commit one or more of the allegations or the investigator found other violations.

If the complaint against the police officer is sustained, the officer will be charged with violation of a work rule and disciplined.   The decision to take disciplinary action against an employee must be based on the totality of factors associated with a particular situation.   The disciplinary authority must determine the type and degree of action that will cause the employee to recognize his or her responsibilities to himself or herself and to the organization.   If a complaint is sustained, the officer's chain of command may make recommendations concerning the degree of discipline.   However, only the final disciplinary authority makes the ultimate decision on the type discipline an officer will receive.   The City of Atlanta imposes a progressive discipline policy, whereby the degree of discipline should be increased with each sustained complaint which is similar in nature.

Although the disciplinary proceedings are confidential, other police officers learn about the discipline either from the disciplined officer or indirectly from

other officers.  Further, everyone in the officer's chain of command and the officer him or herself also will be notified about the results of the OPS investigation. After an investigation file is closed, the information therein becomes public record. The Office of Professional Standards monitors the reception of all complaints from the zone and the imposition of discipline by the individual zones.  In addition, OPS keeps a record of all complaints made against officers, the results of investigation, and the amount of discipline, if any, an officer receives.

The Atlanta Police Department's Disciplinary Manual illustrates with clarity City policies with respect to the receipt and investigation of complaints against police officers, the manner in which the investigation is carried out, the disposition of complaints, and the possible disciplinary actions taken as a result of such complaints.  This manual confirms that the City has in effect written policies which discourage the use of excessive force, lying and other misconduct by its police officers, by investigating completely and objectively all complaints brought against police officers, either by citizens or in-house by the Police Department; by objectively preparing reports which identify whether a police officer's actions are justified or unjustified; by including in reports all information pertaining to the officer's violation of any APD policy or work rule;[88] by developing final

---

[88] When Chief Pennington became the Chief of Police in Atlanta in 2002, he changed the APD work rule of "Truthfulness" and made its violation a terminable offense. See CALEA Accreditations for 2004/5 and 2007/8.

recommendations which are accurate and verifiable; and by identifying instances of improper behavior, especially improper use of force.[89]

As the above illustrates, the Atlanta Police Department has an extensive disciplinary policy of which Junnier, Smith and Tesler were well aware, which is why they chose to kept their extortion enterprise and all its machinations a secret. Junnier, Smith and Tesler knew well that if their illegal activities and policy violations had been discovered prior to this tragic incident, they would have been terminated from the police force and, given the severity of their activities, likely reported to the Fulton County District Attorney.

City Defendants – The City of Atlanta, Chief of Police Richard Pennington, Asst. Chief Alan Dreher, Deputy Chief Peter Andresen, Maj. Pearlene Williams, Maj. Marion L. Brooks (ret.), Maj. E.R. Finley, Maj. John Mathis, Maj. C.J. Davis and Lt. Stacie Gibbs – were not involved in the illegal activities of Junnier, Smith, Tesler and Stallings. City Defendants did not personally participate in the raid on Ms. Johnston's home and did not violate the constitutional rights of Ms. Johnston. The illegal acts of Junnier, Smith, Tesler and Stallings should not be imputed to the Defendant City of Atlanta, nor should those illegal acts be imputed to their supervisors. City Defendants' Motion for Summary Judgment on the federal claims should be granted.

---

[89] APD Disciplinary Manual, http://horizon/wd/Chapter2/APDSOP2020DisciplinaryProcess.htm.

## III. STATE LAW CLAIMS AGAINST A MUNICIPAL DEFENDANT ARE BARRED BY THE DOCTRINE OF GOVERNMENTAL IMMUNITY – O.C.G.A. §§ 36-33-1 THROUGH 5.

**Count 3** of Plaintiff's Complaint lists the following state law claims against all Defendants: Trespass, Assault and Battery, False Arrest, False Imprisonment and Intentional Infliction of Emotional Distress [Amended Complaint, ¶ 65]. In **Count 4**, Plaintiff assert a negligence claim alleging that Defendants "negligently performed ministerial duties as required by Georgia law when they unlawfully obtained a search warrant and/or no-knock warrant with false statements and executed said illegal warrant... and when they failed to properly supervise and train their officers." [Id., ¶ ¶ 67, 68].

### A. Defendant City of Atlanta is Entitled to Sovereign Immunity.

Sovereign immunity for the state has long been a part of the common law in Georgia: it was a judicially created rule.[90] The strictures for finding municipality liability under state law are much narrower than the federal under *Monell.* Generally, two Georgia statutes clearly set forth the governmental immunity principles applicable to the City of Atlanta in this case. O.C.G.A. § 36-33-1 states:

> *(a)* Pursuant to Article IX, Section II, Paragraph IX of the Constitution of the State of Georgia, the General Assembly, except as provided in this Code section and in Chapter 92 of this title, declares *it is the public policy of the State of Georgia that there is no waiver of the sovereign immunity of municipal*

---

[90] *Crowder v. State Parks Dept.,* 228 Ga. 436, 185 S.E. 2d 908 (1971).

*corporations of the state and such municipal corporations shall be immune from liability for damages.* A municipal corporation shall not waive its immunity by the purchase of liability insurance, except as provided in Code Section 33-24-51 or 36-92-2, or unless the policy of insurance issued covers an occurrence for which the defense of sovereign immunity is available, and then only to the extent of the limits of such insurance policy. This subsection shall not be construed to affect any litigation pending on July 1, 1986.

(b) Municipal corporations shall not be liable for failure to perform or for errors in performing their legislative or judicial powers. For neglect to perform or improper or unskillful performance of their ministerial duties, they shall be liable.

Additionally, O.C.G.A. § 36-33-3 states:

*A municipal corporation shall not be liable for the torts of policemen or other officers engaged in the discharge of the duties imposed on them by law.*[91]

The principle of non-liability rests upon the broad ground that, in the discharge of a purely governmental function, a municipality is not liable for torts committed in the discharge of such duties. Thus, governmental immunity precludes this lawsuit against the City of Atlanta unless the City waived its immunity by purchasing liability insurance.[92] The doctrine of governmental immunity also protects the City of Atlanta from liability for the actions of its employees (*Id.,* holding same regarding police officer in that case).   City of Atlanta is immune

---

[91]*See also City of Atlanta v. Heard*, 252 Ga.App. 179, 181 (2001) (citing the same statutes and reversing the trial court's denial of summary judgment in favor of the city); *Elarika v. City of East Point*, 204 Ga. App. 731, 733 (1992); *Peeples v. City of Atlanta*, 189 Ga. App. 888, 890 (1992).

[92] *Reese v. City of Atlanta*, 261 Ga.App. 761, 762 (2003)(stating same and affirming trial court's grant of summary judgment in favor of the city).

from liability regardless of whether the alleged tortuous conduct was *intentional or negligent*.[93]

The City of Atlanta has not waived its sovereign immunity and does not have liability insurance covering the acts described in Plaintiff's Complaint [See Affidavit of Sally Detter, Manager of Contract Compliance & Insurance, attached hereto as Exhibit "K"].    Accordingly, the City of Atlanta is immune from Plaintiff's state law claims and is entitled to summary judgment.

Since Plaintiff's claims against the individual officers, in their *official capacity*, are in reality claims against the City of Atlanta, these claims must also fail as a matter of law.[94]  "Suits against public employees in their official capacities are in reality suits against the state and, therefore involve sovereign (governmental) immunity."[95] The issue of sovereign or governmental immunity is a question of law to be decided by the court.[96]

**B.    Under Georgia Law there is no Vicarious Liability for Supervisors for Discretionary Acts of Subordinates.**

Although damage suits are maintainable in this state against government officers and agents for failure to perform ministerial duties, such officers and employees are immune from negligence claims when the acts complained of

---

[93] *Brown v. City of Union Point*, 52 Ga. App. 212 (1935).

[94] *Gilbert v. Richardson*, 264 Ga. 744, 452 S.E. 2d 476, 478 n.4 (1994).

[95] *Donaldson v. Department of Transportation*, 262 Ga. 49 (1992).

[96] *See Acker v. City of Elberton*, 176 Ga. App. 580 (1985); *Foster v. Crowder*, 117 Ga. App 568 (1968).

involve a discretionary function of an office … unless the public official's discretionary acts are willful, malicious or corrupt.[97]

Junnier, Smith and Tesler were executing a warrant when this tragic incident occurred. The Eleventh Circuit has held that the acts of obtaining and executing an arrest warrant are discretionary functions.[98] Whereas *Mathis* held that a warden could be held liable for his negligent supervision of subordinates engaged in a ministerial duty, *respondeat superior* will not apply to impute negligence to public officers for acts of subordinates engaged in discretionary acts.[99]

City Defendants – Chief of Police Richard Pennington, Asst. Chief Alan Dreher, Deputy Chief Peter Andresen, Maj. Pearlene Williams, Maj. Marion L. Brooks (ret.), Maj. E.R. Finley, Maj. John Mathis, Maj. C.J. Davis and Lt. Stacie Gibbs – did not personally participate in any of the illegal acts of Junnier, Smith and Tesler. City Defendants did not trespass, assault or batter, falsely arrest, falsely imprison or intentionally inflict emotional distress on Ms. Johnston. The illegal discretionary acts of Junnier, Smith and Tesler should not be imputed the command staff of the Atlanta Police Department unless Plaintiff can show some direct involvement or personal participation in the discretionary acts. Plaintiff cannot make this showing.

---

[97] *Hennessey v. Webb*, 245 Ga. 329, 264 S.E.2d 878 (1980); *Gray v. Linahan*, 157 Ga. App. 227, 276 S.E.2d 894 (1981).
[98] *Brock v. City of Zephyrhills*, 323 Fed. Appx. 925 (C.A. 11th Cir. (Fla.) 2007).
[99] *Lazenby v. Spaulding County*, 249 Ga. 334, 290 S.E.2d 915.

In addition to the above, unless Plaintiff can show that the supervisor's actions were malicious, they are entitled to official immunity. Plaintiff has not alleged or specified which supervisors did what. Without specific allegations of specific actions and no showing of malice, Plaintiff's state law claims against the supervisors must fail.

## IV.   RICO CLAIMS

In **Count 5**, Plaintiff asserts several claims under Georgia's RICO statute. Without specifying dates, times or identifying the incident(s), Plaintiff contends that all named defendants were involved in some form of racketeering in violation of the Georgia's RICO statute [Id., ¶ 71].

City Defendants contend the Count 5 should be dismissed in its entirety against Defendant City of Atlanta.   It is well established that a municipal corporation can only act through its officers and is incapable of forming the *mens rea* or criminal intent necessary to perform the predicate acts of a conspiracy.   In addition, public policy has immunized cities from the treble damages provision of the RICO statutes because any award would require payment to be made by the innocent taxpayers.[100]

As stated *supra,* it is undisputed that City Defendants – Chief of Police Richard Pennington, Asst. Chief Alan Dreher, Deputy Chief Peter Andresen, Maj.

---

[100] *Massey v. Oklahoma City*, 643 F.Supp. 81 (1986).

Pearlene Williams, Maj. Marion L. Brooks (ret.), Maj. E.R. Finley, Maj. John Mathis, Maj. C.J. Davis and Lt. Stacie Gibbs – did not personally participate in any of the illegal acts of Junnier, Smith and Tesler, nor were they aware of their illegal activities. Junnier, Smith and Tesler admitted they kept their own counsel and did not inform any APD personnel of their activities, except Sgt. Stallings, who occasionally split the extortion money with them [Citations *supra*]. The conspiracy and the cover up was confined to Junnier, Smith and Tesler. Summary judgment should be granted in favor of all City Defendants on the RICO claims.

## V.    CONCLUSION

### A.    The Official Capacity and Fourteenth Amendment Claims.

(1)    All claims against APD supervisors in their "official capacity" should be dismissed as redundant pursuant to *Gilbert v. Richardson*, 264 Ga. 744 and *Donaldson v. Department of Transportation*, 262 Ga. 49.

(2)    Plaintiff's claims of excessive force under the Fourteenth Amendment should be dismissed pursuant to the Supreme Court's holding in *Graham v. Conner*, 490 U.S. 386 (1989).

### B.    City Defendants Are Entitled To Summary Judgment On Plaintiff's Fourth Amendment Claims Because There Are No Genuine Issues Of Material Fact As To The Following:

(1)    The City of Atlanta, a municipality, cannot be held liable under

the doctrine of *respondeat superior*;

  (2) The City of Atlanta does not have an unconstitutional policy, custom or practice that caused Plaintiffs' injuries, thus the City of Atlanta cannot be held liable under *Monell* for injuries inflicted by its employees;

  (3) The City of Atlanta does not have "unconstitutional and illegal performance targets."

  (4) The City of Atlanta adequately trained former APD officers Junnier, Smith, Tesler and Stallings;

  (5) The policy makers and APD command staff -- Chief of Police Richard Pennington, Asst. Chief Alan Dreher, Deputy Chief Peter Andresen, Maj. Pearlene Williams, Maj. Marion L. Brooks (ret.), Maj. E.R. Finley, Maj. John Mathis, Maj. C.J. Davis and Lt. Stacie Gibbs – did not participate in any of the illegal acts of Junnier, Smith and Tesler, nor were they aware of their illegal activities;

  (6) There was no pattern of prior similar incidents in which a citizen's constitutional rights were violated that would give notice to APD policymakers or APD command staff;

  (7) Former APD officers Gregg Junnier, Jason R. Smith and Arthur

Tesler committed criminal acts, violated their oath of office and APD policy(s).

**C.      City Defendants Are Entitled To Summary Judgment On Plaintiffs' State Law Claims Because There Is No Genuine Issue Of Material Fact As To:**

    (1)     Pursuant to O.C.G.A. § 36-33-3, the City of Atlanta cannot be held liable for the torts of policemen;

    (2)     Under Georgia law there is no vicarious liability for supervisors for discretionary acts of subordinates.

    (3)     APD command staff are entitled to official immunity on all of Plaintiffs' state law claims against them in their individual capacity;

**D.      City Defendants Are Entitled To Summary Judgment On Plaintiffs' RICO Claims Because There Is No Genuine Issue Of Material Fact As To:**

    (1)     The City of Atlanta, a municipality is incapable of forming the criminal intent necessary to perform the predicate acts of a conspiracy;

    (2)     It is undisputed that none of the City Defendant personally participated in any of the illegal acts of Defendants Junnier, Smith and Tesler.

City Defendants are entitled to judgment as a matter of law. City Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted this _16th_ day of December 2009.

**R. ROGER BHANDARI**
City Attorney
Georgia Bar No. 056340

BY:  _____

**DENNIS M. YOUNG**
Senior Assistant City Attorney
Georgia Bar No. 781744

**STEPHEN A. POWER**
Associate City Attorney
Georgia Bar No. 600565

Attorneys for City Defendants
Chief of Police Richard Pennington,
Asst. Chief Alan Dreher, Deputy
Chief Peter Andresen, Maj. Pearlene
Williams, Maj. Marion L. Brooks
(ret.), Maj. E.R. Finley, Maj. John
Mathis, Maj. C.J. Davis and Lt. Stacie
Gibbs

**CITY OF ATLANTA LAW DEPARTMENT**
68 Mitchell Street, SW, Suite 4100
Atlanta, GA  30303
(404) 330-6567 (telephone)
(404) 546-8581 (facsimile)
dmyoung@atlantaga.gov

- 78 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SARAH DOZIER, as Administrator of )
the Estate of KATHRYN JOHNSTON, )
                             )
     Plaintiff, )
                             )
v. )   **CIVIL ACTION CASE NO.**
                             )   **1:08-CV-00007-MHS**
CITY OF ATLANTA, et al., )
                             )
     Defendants. )

## CERTIFICATE OF SERVICE

I hereby certify that on December \_\_\_, 2009, I filed the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT** with the Clerk of Court via hand delivery. I have also this day served counsel for the opposing parties with a copy of the within and foregoing by depositing it in the U.S. Mail with proper postage, addressed to Plaintiff's attorneys of record as follows:

Hezekiah Sistrunk, Jr., Esq.
Jane Lamberti Sams, Esq.
Shean Williams, Esq.
**COCHRAN, CHERRY, GIVENS, SMITH, SISTRUNK & SAMS, P.C.**
800 The Candler Building
127 Peachtree Street, N.E.
Atlanta, GA 30303

*[continued on next page]*

William Mitchell, Esq.
**CRUSER & MITCHELL, LLP**
Meridian II, Suite 2000
275 Scientific Drive
Norcross, GA 30092

Nicholas C. Moraitakis, Esq.
**MORAITAKIS, KISHEL, PEARSON & GARDNER, LLP**
3445 Peachtree Road, N.E., Suite 425
Atlanta, GA 30326

Additionally, a true and correct copy of the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT** was placed in an envelope with adequate postage affixed thereto and mailed to:

Arthur Tesler, *pro se*
4014 Caddie Drive
Acworth, Georgia 30101

Gregg Junnier (59088-019)
FCI Coleman Medium
Federal Correctional Institution
Post Office Box 1032
Coleman, FL 33521

Jason R. Smith (59089-019)
FCI Fairton
Federal Correctional Institution
Post Office Box 420
Fairton, NJ 08320

*[continued on next page]*

Wilbert Stallings (05587-019)
FMC Devens
Federal Medical Center
Post Office Box 879
Ayer, MA  01432

**DENNIS M. YOUNG**
Senior Assistant City Attorney
Georgia Bar No. 781744

**CITY OF ATLANTA LAW DEPARTMENT**
68 Mitchell Street, SW, Suite 4100
Atlanta, GA  30303
(404) 330-6567 (telephone)
(404) 546-8581 (facsimile)
dmyoung@atlantaga.gov