# EXHIBIT "A"

# AFFIDAVIT OF
# LT. STACIE GIBBS

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| SARAH DOZIER, as Administrator of the Estate of KATHRYN JOHNSTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **CIVIL ACTION CASE NO. 1:08-CV-00007-MHS** |
| CITY OF ATLANTA, et al., | ) ) | |
| Defendants. | ) | |

## AFFIDAVIT OF LIEUTENANT STACIE GIBBS

Now before me, the undersigned officer duly sworn to administer oaths, appeared affiant LIEUTENANT STACIE GIBBS who, after being sworn and placed under oath, gave the following testimony based upon her personal knowledge and information.

1.

My name is Stacie Gibbs. I am over the age of eighteen, suffer from no mental or legal disabilities and freely give the following testimony based upon my own knowledge and personal observations.

436349-1

**2.**

I am employed by the City of Atlanta Police Department, where I serve as a Lieutenant in Police Operations. I have also served as an Investigator and a Sergeant, as well as a Lieutenant in the Narcotics Division.

**3.**

From January 26, 2006 through May 29, 2009, I served as Commander of the Narcotics Unit of the Atlanta Police Department.

**4.**

Several federal and state agencies work alongside and in partnership with the Atlanta Police Department in drug interdiction: HIDTA, DEA and Weed and Seed, along with many others. Statistics are kept regarding the total amount of drugs seized, cash confiscated, etc. [See Attachment 1].

**5.**

During my tenure as commander of the Narcotics Unit, I was neither aware of nor participated in any illegal or criminal activities involving the officers under my command. I was not aware of any citizen complaints or improper search warrants being issued under my command. If I had been made aware of any illegal or criminal acts, citizen complaints or improper search warrants, I would have immediately reported the incident to the Office of Professional Standards (OPS).

436349-1

6.

A review of OPS Complaint history from 2001 through and including 2006 does not reveal any prior similar incidents of misconduct of the type that occurred in the Neal Street incident or the facts leading up to that incident. There have, however, been three (3) citizen complaint incidents since 2003 that may be considered relevant but not conclusive: a) Ms. Mary McCoy (filed May 19, 2003); b) Mr. Alphonso Howard (filed March 3, 2005); and c) Latisha Colbert (filed January 8, 2008). Other than these isolated incidents, OPS does not have any other record of prior acts of misconduct similar to the acts of Junnier, Smith and Tesler in the Neal Street shooting. There is no pattern of similar prior incidents in which a citizen's constitutional rights were violated that would put me or the other command staff on notice of Junnier's extortion activities.

7.

During my tenure as commander of the Narcotics Unit, I insisted that the officers under my command follow and adhere to all Atlanta Police Department Standard Operating Procedures (SOP). Specifically regarding search and seizure, the Atlanta Police Department's search warrant policy is set forth in the Policy Manual, SOP 3020: Search and Seizure, § 4.2.5 [See Attachment 2].

3

2) Operational Procedures; and 3) Law Enforcement. The goals set forth in the performance evaluation plans are fluid and subjective, never arbitrary or fixed.

12.

As part of establishing performance indicators, for narcotics Officers evaluations, in order to receive a rating of "Effective" in the job element of Enforcement Operations, the employee was to average at least two (2) search warrants per month, clear 50% of their assigned lead sheets by arrest, and be within 30% of the Yearly Watch Average. In order to receive a rating of "Highly Effective" in the job element of Enforcement Operations, the employee was to average at least three (3) search warrants per month, clear 60% of their assigned lead sheets by arrest, and exceed the Yearly Watch Average by five percent (5%). Evaluations were not monitored monthly so warrants and arrest averages were averaged out over the course of the 12-month evaluation period. Investigator Junnier consistently received "Outstanding" performance ratings beginning in 1998 – 2006. Investigators Tesler and Smith both received "Highly Effective" evaluations for 2006, and Investigator Smith received the same for 2005. The enforcement element was based on Lead Sheets and Self Initiated Investigations resulting from Citizen and Department Complaints. Lead Sheets consisted of any documented information provided to the Unit concerning Narcotics Activity. The documented activity was entered into the Lead Sheet Database and given a

5

number. Lead Sheets were then assigned to investigators based on the location of the activity.

13.

Approximately two (2) months prior to the Johnston incident, I spoke with Investigator Holly Buchanan regarding a similar incident involving Ms. Francis Thompson.  The search used in that raid was a good search warrant with no false information, but no drugs were found in the home.  Based on my experience, approximately 20% to 25% of all search warrants issued yield no drugs or drug activity.  It was also common knowledge in the Narcotics Unit that grandchildren would often use the homes of their grandparents, without their knowledge or permission, to sell drugs.  The warrant was executed on September 20, 2006 at 1430 hours at 1425 Simpson Road, A-102. The resident of this location was an elderly female named Francis Thompson.  I was alerted to the incident due to Ms. Thompson having pointed a plastic weapon at Narcotics Team 1 upon their entry into her residence. Ms. Thompson had put the gun down when asked by Investigators and no injuries resulted. It was later determined that the weapon was not real. Investigator Buchannan had called to notify me that they had encountered a resident with a weapon; however no injuries had occurred. I had not received a call such as this prior to that date, as to the best of my knowledge neither Narcotics Team 1 or 2 had encountered a person holding a weapon in an offensive matter

6

although weapons were routinely recovered. Although I was concerned about Investigator safety, I was not alarmed by the age of the victim, nor that drugs were not found in the residence, as I have personally purchased narcotics from elderly individuals, including females and have recovered narcotics from other elderly females subsequent to arrest. I have also personally purchased narcotics from younger individuals living with their elderly grandparents/aunts and uncles at the time the narcotics were sold. I was further not alarmed by the fact that narcotics were not recovered, as I have personally purchased narcotics from an individual and returned within 30 minutes of doing so and not recovered narcotics. The majority of the investigations conducted by the Narcotics Unit involved "mid-level" dealers who, in most cases, kept their narcotics with them. If the suspect is at the location the drugs usually are, if the suspect leaves the location, he/she takes the drugs with them.

14.

All Atlanta Police Department Investigators, including Junnier, Smith and Tesler (in spite of their claims to the contrary), were adequately trained in narcotics procedures as part of their Peace Officer Standards and Training (POST) certification before they are licensed to carry a firearm and wear a badge [See copies of Junnier's, J.R. Smith's and Tesler's POST Certification and Training records attached as Attachment 3]. This training included post-academy training in

7

436349-1

the Basic Investigator's Course on how to obtain a search warrant, how to write an affidavit and how to assess probable cause. Copies of Sgt. Stallings' training records are also attached. Sgt. Stallings received several additional hours in supervisory training as well as specific training on narcotics enforcement [See Attachment 6].

15.

Investigators Smith and Tesler both attended a 40 hour Investigations Class twice, once in 2004 and once in 2005. This class is taught to employees who have been, or are expected to be, promoted to the rank of Investigator, or who have been chosen by their supervisors to work a plain-clothes assignment as an officer. Investigator Junnier attended the 40 hour Pre-Selection Investigator Course in 1992. In addition to classroom training, Junnier had to complete practical exercises in the field and take a comprehensive test, which included writing a search warrant. Junnier passed both the written test and the search warrant test. In addition to the Basic Investigator course, Investigator Smith also attended the following POST Certified classes: Undercover Operations (2005), Meth Labs: Detection & Response (2005), and Tactical Drug Operations (2005). Investigator Tesler completed training in Drug Identification (2002) prior to becoming an Investigator, and Courtroom Demeanor and Testimony in 2006.

16.

Investigator Junnier has repeatedly stated to the FBI investigators that he did not receive any training in an attempt to deflect his duplicity onto the City of Atlanta.  However, in the affidavit for the search warrant on 161 Rhodesia Drive (Latisha Colbert matter) as well as other affidavits for search warrants, he repeatedly states that he *did* have extensive training in narcotics enforcement and interdiction and trafficking of illegal drugs [See Affidavit for 161 Rhodesia Drive, Attachment 4].

**FURTHER AFFIANT SAYETH NOT.**

STACIE GIBBS
Lieutenant, Police Operations
City of Atlanta Police Department


Sworn to and subscribed before me, this 9th day of December, 2009.

Notary Public
My commission expires: March 7, 2011

Fulton County, Georgia
Notary Public
Karen C. Morrow
My Commission Expires 3/07/2011

436349-1

# ATTACHMENT 1
# TO GIBBS' AFFIDAVIT

# Exhibit A

|       | Junnier | | Narcotics | | Drugs Seized |
|-------|---------|----------|----------|----------|--------------|
|       | Arrest  | Warrants | Arrests  | Warrants |              |
| **2003** | 206  | 57       | 3180     | 487      | 1,739,735.00 |
| **2004** | 113  | 43       | 1656     | 210      | 4,114,750.00 |
| **2005** | 119  | 31       | 994      | 142      | 2,381,880.00 |
| **2006** | 189  | 54       | 1930     | 459      | 2,298,897.00 |

# Narcotics – 2003

| Month | Junnier | | | Narcotic Arrests | Search Warrants | Drug Seized |
|---|---|---|---|---|---|---|
| | Arrest s | Warrants | | | | |
| January | 14 | 0 | | 256 | 31 | 86,830 |
| February | 33 | 9 | | 344 | 65 | 147,985 |
| March | 27 | 9 | | 47 | 56 | 130,760 |
| April | 15 | 3 | | 217 | 33 | 88,785 |
| May | 30 | 10 | | 375 | 55 | 32,395 |
| June | 9 | 6 | | 277 | 53 | 563,935 |
| July | 10 | 0 | | 240 | 39 | 37,555 |
| August | 27 | 8 | | 362 | 47 | 113,765 |
| September | 15 | 4 | | 272 | 33 | 135,345 |
| October | 14 | 7 | | 272 | 32 | 59,820 |
| November | 5 | 0 | | 119 | 22 | 162,600 |
| December | 7 | 1 | | 166 | 21 | 179,665 |
| | | | | | | |
| Total | 206 | 57 | | 3180 | 487 | 1,739,735.00 |
| | | | | | | |
| Yearly Avg | 206 | 57 | | 138 | 21.1 | |
| Monthly Avg | 16.9 | 4.75 | | 11 | 1.76 | |

## Narcotics – 2004

| Month | Junnier Arrest s | Warrants | Narcotic Arrests | Search Warrants | Drug Seized |
|---|---|---|---|---|---|
| January | 9 | 4 | 157 | 32 | 336,355 |
| February | 10 | 9 | 194 | 48 | 286,045 |
| March | 12 | 6 | 153 | 37 | 51,180 |
| April | 12 | 2 | 190 | 30 | 97,915 |
| May | 15 | 5 | 156 | 32 | 207,525 |
| June | 6 | 2 | 155 | 35 | 1,272,400 |
| July | 8 | 2 | 137 | 31 | 91,740 |
| August | Missing | | | | |
| September | 9 | 3 | 151 | 35 | 814,810 |
| October | 18 | 5 | 136 | 33 | 819,060 |
| November | 7 | 1 | 132 | 28 | 70,650 |
| December | 7 | 1 | 95 | 16 | 67,070 |
| | | | | | |
| Total | 113 | 43 | 1656 | 210 | 4,114,750.00 |
| | | | | | |
| Yearly Avg | 113 | 43 | | | |
| Monthly Avg | | | | | |

# Narcotics – 2005

| Month | Junnier Arrest s | Warrants | Narcotic Arrests | Search Warrants | Drug Seized |
|---|---|---|---|---|---|
| January | 11 | 5 | 122 | 31 | 155,130 |
| February | Missing | | | | |
| March | 32 | 10 | 155 | 44 | 280,000 |
| April | 38 | 2 | 113 | 18 | 470,660 |
| May | 20 | 7 | 127 | 27 | 613,725 |
| June | 3 | 1 | 181 | 24 | 194,550 |
| July | 5 | 0 | 147 | 14 | 141,505 |
| August | 10 | 6 | 149 | 37 | 384,805 |
| September | | | | | |
| October | | | | | |
| November | | | | | |
| December | | | . | | |
| | | | | | |
| Total | 119 | 31 | 994 | 142 | 2,381,880.00 |
| Yearly Avg | . | | 55.2 | 7.8 | |
| Monthly Avg | 17 | 4.4 | 4.6 | 0.65 | |

# Narcotics – 2006

| Month | Junnier Arrest s | Warrants | Narcotic Arrests | Search Warrants | Drug Seized |
|-------|------------------|----------|------------------|-----------------|-------------|
| January | 19 | 6 | 85 (Team 1 only) | 28 | 404,956 |
| February | 14 | 4 | 135 | 36 | 580,670 |
| March | 27 | 8 | 189 | 54 | 328,215 |
| April | 30 | 6 | 107 (Team 1 only) | 31 | 137,572 |
| May | 14 | 5 | 187 | 45 | 66,877 |
| June | 6 | 1 | 160 | 33 | 267,490 |
| July | 13 | 3 | 222 | 32 | 275,715 |
| August | 22 | 11 | 233 | 64 | 58,400 |
| September | 13 | 3 | 175 | 44 | 71,117 |
| October | 8 | 2 | 174 | 44 | 49,705 |
| November | 23 | 5 | 209 | 47 | 48,955 |
| December | N/A | | 54 (Team II only) | 1 | 9,225 |
| | | | | | |
| **Total** | **189** | **54** | **1930** | **458** | **2,298,897.00** |
| | | | | | |
| Yearly Avg | 189 | 54 | 91.9 | 26.9 | |
| Monthly Avg | 17.2 | 4.9 | 113 | 2.24 | |

******Statistical data also includes arrest made and warrants executed while working AHA approved overtime****

# ATTACHMENT 2
# TO GIBBS' AFFIDAVIT



| Atlanta Police Department Policy Manual | | Standard Operating Procedure |
|---|---|---|
| Effective Date July 1, 2004 revised November 1, 2004 | | APD.SOP.3020 Search and Seizure |

| Applicable To:  All employees |
|---|
| Approval Authority:  Chief Richard J. Pennington |
| Signature:  Signed by RJP                                                    Date Signed:  11/1/2004 |

Table of Content

| | | |
|---|---|---|
| 1. | PURPOSE | 1 |
| 2. | POLICY | 1 |
| 3. | RESPONSIBILITIES | 1 |
| 4. | ACTION | 2 |
| 4.1 | General | 2 |
| 4.2 | Searches With a Warrant | 2 |
| 4.2.2 | Scope of the Search | 2 |
| 4.2.3 | Purpose of Search | 3 |
| 4.3 | Searches without a warrant | 6 |
| 4.3.1 | Generally | 6 |
| 4.3.2 | Incident to lawful arrest | 6 |
| 4.3.3 | Stop and Frisk | 7 |
| 4.3.4 | Exigent Circumstances | 8 |
| 4.3.5 | Crime Scenes | 8 |
| 4.3.6 | Hot Pursuit | 9 |
| 4.3.7 | Consent | 9 |
| 4.3.8 | Abandoned Property | 10 |
| 4.3.9 | Plain View | 10 |
| 4.3.10 | Open Fields | 10 |
| 4.3.11 | Border Searches | 10 |
| 4.3.12 | Vehicles | 11 |
| 5. | DEFINITIONS | 12 |
| 6. | CANCELLATIONS | 13 |
| 7. | REFERENCES | 13 |

1.        PURPOSE

         To establish the policies and procedures for conducting searches and seizures of private property.

2.        POLICY

         The Atlanta Police Department places the highest priority on maintaining the Constitutional rights of all individuals. All searches and seizures of private property will be conducted and performed in compliance with applicable federal and state laws and in a manner that provides for the highest degree of safety for all involved parties.

3.        RESPONSIBILITIES

3.1       Division, section, and unit commanders are responsible for ensuring that all employees within their chain of command comply with the requirements of this directive.

3.2       Supervisors are responsible for ensuring compliance with this directive and being present when employees under their chain of command execute a search warrant.

3.3       All employees are responsible for complying with the requirements of this directive.



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



4.      ACTION

4.1     General

4.1.1   The validity of the scope of a search depends upon the reasonableness of the search in light of its purpose. The scope of a search must be strictly tied to and justified by the circumstances that rendered its initiation permissible.

4.1.2   Officers are justified in staying on the premises only as long as necessary to conduct a reasonable search. Officers must not exceed their authority and should be considerate of the comfort, convenience, and feelings of the occupants.

4.1.3   Officers are obligated to avoid unnecessary damage to the premises and to terminate the search as soon as the object of the search has been discovered.

4.1.4   The validity of an initial search, pursuant to a warrant or under an exception to the warrant requirements, generally will not sustain a later search of the same area unless a new warrant is obtained, or unless there again exists a right to search without a warrant.

4.1.5   Officers will not allow the news media to enter a suspect's home to witness a search or arrest when their presence is not in aid of the execution of the warrant (Wilson v. Layne, 119 S. Ct. 1692 (1999)).

4.2     Searches With a Warrant

4.2.1   A search warrant may be issued for the seizure of the following (OCGA § 17-5-21):

    1.  Instruments, articles, things, including private papers of any person, which are designed, intended for use, or which have been used in the commission of the offense in connection with which the warrant is issued;

    2.  Any person who has been kidnapped in violation of the laws of the state, kidnapped in another jurisdiction and now concealed in this state, or any human fetus or human corpse;

    3.  Stolen or embezzled property;

    4.  Any item, substance, object, thing, or matter, the possession of which is unlawful;

    5.  Any item, substance, object, thing, or matter, other than the private papers of any person, which is tangible evidence of the commission of the crime for which probable cause is shown.

4.2.2   Scope of the Search

        Officers may search the premises that are located at the place described in the search warrant, including the curtilage around the place described. No warrant is required to search an area beyond the curtilage as no constitutional protection extends to open fields or other lands that are not an immediate part of the place described or when there is a clear indication that the area in question was (or is) open to the public.

 

Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure

4.2.3     Purpose of Search

An officer may search anywhere within the permissible area in which the object or objects of the search may be located, but not in an area in which the object of the search could not be located. Officers must take care to avoid unnecessary damage to the premises and personal property located therein.

4.2.4     Property Which May Be Seized

Officers may seize only those items particularly described in the warrant. Officers conducting a lawful search may also seize items not listed in the search warrant if the discovery of that item resulted from a bona fide search for the items named in the warrant. Items that may be seized include contraband, stolen property, and evidence of the commission of a crime.

4.2.5     Obtaining A Search Warrant

1.    Only sworn and POST certified employees may obtain a search warrant (OCGA § 17-5-21; 17-5-24).

2.    Officers must file a written complaint (affidavit) for the issuance of a search warrant. Affidavits to support the issuance of a search warrant should include the following:

     a.    The criminal offense committed;

     b.    Description of the premises, properties, and persons to be searched;

     c.    Description of the property, evidence, and contraband to be seized;

     d.    Any information provided by an informed or concerned citizen to support the issuance of the search warrant;

     e.    Any information obtained as a result of an independent investigation by the officer;

     f.    Statement of probable cause; and

     g.    Justification for obtaining an "other party" and/or a "no knock" clause, if needed.

3.    Officers must also complete the search warrant, which should include the following information:

     a.    The criminal offense

     b.    A detailed description of the premises, properties, and persons to be searched;

     c.    An "other party" and/or "no knock" clause, if needed;

     d.    The signature of a neutral and detached magistrate.

4.    All search warrants must be based on a determination of probable cause, supported by oath or affirmation, and can only be issued and signed by a neutral and detached magistrate who is authorized to hold a court of inquiry for any area of the county in which the premises described in the search warrant is located (OCGA § 17-5-21).



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



4.2.6   Pre-Search Planning

1.   Prior to executing the search warrant, the officer who obtained the search warrant will verify the information contained in the warrant, will attempt to determine if any circumstances have changed that make executing the warrant unjustifiable or undesirable, and will confirm the actual location of the search site to avoid searching the wrong location.

2.   Prior to the actual execution of the search warrant, a pre-entry briefing will be held with all search personnel. This briefing will provide and document information concerning the following:

   a.   Number of suspects, descriptions, and photographs if available;

   b.   Criminal history and/or background of the suspects and the premises;

   c.   Probability of the existence of weapons and the types of weapons;

   d.   The address of the premises to be searched;

   e.   The exterior and interior description of the premises to be searched;

   f.   The existence of children, animals, or other factors that may necessitate special precautions during the search;

   g.   A thorough description of the items to be seized;

   h.   The tactics to be used if a forced entry is required;

   i.   Any special provisions authorized in the search warrant;

   j.   The availability of all items of equipment required;

   k.   The specific duties and responsibilities of all persons involved in the search; and

   l.   Any other information necessary for the safe and successful execution of the search warrant.

4.2.7   Executing The Search Warrant

1.   A search warrant must be executed within 10 days from the time of its issuance. If the warrant is not executed within the 10-day period, it will be void and must be returned to the court of issuance (OCGA § 17-5-25).

2.   Search warrants may be executed at any reasonable time within the 10-day period (OCGA § 17-5-26).

3.   Only sworn and POST certified personnel may execute a search warrant (OCGA § 17-5-24).

4.   At least one uniformed officer will be present during the execution of search warrants by non-uniformed officers. All non-uniformed officers will be clearly identifiable, wearing clothing and equipment that identifies them as police officers and in compliance with



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



APD.SOP.2130 "Dress Code/Uniforms". If the search warrant is executed at any location outside the City of Atlanta, the officer(s) will have uniformed officers from the agency responsible for law enforcement within that location present during warrant execution.

5.  At least one supervisor must be present during the execution of search warrants. The supervisor present is responsible for notifying Communications.

6.  Reasonable and necessary force may be used to effect entry into any building or property (or part thereof) to execute a search warrant, if, after verbal notice or an attempt in good faith to give verbal notice by the officer directed to execute the same of his authority and purpose:

    a.  The officer is refused admittance;

    b.  The person or persons within the building or property or part thereof refuse to acknowledge and answer the verbal notice;

    c.  The presence of the person or persons therein is unknown to the officer; or

    d.  The building or property or part thereof is not then occupied by any person. (OCGA § 17-5-27)

7.  Officers are not required to give verbal notice prior to entering when they have reasonable grounds to believe that such a warning would jeopardize their safety or lead to the immediate destruction of evidence.

8.  In the execution of the search warrant, the officer executing the warrant may reasonably detain or search any person in the place at the time:

    a.  To protect himself from attack; or

    b.  To prevent the disposal or concealment of any instruments, articles, or things particularly described in the search warrant (OCGA § 17-5-28).

9.  When conducting the search, officers will first perform a security sweep for other individuals located or hiding within the entire premises. Officers are allowed to make a limited protective sweep when the officer possesses a reasonable belief, based on specific and articulable facts, that the area to be swept harbors an individual posing a danger to those on the search scene. This protective sweep may extend only to a cursory inspection of those spaces where a person may be found.

10. Officers will limit their search to the location, person(s), and properties described in the warrant. The areas to be searched are limited to those areas where the object(s) sought might be located.

11. Officers may seize only those items particularly described in the warrant. Officers conducting a lawful search may also seize items not listed in the search warrant if the discovery of that item resulted from a bona fide search for the items named in the warrant. Items that may be seized include contraband, stolen property, and evidence of the commission of a crime.



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



12. The officer who prepared the search warrant is responsible for preparing an inventory of the items seized during the execution of the warrant. Property seized should be turned in to Property Control as soon as practicable.

13. When executed, the duplicate copy of the warrant will be left with the person from whom any items are seized. If no person is available, a copy of the warrant and an inventory of the times seized will be left in a conspicuous place on the premises (OCGA § 17-5-25)

4.2.8    Return of the Search Warrant

After the search has been completed, it is the duty of the officer to return the search warrant and file a verified list of the items seized with the judicial officer named in the warrant or before any court of competent jurisdiction (OCGA § 17-5-29).

4.3      Searches without a warrant

4.3.1    Generally

1. There is a constitutional preference for searches to be conducted pursuant to a warrant rather than without one. Searches conducted without a warrant are per se unreasonable, subject to only a few specifically and well-delineated exceptions.

2. To justify a warrantless search, two essential elements must exist:

   a. It must be established that the circumstances at the time of the search were sufficient to require immediate action, which necessitated not complying with the restrictions of the warrant requirement of the Fourth Amendment.

   b. The manner and scope of the search that was conducted must be reasonably related to the justification of the search.

3. In a lawful search without a warrant, officers may seize any contraband, stolen property, or mere evidence of a crime which is in plain view and which is immediately recognizable as such, provided that the scope of the search was strictly tied to and justified by the circumstances that rendered it permissible when initiated.

4.3.2    Incident to lawful arrest

1. Officers may search the person arrested and the area within the person's immediate presence for the purpose of:

   a. Protecting the officer from attack;

   b. Preventing the person from escaping;

   c. Discovering or seizing the fruits of the crime for which the person has been arrested; or

   d. Discovering or seizing any instruments, articles, or things which are being used, or which have been used, in the commission of the crime for which the person has been arrested (OCGA § 17-5-1).



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



2. A search incident to an arrest will not be valid unless the arrest itself is lawful. The arrest may not be made as a pretext for conducting a search, and it will not be validated by what is found in the search. The arrest must generally precede the search or be substantially contemporaneous with the search.

4.3.3   Stop and Frisk

1. There are three types of police-citizen encounters:

   a. Communication between police and citizens involving no coercion or detention. Voluntary, non-coercive communication may include questioning, for which no standard of cause is needed, as long as the encounter does not interfere with a person's liberty;

   b. Brief seizures that must be supported by reasonable suspicion. They are limited in both duration and scope, and must be based upon reasonable articulable suspicion;

   c. Arrest, which must be supported by probable cause.

2. Officers may approach, converse with, and inquire from, persons and request information as long as the confrontation is voluntary to such a degree that the person feels they are free to go. There must not be any detention for this rule to exist.

3. Officers may detain an individual when they have articulable facts that lead them to believe criminal activity is occurring. Officers will consider the totality of the circumstances in determining whether reasonable articulable suspicion exists authorizing the detention. Based upon this, officers must have a particularized and objective basis for suspecting the particular person detained of criminal activity. The following elements must exist prior to the stop for it to be permissible:

   a. The assessment must be based on a totality of the circumstances. This analysis proceeds with various objective observations, information, and the consideration of the modes and patterns of operation of certain kinds of lawbreakers. From this information, an officer draws inferences and makes deductions.

   b. This process must raise a suspicion that the particular individual being detained is engaged in a criminal act or the furtherance of a criminal act, or suspected of being one wanted in connection with a completed criminal violation.

4. The authority to detain or stop does not automatically include the authority to frisk or pat down. A stop is a brief (temporary) investigative detention of an individual short of arrest. A frisk is an intrusion reasonably necessary to discover weapons, based on the officer's belief that the person may be armed. The authority to frisk or pat down must not be driven by an investigatory motive, but propelled by the officer's concern for their safety or the safety of others. If, following the stop, the officer reasonably believes that the person is armed and dangerous, they may frisk the suspect for weapons. The frisk may not be justified by the desire to discover or prevent the destruction of evidence in the absence of probable cause, and a valid stop does not justify a frisk. The scope of the frisk must be limited to an intrusion necessary to discover weapons on or about the person detained.



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



4.3.4    Exigent Circumstances

1.    Officers may conduct a warrantless search in some emergency situations when there is an immediate necessity to search and no opportunity to obtain a warrant. To establish the existence of an emergency situation, the following basic elements must appear:

a.    The officer must have reasonable grounds to believe that there is an emergency at hand and an immediate need for police assistance for the protection of life or property.

b.    The search must not be primarily motivated by intent to arrest and seize evidence.

c.    There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

2.    A case-by-case scrutiny of the circumstances is necessary. Circumstances determined to have been relevant to the courts include:

a.    The degree of urgency involved and the amount of time necessary to obtain a warrant.

b.    The reasonable belief that the contraband or evidence is about to be removed or destroyed.

c.    The possibility of danger to police officers guarding the site of the evidence or contraband while a search warrant is sought.

d.    Information indicating the possessors of the contraband or evidence are aware that the police are on their trail.

e.    The ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behaviors of persons engaged in narcotics trafficking.

3.    In all cases where judgments are made concerning a warrantless search based on exigent circumstances, officers will ensure that they can factually articulate and document their reasoning in support of their investigatory acts.

4.3.5    Crime Scenes

1.    Crime scenes are not, by their nature, an exception to the warrant rule.

2.    The seriousness of the offense under investigation does not, in and of itself, create an exigent circumstance.

3.    If exigent circumstances exist, a warrantless search must be strictly limited by the exigencies that justify its initiation: the need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal, absent exigent circumstances. Mincey v. Arizona 437 U.S. 385 (1978).

4.    If exigent circumstances do not exist, a search warrant or consent to search is required.



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



4.3.6      Hot Pursuit

1.   A suspect may not defeat a lawful arrest by escaping to a private place. A warrantless search for persons and weapons may be valid when an officer is in hot pursuit. The essential elements of hot pursuit are:

a.   Continuity of the pursuit: the pursuit must be maintained in a continuous manner without any significant break in the action.

b.   Immediacy of the pursuit: the immediacy of the pursuit will depend on such factors as the nature and severity of the crime, the possible destruction of evidence, and the safety and security of all persons.

4.3.7      Consent

1.   A valid consent to search eliminates the requirement for a search warrant. However, the consent to search is not necessarily the consent to seize. Items that may be seized include contraband, stolen property, and evidence of the commission of a crime. To obtain a valid consent to search, the following criteria must be satisfied:

a.   The officer must have a legal right to be at that location at the time of the consent.

b.   The individual consenting must have the apparent authority over the place or thing to be searched.

c.   The individual consenting needs to be advised of the specific location, place, or thing to be searched.

d.   Consent must be freely and voluntarily given, without any coercion or duress by a law enforcement officer.

e.   Consent may be revoked at any time.

2.   The test of the validity of a consent to search by a third party centers on whether the facts available to the officer at the moment would warrant a person of reasonable caution to believe that the consenting party had authority over the premises.

3.   A third party may consent if that person possesses common authority over, or sufficient relationship to, the premises or effects to be searched. The officer must articulate that it is reasonable to recognize that any of the co-inhabitants has the right to permit a search in their own right and that the others have assumed the risk that one of them might permit common areas to be searched.

4.   To be capable of giving consent, a person has to be sufficiently able to understand the circumstances and consequences of their actions. A minor or a person with diminished mental capacity may not have the minimal discretion required to provide a valid consent. The courts have considered the following factors regarding minors giving consent:

a.   Whether the minor lived on the premises.

b.   Whether the minor had a right of access to the premises and the right to invite others there also.



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



  c. Whether the minor was of an age making it reasonable to expect him or her to be able to exercise at least minimal discretion.

  d. Whether officers acted reasonably in believing that the minor had sufficient control over the premises to give a valid consent to search.

4.3.8 Abandoned Property

Abandonment is the voluntary relinquishment of control over property by a person to the extent that that person no longer has a reasonable expectation of privacy at the time of the search. All relevant circumstances existing at the time of the alleged abandonment should be considered. Denying ownership, interest, or discarding a piece of property while in a state of flight are all considered to be abandonment. Abandoned property is not protected by the Fourth Amendment and is not subject to policies governing searches with or without a warrant.

4.3.9 Plain View

 1. The plain view rule or doctrine is not an exception to the warrant requirement for a search, in that articles discovered as a result of "plain view" are not discovered as a result of a search. No warrant is required since no search is conducted. Officers may seize and act upon evidence of a crime and/or contraband when its discovery is based upon plain or open view.

 2. The criteria for a plain view seizure include:

  a. Officer must have a legal right to be where they are at the time of discovery.

  b. It must be immediately apparent that the item to be seized is stolen property, contraband, or other evidence of a crime.

 3. Officers will be mindful of the fact that a further search beyond the scope of those items discovered in plain view may require a warrant, absent exigent circumstances.

4.3.10 Open Fields

No search warrant is necessary for the search of an open field. The open fields doctrine applies to all land outside the curtilage regardless of how remote the land is and regardless of the efforts of the property owner to keep others out. Open fields may include any unoccupied or undeveloped area outside the curtilage, and need be neither 'open' nor a 'field' as those terms are used in common speech.

4.3.11 Border Searches

 1. An airport at which passengers arrive after a non-stop flight from outside the country is the functional equivalent to a border of the United States.

 2. A search at a border, incident to the entrance of a person into the United States, is not protected by the Fourth Amendment, therefore no search warrant is required for such searches.



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



4.3.12    Vehicles

1.    The following exceptions or limitations may apply to the rule requiring a search warrant for a motor vehicle:

   a.    Search incident to a lawful arrest;

   b.    When there is probable cause to search;

   c.    When the car is impounded or placed in storage;

   d.    When there is consent to the search;

   e.    Search of a car at or near a border of the United States; or

   f.    Search of an abandoned vehicle.

2.    Officers may search a motor vehicle without a warrant, by consent, or when the following two factors exist simultaneously:

   a.    The officer has probable cause to believe that evidence or contraband is contained in the vehicle or containers therein.

   b.    The officer possesses knowledge that the motor vehicle has the capability to become mobile.

3.    When there is a reasonable and articulable suspicion that a vehicle contains illegal drugs, an officer is authorized to walk a drug dog around the vehicle to see if the dog alerts for drugs. If the dog alerted for drugs, that factor, combined with the other factors prompting the use of the drug dog may establish probable cause authorizing the search of the vehicles interior.

4.    An officer who has made a lawful arrest of an occupant of a motor vehicle may, at the time of that arrest, search the passenger compartment of that vehicle. This right to search also applies to containers located in the passenger compartment.

5.    Officers may search a stopped automobile without a warrant if there is probable cause to believe that contraband or other evidence of crime is within the vehicle and it is not practicable to secure a search warrant. The probable cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the officer.

6.    When probable cause exists, officers may search every part of the vehicle and its contents that may conceal contraband. The scope of the warrantless search of a vehicle is not defined by the nature of the container in which the contraband is secreted; rather it is defined by the object of the search and the places in which there is probable cause to believe the contraband may be found.

7.    When a driver is arrested, and there is probable cause to believe that evidence pertaining to the crime is in the vehicle, the officer may require passengers to get out so that the officer can safely and effectively search the vehicle. Officers may search the passengers based on probable cause to arrest as a search incident to a lawful arrest.



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



8. Abandoned vehicles may be searched without a warrant as the owner has no standing or expectation of privacy. A vehicle may be temporarily abandoned, may be abandoned if given to another person, by leaving at a location for an unreasonable period of time, or after the driver of that vehicle flees the vehicle.

9. Officers may conduct an inventory of an impounded vehicle for the purpose of:

   a. Protecting the owner's property while they are in custody or elsewhere;

   b. Protecting the officer against claims of the owner for alleged missing property;

   c. Protecting the public and the police from illegal weapons which might be contained in the car;

   d. Determining whether the vehicle has been stolen

10  In conducting an inventory, an officer may check all areas of the automobile for which reasonable probable cause exists to believe might contain any of the items to be inventoried. Inventory searches serve two purposes:

   a. To protect the vehicle and the property in it; or

   b. Safeguard the officer or other officers from claims of lost possessions

5.    DEFINITIONS

5.1   Contraband: items, objects, properties that cannot be lawfully carried, possessed, furnished, or owned.

5.2   Curtilage: the area immediately surrounding a house or dwelling which is reserved for or used by the occupants for their enjoyment or work. Curtilage may or may not be enclosed by fencing and includes any outhouses such as stand-alone garages or workshops.

5.3   Exigent circumstances: an emergency or a dangerous situation, such as hot pursuit, threat to an individual's life or public safety, and/or destruction of evidence.

5.4   Fruits of the crime: material objects acquired by means in consequence of the commission of a crime and/or containing subject matter of the crime.

5.5   Motor vehicle: any vehicle operating or capable of being operated on public streets or highways, to include automobiles, trucks, trailers, recreation vehicles, mobile homes, motor homes, and any other type of vehicle, whether self propelled or towed.

5.6   Private Papers: any papers that are covered or protected by privilege, i.e., attorney-client, doctor-patient, etc.

5.7   Probable Cause: that set of facts or circumstances which would lead a reasonably prudent person using all of ones senses to believe that a crime has been, is being, or is about to be committed by the suspected person.



Atlanta Police Department Policy Manual
APD.SOP.3020
Search and Seizure



5.8     Reasonable suspicion: based on articulable facts and circumstances, which, taken together with reasonable inferences in light of an officer's training and experience, would cause an officer to conclude that a person is, has been, or is about to be, involved in criminal activity or that a person is armed with a weapon that constitutes a danger to the officer or others.

5.9     Search: a law enforcement action which infringes upon a person's reasonable expectation of privacy. A search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.

5.10    Search Warrant: a judicial command to search a place or person particularly described in the warrant and to seize the instruments, articles, or things particularly described in the warrant (OCGA § 17-5-23).

5.11    Seizure: occurs when there is some meaningful interference with an individual's possessory interests in the property seized (Maryland v. Macon, 105 S. Ct. 2778 (1985).

5.12    Stop and Frisk: a brief detention of a person to verify or dispel a reasonable and articulable suspicion of criminal activity and a pat down of the subject's outer clothing to determine the existence of weapons if there is reason to believe that such weapons exist.

6.      CANCELLATIONS

        APD.SOP.3020 "Search and Seizure", issued July 1, 2004

7.      REFERENCES

        Commission on Accreditation for Law Enforcement Agencies, (CALEA) Standard 1.2.4

# ATTACHMENT 3
# TO GIBBS' AFFIDAVIT

**Georgia Peace Officer Standards and Training Council**
**5000 Austell-Powder Springs Road, Suite 261**
**Austell, Georgia 30106**

# Officer Profile Report For:

## GREGG E JUNNIER



SEX:    M    RACE:    W        BIRTH: ████████████
                 EDUC:   HS    STATUS:    XCFM

### Officer Certifications

| | | |
|---|---|---|
| PS16970116S | LIDAR (LASER) OPERATOR | 03/14/1997 |
| PS0992R284S | RADAR OPERATOR | 12/12/1995 |
| PBLE890851S | BASIC LAW ENFORCEMENT | 04/12/1989 |

### Investigations

No Cases In File

### Employment History

| AGENCY NAME | CODE | Started | To |
|---|---|---|---|
| ATLANTA POLICE DEPARTMENT | G1505 | 04/22/1992 | 01/08/2007 |
| ATLANTA POLICE DEPARTMENT | G1505 | 09/09/1988 | 04/21/1992 |

### Training History

| DATE | NUMBER | COURSE | HOURS |
|---|---|---|---|
| 10/18/2006 | IYC25G1 | MOBILE DATA COMMUNICATIONS | 8 |
| 10/04/2006 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |

**TOTAL HOURS for 1999: 29**

| | | | |
|---|---|---|---|
| 04/28/1999 | XXC00G1 | CLANDESTINE DRUG LABS | 4 |
| 06/08/1999 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |
| 06/09/1999 | UFR00F1 | FIREARMS REQUALIFICATIONS | 8 |
| 06/29/1999 | ILM00G1 | MISCELLANEOUS LEGAL TOPICS | 1 |

**TOTAL HOURS for 2000: 35**

| | | | |
|---|---|---|---|
| 07/19/2000 | IGB01G1 | G.C.I.C. TRAINING | 2 |
| 07/19/2000 | NNG06G1 | SEXUAL HARASSMENT | 1 |
| 06/12/2000 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |
| 06/13/2000 | UFR00F1 | FIREARMS REQUALIFICATIONS | 8 |
| 10/03/2000 | NXM07G1 | METHAMPHETAMINE | 8 |

**TOTAL HOURS for 2001: 24**

| | | | |
|---|---|---|---|
| 09/24/2001 | UFR00F1 | FIREARMS REQUALIFICATIONS | 8 |
| 09/26/2001 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |

**TOTAL HOURS for 2002: 34**

| | | | |
|---|---|---|---|
| 02/22/2002 | IHB02G1 | WEAPONS OF MASS DESTRUCTION | 1 |
| 08/26/2002 | UFR00F1 | FIREARMS REQUALIFICATIONS | 8 |
| 08/28/2002 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |
| 11/04/2002 | NXM26G1 | RAVE/CLUB DRUG AWARENESS | 6 |
| 12/05/2002 | IHB03G1 | WEAPONS OF MASS DESTRUCTION | 3 |

**TOTAL HOURS for 2003: 88**

| | | | |
|---|---|---|---|
| 02/26/2003 | CAD01E1 | FIRST RESPONDER | 16 |
| 03/05/2003 | IGG00G1 | COMPUTER TRAINING | 8 |
| 03/13/2003 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |
| 03/14/2003 | UFR00F1 | FIREARMS REQUALIFICATIONS | 8 |
| 03/20/2003 | AGC23G1 | INTRODUCTION TO MICROCOMPUTERS '87 | 8 |
| 04/28/2003 | IXU00G1 | UNDERCOVER OPERATIONS | 16 |
| 05/13/2003 | IDI01G1 | MASS ARREST TRAINING | 3 |
| 08/28/2003 | ICD00G1 | DOMESTIC VIOLENCE | 4 |
| 09/11/2003 | IHG00G1 | TERRORISM | 3 |
| 10/22/2003 | NOD71G1 | MANAGING CHANGE | 6 |

**TOTAL HOURS for 2004: 56**

| | | | |
|---|---|---|---|
| 02/13/2004 | AGB08G1 | TERMINAL OPERATOR INQUIRY CERT. | 32 |
| 08/16/2004 | UFR00F1 | FIREARMS REQUALIFICATIONS | 8 |
| 08/18/2004 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |

**TOTAL HOURS for 2005: 16**

| | | | |
|---|---|---|---|
| 09/28/2005 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |

**TOTAL HOURS for 2006: 33**

| | | | |
|---|---|---|---|
| 08/28/2006 | UFR00F1 | FIREARMS REQUALIFICATIONS | 8 |
| 08/28/2006 | IDU01G1 | DEADLY FORCE/RECORDS CORRECTION | 1 |

| | | | |
|---|---|---|---|
| 05/01/1998 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |
| 04/29/1998 | UFR00F1 | FIREARMS REQUALIFICATIONS | 8 |

TOTAL HOURS for 1998: 24

| | | | |
|---|---|---|---|
| 08/13/1997 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |
| 08/11/1997 | XFR00F1 | REQUALIFICATIONS FIREARMS | 8 |
| 08/06/1997 | XLF00G1 | DISCRIMINATION IN THE WORKPLACE | 1 |
| 03/26/1997 | ITF00G1 | TRAFFIC DIRECTION AND CONTROL | 3 |
| 01/23/1997 | ITL00R1 | LASER | 6 |

TOTAL HOURS for 1997: 34

| | | | |
|---|---|---|---|
| 12/11/1996 | XQP00G | POLICY/PROCEDURES | 1 |
| 10/29/1996 | IGS00G1 | COMMUNITY ORIENTED POLICING | 3 |
| 05/17/1996 | XFR00F1 | REQUALIFICATIONS FIREARMS | 8 |
| 05/16/1996 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |
| 03/26/1996 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 3 |

TOTAL HOURS for 1996: 31

| | | | |
|---|---|---|---|
| 12/12/1995 | UTT02R | RADAR RECERTIFICATION | 4 |
| 11/15/1995 | IEC00E1 | CPR | 9 |
| 11/14/1995 | IYC00G1 | COMMUNICATIONS | 2 |
| 10/11/1995 | ID000G1 | OLEORESIN CAPSICUM | 1 |
| 09/25/1995 | IYC00G1 | COMMUNICATIONS | 2 |
| 09/20/1995 | SBE00G1 | AUTO THEFT INVESTIGATION | 2 |
| 08/30/1995 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 24 |
| 08/07/1995 | BML95G | BASIC LAW ENFORCEMENT TRAINING CRS. | 360 |
| 05/18/1995 | ILF00G1 | DISCRIMINATION IN THE WORKPLACE | 3 |
| 04/03/1995 | AXN02G1 | MARIJUANA - CERTIFIED EXAMINER CRS. | 8 |

TOTAL HOURS for 1995: 415

| | | | |
|---|---|---|---|
| 10/26/1994 | IQP00G1 | POLICY/PROCEDURES | 16 |
| 09/14/1994 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 24 |
| 08/25/1994 | ISA00T1 | ACCIDENT AVOIDANCE | 6 |

TOTAL HOURS for 1994: 46

| | | | |
|---|---|---|---|
| 11/22/1993 | Y0195G | RADAR RECERTIFICATION | 4 |
| 06/23/1993 | Y0533G | 1993 IN-SERVICE TRAINING | 24 |
| 06/16/1993 | Y0535G | OLEORESIN CAPSICUM GAS TRAINING | 2 |
| 03/31/1993 | PBI931 | CROWD CONTROL | 2 |

TOTAL HOURS for 1993: 32

| | | | |
|---|---|---|---|
| 10/09/1992 | PAE01E | PRE-SELECTION INVESTIGATOR | 40 |
| 03/27/1992 | Y0205G | IN-SERVICE TRAINING | 24 |
| 01/29/1992 | Y0291G | RADAR OPERATOR TRAINING COU | 16 |

TOTAL HOURS for 1992: 80

| | | | |
|---|---|---|---|
| 09/27/1991 | PAE013 | DUI DETECT AND FLD SOB TEST | 24 |
| 05/24/1991 | Y0283G | 1991 IN-SERVICE TRNG (OFFIC | 40 |

TOTAL HOURS for 1991: 64

```
09/10/1990   P94        FIREARMS TRAINING                        8
03/05/1990   P90   1    9MM INSERVICE TRNG                      16
03/05/1990   P94        FIREARMS TRAINING                        8

                        TOTAL HOURS for 1990: 32


                        Grand Total Hours: 1073
```

# ATTACHMENT 4
# TO GIBBS' AFFIDAVIT

**Georgia Peace Officer Standards and Training Council**
**5000 Austell-Powder Springs Road, Suite 261**
**Austell, Georgia 30106**

# Officer Profile Report For:

## JASON R SMITH



SEX:   M   RACE:  W      BIRTH:
                EDUC: H.S.   STATUS:  XAIC

## Officer Certifications

PBLE001434S    BASIC LAW ENFORCEMENT          10/04/2000

## Investigations

No Cases In File

## Employment History

| AGENCY NAME | CODE | Started | To |
|---|---|---|---|
| ATLANTA POLICE DEPARTMENT | G1505 | 12/21/1999 | -Present-- |

## Training History

| DATE | NUMBER | COURSE | HOURS |
|---|---|---|---|
| 10/18/2006 | IYC25G1 | MOBILE DATA COMMUNICATIONS | 8 |
| 08/30/2006 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |
| 08/28/2006 | IDU01G1 | DEADLY FORCE/RECORDS CORRECTION | 1 |
| 08/28/2006 | UFR00F1 | FIREARMS REQUALIFICATIONS | 8 |

TOTAL HOURS for 2006: 33

```
12/16/2005   IHM20G1   NIMS: IS-100 INTRO TO ICS              3
12/16/2005   IHM24G1   NIMS: IS-700 NIMS INTRO COURSE         3
08/10/2005   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING     16
08/08/2005   UFR00F1   FIREARMS REQUALIFICATIONS              8
06/17/2005   ABI03G1   BASIC INVESTIGATOR'S COURSE           40
05/09/2005   NKG10G1   CRIMINAL GANGS                         8
05/06/2005   IXM11G1   TACTICAL DRUG OPERATIONS              36
04/13/2005   NXC07G1   METH LABS: DETECTION & RESPONSE        4
02/15/2005   NXU03G1   UNDERCOVER OPERATIONS                 16
01/26/2005   NXN09G1   NARCOTIC FIELD TESTING                 8
```

TOTAL HOURS for 2005: 142

```
06/28/2004   UFR00F1   FIREARMS REQUALIFICATIONS              8
06/08/2004   AGB08G1   TERMINAL OPERATOR INQUIRY CERT.       32
04/23/2004   IBI00G1   INVESTIGATIONS                        40
03/30/2004   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING     16
```

TOTAL HOURS for 2004: 96

```
12/31/2003   PAV95M    20 HOUR MILITARY WAIVER               20
```

TOTAL HOURS for 2003: 20

```
12/05/2002   IHB02G1   WEAPONS OF MASS DESTRUCTION            3
07/24/2002   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING     16
07/22/2002   UFR00F1   FIREARMS REQUALIFICATIONS              8
02/21/2002   IHB02G1   WEAPONS OF MASS DESTRUCTION            1
```

TOTAL HOURS for 2002: 28

```
11/28/2001   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING     16
11/26/2001   UFR00F1   FIREARMS REQUALIFICATIONS              8
07/13/2001   IFO00F1   OFFICER SURVIVAL                       8
```

TOTAL HOURS for 2001: 32

```
10/17/2000   BMS02G1   EXTENDED BASIC MANDATE (ATLANTA PD)  600
09/01/2000   BML99G1   BASIC LAW ENFORCEMENT TRAINING CRS.  400
08/15/2000   ATL01R1   LIDAR SPEED MEASUREMENT                8
```

TOTAL HOURS for 2000: 1008

Grand Total Hours: 1359

# ATTACHMENT 5
# TO GIBBS' AFFIDAVIT

**Georgia Peace Officer Standards and Training Council**
**5000 Austell-Powder Springs Road, Suite 261**
**Austell, Georgia 30106**

# Officer Profile Report For:

### ARTHUR B TESLER



| | | | | |
|---|---|---|---|---|
| SEX: | M | RACE: | W | BIRTH: |
| | | EDUC: HS | STATUS: | XAFC |

## Officer Certifications

| | | |
|---|---|---|
| PS16020245S | LIDAR (LASER) OPERATOR | 05/10/2002 |
| PBLE000880S | BASIC LAW ENFORCEMENT | 05/26/2000 |

## Investigations

No Cases In File

## Employment History

| AGENCY NAME | CODE | Started | To |
|---|---|---|---|
| ATLANTA POLICE DEPARTMENT | G1505 | 08/03/1999 | -Present-- |

## Training History

| DATE | NUMBER | COURSE | HOURS |
|---|---|---|---|
| 07/19/2006 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |
| 07/17/2006 | IDU01G1 | DEADLY FORCE/RECORDS CORRECTION | 1 |
| 07/17/2006 | UFR00F1 | FIREARMS REQUALIFICATIONS | 8 |
| 06/27/2006 | IYC25G1 | MOBILE DATA COMMUNICATIONS | 8 |

```
04/17/2006   NXI03G1   HIGHWAY DRUG INTERDICTION            8
02/28/2006   NYT00G1   COURTROOM DEMEANOR & TESTIMONY      16
01/17/2006   ADO04G1   O.C. FAMILIARIZATION                1

              TOTAL HOURS for 2006: 58


12/16/2005   IHM20G1   NIMS: IS-100 INTRO TO ICS           3
12/16/2005   IHM24G1   NIMS: IS-700 NIMS INTRO COURSE      3
08/03/2005   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING  16
08/01/2005   UFR00F1   FIREARMS REQUALIFICATIONS           8
06/17/2005   ABI03G1   BASIC INVESTIGATOR'S COURSE         40
04/29/2005   ITI01G1   ON SCENE ACCIDENT INVEST. LEVEL 2  40
01/12/2005   ABM11G1   FINANCIAL INVESTIGATION            24

              TOTAL HOURS for 2005: 134


11/19/2004   IBI00G1   INVESTIGATIONS                     40
10/18/2004   IBF00G1   FINGERPRINTING                      4
09/17/2004   ATI12G1   ON SCENE ACCIDENT INVESTIGATION    80
06/28/2004   UFR00F1   FIREARMS REQUALIFICATIONS           8
05/25/2004   IGM34G1   G8 - PROTECTIVE OPERATIONS          3
05/11/2004   IGM34G1   G8 - PROTECTIVE OPERATIONS          6
03/30/2004   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING  16
03/25/2004   ODR01G1   MOBILE FIELD FORCE                 24

              TOTAL HOURS for 2004: 181


10/22/2003   NOD71G1   MANAGING CHANGE                     6
05/20/2003   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING  24
05/13/2003   IDR01G1   MASS ARREST TRAINING                3

              TOTAL HOURS for 2003: 33


12/02/2002   IHB02G1   WEAPONS OF MASS DESTRUCTION         3
06/04/2002   ASE00T1   EMERGENCY VEHICLE OPERATIONS       16
05/20/2002   AXM07G1   DRUG IDENTIFICATION                 8
04/17/2002   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING  16
04/15/2002   UFR00F1   FIREARMS REQUALIFICATIONS           8

              TOTAL HOURS for 2002: 51


07/28/2001   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING  16
07/25/2001   UFR00F1   FIREARMS REQUALIFICATIONS           8

              TOTAL HOURS for 2001: 24


08/07/2000   IGB01G1   G.C.I.C. TRAINING                   2
08/07/2000   NNG06G1   SEXUAL HARASSMENT                   1
06/06/2000   BMS02G1   EXTENDED BASIC MANDATE (ATLANTA PD) 600
06/06/2000   BML99G1   BASIC LAW ENFORCEMENT TRAINING CRS. 400
04/07/2000   IGC00G2   COMPUTER TRAINING                   8
04/06/2000   IGC00G1   COMPUTER TRAINING                   8

              TOTAL HOURS for 2000: 1019



              Grand Total Hours: 1500
```

4/30/2007 9:12 AM

# ATTACHMENT 6
# TO GIBBS' AFFIDAVIT

Georgia Peace Officer Standards and Training Council
5000 Austell-Powder Springs Road, Suite 261
Austell, Georgia 30106

# Officer Profile Report For:

## WILBERT T STALLINGS

★★★—★★—███████

SEX:   M   RACE:   B   BIRTH: ████████
EDUC: HS000

### Officer Certifications

PBLE851076S   BASIC LAW ENFORCEMENT                10/29/1985

### Officer Speed Detection Certifications

PS0984R232N   RADAR OPERATOR                       04/30/1984
          RADAR Certification expires  12/31/1986

### Instructor Certifications
No Instructor Certification currently in File.

### Investigations

No Cases In File

### Employment History

| AGENCY NAME | CODE | Started | To |
|---|---|---|---|
| ATLANTA POLICE DEPARTMENT | G1505 | 10/29/1985 | Present |
| ATLANTA POLICE DEPARTMENT | G1505 | 03/05/1985 | 10/28/1985 |

### Training History

| DATE | NUMBER | COURSE | HOURS |
|---|---|---|---|
| 10/04/2006 | UFRO0F1 | FIREARMS REQUALIFICATIONS | 8 |
| 09/06/2006 | IYC25G1 | MOBILE DATA COMMUNICATIONS | 8 |
| 05/10/2006 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |

TOTAL HOURS for 2006: 32

| | | | |
|---|---|---|---|
| 12/16/2005 | IHM20G1 | NIMS: IS-100 INTRO TO ICS | 3 |
| 12/16/2005 | IHM24G1 | NIMS: IS-700 NIMS INTRO COURSE | 3 |
| 11/18/2005 | UFRO0F1 | FIREARMS REQUALIFICATIONS | 8 |
| 05/18/2005 | INA00G1 | ATLANTA ANNUAL INSERVICE TRAINING | 16 |
| 05/16/2005 | NXI02G1 | STASH HOUSE & HOTEL/MOTEL INTERDICTI | 8 |

TOTAL HOURS for 2005: 38


```
05/14/2004   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING      16
05/12/2004   UFR00F1   FIREARMS REQUALIFICATIONS               8
02/13/2004   AGB08G1   TERMINAL OPERATOR INQUIRY CERT.        32
01/26/2004   IXI02G    COMMERCIAL VEHICLE DRUG INTERDICTION   16
```

TOTAL HOURS for 2004: 72


```
10/22/2003   NOD71G1   MANAGING CHANGE                         6
10/02/2003   IXS00G    SEARCH & SEIZURE IN DRUG CASES         24
05/13/2003   IDR01G1   MASS ARREST TRAINING                    3
04/28/2003   IXU00G1   UNDERCOVER OPERATIONS                  16
```

TOTAL HOURS for 2003: 49


```
12/13/2002   IHB02G1   WEAPONS OF MASS DESTRUCTION             3
09/18/2002   IQS00G1   SUPERVISION                             2
08/26/2002   UFR00F1   FIREARMS REQUALIFICATIONS               8
04/26/2002   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING      16
02/22/2002   IHB02G1   WEAPONS OF MASS DESTRUCTION             1
```

TOTAL HOURS for 2002: 30


```
09/14/2001   AQS07G1   SUPERVISORY TRNG. (ATLANTA P.D.)        3
08/17/2001   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING      16
08/15/2001   UFR00F1   FIREARMS REQUALIFICATIONS               8
04/24/2001   IXN00G    NARCOTICS AND DANGEROUS DRUGS           8
```

TOTAL HOURS for 2001: 35


```
12/12/2000   NNG06G1   SEXUAL HARASSMENT                       1
12/12/2000   IGB01G1   G.C.I.C. TRAINING                       2
10/03/2000   NXM07G1   METHAMPHETAMINE                         8
09/20/2000   UFR00F1   FIREARMS REQUALIFICATIONS               8
09/19/2000   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING      16
```

TOTAL HOURS for 2000: 35


```
09/29/1999   ILM00G1   MISCELLANEOUS LEGAL TOPICS              1
08/20/1999   XQE00G1   EVALUATIONS                            16
04/28/1999   UFR00F1   FIREARMS REQUALIFICATIONS               8
04/27/1999   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING      16
```

TOTAL HOURS for 1999: 41


```
04/30/1998   NGC02G1   COMPUTER AND DATA SECURITY              3
03/25/1998   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING      16
03/23/1998   UFR00F1   FIREARMS REQUALIFICATIONS               8
01/14/1998   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING       1
```

TOTAL HOURS for 1998: 28

```
09/29/1997   NGS00G1   COMMUNITY ORIENTED POLICING              3
09/03/1997   ILF00G1   DISCRIMINATION IN THE WORKPLACE          1
05/22/1997   ITM00G1   MISCELLANEOUS TRAFFIC                   16
03/13/1997   ITF00G    TRAFFIC DIRECTION AND CONTROL            3
02/26/1997   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING       16
02/24/1997   XFR00F1   REQUALIFICATIONS FIREARMS                8

                     TOTAL HOURS for 1997: 47


11/21/1996   XQP00G    POLICY/PROCEDURES                        1
11/15/1996   XQS00G    SUPERVISION                             24
10/23/1996   XYC00G1   COMMUNICATIONS                           3
09/25/1996   IGS00G    COMMUNITY ORIENTED POLICING              3
05/30/1996   XFR00F1   REQUALIFICATIONS FIREARMS                8
05/10/1996   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING        8
05/07/1996   IGU00G1   OLYMPIC SECURITY TRAINING                4
04/29/1996   IGU00G1   OLYMPIC SECURITY TRAINING                8
03/08/1996   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING        3
02/05/1996   IEC00E1   CPR                                      9

                     TOTAL HOURS for 1996: 71


11/08/1995   INA00G1   ATLANTA ANNUAL INSERVICE TRAINING        8
10/19/1995   IDO00G1   OLEORESIN CAPSICUM                       1
09/28/1995   IYC00G1   COMMUNICATIONS                           2
07/21/1995   AQS07G1   SUPERVISORY TRNG. (ATLANTA P.D.)        80
05/17/1995   ILF00G1   DISCRIMINATION IN THE WORKPLACE          3

                     TOTAL HOURS for 1995: 94


08/17/1994   ISA00T1   ACCIDENT AVOIDANCE                       6

                     TOTAL HOURS for 1994: 6


07/23/1993   Y0533G    1993 IN-SERVICE TRAINING                24
06/10/1993   Y0576G    OLEORESIN CAPSICUM                       2
03/16/1993   PBI931    CROWD CONTROL                            2

                     TOTAL HOURS for 1993: 28


11/06/1992   PAE01E    PRE-SELECTION INVESTIGATOR              40
05/01/1992   Y0205G    IN-SERVICE TRAINING                     24

                     TOTAL HOURS for 1992: 64


11/02/1991   Y0198G    1991 IN-SERVICE TRAINING                40

                     TOTAL HOURS for 1991: 40


10/17/1990   Y0174G    SHOTGUN INSERVICE                        8
06/06/1990   P90  1    9MM INSERVICE TRNG                      16
```

```
06/06/1990   P94       FIREARMS TRAINING                          8
                       TOTAL HOURS for 1990: 32


11/02/1989   P89 13   89 INSERVICE TRAINING                      22
11/02/1989   P94       FIREARMS TRAINING                          8
                       TOTAL HOURS for 1989: 30


05/12/1986   P94       FIREARMS TRAINING                          8
                       TOTAL HOURS for 1986: 8


09/06/1985   BML92G   BASIC LAW ENFORCEMENT TRAINING COURS  240
                       TOTAL HOURS for 1985: 240


                       Grand Total Hours: 1020
```