# EXHIBIT "G"

# AFFIDAVIT OF MAJOR LANE HAGIN

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| SARAH DOZIER, as Administrator of the Estate of KATHRYN JOHNSTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **CIVIL ACTION CASE NO. 1:08-CV-00007-MHS** |
| CITY OF ATLANTA, et al., | ) ) | |
| Defendants. | ) | |

### AFFIDAVIT OF MAJOR LANE HAGIN

Now before me, the undersigned officer duly sworn to administer oaths, appeared affiant MAJOR LANE HAGIN who, after being sworn and placed under oath, gave the following testimony based upon his personal knowledge and information.

1.

My name is Lane A. Hagin. I am over the age of eighteen, suffer from no mental or legal disabilities and freely give the following testimony based upon my own knowledge and personal observations.

2.

I am a major with the Atlanta Police Department. I have been an officer with the Atlanta Police Department for seventeen years.

3.

I am currently the commanding officer of the Office of Professional Standards ("OPS").

4.

OPS investigates allegations of criminal misconduct and violations of Atlanta Police Department's Standard Operating Procedures (SOPs) by members of the Atlanta Police Department.

5.

As part of my duties as commander of OPS, I am in charge of the Atlanta Police Department's internal criminal investigation arising out of the November 21, 2006 shooting of Kathryn Johnston.

6.

A review of OPS Complaint history from 2001 through and including 2006 does not reveal any prior similar incidents of misconduct of the type that occurred in the Neal Street incident or the facts leading up to that incident.  There have, however, been three (3) citizen complaint incidents since 2003 that may be considered relevant but not conclusive:  a)  Ms. Mary McCoy (filed May 19, 2003);  b)  Mr. Alphonso Howard (filed March 3, 2005); and c)  Latisha Colbert (filed January 8, 2008).  Other than these isolated incidents, OPS does not have any

other record of prior acts of misconduct similar to the acts of Junnier, Smith and Tesler in the Neal Street shooting.

7.

The present investigation is based in large part on information gathered by the FBI and presented to the Atlanta Police Department in a written report on November 3, 2008. While the FBI conducted their investigation into the Kathryn Johnston shooting incident, my office was asked to suspend its investigation until the FBI had completed their investigation [See FBI Letter and Report filed under seal with this motion].

8.

As the OPS investigation is active and ongoing, the disclosure of the FBI's report to the public would severely hamper the Atlanta Police Department's ability to investigate and arrest any individuals suspected of criminal wrongdoing.

**FURTHER AFFIANT SAYETH NOT.**

_____
**MAJOR LANE HAGIN**

Sworn to and subscribed before me, this __3__ day of __December__ , 2009.

_____
Notary Public
My commission expires: _____

438005-1                                   3

# ATTACHMENT 1 TO HAGIN'S AFFIDAVIT

# FBI LETTER AND REPORT NOVEMBER 3, 2008:

# INVESTIGATIVE FINDINGS RELATED TO THE DEATH OF KATHRYN JOHNSTON WHICH OCCURRED ON NOVEMBER 21, 2006

## THIS DOCUMENT IS PRESENTED IN THE ORDER THE REPORT SHOULD BE READ – IT IS **NOT** IN BATES-NUMBERED ORDER

# CONFIDENTIAL 

**U.S. Department of Justice**



Federal Bureau of Investigation

---

In Reply, Please Refer to
File No.

2635 Century Parkway NE
Atlanta, Georgia 30345
404-679-9000
November 3, 2008

Dear Chief Pennington:

The purpose of this letter[1] is to provide a synopsis of the investigative findings related to the death of Kathryn Johnston which occurred on November 21, 2006 at 933 Neal Street, Atlanta, Georgia.  During the course of the investigation of Ms. Johnston's death, the Federal Bureau of Investigation (FBI) discovered evidence of other criminal acts and misconduct by several police officers within your department.  This letter will generally address the following areas of concern: the Neal Street shooting, search warrant affidavits, quotas on search warrants and arrests, on-duty extra jobs, training, and management oversight.

The information contained in this letter is being presented in a summary format and is not intended to address every detail of the FBI investigation.  Interview reports and other documents are attached and should be considered the primary source of evidence.  In addition, we are providing no federal grand jury information and information restricted to federal use.

As you are aware, the FBI initiated a civil rights investigation of the shooting on November 27, 2006 based on a complaint received from Alexis White, the Atlanta Police Department (APD) informant who purportedly provided the probable cause to obtain the search warrant for 933 Neal Street.

As a result of the investigation, APD Officers Gregg Junnier and Jason Smith pleaded guilty to conspiracy to violate civil rights (resulting in death) in the United States District Court and voluntary manslaughter in state court.  Both are currently incarcerated and are awaiting sentencing.  APD Officer Arthur Bruce Tesler was found guilty of false statements in a state court jury trial and was sentenced to four and a half years

---

[1] The information contained in this letter is the property of the Federal Bureau of Investigation (FBI), and may be distributed to State, Local, or Tribal government Law Enforcement officials with a need to know, and for official purposes.  Further distribution without FBI authorization is prohibited.  Precautions should be taken to ensure that this information is stored and/or destroyed in a manner that will prevent unauthorized access.

# CONFIDENTIAL



in state prison.  Officer Tesler recently pleaded guilty to conspiracy to violate civil rights (resulting in death) in the United States District Court based on his role in the Neal Street shooting and other illegal activity.  Sergeant Wilbert Stallings pleaded guilty in United States District Court to conspiracy to violate civil rights on a search unrelated to the Neal Street shooting and is awaiting sentencing.  Officer Daniel Betts pleaded guilty in United States District Court to extortion under color of law and was sentenced to six months home confinement and two and a half years on probation.

The United States Attorney's Office has determined, based upon the evidence, law, and other circumstances of individual cases, that no further federal criminal prosecutions are anticipated as a result of the FBI investigation to date.  The United States Attorney has authorized the FBI to disclose information about potential misconduct by other APD officers to APD for consideration of possible administrative discipline and/or state criminal prosecution.

## Neal Street Shooting

The following information is a synopsis of what was discovered by the FBI investigation to have occurred leading up to the shooting, the shooting itself, and the events that transpired in the days following the shooting incident.  The majority of this information was obtained through interviews of Alexis White, APD's  informant; the admissions of APD Officers Gregg Junnier, Arthur Tesler, and Jason Smith; interviews of other APD Officers and witnesses; and other various records, photographs, and APD documents.  The Georgia Bureau of Investigation (GBI) and APD crime scene unit provided the majority of forensic information obtained from the shooting location.

On November 21, 2006, at approximately 2:00 p.m.,  APD Officers Junnier, Tesler, and Smith were patrolling in a marked APD police car at an apartment complex located at 350 Lanier Street.  While checking some of the vacant apartments and the wood line adjacent to the apartments, Officer Smith located several plastic baggies that contained marijuana.  Officer Smith placed the abandoned drugs in the trunk of the police car.

At approximately 4:00 p.m., Officer Smith received information from an APD confidential, registered informant that a known drug dealer named Fabian Sheets was dealing drugs outside a store located at 1143 Simpson Road.  The three officers drove out to that location and saw Sheets.  After a short chase, Sheets was apprehended.  An APD Canine Officer, Connie Carson, was dispatched to the scene and found several plastic baggies which contained marijuana and two hits of crack cocaine in the general

2

DOZIER-COA
00002

# CONFIDENTIAL

area of Sheets' location.  The officers knew Sheets had a lengthy criminal history and encouraged him to give them drug information or else face a long sentence for the drugs that were found in his possession.  Sheets told the officers that a kilogram of cocaine was being cut up at 933 Neal Street by a black male named "Sam." Officers Junnier, Tesler, and Smith then drove Sheets to 933 Neal Street where he affirmatively pointed out that address as being the residence containing the cocaine.  Sheets has consistently denied that he ever gave the officers any information, but all three officers claimed it was Sheets that told them about 933 Neal Street.  The FBI investigation did not identify any other logical reason for the officers to have focused on 933 Neal Street.

Based on Sheets' information, Junnier called White at about 5:00 p.m. and asked if he could make a drug purchase for them.  White told Junnier he would do it, but he had no way to travel to Junnier's location which was at least 20 minutes away. Officer Junnier decided there was not enough time to go get White, so he told White that he would call back.  Officers Junnier, Tesler, and Smith, along with Sheets in the vehicle, drove to the Fulton County Jail.  Officer Smith then went to the Warrant Room and typed an electronic search warrant affidavit. The affidavit reflected that, "a confidential and reliable informant" was used to make a drug purchase from 933 Neal Street from a person only known as "Sam."  The FBI investigation revealed that all the substantive information contained in the affidavit was false.  Officer Smith also requested a no-knock provision to the search warrant, falsely citing that surveillance cameras were located at 933 Neal Street.  Officer Smith swore to the affidavit before Fulton County Magistrate Kim Warden via teleconference.  Officer Smith returned to the vehicle and announced to Officers Junnier and Tesler that he had obtained a search warrant for the Neal Street location.

On that same day, at approximately 6:30 p.m., APD Narcotics Team 1 assembled at an Atlanta Fire Station located at 1048 Simpson Road.  The assembled team consisted of APD Officers Junnier, Tesler, Jason Smith, Cary Bond, Nathan Lucas, Maurice Guerin, Gary Smith, and Sergeant Wilbert Stallings.  Narcotics Team 1 member Holly Buchanan was not present, as she was on leave that day.  An operations plan was developed and assignments were given out in anticipation of executing the search warrant at 933 Neal Street.  During the briefing, Officer Jason Smith falsely told the team that a drug purchase had been made at 933 Neal Street.

At approximately 7:00 p.m., the team approached 933 Neal Street and attempted to breach the front door.  The team had trouble forcing the burglar bar door covering the wooden front door.  Several of the officers then yelled out "Police!" since

3

DOZIER-COA
00003

## CONFIDENTIAL

the element of surprise was gone.  As the front door was opening,
the team was fired on by Ms. Johnston.  Ms. Johnston shot at
least one round from a .38 revolver in the direction of the
officers from inside the residence.  Officers Junnier, Jason
Smith, Bond, Gary Smith, and Lucas returned fire striking Ms.
Johnston a number of times causing her death.  The GBI was unable
to ascertain which officers' rounds actually killed Ms. Johnston.
Officers Junnier, Bond, and Gary Smith received injuries as a
result of shots and/or ricochets from police weapons.  There has
been no evidence discovered by the FBI investigation at this time
to suggest that anyone other than Officers Junnier, Jason Smith,
and Tesler knew the information in the affidavit was false prior
to execution of the search warrant.

     After the shooting at 933 Neal Street, Officers
Junnier, Smith, and Tesler immediately began to take several
steps to cover up the fact that they had obtained a search
warrant based on fabricated evidence.  Once the rest of the team
cleared the house after the shooting, Officer Smith realized that
only an elderly woman lived at the address, and it was unlikely
that any drugs would be found.  Officers Smith, in the presence
of Officer Tesler, then planted three of the baggies containing
marijuana from 350 Lanier Street on the basement floor of the
residence.  These baggies were later found by APD Canine Officer
Carson's drug dog "Chad."  Officer Smith then turned the two hits
of crack cocaine seized earlier in the day from the area near
Sheets into evidence and claimed it was the cocaine bought from
"Sam" at 933 Neal Street.  Officers Smith and Tesler destroyed
the remaining similar baggies containing marijuana from 350
Lanier Street by throwing them in to a storm sewer so that no one
could match them to the baggies planted at 933 Neal Street.
Officer Tesler completed a false APD report about Sheets' arrest
and turned in the remaining marijuana found at 1143 Simpson.
When Tesler was later questioned by Canine Officer Carson about
the weight of the cocaine and marijuana she recovered at 1143
Simpson, Tesler lied and told her it was fake crack cocaine and
that he threw it away.

     Officers Junnier, Smith, and Tesler had several
conversations with White about creating a cover story for the
fake drug purchase at 933 Neal Street.  On November 23, 2006
Officer Smith took White to APD City Hall East to sign a
backdated voucher.  Officer Smith paid White $50 from the voucher
and Officer Junnier arranged for White to be paid $100 from one
of Officer Junnier's "extra jobs."  At first, White agreed to
cover for the officers, but once he realized the seriousness of
the situation and believed the officers would blame him for the
bad information in the search warrant affidavit, he reported the
truth to Bureau of Alcohol, Tobacco, Firearms, and Explosives
Special Agents and the news media and began to cooperate with the
FBI.

DOZIER-COA
00004

# CONFIDENTIAL

Officers Junnier, Smith, and Tesler also met several times to make sure their stories matched. They even went so far as to travel the route they would have taken had White actually made the drug purchase at 933 Neal Street. Officers Smith and Tesler then lied in their initial interviews to the FBI about their involvement. All this was done in an effort to conceal the true circumstances of 933 Neal Street from APD, the FBI, and the public.

APD Affidavits

During the course of the FBI investigation, interviews of APD officers, interviews of APD informants, and a review of APD records revealed that several members of Narcotics Team 1 and officers from other APD units falsified information on numerous search warrant affidavits. Based on this information, the FBI conducted an investigation of each officer on Narcotics Team 1 and other implicated officers. Each officer is addressed below.

Officer Gregg Junnier:

Officer Junnier was interviewed several times by the FBI. He not only admitted his role in the Neal Street shooting, but he also admitted that the probable cause was fabricated for the search warrant obtained in November 2006 at 161 Rhodesia Avenue, Atlanta, Georgia. Officer Junnier was the Affiant on that search warrant. Officer Junnier also advised that there may have been one other warrant where the probable cause was mostly fabricated. To date that location has not been discovered.

In addition to admitting his own wrongdoing, Officer Junnier identified seven areas where he and other APD officers falsified information on affidavits and APD paperwork. First, officers routinely stated in search warrant affidavits that they observed informants go to the door of a house and buy drugs when in fact the officers did not observe the transaction and were usually not in the vicinity.

Second, officers padded APD vouchers. For example, an officer would turn in a voucher stating that an informant bought $50 worth of drugs when in reality the informant only bought $40 worth of drugs. The extra $10 would be used to buy the informant gas or food.

Third, although informants typically drove themselves to make drug purchases, officers would state in affidavits that they rode in the vehicle with the informant.

Fourth, Officer Junnier admitted that he and many other officers rarely, if ever, actually patted down their informants before and after sending them to make a drug purchase. This was

5

## CONFIDENTIAL

contrary to what was sworn to by Officer Junnier and the other officers in their search warrant affidavits.

Fifth, if a drug purchase became stale, Officer Junnier and other officers would often write into an affidavit that he conducted surveillance where he witnessed drug activity, when in fact he did not witness the activity.

Sixth, APD officers would sometimes use an unregistered informant to make a drug purchases. Officers falsely stated in search warrant affidavits that "a registered, confidential and reliable source" was used to make a drug purchase. In fact, the source used was both unregistered and unreliable. Sometimes the officers would split the money for the buy between both informants.

Finally, it was common practice to use "hand-offs." "Hand-offs" consisted of one officer providing information to establish probable cause to another officer to include in an affidavit for a search warrant. The second officer would then write the affidavit stating that the second officer actually had first hand knowledge of the information. As an example, Officer Junnier admitted taking White by himself and making several undercover drug purchases. Officer Junnier then placed all of the drugs into evidence and provided the purchase information to other officers. These other officers then wrote the information up in affidavits for search warrants swearing that they actually witnessed White making the drug purchases. A review of search warrant affidavits, APD property log books, and APD incident reports corroborated Officer Junnier's information about search warrant practices.

The FBI investigation revealed that one of the main reason "hand-offs" were done was so they would not spend all of their time in court testifying about drug purchases. This freed up time for officers to work more cases and work unauthorized "extra jobs" while on duty.

Officer Jason Smith:

Like Officer Junnier, Officer Smith admitted his role in the Neal Street shooting and his participation in the fabricated search warrant affidavit at 161 Rhodesia Avenue. Officer Smith further corroborated Officer Junnier by admitting his knowledge and participation in "hand-offs," padding vouchers, and failing to supervise informants properly. He also admitted to using "INS" or insurance drugs. "INS" drugs were drugs used to plant on suspected drug dealers to encourage them to cooperate with the police. Officer Smith also described what was known as a "Thunder Run" or "Jump Out." This was when Officer Smith and other members of Narcotics Team 1 would stop a person on the

6

## CONFIDENTIAL

street without any probable cause or reasonable suspicion and search that person for weapons and drugs.

Officer Arthur Bruce Tesler:

Prior to Neal Street, Officer Tesler obtained search warrants for 2139 Martin Luther King Drive, N.W., 1370 Graymont Drive, S.W., and 1981 Martin Luther King Drive. Officer Tesler falsely swore before a state magistrate judge that he witnessed a controlled drug purchase at each of these locations when in fact he did not. Officers Junnier, Smith, and other APD officers confirmed that several of Officer Tesler's warrants were "hand-offs."

Officer Holly Buchanan:

Officer Junnier stated that Officer Buchanan took "hand-offs" from him on at least two search warrant affidavits. At 2479 Abner Terrace, Officer Buchanan obtained a search warrant based on a drug purchase made by White. However, White claimed that he attempted to make a purchase at that location for Officer Buchanan, but he told her that he was unable to make the purchase. Officer Buchanan is also believed to have used an unregistered informant several times to obtain search warrants.

Officer Cary Bond:

Officer Bond admitted to the FBI that he padded vouchers and had informants sign blank vouchers. White claims that he never made a drug purchase from 674 Alta Place. A review of White's informant file showed that the search warrant obtained for 674 Alta Place was based on a drug purchase made by White. That information was included in a search warrant affidavit swore to by Officer Bond. White also suspected that Bond received several "hand-offs" from Officer Junnier. Officer Junnier claimed that Bond was present when White was unable to make a drug purchase at 161 Rhodesia Avenue.

Officers Gary Smith, Nathan Lucas and Maurice Guerin:

There was no credible evidence discovered during the investigation that implicated Officers Smith, Lucas, or Guerin in any wrongdoing related to this case.

Officer Brad Burchfield:

Officer Burchfield was assigned to APD's Zone 1 Field Investigative Team and occasionally used White as an informant to make drug purchases. White described in detail how in November 2006 Officer Burchfield split a rock of crack cocaine White had purchased previously that day from a residence. Officer

7

# CONFIDENTIAL

Burchfield told White that he was going to use one of the pieces of crack as evidence of a drug purchase from a residence located at 826 Wood Street. White had attempted to purchase drugs from 826 Wood Street earlier that day but was unsuccessful. Officer Burchfield filled out a voucher as if White had in fact purchased the crack from 826 Wood Street. Burchfield never obtained a search warrant for the location.

Officer Paul Vignola:

Officer Vignola was a former member of Narcotics Team 1 and worked with Officer Junnier. Officer Junnier claimed that Officer Vignola accepted several "hand-offs" when they worked together. One APD officer told the FBI that Junnier learned to do "hand-offs" from Officer Vignola. Officer Vignola used White as an informant on several occasions.

Other Officers:

During the course of the investigation, the FBI heard that other officers were participating in falsifying search warrant affidavits. Most of these allegations dealt with "hand-offs." According to Officer Junnier, an examination of the drug property log books may reveal which officers received "hand-offs." Officer Junnier advised that by comparing entries in the log books where Officer Junnier or other officers had logged in several different drug purchases in one day with the drug purchase location to a particular search warrant, it could possibly be determined if a "hand-off" occurred.

Quotas for Search Warrants and Arrests

Throughout the investigation of Neal Street, APD officers that worked narcotics referred to "nine and two." According to several officers, this was an unwritten quota requirement known among narcotics units. Almost all the APD officers interviewed by the FBI acknowledged the existence of a rule that required narcotics officers to obtain at least two narcotics search warrants and make nine narcotics related arrests per month. Some officers indicated that their performance appraisals were tied directly to the "nine and two" requirement. Other officers downplayed the significance of "nine and two" but pointed to a more indirect result of not achieving the quota. If an officer's performance was poor then that officer risked being sent to another unit. Many officers viewed this as a punishment, because the flexibility of a narcotics unit assignment allowed them to work some of the better and higher paying off duty jobs. Some officers advised they were happy with the "nine and two" quota, because it forced lazy officers to work harder.

8

DOZIER-COA
00008

# CONFIDENTIAL



        Another indicator the quota system was at least
perceived to be in effect for narcotics units at APD was the fact
that the vast majority of APD narcotics investigations were
limited to street level deals.  The APD narcotics teams appeared
to work as a street interdiction team making small drug busts
instead of focusing on longer term narcotics investigations with
much larger drug and money seizures.  Atlanta has been a major
drug distribution area for the last several years.  Other local,
state, and federal agencies in the Atlanta metropolitan area are
leading the nation in drug and money seizures.

        At least one high ranking officer within APD admitted
to the FBI that many officers do in fact believe an unwritten
quota system is in effect.  This is based on the fact that one of
the three core elements that APD officers are evaluated on is
based on monthly and yearly averages of arrests and search
warrants.

APD On-Duty "Extra Jobs"

        Another problem discovered during the course of the FBI
investigation dealt with APD officers' receipt of payment for
"extra jobs" that in fact were worked during on-duty hours.  The
FBI investigation revealed an environment that was created among
many business owners in APD Zone 1 who felt that they must pay
APD officers in order to get responsive, on duty police service.
Many businesses got to the point where they would call the
officer who was employed through their "extra job" instead of
calling 911.  Under this arrangement, these officers responded to
calls even when on duty and received extra pay for their
services.  If the officer was off duty and unable to respond, he
would often call an officer who was on duty and ask him to
respond in their place.  The responding officer would often times
get a percentage of the "extra job" money for responding.

        During the debriefings of Officers Junnier and Smith,
they acknowledged that they worked and got paid for their "extra
jobs" while on duty.  These "extra jobs" mainly included
businesses and apartment complexes in APD Zone 1.  Officer
Junnier sometimes submitted requests to work "extra jobs" at
these businesses, claiming to be working as a "consultant."
Officers Smith and Tesler never submitted the required requests.
Junnier claims that he learned how to work these unauthorized
jobs from a former APD narcotics lieutenant.  Officer Junnier
further acknowledged that he frequently lied on APD reports about
the location of where he arrested drug suspects.  He did this in
an effort to help conceal the fact that there was drug activity
at his "extra job" locations.

DOZIER-COA
00009

# CONFIDENTIAL

Officers Junnier, Smith, and Tesler routinely used marked APD cars to patrol their "extra job" businesses while on duty. The FBI investigation revealed that they were actually patrolling at 350 Lanier Street several hours before the Neal Street shooting, thereby working an "extra job" while they were on duty. Some APD officers used the entire Narcotics Unit to do details at their "extra job" businesses. One of the business owners stated that after hiring Officer Smith as a security consultant, the narcotics unit made 32 arrests at his apartment complex in a 60 day period. However, another complex in the same area that did not pay APD officers stated they were unable to get any type of support from APD despite making numerous calls and complaints.

One of the more egregious examples of an officer abusing "extra jobs" involved APD Officer Daniel Betts. When Officer Junnier was suspended as a result of the FBI investigation of Neal Street, he handed over all of his "extra jobs" to APD Zone 1 Officer Brad Burchfield. Officer Burchfield told Officer Junnier he would use other Zone 1 officers to assist him with the jobs. When Officer Burchfield was suspended, he handed over some of the "extra jobs" to Officer Betts. At one of the "extra jobs," the FBI discovered that Officer Betts was merely collecting money from the apartment complex owner and providing no off duty service. Officer Betts made it clear to the owner that he was only being paid for providing services that would normally be provided to any citizen of Atlanta. Officer Betts provided a percentage of this "extra job" money to Officer Burchfield even though Officer Burchfield was suspended.

<u>Training</u>

Throughout the investigation of Neal Street many officers were interviewed about their involvement in falsifying information on search warrant affidavits. Some of these officers frequently cited a lack of training by APD as a reason for the bad warrants. Most complained that they never received any formal training from APD on how to write a search warrant affidavit. However, most of the narcotics affidavits that were reviewed listed a litany of training received for narcotics investigations for each officer. Many of the affidavits reviewed contained properly written third party affidavits, as opposed to "hand-offs," which indicated that at least some officers were aware of how to write truthful and accurate search warrant affidavits.

There was no evidence to suggest that APD provided training to its officers instructing them to lie or fabricate information to put in sworn search warrant affidavits. However, some members of Narcotics Team 1 did indicate that they were

10

# CONFIDENTIAL

taught to falsify affidavits through Officer Junnier and
Narcotics Team 1 Sergeant Wilbert Stallings.

<u>Management Oversight</u>

The FBI investigation revealed that the majority of APD
officers assigned to Narcotics Team 1 participated at some level
in falsifying search warrant affidavits, falsifying APD
paperwork, improperly using informants, and/or working "extra
jobs" that violated APD policy.  The FBI investigation revealed
that these officers were able to freely engage in such activity,
in part, because their direct supervisor, Sergeant Wilbert
Stallings, participated in these illegal activities as well.
Several examples of Stallings' behavior were discovered during
the FBI investigation.

First, Sergeant Stallings participated in searching a
home without a valid search warrant.  In October, 2005, Sergeant
Stallings joined other APD officers in executing a search warrant
at a duplex apartment located at 1058 Dill Avenue, Atlanta,
Georgia.  Officer Junnier had obtained a search warrant for only
one side of the duplex.  The other side of the duplex was 1056
Dill Avenue.  After executing the warrant for 1058 Dill Avenue,
but finding no illegal drugs, Sergeant Stallings and Officer
Junnier agreed to search 1056 Dill Avenue despite the fact that
they did not have a search warrant for that residence.  Sergeant
Stallings, Officer Junnier, and other members of the narcotics
team used a ram to break down the door to 1056 Dill Avenue, enter
the duplex, and search it.  No one was home at the time, and no
evidence was found.  Sergeant Stallings then directed the
officers to leave the apartment and shut the door that they had
broken with the ram.  He then made the statement, "Just shut the
door.  They'll just think it was a break-in."  Sergeant Stallings
ultimately pleaded guilty in United States District Court to
conspiracy to violate civil rights for his involvement in this
activity.

Second, Sergeant Stallings encouraged and participated
in falsifying search warrant affidavits.  The FBI investigation
revealed that Sergeant Stallings knew that Officer Junnier and
other officers on the team participated in "hand-off" affidavits.
Sergeant Stallings encouraged Officer Junnier to give "hand-offs"
to other team members, so everyone on the team would make their
quota.  Sergeant Stallings also allowed Officer Junnier and other
officers to let their informants make drug purchases without
being observed by an officer contrary to APD policy.

Third, Sergeant Stallings and other team members
"padded" the payment vouchers for informants who made undercover
purchases of drugs.  Sergeant Stallings was aware of this

DOZIER-COA
00011

## CONFIDENTIAL

practice and signed many of the vouchers knowing they were inaccurate.

Fourth, Sergeant Stallings and other members of his team used one particular unregistered informant as a source of information. Sergeant Stallings and the other officers would falsely identify that informant as a registered, confidential and reliable informant in order to procure numerous search warrants. Sergeant Stallings never attempted to register this particular informant, because he was on active probation for another offense and had an outstanding warrant for his arrest. Despite APD's policy prohibiting the use of such informants, Sergeant Stallings and other team members continued to use the informant as a confidential and reliable source of information.

Finally, as described above, Officer Junnier and other officers spent time while on duty working "extra jobs," where business owners paid the officers to provide police protection and services that should have been free of charge to all citizens. Sergeant Stallings was fully aware that officers on his team were working these jobs while on duty, and allowed them to do so. Sergeant Stallings also received a share of the money that businesses paid to the officers on his team. Sergeant Stallings allowed this activity despite the fact that some members of the team complained about how much time they were spending on these "extra jobs" and that it was taking them away from performing their regular duties as police officers.

Although the most egregious examples of criminal activity and lack of oversight came from Narcotics Team 1, officers assigned to other units or precincts were found to be engaging in similar activities. Because the FBI investigation was limited in its scope to federal criminal violations, it was unable to determine if the same lack of oversight occurred in these other units or at a higher level beyond the rank of sergeant. However, based on the pattern of violations, it appears likely that such oversight may be an issue.

DOZIER-COA
00012

**CONFIDENTIAL**

We are available to discuss these matters at your request.

Sincerely yours,

Gregory Jones
Special Agent in Charge

encls.: FBI interviews, redacted of law enforcement sensitive
and personal identifying information; samples of APD
search warrant affidavits; property log book entries;
various APD paperwork; and statements of facts from
officers that pleaded guilty.

cc:   David E. Nahmias, United States Attorney (w/out encs.)
Paul Howard, Fulton County District Attorney (w/out encs.)
Major Lane Hagin, APD OPS (w/ encs.)

DOZIER-COA
00013

CONFIDENTIAL

Informants

**DOZIER-COA**
**00014**

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/29/2006

       JORGE TAVARES-CEPIN, also known as EDDY was interviewed at about 1:30 p.m. at his store, M.A. SUPERMARKET, 2185 Martin Luther King Drive, Atlanta, Georgia 30310, telephone ▆▆▆▆▆▆▆. He was advised of the identity of the interviewing Agent by a display of credentials and informed of the nature of the interview. He then provided the following information:

       Officer GREGORY JUNNIER had worked for TAVARES-CEPIN on an informal basis for about one and one-half years. JUNNIER provided a quick police response if there was suspected drug dealing or other types of criminal activity around the store. TAVARES-CEPIN also recalled that JUNNIER had helped him out regarding a licensing issue.  The City of Atlanta had closed down M.A. SUPERMARKET for not having the correct license.  TAVARES-CEPIN had paid for the proper license, but had not received it.  He called JUNNIER who took care of the problem and TAVARES-CEPIN was back in business quickly. TAVARES-CEPIN paid JUNNIER $100 cash at the conclusion of each week, generally on a Wednesday, but sometimes on Monday.

       TAVARES-CEPIN was aware that JUNNIER had been involved in a shooting on November 21, 2006.  JUNNIER came into the M.A. SUPERMARKET the following evening, Wednesday, November 22, 2006 and showed TAVARES-CEPIN where he had been shot.  TAVARES-CEPIN paid JUNNIER $100 cash for the week.

       The following day, November 23, 2006, which was Thanksgiving, TAVARES-CEPIN received a telephone call from JUNNIER. JUNNIER told him that a man was going to come into the store.  He asked TAVARES-CEPIN to give the usual $100 to this man.

       Note:  TAVARES-CEPIN acknowledged to the interviewing Agent that this would have been payment in advance for the following week.  He did not recall discussing this issue with JUNNIER.

       Sometime between noon and 12:30, a black male, about 5'10", in his late 20's came to the counter of the store. TAVARES-CEPIN did not know how the man had arrived, as he had not seen his car.  The man asked TAVARES-CEPIN if JUNNIER had called. TAVARES-CEPIN gave the man $100 cash.   TAVARES-CEPIN advised that

---

Investigation on   11/29/2006   at   Atlanta, Georgia

File # ▆▆▆▆▆▆▆▆▆▆▆▆                                    Date dictated   11/29/2006

by   SA Bret C. Aitchison/bca

**DOZIER-COA
00022**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL 

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___JORGE TAVARES-CEPI_____ , On _11/29/2006___ , Page __2__

he did not know the man's name, but that he had seen him in the store a month or two before and believed that he worked with JUNNIER in drug investigations.

The man was not with anyone to TAVARES-CEPIN's knowledge. He stated that he knows a police officer named JR who has accompanied JUNNIER on occasion. He described JR as a tall, former Army guy. TAVARES-CEPIN did not see JR on Thanksgiving.

TAVARES-CEPIN stated that this was not the only time he had been instructed to give the $100 weekly payment to someone beside JUNNIER. He stated that previously, when JUNNIER was on vacation in Florida, he had called TAVARES-CEPIN and told him someone would pick up the weekly payment. TAVARES-CEPIN stated that an individual, believed to be another police officer, later came by and TAVARES-CEPIN gave him $100 cash.

TAVARES-CEPIN advised that he had received a call today (11/29/2006) from GREGORY JUNNIER. JUNNIER stated that he was going to be on leave because of the shooting and would be at his home.

TAVARES-CEPIN provided GREGORY JUNNIER's cell number as ▆▆▆▆▆▆▆▆▆▆▆ .

JORGE TAVARES-CEPIN was recontacted telephonically at about 4:15 p.m. and he provided the following information:

M.A. SUPERMARKET does have security cameras, however, they are not kept supplied with videotape, so no tape is available from Thanksgiving, 2006.

JORGE TAVARES-CEPIN stated that he had called JUNNIER about fifteen minutes ago and informed him that an FBI Agent had spoken with him.

DOZIER-COA
00023

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___JORGE TAVARES-CEPI_____ , On _11/29/2006__ , Page __3__

             The following is information regarding JORGE TAVARES-
CEPIN:

| | |
|---|---|
| Name: | JORGE TAVARES-CEPIN |
| a.k.a.: | Eddy |
| Home Address: | ████████████████, |
| | ████████████████████████ |
| Cell Number: | █ █████████ |
| Race: | White/Hispanic |
| Sex: | Male |
| SSAN: | ████████████ |
| DOB: | ██████████ |
| Occupation: | Store Owner |
| Business: | M.A. SUPERMARKET |
| Address: | 2185 Martin Luther King Drive, Atlanta, Georgia 30310 |
| Telephone: | ██████████. |

DOZIER-COA
00024

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/11/2006

      SANG HYUN LEE, date of birth, ▬▬▬▬▬, Georgia drivers license number ▬▬▬▬▬.  LEE works as a custodian at the Atlanta Police Department located at 675 Ponce De Leon Avenue, N.E., Atlanta, Georgia, 30308.  LEE resides at ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ home telephone number ▬▬▬▬▬.  Federal Bureau of Investigation, Task Force Officer KIM SUNG was also present during the interview. LEE was interviewed at the above mentioned address.  After being advised of the identity of the interviewing agents and the nature of the interview, LEE provided the following information.

      LEE stated he worked on November 23, 2006, at the Atlanta Police Department, but he did not pay attention to which Police Officers were coming into the building.

---

Investigation on    12/11/2006    at  Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬                              Date dictated

by    SA Brian P. Davis

**DOZIER-COA**
**00027**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

-1-

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/14/2006

TERRY A. ALMOND, date of birth, ▬▬▬▬, social
security account number ▬▬▬▬▬▬.  ALMOND resides at ▬▬▬
▬▬▬▬▬, Atlanta, Georgia, ▬▬▬, home telephone number ▬▬▬▬
▬▬▬▬▬, and cellular telephone number ▬▬▬▬▬▬▬.  ALMOND was
interviewed in a close proximity of his residence.  After being
advised of the identity of the interviewing agent and the nature of
the interview, ALMOND provided the following information.

ALMOND works as an informant for the Atlanta Police
Department.  ALMOND reports drug activities and occasionally makes
drug buys for Investigator J.R. SMITH of the Atlanta Police
Department.  ALMOND is paid $20.00 through $30.00 for a drug buy
and can be paid $100.00 or possibly more for reporting a drug
dealer which leads to an arrest and seizure.  ALMOND stated J.R.
SMITH and the Team 1 narcotic officers have always treated ALMOND
in a professional manner.  ALMOND advised his vehicle and person is
always searched before and after each drug deal.

ALMOND advised on 11/21/2006, he was driving around with
his son ▬▬▬▬▬ALMOND, when ALMOND noticed a black male named "FAT"
selling drugs in front of the "green store" located at 1143 Simpson
road, Atlanta, Georgia.  "FAT" approached ALMOND and attempted to
sell ALMOND a crack rock.  ALMOND witnessed where "FAT" was hiding
his drug stash.  ALMOND contacted SMITH and advised SMITH of
"FAT'S" location.

SMITH called ALMOND back in approximately 10 minutes and
asked ALMOND where "FAT'S" drug stash was hidden.  ALMOND told
SMITH where the drugs were hidden.  SMITH called a second time
asking where "FAT'S" drug stash was hidden.  SMITH called ALMOND on
a third occasion and advised he had found the drug stash.  ALMOND
advised that he has not received money for this deal.

ALMOND has witnessed different drug dealers selling drugs
around 933 Neal street, Atlanta, Georgia.  ALMOND stated the drug
dealers will pay the home owner money, so they can sell the drugs
out of the front yard or behind the house.  The drug dealers will
tell the home owner they will rake the yard for free or give the
home owner money and tell them to put it in the collection plate at
church.

---

Investigation on   12/13/2006   at Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬                              Date dictated _____

SA Matthew J. Ross

by  SA Brian P. Davis

**DOZIER-COA
00017**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

-1-

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    07/16/2007

JERMAINE ROZIER, ██████████████████
████████████████ cellular telephone number ████████████████, was
interviewed at the IRON SKILLET RESTAURANT, 3181 Bankhead Highway,
Atlanta, Georgia. ·███████ Last Name Unknown (LNU), ROZIER's
stepmother, was also present. After being advised of the
identities of the interviewing agents and the nature of the
interview, ROZIER provided the following information:

          ROZIER sometimes stays at ████████████████████████

          ROZIER was a confidential informant (CI) for the ATLANTA
POLICE DEPARTMENT (APD), and ROZIER worked with APD Officers HOLLY
Last Name Unknown (LNU), J.R. LNU, GARY LNU, and PETE LNU. ROZIER
mainly worked with HOLLY LNU and GARY LNU. ROZIER became a CI to
help resolve an arrest warrant for his father, CURT ROZIER. HOLLY
LNU and PETE LNU were aware of the arrest warrant for CURT ROZIER.

          ROZIER purchased drugs at the direction of APD officers.
HOLLY LNU searched ROZIER prior to drug buys and was in the area of
residences while he purchased drugs from those residences. ROZIER
last purchased drugs at the direction of an APD officer during
November, 2006.

          ROZIER recalled an address near Turner Field from which
he tried to purchase drugs but did not, and APD later served a
search warrant at that address. ROZIER could not recall the
specific address.

          ROZIER signed multiple vouchers at a time, and he would
sign more vouchers than buys he did.

          ROZIER has not spoken with any of the officers with whom
he worked since November, 2006.

---

Investigation on   07/10/2007    at  Atlanta, Georgia

File # ████████████████████                     Date dictated   N/A

by  SA Andrew Van Epps:ajve
    SA Matthew Ross

**DOZIER-COA
00015**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/08/2007

        CURTIS ROZIER, date of birth (DOB) ▬▬▬▬▬▬, ▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, telephone number
▬▬▬▬▬▬▬▬, was interviewed at the Iron Skillet Restaurant,
3181 Bankhead Highway, Atlanta, Georgia. MICHELLE Last Name
Unknown (LNU) was also present. After being advised of the
identities of the interviewing agents and the nature of the
interview, ROZIER provided the following information:

        ATLANTA POLICE DEPARTMENT (APD) Sergeant PETE STALLINGS
was ROZIER's main APD contact. APD Investigator GARY SMITH told
ROZIER not to work with some investigators because they did not do
their paperwork correctly. ROZIER believes APD Investigators HOLLY
BUCHANAN and SMITH and are straight.

        For approximately two years, ROZIER was told by APD
officers that they could not sign him up as a confidential
informant (CI) because he had a pending criminal case. ROZIER
purchased drugs approximately 100 times for APD. ROZIER and his
son, JERMAINE, purchased drugs together approximately 30 times for
APD, but JERMAINE purchased drugs alone one time.

        STACEY FAVORS was dating SHAYLA PITTS. FAVORS would not
sell drugs to APD Investigator MAURICE GEURIN, acting in an
undercover capacity. At some point, PITTS called STALLINGS and
told him FAVORS had a handgun. STALLINGS told ROZIER to ride with
FAVORS. STALLINGS said he was at home but would write his report
as if he saw the entire incident. ROZIER talked to STALLINGS
approximately two weeks ago, and STALLINGS told him not to bring up
FAVORS when interviewed.

        After the death of KATHRYN JOHNSTON, STALLINGS wanted
ROZIER to say he bought drugs from  933 Neal Street, Atlanta,
Georgia, but SMITH did not want ROZIER involved. SMITH told him
not to get involved, not to lie, and that some officers messed up
that day.

        APD Investigator J.R. SMITH told ROZIER that he had a
personal bank account, in which he kept APD funds.

Investigation on   10/29/2007   at Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬              Date dictated   N/A

      Brian P. Davis                                              **DOZIER-COA**
by   Andrew J. Van Epps                                          **00016**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   01/28/2008

ANNATTE BULTRON, date of birth ▬▬▬▬▬, was interviewed at her place of employment, Trafalgar Square apartments located at 1155 Simpson Road, Atlanta, Georgia, work telephone number ▬▬▬▬▬.  BULTRON resides at ▬▬▬▬▬ ▬▬▬▬▬.  After being advised of the nature of the interview and the identity of the interviewing Agents, BULTRON provided the following information.

BULTRON met Atlanta Police Officer TESSLER in approximately May 2006.  TESSLER introduced himself to BULTRON and asked if he could speak to her boss.  TESSLER told BULTRON that he and some other officers could supply security for the apartment complex.  BULTRON explained to the agents that they needed security because the apartment complex had a high crime rate.  BULTRON also said the convenience store at the top of the apartment's driveway had a lot of drug dealers coming in and out of the apartment complex and staying around the convenience store.

BULTRON had a number to call TESSLER if she needed his assistance, but she would have to leave a message for TESSLER. TESSLER did not patrol the complex at night.  TESSLER would come by every Thursday to pick up money.  BULTRON would hand TESSLER the money in an envelope.  TESSLER would drive a patrol car with another officer to pick up the money.  BULTRON stated that TESSLER was not in his uniform when he would drive the patrol car.

Investigation on   11/14/2007   at   Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬     Date dictated   N/A

by   SA Brian P. Davis     SA Andrew J. Van Epps

**DOZIER-COA
00034**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   02/06/2008

      SYED MOHAMMAD ALI, date of birth, ▬▬▬▬▬, was interviewed at his residence located at ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. ALI is employed by AK FOOD MART located at 1981 Simpson Road, Atlanta, Georgia. After being advised of the nature of the interview and the identity of the interviewing Agent, ALI provided the following information.

      ALI stated they had used an Atlanta Police Officer to provide security for their store for a few years. ALI stated he began using security after he met an Atlanta Police Officer JUNNIER. JUNNIER told ALI that he could provide a Police Officer for 3 hours one night a week for $60.00.

      The first Atlanta Police Officer to work at the store was K-9 officer MILLER. According to ALI, MILLER did a bad job and he asked JUNNIER to provide another officer.

      ALI stated that JUNNIER then introduced him to a second Atlanta Police Officer CRAWFORD. CRAWFORD began to work one night a week from 8:00pm through 11:00pm. ALI stated that CRAWFORD would work a second night at an apartment complex behind the store. On the second night CRAWFORD would come by the store two or three times during the night for approximately 10 - 15 minutes at a time.

      ALI stated that a second police officer has began to work in CRAWFORD'S place. The second police officer drives a motorcycle to work on some occasions. The second police officer only works one night a week at the store.

---

Investigation on   11/14/2007   at   Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬   Date dictated   N/A

by   SA Brian P. Davis

**DOZIER-COA
00026**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    <u>12/04/2007</u>

‎▬▬▬▬▬▬▬ was interviewed at his place of
employment, AK FOOD MART located at 1981 Simpson Road, Atlanta,
Georgia. ▬▬▬ resides at ▬▬▬▬▬▬▬▬▬
▬▬▬, cellular phone ▬▬▬▬▬▬. After being advised of the
identity of the interviewing agent and the nature of the interview,
▬▬▬ provided the following information:

     ▬▬▬ stated that AK FOOD MART paid for off duty police
officers to work security at the store. ▬▬▬ advised that they
would pay Atlanta Police officer CRAWFORD $120.00 to work one
night a week at the store. CRAWFORD would normally work on Tuesday
or Thursday from 8:30pm through 11:00pm. The officer would drive
his personal vehicle to the store and wear a police uniform. After
CRAWFORD was injured a second officer began to work at the store.

     ▬▬▬ stated the same officers would work a second night
at an apartment complex located behind the store. ▬▬▬ advised
the officers seemed to work the same hours at the apartment complex
and they would normally come by his store once during the night and
get a drink and then leave. ▬▬▬ stated on an occasion he may
see the officers twice on the nights they were working at the
apartment complex.

Investigation on   <u>11/16/2007</u>   at   Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬        Date dictated   <u>N/A</u>

by   <u>SA Brian P. Davis</u>

**DOZIER-COA
00028**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



-1-

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    02/06/2008

      SAMATRA PHILLIPS, date of birth, ▬▬▬▬▬, was interviewed at her place of employment, 377 Westchester Blvd. Atlanta, Georgia, ▬▬▬▬▬▬▬▬▬▬▬▬ After being advised of the identity of the interviewing agent and the nature of the interview, PHILLIPS provided the following information.

      PHILLIPS advised Atlanta Police Officer JUNNIER was providing security for her apartment complex located at 377 Westchester Blvd. Atlanta, Georgia, until JUNNIER was arrested in 2006.

      After JUNNIER'S arrest Atlanta Police Officer BURCHFIELD began to pickup the money from PHILLIPS on every Friday or Monday. PHILLIPS gave BURCHFIELD $245.00 a week.  PHILLIPS said BURCHFIELD was suppose to patrol through the area and help clean up the crime problem.  PHILLIPS believes BURCHFIELD was splitting the money with Atlanta Police Officer CRAWFORD and possibly one other officer. BURCHFIELD would pickup the money while on duty.

      When BURCHFIELD was suspended PHILLIPS stated that Atlanta Police Officer BETTS began to pick up the money on Fridays and occasionally on Monday.  PHILLIPS had never made any arrangements with BETTS or ever discussed his work hours. According to PHILLIPS, BETTS did begin to hang around on Fridays and talking to the workers during payroll.

---

Investigation on   11/16/2007   at Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬▬                    Date dictated  N/A          **DOZIER-COA**
                                                                    **00035**
by   SA Brian P. Davis

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   12/17/2007

    REMBERTO "RANDY" CARBO, owner, 1247 Simpson Road NW, Atlanta, Georgia 30314, was interviewed at his apartment complex. Also present was the apartment complex manager, ▬▬▬▬▬▬▬▬▬ After being advised of the identities of the interviewing Agents and the nature of the interview, he provided the following information:

    Sometime in early 2005, CARBO observed ATLANTA POLICE DEPARTMENT (APD) Officer JR SMITH (JR) arresting a drug dealer on CARBO's property. After CARBO approached JR to comment that it was about time that APD did something about the crime problem, a conversation ensued between the two regarding onsite security. When CARBO commented that he could not afford paying a security company, JR asked him if he could afford $150 a week. Within two weeks of their initial conversation, CARBO began paying JR for his security services.

    For $150 per week, JR along with APD Officers TESLER and JUNNIER, would drive by CARBO's property and provide a quick response to any criminal issues at his property. Additionally, JR would call APD to assist in any big problems happening at CARBO's complex. JR gave CARBO the impression that between 15-20 officers were available to help, but CARBO only saw JR, TESLER, and JUNNIER during that time.

    JR would come by every Friday to collect $150. JR requested to be paid in cash, and although CARBO was uncomfortable with that, he agreed because he saw the results of JR's attention. In early 2006, 32 people were arrested on CARBO's property in a period of about 60 days.

    After the shooting at Neal Street and the suspension of JR, TESLER, and JUNNIER, APD Officer BURCHFIELD began picking up the money. When BURCHFIELD collected the money, he arrived in either plain clothes or in uniform, and drove a tan Taurus.

    The crime problem worsened when BURCHFIELD became involved, since BURCHFIELD provided little, if any service. CARBO confronted BURCHFIELD by telling him that whatever he was doing to keep CARBO's apartments safe was not working. CARBO asked BURCHFIELD what services he was providing, and BURCHFIELD responded

---

Investigation on   12/14/2007   at   Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬   Date dictated ▬▬▬▬▬

by   SA Brian P. Davis
SA Eulis Mile Brosas:emb

**DOZIER-COA
00020**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___REMBERTO CARBO_____ , On 12/14/2007 , Page ___2___

by saying that he does drive bys and numerous arrests at CARBO's property.  CARBO did not believe BURCHFIELD, and told him that he should call JR for advice.

After CARBO confronted BURCHFIELD, the crime problem seemed to get better.  However, CARBO still felt that BURCHFIELD, (and then later, APD Officer BETTS) mainly came by his complex to pick up the money.

It was CARBO's understanding that he had an agreement with JR, and not with BURCHFIELD.  CARBO was given cellular telephone numbers by JR, TESLER, and JUNNIER, who would respond quickly whenever CARBO called.  BURCHFIELD and BETTS also provided their cell phone numbers to CARBO, but they gave a much different response.  BURCHFIELD never seemed to answer his phone, but was prompt to collect his money.  While BETTS did answer his phone, he always seemed too busy to do anything for CARBO.  Neither BURCHFIELD nor BETTS provided an adequate response for CARBO.

CARBO last paid BETTS $300, since BETTS missed picking up his previous payment.  BETTS arrived in uniform, driving his APD patrol car.

CARBO eventually hired a new security guard, and there was a short period of time when he paid both BETTS and the new guard.  In an effort to curb the crime on the property, the new security guard advised CARBO to change his outdoor lighting, to post "no trespassing" signs, and to establish tow away zones.

DOZIER-COA
00021

FD-302 (Rev. 10-6-95)

# CONFIDENTIAL

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   01/08/2008

    STEPHANIE NOLAN, born ▬▬▬▬▬▬▬, social security account number ▬▬▬▬▬▬, of ▬▬▬▬▬▬▬▬▬▬▬▬, cellular telephone number ▬▬▬▬▬▬▬▬, was interviewed at her residence.  NOLAN, who was previously made aware of the identities of the interviewing Agents, was advised of the the nature of the interview, and thereafter provided the following information:

    NOLAN has owned the QUALITY PLAZA (QP) shopping center, located at 1217 through 1241 Simpson Road, Atlanta, Georgia since 1991.  Sometime in late 2005, NOLAN met ATLANTA POLICE DEPARTMENT (APD) Officer GREGG JUNNIER through ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬.  ▬▬▬▬▬ told NOLAN that due to the efforts of APD, drug dealers where being pushed away from a nearby apartment complex and were starting to hang around the QP.  As a result, drugs were being sold around ▬▬▬▬▬ store.  ▬▬▬▬▬ advised NOLAN that JUNNIER could help with the crime problem at the QP,  and introduced JUNNIER to her.

    JUNNIER told NOLAN that for $600 a month, he would clean up the area and keep drug dealers from doing there business there. JUNNIER requested that the $600 be paid in cash, and advised her that the money would be split between four officers.  The officers would patrol around the QP during both on-duty and off-duty hours. NOLAN agreed to JUNNIER's proposal, and began paying him sometime in late 2005.

    NOLAN described the four APD officers as follows:
- APD Officer GREGG JUNNIER;
- a white male with brown hair who would get out of the patrol car and look around; and
- two other white male officers who would stay in the patrol car.

    NOLAN felt that JUNNIER and his group did a good job at ridding the QP of crime.  NOLAN had JUNNIER's cellular telephone number, and may have called him to take care of a problem from time to time.

    In October 2006, the QP tenant who operated a coin laundry advised NOLAN that she should not have to pay for JUNNIER's

| | | |
|---|---|---|
| Investigation on | 01/03/2008 | at Atlanta, Georgia |

File # ▬▬▬▬▬▬▬▬▬▬▬   Date dictated ____

    SA Brian P. Davis
by SA Eulis Mile Brosas:emb

**DOZIER-COA
00031**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

# CONFIDENTIAL

Continuation of FD-302 of _____ STEPHANIE NOLAN _____ , On 01/03/2008 , Page __2__

service, but that ▆▆▆▆ should.  NOLAN is not sure, but thinks that
SINGH may having been paying JUNNIER in addition to what she paid
him.

Sometime before the KATHRYN JOHNSTON shooting that
occurred in November 2006, NOLAN stopped paying JUNNIER.  After the
shooting incident, NOLAN called JUNNIER to offer her support.

The situation at QP started worsening after JUNNIER
stopped patrolling the area.  It now takes APD hours to respond to
complaint calls from the QP.

Sometime in 2007, NOLAN met APD Officer DANIEL BETTS
while he was sitting in his car at the QP.  NOLAN asked BETTS if he
could patrol around the area more often, and he responded by
telling her to call him to discuss it further.  NOLAN later called
BETTS, but since he was injured at the time, he could not provide
any service.  NOLAN and BETTS did not discuss payment for his
services.

**DOZIER-COA
00032**

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription __02/07/2008__

    JORGE EDUARDO "EDDIE" TAVAREZ-CEPIN, owner, M.A.
SUPERMARKET, 2185 Martin Luther King Jr. Boulevard, Atlanta,
Georgia, was interviewed at his place of employment.  After being
advised of the identity of the interviewing Agent and the nature of
the interview, he provided the following information:

    CEPIN knew ATLANTA POLICE DEPARTMENT (APD) Officer GREGG
JUNNIER as a narcotics officer who patrolled around the M.A.
SUPERMARKET.  In approximately mid-2005, CEPIN began paying JUNNIER
$100 a week to provide extra security at his store.  As per their
arrangement, CEPIN could call JUNNIER when he needed help with
criminal activity at his store, and JUNNIER would either come by
quickly, or arrange for other officers to come by.

    At first, JUNNIER came by and collected $150 each week,
$50 of which JUNNIER would then give to APD Officer JUHLS.  Later
at some point, JUNNIER would collect $100 a week for himself, and
JUHLS would also come by to collect $50.

    After JUNNIER was suspended as a result of the shooting
death of KATHRYN JOHNSTON, JUHLS came by to tell CEPIN that he
(JUHLS) would continue to keep an eye on the store, but that CEPIN
did not have to pay him.  CEPIN has not paid any APD officer since
JUNNIER's suspension, nor have any officers come by to ask for
payment.

---

Investigation on __02/06/2008__   at  Atlanta, Georgia

File # ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄   Date dictated ____

by __SA Eulis Mile Brosas__

**DOZIER-COA
00025**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

-1-

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   02/07/2008

GREG SWARTZBERG, PROPORT PROPERTY PORTFOLIOS LLC., 214
Ponce De Leon Avenue, Suite 3, Atlanta, Georgia 30308, ▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ was
interviewed at his workplace, ▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ After being advised of the
identities of the interviewing Agents and the nature of the
interview, he provided the following information:

SWARTZBERG met ATLANTA POLICE DEPARTMENT (APD) Officer
GREGG JUNNIER at one of SWARTZBERG's properties, a shopping center
located at 2097 and 2079 Simpson Road. JUNNIER, who patrolled in
the area, offered to provide extra security for the premises.
SWARTZBERG agreed to JUNNIER's offer, and paid him or another APD
Officer BRUCE Last Name Unknown (LNU) between $100 and $200 every
few weeks. SWARTZBERG paid BRUCE LNU most of the time, and JUNNIER
some of the time, and called them to meet him at one of
SWARTZBERG's three locations they patrolled for him. Most of the
time, BRUCE LNU or JUNNIER met SWARTZBERG either before or after
work.

SWARTZBERG advised that he began paying them a couple of
years ago and stopped paying them when they were suspended as a
result of the shooting on Neal Street in November 2006. SWARTZBERG
would call BRUCE LNU or JUNNIER to ask them to get rid of criminal
activity at his properties, and they would effectively respond.
Paying BRUCE LNU and JUNNIER for their services definitely helped
with the crime problem. Both prior to using them and after
SWARTZBERG stopped paying, SWARTZBERG would not get a police
response to his 911 calls.

SWARTZBERG advised that he contacted BRUCE LNU at
telephone number ▬▬▬▬▬▬▬▬▬▬ .

---

Investigation on   02/07/2008   at Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬▬▬   Date dictated ▬▬▬

by   SA Brian P. Davis
     SA Eulis Mile Brosas:emb

**DOZIER-COA
00033**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    02/08/2008

MARIO JULIO JAQUEZ, of ▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬ cellular telephone number ▬▬▬▬▬▬▬▬▬ was
interviewed at his residence.  After being advised of the identity
of the interviewing Agent and the nature of the interview, he
provided the following information:

        JAQUEZ owns a convenience store located at 617 Magnolia
Street in southwest Atlanta.  During the summer of 2006, JAQUEZ
also managed a convenience store located at 320 Simpson Road.
JAQUEZ was interested in buying the Simpson Road store, and knew
ATLANTA POLICE DEPARTMENT (APD) Officer GREGG JUNNIER through the
security JUNNIER provided at another store on Simpson Road called
THE GREEN STORE.  The owners there, JUAN Last Name Unknown (LNU)
and JOSE LNU, also known as "Manita," told JUNNIER that JAQUEZ
might be interested in hiring him.

        At the time, JAQUEZ was having trouble with people
loitering around both the Magnolia Street store and the Simpson
Road store.  One day, JUNNIER approached JAQUEZ at the Magnolia
Street store, and told him that he could patrol the area, keep the
crowds under control, and clean up the crime.

        JUNNIER did what he promised, and cleaned up around
JAQUEZ's stores.  JUNNIER patrolled the area and searched people
who were loitering outside.  JUNNIER would also enter the store
pretending not to know JAQUEZ, and would look around before buying
a soda.  By doing this, JUNNIER would discourage people from
hanging around inside JAQUEZ's store.

        JAQUEZ paid JUNNIER $150 a week for his services, and
JUNNIER usually came by on Fridays to pick up the money.  JUNNIER
sometimes came alone, and sometimes came accompanied by APD
Officers J.R. SMITH and BRUCE TESLER.  JUNNIER explained to JAQUEZ
that he kept $50, and gave SMITH and TESLER $50 each.

        Occasionally, JUNNIER came to pick up the money with
another officer whose name JAQUEZ did not know, but who he
described as a short and skinny white male, with short blond hair.
JAQUEZ also recalled paying J.R. SMITH on a few occasions.

Investigation on    02/07/2008    at   Jonesboro, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬        Date dictated ▬▬▬▬▬▬

by   SA Eulis Mile Brosas

**DOZIER-COA
00029**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ MARIO JULIO JAQUEZ _____ , On 02/07/2008 , Page ___2___

        Shortly after the Neal Street shooting occurred, JUNNIER stopped showing up. Neither JUNNIER, SMITH, or TESLER called JAQUEZ to explain why they were no longer providing security, and it was not until later that JAQUEZ figured out that they were involved in the shooting at Neal Street.

        After JUNNIER stopped showing up, the other officer came by and told JAQUEZ that he was taking JUNNIER's place. While the officer said that the security services would continue, he never indicated that JUNNIER was suspended or was in trouble. JAQUEZ continued paying the officer $150 each week, but thought the money was still going to JUNNIER, SMITH and TESLER.

        JAQUEZ thinks he paid the officer at least twice, but no more than four times. JAQUEZ did not see the officer patrol around the area, nor did he see him come inside the store to deter loiterers.

        In early 2007, JAQUEZ concluded that the reason JUNNIER stopped coming was that he was suspended. Since the security around the stores began deteriorating, JAQUEZ told the other officer that his services were no longer needed, and stopped paying.

DOZIER-COA
00030

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   02/26/2008

PAM HUNT, Southern Regional Manager, MB MANAGEMENT
COMPANY, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ was
interviewed at the DUNKIN DONUTS on Highway 92, Woodstock, Georgia.
After being advised of the identity of the interviewing Agent and
the nature of the interview, she provided the following
information:

Sometime in 2006, CARL JOHNSON purchased a distressed
property located at 350 Lanier Street, NW, Atlanta, Georgia known
as the HERITAGE SQUARE APARTMENTS (HSA). In a letter JOHNSON
received dated June 15, 2006 from the FULTON COUNTY DISTRICT
ATTORNEY'S OFFICE (FCDA), the FCDA stated that HSA was the site of
numerous drug arrests, and that the FCDA would like to meet to
discuss how to reduce crime in the area. In response to this
letter, JOHNSON hired HUNT as a property consultant whose
responsibilities would include addressing crime prevention and
safety concerns.

On August 15, 2006, based on recommendations from the
FCDA, HUNT met with ATLANTA POLICE DEPARTMENT (APD) Major DALLAS,
and Officers GREGG JUNNIER, J.R. SMITH, and BRUCE TESLER. Just
prior to that meeting, on August 9, 2006, HUNT asked JUNNIER to
start providing security for HSA, with the understanding that the
details of JUNNIER's services would be finalized at the meeting.

HUNT paid JUNNIER $650 per month in exchange for his off-
duty security work, as well as for his presence and access during
his on-duty hours. JUNNIER was given free rein to determine which
officers would work with him, and to determine what he needed to do
*to establish a strong APD presence at HSA. HUNT saw JUNNIER one to*
two hours per week on site, but advised that site managers ▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ had more interactions with the
JUNNIER. HUNT saw JUNNIER primarily working with TESLER, although
she also saw J.R. SMITH at HSA.

After the shooting incident at Neal Street in November
2006, HUNT received a call from either JUNNIER or TESLER,
explaining that they could not provide security at HSA while they
were on suspension. HUNT was told however that they (JUNNIER or

---

Investigation on   02/25/2008   at   Woodstock, Georgia

File # ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆   Date dictated ▆▆▆▆▆▆▆

by   SA Eulis Mile Brosas

**DOZIER-COA
00018**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

---

Continuation of FD-302 of _____PAM HUNT_____ , On 02/25/2008 , Page __2__

TESLER) would find replacement officers to continue the services while their situation was being resolved.

HUNT advised that the replacement officers were "rookies" compared to JUNNIER and his team, and as a result, the crime went up at HSA.  Since HUNT's consulting responsibilities were winding down around the time of the shooting incident, she was not heavily involved with the officers that took over the security services, and does not remember any of the officers' names.

CONFIDENTIAL

Alex White

DOZIER-COA
00036

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription      03/09/2007

      ALEXIS A. WHITE was interviewed in Atlanta, Georgia.
WHITE was a confidential informant (CI) for officers of the ATLANTA
POLICE DEPARTMENT's (APD) narcotics unit.  During a previous
interview, WHITE stated he attempted, at the direction of APD
officers, but did not purchase drugs from 161 Rhodesia Avenue,
Atlanta, Georgia (161 Rhodesia).  A warrant was executed at 161
Rhodesia by APD officers, and in the affidavit, it was stated an
APD CI purchased drugs from 161 Rhodesia.  WHITE was aware of the
identities of the interviewing agents, and after being advised of
the nature of the interview, WHITE provided the following
information:

      During November, 2006, APD Officers CARY BOND and J.R.
SMITH picked up WHITE in a red pickup truck with tinted windows,
and they drove by 161 Rhodesia.  When WHITE saw the house, he told
BOND that ███████████████████████████████████████████████
████████ ████████████████████ but had not told BOND about it.  [WHITE
was aware of 161 Rhodesia because he drove an unidentified male
known as FLORIDA there to buy marijuana.  When WHITE entered the
house, there were three or four unidentified black males, and WHITE
observed two handguns.  FLORIDA bought one to two ounces of powder
cocaine.]  BOND told WHITE to call ████████████████████ told BOND it
was okay for APD to attempt to purchase drugs from 161 Rhodesia.

      BOND parked at the SOMETHING SPECIAL RESTAURANT, 1665
Jonesboro Road, Atlanta, Georgia, and WHITE got out of the pickup
truck.  WHITE walked to 161 Rhodesia.  There was a little boy on
the front steps, and WHITE told him to get his mother.  A female
and approximately three men came out, and one of them was smoking
marijuana.  None of them looked familiar.  WHITE asked for MARIO
and said he wanted to get a sack of "purple."  Someone responded
that MARIO did not live there.  WHITE did not purchase drugs from
161 Rhodesia.  BOND and SMITH drove by in the red pickup truck
while WHITE was in the yard.  As WHITE walked on Rhodesia Avenue
toward SOMETHING SPECIAL, the girl from 161 Rhodesia walked on
Rhodesia Avenue in the same direction, and one of the men drove by
WHITE on a scooter.

      WHITE met BOND and SMITH at SOMETHING SPECIAL.  WHITE
told them he was not able to buy anything, and BOND told him to

---

Investigation on  03/09, 21/2007  at  Atlanta, Georgia

File #  ███████████████████

by  SA Andrew J. Van Epps:ajve
    SA Eulis Mile Brosas, SA Brian P. Davis

Date dictated  N/A

**DOZIER-COA
00037**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Alexis A. White___ , On 03/09/2007 , Page __2__

keep the $100 for other purchases of drugs that day.  WHITE told them that the people at 161 came on to the porch, and one was smoking marijuana.  SMITH stated he (SMITH) smelled weed and that WHITE smelled weed.  WHITE never saw SMITH in a position in which he could have smelled marijuana.  WHITE never went back to 161 Rhodesia to purchase drugs.

WHITE talked to ▇▇▇▇ and told him that WHITE did not purchase drugs from 161 Rhodesia, but APD officers were going to get a warrant based upon smelling weed. ▇▇▇▇ responded that he told WHITE that APD does things differently.

On March 21, 2007, SAs DAVIS and VAN EPPS reinterviewed WHITE, and WHITE provided the following information:

WHITE drove FLORIDA to 161 Rhodesia between six months and a year prior to the day he attempted, at BOND's direction, to buy drugs from 161 Rhodesia.

BOND told WHITE to ask for MARIO at 161 Rhodesia.

WHITE's pants pockets were felt by an APD officer before he got out of the red pickup truck to attempt to purchase drugs from 161 Rhodesia, but neither officer felt his pockets after he returned to the truck.

After WHITE attempted to purchase drugs from 161 Rhodesia, SMITH stated he would get a warrant for the residence that night.  BOND was quiet when SMITH made that statement.

WHITE did not see APD Officer GREGG JUNNIER on the day WHITE attempted to purchase drugs from 161 Rhodesia.

On November 23, 2006, at East Atlanta City Hall, SMITH paid WHITE $100 for work on Payne Street, but WHITE does not recall work on a street with that name.  SMITH stated he was paying WHITE with his own money.  WHITE signed a blank voucher, and SMITH said it was for the work on Payne Street.  JUNNIER telephonically told WHITE that the $100 payment from ▇▇▇▇▇▇▇▇▇▇▇▇ who owns a market on Martin Luther King, Junior, Boulevard, was for WHITE's work at 161 Rhodesia.

DOZIER-COA
00038

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    03/12/2007

      ALEXIS A. WHITE was interviewed in Atlanta, Georgia.
WHITE was a confidential informant (CI) for the Investigators of
the ATLANTA POLICE DEPARTMENT's (APD) narcotics unit.  WHITE was
interviewed in reference to his CI drug buy from 1994 Bent Creek
Way apartment D-103, Atlanta, Georgia.  WHITE was aware of the
identities of the interviewing agents, and after being advised of
the nature of the interview, WHITE provided the following
information:

      WHITE stated Investigator BOND had asked WHITE to go to
1994 Bent Creek Way apartment D-103, Atlanta, Georgia, and attempt
to purchase drugs.  WHITE advised that he did not meet with BOND
before he drove to the above mentioned apartment.  WHITE was
attempting to purchase the drugs by using his own money.  WHITE was
driving his friend KATRINA STRICKLAND's car a burgundy Saturn.
WHITE approached the apartment and knocked on the door.  WHITE
stated that no one was home so he left the area.  WHITE called BOND
and explained no one answered the door at the apartment.  WHITE
never met with BOND on this day.

      On a later date WHITE was contacted by BOND to go back to
1994 Bent Creek Way apartment D-103. WHITE met with BOND at a
prearranged location and BOND gave WHITE approximately $100.00 to
make a drug buy.  WHITE was driving his friend ▆▆▆▆▆▆▆▆▆
burgundy Saturn.

      WHITE left BOND after receiving the hundred dollars and
went to the Bent Creek apartments.  WHITE recognized a friend named
FERNANDO that WHITE had attended middle school with standing
outside of the apartment.  WHITE started a conversation with
FERNANDO.  WHITE was able to meet other people that were standing
outside of the apartment and eventually WHITE asked an unknown
black male, if he could buy some crack.  The subject went inside of
apartment D-103 and came back out with what appeared to be the
drugs in his hand.  The subject then ran to the top floor of the
apartment complex and went inside of another apartment.  The
subject was inside of this apartment for approximately 30 seconds
and then came back down the stairs.  WHITE was not sure why the
subject had gone upstairs.  The subject sold the crack cocaine to
WHITE for $100.00.

---

Investigation on   03/12/2007   at Atlanta, Georgia

File # ▆▆▆▆▆▆▆▆▆▆▆▆▆▆        ▆▆▆▆▆▆▆▆▆▆   Date dictated   ____
    SA Brian P. Davis:bpd
by  SA Andrew J. Van Epps

**DOZIER-COA**
**00039**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___**Alexis A. White**___ , On _03/12/2007_ , Page ___2___

     WHITE was paid by Investigator Bond for completing the drug purchase.

     WHITE stated he only made one drug purchase from 1994 Bent Creek Way Apartments for the Atlanta Police Department.

     On a later date APD Investigator GREGG JUNNIER asked WHITE to go by 1994 Bent Creek Way Apartment and see if a Monte Carlo SS was parked close to Apartment D-103.  WHITE spotted the car and informed JUNNIER.  JUNNIER asked WHITE watch the car and to call him if it moved.  WHITE witnessed a female get into the car and leave the apartment complex.  WHITE followed the unknown female until he watched JUNNIER and BOND pull the car over.  JUNNIER then told WHITE to return to the apartment and watch for the unknown black male to return to apartment D-103.  WHITE stated that the investigators eventually returned to the apartment complex and searched the apartment.

     WHITE could not recall if he received money for the search of the apartment.

**DOZIER-COA**
**00040**

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription __03/16/2007__

        ALEXIS A. WHITE was interviewed in Atlanta, Georgia. During a previous interview, WHITE stated he attempted, at the direction of an ATLANTA POLICE DEPARTMENT (APD) officer, but did not purchase drugs from a residence on Wood Street, Atlanta, Georgia; WHITE believes the officer submitted a piece of crack purchased from another residence as evidence that drugs were being sold from the residence on Wood Street, and WHITE was interviewed to provide further information.   WHITE was aware of the identities of the interviewing agents, and after being advised of the nature of the interview, WHITE provided the following information:

        WHITE first met APD Officer BRAD BURCHFIELD at an apartment complex at 3762 Martin Luther King, Junior, (MLK) Drive. WHITE had gone there to hang out because he knew people in the complex because he had lived nearby.  WHITE parked the car, a white Pontiac Grand Prix, he was driving, popped the hood, and got out. While WHITE was standing by the car, BURCHFIELD drove up in a patrol car.  While in the parking lot of 3762 MLK Drive, BURCHFIELD put WHITE in handcuffs, put him in the patrol car, and then drove out of the complex.  WHITE asked for the reason he was being detained, and BURCHFIELD did not respond.  While in the patrol car, WHITE told BURCHFIELD that he worked as a confidential informant (CI) for APD Officer GREGG JUNNIER.  After talking with JUNNIER, BURCHFIELD returned to 3762 MLK and released WHITE.

        WHITE does not recall how he started working as a CI for BURCHFIELD.

        BURCHFIELD told WHITE there was a residence at 826 Wood Street (826 Wood) from which guns and drugs were sold, and when a warrant was obtained, the BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS (ATF) would participate in the search.  In late October or early November, 2006, BURCHFIELD dropped off WHITE on Mildred Place, and WHITE walked through a parking lot toward Wood Street.  As WHITE walked through the gate between the parking lot and Wood Street, a white Dodge Stratus was leaving 826 Wood.  When WHITE saw the car leave, he called BURCHFIELD, who was driving on Wood Street toward Hollowell Parkway, and then started walking in the same direction. BURCHFIELD picked up WHITE at the end of Wood Street near its intersection with Hollowell Parkway.  BURCHFIELD stated that they

---

Investigation on __03/14/2007__  at __Atlanta, Georgia__

File # ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓    Date dictated __N/A__

     SA Andrew J. Van Epps:ajve
by __SA Brian P. Davis__

**DOZIER-COA
00041**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of     __Alexis A. White_____ , On _03/14/2007_ , Page __2__

would go back after attempting to purchase drugs from other
residences, but they never did.

          After 826 Wood, WHITE purchased a bag of marijuana from
2422 Main Street (2422 Main). WHITE tried to purchase marijuana
from a residence on Mary George Avenue (Mary George), but none was
available. WHITE went to 2415 First Avenue (2415 First), and an
unidentified lady stopped WHITE in the yard. The lady told WHITE
that they would not sell to WHITE if they did not know him. An
individual known as HANDYMAN lived at the residence; WHITE did not
know HANDYMAN but had heard of him. WHITE called BURCHFIELD, who
told WHITE to use the lady to buy for him. WHITE told the lady to
buy for him, gave her $20 for the drugs, and gave her a couple of
dollars for her help. The lady went into the house, came back out,
and gave WHITE a bag with a piece of crack cocaine in it. Part of
the crack was sticking out of the bag, and the bag was closed
around the crack. WHITE walked to Perry Boulevard, where he met
BURCHFIELD.

          BURCHFIELD and WHITE later stopped at a BP gas station at
the corner of Ashby Street and MLK Drive, and WHITE went into the
BP to play the lottery. When WHITE returned, BURCHFIELD had split
the crack from 2415 First into two pieces and told WHITE that he
(BURCHFIELD) owed WHITE $30 for the buy on Wood Street. WHITE did
not respond to BURCHFIELD's comment. BURCHFIELD had already paid
WHITE $50 - $20 for the buy from 2422 Main and $30 for the buy from
2415 First. WHITE believes he talked to ATF SA ERIC DEGREE the
same day and told him that BURCHFIELD took crack from one house and
put part of it on 826 Wood. DEGREE stated he was glad WHITE told
him because he was supposed to execute the search warrant with APD
and now would not.

          On March 27, 2007, SAs DAVIS and VAN EPPS reinterviewed
WHITE, and WHITE provided the following information:

          WHITE had not been to 826 Wood before he attempted to
purchase drugs from that residence and has not been to it since
that time. No other APD officers were with WHITE and BURCHFIELD on
the day he attempted to purchase drugs from 826 Wood. BURCHFIELD
gave WHITE $50 to purchase drugs from 826 Wood, and WHITE gave it
back to BURCHFIELD when he picked up WHITE on Wood Street. WHITE
signed three blank payment vouchers after leaving Main Street, and
then WHITE signed a blank voucher while at the BP station.

DOZIER-COA
00042

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/26/2007

     ALEXIS A. WHITE was interviewed in Atlanta, Georgia.  The
ATLANTA POLICE DEPARTMENT (APD) executed a search warrant at 674
Alta, and according to the affidavit, an APD confidential informant
(CI) purchased drugs from 674 Alta.  WHITE was the APD confidential
informant (CI) credited with the drug purchase from 674 Alta.
WHITE was aware of the identities of the interviewing agents, and
after being advised of the nature of the interview, WHITE provided
the following information:

     In approximately December, 2004, WHITE met APD Officer
CARY BOND at the Hamilton E. Holmes MARTA Station.  BOND was alone
when he picked up WHITE.  BOND searched WHITE shortly after leaving
the MARTA station.  Some time during the day, another APD officer
joined them, and WHITE believes BOND and he went to CHURCH'S
CHICKEN (CHURCH'S) at the corner of Bankhead Highway and Hamilton
E. Holmes Drive to meet that officer.  While at CHURCH'S, WHITE
talked to an individual known as NARD.  WHITE asked NARD where he
could get drugs, and NARD told him to talk to an individual known
as DANTE and provided either the address, 674 Alta, or a good
description of the house.  WHITE was familiar with DANTE from the
neighborhood.

     WHITE and BOND drove by 674 Alta, turned around at the
dead end, and then drove back toward Bankhead Highway.  It was
obvious to WHITE that drugs were being sold from 674 Alta because
of the traffic at the house.  WHITE got out of the truck at the
intersection of Alta Place and Sarah Street.  A red-skinned black
male let WHITE into 674 Alta.  WHITE asked for weed but was told
that none was available.  WHITE did not ask for anything else
because he was concerned by the presence of guns.  WHITE did not
recognize anyone in the house.

     WHITE told BOND that he asked for weed but did not get
anything.  BOND asked whether or not WHITE saw guns, and WHITE told
BOND that he saw handguns.  After trying to purchase drugs from 674
Alta, WHITE gave the buy money back to BOND.  On the day that WHITE
tried to purchase drugs from 674 Alta, WHITE also went to a
residence on Baker Ridge and others but can not recall those
addresses.

Investigation on 03/23,04/06/2007 at Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬

Date dictated   N/A

by   SA Brian P. Davis
     SA Andrew J. Van Epps:ajve

**DOZIER-COA**
**00044**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___ Alexis A. White _____ , On 03/23/2007 , Page _2_

     WHITE never went back to 674 Alta by himself or with APD after that day.  WHITE previously purchased drugs from NARD in Bowen Homes; WHITE purchased crack cocaine to sell.  WHITE has not purchased drugs from NARD since he tried to buy drugs at 674 Alta. WHITE never bought from DANTE before he tried to buy from 674 Alta. Since he tried to buy from 674 Alta, WHITE purchased drugs from DANTE for APD Officers GREGG JUNNIER and BOND.

     WHITE later received a call from JUNNIER who said that he was at 674 Alta, and it was payday.

     WHITE did not get paid by BOND for purchasing drugs from 674 Alta on the day that he went there.  After the search, APD Sergeant STALLINGS paid WHITE for 674 Alta in the bathroom at MCDONALD'S, 1166 Ralph David Abernathy Boulevard.  WHITE believes he was paid between $1,300 and $1,800 for 674 Alta but knows it was not $2,000.

     On April 6, 2007, SA VAN EPPS interviewed WHITE, who provided the following information:

     WHITE had never been to 674 Alta prior to the day he attempted to buy drugs at BOND's direction.

     WHITE did not see any drugs in 674 Alta when he attempted to buy drugs at BOND's direction.

**DOZIER-COA**
**00043**

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    03/28/2007

     ALEXIS A. WHITE was interviewed in Atlanta, Georgia.  The
Atlanta Police Department (APD) executed a search warrant at 834
Brookline Street, Georgia, 30310, and according to the affidavit,
an APD Confidential Informant (CI) purchased drugs from 834
Brookline Street.  WHITE was the APD CI credited with the drug
purchase from 834 Brookline.  WHITE was aware of the identities of
the interviewing agents, and after being advised of the nature of
the interview, WHITE provided the following information:

     WHITE stated he had been by 834 Brookline Street on two
different occasions.  On the first occasion WHITE was riding around
with a friend named ▉▉▉▉▉▉▉▉  ▉▉▉▉▉▉▉▉ was driving and
stated he needed to stop by his mom's house which resides at 834
Brookline Street.  WHITE sat in the car and ▉▉▉▉▉▉▉ ran inside of
the house.  WHITE stated ▉▉▉▉▉▉'S mom appeared to be selling
drugs out of the house.  WHITE watched several people pull up in
their cars and then run into the house and leave within a few
minutes.  ▉▉▉▉▉▉▉ stayed in the house for about ten minutes and
then returned to the car and left the residence.  WHITE has never
met nor seen ▉▉▉▉▉▉'S mother.

     WHITE told Atlanta Police Department investigator GREGG
JUNNIER about 834 Brookline Street as being a possible drug house.
WHITE and JUNNIER drove by the address and watched a few cars pull
up to the house and then leave within a few minutes.  JUNNIER told
WHITE that he did not want him (WHITE) to buy from this house.

     WHITE later heard from JUNNIER that they had raided 834
Brookline Street.  WHITE was not positive if he was paid by JUNNIER
for this house, because WHITE always signed blank vouchers.

---

Investigation on   03/28/2007   at  Atlanta, Georgia

File # ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉      ▉▉▉▉▉▉▉▉▉▉▉▉      Date dictated _____

by    SA Brian P. Davis:bpd
      SA Andrew J. Van Epps

**DOZIER-COA
00045**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

Howard
V
CoA

**DOZIER-COA**
**00047**

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    04/04/2007

    ALEXIS A. WHITE was interviewed in Atlanta, Georgia.  The attorney for ALPHONSO HOWARD, the occupant of 1271 Elizabeth Avenue, Atlanta, Georgia (1271 Elizabeth), contacted the FBI. ATLANTA POLICE DEPARTMENT (APD) officers executed a search warrant at 1271 Elizabeth and found no drugs.  According to the affidavit, an APD confidential informant (CI) purchased drugs from 1271 Elizabeth.  WHITE was the APD CI credited with purchasing drugs from 1271 Elizabeth.  WHITE was aware of the identities of the interviewing agents, and after being advised of the nature of the interview, WHITE provided the following information:

    WHITE does not know anything about 1271 Elizabeth.  WHITE did not try to purchase drugs from 1271 Elizabeth and has never been to 1271 Elizabeth.  Other than 1366 Elizabeth Avenue (1366 Elizabeth), WHITE did not attempt any other drug buys on Elizabeth Avenue.

    WHITE recalls being directed to 1366 Elizabeth by APD Officer GREGG JUNNIER but can not recall the reason they were in the area.  WHITE did not provide information about 1366 Elizabeth to APD officers.  When he went to 1366 Elizabeth, WHITE is unsure whether he was driving a vehicle or rode with APD officers.  WHITE believes APD officers BRUCE TESLER and CARY BOND were also present. Prior to trying to purchase drugs, WHITE was patted down by an APD officer.  WHITE is unsure whether or not an APD officer gave him money for the attempted purchase of drugs.  WHITE did not see officers watching him when he tried to purchase drugs.  There were cars and seven or eight people in the yard.  WHITE talked to some of the people in the yard and asked about drugs.  He does not recall the response, did not go into the house, and did not purchase any drugs.  WHITE told the APD officers he did not purchase drugs but does not recall their response.  WHITE does not recall whether or not an officer patted him down after attempting to purchase drugs.  WHITE does not recall getting paid for purchasing drugs from 1366 Elizabeth and does not recall signing a voucher that day.  WHITE does not recall other purchases that he attempted that day at the direction of APD.

---

Investigation on  04/03, 04/27/07 at Atlanta, Georgia

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮                                    Date dictated  N/A

by  SA Andrew J. Van Epps:ajve
SA Brian P. Davis

**DOZIER-COA
00048**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  04/04/2007

    ALEXIS A. WHITE was interviewed in Atlanta, Georgia.  The attorney for ALPHONSO HOWARD, the occupant of 1271 Elizabeth Avenue, Atlanta, Georgia (1271 Elizabeth), contacted the FBI. ATLANTA POLICE DEPARTMENT (APD) officers executed a search warrant at 1271 Elizabeth and found no drugs.  According to the affidavit, an APD confidential informant (CI) purchased drugs from 1271 Elizabeth.  WHITE was the APD CI credited with purchasing drugs from 1271 Elizabeth.  WHITE was aware of the identities of the interviewing agents, and after being advised of the nature of the interview, WHITE provided the following information:

    WHITE does not know anything about 1271 Elizabeth.  WHITE did not try to purchase drugs from 1271 Elizabeth and has never been to 1271 Elizabeth.  Other than 1366 Elizabeth Avenue (1366 Elizabeth), WHITE did not attempt any other drug buys on Elizabeth Avenue.

    WHITE recalls being directed to 1366 Elizabeth by APD Officer GREGG JUNNIER but can not recall the reason they were in the area.  WHITE did not provide information about 1366 Elizabeth to APD officers.  When he went to 1366 Elizabeth, WHITE is unsure whether he was driving a vehicle or rode with APD officers.  WHITE believes APD officers BRUCE TESLER and CARY BOND were also present. Prior to trying to purchase drugs, WHITE was patted down by an APD officer.  WHITE is unsure whether or not an APD officer gave him money for the attempted purchase of drugs.  WHITE did not see officers watching him when he tried to purchase drugs.  There were cars and seven or eight people in the yard.  WHITE talked to some of the people in the yard and asked about drugs.  He does not recall the response, did not go into the house, and did not purchase any drugs.  WHITE told the APD officers he did not purchase drugs but does not recall their response.  WHITE does not recall whether or not an officer patted him down after attempting to purchase drugs.  WHITE does not recall getting paid for purchasing drugs from 1366 Elizabeth and does not recall signing a voucher that day.  WHITE does not recall other purchases that he attempted that day at the direction of APD.

---

Investigation on  04/03, 04/27/07  at  Atlanta, Georgia

File #

Date dictated  N/A

    SA Andrew J. Van Epps:ajve
by  SA Brian P. Davis

**DOZIER-COA
00046**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   04/24/2007

       ALEXIS A. WHITE was interviewed in Atlanta, Georgia.  The ATLANTA POLICE DEPARTMENT (APD) executed a search warrant at 3350 Mount Gilead Road, #48, Atlanta, Georgia (3350 Mount Gilead #48), and according to an affidavit, an APD confidential informant (CI) purchased drugs from 3350 Mount Gilead #48.  WHITE was the APD CI credited with the drug purchase from 3350 Mount Gilead #48.  WHITE was aware of the identities of the interviewing agents, and after being advised of the nature of the interview, WHITE provided the following information:

       WHITE confirmed that approximately two years ago he told APD Officer GREGG JUNNIER about an individual known as MARCO.  WHITE's ▮▮▮▮▮▮ told WHITE that 3350 Mount Gilead #48 was MARCO's apartment.  WHITE has not been inside of 3350 Mount Gilead #48.

       WHITE drove by 3350 Mount Gilead #48 and saw MARCO's red Lexus.  WHITE contacted JUNNIER about 3350 Mount Gilead #48 and gave him directions to the apartment.  JUNNIER could not locate it, so WHITE met JUNNIER, and then JUNNIER and WHITE, in JUNNIER's vehicle, drove by 3350 Mount Gilead #48.  WHITE does not believe any other officers were with them.

       WHITE told JUNNIER that someone could not knock on the door and purchase drugs from the apartment.  JUNNIER did not want WHITE to try to purchase drugs from 3350 Mount Gilead #48.  WHITE has not attempted to purchase drugs from 3350 Mount Gilead #48.

       WHITE does not recall being paid for purchasing drugs from 3350 Mount Gilead #48 or signing a voucher for a purchase from 3350 Mount Gilead #48.  WHITE believes he was paid and signed a payment voucher for that payment after APD executed a search warrant at 3350 Mount Gilead #48.

       WHITE does not recall attempting to purchase drugs from any other locations on the day that JUNNIER and WHITE drove by 3350 Mount Gilead #48.

---

Investigation on   04/23/2007   at Atlanta, Georgia

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Date dictated ▮▮▮▮▮▮

by   SA Andrew J. Van Epps:ajve
     SA Brian P. Davis

**DOZIER-COA
00049**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription     05/22/2007

     ALEXIS A. WHITE was interviewed in Atlanta, Georgia.
WHITE was aware of the identities of the interviewing agents, and
after being advised of the nature of the interview, WHITE provided
the following information:

     WHITE confirmed he purchased drugs from 940 Bolton Road,
A5, Atlanta, Georgia (940 Bolton Road, A5), during December, 2005
at the direction of ATLANTA POLICE DEPARTMENT (APD) Officer BRAD
BURCHFIELD.  WHITE confirmed he later purchased drugs from 940
Bolton Road, A5, at the direction of APD Officer CARY BOND.

Investigation on   05/16/2007   at  Atlanta, Georgia

File #  2▮▮▮▮▮▮▮▮▮▮▮▮                          Date dictated  05/22/2007

SA Brian P. Davis

by   SA Andrew J. Van Epps:ajve

DOZIER-COA
00050

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/04/2007

       ALEXIS WHITE was interviewed in Atlanta, Georgia.  The ATLANTA POLICE DEPARTMENT (APD) executed a search warrant at 3762 Martin Luther King Drive, Apartment B5, Atlanta, Georgia (3762 MLK, B5), and according to the affidavit, an APD confidential informant (CI) purchased drugs from 3762 MLK, B5.  WHITE was the APD CI credited with the drug purchase from 3762 MLK, B5.  WHITE was aware of the identities of the interviewing agents, and after being advised of the nature of the interview, WHITE provided the following information:

       WHITE confirmed he purchased drugs from 3762 MLK, B5, at the beginning of 2006 at the direction of APD Officer BRAD BURCHFIELD.

Investigation on    05/30/2007    at  Atlanta, Georgia

File # ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                    Date dictated  N/A

     SA Brian P. Davis
by    SA Andrew J. Van Epps:ajve

**DOZIER-COA
00051**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription     06/05/2007

    ALEXIS WHITE was interviewed in Atlanta, Georgia.  The ATLANTA POLICE DEPARTMENT (APD) executed a search warrant at 3762 Martin Luther King, C9, Atlanta, Georgia (3762 MLK, C9), and according to the affidavit for the search warrant, an APD confidential informant (CI) purchased drugs from 3762 MLK, C9. WHITE was the APD CI credited with the drug purchase from 3762 MLK, C9.  WHITE was aware of the identities of the interviewing agents, and after being advised of the nature of the interview, WHITE provided the following information:

    APD Officer BRAD BURCHFIELD told WHITE he worked for 3762 MLK.

    WHITE recalls an individual known as Q living at 3762 MLK, C9.

    WHITE believes Q was not a drug dealer but was a drug user.  WHITE recalls other drug users going to Q's apartment to use drugs.  WHITE never went into Q's apartment.

    WHITE did not give information about Q to BURCHFIELD. WHITE did not buy drugs from Q, and BURCHFIELD did not tell WHITE to attempt to buy drugs from Q.

    ████████████████████ During the last half of 2005, WHITE recalls ███████ took BURCHFIELD to C9 and opened the door to C9.  BURCHFIELD did not enter the apartment.

    WHITE does not recall signing a voucher or getting paid as a result of 3762 MLK, C9.

Investigation on  05/30,07/06/07  at  Atlanta, Georgia

File # ████████████████                    Date dictated  N/A

by  SA Brian P. Davis
    SA Andrew J. Van Epps:ajve

**DOZIER-COA 00053**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

-1-

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    06/07/2007

        ALEXIS A. WHITE, was interviewed in the parking lot of the Flipper Apartment Complex, 2479 Abner Terrace,  Atlanta, Georgia 30318.  After being advised of the identity of the interviewing Agents and the nature of the interview, WHITE voluntarily provided the following information:

        WHITE met Atlanta Police Department (APD) Investigator GREG JUNNIER at the M & A Supermarket ██████████████, 2185 Martin Luther King, Jr. Drive, S.W., Atlanta, Georgia 30310, sometime in the Spring or Summer of 2006.  WHITE was meeting JUNNIER to get paid for information that he had provided earlier.  While at the store JUNNIER paid WHITE and had him sign several blank voucher forms.  Before leaving, JUNNIER asked WHITE if he would make a controlled drug purchase for APD Investigator HOLLY BUCHANAN.  WHITE agreed and JUNNIER and BUCHANAN both briefed him with the details.  Investigator CARY BOND may have also been at the store.  JUNNIER and BUCHANAN directed WHITE to go to the Flipper Apartment Complex, 2479 Abner Terrace, Atlanta, Georgia, and attempt to buy cocaine from a black male with tattoos.  WHITE was unsure if the officers directed him to a specific apartment, but he remembered being directed to the lower backside of the complex.

        After receiving instructions and buy money from JUNNIER and BUCHANAN, WHITE drove himself to the apartment complex.  WHITE was never searched by the officers before leaving Eddie's Store.  WHITE drove to the back of the apartment complex and saw a black male matching the description given to him earlier.  The black male was standing in the court yard.  WHITE approached the man and attempted to purchase cocaine.  The man told WHITE that he was out and to come back some other time.  WHITE then drove back to Eddie's Store and told JUNNIER and BUCHANAN that he was unable to make a buy.  BUCHANAN commented that the suspect probably did not sell to WHITE, because he did not know him.  WHITE was never paid for the attempted buy.  Sometime later, JUNNIER told WHITE that the Narcotics team served a search warrant at the Flipper Apartment Complex and did not find anything.  That was the only time WHITE ever made an attempt to buy drugs from the Flipper Apartment Complex.

---

Investigation on    06/04/2007    at Atlanta, Georgia

File # ██████████████████████████████████████    Date dictated  N/A

by    SA Matthew J. Ross
     SA Andrew J. Van Epps

**DOZIER-COA
00052**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    06/11/2007

       ALEXIS A. WHITE, was interviewed in the driveway of a residence located at 3575 Boulder Park Drive, Atlanta, Georgia. After being advised of the identity of the interviewing Agents and the nature of the interview, WHITE voluntarily provided the following information:

       WHITE advised that in 2004 or 2005 he made a drug purchase under the direction of BUCHANAN and another officer.  The other officer could have been CARY BOND, but WHITE was unsure. WHITE rode with BUCHANAN and the other officer in an undercover car.  BUCHANAN first dropped WHITE off on Delmar Lane to make a drug purchase.  She then took WHITE near 3575 Boulder Park Drive and dropped him off on a side street.  WHITE walked to the address and encountered two dark skinned, black males outside in the yard. WHITE then asked to purchase some illegal narcotics.  He was unsure what type of narcotics BUCHANAN directed him to buy.  One of the males went inside the residence and returned with the requested drugs.  WHITE then met BUCHANAN up the street where she dropped him off.  WHITE gave the drugs to BUCHANAN.  He could not remember if she ever patted him down before or after the purchase.  BUCHANAN did have WHITE sign a blank voucher form, and she paid him for the purchase.

---

Investigation on    06/07/2007    at  Atlanta, Georgia

File #  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮    Date dictated  N/A

    SA Matthew J. Ross
by   SA Andrew J. Van Epps

**DOZIER-COA
00054**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/11/2007

     ALEXIS A. WHITE, was interviewed in the parking lot of an apartment complex made up of four red brick buildings, each marked with a letter A, B, C, or D, located at 350 Lanier Street, Atlanta, Georgia.  After being advised of the identity of the interviewing Agents and the nature of the interview, WHITE voluntarily provided the following information:

     WHITE advised that sometime in 2005, he was directed by Investigator GREG JUNNIER of the Atlanta Police Department (APD) to make a drug purchase at Building D.  WHITE recalled that he bought approximately $5.00 worth of marijuana from a black male in apartment number three or five of Building D.  He gave the drugs to JUNNIER.  WHITE was never patted down by JUNNIER or anyone else from APD prior to making the purchase.  WHITE only met with JUNNIER during that day.  At no time was Investigator HOLLY BUCHANAN of APD ever present before, during, or after the buy.  This was the only time WHITE bought drugs from the apartments at 350 Lanier Street.

Investigation on    06/07/2007    at  Atlanta, Georgia

File #

Date dictated   N/A

**DOZIER-COA**
**00055**

SA Matthew J. Ross
by   SA Andrew J. Van Epps

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

## CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/11/2007

ALEXIS A. WHITE, was interviewed in the driveway of a residence located at 1109 Lookout Avenue, Atlanta, Georgia. After being advised of the identity of the interviewing Agents and the nature of the interview, WHITE voluntarily provided the following information:

WHITE advised that he had never been to or bought drugs from the residence located at 1109 Lookout Avenue.

---

Investigation on    06/07/2007    at  Atlanta, Georgia

File #                                         Date dictated   N/A

**DOZIER-COA
00056**

by    SA Matthew J. Ross
      SA Andrew J. Van Epps

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

## CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription   06/11/2007

      ALEXIS A. WHITE, was interviewed in front of a residence located at 580 Mayland Avenue, Atlanta, Georgia.  After being advised of the identity of the interviewing Agents and the nature of the interview, WHITE voluntarily provided the following information:

      WHITE recalled that sometime in 2005, JUNNIER took him to several locations on the same day to make drug purchases.  One of the locations JUNNIER took WHITE to was a residence at 580 Mayland Avenue.  JUNNIER dropped WHITE off near the residence.  WHITE walked to the back door of the house and bought an amount of crack cocaine from an unknown individual.  WHITE then walked back to JUNNIER's car and gave him the drugs.  JUNNIER paid WHITE for the buy that day.  JUNNIER was the only officer he worked with or saw that day.  This was the only time WHITE bought drugs from 580 Mayland Avenue.

      WHITE also advised that on that same day JUNNIER directed him to attempt a purchase at 1094 Welch, Atlanta, Georgia.  There were several black males standing in the front of the residence. WHITE attempted to buy drugs from them but had no success.  WHITE told JUNNIER that he was unable to purchase drugs at that location. This was the only time WHITE attempted to buy drugs from 1094 Welch.

---

Investigation on   06/07/2007   at  Atlanta, Georgia

File #  ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪   Date dictated  N/A

    SA Matthew J. Ross

by   SA Andrew J. Van Epps

**DOZIER-COA
00057**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

## CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/21/2007

　　　　ALEXIS A. WHITE was interviewed in Atlanta, Georgia.  The
ATLANTA POLICE DEPARTMENT (APD) executed search warrants at 2251
and 2259 Sisk Street, and according to affidavits for the search
warrants, a confidential informant (CI) observed drugs at both
addresses during a drug deal.  WHITE received credit as a result of
the searches at both addresses.  WHITE was aware of the identities
of the interviewing agents, and after being advised of the nature
of the interview, WHITE provided the following information:

　　　　Approximately one year ago, BURCHFIELD drove WHITE down
Sisk Street; other than BURCHFIELD, no other APD officers were
present.  BURCHFIELD told WHITE that the girlfriend of an
individual known as BLACK had called him and told him BLACK lived
in a house on Sisk Street.  WHITE was familiar with BLACK because
he had previously purchased drugs for personal use from BLACK at
another location.

　　　　BURCHFIELD wanted WHITE to purchase drugs from BLACK at
either 2259 or 2263 Sisk Street.  WHITE told BURCHFIELD he could
not purchase from BLACK on Sisk Street because BLACK would be
suspicious of WHITE showing up at his house and trying to purchase
drugs.  WHITE has neither purchased drugs from nor been in any
house on Sisk Street.

　　　　WHITE does not recall being paid for purchasing drugs on
Sisk Street.

Investigation on  06/15,07/06/07  at  Atlanta, Georgia

File # ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪          Date dictated  N/A

　　　　SA Andrew Van Epps:ajve
by ___ SA Brian Davis

**DOZIER-COA
00058**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-1023 (Rev. 6-22-2007)

## FEDERAL BUREAU OF INVESTIGATION

Confidential Human Source (CHS) Reporting Document

**Reporting Date:** 09/04/2007

**Case ID:** ███████████████ (Pending)
████████████ (Pending)
█████████████ (Pending)

**Contact Date:** 08/27/2007

**Type of Contact:**    In person

**Location:**    Atlanta, Georgia

**Written by:**   SA Eulis Mile Brosas
**Other(s) Present:**   SA Andrew J. Van Epps

**Source Reporting:**

ALEXIS A. WHITE, who has been previously interviewed, was interviewed in Atlanta, Georgia. WHITE was aware of the identities of the interviewing Agents, and after being advised of the nature of the interview, he provided the following information:

**ROLLING BENDS APARTMENTS**
**2500 Center Street N.W.**
**2591 Etheridge Drive N.W.**
**Atlanta, Georgia**

WHITE purchased drugs as a confidential informant (CI) for the ATLANTA POLICE DEPARTMENT (APD) from the ROLLING BENDS apartments located at 2500 Center Street N.W., building D, Atlanta, Georgia. WHITE believes the purchase was made sometime in 2004.

WHITE has never made a drug buy at building A at the adjacent ROLLING BENDS apartment buildings located at 2591 Etheridge Drive N.W. While WHITE does not know a male named "Eddie" who lived in building A, WHITE knew a man known as "Black" who lived in unit #401 in building A.

**BOWEN HOMES APARTMENTS**
**1259 Wilkes Circle N.W.**
**Atlanta, Georgia**

WHITE has made two drug purchases for APD in the BOWEN HOMES apartment complex. One buy was made in 2004 or 2005 from a man known as "Zayeed" (phonetic) who lived at 1275 Wilkes Circle

DOZIER-COA
00060

# CONFIDENTIAL

CHS Reporting



(Pending), 08/27/2007

N.W.  The other buy was made from "Larry" who lived at 1056 Chivers Street N.W.

WHITE has never purchased drugs from 1259 Wilkes Circle N.W.

**RIVERWOOD CLUB APARTMENTS**
**901 Bolton Road #C-5**
**Atlanta, Georgia**

WHITE made a drug purchase from a man known as "J.J." who resided at 901 Bolton Road, unit #C-5.  WHITE advised that the buy was conducted for former APD Narcotics Investigator GREGG JUNNIER.  WHITE is almost certain that APD Investigator BRUCE TESLER was not present during this drug buy.

♦♦

2

DOZIER-COA
00059

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    11/26/2006

      An individual, who is in a position to testify, provided the following information:

      Individual began working as a source for ATLANTA POLICE DEPARTMENT (APD) Officer CARY BOND approximately four years ago. APD Officer GREGG JUNNIER and BOND arrested individual on Martin Luther King, Junior, (MLK) Drive.  Individual lived in an apartment on MLK Drive, and BOND and JUNNIER approached individual when he was outside of his apartment.  Individual threw his marijuana under a car.  JUNNIER took individual's keys and started trying the keys in different apartments.  Individual was told he could either sign a consent to search for his apartment or the officers would search anyway because they smelled weed.  Individual signed the consent because he knew there were no drugs in the house.  A K-9 unit went through the house, and individual was told that the dog smelled drugs.  JUNNIER said he found weed in the house, and individual knew that it was not his because he had thrown his marijuana under a car.  When individual was arrested, BOND gave his telephone number to individual, and after individual's release, he contacted BOND.  Individual met BOND at an APD office.  BOND asked individual some questions, and he signed some paperwork.  As an APD source, individual did not work with just one officer.

      Individual is the source who, according to the affidavit, purchased drugs from an unidentified individual at 933 Neal Street, Atlanta, Georgia, but individual did not purchase any drugs from an individual known as SAM at that residence.  Additionally, JUNNIER previously used individual in warrant affidavits when individual has not purchased drugs from either the individual or the residence named in the warrant, and APD Officer BRUCE TESLER, APD Officer J.R. SMITH, and BOND are aware of this.  Individual is unsure whether or not the following APD officers were aware:  First Name Unknown (FNU) DAVENPORT, FNU LUCAS, Sergeant FNU STALLINGS, an officer known as HOLLY, FNU GRIFFIN, and FNU MILLER, a K-9 handler.  Individual believes MILLER is aware because JUNNIER regularly contacts MILLER to conduct K-9 searches.

      On November 21, 2006, individual spoke with BOND about making drug purchases.  BOND told individual that they would do drug purchases after 6 p.m.

---

| | | | |
|---|---|---|---|
| Investigation on | 11/25/2006 | at | Atlanta, Georgia |

| File # | | Date dictated | 11/26/2006 |
|---|---|---|---|

by   SSA Michael McKinney
    SA Andrew J. Van Epps

**DOZIER-COA 00065**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ____Individual_____ , On __11/25/2006__ , Page ___2___

     At 5:05 p.m., individual received a telephone call from JUNNIER, who asked individual whether or not he was available to make a drug purchase. Individual told JUNNIER that individual was available. JUNNIER stated that he would call back the individual soon, but JUNNIER never called. Approximately one hour later, individual called JUNNIER and asked him whether he was still coming. JUNNIER responded don't about it; we have you covered.

     At approximately 6:40 p.m., individual received a telephone call from SMITH, who said we need you to cover our asses; we fucked up; it wasn't the right house. Then SMITH told individual that it was really important that individual listened to SMITH. SMITH told individual that TESLER and SMITH met individual at a car wash at 1125 Bankhead Highway, left their car there, and rode in individual's car. SMITH told individual that SMITH sat in the back seat on the passenger side, and TESLER sat in the backseat behind the driver. SMITH told individual that he had purchased drugs from an individual named SAM at 933 Neal Street. SMITH described SAM as approximately 6'1" - 6'2", 30 - 35 years old. SMITH told individual that he went up to the house, and SAM was in the house; then SMITH said no, no, SAM was in the yard. SMITH stated SAM walked individual to the back of the house to the basement, and the door to the basement was already open. SMITH then stated SAM went in and got the bags of crack. SMITH told individual to say he bought two $25 bags of crack. Individual described SMITH as not calm during the telephone call, and SMITH did not say anything about anyone getting shot.

     During individual's telephone conversation with SMITH, individual received a telephone call from APD Officer BRAD BURCHFIELD, and individual called him back. BURCHFIELD asked individual where he was, and individual stated he was at home. BURCHFIELD asked aren't you with JUNNIER, and individual responded no. BURCHFIELD asked whether individual had been with JUNNIER, and individual replied yes. BURCHFIELD asked when individual had been with JUNNIER, and individual responded six something, no, might have been close to five. BURCHFIELD told individual about the shooting.

     SMITH called individual a second time to ask whether they were clear and whether individual got it. During a third telephone call from SMITH, individual asked whether SMITH was alright. SMITH stated that they had screwed up.

DOZIER-COA
00061

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Individual_____ , On _11/25/2006_ , Page ___3___

    Individual called SMITH to ask for details about 933 Neal Street.  SMITH told him the house had shutters, and there was a grill and a couple of chairs in the back yard.  SMITH reminded individual that the back door had been open.

    During one of their conversations, SMITH asked individual the type of vehicle he drove during the purchase at 933 Neal Street, and individual stated it was a green Lumina.  Individual does not own a green Lumina.  Individual previously purchased drugs at a house on Neal, but individual has never been to 933 Neal Street.  Individual has never pulled up to a residence from which he purchased drugs with APD officers in his car.

    On November 22, 2006, individual called ALCOHOL, TOBACCO, AND FIREARMS (ATF) Special Agent (SA) ERIC DEGREE.  Individual asked whether DEGREE knew JUNNIER had been shot and told him that it had not occurred as described.  DEGREE then said that he would be right over.  DEGREE and ATF SA AARON LAST NAME UNKNOWN (LNU) picked up individual, pulled over the car, and talked to him for approximately 30 minutes.  DEGREE dropped him off and told him not to go anywhere.

    Individual received a telephone call from JUNNIER who told individual about the shooting and then reminded individual of what SMITH had told individual.

    APD Officer FNU DUNCAN and an unidentified officer, described as a slim male with glasses, picked up individual from his mother's residence.  DUNCAN asked individual questions, including the following:

        Did he make the buy?
        What did the house look like?
        How many ways were there to get on the porch?
        Who did he buy from?
        How would he describe the individual he bought from?
        What did the back of the residence look like?

    DUNCAN then stated that they would drive by 933 Neal Street to look for SAM.  Individual called DEGREE approximately five times while individual was with DUNCAN.  During one conversation, DEGREE stated that he would come pick up individual, and DUNCAN stated that he had individual at the time, and DEGREE would have to wait.

DOZIER-COA
00062

# CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Individual_____ , On _11/25/2006__ , Page ___4___

     Individual became nervous and jumped out of DUNCAN's car, ran into and out of the VARSITY, and ran into the BP gas station near the intersection of Spring Street and North Avenue.  During this time, individual lost DUNCAN and his partner.  While he was in the BP gas station, individual called 911 and DEGREE, who came to the BP gas station and then took individual to the ATF office.  Individual was at the ATF office for approximately one hour, and then two APD officers took individual to APD Internal Affairs.  While at APD Internal Affairs, individual was interviewed, made consensually-monitored telephone calls, and submitted to a voice-stress test.

     Individual received calls from JUNNIER that night, and individual called the FBI at approximately 1:00 a.m.  Individual received a call from TESLER, who asked individual if he was okay and whether he knew what was going on.

     SMITH picked up individual on November 23, 2006, at approximately 11 a.m.  SMITH was driving a white truck.  SMITH stated that they were going to the office to look at photographs, but they did not look at any pictures.  SMITH went into his office, paid individual $100, took him by 933 Neal Street, and talked to him about the story.  They went to a store on MLK Drive owned by EDDIE LNU, where JUNNIER works a second job.  EDDIE LNU gave individual $100 that was from JUNNIER.  At approximately 1:00 to 2:00 p.m., SMITH dropped individual at a cousin's house on Six Flags Parkway, where he ate Thanksgiving dinner.

     On November 24, 2006, individual was interviewed by NICOLE ALLSHOUSE, FOX 5 NEWS, and called JUNNIER, SMITH, TESLER, STALLINGS, and BOND.  The conversations with JUNNIER, TESLER, STALLINGS, and BOND were recorded; individual did not speak to SMITH.

     Approximately two weeks ago, individual went to a residence at 161 Rhodesia and asked for an individual named MARIO.  An unidentified individual at the residence stated MARIO did not stay there.  SMITH stated he smelled weed and so did individual.

     JUNNIER sent individual to a residence on Brent Creek Way, and individual purchased drugs from an unidentified individual who had access to two apartments.  JUNNIER obtained search warrants for both apartments.  Individual could not recall the date.

DOZIER-COA
00063

# CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Individual_____ , On _11/25/2006___ , Page __5__

      Last week, individual purchased crack from one location, and BURCHFIELD split the rock from that purchase and put half of it on the location from individual had purchased it and half on a house on Wood, which is near a GIANT store.

      Individual never lied to the APD officers to get a deal finished because individual never needed to lie because they had a lot going on.  Individual did not stretch the truth to get a buy done.  If he purchased marijuana, then he was paid $20; if he purchased crack or cocaine, then he was paid $30.  If he purchased pills, then he was paid $20 - $30.

      Individual signed blank vouchers for APD officers.

      STALLINGS asked individual whether or not he was getting paid and whether or not individual thinks JUNNIER is okay.

DOZIER-COA
00064

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/30/2006

An individual, who is in a position to testify, provided the following information:

Individual identified VARIETY CAR WASH as the location at which J.R. SMITH told individual that BRUCE TESLER and SMITH met the individual on November 21, 2006.

Individual identified M.A. SUPERMARKET, telephone number ▮▮▮▮▮▮▮▮▮▮▮▮▮ on Martin Luther King, Junior, Drive as the store owned by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Investigation on    11/27/2006    at  Atlanta, Georgia

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Date dictated  11/30/2006

by    SA Andrew J. Van Epps

**DOZIER-COA
00067**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription     11/30/2006

An individual, who is in a position to testify, provided the following information:

Individual stated on Monday, November 20, 2006, he/she was staying at his/her mother's residence which is located at ███
████████████████████████████████████████████████████ The individual did not leave this residence on November 20, 2006, or on November 21, 2006, except to take a short walk through the apartment complex on both days.

Investigation on    11/30/2006    at  Atlanta, Georgia

File # ███████████████  ████████████        Date dictated _____

by   SA Brian P. Davis
     SA Andrew J. Van Epps

**DOZIER-COA
00066**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   12/08/2006

An individual, who is in a position to testify, provided the following information:

On November 21, 2006, individual did not receive any text messages between his call with ATLANTA POLICE DEPARTMENT (APD) Officer GREGG JUNNIER at approximately 5:05 p.m: and his call with JUNNIER approximately one hour later.

Individual only has one cellular telephone, and that telephone number is ▬▬▬▬▬▬. Individual was not given a telephone by APD officers.

Individual has neither rented nor borrowed a green Lumina. Individual borrowed a 1974 Monte Carlo from ▬▬▬▬▬▬. Individual was driving a green Oldsmobile Intrigue when he was in a car accident. Individual can not rent a car because he does not have the credit. Individual sold a Crown Victoria to ▬▬▬▬▬▬. ▬▬▬▬▬▬ rented a gray Grand Prix for individual from AVIS at the Atlanta airport. Individual was driving a FOX 5 vehicle in the story that was on FOX 5 news. ▬▬▬▬▬▬ drives a white Ford Expedition. Individual's father, ▬▬▬▬▬▬, drives a blue/gray Chevrolet van. Individual's uncle, ▬▬▬▬▬▬, drives a green Suburban.

Individual voluntarily provided major-case fingerprints.

Individual reviewed his verbatim phone records to help identify unknown phone numbers. The following phone numbers were identified by the individual as belonging to the following subjects.

1)  ▬▬▬▬▬▬, ▬▬▬▬▬▬
    ▬▬▬▬▬▬

2)  ▬▬▬▬▬▬, ▬▬▬▬▬▬ Fulton County
    Marshal or Sheriff's office. Individual called
    Orange to tell her about the shooting.

3)  ▬▬▬▬▬▬, Individual's brother ▬▬▬▬▬▬

Investigation on   12/08/2006   at Atlanta, Georgia

File # ▬▬ - - - - - - - - - - - - -                          Date dictated   12/08/2006

by   SA Andrew J. Van Epps
     SA Brian P. Davis

**DOZIER-COA
00068**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302a (Rev. 10-6-95)

████████████████

Continuation of FD-302 of  ___Individual_____ , On _12/08/2006_ , Page __2__

4) ████████████ , ████████████████████████████
   ████████████

5) ████████████ , ███████████████████████

6) ████████████ , ███████████████

7) ████████████ , ██████████████████
   █████████████████████████

8) ████████████ , ████████████████

9) (404) 853-4235, CITY HALL EAST, Atlanta Police.

10) (404) 455-6927, Investigator BIRCHFIELD.

11) ████████████ , ███████████████████

12) ████████████ , ██████████████████████

13) ████████████ , █████████████████████████

14) ████████████ , █████████████████████

15) ████████████ , ██████████████████████

16) ████████████ , ████████████████████

18) ████████████ , ████████████████

19) ████████████ , ████████████

20) (404) 222-9922, Taxi service.

21) (404) 232-3000, Department of Labor.

22) ████████████ , ████████████████████

23) █████████████ , female friend, ███████████████████
   ████████████████████

24) ████████████ , ███████████████████████

25) ████████████ , ████████████████████

DOZIER-COA
00069

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Individual_____, On _12/08/2006_ , Page __3__

   26) ████████████, ████████████████

   27) ████████████, ██████████████████████

   28) ████████████, ██████████████████████

   29) (404) 741-9833, Radio Station.

   30) ████████████, ████████████████

   31) ████████████, ████████████████████

   32) ████████████, █████████████████

   33) (770) 425-8259, Georgia lottery.

   34) ████████████, ██████████████████████████

   35) (770) 595-8790, Investigator BOND.

   36) ████████████, █████████████████

DOZIER-COA
00070

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   01/04/2007

An individual, who is in a position to testify, provided the following information:

On either October 8 or October 9, 2006, ATLANTA POLICE DEPARTMENT (APD) Officer GREGG JUNNIER called individual and stated he needed individual's assistance to purchase illegal drugs.

APD Officer BRUCE TESLER picked up individual at the BP station on the corner of Boulevard and Ralph McGill Boulevard.  At the direction of APD, individual purchased drugs from three or four locations.

After the buys, TESLER paid individual while they were at East Atlanta City Hall.  When APD Officer CARY BOND arrived, BOND stated he had been watching individual during the drug buys.  BOND asked individual where he had purchased the drugs that were about to be turned in to APD property.  BOND stated he needed to know what was on the other side of the doors of the houses from which individual purchased drugs for the APD.  BOND also stated he needed a good description of each subject and whether or not he possessed a gun.  BOND further stated that he did not care what individual did while working with JUNNIER.  TESLER and APD Officer HOLLY BUCHANAN were also present during the conversation.

---

Investigation on    01/03/2007    at Atlanta, Georgia

File #  ██████████████████                                Date dictated   01/04/2007

        SA Brian P. Davis
by      SA Andrew J. Van Epps:ajve

DOZIER-COA
00071

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   01/29/2007

            An individual, who is in a position to testify, provided
the following information:

            Individual confirmed that he purchased drugs from 238
Newport Street, Atlanta, Georgia, for the ATLANTA POLICE DEPARTMENT
(APD).  Individual knew three people - DERRICK Last Name Unknown
(LNU), TONIO LNU, and a person known as Pie - at that address.

            Individual was directed by an APD officer to purchase
drugs from 1994 Bent Creek Way, Atlanta, Georgia.  When individual
approached the apartment, FIRST NAME UNKNOWN (FNU) DAY was outside
the apartment with other people.  Individual gave cash to DAY, and
DAY went into a downstairs apartment.  DAY came out of the
downstairs apartment with drugs in his hand, went into an apartment
upstairs, came out of the apartment upstairs and gave the drugs to
individual.  Individual never purchased drugs for himself from 1994
Bent Creek Way and only purchased drugs one time from 1994 Bent
Creek Way.

            Individual recalled that 3350 Mount Gilead Road is an
apartment complex with English in its name.  MARCO LNU sold drugs
out of an apartment in that complex.  MARCO LNU sold to people who
sold drugs on the street.  Individual told APD officer GREGG
JUNNIER about MARCO LNU's drug activity but told JUNNIER that he
could not purchase drugs from MARCO LNU.  Individual did not
purchase drugs from MARCO LNU at 3350 Mount Gilead Way.

            Individual did not purchased drugs from PATRICIA
HANDSPIKE at 834 Brookline Street, Atlanta, Georgia.  Individual
sat in a car with JUNNIER and watched the residence, and it was
obvious that drugs were being sold in the house.  JUNNIER asked
individual whether or not individual could purchase drugs from
PATRICIA HANDSPIKE, but individual was not comfortable purchasing
from her because individual did not know PATRICIA HANDSPIKE, who is
the mother of an acquaintance, TELLIE HANDSPIKE.

            APD officer CARY BOND directed individual to purchase
drugs from 674 Alta Place, Atlanta, Georgia.  BOND drove individual
to a street near 674 Alta Place, and individual walked to the
residence.  Individual knocked on the door, talked to someone at
the residence, but the drug requested by the individual was not

---

Investigation on   01/15/2007   at Atlanta, Georgia

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                        Date dictated   01/29/2007

SA Andrew J. Van Epps:ajve
by  SA Brian P. Davis

**DOZIER-COA
00073**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Individual_____, On 01/15/2007 , Page ___2___

available, and he returned without any drugs to BOND's vehicle.
Individual returned the money for the drug purchase to BOND.
JUNNIER later called individual and told him that he did a good job
at 674 Alta Place.  Individual received approximately $1,800 as
payment from APD after the search was executed.

DOZIER-COA
00072

CONFIDENTIAL

Issues

DOZIER-COA
00100

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    06/15/2007

        Major ERNEST N. FINLEY, JR., Zone 3 Commander, Atlanta
Police Department, 880 Cherokee Avenue, Atlanta, GA 30315,(404)
624-0674 (office), ▬▬▬▬▬▬ (mobile),was interviewed at his
office by Supervisory Special Agent (SSA) Michael McKinney.

        FINLEY was advised of the identity of the interviewing
agent and the nature of the interview, which was to discuss his
tenure as a Lieutenant in the APD's Narcotics Unit.  FINLEY was
advised that his statements would be voluntary and that he was not
being compelled administratively to answer questions.  FINLEY
thereafter provided the following information.

        FINLEY advised that he has been with APD for
approximately 21 years.  He began his career with the APD on March
20, 1986, after serving four years in the Army and attending
Rutgers University.  He initially left college without obtaining a
degree, in order to take a job with the APD, but he later returned
and earned a Bachelors Degree of Science from Rutgers.

        FINLEY began his APD career as a patrol officer in Zone 2
(9 months), and then Zone 6 (3 years).  He was assigned to Red Dog
("Rid Every Drug Dealer Out of Georgia") (3 years), and Background
& Recruitment (5 months).  He was promoted to Sergeant in 06/1993
and transferred to Zone 6 (2 years).  He was then assigned to Sex
Crimes (1 year) and the Youth Squad (8 months).

        FINLEY was transferred to Narcotics in 01/1996 where he
worked as a Sergeant for 2 years under the command of Major
Shannon.  In 1998, he was promoted to Lieutenant and transferred to
Zone 3.  In 2001, he was reassigned as the Lieutenant in Narcotics.
In 2003, he was promoted to Major and assigned as the Commander of
Zone 3.

        As a Sergeant in Narcotics (1996 - 1998), FINLEY
developed an understanding of the scope of his job in law
enforcement.  Under Major Shannon, the Narcotics Unit was "lead
sheet driven", and this required FINLEY to get involved with the
community.  He began attending community meetings and developed a
stronger appreciation for the needs of the community.  His team was
assigned to work a zone and cover leads, and he was responsible for
"hot spots" in an assigned area.  This resulted in higher numbers

Investigation on    06/15/2007    at  Atlanta, GA

File # ▬▬▬▬▬▬▬▬▬▬▬▬                    Date dictated   06/15/2007

by   SSA Michael McKinney

**DOZIER-COA
00074**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ernest N. Finley, Jr._____ , On _06/15/2007___ , Page ___2___

of arrests, but the focus was on giving the community what it needed.

FINLEY stated that he applied this same structure when he took over as Lieutenant in Narcotics (2001 - 2003). He reported to Leander Robinson and then John Mathis while assigned as the Narcotics Lieutenant. Both Robinson and Mathis approved of Finley's methods of enforcement.

There were 5-8 investigators in each unit in Narcotics when FINLEY arrived, and a Sergeant served as the supervisor of each team. FINLEY made some changes based upon the strength of each team, focusing on the individual strengths of the people assigned. Some were great at surveillance, or undercover buys, performing administrative duties, or tactical duties such as raid planning and entry. FINLEY tried to put people where they could utilize their strengths, understanding not everyone was capable of producing in the area of arrests and search warrants.

The Narcotics teams were assigned to various zones, wherein FINLEY expected them to address all lead sheets (complaints from the community) and "hot spots". He advised that hot spots are open areas where there are problems, such as liquor stores, grocery stores, and the horseshoe areas within many apartment complexes. The members of Narcotics were expected to make arrests and execute search warrants, but just as important to FINLEY were community oriented issues such as building rapport and earning respect.

FINLEY would attend community meetings to hear the citizen concerns, which would help him identify where the problems were. He would then flood the target area with informants, undercovers, and Vice in order to determine who was selling drugs and to get them to identify their suppliers. This would give the Narcotics Unit a chance at the low and mid-level dealers.

FINLEY held weekly meetings with his Sergeants to find out what they were doing in the area. He could not recall who the Sergeants were when he arrived, but stated his staff consisted of the following Sergeants when he left in 2006: W. Stallings, J. Durant, C. Mills, Stacie Gibbs, G. Sanchez, Paul Sparwath, and Steve Keeble.

For the most part, each team had a zone to cover and FINLEY expected arrests and enforcement in that area. FINLEY expected them to identify problems from lead sheets, and expected

DOZIER-COA
00075

## CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Ernest N. Finley, Jr._____, On _06/15/2007___, Page ___3___

them to focus on those within the zones that were in a cluster.
They also discussed Unit operations, manpower issues, personnel
problems and concerns, and there were often discussions concerning
upcoming details.

FINLEY advised that he tried to personally review as many
warrants as possible, but that was something the sergeants, judges,
and attorneys were already doing.  FINLEY advised that as a
Sergeant in Narcotics he was very much involved in reviewing the
team's paperwork, but he did not regularly review warrants and
reports as a Lieutenant.

Regarding informants, FINLEY recalled that the policy
required at least two buys and some surveillance or observation
before a warrant could be obtained.  FINLEY stated that he was very
quick to deactivate any source for 6 months or 1 year who had
issues.  This was often unpopular among the sergeants and
investigators who worked for him.

FINLEY advised that he has absolutely no recollection of
anyone cutting corners during his tenure as a sergeant and
lieutenant in Narcotics, other than that which was dealt with.  He
stated that he has a reputation for being by-the-book and it is
unlikely that anyone would have voluntarily advised him of issues
unless they wanted something fixed.  Also, FINLEY stated that
although he tried to get to know officers who worked under him, he
was not their friend.  He does not believe officers would have
confided in him to discuss something improper, again, unless they
were trying to official report it.  FINLEY stated that it would not
be worth risking his career to cover for anyone who is breaking the
rules and/or the law.

FINLEY advised that the APD does not have quotas.
Officers assigned to the Narcotics Unit during FINLEY's tenure were
evaluated monthly on a performance system, and goals and objectives
were set in place to measure their work performance.  The system of
evaluation was determined by APD, and the expectations were
established by FINLEY using the performance averages from the
previous year.

The performance evaluation that FINLEY established in
Narcotics covered the following three critical job elements:

DOZIER-COA
00076

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  __Ernest N. Finley, Jr._____ , On __06/15/2007__ , Page __4__

    a)   Law Enforcement - based on monthly and yearly averages, which includes arrest/search warrants, arrests, detail participation (2 out of 3 indicators must be met).

    b)   Operational Procedures - paperwork (reports and warrants) turned in on time; completing assigned tasks.

    c)   Departmental Policies and Procedures - sustained complaints, employee not conforming to written directive(s), failure to keep [superiors] updated.

    FINLEY advised that the above evaluation system does not amount to pressure or quotas, but he believes it is the reason for the current statement of "nine and two".  FINLEY stated that there has always been a "magic" number for officers to meet in order to stay under the radar, but it has never been a directive from management.

    FINLEY stated that it was his goal to ensure that everyone working for him received a rating of "Effective" or higher, even though many officers were not great at making statistics in the form of arrests and warrants.  This was accomplished by placing those officers in an assignment within Narcotics wherein they could succeed.

    FINLEY stated that no investigators were ever disciplined for not meeting or going under the performance measures; no investigators were ever evaluated poorly based upon FINLEY's measures; no investigators were ever transferred because of their lack of productivity; no investigators were ever told to violate departmental policies, city ordinances, state laws, and or citizens' civil rights in order to make an arrest.  FINLEY is not aware of the performance measures utilized by the three or four Narcotics Lieutenants who succeeded him.

    Concerning the policy on informants, FINLEY advised that he tasked Gregg Junnier to assist in a re-engineering project to update the Narcotics SOP (standard operating procedure), including updating the policy concerning payments to CIs (informants).  He selected Junnier because of his training and experience, and because Junnier was one of the hardest workers in the unit.  FINLEY described Junnier as being a very knowledgeable leader who had the respect of everyone within the unit.

DOZIER-COA
00077

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of     __Ernest N. Finley, Jr._____ , On _06/15/2007_ , Page ___5___

      FINLEY advised that the media reports that Junnier was poorly trained are foolish and absolutely ridiculous.  FINLEY stated that Junnier worked in the Narcotics Unit for several years, having arrived during FINLEY's tenure as a sergeant.  He described Junnier as a hard worker who knew what he was doing back then, which means he was even more experienced at the time of the Neal Street shooting.  FINLEY stated he really did not know or work with Investigators J.R. Smith and Bruce Tesler, but there is no doubt Junnier knew what he was doing, and it was his character to speak up if he saw something he did not like.

      Concerning a report that FINLEY punished Junnier for taking vacation at a time when the unit needed statistics, FINLEY remembered the following:

      It was either Thanksgiving or New Years Eve and there was an upcoming detail where people were needed.  Junnier routinely scheduled several weeks of vacation around the holidays, and possibly during the summer.  FINLEY may have told Junnier or his Sergeant that he was needed, but it was because the Unit was short on personnel, not because there were quotas.  FINLEY advised that he does not remember ever instructing Junnier or anyone else to cancel their vacation.  If he wanted someone at work, regardless of the reason, FINLEY, as the Narcotics Commander, would have simply ordered them to report.

      FINLEY believes he may have sent Junnier to work the detail because Junnier had never been assigned to work it, and FINLEY did not want to set a bad example by continually sending the less experienced officers.  Junnier may have considered this a punishment only because he did not want to go on the assignment.

      Regarding extra jobs, FINLEY advised that he recalls having one off-duty job while he was assigned as the Lieutenant in Narcotics.  The job was at a liquor store and it had nothing to do with his position in Narcotics.  He advised that he is puzzled that Junnier or another officer would state that he coordinated or participated in anyone having extra work, except where he had to approve it.

      FINLEY stated that he remembers that Junnier had several extra jobs in apartment complexes, stores, and other places. FINLEY believes the APD was aware of the jobs because all or many were approved.  FINLEY does not recall there ever being a conflict between the extra jobs and Junnier's job as a police officer.

DOZIER-COA
00078

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  __Ernest N. Finley, Jr.__  , On __06/15/2007__ , Page  __6__

     FINLEY stated that Sergeant Pete Stallings was Junnier's immediate supervisor, and like Junnier, Stallings had several off-duty jobs.  FINLEY then stated that he did not get along with Stallings and actually got into an argument with him on FINLEY's second day as Lieutenant.

     According to FINLEY, on FINLEY's second day in Narcotics, Stallings made the claim that his team had a flexible schedule to which FINLEY responded "not any more".  FINLEY advised that Stallings was lazy and too laid back to be a Sergeant, and he constantly challenged FINLEY during meetings.  FINLEY stated that he distinctly remembers writing a two-page letter recommending Stallings' removal from Narcotics, but the request was denied. FINLEY advised that he would try to find the letter, but doubts he has a copy since it was written several years ago (2001).

     FINLEY was shown a copy of an internal memorandum, dated August 5, 2003, entitled "Narcotics Unit Expectations" (copy attached hereto).  FINLEY confirmed that he authored the memo and forwarded it to his superiors for approval.  However, the changes proposed in the document never went into effect because FINLEY's boss (Major Brooks) rescinded the proposed changes the following day.  In addition, FINLEY was promoted to his current position of Major a few days after drafting the memo.  FINLEY had no idea he was going to be promoted when he drafted the document.

     FINLEY advised that he has no recollection of officers cutting corners during his tenure as Sergeant and Lieutenant in Narcotics.  Nor did he recall any instances of officers "padding" vouchers for payments of informants.

     FINLEY did not initially understand when asked whether he was aware that Narcotics Investigators may have shared buys during his command.  FINLEY was then advised that the concept includes one officer using an informant to conduct drug buys and then turning the work over to another officer.  The second officer then writes an Incident Report and/or Affidavit which reads as though the second officer conducted the entire investigation.  FINLEY advised that he has never heard of this concept, and he was absolutely unaware that it may have happened during his time in Narcotics.

     FINLEY advised that he initially did not understand because he had not heard the term "sharing buys".  He stated that you don't need training to know that it is clearly wrong to say you

DOZIER-COA
00079

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of      Ernest N. Finley, Jr.       , On 06/15/2007 , Page   7

did something that you did not do. He advised that it is called
lying.

      FINLEY was advised that some officers have stated that
everyone in Narcotics does it or is aware of it. FINLEY stated
then "everyone" will probably be in a lot of trouble. He advised
that this is not something that an Investigator would do and then
tell his or her Lieutenant about, and he advised that he doubts any
of the Lieutenants were aware it was happening. FINLEY advised
that he definitely was not aware of it.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/03/2007

      PAUL A. VIGNOLA, date of birth, ▬▬▬▬▬▬, Atlanta
Police Department investigator. VIGNOLA was interviewed at 763
Juniper Street, Atlanta, Georgia, 30308, work telephone number 404-
815-4400. After being advised of the identity of the interviewing
agents and the nature of the interview, VIGNOLA provided the
following information.

      VIGNOLA was transferred to the Narcotics Team 1 in
approximately 1998. While working on Team 1 he would occasionally
use an informant named ALEX WHITE. VIGNOLA used WHITE
approximately 10 times to make drug buys. WHITE appeared to be a
reliable informant.

      VIGNOLA stated that Team 1 investigator BOND and
investigator JUNNIER used WHITE the most. VIGNOLA also stated that
at one point WHITE had gotten into some trouble and the
investigators quit using WHITE for a short period of time.

      VIGNOLA recalls WHITE driving a white caprice and on some
occasions the investigators would pick up WHITE at different
locations. VIGNOLA never picked WHITE up from his house.

---

Investigation on   12/21/2006   at Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬    Date dictated _____    **DOZIER-COA**
    SA BRIAN P. DAVIS    **00081**
by   SA BRET C. AITCHISON

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of   **PAUL VIGNOLA**    , On **12/21/2006** , Page  **2**

        The following is the home address of Investigator VIGNOLA. VIGNOLA requested his personal information stay confidential.

        VIGNOLA'S home address is ▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆ home telephone number ▆▆▆▆▆▆▆▆▆.

DOZIER-COA
00082

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/21/2006

     HOLLY CHRISTINE BUCHANAN, Atlanta Police Department
(APD)Narcotics Investigator assigned to Team 1, was interviewed at
the Atlanta Police Department located at 675 Ponce De Leon Avenue,
Atlanta, Georgia, 30308.  After being advised of the identity of
the interviewing agent and the nature of the interview, BUCHANAN
provided the following information:

     BUCHANAN, started working with the Atlanta Police
Department in approximately May 1996.  BUCHANAN was recently
assigned as an investigator on the narcotics unit Team 1.  BUCHANAN
started on the narcotics unit at the same time as investigator J.R.
SMITH.

     BUCHANAN has met APD informant ALEX WHITE on several
occasions.  BUCHANAN has used WHITE as an informant on
approximately 7 occasions to buy drugs.  BUCHANAN would follow
WHITE to the drug location and watch him make his drug buys.  WHITE
was a reliable informant that was great at noticing details and
identifying subjects in photo displays.

     BUCHANAN had witnessed WHITE driving different vehicles
on different occasions.  WHITE has driven a white Grand Prix, a
green four door vehicle, and a red car.  BUCHANAN has dropped WHITE
off near to the drug house and allowed him to walk to the house.

     BUCHANAN stated that she would sometimes use test kits to
test drugs.  BUCHANAN would place all drugs into evidence.
BUCHANAN stated when drugs test negative or "fake" she would have
the drugs destroyed.

---

Investigation on    12/20/2006    at  Atlanta, Georgia

File #  ▬▬▬▬▬▬▬▬▬▬▬▬                      Date dictated  ___

    SA Bret C. Aitchison                              **DOZIER-COA**
by   SA Brian P. Davis                                **00083**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    <u>HOLLY CHRISTINE BUCHANAN</u>    , On <u>12/20/2006</u> , Page   <u>2</u>

        The following is biographical information regarding investigator BUCHANAN.  BUCHANAN requested her personal information stay confidential.

        BUCHANAN'S date of birth ████████, social security account number ████████.  BUCHANAN'S home address is ████ ████████████████████ cellular phone number ████████, work telephone number 404-853-4245, ext-45678.

DOZIER-COA
00084

FD-302 (Rev. 10-6-95)

# CONFIDENTIAL



-1-

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription   06/18/2007

On June 15, 2007, Special Agents Matthew J. Ross and Brian Davis of the Federal Bureau of Investigation delivered a letter to Investigator HOLLY BUCHANAN, Atlanta Police Department, from the United States Attorney's Office, Northern District of Georgia.  The purpose of the letter was to advise BUCHANAN that she is currently a subject of a federal criminal investigation.  After advising BUCHANAN of the identity of the interviewing Agents and delivering the letter, BUCHANAN was told several times by the interviewing Agents that it would be best if she retained an attorney before speaking.  Despite these admonitions, BUCHANAN voluntarily provided the following information:

BUCHANAN was advised by the interviewing Agents that the truthfulness of many of her search warrant affidavits were being called into question.  BUCHANAN stated that she did not intend to do anything wrong.

BUCHANAN insisted on being told which search warrants were being questioned.  Special Agent Ross then wrote the following four addresses as examples on a plain sheet of notebook paper:

2479 Abner Terrace #41;
350 Lanier Street C-6;
1109 Lookout Avenue; and
580 Mayland Avenue.

Special Agent Ross then folded the paper in half and handed it to BUCHANAN.  After looking at the addresses on the paper, BUCHANAN responded with one word, "Fuck."

---

Investigation on   06/15/2007   at Atlanta, Georgia

File #  ▬▬▬▬▬▬▬▬▬▬▬                               Date dictated  N/A

        SA Matthew J. Ross                                      **DOZIER-COA**
by   SA Brian P. Davis                                         **00085**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302 (Rev. 10-6-95)

# CONFIDENTIAL

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    01/07/2007

        Atlanta Police Department (APD) Officer Cary Bond was
interviewed at the Atlanta Office of the FBI on December 6, 2006.
Bond's attorney, Rand Csehy, was present with him.  Also present
were APD Officer Bobby Render and Assistant United States Attorneys
Yonette Buchanan and Jon Peter Kelly.  Bond signed a consent form
waiving his right to not have his written statement to APD Homicide
concerning the shooting of Kathryn Johnston on November 21, 2006,
used against him.  Bond's date of birth is ████████3.  He has been
with the APD for fourteen years and on Narcotics Team #1 for three
years.  He provided the following information:

        On the afternoon of the day of the shooting of Kathryn
Johnston, Sargent Stallings told Bond that he would need to help on
a warrant that Officer Greg Junnier was working on.  Thereafter,
Bond went to the fire station at Simpson and Flowers.  He rode
there in a van with Stallings and Officer Gary Smith.  They met
Officers Junnier, Bruce Tesler and J. R. Smith (JR) at the fire
station.  Fabian Sheats was with Junnier, Tesler and JR.  Bond
recognized Sheats because he locked him up once before around the
1140 block of Simpson Street.  Sheats is one of the guys who hangs
out near a green store on that block.  Bond had spoken to Sheats
before and had seen him on Simpson St.

        At the fire station, JR briefed the execution of the
warrant for the residence at 933 Neal St.  JR described the
residence in detail.  He described burglar bars, a wheel chair ramp
and gave the color of the house.  It was briefed that there was
supposed to be a kilo of cocaine in a shoe box at 933 Neal St.  It
was further briefed that a buy had been done and Bond cannot recall
if it was briefed that crack was the drug purchased.  A description
of the seller of the drugs was also provided in the brief.  There
was also a tactical briefing.  Gary Smith was going to carry the
shield.  Junnier was first cover.  JR was third cover and had the
halogen tool.  Bond was fourth cover.  Officer Maurice Guerin had
the ram.  Officer Nathan Lucas was also in the stack.  Tesler and
Stallings were to cover the back of the house.

        At some time in the past, Bond was involved in raiding
the house next to 933 Neal St., on the right as you're facing 933
Neal St.  There was a father-son drug operation at that house.

Investigation on    12/6/06      at  Atlanta, GA

File #  ████████████              Date dictated  1/7/06      **DOZIER-COA**
        Michael L. Grant                                     **00086**
by  F. Joseph Robuck:fjr

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.



**CONFIDENTIAL**

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Cary Bond_____ , On **12/6/06**_____ , Page ___2___

      When the raid on 933 Neal St. occurred, Officer Sperl, a
K-9 officer, was at the scene.  It was dark when the raid happened.
There was a marked police car at the scene, but its blue lights
were not flashing.

      When the raid team approached the house at 933 Neal St.,
it approached it from the right side as you face the house.  Gary
Smith took a position at the front door.  JR began working on the
burglar bars with a halogen tool.  At least a minute or two went by
before JR got the burglar bars opened.  Bond recalls someone
yelling "Atlanta Police."  Bond was not yelling anything at that
point.  Guerin hit the front door of the house with the ram.  Until
the front door was opened, Bond couldn't see inside the house.  As
soon as the door opened, Bond could see a silhouette of a person.
He couldn't tell the age of that person.  He saw a revolver pointed
at Gary Smith.  At about the same time, either before the first
shot rang out or at the same time, Bond started yelling "Atlanta
Police Search Warrant."  When the door opened, Bond saw a muzzle
flash and heard an eruption of gun shots.

      After the first shot was heard, Bond saw Junnier go
backwards down the steps of the front porch of the house.  Bond was
backing down and getting hit by shrapnel.  Bond remembers firing
one round, but he actually shot two according to APD Homicide.
Bond continued down the stairs and around the corner.  He saw that
Junnier was injured and someone else was injured.  Someone said
that the shooter was down and then the team re-stacked and entered
the house.  The team did a security sweep of the house.  After the
house was cleared, Bond saw a gun by the victim and he moved it to
a bed in a nearby bedroom.  The victim was still moving at that
point in time.  About that time, Bond's arm started to throb, so he
left the house to find some medical attention.  Thereafter, he left
the scene to go to the hospital.

      After Bond made his statement to homicide, he talked to
Junnier on the telephone.  Bond is not sure who called who.
Junnier told him that they took Fabian by 933 Neal St. and he
identified that house as a place that he had, earlier that day,
seen cocaine in a shoe box.

      Bond has no information, besides what he has heard from
the media, that Alex White (Alex) made a buy at 933 Neal St.  Alex
is a hustler.  He is always on the move and in tune with the
street.  Bond arrested Alex on Martin Luther King on marijuana
charges.  It was a minor amount of marijuana, but Alex had an

**DOZIER-COA
00087**

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____Cary Bond_____ , On _12/6/06___ , Page ___3___

outstanding charge in East Point, GA. Alex just started talking
(i.e. cooperating). Bond gave Alex his telephone number for after
he got his East Point problem resolved.

Alex has had a number of different cars that he has used:
a green Altima (which is his girlfriend's car), a Dodge Magnum, a
Ford F-150, several Ford Crown Victorias, a bright blue Monte
Carlo, and some rental cars. Alex makes money by selling Nike
knock-offs and he might do some construction work with his father.
Alex's main motivation in life, in Bond's opinion, is money.
Lately, Alex has used just one cell phone number, (678)754-1933.
Bond is not familiar with a Green Lumina that may have been used by
Alex.

Bond has written up drug buys in a way to get gas money
for the informant. For example, the informant might buy $45 worth
of drugs, but Bond would submit a voucher for $50 and give the
informant $5 for gas. The informant would also get an extra $20
for buying marijuana and $30 for buying cocaine. An informant
would get a big payment if "weight" is found in a house where the
informant made a buy. Bond has had Alex sign blank vouchers.

Bond has not paid Alex for the buy at 933 Neal St. In
fact, Bond didn't pay Alex during the week of Thanksgiving for
anything. Moreover, Bond doesn't know if anyone else paid him for
anything. Bond would only pay Alex based on the police scale ($20
for marijuana, $30 for cocaine, etc.) and for gas money.

On the day that Bond gave his homicide statement, Alex
told him in a telephone call that he didn't do the buy at 933 Neal
St. Alex further stated that he was told by Junnier and JR that he
should falsely say that he did do it. Bond reported that call to
Sargent Stallings. Bond has never seen Junnier, JR or Tesler do
anything like what Alex alleges and none of them has ever told him
about doing any such thing. In addition, Bond is not aware of any
effort by any officers to lie or have someone else lie about the
facts surrounding the drug buy or the shooting.

Alex has a domestic violence arrest. The arrest was for
aggravated stalking. The resolution of that case could affect
Alex's reliability, but it is not yet resolved. In approximately
September 2005, Alex failed to report to Bond that he was arrested
for possession with intent to distribute. By selling marijuana,
Alex violated his agreement with Bond and thereafter, he had to
build his reliability back up.

DOZIER-COA
00088

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    **BRAD BURCHFIELD** _____ , On **12/01/2006** , Page ____**4**____

## ALEX WHITE

BURCHFIELD explained that he had dealt with WHITE numerous times in the past and that he had been a reliable informant.   WHITE was operated by BOND, but any of the investigators could work with him.  BURCHFIELD had never worked with WHITE regarding any Neal Street address.

BURCHFIELD stated that over the 1 ½ to two years that he has worked with WHITE, he has probably paid him about $2,000.   The biggest bust with WHITE was about four pounds of marijuana.

BURCHFIELD stated that WHITE had different vehicles which he had rented.  BURCHFIELD stated that he knew WHITE had driven a green Lumina, a white Dodge Charger and a blue car of some sort.

BURCHFIELD stated that WHITE had ridden with him in his car on several occasions and that it is a common practice to let the informant out near the target house.  He stated that his last buy with WHITE was about a week before on 1st Street.   BURCHFIELD said he had also been watching a place on Wood Street.  He let WHITE out to make a buy at the house, but a guy in a white car pulled out at the address at the same time.  WHITE never made the buy.  BURCHFIELD described the residence as a yellow house with green shutters.  It is located near the Food Giant on Howell Road.

Regarding drug dealing in the vicinity of 133 Neal Street,  BURCHFIELD  advised that there had been drug arrests made of a group of people coming out of a large white apartment complex located south of Joseph Lowery Boulevard.  BURCHFIELD has also heard, but has not verified, that there was dope being sold from a house located at the end of Neal Street.

BURCHFIELD said that he had seen the search warrant affidavit regarding 933 Neal Street on 11/30/2006 at the precinct. He said that it matched up with what WHITE had told him the first night.   He had also seen WHITE on the Fox 5 News report on Monday claiming that the officers had told him to lie.  BURCHFIELD did not believe this to be true based on his initial call to WHITE. BURCHFIELD normally knows Team 1 narcotics officers to do good searches.  BURCHFIELD had not been directed by anyone on the team to tell a certain story to investigators.

**DOZIER-COA
00089**

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

███████████████

Continuation of FD-302 of ___BRAD BURCHFIELD_____ , On 12/01/2006 , Page ___5___

           The following is personal and identifying information regarding BURCHFIELD which, due to the nature of BURCHFIELD's position, should be handled in an appropriate and confidential manner.

         Name:            BRAD JOSEPH BURCHFIELD
         Home Address:    ████████████████
                             ████████████████████████
         Telephone:      ████████████
         DOB:             ████████████



CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/04/2006

Officer BRAD BURCHFIELD, ATLANTA POLICE DEPARTMENT, Field
Inspection Team (FIT) was interviewed at the offices of the FBI
Atlanta.  He was advised of the identity of the interviewing Agents
by a display of credentials and then provided the following
information:

He has been with the Atlanta Police Department (APD) as a
police officer for four years and works out of the Zone 1 mini-
precinct located at 676 Fair Street where the FIT team operates.
His cell phone number is ▬▬▬▬▬▬▬▬

**Tuesday, 11/21/2006**

BURCHFIELD had finished his shift on 11/21/2006 and was
on his way home at about 6:30 p.m.  He received a call from Officer
COOPER who works Validation at East City Hall and was off duty.
She informed him that there had been an officer involved shooting
on Neal Street and asked if he knew who had been shot.  BURCHFIELD
began calling other police officers including ZYGI who led
Narcotics Team 2.  ZYGI did not know.  He also contacted
Investigator DEATON but received no answer.  He called Detectives
JUNNIER and BOND, but received no answer.

BURCHFIELD called ALEX WHITE at around 7:00 p.m. as he
had dealt with him before as an informant.  He asked WHITE if he
had a house up on Neal Street and WHITE confirmed that he did.
WHITE said that he was out with narcotics officer and did a buy on
Neal Street.  BURCHFIELD told WHITE that he was looking at a house
over there too and asked who WHITE did the buy from.  WHITE told
him it was "Sam"  WHITE sounded normal.

Note: BURCHFIELD explained to the interviewing Agents
that to "have a house up" means that they are investigating or had
a warrant to search a drug house.  BURCHFIELD knew that WHITE
normally worked with Detectives JUNNIER and BONDS, so knew that it
had been Team One involved in the shooting.  BURCHFIELD did not say
anything to WHITE regarding any officers being shot.  BURCHFIELD
did not know where WHITE was physically located when he spoke with
him.

---

Investigation on   12/01/2006   at Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬                     Date dictated  NA

by   SA A. Brett Fears/
     SA Bret C. Aitchison:bca

**DOZIER-COA**
**00091**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

---

Continuation of FD-302 of ____BRAD BURCHFIELD_____ , On 12/01/2006 , Page ___2__

      BURCHFIELD then called Investigator DEATON who told him that JUNNIER's team had been involved in the shooting.  JUNNIER and SMITH had been shot, but their injuries were not life threatening. BURCHFIELD relayed this information to COOPER.  BURCHFIELD then went to his mother-in-law's house.

### Wednesday, 11/22/2006

      On Wednesday, November 22, 2006, BURCHFIELD went to work and worked the area around Neal Street for information regarding "Sam." BURCHFIELD spoke with JUNNIER and SMITH the following day on his cell phone regarding their condition.  They did not discuss any details regarding the shooting or BURCHFIELD's contact with WHITE.

      BURCHFIELD finished his shift and went to PUBLIX located at 100 Ponce De Leon where he was working a part-time security job. His shift was from 6:00 p.m. until 11:00 p.m.  Early in the shift, ZYGI called and asked him "What's up with your boy?"  He said that he was riding with Detective DUNCAN when he jumped out of the car and took off.  He told BURCHFIELD the fugitive investigators were looking for him.  BURCHFIELD talked to one of the investigators (name unrecalled) and told him where WHITE's mother's house was over near the Federal Penitentiary.  BURCHFIELD knew this information because he had picked up WHITE from the location.  The investigator told BURCHFIELD that they had put together a line-up and wanted WHITE to look at it.  He asked BURCHFIELD to call WHITE. BURCHFIELD called WHITE and left a message.  WHITE called back later on and BURCHFIELD told him that they just wanted him to look at some pictures.  WHITE said he had been scared and didn't know (DUNCAN) so that was why he had run.  He agreed to come down to the PUBLIX to meet with BURCHFIELD but that he had to drop off his girlfriend in Hiram, Georgia first.  BURCHFIELD told him he was there until 11:00 p.m.    At about 8:00 p.m., JR SMITH called BURCHFIELD and asked if WHITE was coming to PUBLIX.  SMITH said he needed to pay WHITE for work he had done previously, about $35-40.

      The fugitive investigator brought by the line-up to BURCHFIELD at about 8:00 or 8:30 p.m. and left it with BURCHFIELD. JR SMITH arrived at about 8:45 p.m. and met with BURCHFIELD.  He told BURCHFIELD that he "felt like shit" when asked how he was doing.  He had small cuts on him.  They both took a look at the line-up, but didn't recognize anyone.  SMITH stayed around twenty to thirty minutes, calling WHITE two or three times during this period with no answer, after which SMITH left.

DOZIER-COA
00092

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____BRAD BURCHFIELD_____ , On _12/01/2006_ , Page ___3___

      BURCHFIELD finished his shift and was headed home when WHITE called at about 11:20 p.m.   WHITE said he was on his way when BURCHFIELD told him he wasn't there (at PUBLIX) and that it was Thanksgiving.  He told WHITE that he (BURCHFIELD) was off Thursday and Friday.  He told him he would call Friday to arrange a time to meet  on Saturday.  BURCHFIELD called Sergeant KREHER and told him about his plan to meet WHITE on Saturday to show him the line-up.   Thursday was Thanksgiving and uneventful for BURCHFIELD who received no calls regarding the case.

### Friday, 11/24/2006

      On Friday, 11/24/2006, BURCHFIELD went to his job at PUBLIX.  He called WHITE at 6:00 p.m. and WHITE seemed irritated.  BURCHFIELD asked him to pick a time to meet the following day.  WHITE said that they were fucking him now and to tell your boys to stop looking for him or he was going to tell everyone that they had told him to lie and that he had never went to the house.  BURCHFIELD tried to calm him down and told WHITE that he didn't have to look at the line-up.

      BURCHFIELD called Sergeant KREHR and left a message. KREHR called a few minutes later and BURCHFIELD relayed the above information.  KREHR told him not to call WHITE anymore.

### Procedural Issues

      BURCHFIELD said that there was a certain amount of money available, he believed around $1,500 with which narcotics officers could do buys.  The going rate for a crack buy was $35-40 and $20 for marijuana.  The informant would get a bonus based upon the weight of drugs found in a later arrest or search.  One to ten grams of cocaine got a certain amount of money with one kilo getting more.  The informant is not always paid at the time he makes a buy, but often later in the month or the following month.

      The informant has to sign a voucher to get paid and two people are supposed to witness the payment.  The control officer does not have to be one of the witnessing officers.

DOZIER-COA
00093