CONFIDENTIAL

FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 12/04/2006

Officer BRAD BURCHFIELD, ATLANTA POLICE DEPARTMENT (APD) was telephonically contacted at [redacted]. BURCHFIELD advised that after reviewing his cellular telephone records he recalled the following:

BURCHFIELD called ALEX WHITE on Friday, 11/24/2006 at 8:48pm. After talking with WHITE, BURCHFIELD called GREGG JUNNIER at 8:51pm. BURCHFIELD called JUNNIER to see how his injury was doing. JUNNIER asked BURCHFIELD to work his second job as an apartment security officer. BURCHFIELD said yes. BURCHFIELD also told JUNNIER about WHITE's comment stating that everybody needs to leave him alone or he will tell that they told him to lie and say that he made a drug buy on Neal Street.

BURCHFIELD also advised that it was 7:21pm when he talked with WHITE on Tuesday, 11/21/2006. It was during this conversation that WHITE told BURCHFIELD that he did do a drug buy on Neal Street.

Investigation on 12/03/2006 at Atlanta, Georgia (telephonically)

File # [redacted] Date dictated 12/04/2006

by SA A. Brett Fears:abf

DOZIER-COA 00094

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL



FD-302 (Rev. 10-6-95)



# FEDERAL BUREAU OF INVESTIGATION

Date of transcription 12/07/2006

Officer BRAD BURCHFIELD Atlanta Police Department, FIT team, contacted the interviewing Agent telephonically at about 4:30 p.m. and inquired about ALEX WHITE being in Federal protective custody. Writer did not inform BURCHFIELD of WHITE's current status. BURCHFIELD stated that he had just been called by ALEX WHITE who was attempting to get paid for information he had given BURCHFIELD previously. BURCHFIELD informed WHITE that no warrants based upon WHITE's information would be executed in the near future. WHITE stated during the conversation that JR SMITH had been the one who told him to lie. BURCHFIELD had put the conversation on speaker-phone so that others, including his Sergeant, would hear the conversation.

BURCHFIELD also stated that he had been contacted for interview by PBA (Police Union) attorneys or investigators and asked writer whether or not to speak with them. BURCHFIELD agreed to meet with writer at his employment at PUBLIX on Spring Street, Atlanta, Georgia later in the evening and provide billing records from his cell phone.

BURCHFIELD was contacted at his employment as a security officer for PUBLIX Supermarket located on Spring Street, Atlanta, Georgia at 11:15 p.m. He advised that ALEX WHITE had telephonically contacted him at 4:08 p.m. from a blocked number which BURCHFIELD displayed on his telephone for the interviewing Agent.

Regarding meeting with PBA lawyers or investigators, writer informed BURCHFIELD that while the FBI could not direct him not to speak with these individuals, it would not help the FBI and would create additional statements from him. BURCHFIELD stated that he really didn't want to talk to these individuals.

BURCHFIELD supplied a billing record for his cell-phone [redacted] for November 20, 2006 through 10:48 a.m. on November 30, 2006. He had delineated his first telephonic contact with Officer Cooper regarding the shooting. This call had taken place at 6:59 p.m. on 11/21/2006. BURCHFIELD had marked the telephone numbers with the associated name for most subsequent calls which he could identify. A copy of this billing record is attached and made a part of this report.

Investigation on 12/06/2006 at Atlanta, Georgia

File # [redacted] Date dictated NA

by SA Bret C. Aitchison/bca

DOZIER-COA 00095

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of BRAD BURCHFIELD , On 12/06/2006 , Page 2

CONFIDENTIAL

FD-302 (Rev. 10-6-95)



FEDERAL BUREAU OF INVESTIGATION

Date of transcription 03/22/2007

Officer BRAD BURCHFIELD, Atlanta Police Department (APD) Field Inspection Team FIT was interviewed at his precinct located at 676 Fair Street, Atlanta, Georgia.. Also present during the interview was attorney GRADY DUKES, SOUTHERN STATES POLICE BENEVOLENT ASSOCIATION, 1900 Brannan Road, McDonough, Georgia 30253, telephone 770/389-5391, extension 385. DUKES and BURCHFIELD were advised of the respective identity of the interviewing Agents and informed of the nature of the interview. BURCHFIELD then provided the following information:

BURCHFIELD met ALEX WHITE about one and one-half years ago when WHITE flagged down BURCHFIELD at 3775 MLK (Martin Luther King) an apartment complex consisting of three buildings. WHITE introduced himself to BURCHFIELD and informed BURCHFIELD that he was working for APD officers CAREY BOND and GREG JUNNIER and told BURCHFIELD what he could do (as a drug informant). BURCHFIELD did not know BOND or JUNNIER at that time, but called BOND about a day later. BOND confirmed that WHITE worked for him and that WHITE could work for BURCHFIELD also. He asked that BURCHFIELD inform him when he was going to use WHITE. BOND told BURCHFIELD that WHITE had been a reliable informant. BURCHFIELD did not have access to money to pay WHITE, so after he first used WHITE to obtain information, BURCHFIELD went to BOND with his report. BOND obtained the money to pay WHITE.

BURCHFIELD didn't meet GREG JUNNIER until some time after meeting BOND. BURCHFIELD, as part of the FIT team, did not work on a regular basis with Narcotics Team 1. There were times, however, when the FIT team would assist Narcotics Team 1 with the execution of warrants. BURCHFIELD specifically recalled working a search warrant execution at 901 Bolton Road with Team 1. The information for the warrant came from ALEX WHITE. BURCHFIELD assisted by providing a marked patrol car.

BURCHFIELD worked an extra job at an apartment complex on Bolton Road with JR SMITH. He has spoken with JR two or three times since the shooting incident. He considers JR an acquaintance, not a friend. BURCHFIELD didn't know TESLER and couldn't point him out in a crowd. BURCHFIELD considers GREG JUNNIER a friend, but doesn't socialize with him outside of work.

Investigation on 03/15/2007 at Atlanta, Georgia

File # [redacted]    Date dictated 03/22/2007

by SA Andrew Van Epps,
SA Bret C. Aitchison/bca

DOZIER-COA
00097

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of BRAD BURCHFIELD , On 03/15/2007 , Page 2

ALEX WHITE has provided BURCHFIELD information on 18 or 19 cases. BURCHFIELD thought that WHITE was reliable, until the shooting incident.

**SHORTCUTS**

BURCHFIELD was questioned regarding his knowledge of any officers using "shortcuts" in obtaining warrants. BURCHFIELD advised that he had never heard of any police officers using INS or insurance drugs. He had never heard this terminology for throwdown drugs and had never known or observed anyone use such drugs. BURCHFIELD stated that he had never heard or known of any officer attributing information which came from an unreliable source to a known reliable source. He added that he was not privy to any conversations between officers JUNNIER, SMITH, BOND or other individuals involved in the shooting. BURCHFIELD had never heard of or observed the splitting of probable cause in order to do more searches or arrests. He had never known anyone to use drugs as a ruse, for example, pretending that drugs that an officer already had in his possession were recovered from or near a drug suspect. BURCHFIELD stated that he knew of no drugs obtained from one location being attributed to another location.

BURCHFIELD stated that there were no specific number of drug arrest goals set forth by management. He stated that officers in the Zone were to concentrate on whatever presented itself in the Zone at the time.

BURCHFIELD stated that the night after the shooting, he was working a second job at PUBLIX when JR SMITH showed up. ALEX WHITE had escaped from detectives trying to interview him about the shooting and BURCHFIELD had been trying to call WHITE to get him to look at some photos of potential suspects (SAM). SMITH told BURCHFIELD that he needed to pay WHITE for a previous drug buy. BURCHFIELD did not know which deal that SMITH was paying WHITE for, but it did not seem to be for the night of the shooting. BURCHFIELD didn't see that SMITH had any paperwork to document an informant payment. There is usually a second officer required to sign as a witness, but this rule commonly is ignored. SMITH did not mention needing BURCHFIELD to sign as a witness. WHITE never did show up that night.

BURCHFIELD stated that there never was any search warrant executed on Woods Street. BURCHFIELD did not know of any crack

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of BRAD BURCHFIELD, On 03/15/2007, Page 3

rock being split and attributed to two locations by himself or any officer.

GRADY DUKES then discontinued the interview pending his ability to speak with BURCHFIELD more in depth concerning issues raised.

CONFIDENTIAL



FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 12/04/2006

Lieutenant STACIE GIBBS, Criminal Investigations Division, Narcotics Unit Commander of the Atlanta Police Department, was interviewed at the Atlanta Police Department located at 675 Ponce De Leon Avenue, N.E., Atlanta, Georgia, 30308, work telephone number (404) 853-4652, and cellular telephone number [redacted] After being advised of the identities of the interviewing Agents and the nature of the interview, GIBBS, provided the following information:

GIBBS became the lieutenant over narcotics on January 26, 2006. GIBBS has approximately 21 sworn law enforcement officers working for her in the narcotics section.

Sergeant W.T. STALLINGS is over 8 people on Team I. Team I normal work hours are from 12:00pm through 8:00pm. These hours can vary on a daily basis.

Sergeant PAUL SPARWATH is over 9 people on Team II. Team II normal work hours are from 4:00pm through 12:00am. These hours can vary on a daily basis.

Sergeant STEVE KEEBLE is the narcotic's squad administrative Sergeant. KEEBLE keeps all of the source information, payment vouchers, and money for source payments. KEEBLE'S normal work hours are from 7:00am through 4:00pm.

SPARWATH also has access to the money to pay sources for after hour drug buys.

GIBBS stated the narcotic investigators are suppose to use the Standard Operating Procedures(SOP) as the guidelines for how much money to pay informants for different drug buys. Informants have to sign a voucher for the money they receive and the investigator has to do a write up about the drug buy.

GIBBS stated there are no set rules for how many times to buy drugs from a house in order to receive a search warrant for the house. GIBBS advised you can receive a search warrant for a house after one drug buy.

Investigation on 12/04/2006 at Atlanta, Georgia

File # [redacted] Date dictated

by SA EULIS MILE BROSAS
SA Brian P. Davis:bpd

DOZIER-COA 00101

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Stacie Gibbs , On 12/04/2006 , Page 2

The investigators do not have take home cars. The narcotic teams have specific cars assigned to their teams. The narcotic teams share undercover cars when necessary.

The narcotic teams normally administer their own search warrants. GIBBS does not remember a search warrant in which the narcotics unit had to request SWAT or Red Dog to serve. The narcotic unit has served 293 search warrants, year to date.

On 11/21/2006, GIBBS had knowledge of Team I attempting a possible "buy/bust". GIBBS went to lunch and when she returned she noticed Narcotics Investigator LUCAS and Investigator GEURIN, leaving the office carrying their raid equipment. GIBBS told LUCAS and GEURIN "Yall didn't call me." One of the investigators responded by stating "GREG and them have got a warrant on a location." GIBBS decided not to join the Investigators on the raid because she was not dressed appropriately to assist on a drug raid.

GIBBS heard over her police radio that her narcotics Team I was calling for assistance. GIBBS called STALLINGS' cell phone to check on Team I's status and STALLINGS informed GIBBS that his team had been involved in a shooting. When GIBBS arrived at the scene the investigation had been turned over to Atlanta's homicide investigators.

GIBBS has had contact with the Team I members that were involved in the shooting, but she has never discussed the shooting with the investigators. GIBBS was contacted by Investigator J.R. SMITH on 11/23/2006, to inform GIBBS that he (SMITH) had driven the Confidential Source to 675 Ponce De Leon Avenue, Atlanta, Georgia, to view pictures of suspects fitting the description of SAM. SMITH informed GIBBS of other investigators, and a custodian that had witnessed him and the informant in the building. SMITH also reminded GIBBS to check the video system to witness SMITH pulling into and out of the police department's parking lot.

CONFIDENTIAL

FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 12/13/2006

Lieutenant STACIE GIBBS, Criminal Investigations Division, Narcotics Unit Commander of the Atlanta Police Department, was interviewed at the Atlanta Police Department located at 675 Ponce De Leon Avenue, N.E., Atlanta, Georgia, 30308, work telephone number (404) 853-3272, and cellular telephone number [redacted]. After being advised of the identities of the interviewing Agents and the nature of the interview, GIBBS, provided the following information:

GIBBS stated she had been contacted on 11/30/2006, at approximately 3:15pm, by Investigator J.R. SMITH. SMITH advised he had brought an informant by the Atlanta Police Department on Thanksgiving day. SMITH advised that he (SMITH) and the informant should be on the Atlanta Police Department's surveillance cameras.

Investigation on 12/08/2006 at Atlanta, Georgia

File # [redacted] Date dictated

by SA Brian P. Davis

DOZIER-COA 00103

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302 (Rev. 10-6-95)



FEDERAL BUREAU OF INVESTIGATION

Date of transcription 05/25/2007

Lieutenant STACIE GIBBS, Atlanta Police Department (APD), Narcotics Unit Commander, Criminal Investigations Division, was interviewed in her office on the 7th Floor at APD Headquarters, 675 Ponce De Leon Avenue, N.E., Atlanta, GA 30308, office (404) 853-3272; mobile [redacted]; e-mail [redacted]

GIBBS was advised of the identity of the interviewing agent and the nature of the interview, which was to discuss GIBBS' knowledge of APD policies and procedures concerning obtaining search warrants, use of confidential sources, and preparation and submission of payment vouchers. Additionally, GIBBS was advised the interview would include questions concerning allegations of quotas or performance measures instituted by APD and/or GIBBS. GIBBS confirmed that she understood that her statements would be voluntary and she was not being compelled by APD to answer questions. GIBBS provided the following information:

GIBBS confirmed that she took over as Lieutenant in the Narcotics Unit on January 26, 2006, replacing Lieutenant Robert Browning, who was transferred to the High Intensity Drug Trafficking Area (HIDTA) Task Force. She advised that she previously served as an Investigator and Sergeant in Narcotics.

GIBBS stated that during her tenure as an Investigator, Sergeant, and Lieutenant in Narcotics, she never knowingly witnessed or participated in any criminal activity. She described criminal activity as including anything that is an obvious violation of the law, such as stealing, planting drugs or other evidence, and making false statements on reports or affidavits. As Lieutenant, she was not aware of and would never condone criminal activity involving members of her staff. She would have immediately reported anyone who committed a crime.

GIBBS advised that she is not aware of situations wherein officers have lied on reports in order to receive credit for an arrest or search warrant. GIBBS never pressured anyone to make arrests or obtain search warrants, and is unaware of any circumstances where officers were pressured in that regard. She stated that police work in general is driven by statistics. Therefore, performance within the Narcotics Unit to a certain extent, is measured on the number of arrests and search warrants.

Investigation on 05/22/2007 at Atlanta, GA

File # [redacted] Date dictated 05/25/2007

by SSA Michael McKinney

DOZIER-COA 00104

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Lieutenant Stacie Gibbs , On 05/22/2007 , Page 2

She is certain that no one under her command was ever punished for failing to meet certain numbers. However, the nature of work in Narcotics dictates that officers who are unable to make cases (arrests and search warrants) should not be assigned to the Narcotics Unit.

GIBBS provided a copy of the Performance Development Plans for Investigators Gregg Junnier and J.R. Smith and explained the content and structure of the documents. The Plans for Junnier and Smith, dated 08/01/2006, were identical and GIBBS explained that everyone in Narcotics had the same Plan. She actually prepared them in October 2006 but was instructed to have each employee list 08/01/2006 as the signing date. This was because the formal evaluation period began on 08/01/2006.

GIBBS pointed out that she established the following "performance indicators" in setting forth the rating requirements for the three Critical Job Elements for Narcotics Investigators:

Critical Job Element#1

**DEPARTMENT POLICIES AND PROCEDURES**

Effective - no more than three incidents of not properly conforming to directives, policies and procedures.

Highly Effective - no more than two incidents.

Outstanding - No incidents.

Needs Improvement - more than 3 but less than 5 instances.

Unacceptable - more than 5 instances of failing to conform to directives, policies and procedures.

Critical Job Element #2

**OPERATIONAL PROCEDURES**

No more than three incidents during the annual evaluation period wherein an employee: (1) fails to turn in a complete and legible written correspondence when required; (2) fails to swipe/sign in and out for his or her tour of duty and notify a supervisor or designated

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Lieutenant Stacie Gibbs , On 05/22/2007 , Page 3

person when he/she is going to be late/absent; (3) does not have all his/her equipment present, clean and updated during a monthly inspection; (4) fails to complete an assigned task within a prescribed deadline.

Effective - two indicators must be met.

Highly Effective - three indicators must be met.

Outstanding - All four indicators must be met.

Needs Improvement - less than 2 met.

Critical Job Element #3

**ENFORCEMENT OPERATIONS**

Effective - employee averages at least two search warrants per month, clears 50% of their assigned lead sheets by arrest, and is within 30% of the yearly watch average in arrests.

Highly Effective - averages at least three search warrants per month, clears 60% of their assigned lead sheets by arrest, and exceeds the yearly watch average by 5%.

Outstanding - averages at least 4 search warrants per month, clears 70% of their lead sheets by arrest, and exceeds the yearly watch average by 10%.

Needs Improvement - averages 1 search warrant per month, clears between 30 and 49% of their lead sheets by arrest and fails to meet the watch average in arrests by 5%.

Unacceptable - no search warrants, clears less than 30% of lead sheets by arrests and fails to meet the watch average by 6% or greater.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Lieutenant Stacie Gibbs , On 05/22/2007 , Page 4

GIBBS advised that the above are performance standards, not quotas. There are no requirements to meet certain numbers in order to remain in Narcotics, and anyone who cannot meet the requirements for a rating of Effective is simply rated as Needs Improvement or Unacceptable.

GIBBS stated that she would be willing to discuss these performance standards with anyone who has the misunderstanding that officers in Narcotics were under pressure to perform. She disagrees that there was pressure, and again stated that it is not overwhelming to expect Narcotics Investigators to conduct a certain number of search warrants and make arrests. She stated that some officers, unfortunately, identified the minimum required in order to remain under the radar and then worked until they met that "goal". Having met the minimum, they would stop working as hard. These officers were never punished, although GIBBS believed they could have been according to departmental regulations.

GIBBS again advised that she was unaware of officers lying on reports and affidavits, padding vouchers, using unregistered sources, and other administrative violations. GIBBS confirmed that it now appears that certain officers may have been doing it, and she will need to take responsibility for not catching it, but it happened without her knowledge. GIBBS stated that officers who lied on reports and/or affidavits will have to deal with the consequences of their actions.

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 01/22/2007

Jason R. Smith (JR) was interviewed on January 9 and 10, 2007, at the United States Attorneys Office in Atlanta. JR's attorneys, Ed Garland and John Garland, were present for the interview. Also present were Department of Justice Attorney Page Fitzgerald, Assistant United States Attorneys Yonette Buchanan and Jon Peter Kelly, Fulton County Assistant District Attorney Shukura Ingram and Fulton County District Attorney Investigator Tracey Brumfield. Pursuant to a proffer agreement, JR provided the following information:

(The interview was begun by reviewing the second paragraph of JR's affidavit for the search warrant for 933 Neal St. which JR obtained on November 21, 2006, and asking JR if each sentence were true or false) The first sentence of the second paragraph which reads, "Between the dates of November 20, 2006 and November 21, 2006 in the City of Atlanta, Fulton County, Investigator A. Tesler and I directed a confidential and reliable informant (CRI) to 933 Neal St NW, Atlanta, GA 30318, to enter the home and purchase from the resident cocaine," is not true. The second sentence which reads, "The CRI has proven to be reliable in the past and has provided information leading to the seizure of cocaine and numerous narcotics arrest [sic]" is true. The third sentence is "The CRI was searched and given $50.00 (city funds) to purchase the crack cocaine from the resident at 933 Neal St NW, Atlanta GA 30318." JR knows now that the informant was never searched or given $50 and he knew at the time that he wrote the affidavit that the informant was never searched or given $50. The fourth sentence in the affidavit which reads, "As the CRI approached the home and went to the front door the CRI was met by 'Sam,'" is not truthful information.

When JR's narcotics teammate Gregg Junnier does buys with Alex, who was the informant described by JR in the affidavit for 933 Neal St., Junnier just tells Alex to go make the buy and use his own money. There is no pat down or surveillance of the buy. JR has first hand knowledge of more than ten occasions when Junnier had Alex do buys without pat downs or surveillance. JR's teammates Cary Bond and Bruce Tesler do their buys with Alex the same way that Junnier does. JR does his buys with Alex the same way.

Investigation on 1/9/07-1/10/07 at Atlanta, GA

File # ██████ Date dictated 1/22/07

by Michael L. Grant, F. Joseph Robuck:fjr

DOZIER-COA 00108

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07, Page 2

JR has never received any formal training on writing warrants. He was taught to do shortcuts by his teammates. Even members of Atlanta Police Department (APD) Narcotics Team #2 know that Alex does buys on his own. JR has done buys with another informant, known as Diamond, the right way. There is a lot of pressure by the APD for narcotics officers to get warrants.

When JR went into the Fulton County Jail to do an electronic search warrant application for a search at 933 Neal St., he pulled up an old warrant which had been saved on the system and he began to cut and paste. He had some information from informant Fabian Sheats, but he did not know how much or what kind of dope to say was purchased at 933 Neal St. He telephoned Junnier, who was waiting with Tesler and Sheats in the parking lot of the jail, and Junnier told him to use two $25 hits of crack and the same "78", that is, the same description of "Sam" that JR heard Sheats give earlier.

JR did not know everything that Sheats had told Junnier, because when Junnier was debriefing Sheats in the patrol car at 1143 Simpson, JR was outside the patrol car looking for dope. JR was only in the car with Sheats for about ten minutes before going into the jail to apply for the warrant.

When JR was at the jail applying for the search warrant, he did not know whether or not Alex made the buy at 933 Neal St. He suspected that the buy might not have been made. If Junnier would have said to him that with 100% certainty Alex did not make a buy at 933 Neal St., it is hard for JR to say what he would have done. He would never go into someone's house without thinking that he had probable cause. When he applied for the search warrant for 933 Neal St., he was not thinking, at the time, about the fact that he was lying to a magistrate. By that point in his career, it was routine for him to lie to a magistrate when applying for warrants.

The fifth sentence in the second paragraph of the affidavit for the search warrant for 933 Neal St. reads, "'Sam' and the CRI spoke briefly at the front porch." At the time that he was writing and then swearing to the information in the fifth sentence and all the sentences in the second paragraph after the fifth sentence, JR did not know that the information was true. Therefore, his swearing that all that information was true was a lie. In JR's mind at the time he was swearing to the affidavit, there was some possibility that some of the information in the

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 3

affidavit was true. It is completely 100% untrue that he witnessed a buy at 933 Neal St. as was described in the affidavit.

Anybody who used Alex to make buys probably did their affidavits just like JR did the affidavit for 933 Neal St. JR believes that Alex has been truthful with the FBI.

JR either heard Sheats say that "Sam" had surveillance cameras or he heard Junnier say that Sheats said that "Sam" had surveillance cameras. Based on all the information from Sheats, JR believed that there was dope at 933 Neal St.

At the briefing at the fire station before the raid at 933 Neal St., JR told his teammates that a drug buy had been done at 933 Neal St. Prior to the briefing, JR had started a written tactical plan, but he didn't finish it. After the raid, Sergeant Stallings told JR to finish the written tactical plan.

When JR submitted a voucher for paying Alex for a drug buy at 933 Neal St., JR knew that the buy had not happened. On the day after the shooting at 933 Neal St., Junnier repeatedly told JR to pay Alex. Junnier told JR to go to a particular Publix grocery store and meet Officer Burchfield from Narcotics Team #2 (Burchfield had an off-duty job at Publix) and pay Alex. JR did in fact meet with Burchfield that day at Publix, but Alex never showed up. The next day, which was Thanksgiving, JR picked up Alex by the Atlanta Federal Penitentiary and drove him to City Hall East. JR filled out a voucher and Alex signed it. Next, JR drove Alex to a store owned by an individual named Eddie. Junnier worked a second job for Eddie. Alex was paid $100 by Eddie that day.

The padding of vouchers is a common practice by the APD narcotics teams. JR has done it. Junnier has done it. Sergeant Stallings has said, "Cushion your buy," meaning pad your voucher. The practice works like this: an informant buys $20 worth of crack; the informant's handling officer might falsely tell the APD that the informant bought $100 worth of crack; the officer keeps $80; the officer then might use the $80 to tint windows in his city vehicle, buy gatorade for the narcotics team or throw a cookout for the team. This padding of vouchers works because it is hard for anybody to look at a particular amount of crack and put a definite street value on it. Some officers, including JR, get informants to sign a stack of blank vouchers in advance of doing buys which facilitates the padding. JR had a blank voucher that had been signed by Alex in his desk at City Hall East and after the shooting

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 4

at 933 Neal St., he shredded it. JR has falsely witnessed vouchers and has asked others to falsely witness them.

Sergeant Stallings knew that JR's statement to APD Homicide was not truthful. After the shooting at 933 Neal St. and while still at the scene, JR told Stallings at the back of the house that he (JR) didn't see the buy at 933 Neal St. Stallings said something like, "Yeah, I know." Much later, Stallings telephoned JR and told him that he should go to the FBI, make a statement and tell the truth. JR thought that Stallings told him to tell the truth because Stallings thought that the telephones might be bugged. Someone at APD Homicide told JR that the FBI agents who were going to interview him were good guys and that everything was going to be all right. JR thought it was possible that the FBI agents were in on the cover-up.

JR didn't know that Alex didn't have a car to use on the day of the shooting at 933 Neal St.

Not long after the shooting, JR made a written statement about the incident for Workman's Compensation purposes. The statement was vague. JR can't recall the details of that statement. JR gave that statement to Stallings.

Another report had to be done about the execution of the warrant at 933 Neal St. The report was done and APD Sergeant Guerrucci told JR that more detail about the drug buy at 933 Neal St. was needed. Lt. Gibbs typed the revised version of that report and JR signed it.

The very first report that JR made about the incident at 933 Neal St. was an oral report to Lt. Gibbs and Major Davis at Grady Hospital immediately after the shooting. JR told them that Junnier and Tesler watched the drug buy at 933 Neal St. from their patrol car. Junnier later told JR that he had to change that story to say that JR and Tesler watched the buy occur. In the parking lot at Grady Hospital, JR told Stallings that he (JR) needed to change his story from Junnier and Tesler in the patrol car to JR and Tesler in Alex' car. Stallings told him to pick one story and stick with it.

At 350 Lanier St on the day of the shooting, JR went to the back of that address and found two different sandwich bags containing marijuana. One bag contained forty to fifty blue $10 bags and the other contained different color $10 bags, possibly

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 5

yellow, pink or clear. Someone, possibly even JR, called a K-9 unit to the scene.

At 1143 Simpson on the day of the shooting, Junnier told JR to take "INS" drugs (drugs that they had recovered from another location; "INS" stands for insurance) behind 1143 Simpson and let the K-9 unit find it. JR did that. It was a rouse to pressure Sheats. JR actually did find empty plastic bags and a scale behind 1143 Simpson. The K-9 unit also found some marijuana and three bags of crack cocaine which JR had not planted.

Before the shooting at 933 Neal St., someone, JR doesn't remember who, handed him two bags of crack. Later, he turned them in to the APD evidence room as having come from 933 Neal St. At the time that he turned that crack cocaine into the evidence room, he knew that it hadn't come from 933 Neal St., because he had spoken to Alex on the telephone. Alex told JR in that telephone call that he didn't make a buy at 933 Neal St. JR believed Alex.

After the shooting, JR took some marijuana from the trunk of his patrol car and took it into 933 Neal St. for the purpose of planting it. He did that because immediately after the shooting, Junnier told JR that dope needs to be in the house. JR interpreted that to mean that he needed to plant dope in the house. He went to the trunk of the patrol car he had been riding in that day and removed some blue bags containing marijuana that he had seized from 350 Lanier St. earlier that day. He took the marijuana into the kitchen of the house and put it in a cabinet next to the refrigerator. As you are looking at the refrigerator, the cabinet is the cabinet farthest to the right. He put the marijuana in or behind a bowl and closed the cabinet door. This all happened about five or ten minutes after the shooting.

At the time that he placed the marijuana in the kitchen cabinet, the house was full of people. After placing the marijuana in the cabinet, JR walked into the living room. He looked around and realized that an old lady lived in that house and nobody had been selling drugs there. Consequently, he went back into the kitchen and removed the marijuana from the cabinet. He put the marijuana in to his lower leg pocket and he returned it to the trunk of the patrol car.

At the time that he removed the marijuana from the kitchen cabinet to return it to the patrol car, APD Officers Lucas and Chambers were still in the house. Before JR left the kitchen,

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07, Page 6

he took out his leatherman tool and popped the lock on the kitchen door which leads down to the basement. He asked if the basement had been cleared. Lucas said that he didn't know if it had been cleared and he suggested that they clear it. Lucas went down into the basement, but JR did not. JR was never in the basement of the house.

[At this point in the interview, JR was told that the FBI could prove that he was in the basement. Thereafter, it was agreed that JR would have some time to speak with his lawyers privately. After JR's private conversation with his lawyers, the interview continued.]

JR admitted to the interviewing agents that he lied about never being in the basement. In fact, he planted drugs in the basement. When he was at 350 Lanier St. on the day of the shooting, JR actually found three sandwich bags of marijuana, not two like he advised earlier in the interview. K-9 Officer Ramsey knows there were three bags. The third bag contained ten clear bags of marijuana. After the shooting, Junnier did tell JR that there's got to be dope in the house. JR did go to the trunk of the patrol car and he removed the sandwich bag containing the ten clear bags of marijuana.

Lucas and Chambers cleared the basement of the house. JR then went down the stairs from the kitchen into the basement. Tesler stepped in through the back door of the basement. That door had been breached by that point in time. JR took the baggies out of his pocket and wiped them off. He flicked them on to the floor, so as to not get fingerprints on the bags. Tesler watched him do that. Thereafter, Sergeant Stallings came by the basement door, in the backyard, and talked about a wire going up the back of the house and how it might be for a surveillance system.

Next, JR walked from the door of the basement, by way of the driveway of the house, to the black police van parked in front of the house. Sheats was in the black van and JR confronted him. APD Detective Keith Johnson was present. Sheats told JR that he hit the wrong house.

Previously in this interview, JR minimized his state of mind at the time he was handed the two hits of crack which were to be from a buy at 933 Neal St. JR was almost sure that the two hits of crack came from Sheats. It looked like the crack recovered from 1143 Simpson. JR really does not recall who handed him that crack.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 7

At the time that he briefed his team before the raid at 933 Neal St., JR knew that Alex had not done a buy at that address. He had a "strong suspicion" that the crack came from 1143 Simpson. Nobody ever said anything about a drug buy being done at 933 Neal St. after JR got back into the patrol car after swearing out the warrant at the Fulton County Jail. That is another reason that he knew the buy hadn't happen.

On the day after the shooting, JR and Tesler took the rest of the marijuana that was in the third bag from 350 Lanier St. and threw it down a sewer near City Hall East. They had to do that because they didn't want anyone matching the marijuana planted by JR at 933 Neal St. to marijuana left in that third bag from 350 Lanier St. Throwing that marijuana down the sewer was completely JR's idea. It was actually Tesler who physically threw the marijuana in the sewer. The sewer that it was discarded in is located behind Masquerade, a nightclub about one block south of City Hall East.

JR deleted two photos from his cellphone that is currently in the possession of the FBI. One of the photos was of the two hits of crack that were submitted to the APD evidence room as being purchased from 933 Neal St.

[At this point, the interview was suspended until the next morning. When the interview was continued on 1/10/07, all the same people were present with the exception of Attorney Ed Garland.]

JR recently did a tour of duty with the Army in Iraq. At first he was stationed at a prison and then he was given a mission at the Port of Um Kasar (phonetic). He was a lieutenant commanding 32 soldiers. While at the Port of Um Kasar, his unit came under enemy fire. He was supposed to know what to do, but he got confused. He started running around trying to act like he knew what to do, but he didn't know what to do. When he was counted on to act under pressure, he failed.

When the gunfire stopped on the night of the shooting at 933 Neal St., JR was again confused like he had been in Iraq. When the shooting stopped, Officer Gary Smith said, "Let's go" to JR, but JR didn't want to go into the house. He did go into the house and he saw Ms. Johnston lying on the floor. He looked around the house and could tell that it was not a drug house. JR was thinking to himself, "Oh shit, oh shit." He saw that Junnier and Officer

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 8

Cary Bond were bleeding. JR's face was bleeding. Junnier, who was inside the house at the time, said to him that there needs to be dope in this house. He also told JR to calm down.

It is hard for JR to say what happened right after that. He does remember that he walked out of the house and saw other police officers and he didn't want to face them. He went back in the house and then back outside. He saw some of his friends who are assigned to REDDOG. He then walked to the patrol car he had been riding in that day and removed a bag of marijuana from the trunk. He went back in the house. Sergeant Stallings told him to handcuff Ms. Johnston. Lucas was "freaking out" saying something like, "Nothing like this has ever happened."

Next, JR planted marijuana in the kitchen. He then pried open the lock on the door leading from the kitchen to the basement. Lucas asked if the basement had been cleared, or maybe JR asked that question. It seemed to JR that he was receiving a lot of calls on his cellphone. At some point, Junnier telephoned him and told him to call Alex. JR understood that the purpose of calling Alex was to create a false story. [JR advised at this point that he is not sure that his recollections are in the correct chronological order.]

JR was at the top of the basement stairs when Chambers and Lucas went down into the basement to search it. JR took the marijuana that he had planted in the kitchen cabinet back out of the cabinet and walked downstairs into the basement. He may have then telephoned Tesler and told him to meet him around the back of the house. JR is 100% certain that he went down into the basement using the stairs from the kitchen. He walked through the basement and to the back door. He dropped the marijuana on to the floor. He is 100% certain that Tesler was there when he put the marijuana on the floor. Tesler would have seen him do that.

[JR interjects at this point in the interview that he is "done with this crap," meaning he is done lying.]

After JR planted the marijuana in the basement, he stepped out the back door into the backyard. Tesler was still with him and Stallings met them in the backyard.

While in the backyard, JR telephoned Alex and described to Alex the back of the house including the back door and the wires running up the back of the house. This is the point when it was

DOZIER-COA 00115

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 9

established that Alex would say that he bought drugs at the back of the house at 933 Neal St. Actually, JR believes that he talked to Alex twice on the telephone from the back of the house. Both calls concerned putting a false story together.

JR knew that Alex had not done a buy at 933 Neal St. When he telephoned Alex from the backyard, he filled Alex in on what had just happened. He told Alex that the story was going to be: that Alex made a buy at 933 Neal St., that he walked down the driveway to the back of the house, that he saw wires going up the back of the house, that he saw a barbeque grill, that he met with a guy named Sam and JR gave Alex Sam's description and that he bought the drugs at the back door. Alex told JR that he had a dark green Chevy Lumina. In JR's opinion, there was no twisting of Alex's arm for him to go along with the cover-up. Alex was plenty willing to adopt the story.

JR may have talked to Alex about creating a lie about doing a buy at 933 Neal St. in front of Stallings. JR is not sure. He is, however, 100% sure that he told Stallings that he didn't see a buy occur at 933 Neal St.

Next, JR went to the front of the house by walking back up the driveway. He doesn't recall if Tesler or Stallings went with him. He went to the van in which Sheats was sitting. He asked Sheats, "What the fuck happened?" Sheats told him that he hit the wrong house. JR felt as if Sheats had set up him and his teammates. Even though JR and his teammates had been after Sheats for some time, he didn't think that they and Sheats had a "hate-hate" relationship.

The next thing that JR can remember is that he went to the trunk of his patrol car and got something out. At about the same time, one of the crime scene investigators fell in a hole and broke her leg. JR next went to the back of the crime scene van and got his photo taken. Sergeant Sparwath of Narcotics Team #2 told him that he would give him a ride. Thereafter, Sparwath drove Tesler and JR to Grady Hospital.

JR heard that there may have been a lot of stolen property found in the basement of 933 Neal St.

On the way to Grady Hospital with Sparwath, JR had the two hits of crack from 1143 Simpson and the rest of the third bag of marijuana from 350 Lanier St. with him. At Grady, he looked for

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 10

Junnier. He found Junnier with Junnier's family. JR also checked on Cary Bond who was with his wife. He then checked on Gary Smith and he got emotional when he was with Smith. Gary Smith doesn't know anything about the warrant for 933 Neal St. or the cover-up.

Officer Holly Buchanan of APD Narcotics Team #1 had a warrant on Simpson Road up from the Tasty Dog restaurant. The target of that warrant was a drug dealer who goes by the name "Hollywood." When Buchanan executed her warranted, there was an eighty-year-old lady in the house with a gun. The gun turned out to be fake. There was no dope in the house. Buchanan said that she made the buy from the house using an informant named Curt or Kirk. Two hundred feet from the house where that warrant was executed a gun and some dope belonging to Hollywood were found.

After the shooting at 933 Neal St., Lieutenant Gibbs asked JR what happened. JR told her that Junnier and Tesler watched the drug buy that Alex made at 933 Neal St. JR does not know why he told her something that conflicted with what the search warrant affidavit said. Lt. Gibbs was asking him because, according to her, she wanted to know what to tell the news media about the shooting. JR told Lt. Gibbs that there was a buy. APD Major Davis was present when JR made that statement to Gibbs.

Thereafter, JR checked on Bond and Gary Smith again. He then went to talk to Junnier. Junnier's dad was present and JR shook his hand. (Sergeant Stallings, Junnier, Bond and Tesler went on a fishing trip on one occasion to Junnier's dad's condo in Florida.) Junnier gave JR Junnier's wife's cellphone number, because Junnier's cellphone battery was dead. JR went out into the hallway and telephoned Junnier. JR told Junnier what he had told Lt. Gibbs. Junnier told JR that that story was not going to work. He told JR that he needed to tell Lt. Gibbs that JR and Tesler were in Alex's car and watched Alex do a buy at 933 Neal St.

JR told Tesler what Junnier had said about changing the story. JR also told Sergeant Stallings in the parking lot of Grady that Junnier wanted JR and Tesler to be in Alex's car during the buy in the cover-up story. Stallings told JR to pick one story and stick with it. Lt. Gibbs drove JR and Tesler to City Hall East after Grady Hospital and dropped them off. JR couldn't bring himself to change his story with Gibbs.

After Gibbs dropped JR and Tesler off at City Hall East, JR turned in his weapon and made a discharge statement. Officer

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 11

Nathan Lucas and Detective A.C. Smith were there at the time. JR believes that he then went to the APD property room to get a different weapon to carry. There was a white female sergeant working morning watch at the property room. JR thinks that he turned in the two hits of crack to the property room at the same time. He believes that he went home after that.

On his way home, JR telephoned Tesler a couple of times. He asked Tesler if Tesler had Officer Schiffbauer's telephone number so that JR could find out if marijuana had been found at the house yet. Tesler and Schiffbauer were police academy classmates. When he talked to Tesler he said to him, "what the fuck are we going to do?" Tesler telephoned Schiffbauer to see if the drugs were found.

JR also talked to Alex on his way home. Alex wanted to get paid. He really didn't want to go over the concocted story. JR thinks that Alex is "a pretty honest guy." Tesler called JR later and told him that the planted marijuana had been found.

On Wednesday, November 22, 2006, JR went into his office. Junnier and Tesler and everybody else from his team were there. Sergeant Stallings told JR that he (JR) and Tesler needed to sit down and "work this out." JR then met with Tesler at JR's cubicle and they got their fictitious story together. Thereafter, Junnier joined the discussion. Off and on that whole morning, they worked to perfect the cover-up.

JR talked to APD's psychological services representative. He also talked to his PBA representative, Summer Benton, and his PBA attorney, Don English, at the narcotics office at City Hall East. He told them the fabricated story. Next, he went to APD Homicide and gave a statement. It was a question and answer, not a narrative. Tesler was "out of control nervous" about making a statement to Homicide.

Everything that Narcotics Team #2 found in the search of 933 Neal St., except the planted marijuana, was left on JR's desk at City Hall East. He did a new property sheet. JR told Tesler that he was going to the property room and Tesler said that he would take the drugs from 350 Lanier to APD Property. Before they went to Property, JR and Tesler went out to the parking lot and got in JR's truck. They drove to behind the Masquerade Club near City Hall East and disposed of the remainder of the third bag of marijuana from 350 Lanier. Tesler got out of the truck and placed

CONFIDENTIAL

FD-302a (Rev. 10-6-95)



that marijuana into the sewer. They then drove back to City Hall East and went to the property room. At the property room, Tesler turned in the remaining drugs recovered from 350 Lanier and JR turned in the other property from 933 Neal St. JR went back to the sixth floor of City Hall East. After that, he didn't want to go home because Junnier and Tesler were like a security blanket for him.

JR heard the story about Alex jumping out of APD Officer Duncan's car and running into the Varsity restaurant. Later that night, Junnier told JR that Alex had called Junnier. Junnier told JR that JR needed to get with Alex and pay him. JR then called Alex and told him that he had money for a buy at 933 Neal St. JR and Alex agreed to meet at the Publix grocery store where APD Officer Burchfield had a second job. JR went to Publix and met Burchfield, but Alex never showed up. Burchfield and Junnier are good friends. Burchfield has used Alex a lot.

After JR left Publix and was on his way home, Alex called him. Alex said that he couldn't meet at Publix, but he really needed the money. JR told Alex that he would meet him on Thanksgiving. [At this point in the interview, JR advised that the more he thought about it, he may not have talked to Alex on the night of the shooting.]

On Thanksgiving, which was Thursday, November 23, 2006, JR talked to Alex on the telephone. Alex asked JR to pick him up near the Atlanta Federal Penitentiary. JR picked up Alex and drove him to City Hall East. He wanted Alex to look at a photo line-up which had been compiled to try to identify Sam, the individual identified by Sheats as dealing drugs from 933 Neal St. JR doesn't know why he was thinking about that because he knew that Alex had not done a buy from Sam at 933 Neal St. Also, while in his truck at City Hall East with Alex, he filled out a voucher and paid Alex $30. Alex complained about the amount of money. While inside City Hall East, JR could not find anyone from the fugitive unit and he was never able to show Alex the photo line-up.

After leaving City Hall East, JR drove Alex to Donald Lee Hollowell Parkway to show him the car wash where they supposedly met before doing the buy at 933 Neal St. At about the same time, Alex told JR that Junnier was going to give Alex $100. JR telephoned Junnier to find out about that and Junnier told JR to take Alex to Eddie's store to get the $100. JR then drove Alex to Eddie's store. On the way, they went past Neal St. so Alex could

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 13

see 933 Neal St. When they arrived at Eddie's store, Alex went in by himself. Later, JR dropped Alex off near Six Flags.

On Monday, November 27, 2006, Lt. Gibbs telephoned JR and told him that they needed to work on the incident report that JR had previously done. JR had turned in the original incident report to Sergeant Stalling and Officer Guerrucci. While JR was on his way to meet with Lt. Gibbs, Junnier called him and said that Alex was on the TV news saying that he never did a buy at 933 Neal St. Later, JR turned his badge and gun into APD OPS. Also, on the same day, Tesler told JR that Junnier wanted to meet at the Kroger on Howell Mill Road. JR, Tesler and Junnier met at that Kroger and Junnier talked about Alex coming forward and he went over the fictitious story which they had agreed to tell. Junnier was also "slamming" Alex. Junnier said to be careful talking on the telephone. After the meeting, JR went back to City Hall East and wrote another incident report. He then took it to APD Major Davis. She made JR add more information about the buy at 933 Neal St. and then she OK'd it. JR went home from there.

Sometime between Monday, November 27, 2006, and Saturday, December 2, 2006, Junnier called JR and called a meeting at My Cousin Vinnie's pizza restaurant near Town Center Mall. When JR, Junnier and Tesler met at the restaurant, Junnier had with him a typed statement of events which occurred on the day of the shooting. JR asked Junnier for a copy, but Junnier wouldn't give him one. Junnier said that if the FBI did a search warrant at JR's house, they might find the statement. JR brought a folder to that meeting which contained a buy report, the search warrant for 933 Neal St., an informant payment voucher, an incident report and his own telephone records. He didn't have a written statement at that meeting. He typed his statement a couple of days later. JR doesn't recall Tesler bringing anything to that meeting. The only thing that Junnier had was Junnier's statement. The three of them went over the details of the fictitious story they were going to tell as part of their cover-up. JR pulled out an informant voucher for the payment that he made to Alex on Thanksgiving for a buy at 933 Neal St. and asked Tesler to sign it as a witness. Tesler refused. Junnier also said that Tesler shouldn't sign it because it was Thanksgiving and Tesler wasn't present when JR paid Alex.

Sometime before Saturday, December 2, 2006, Junnier called a meeting at the parking lot of My Cousin Vinnie's. The gist of the conversation at that meeting was that Junnier asked JR and Tesler to cover for him regarding his warrant for a search at a

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 14

Rhodesia Road address. Junnier also said that he was going to talk to people who were close to the FBI investigation. He said that he knew that the focus of the investigation was on JR. Junnier further said that he would call Tesler and JR later and would tell them in code how the investigation was going. Junnier said that if he called and told them that his daughter's basketball game was good that would mean that the investigation was going well for them. Junnier went on to tell JR and Tesler what they should tell the FBI when interviewed and Junnier told them a detailed story about Alex doing a buy at the Rhodesia Road address. JR believes that Junnier learned about lying in warrants from APD Officer Doug Little.

Junnier established a code for JR, Tesler and himself to use when talking on the telephone. For example, if one of them said to meet at a certain time, then the actual meeting time would be two hours before the time given. If Junnier said to meet at his house, that would mean to meet at the Best Buy parking lot.

On Saturday, December 2, 2006, JR received a telephone call from Sergeant Stallings. Stallings asked him to call APD Officer Bobby Render to set up a meeting with the FBI. JR telephoned Bobby Render and talked to him. After that, he telephoned PBA attorney Don English. After that call, he called Junnier and told him about talking to Render regarding being interviewed by the FBI.

On the day that JR, Junnier and Tesler met together with Attorney Don English, Junnier used his code for talking on the telephone and he set a meeting at the Best Buy just south of Little Five Points in Atlanta for before the meeting with English. At that point in time, despite the fact that Junnier and Tesler were his good buddies, JR didn't know if he could trust them. At the meeting, Junnier suggested that they drive the route that they had driven on the day of the shooting and they all again went over the fictitious story they were going to tell. Junnier did a narrative the entire time that they were driving the route. After that meeting, JR followed Junnier and Tesler to meet with English. After the meeting with English, the three officers spoke briefly in a parking lot. At that time, JR told Tesler that he wanted to give Tesler a written version of the facts that he (JR) wrote.

A couple of days after the meeting with English, Junnier called JR and told him that he had money for JR from an extra job. Junnier said that he'd give that money to Tesler and JR could get

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 1/9/07-1/10/07 , Page 15

it from him. Thereafter, JR met Tesler at Fellini's on Ponce De Leon in Atlanta. That meeting occurred after Tesler was interviewed by the FBI the first time. Tesler told JR how his interview with the FBI went. JR gave Tesler JR's written version of the facts from the day of the shooting. JR asked Tesler to let JR know if there were any conflicts between what Tesler had told the FBI and what JR had written. JR also collected the extra job money from Tesler that Junnier had called JR about earlier.

After about the time that JR met with Tesler at Fellini's, Junnier quit talking to JR. On the day before JR first met with the FBI, there was a benefit held for the officers involved at 933 Neal St. at an Irish Pub off of 14th St. and Peachtree in Atlanta. Junnier did not show up. Junnier was the only one from the entire narcotics team that wasn't there. Tesler was a little standoffish toward JR at the benefit.

When JR telephoned Junnier from the Fulton County Jail where he was using the electronic warrant system to apply for the warrant at 933 Neal St., Junnier was very vague when telling JR about the two $25 hits of crack and Sam's description.

It is an element of the truth about what happened on the day of the shooting at 933 Neal St. that JR wasn't good at writing warrants. He did not know how to articulate the information that he had been given by Sheats. Moreover, JR admits that he is lazy when it comes to putting all the probable cause available in an affidavit. These are reasons why he did the warrant for 933 Neal St. the way he did it.

CONFIDENTIAL

FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 05/17/2007

Jason R. Smith (JR) was interviewed on May 9, 2007, pursuant to a Guilty Plea and Plea Agreement executed on April 23, 2007. Also present for the interview was JR's attorney, John Garland. The interview was conducted at Garland's office, Garland, Samuel & Loeb, P.C., 3151 Maple Drive, N.E., Atlanta, GA 30305. JR provided the following information:

JR became a sworn officer on October 17, 2000, when Beverly Harvard was the Chief of the Atlanta Police Department (APD). His first assignment was Zone 6 foot patrol. While still at the police academy, he had field training which is when he first learned about the point system at the APD. An officer received four points for a green ticket (an arrest ticket) and two pints for a pink ticket (a traffic ticket). While JR was field training, Zone 6 required four points per day per APD Major Banda. Major Banda issued a memo that stated that if officers did not get their four points per day they could: 1) lose their regular off-days (i.e. their off-days would change regularly), 2) lose good assignments, and/or 3) have their permits to work extra jobs rescinded. APD Officer Mike Alban, who works in the APD Property Unit, told JR that he might still have the memo from Major Banda.

APD officers who would get four points or more per day would get better assignments. This was all related to "QPAI." QPAI stands for Quality Performance Appraisal Initiative. Some of the officers who trained JR would get their four points early in a shift and just hang out somewhere until their shift was over.

When JR came back to APD from his tour of duty in Iraq in 2004, the department was pushing "bodies in jail" instead of points for green and pink tickets. Handling 911 calls was secondary. Beat officers needed one body per day. There was a memo that said that four pink tickets count as a body. The department's focus was not to protect and serve, but rather to put bodies in jail even for the minor offenses that officers would not previously have bothered with. Disorderly Conduct was a charge often used to get a body in jail. The charge was commonly known as a DC-6. Municipal court judges routinely dismissed DC-6 cases, but officers didn't care because they got credit for a body in jail. JR only actually went to court a couple of times in his career with APD.

Investigation on 5/9/07 at Atlanta, GA

File # [redacted] Date dictated 5/17/07

by Andy Van Epps
F. Joseph Robuck:fjr

DOZIER-COA 00123

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 5/9/07 , Page 2

On many occasions while on duty, JR would see a suspicious individual that he wanted to stop and search and he would do so even without any legal cause. He would later lie about the cause in his police reports. For example, he might falsely state in his reports that he observed the subject drop something and then he did a search incident to an arrest for littering. He learned to lie about the legal cause to make a stop while on REDDOG. While he was on REDDOG from November 2004 to June 2005, it was a nightly occurrence that the team he was riding with would stop an individual or a vehicle without any legal cause to do so. Whoever wrote the incident report would lie about the cause for the stop. The percentages were that the case would never go to court anyway.

From his first day on Narcotics Team #1, JR heard about the requirement that each officer on the team had to have nine arrests and two search warrants a month. About a year ago, JR had a conversation with Sergeant Stallings who told him that to be rated "effective" under QPAI, he had to get his nine and two. JR asked Stallings if he could take a week for training. Stallings responded that he could take as many weeks as he wanted as long as he got his nine and two. Stallings didn't worry about the team covering lead sheets or doing follow-up investigations. He evaluated Team #1 based on nine and two. JR never discussed nine and two with Lieutenant Gibbs. Holly Buchanan kept all the stats for Team #1 and she may have some information about the nine and two requirement.

The APD academy is six months long. Maybe two-thirds of it is academics. There was zero information provided at the academy about writing warrants. In the six years of JR's career after his time at the academy, he had about one to two hours of training on writing warrants. His post-academy training was as follows: 40 hours of basic investigations, 8 hours regarding field testing narcotics, 16 hours of undercover training, 4 hours related to meth labs, 36 hours regarding tactical drug operations, 8 hours concerning criminal gangs and another 40 hours of basic investigations. It was during the basic investigation courses that he received some training regarding writing warrants.

JR wrote two warrants while on REDDOG. He wrote a lot of warrants while on Team #1.

JR never went with Alex White for White to make a buy. Greg Junnier gave those buys to JR. JR did go out with his informant known as Diamond to make buys. Both Carey Bond and Bruce Tesler took drugs from Junnier, which were from buys done by White, and wrote warrant

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

[redacted]

Continuation of FD-302 of Jason R. Smith , On 5/9/07 , Page 3

affidavits falsely stating that they, not Junnier, supervised the buys. Both Bond and JR wanted to do warrants the right way, but they took drugs from Junnier and falsely claimed that they were responsible for supervising buys because of nine and two.

During months when Team #1 was working a special detail, team members would be required to do nine arrests and four warrants. There was a special detail almost every month that JR was on Team #1.

JR, Junnier and Tesler normally worked three twelve-hour shifts and two eight-hour shifts per week while on Team #1. The extra four hours on the twelve-hour shifts were supposed to be for patrols at Bowen Homes housing project. JR thinks that the APD received federal funds to pay for extra patrols in certain housing projects. The Bowen Homes detail required that drug cases be made at Bowen Homes. On many of the twelve-hour days, there was not enough time to actually do any patrols at Bowen Homes. On some days when they couldn't get to Bowen Homes, JR, Junnier and Tesler would take some drugs seized from a location other than Bowen Homes and they would turn the drugs into the APD Property Unit claiming they were from Bowen Homes. JR did that two or three times himself.

JR drove to the fire station for the raid briefing on the night of the raid at 933 Neal St. with Tesler, Junnier and Fabian Sheats. JR saw Tesler at the fire station just before the briefing began. He didn't see Tesler leave the fire station until they departed to do the raid.

At the conclusion of the interview, JR provided to the interviewing agents a copy of Atlanta's Disorderly Conduct ordinance and a series of e-mails to a web-site known as [redacted]

CONFIDENTIAL

FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 05/30/2007

JASON R. SMITH was interviewed at the Atlanta office of the FBI pursuant to a guilty plea and plea agreement. Also present was SMITH's attorney, JOHN GARLAND. SMITH was aware of the identities of the interviewing agents, and after being advised of the nature of the interview, SMITH provided the following information:

ATLANTA POLICE DEPARTMENT (APD) Officer BRUCE TESLER stated in a police report he did surveillance on FABIAN SHEETS prior to his arrest on November 21, 2006, but SMITH's confidential informant (CI), Diamond, actually provided the information.

Before the execution of the search warrant at 933 Neal Street (933 Neal), APD Officers GREGG JUNNIER, TESLER, and SMITH did not discuss that it could be personally profitable to seize a kilo of cocaine.

While at 933 Neal after the shooting, SMITH told APD Sergeant STALLINGS that he (SMITH) did not see the buy. STALLINGS told SMITH to say ALEX WHITE came to the back door and to use the wires running up the back of the house as the reason for the belief that surveillance equipment existed. The night of the shooting at GRADY MEMORIAL HOSPITAL and again the next day in the narcotics office, STALLINGS told SMITH to pick one story and stick to it.

The squad did "jump outs" and "thunder runs." On jump outs, they stopped the team van, detained a person on the street, and searched his pockets. Officers did not ask questions before searching the person. If the person had drugs, then he was arrested. STALLINGS was present during jump outs and thunder runs. SMITH observed more than ten and possibly as many as 50 situations during which APD Officer CARY BOND detained someone, but based upon the facts observed by SMITH, SMITH would not have been able to legally detain that person. SMITH did not hear BOND say he needed to make up probable cause (PC).

SMITH is unsure whether or not BOND gave him drugs and told him the address from which a CI purchased them. SMITH did not hear BOND call WHITE, give him an address, and direct him to buy from that address. At least once, SMITH was with BOND, and then BOND said he had to meet WHITE. BOND was then gone 10 - 15 minutes

Investigation on 05/25/2007 at Atlanta, Georgia

File # [redacted] Date dictated 05/31/2007

by SA F. Joseph Robuck
SA Andrew J. Van Epps:ajve

DOZIER-COA 00126

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 05/25/2007 , Page 2

and returned with drugs. BOND was not gone long enough to watch WHITE purchase drugs.

SMITH recalls an occasion when WHITE met JUNNIER and SMITH near the APD property room. WHITE gave them four packages of drugs and told them the locations from which he purchased the drugs. SMITH was present when JUNNIER later gave drugs from WHITE to BOND and told him the address from which WHITE had purchased those drugs.

After TESLER transferred to narcotics, SMITH and TESLER were almost always together while on duty. Other than two purchases of drugs by Diamond that SMITH and TESLER observed, SMITH was not with TESLER when he observed other drug buys. SMITH did not give drugs to TESLER from buys made by Diamond that TESLER did not observe. At least one time, SMITH saw JUNNIER give drugs to TESLER, so he could get a search warrant.

APD Sergeant STALLINGS and Officer HOLLY BUCHANAN operated a CI named KIRK Last Name Unknown (LNU). KIRK LNU's son actually bought drugs, but the son could not be signed up because he was on probation.

During an evaluation, STALLINGS told SMITH to keep up with the watch average and said it was nine and two.

Fulton County Assistant District Attorney (ADA) DAVID KATZ sent letters to apartment complexes because crime at those complexes was high. Some apartment managers then contacted KATZ, who referred some to JUNNIER.

JUNNIER coordinated extra jobs at some apartment complexes. Whenever an apartment complex had an incident, the management contacted the officer it hired. If the officer was on duty, then he would go to the complex. While on duty, JUNNIER and SMITH patrolled apartment complexes whose management paid them. SMITH recalls stating they should patrol a certain complex, and JUNNIER stated the complex was not paying them. While off duty, SMITH worked one to two hours weekly at an apartment complex that paid him. Whenever JUNNIER was absent on a Friday, SMITH collected JUNNIER's pay from apartment complexes and stores. SMITH did not pay taxes on his extra jobs, and according to SMITH, no one liked "1099 jobs." JUNNIER told SMITH that STALLINGS was planning to start working extra jobs again. BOND did not work extra jobs, like SMITH's, at apartment complexes, but TESLER did work them on duty.

CONFIDENTIAL

FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 06/05/2007

JASON R. SMITH was interviewed at the Atlanta office of the FBI pursuant to a guilty plea and plea agreement. SMITH's attorney, JOHN GARLAND, was also present. SMITH was aware of the identities of the interviewing agents, and after being advised of the nature of the interview, SMITH provided the following information:

On one occasion, ATLANTA POLICE DEPARTMENT (APD) Officer PAT APOIN was assigned to drive the paddy wagon, and a defendant in the wagon was causing trouble. APOIN met APD Officer JEFF BRANHAM to get a person whom BRANHAM had arrested. When BRANHAM became aware of the defendant causing trouble, BRANHAM asked for APOIN's knife, which APOIN gave to BRANHAM. BRANHAM put the knife on the seat next to the defendant, put his handgun to the defendant's head, and told him to grab the knife. APOIN told SMITH about this incident.

During the execution of a search warrant, SMITH and APD Officer CARY BOND took several DVDs, and APD Officer NATHAN LUCAS took a lot of them. SMITH does not recall any APD officers taking guns or cash for personal use from subjects during the execution of search warrants.

On one occasion, APD Officers GREGG JUNNIER, BRUCE TESLER, BOND, and SMITH were in their vehicle on Donald Lee Hollowell Parkway. JUNNIER stopped the car, and they confronted some people in front of a business. SMITH went inside the business and asked to use the restroom, but an individual in the business told him he could not use it. TESLER told SMITH that he found marijuana on one of the people outside of the business and showed the marijuana to SMITH. BOND went to get a warrant to search the business, and when SMITH found out that BOND was getting a warrant, SMITH did a protective sweep of the business and to freeze the scene. BOND obtained a warrant to search the business.

SMITH believes APD Officers HOLLY BUCHANAN and SPERL are good officers.

Investigation on 06/01/2007 at Atlanta, Georgia

File # [redacted] Date dictated N/A

by SA F. Joseph Robuck
SA Andrew J. Van Epps:ajve

DOZIER-COA 00128

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 06/11/2007

Jason R. Smith (JR) was interviewed at his attorney's office on June 8, 2007. His attorney, John Garland, was present for the interview. JR provided the following information:

JR's cell phone number is [redacted]. His wife, [redacted], put the message on JR's voice mail.

Atlanta Police Department (APD) Team #2 worked a housing project at McDaniel Glen like Team #1 worked Bowen Homes. Team #2 also worked an extra job at Bedford Pines apartment complex. Bedford Pines paid the officers a bonus for arrests made at Bedford Pines. Team #2 worked their extra job at Bedford Pines while on duty which is common at APD.

JR provided a list of APD Officer Greg Junnier's extra jobs that JR knows about. There are 32 jobs on the list. JR also provided maps showing the locations of the extra jobs.

In addition to other investigative techniques described previously by JR, Team #1 also used "knock and talks." The way that Team #1 would do those was that an officer would knock on the door of a residence, an occupant would answer the door and Team #1 would flood the inside of the residence with officers. One officer would then coerce the occupant into signing a consent to search. JR advised that that technique was used at 2175 Lennox Road, Apt A-5, on 11/8/05. He further advised, however, that Spanish was spoken at the front door and he really didn't know whether the occupant gave the team consent to enter.

JR also cited a situation which started at 1640 South Gordon in approximately April 2006 as another example of a "knock and talk." The occupant at 1640 South Gordon was Keith Jones. Team #1 had a valid search warrant for Jones' residence and five pounds of marijuana was found there. Jones telephoned his supplier, Oscar Harris, and Harris unwittingly brought 15 more pounds of marijuana to Jones' residence where he was confronted by Team #1. Harris, in turn, told Team #1 that he would give up his supplier who had 50 pounds. Harris took the team to the apartment where his supplier lived. Sergeant Stallings and Officers Junnier and Carey Bond came up with a plan to get into the apartment. The team went to the door to do a "knock and talk." Officer Gary Smith

Investigation on 6/8/07 at Atlanta, GA

File # [redacted] Date dictated 6/11/07

by Andrew J. Van Epps
F. Joseph Robuck:fjr

DOZIER-COA
00129

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Jason R. Smith , On 6/8/07 , Page 2

took a shield and Officer Nathan Lucas took a battering ram. JR stayed in the police van with Oscar Harris. Some of the Team #1 officers said that they smelled marijuana and they forced entry. JR believes that the plan was to force entry whether or not there was a legal reason for it and he doubts that they actually smelled marijuana. Oscar Harris was released on a copy of charges for the 15 pounds of marijuana.

In an affidavit dated 8/9/06, APD Officer Bruce Tesler avers that he observed a drug buy on 8/1/06 at 850 Westmont Road. JR was there on 8/1/06, but Tesler was not. The buy did occur, but Tesler was not there to see it as he states in his affidavit. JR does not know of any other fact in the affidavit that is definitely false.

Tesler also swore to an affidavit dated 6/8/06 and related to 1247 Simpson Road, Apartment #34. Tesler described a drug buy that he observed. The chances are "slim to none" that Tesler actually observed that buy. Moreover, the real reason that Tesler got that warrant was that the manager of the apartment complex at that address, Randy Carbo, wanted the people in Apartment #34 to be evicted. Tesler, Junnier and JR had an extra job at that complex and were paid by Carbo.

CONFIDENTIAL



FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 04/01/2008

JASON R. SMITH was interviewed at the PAULDING COUNTY DETENTION CENTER, 25 Industrial Way North, Dallas, Georgia 30132 pursuant to a guilty plea and a plea agreement. SMITH was aware of the identities of the interviewing Agents and was advised of the statements set forth on a consent to search form (FD-26). SMITH was provided with a copy of this form, which he read, acknowledged that he understood its contents, and signed the form, authorizing a complete search of the cellular telephone he surrendered to the FBI in December 2006. He thereafter provided the following information:

Sometime in 2004, shortly after SMITH was assigned to the ATLANTA POLICE DEPARTMENT (APD) REDDOG team, the team targeted a house located at 833 Drummond Street as a drug house. During a drive-by of the neighborhood, an unknown male ran to the porch upon seeing the REDDOG vehicle. Officers RAMON RIVERS and FREDDIE WATSON chased the male and tackled him on the porch. After instructing SMITH to guard the restrained male, RIVERS and WATSON entered the house and performed a quick search, but did not find any drugs.

Afterward, RIVERS, who was SMITH's team leader on REDDOG, told SMITH to work toward getting a search warrant for the house. RIVERS told SMITH, who was new to REDDOG and had never written a search warrant affidavit before, that he needed to "pick off" someone who bought drugs there in order to get a warrant.

A few days later, SMITH, RIVERS, and Officer PERCY TOWNS arrested a male with crack in his pocket, approximately one block south of the house. RIVERS told SMITH to write the affidavit as if the male purchased the crack from 833 Drummond Street. RIVERS directed SMITH to do this even though there was no indication that he actually purchased drugs from the house. TOWNS was present during this conversation.

Investigation on 04/01/2008 at Dallas, Georgia

File # [redacted] Date dictated

by SA Andrew J. Van Epps
SA Eulis Mile Brosas:emb

DOZIER-COA 00131

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 01/11/2007

Arthur Bruce Tesler was interviewed on January 4, 2007, at the United States Attorneys Office in Atlanta. His attorney, Bill McKinney was present for the interview. Also present were Assistant United States Attorneys Yonette Buchanan and Jon Peter Kelly, Department of Justice Attorney Page Fitzgerald, Fulton County Assistant District Attorney Shukura Ingram and Fulton County District Attorney's Investigator Jeff Holmes. Pursuant to a proffer agreement, Tesler provided the following information:

In the afternoon of November 21, 2006, the day of the shooting of Kathryn Johnston, Tesler, J. R. Smith (JR) and Greg Junnier were conducting a routine patrol in a marked patrol car in the vicinity of Simpson and Lanier Streets in Atlanta. At approximately 2:00 p.m., they pulled into a parking lot at 350 Lanier St. Tesler and Junnier checked on some vacant apartments at that address and JR went into the wood line near the apartments. Tesler and Junnier didn't find anything, but JR came back to the patrol car with a paper bag. JR said that he had found marijuana. Tesler didn't see the marijuana or the packaging. JR put what he had found in the trunk of the patrol car.

A K-9 unit was called to 350 Lanier St. Officer George Ramsey and his dog Max responded to the call. Ramsey would have been told by someone that marijuana was found in the woods. Ramsey did a search, but didn't find any more drugs. At about 3:00 p.m., Tesler, Junnier and JR departed 350 Lanier St. in their patrol car.

At approximately 3:30 p.m., JR received a telephone call from his informant, Diamond. Diamond told him that a guy wearing a yellow or gold jacket was outside of a store at 1143 Simpson St. selling marijuana. Probably about ten minutes later, Tesler, Junnier and JR arrived at 1143 Simpson St. They recognized the individual that had been described by Diamond to be Fabian Sheats who they had previously arrested. Sheats saw the marked patrol car and he put something like a plastic bag in his mouth. Tesler exited the vehicle and confronted Sheats. While he was confronting Sheats, Junnier also got out of the vehicle. Shortly thereafter, Junnier got back in the driver's seat and Tesler and Sheats got in the back seat of the vehicle. Tesler is not sure where JR was at that entire time.

Investigation on 1/4/07 at Atlanta, GA

File # [redacted] Date dictated 1/11/07

by Michael L. Grant
F. Joseph Robuck

DOZIER-COA 00132

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Arthur Bruce Tesler , On 1/4/07 , Page 2

Junnier pulled the patrol car into the parking lot by 1143 Simpson. JR walked around the white house at 1141 Simpson where there is a trail in the wood line. JR was back there for a few minutes. JR came back to the patrol car later with a scale and 20 to 30 empty blue bags that looked like packaging for marijuana. Tesler decided to take the case against Sheats and he started to do some paperwork. This was the third time that Tesler's team had arrested Sheats and it was Tesler's turn to take the case.

Either JR or Junnier called for a K-9 unit to respond to 1143 Simpson. They had been at 1143 Simpson about five or ten minutes before the call was made for the K-9 unit. It took the K-9 unit about five minutes to get there after the call was made. Connie Carson with her dog Chad and Rich Sperl with his dog both responded to 1143 Simpson. Sperl did not get his dog out of his vehicle. Sperl and JR went with Carson and Chad back around 1141 Simpson to do a search. A couple minutes later, JR indicated that there were more drugs found. Tesler started to write a green ticket, that is, a citation, and he advised Sheats of his Miranda Rights.

At some point while at 1143 Simpson, JR showed Tesler a plastic bag containing approximately 45 blue bags of marijuana and a clear plastic bag containing approximately 10 yellow bags of marijuana and two $15 to $25 bags of crack cocaine. Tesler is not sure what color the bags were that the crack was in.

Sheats knows Tesler, Junnier and JR and he "knows the deal." Junnier was encouraging Sheats to help himself. Sheats volunteered that some of the drugs found at 1143 Simpson belonged to him and he said that he knew of another house where more "weight" could be found. He said that he'd take the officers to that house.

Tesler is not sure which officer put the drugs found at 1143 Simpson in the trunk of the patrol car and when they were put there. The drugs may have been in the visor of the patrol car for a while. The scale and the packaging that did not contain marijuana that was found at 1143 Simpson was never turned into the Atlanta Police Department (APD) evidence room.

The story that Tesler told the FBI in his first interview about field testing the crack cocaine found at 1143 Simpson was false. Tesler told that lie to cover for JR.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Arthur Bruce Tesler , On 1/4/07 , Page 3

After the shooting at 933 Neal St., Tesler went to the trunk of the patrol car that he had been riding in that day. Sheats was going to be locked up and Tesler had some paperwork to do before Sheats was taken to jail. Tesler began to write the ticket for Sheats, but he was having trouble doing it because of his mental state as a result of the shooting. Officer P.J. Roberson was near Tesler when he was at the trunk. Roberson saw that Tesler was having trouble and he offered to help him with the paperwork. Tesler gave Roberson the paperwork and Tesler looked inside the trunk for the drugs from 1143 Simpson. Tesler started to tell Roberson that the charges on Sheats would be possession of marijuana and crack cocaine with intent to distribute when Tesler realized that the crack from 1143 Simpson was not with the marijuana found at that address. Tesler told Roberson that there was no cocaine and therefore the charges would be just possession of marijuana with intent to distribute.

Tesler talked to JR on the Wednesday morning after the shooting in the narcotics office at APD. This was before they gave statements to APD Homicide. JR told Tesler what the story was going to be regarding Alex making a buy at 933 Neal St. and he told Tesler to get familiar with the warrant. Tesler read the warrant at that point. JR told Tesler that the story was going to be that Alex bought two hits of crack at 933 Neal St. He further stated that those two hits of crack would be the two hits from Fabian Sheats.

About five minutes after driving away from 1143 Simpson on the day of the shooting, Tesler, Junnier, JR and Sheats pulled into a parking lot in the 800 block of Simpson St. The three officers wanted to make it clear to Sheats that either he would take them to the house where the "weight" was or they would call a paddy wagon. The officers and Sheats were parked in the parking lot for about five minutes. Sheats told the officers that at about 3:00 p.m. that day, he saw a shoe box containing a kilo of cocaine at a house on Neal St. He described an individual named Sam as being in possession of that kilo. His description of Sam was: black male, heavy set, neatly trimmed beard, 6'0"-6'1" tall. He added that Sam was not from around Neal St.

At some point before the shooting, either while in the parking lot in the 800 block of Simpson or sometime after that, Sheats said that Sam didn't have guns because he was a convicted felon. He also said that there was an older female in the house where Sam was. Tesler didn't know how old that female was. Sheats

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Arthur Bruce Tesler, On 1/4/07, Page 4

also said that Sam had surveillance equipment and could monitor cameras from inside the house.

Sometime before Tesler, Junnier, JR and Sheats went to the jail for JR to swear out a warrant for 933 Neal St., the officers discussed doing a "knock and talk" at 933 Neal St. They also discussed getting an undercover vehicle from which to do surveillance. However, time was an issue because Sheats was in the patrol car and other members of Narcotics Team #1 were working on a warrant in another part of town.

Sometime before they parked in the lot in the 800 block of Simpson, JR and Junnier got out of the patrol car and had a private conversation. Tesler speculates that they discussed how to get into 933 Neal St. and how to verify Sheats' information. After leaving the parking lot in the 800 block of Simpson, Sheats directed the officers to 933 Neal St. They drove by 933 Neal St. and Sheats pointed out the house located at that address. They then drove down Jett St. and looked at 933 Neal St. from the back. Thereafter, they went back down Neal St. at which time JR asked Sheats if he meant the house with the red awning. Sheats told him that it wasn't that house; it was the house with the green shudders and wheelchair ramp. Junnier then confirmed with Sheats again that Sheats meant the house with the wheelchair ramp.

The next significant event that happened was that Tesler, Junnier, JR and Sheats arrived at the Fulton County Jail. Tesler looked at the clock when they arrived and it was 5:34 p.m. or 5:35 p.m. After JR exited the vehicle to go into the jail to apply for the search warrant for 933 Neal St., Junnier and Tesler made bets on how long it would take JR to get a warrant. Before JR got out of the vehicle, there was a discussion about who was going to do the warrant. JR said that he would do it.

Tesler didn't think there was enough probable cause from Sheats to get a warrant to search 933 Neal St. He suspected that when JR went into the Fulton County Jail to apply for the warrant, he was going to take a shortcut. Tesler didn't know at the time that JR went to apply for the warrant that Alex couldn't do a buy because he didn't have transportation to get there. However, Tesler pretty much knew that Alex hadn't made a buy. Tesler has no recollection of Junnier calling Alex to see if he was available to make a buy, but he would not dispute that Junnier made that call.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Arthur Bruce Tesler , On 1/4/07 , Page 5

Junnier telephoned Sargent Stallings while they were waiting for JR at the jail to tell Stallings that he needed to get the team together to do a raid at 933 Neal St. Tesler generally recalls Junnier receiving a telephone call while at the jail. Tesler also recalls that either Tesler or Junnier received a telephone call from JR who was inside the jail and who said that the warrant had been signed. Thereafter, JR returned to the vehicle and said that he had a signed warrant. They then proceeded to the fire station at Flowers and Simpson.

The tactical briefing to the rest of the narcotics team occurred at the fire station. JR pretty much read the warrant at the briefing. Tesler absolutely didn't believe that a buy had been done which is what JR briefed. He didn't challenge JR about the buy being done at the briefing because he was low man on the totem pole. There was a history of shortcuts being done in warrants, so it wasn't the first time he had been briefed when he knew something hadn't happened.

After the shooting, Tesler overheard Sargent Stallings ask JR if JR had done an operations plan. JR said that he hadn't, but that he would work on one.

Immediately before the shooting, Tesler covered the back of the house at 933 Neal St. Sargent Stallings was also there. Tesler showed Stallings a wire running up the back of the house. Tesler thought that that wire might be connected to a surveillance system.

After the shooting, Tesler helped clear the basement of 933 Neal St. with Officers Guerin, Sperl and a couple of REDDOG members and maybe also some Zone 1 officers. There were seven or eight officers total.

After he helped clear the basement, he went back toward the front of the house where he met up with JR. JR asked Tesler to walk to the back of the house with him which Tesler did. At the back of the house, JR rolled up his one sleeve and showed Tesler more than one clear baggie of marijuana. JR said, "What do you think," meaning about JR planting drugs in the house. Tesler shook his head no and walked away. Tesler did not observe what JR did next. Tesler had an idea at the time that the marijuana under JR's sleeve was from 350 Lanier. He hadn't seen all the marijuana recovered from that location. Later, Tesler discovered that the

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Arthur Bruce Tesler , On 1/4/07 , Page 6

two hits of crack recovered from 1143 Simpson were missing from the trunk of the patrol car they had driven on the day of the shooting.

Sometime on the night of the shooting, after the shooting occurred, JR told Tesler that Tesler's name was in the warrant. On the night of the shooting or early the next morning, JR told Tesler that Alex made a buy at 933 Neal St. Tesler understood that that was what the story was going to be. JR said that the two hits of crack described in the warrant were from 1143 Simpson.

Tesler has no trust in the system at the APD. In October 2003, Tesler became aware of a bad officer, Officer English, in APD Zone 2 which is where Tesler worked at the time. Tesler observed English use excessive force and it was rumored that English had stolen some money. Tesler made a complaint to his supervisor. He told his supervisor that English was a liability. Tesler had to go to APD's Office of Professional Standards (OPS) to report English. Tesler's partner at the time was officer Baumeljay (phonetic) and Baumeljay was corroborating Tesler's information about English. Baumeljay was told by OPS that Tesler and Baumeljay were only coming forward because they had ulterior motives. Tesler got a reputation as a rat in the department. He took a lot of "crap" from his co-workers. OPS let English resign. Thereafter, Tesler was re-assigned to the airport. English got a job at the airport as a baggage handler.

Tesler was scared after the shooting that if he told the truth, no one was going to believe him over the more senior members of his team. Sergeant Stallings and Junnier got on the narcotics team at the same time and are close friends. After the shooting, Tesler went into a defensive mode.

After leaving the hospital on the night of the shooting, Tesler and JR went to the APD evidence room to turn in evidence. Tesler turned in the marijuana that he charged Sheats with. Tesler observed JR turn in the two hits of crack. At about 3:30 a.m. that same night, Officer Schiffbauer called Tesler on Tesler's cellphone and told him that marijuana had been found in the house at 933 Neal St.

Between midnight and 1:00 a.m. on the night of the shooting, Tesler spoke to Junnier at the hospital. If there was any discussion about a cover-up at that time, it was vague because Junnier's family was around. Tesler doesn't recall any such discussion.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Arthur Bruce Tesler , On 1/4/07 , Page 7

On the day after the shooting, at JR's cubicle in the narcotics office on the seventh floor of City Hall East, JR told Tesler the details of the false story about Alex making a buy at 933 Neal St. Those are the details that Tesler gave to the FBI at his first interview with the FBI. JR wrote a diagram showing Tesler where they met Alex and where they and Alex parked their vehicles. At Junnier's suggestion, Tesler called Alex maybe twice before Tesler made a statement to APD Homicide. Alex was completely on board with saying that he did a buy at 933 Neal St. and with the cover-up.

After he gave his statement to APD Homicide, Tesler told Sergeant Stallings that the drugs from 350 Lanier hadn't been turned into the APD evidence room. Thereafter, JR and Tesler went to their patrol car, which had been part of the crime scene, and retrieved marijuana from the trunk. That marijuana was in a bag which in turn contained six green plastic bags of marijuana and many more clear plastic bags, maybe fifteen, of marijuana. JR told Tesler that the clear bags couldn't be turned in to the APD evidence room because he planted some of those bags at 933 Neal St. Tesler observed that the clear plastic bags matched the bags that he had seen hidden up JR's sleeve. JR told him to turn in only the green plastic bags. Thereafter, Tesler and JR went to a side street off of Glen Iris, not far from City Hall East. Both Tesler and JR got out of the vehicle they were in and they discarded the remaining clear bags of marijuana down a sewer.

The next day, Thanksgiving Day, Tesler noticed on his cellphone a missed call from Alex at about 10:30 p.m. the night before. Alex left no message.

On Friday, November 24, 2006, Tesler was working an extra job at the Buckhead Bread Company when he received a telephone call from Junnier. Junnier said that Alex was "freaking out." He warned Tesler that Alex might be recording telephone conversations. After that call, Tesler received a call from Alex. Alex asked Tesler why JR did this to him and why JR put him up to this. Tesler only said something like, "Alex, you got to do what you got to do." Next, Tesler received a call from Lt. Gibbs. She told Tesler that he was not to talk to Alex anymore. She said that Alex was acting strange.

On the following Monday, Tesler was called into OPS to turn in his gun and badge. Later that day, he met JR and Junnier

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Arthur Bruce Tesler , On 1/4/07 , Page 8

at the parking lot of the Kroger on Howell Mill Road. They all agreed that they needed to stand by the false story regarding Alex making the buy. It was just a brief meeting. Junnier called the meeting.

A couple of days later, Tesler met JR and Junnier at My Cousin Vinnie's restaurant near Town Center Mall off Barrett Parkway. Tesler doesn't recall who called the meeting. Junnier said that he invited Cary Bond and he might have said that he also invited Sergeant Stallings, but they were not coming. Tesler didn't bring anything to this meeting. Junnier brought a pad of paper. JR showed up with a folder containing documents. He had notes, a script of what the false story was going to be, a copy of a buy report, other reports and other documents. There was more general discussion about how everyone needed to stand by the story.

The day after Tesler had his interview with the FBI on Thursday, December 7, 2006, he met with JR in the parking lot at Filini's on Ponce De Leon. They met in JR's personal car. JR gave Tesler a copy of the detailed script that he had written. It had a minute by minute description of Alex making a buy at 933 Neal St. Tesler read the script and then he threw it away. He later told JR to watch his time line when he was interviewed by the FBI. JR's script was five to ten pages of real dark typing.

Tesler knows that JR and Junnier got their own phone records at some point. They suggested to Tesler that he get his.

At the meeting at My Cousin Vinnie's, JR asked Tesler to sign a payment voucher to pay Alex for making a buy at 933 Neal St. Tesler refused because Tesler was at home with his family when JR paid Alex on Thanksgiving Day and because it just wasn't right.

Tesler met with Junnier before and after Tesler was interviewed the first time by the FBI. They met both times at Wade Green Road, Exit 273 off Interstate 75, at a parking lot in a shopping center. The discussion was pretty much that they had to stick with the false story about Alex making a buy. Junnier asked him how the interview with the FBI went.

Tesler also had a meeting with JR and Junnier at Target off of Moreland Ave, south of Little Five Points in Atlanta. The three of them drove the route that fit with the false story they created about Alex making a buy at 933 Neal St.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Arthur Bruce Tesler, On 1/4/07, Page 9

There was a photo of an individual who generally fits the description of Sam found by APD Narcotics Team #2 at 933 Neal St. on the night of the shooting. That photo was left on JR's desk at City Hall East so that JR could do the return for the search warrant for 933 Neal St.

CONFIDENTIAL

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription 12/22/2006

Gregg Edward Junnier was interviewed at the Atlanta Office of the Federal Bureau of Investigation on December 11, 2006. His attorney, Rand Csehy, (404)688-1395 (office), [redacted] (cell), was present for the interview. Also present for the interview were U.S. Department of Justice Attorney Page Fitzgerald, Assistant United States Attorneys Yonette Buchanan and Jon Peter Kelly, Fulton County Assistant District Attorney Shukura Ingram and Fulton County District Attorney Investigator Cameron Crandall. Junnier has been an officer with the Atlanta Police Department (APD) for about eighteen years. He has been on APD Narcotics Team #1 since 1998. His date of birth is [redacted]. The interview of Junnier was conducted pursuant to a proffer agreement. Junnier provided the following information:

In the afternoon of November 21, 2006, Junnier was on duty working narcotics with APD Officers Jason R. Smith (JR) and Arthur Bruce Tesler. JR and Tesler are also members of APD Narcotics Team #1. The three of them were riding together in a marked police car on the west side of Atlanta. Shortly before 4:00 p.m., JR received a telephone call from an informant known as Diamond. Diamond told JR about a black male in a gold coat selling drugs near 1143 Simpson St. The three officers responded to that address and found an individual matching the description given by Diamond who they knew to be Fabian Sheats. They knew Sheats because they had previously arrested him on drug charges.

Tesler confronted Sheats, Junnier stayed near the car and JR went around the green store located at 1143 Simpson St. to the place where Diamond told him that Sheats was hiding his drugs. JR came back around the green store with blue baggies which did not contain drugs and a scale. Junnier called for a drug dog. Shortly thereafter, the drug dog arrived and searched behind the green store. JR came back around the green store again with a clear sandwich bag full of $5 bags of marijuana. In an attempt to negotiate with the officers, Sheats told them that he was just in a house where he observed a kilo of cocaine broken into smaller quantities in a shoe box. Sheats said that he went to that house a lot and that he could make a buy there. He described the

Investigation on 12/11/06 at Atlanta, GA

File # [redacted] Date dictated 12/22/06

by Michael L. Grant
F. Joseph Robuck:fjr

DOZIER-COA
00232

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Gregg Edward Junnier , On 12/11/06 , Page 2

individual in possession of the cocaine as a black male, 30-35 years old, well-trimmed beard, using the name "Sam."

After getting the description of Sam from Sheats, the three officers, with Sheats in custody with them, started driving in the general direction of the neighborhood where Sam had the kilo according to Sheats. At about the same time, Junnier telephoned informant Alexis White (Alex), to see if he could make a buy that day. Alex told Junnier that he could, but he did not have transportation. On the way to Sam's neighborhood, Sheats started to have second thoughts about cooperating against Sam. Junnier, who was driving, stopped the police car and there was further discussion for about five minutes with Sheats about his cooperation. Sheats was told that he was going to jail if he didn't cooperate. Sheats was also told that even after he identified the house where he had seen Sam earlier, he would stay with the officers until they raided the house. He was told that he would be going to jail if they didn't find any drugs. Sheats changed his mind again and agreed to take the officers to the house where he'd seen Sam.

Next, Sheats directed the officers to Neal St. and he pointed out the house located at 933 Neal St. They drove to the next street, Jett St., and looked at 933 Neal St. from the back. They could see the back of the house from Jett St. Sheats confirmed that 933 Neal St. was the drug house from the back. They then drove back down Neal St. and JR asked Sheats if the drug house was the one with the red awning and Sheats said no it was the one with the green shudders and the wheel chair ramp, which again identified 933 Neal St. They then drove down Joseph Lowery to the jail to write up the warrant.

While stopped with Sheats before going by Neal St., the officers had a discussion about who was going to write up the warrant. Junnier made the comment that they needed to do a buy at 933 Neal St. first. JR responded, "Or not." Junnier said that in that case he was not going to do the affidavit and Tesler also said that he would not. JR said that he would write it. This discussion was had in front of Sheats.

Before confronting Sheats at 1143 Simpson St., the officers were at 350 Lanier St. JR said that he found all kinds of drugs at that location. At 1143 Simpson St., Junnier saw Tesler with some cocaine. Junnier believes that there was some cocaine found at that location.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of Gregg Edward Junnier , On 12/11/06 , Page 3

Five or six days after the shooting, Junnier met with JR and Tesler at a pizza shop near Town Center. Other officers were invited, but none showed up. JR had a binder with him. He had police reports including a buy report. He also had his telephone records. JR and Tesler tried to get their stories straight. Junnier told them that he didn't have to memorize a story because he only contacted Alex. He told them that that was his only part in the story.

Later, immediately before meeting with the PBA attorney, Don English, the three officers met again in a vehicle at Target on Moreland Ave, south of Little Five Points. Only Junnier, JR and Tesler were invited to this meeting. The purpose of the meeting was to go over the details of the fictitious buy at 933 Neal St. Junnier recalls that certain fictitious details were agreed upon including: the moldy smell of Alex's car, Alex's car had a lot of trash in it and his car was green. There was talk that Alex's car was a Lumina or a Monte Carlo, but it was settled upon that they would just say that it was green without committing to a make or model. Junnier told the others at that meeting that he agreed to the fictitious details.

By the meeting in the vehicle at Target, Junnier still had not decided if he were going to carry out the cover-up. He wanted to tell the truth, but he was afraid of going to prison. He also heard the United States Attorney, David Nahmias, on the news warn witnesses, "don't come in here and lie." Ultimately, Junnier couldn't lie. Before coming to his proffer with the FBI, Junnier's teenage son said, "Dad, I'm praying for you." And, his son suggested an outfit that he might wear for the occasion.

At the meeting at the Target, it was agreed that Alex's car was a four-door. It was also agreed that Alex walked down the side of the house at 933 Neal St. before making the buy. Hearing JR and Tesler talk, Junnier was confused about how Alex would have met Sam at the porch. The story was good in his opinion up until that point.

Sheats had told the officers that when Sam is not at 933 Neal St., he has somebody watch the house for him from outside to turn people away. This is a fact that was discussed at the pizza shop meeting as well as at the meeting at Target.

Junnier met with Tesler last Thursday after Tesler was interviewed by the FBI. He met him at Highway 92 and Wade Green