CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Edward Junnier_____ , On _12/11/06____ , Page ___4___

Road. Junnier wanted to pay Tesler at that time for a side job
that both he and Tesler work at. Tesler told Junnier that the
meeting with the FBI went well and that he was able to explain the
time-line before the shooting. Junnier told Tesler that he would
not be using the PBA attorney. Tesler told Junnier that that was
not a good idea. Junnier spoke to Tesler again the next day before
Junnier's daughter's 6:30 p.m. basketball game. It sounded to
Junnier as if Tesler had been to talk to JR about Junnier not using
the PBA attorney.

Junnier thought that maybe JR could have gotten a warrant
based on just Sheats' information. At one point, he questioned JR
about why he hadn't put the information from Sheats in the
affidavit and JR responded that Sheats was not reliable.

Based on looking at his telephone bill, Junnier believes
that he called Alex at about 5 p.m. on the day of the shooting. He
called Alex as he, JR, Tesler and Sheats were leaving 1143 Simpson
St. After that, they drove down Simpson at Sheats' direction and
went to Simpson and Joseph Lowery. It took five minutes or less
until they pulled into a parking lot on Simpson St. across Joseph
Lowery. Five to ten minutes later, they pulled out of the parking
lot and then spent ten to fifteen minutes looking at 933 Neal St.
After they finished at Neal St., they proceeded to the Fulton
County Jail and parked, which took about another five minutes
total. Junnier thinks that they were at the jail at 5:30 p.m. JR
went into the jail and then Junnier and Tesler joked about how long
it would take JR to get the warrant. They each made a guess about
what time he would come back out of the jail. Junnier believes
that JR in fact exited the jail at about 6 p.m. JR has a thumb
drive on which he stores old warrants and he can cut and paste
affidavits fairly quickly.

When JR came out of the jail, JR said, "They got the
buy." Junnier thinks that JR said that for Sheats' benefit.

If there were drugs turned in from a search of 933 Neal
St. which weren't found there legitimately, then they were probably
from JR's stash of throw-down drugs. Junnier does not know where
else they would have come from.

Junnier believes that it was after Tesler's interview
with the FBI that Tesler told him about field testing some cocaine
at 1143 Simpson St. Junnier did not observe Tesler field testing

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Edward Junnier_____ , On __12/11/06___ , Page __5__

any drugs at 1143 Simpson and he didn't hear anyone mention it while they were there or shortly thereafter.

JR never expressed a reason why he didn't want to do the buy at 933 Neal St. Junnier speculates that JR may have been worried about time passing. Junnier believed when JR went into the jail to write the affidavit for the warrant, he was going to include the information from Sheats.

The meeting at the pizza shop was about three or four days before the meeting at Target which was probably on a Wednesday. After Junnier, JR and Tesler left the meeting with the PBA attorney, they sat together in the parking lot for ten minutes. Junnier can't recall any other attempt at that time to get their story straight regarding the events preceding the shooting.

After the officers met at Target, the three of them drove the entire route that they had driven with Fabian Sheats on the day of the shooting. JR and Tesler got their story straight on meeting Alex and Alex doing the buy at 933 Neal St. JR and Tesler were unsure what their story should be regarding when they first met Alex on the day of the shooting. However, they decided that they would say that when JR got out of the car to take his police gear off, he saw Alex.

At the tactical briefing at the fire station on Flowers St. before the raid at 933 Neal St., JR briefed the raid team that a buy had been done at 933 Neal St. Junnier knew that was not true, but it didn't bother him that much because he knew that they had verified the address with Sheats and he believed Sheats when he said he had bought drugs at that address earlier in the day.

Junnier called Sargent Stallings before JR came out of the jail and told Stallings to have everyone rally at the fire station which was a common rally point. Junnier thinks that they drove straight from the jail to the fire station and most of the team was there when they got there. He recalls that Nathan Lucas and Maurice Guerin were not there yet.

When the raid briefing was conducted, Sheats was in a position to hear it. He had plenty of opportunity to say that he had lied about buying drugs there if it didn't happen. In addition, Sargent Stallings confronted Sheats at the time of the briefing telling him that there had better be a lot of drugs at 933 Neal Street. Sheats replied that there were a lot of drugs there.

DOZIER-COA
00236

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Edward Junnier_____ , On _12/11/06_ , Page __6__

At the pizza shop meeting, JR came into the restaurant last.  Tesler told JR that he noticed that JR had shaved and was wearing a nice shirt and glasses.  JR responded that he had to put on a good image.  All three officers brought written statements to that meeting.  JR read his to Tesler.  Junnier heard parts of it while he was getting up and down to get food off of the buffet.

Junnier talked to Alex the day after the shooting.  Alex told Junnier that he had made the buy.  That is, Junnier was trying to instill in Alex's mind that he needed to say that he had made the buy.  Alex told Junnier at one point that JR told him that he would get $300 from JR for the buy and Alex added that that wouldn't be enough.  Junnier told Alex to tell the truth when he was talking to Alex on the telephone because he thought the FBI might be listening.  Junnier later arranged for a store owner named Eddie, who he worked a second job for, to pay Alex $100 to keep Alex happy.  JR told Junnier that he paid Alex $250.  Junnier thinks that that was $50 of the City's money and $200 of JR's money.

At the pizza shop meeting, JR wanted to know when Junnier called Alex on the day of the shooting.  Also, JR was going to ask Alex something like, "Hey, didn't you make that buy?"  JR wanted to flip the problem back on to Alex.

The reason that Junnier arranged for Eddie the store owner to give Alex $100 was because Alex was asking for money, which was not uncommon for Alex to do.  Junnier hoped that the money would encourage Alex to continue to say that he had made the buy at 933 Neal St.  The $100 from Eddie to Alex did not relate to the raid on Rhodesia Road.

When JR went to write the affidavit at the jail, Junnier thought that JR was going to falsely say that a buy happened at 933 Neal St.  On the other hand, he also thought that JR was going to include the information received from Fabian Sheats and attribute it to Sheats.

Regarding the raid that Junnier's team did on Rhodesia Road in November 2006, no buy was made there either.  Junnier's team received information from a drug dealer that marijuana was being sold at 161 Rhodesia Road.  Junnier and Officer Cary Bond sent Alex there to make a buy.  Alex told one of the occupants of the house that he wanted to buy marijuana and that person told him that they were packing up and to come back later.  Alex smelled

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of   <u>Gregg Edward Junnier</u>                    , On <u>12/11/06</u>     , Page   <u>7</u>

marijuana in the house.  JR also attempted to make a buy at 161
Rhodesia Road using his informant, Diamond, but for some reason
Diamond couldn't make the buy.  Junnier subsequently swore out an
affidavit including the information from Alex's attempt to make a
buy but also including the false assertion that a buy had been
made.  JR provided the marijuana that was falsely turned in as
evidence.  JR's handwriting is on the property sheets for that
raid.

JR keeps extra drugs called INS drugs.  INS stands for
insurance in case you don't find drugs on a raid.  JR told Junnier
that he learned about INS drugs while working with REDDOG.  Junnier
believes that JR may have planted drugs on people who were later
prosecuted for possessing those drugs.

Nathan Lucas has taken videos from homes that the
narcotics team has raided.  Sargent Stallings will not let Lucas
count cash because he doesn't trust him.  Junnier has no knowledge
of anyone on his team ever stealing cash from the site of a raid or
anywhere else.

Junnier is aware of a number of different shortcuts used
by APD officers related to warrants.  First, affidavits will state
that an officer observed an informant go to the door of a house to
buy drugs when in fact the officer was not in a position to see the
informant go to the door or in some cases the officer was not even
in the vicinity of the house approached by the informant.  Junnier
has used that shortcut several times.

Second, officers will pad vouchers for buy money to
include gas money for the informant.  That is, an officer may say
an informant bought $50 worth of drugs when he really bought $40
worth of drugs.  The ten dollar difference will be given to the
source for gas when he uses his own vehicle.  The Fulton County
District Attorney's Office never charges defendants with the buys
used for probable cause to get warrants so officers don't have to
falsify testimony when they pad buy money for gas.  Additionally,
officers have had to pad vouchers just to get city cars repaired.

Third, it is common practice on Junnier's narcotics team
for an officer to make a number of buys with an informant and then
give those cases to other officers who need cases.  Those officers
will then write affidavits stating that they witnessed the
informant make a buy when in fact they had not.  This practice is
motivated by the fact that the department has a quota: nine arrests

DOZIER-COA
00238

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Edward Junnier___ , On 12/11/06 , Page __8__

and two search warrants per narcotics officer per month.
Promotions and pay increases depend upon the quotas being met or
exceeded.

    Fourth, most of the time informants will drive themselves
to make a buy.  However, officers will falsely state in affidavits
that they rode with the informants to make buys.

    Fifth, often times an affidavit will state that the
swearing officer patted down the informant before and after he
makes a buy when in fact that did not happen.  With an informant
like Alex who Junnier has a lot of experience with, he would not
pat him down but he would say he did in an affidavit.

    Sixth, if a buy gets stale, Junnier will often write a
surveillance paragraph.  That paragraph states that additional buys
were observed.  Those buys would be fictitious.

    Seventh, sometimes an unreliable informant will make a
buy.  When the handling officer writes the affidavit for a warrant,
he attributes the buy to a reliable informant.  Thereafter, the
unreliable informant and the reliable informant might split the
money for the buy.

    Junnier learned those seven shortcuts from other
narcotics officers over the years.  Many of those shortcuts were
used with Alex who may have done as many as 300 buys for Junnier's
team.  Many times Junnier used shortcuts simply to make sure that
the bad guys went to jail.  He has never once believed that he was
framing an innocent person.

    Regarding the marijuana found in the search of 933 Neal
St. after the shooting, Junnier believes it was planted by JR.
Possibly at the meeting that Junnier, Tesler and JR had at the
pizza shop, JR said that he heard that drugs were found at 933 Neal
St.  He further said something like, "Let's say a few bags of weed
fell out of my pants."  Junnier believes that JR may have gotten
that marijuana at 350 Lanier St. earlier in the day before the
shooting.  At the hospital after the shooting, JR told Junnier that
everything was good, he had it worked out, but he had to talk to
Junnier later.

    Junnier, Tesler and JR arrested Fabian Sheats three times
in the last several months.  Sheats never before gave up his
supplier, but when he was arrested on the day of the shooting, he

DOZIER-COA
00239

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____Gregg Edward Junnier_____ , On __12/11/06__ , Page ___9___

already had two pending cases.  The two previous arrests of Sheats were legitimate.as far as Junnier knows.

Eddie the store-owner pays Junnier $100 per week for security at the store.  Junnier has no regular hours.  Eddie has paid Alex before but with Junnier's money.

Junnier has had pre-signed vouchers from Alex in the past.  Maybe some of Junnier's teammates also had some.

Recently, Alex provided information about drugs at an apartment at 1155 Simpson St., Building C.  Tesler got a warrant.  There were no drugs at that location when the warrant was executed.  An old man and a kid lived there.

On the APD radio, a "38" is a drug matter.  6545 is Junnier's call sign.  6548 is Tesler's call sign.  And, 6541 is JR's.  Any call sign beginning with 18 is a REDDOG member.

Sheats can corroborate that JR and Tesler weren't with Alex making a buy after Sheats was arrested and before the shooting.

DOZIER-COA
00240

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/30/2007

      Gregg Edward Junnier was interviewed at the United States Attorneys Office on January 16, 2007.  His attorney, Rand Csehy, was present.  Also present were Department of Justice Attorney Page Fitzgerald, Assistant United States Attorneys Jon Peter Kelly and Yonette Buchanan, Fulton County Assistant District Attorney Shukura Ingram and Fulton County District Attorney's Investigator Cameron Crandell.  Pursuant to a signed proffer agreement, Junnier provided the following information:

      It was routine for Junnier to send his informant Alex White (Alex) to do drug buys without police surveillance and without being patted down before and after the buy.  Alex would also sometimes use his own money instead of money from the police. Junnier estimates that he wrote twenty-five to fifty affidavits which were used to obtain search warrants which falsely reflected that surveillance and pat downs were done.

      Junnier did not start out with Alex letting him do buys on his own.  Over time he got more comfortable with Alex and then he let him go out on his own.

      In the last eight years, Junnier probably wrote well over a hundred affidavits related to buys done by Alex and other informants in which certain details of the affidavits were false. This amounted to about 80% of the affidavits that he wrote.  On the other hand, he probably wrote no more than three affidavits, in that time period, in which he stated that a drug buy occurred when in fact it had not occurred.  One of those affidavits concerned an address on Rhodesia Road.  Junnier cannot at this time recall other such affidavits.  Additionally, he can't recall an affidavit in which he attributed a drug buy to Alex when the buy was actually done by another informant.

      Junnier has never raided a house where he didn't think there were drugs in the house.  He believed that there were drugs at 933 Neal St.

      Junnier has had maybe four hours of formal training for writing warrants in his eighteen year career with the Atlanta Police Department (APD).  The Narcotics unit has recently re-issued rules for obtaining drug warrants, but Junnier hasn't had the

Investigation on    1/16/07    at Atlanta, GA

File #  ▮▮▮▮▮▮▮▮▮▮▮▮▮                                         Date dictated    1/30/07

by    Michael L. Grant
    F. Joseph Robuck:fjr

**DOZIER-COA
00252**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Edward Junnier_____, On 1/16/07_____, Page ___2___

opportunity to read them.  He has used "ponies" from other
investigators for ideas on how to write warrants.  He would not
have taken shortcuts in affidavits if he hadn't seen other APD
officers do it.  That is how he learned to do it.

     If an officer wants to stay in the APD narcotics unit, he
needs to have a high quantity of warrants.  For years, the rule has
been "2 and 9," that is, every officer needed two search warrants
and nine arrests per month.  Currently, there is even more
incentive to comply with the 2 and 9 rule, because there is
performance based incentive pay at APD.  Junnier has on occasion
not put in for training that he needed because he had to make sure
he got his 2 and 9.

     [Junnier was advised by the interviewing agents that
according to telephone records, he received a telephone call from
JR Smith (JR), who was in the Fulton County Jail applying for the
warrant for 933 Neal St., at 5:41 p.m. on the day of the shooting
at 933 Neal St.]  Junnier thinks that JR called him at 5:41 p.m. to
tell him that he had gotten the warrant signed.  Junnier is 100%
certain that he did not discuss the details of Alex's fictitious
drug buy at 933 Neal St. with JR during that telephone call.

     There was never a time on the day of the shooting that
Junnier thought that Alex made a buy at 933 Neal St.  Junnier
cannot see how it is possible that either Tesler or JR thought that
Alex made a buy.

     Junnier is pretty certain that he did not get out of the
patrol car that he was riding in with JR, Tesler and Sheats on the
day of the shooting between the time that they left 1143 Simpson
and when they arrived at the Fulton County Jail for JR to do an
electronic warrant.  He therefore did not have a private
conversation with JR outside the patrol car.

     When JR got back into the patrol car after swearing out
the warrant at the jail, he said in front of Sheats to Tesler that
Tesler was in the warrant.  JR added, "It is one of those cut and
paste issues."

     Junnier had a conversation with JR in the patrol car
before getting to the jail in front of Tesler and Sheats wherein
Junnier said that they needed to do a buy at 933 Neal St. to which
JR responded, "Or not."  Junnier and Tesler then told JR that they

DOZIER-COA
00241

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Edward Junnier___ , On 1/16/07 ___ , Page ___3___

were not going to swear out the warrant. JR responded that he would do it.

Sheats may have concluded that a buy had been done at 933 Neal St. based on something JR said when he got in the patrol car after finishing at the jail. JR's comment was something like, "The A-team got the buy." Junnier believed that that comment was for Sheats' benefit in order to make him think that a drug buy had been done at 933 Neal St.

Junnier, JR and Tesler also had a discussion in the patrol car with Sheats present during which the question was asked whether they should do a knock and talk at 933 Neal St. or a buy. That is another reason that JR and Tesler would have known that no buy was made.

Junnier is 99% sure that he never had the two hits of crack from 1143 Simpson in his possession. He is 100% certain that he did not hand the crack to JR at any point in time.

Junnier suggests that it may be important to determine when JR telephoned the magistrate to tell her that the warrant application was ready for her to review.

The reason that Junnier told JR and Tesler that he wasn't interested in applying for a warrant for a raid at 933 Neal St. was because he wasn't comfortable with the probable cause. In his mind, if he didn't write the affidavit, he wouldn't get in trouble no matter what JR put in the affidavit. Also, JR didn't have to listen to what Junnier said or take orders from Junnier.

When JR went into the jail to apply for a warrant for 933 Neal St., there was no doubt in Junnier's mind that Alex had not done a buy at that address that day. Moreover, there was no doubt in his mind that JR was going to swear to an affidavit that would say that a drug buy occurred when in fact it had not.

Junnier suspects that anybody who used Alex to do drug buys would have used him like Junnier used him. That is to say that they would say in an affidavit that they did surveillance of Alex doing a buy when they did not.

Junnier did tell JR after the shooting, but not on the night of the shooting, that he (JR) had to pay Alex for a buy at 933 Neal St. JR told Junnier that he was going to meet Alex at

DOZIER-COA
00242

## CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____Gregg Edward Junnier_____ , On 1/16/07 _____ , Page ___4___

Publix with APD Officer Burchfield.  That was not Junnier's idea
for JR to meet Alex at Publix.

Alex would have been paid for a buy at 933 Neal St. even
if the shooting had not occurred.  It was, however, even more
obvious that he needed to be paid because of the shooting.

The purposes for paying Alex for a buy at 933 Neal St.
and having him sign a voucher for the money were: 1) there had to
be a paper trail to make Alex a part of the fictitious story and 2)
to keep Alex happy so that he would stick with the fictitious story
that he made a buy at 933 Neal St.  Junnier got Eddie Tavarez to
pay Alex $100 to help keep Alex happy, even though Junnier didn't
feel that it was his responsibility to keep Alex happy.  It was
JR's responsibility.  Junnier was just helping out JR.  Junnier
thinks that JR paid Alex about $250 of his own money.  JR told
Junnier that $250 was all the extra cash that he had.  As far as
Junnier knows, JR doesn't have a lot of extra money.

If a kilo of cocaine had been found at 933 Neal St. and
there hadn't been a shooting, Alex would have gotten about $2000
from the APD.  Junnier would not have kept any of that money nor
would JR have.  Junnier suspects that his teammate Nathan Lucas may
have pocketed money due informants.  Junnier has no first-hand
knowledge of that, but he does know that Alex has complained about
not getting paid by Lucas what he should have been paid.

Junnier has heard Stallings say things like "cushion your
buy" meaning request through a voucher more money than was actually
used for a drug buy.  The purpose of cushioning a buy is to give
extra money to an informant or get some money for a business
purpose, not to pocket money personally.  APD Lt. Gibbs was a
detective in the narcotics unit and she knows about cushioning
buys.  If you need something around the office for work purposes,
some people will say, "voucher it out."

Junnior has no evidence that Sergeant Stallings knew that
a buy didn't really happen at 933 Neal St.; however, Junnier
believes in his heart that Stallings did know.  If Stallings would
have asked Junnier, Junnier would have told him that a buy didn't
happen.  If Stallings learned that a buy had not happened, he
"would not have let it pass."  Tesler told Junnier that Tesler did
Stallings that a buy did happen at 933 Neal St.  Initially, after
the shooting, Stallings told Junnier, JR and Tesler to get together
on their stories and stick with them.  Later, when the subject of

DOZIER-COA
00243

CONFIDENTIAL 

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Edward Junnier_____ , On _1/16/07_____ , Page __5___

an interview with the FBI was discussed, Stallings told Junnier to tell the truth.

At Grady Hospital after the shooting, JR told Junnier that Lt. Gibbs asked JR about the buy at 933 Neal St. and JR told her that they used the patrol car to drive Alex to Neal St. and they watched the buy happen from the patrol car. Junnier cannot recall if JR said that it was Junnier and Tesler with Alex in the patrol car. Junnier told JR that he couldn't use the patrol car in the story because Sheats was with them the entire time in the patrol car. Junnier remembers talking to JR and Tesler about this subject in person at the hospital. Junnier's family was at the hospital, but they were in and out of his room. Junnier recalls discussing the fact that they needed to use Alex's car in the story.

After the shooting, but while they were still at the scene, Junnier told JR that he had better have his "shit together" on this one. He did tell JR that he had better hope that there was dope in the house. Junnier had no intent when making that statement for JR to plant dope in the house. That statement has been made before by both Junnier and Sergeant Stallings. Junnier said it to Tesler on an "Alex warrant" for 1155 Simpson, Building C. There is no reason that JR would have thought that Junnier was telling him to plant drugs in the house. Moreover, when Junnier saw the inside of 933 Neal St., it didn't look like a drug house. It was a well-kept house.

Junnier does not recall telling JR to calm down at the scene of the shooting. Junnier never got the impression that JR was having a mental breakdown after the shooting.

Junnier was never going to write the affidavit for Neal St. with a fictitious buy in it. If it were up to him, he would have taken his time, gotten Alex and made a buy. There have been times in the past when he has been told by someone that a house had a kilo in it when it turned out not to. Therefore, if JR would have said that he wasn't going to do a warrant for 933 Neal St., then Junnier would have walked away from the situation until he could have gotten a buy made or done a knock and talk.

Alex is motivated by money. He has turned in uncles and cousins for money. Before the shooting, Alex's reliability was

DOZIER-COA
00244

CONFIDENTIAL 

FD-302a (Rev. 10-6-95)

_____

Continuation of FD-302 of   <u>Gregg Edward Junnier</u>                    , On <u>1/16/07</u>       , Page    6

    starting to come into question. Junnier didn't feel as comfortable using Alex as he had. Alex had recently supposedly done buys by himself, but he sometimes couldn't provide the details that Junnier thought he should be able to. Junnier's team had some "zeroes" (i.e. no drugs were found) on some of Alex's warrants. Junnier also received some information, from maybe the Field Investigative Team in APD Zone 3, that Alex was selling drugs. Junnier questioned Alex and he denied it.

    In the days after the shooting, JR, Tesler and Junnier had about three meetings where all three of them were present and where all three were fully involved in discussions of a cover-up.

    Junnier originally thought before the shooting occurred that a bad warrant was on JR because he decided to write it. Immediately after the shooting, he thought that he would get in trouble for knowing about the bad warrant before it was executed. He didn't, however, think that the trouble that he would be in would be serious. He knew that because of the death of Ms. Johnston the matter was very serious, but he didn't think, based on what he had done, that he would be faced with losing his job or going to jail. Later, on the night of the shooting, he started to think that he might be charged with murder. He decided then that it was a better option to lie and say that a buy had occurred. He was thinking at that time that he didn't want to lose his reputation with his peers by squealing on JR and Tesler. Ultimately, before meeting with the FBI and after talking to his priest, wife and his friend Rand Csehy, he decided that he couldn't live with telling a lie. And, he decided to cooperate with the government's investigation.

    [At this point in the interview, Fulton County Assistant District Attorney Shukura Ingram left the room for the remainder of the interview.]

    Junnier saw marijuana at 350 Lanier in JR's hands. There were at least three sandwich bags with multiple bags inside them. He doesn't know how much of that marijuana was turned in as evidence. He also doesn't know about any of that marijuana being disposed of.

    To this day, Junnier doesn't know where the crack cocaine attributed to 933 Neal St. came from. He has never discussed that matter with JR or Tesler. He suspects that it came from Sheats.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Edward Junnier_____ , On _1/16/07_____ , Page ___7___

When Junnier met Tesler and JR at Kroger, he probably did tell them to be careful talking on the telephone. He also probably did criticize Alex. He went over what Alex had been saying in the media.

The first meeting at My Cousin Vinnie's restaurant was called by Tesler. It had previously been agreed to by all that they had to meet at some point. Junnier did take a typed statement that he had written to that meeting and he did tell the others that he would not give them a copy. By that point in time, he was already having second thoughts about being part of a cover-up and he didn't want to give anyone evidence that he was engaging in a cover-up. He does not recall telling the others that the reason he was not going to give them a copy of his statement was because the FBI might do a search warrant. He did tell Tesler not to sign the voucher for paying Alex for a buy at 933 Neal St. and JR was bothered by that. Junnier told JR that Tesler wasn't at City Hall East on Thanksgiving when JR paid Alex and Tesler didn't need to be in any more trouble.

Tesler is more of a follower. Tesler supported JR more than Junnier ever did. On a personal basis, Junnier is more friendly with Tesler than he is with JR. JR and Tesler worked together more than Junnier and Tesler.

At the second meeting at My Cousin Vinnie's, Junnier told JR and Tesler that he'd cover them on the 933 Neal St. warrant, but they needed to cover him on his Rhodesia Road warrant. Junnier can't think of any other time when there was a shortcut used in an affidavit and somebody got hurt.

Junnier did tell JR and Tesler at one point that he might be able to hear something about the federal investigation of the shooting at 933 Neal St. and he would call them and tell them what he heard in code. He would talk about his daughter's basketball game and if he said the game was good, that would mean the investigation was going good for the officers. At the second My Cousin Vinnie meeting, Junnier laid out the false story he wanted told about his Rhodesia Road warrant.

JR did bring a written false statement of facts about the events surrounding the shooting to the first My Cousin Vinnie meeting. All three of the officers had a written statement with them, but none of them passed out copies.

DOZIER-COA
00246

## CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Edward Junnier_____ , On 1/16/07 ___ , Page ___8___

        Doug Little is an APD lieutenant.  He trained Junnier.
Little's warrants are just like Junnier's.

        At the Best Buy parking lot meeting, Junnier did drive
the route that the three officers were going to say they took on
the day of the shooting.  Tesler was really concerned about knowing
the details of that route.  Tesler probably did the most talking
while they were driving the route.

        Junnier does not know who put the marijuana from 350
Lanier in the trunk of the patrol car he was driving on the day of
the shooting.

        While Junnier was at Grady Hospital, Junnier asked JR if
any drugs had been found at 933 Neal St.  JR said, "It's taken care
of."  JR said that he didn't know if the drugs would be found
because it was just a little bit.

        Junnier did see Tesler push Sheats' whole body into the
wall at 1143 Simpson.  It was a pretty hard push.  Junnier didn't
see Sheats' head hit the wall.

        Junnier is pretty sure that he is the one who called the
K-9 unit to come to 1143 Simpson.

        Sheats mentioned that there was a female in the house at
933 Neal St. when he was telling the officers about the drugs
there.  Sheats talked about the female in the patrol car in front
of JR, Tesler and Junnier.  Junnier thought Sheats was talking
about Sam's girlfriend, not an elderly woman.

        Junnier does not recall telling Tesler to call Alex
before Tesler gave his statement to APD Homicide.  He also does not
recall calling Tesler on Thanksgiving or the day after to tell him
that Alex was freaking out and to be careful about Alex recording
telephone conversations, but it is possible that he did.

        Junnier met Tesler in the parking lot of a Mexican
restaurant on Wade Green Road before Tesler had his interview with
the FBI.  Tesler was concerned about Junnier getting his own
attorney and not using the PBA attorney.  Junnier's new attorney,
Rand Csehy, told Junnier to just play along with Tesler, so he
continued to assure Tesler that he would stick with the fictitious
story they had come up with.  Tesler told Junnier to meet him after
Tesler's interview with the FBI.  Junnier met Tesler at the same

DOZIER-COA
00247

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Edward Junnier___ , On 1/16/07 , Page ___9___

parking lot after Tesler's FBI interview.  Tesler was up beat and
he said that his interview with the FBI had gone well.  He told
Junnier that the FBI was focusing on the time line leading up to
the raid at 933 Neal St.  Tesler felt that he had explained the
time line well and he was not worried.  This second meeting at the
Mexican restaurant parking lot was fairly short.  Junnier continued
to play along with the fictitious story.

When JR was conducting the tactical briefing for the
narcotics team just prior to the raid at 933 Neal St., Junnier
heard JR tell the team that a buy had been made at 933 Neal St.
Junnier didn't expect anybody to get hurt during the raid.  Sheats
had told them that there would not be any guns in the house,
because Sam was a convicted felon and didn't want to get caught
with a gun.  Junnier didn't want to put the rest of his team in a
bad spot by letting them know that the warrant was bad.  Junnier
thought that he would not want to know if he was executing someone
else's bad warrant.  JR also briefed the team about there being
surveillance cameras at 933 Neal St.  Junnier doesn't recall JR
saying what the source of that information was.  Junnier also
doesn't recall JR briefing the team about a female being present in
the house.

Junnier believed that Sheats was telling the truth about
drugs being at 933 Neal St. because he never backed down from the
story and he knew that he'd be going to jail if no drugs were found
in the house.  Sheats had never "snitched" before on his drug
sources and he told a detailed story this time.  Sheats seemed
genuinely concerned about Sam seeing him when they drove by 933
Neal St. and he had cold feet about cooperating.

DOZIER-COA
00248

## CONFIDENTIAL

I wish to provide a full accounting of the events leading up to the death of Kathryn Johnston on of November 21, 2007, the actual incident and all subsequent matters to date. I have looked through my notes, referenced phone records, spoken to my wife and even called upon my attorney, Rand Csehy, to refresh my memory as to everything in this statement in order to provide an accurate accounting of what occurred. I have thoroughly exhausted all resources in order to be as complete and accurate as possible. In the end, I must account for my actions, however, I would be lying if I did not acknowledge that I am also doing this to minimize any future punishment I will receive for my role in this matter. Since my last meeting with authorities I have come to realize that anything that I have suffered is nothing compared to that of Ms. Johnston, my fellow officers and the public trust. I am out of excuses, reasons and justifications. I feel that I am a better man today than the one who participated in the Neal Street investigation, but will never be the man my colleagues, friends and family thought me to be. With that, please consider the following:

On November 21, 2007, Investigator J.R. Smith ("JR"), Tesler and I met at APD to discuss the plan for the day. As nothing was planned for us to do as a team, we decided to go out "on the street" to see what we could find. Inv. Bond, who would go out with us, advised that he had other things to do and would meet with us later. JR, Tesler and I left in patrol car #25100 – I drove and Tesler and JR were passengers.

We arrived at 350 Lanier St. to check vacant units where local drug dealers would secret their supplies for sale. JR walked around the building while Tesler and I went into one of the apartments which had been broken into. When JR met back up with us he had a few plastic bags in his hands and said he just found some drugs in the woods next to the complex. I asked him what it was and he said "weed". We then drove to the store nearby to see if anything was going on in front of the store. Officer Ramsey from K9 drove up and we told him JR had just found some drugs in the woods across the street. He and JR went back to the wooded area and searched it with the dog. I don't think they found any additional drugs. While we were there, JR received a phone call from "Diamond", an informant of JR's who had provided information in the past regarding drug activity. Although I never dealt with him personally, Diamond's information had always proven correct with regard to drugs seized.

JR said "Diamond" told him a guy in a gold jacket was selling drugs in front of the green store (1143 Simpson Rd) and that the drugs were packaged in yellow bags. JR also said "Diamond" told him that the suspect was hiding the drugs near the black fence. We knew exactly where he was talking about and "joked" that it was going to be Fabian Sheats out there selling drugs again. When we drove up Sheats who was wearing a gold colored jacket was walking away. Tesler detained Fabian. I stayed with the car. JR walked off toward the fence. Tesler brought Fabian back to the car. I called for a K9 unit to assist JR with the search. Before K9 arrived, JR brought some packaging bags back to the car and said he was getting close. Carson and another K9 unit (Sperill I think) arrived and assisted with the search. A short time later, JR brought a bag containing marijuana packaged for resale in smaller bags and a small amount of cocaine.

DOZIER-COA
00274

## CONFIDENTIAL

Sheats admitted the marijuana was his but the cocaine was not. Sheats pleaded with me to give him a break. I told him that if he could get us more than drugs than he just got caught with that he could get a break. He sat back for a few minutes and then said he could get us a lot more. He also said that he was in a house down the street around 3pm and that he saw at least a kilo of cocaine inside. He said the guy inside selling it sells marijuana too. Sheats continued by saying that he purchased what he had from that same place while he was there. I called JR and told him to try to wrap up his search because we got some information on more drugs to follow up on. JR returned to the car and discussed the information with Sheats. Sheats agreed to show us the house and said he would make a purchase if we wanted him to. I told Sheats that he was not going free if we didn't get any drugs.

At approximately 1700 hours, we traveled to Neal Street, at Sheats direction (I was driving and Tesler was in the front passenger seat while JR and Sheats were in the back seat. Sheats said the seller was a guy named "Sam" He also said "Sam" had a neatly trimmed beard and that he was afraid to be around guns. While we driving, I called Alex and asked him if he was available to make a buy for us. Alex said yes. I asked him if he had wheels and he said "no". I told him "ok" and that I would call him back soon. Fabian changed his mind about showing us the house because we were planning on driving him past the house in the patrol car instead of a UC car. I pulled into a parking lot on Simpson near Joseph Lowery Blvd. I told Sheats I didn't care if he showed us the house or not and started to write out his citation. After a few minutes, Sheats said "come on let's go I'll show you the house." We left the parking lot and drove West on Simpson and turned North on Joseph Lowery. As we approached Neal St., Sheats said "that's it right there" and directed our attention to 933 Neal St. I then drove to the next street and turned left which put us behind the house Sheats was directing us to. Sheats again directed our attention to the same house saying that's it the one with the light on. I then drove around to Neal St. and drove directly in front of the house. We again verified with Sheats that it was the house with the green shutters and the ramp in front. I also saw that the address was 933. We briefly discussed getting a warrant or trying a "knock and talk". I said I felt we should get a warrant and we just needed to get a buy. JR said "or not". I knew what he meant was that he could make up the buy. ( I knew it was wrong, but I justified it as (1) we were going to take a kilo of cocaine off the street and (2) although the information wasn't enough to get a warrant, we weren't just picking a house at random. Regardless, it was wrong and had I said no to the plan, Ms. Johnston would still be alive.) I asked who was going to write it then because I was not going to write it. Tesler said he did not need it (meaning that he had his quota of arrests for the months). JR laughed and said "fuck it I'll write it lets go to the jail". The jail is where we go to get electronic warrants.

At 1730 hours JR went into the jail to get the warrant while Tesler and I remained in the car with Sheats. I called Sgt. Stallings to let him know we would have a warrant to execute and that JR was inside the jail getting it signed. I told him it should be a good warrant involving at least a kilo. He seemed a little frustrated but agreed to get the team together and to meet at the fire station on Simpson Rd at 1830 hrs. Sheats told Tesler and I that the weed that was found at the store really was not his and that he had about 13

CONFIDENTIAL

(yellow) bags or so hidden near the apartments behind the store. I told him that he would have to take us to it after we executed the warrant for Neal St. before we would let him go. Fabian agreed to show us where it was later. After about 25- 30 minutes, JR called me and told me that the warrant was signed and he was just waiting for it to print. JR came back out acting as though other team members (A team) made a buy from the house (obviously for Fabian's benefit) and said he got the warrant. He started to hand it to Tesler and I but I told him I did not need to see it. I figured if something went wrong with it that it was all on him because he is the one who obtained it. I don't think Tesler read it either. As we started to pull off, JR told Tesler "by the way you're in the warrant – a cut and paste thing".

We arrived at the firehouse at approximately 1820 hours for the warrant briefing. When we arrived, Sgt. Stallings, G. Smith & Bond were waiting for us. They were in the van. Lucas & Geurin showed up about 10 –15 min later and had to get geared up. Sgt. Stallings seemed to be a little angry. He told Fabian there better be some big dope in the house because he put other stuff that he was working on all day on hold to do this. Fabian told him there would be. JR briefed the team in front of Fabian who was sitting in the back of the van at this point. I drove the van upon Sgt. Stallings direction. Tesler drove the patrol car. Sperill drove his K9 truck and was assigned to perimeter. Sgt. Stallings and Tesler were assigned to the rear of the house. We (me, JR, G. Smith, Geurin, & Lucas) ran across the front of the house to the right side of the house and then down the driveway or concrete walkway. I expected there to be a door on the right side of the house for us to enter through but I saw no such door. JR was right next to me as we got to the stairs leading up to the front door from the right side of the house. I told him that it did not look right to me because there was no door down the right side. He said "I know, I know" with a sense of urgency like he was rushed. I asked him what he wanted to do. He pointed to the door and said hit it. I approached the door and saw that it appeared to be a sturdy burglar bar door. Geurin began using the tool to pry the burglar bar door open. He was having trouble getting the tool inserted into the door. I grabbed the burglar bar door to hold pressure on it as Geurin was prying the door. I think Lucas even had to use the ram to seat the tool into the door. It took longer than usual to open the burglar bar door. After the burglar bar door came open, I reached in and checked the main door to see if it was locked with my right (non-weapon) hand. I looked back to see Lucas moving in with the ram. I yelled "Atlanta Police search warrant" just as Lucas rammed the door. The door flew open. Immediately, I saw a person standing on the inside armed with a gun which discharged in my direction. I saw a bright flash and felt as though I just got punched in the face. I returned fire at the armed person as I backed away from the door. I then fell down the steps of the porch. It was at this point where everything went into slow motion. I was not sure how many times I fired, so I began to reload my weapon so I would not re-enter the battle with an empty gun. I could hear repeated gun fire and thought we were going to have multiple suspects. As I reloaded my city issued pistol I saw blood dripping onto my hands and felt the blood dripping down my face. I was truly terrified. I knew where I was and what was going on but at the same time I was afraid that I was mortally wounded and the it just had not taken its toll on me yet. I stood back up to see G. Smith still engaging the armed person at the door while standing toward the left side of the door along the wall. I fired one additional shot

DOZIER-COA
00276

CONFIDENTIAL

and then no longer saw the armed person. I then backed down the stairs to cover the windows along the side of the house while still maintaining a position to react to another threat from the door. Sgt. Stallings came to the front right side of the house and asked if everyone was ok. I told him that I was hit but I thought I was ok. Bond said the same thing. JR was on the porch to the left side of the door behind G. Smith who was grabbing his leg. I remember Sgt. Stallings saying that looks like friendly fire to me. I did not see Geurin or Lucas. Sgt. Stallings then said we have to clear the house. I said ok let's do it and the team reassembled behind G. Smith who was manning the shield. I could not see anyone from the doorway. I thought that we were going to be in another gun battle as soon as we made the right turn through the doorway after entering the house. Fortunately, that did not happen. I saw a person on the floor to the right side of the doorway with a gun a short distance away. G. Smith, JR and I cleared the right side of the house while other team members tended to the downed suspect. JR approached me as I was about to exit the house. I angrily told him that he better have his shit together on this one and that he better hope there was some dope here and walked out of the house to evaluate my injuries. I still thought I was seriously injured. My face was bleeding and felt like it was burning from two different areas. My leg was also burning. I walked out on to the porch where an officer who was already on the scene looked at me and said you have been shot in the chest and showed me the hole in my vest. I then discovered that I had also been shot in the left thigh, right side of the face, and was cut on the left side of the nose. The officers on the scene assisted me with getting out of the gear and directed me to the medical personnel who were arriving on the scene. Bond and G. Smith were also directed to the ambulance with me. We were all three transported together in the same ambulance to Grady Hospital.

All three of us were taken to the same trauma room which seemed to be prepared for us with three beds and what seemed to be three medical teams. Bond had a gun shot wound to his forearm. G. Smith had a gun shot to the back of his leg. It was in the trauma room at Grady Hospital that I learned that the armed person we encountered at the house was a woman not a man as I had originally thought and that she had been killed in the exchange of gunfire. Not only did I feel sick to my stomach about an innocent woman dying, I immediately realized that I either needed to tell someone what had happened or continue with the lie. For the time, I decided to wait it out and justify it all by "not having seen the warrant." Family members and officers were in and out of the trauma room. Our team members Sgt. Stallings, Lucas, JR, Geurin, and Tesler arrived at the hospital after a while. JR seemed to be upset and was telling me he had been trying to call me and that we needed to talk. I ignored him at first because it made me a angry that he thought I should be answering phone calls. He said it couple of times while standing with Tesler. I asked him if everything was ok and he said yes. I asked me if any drugs were found in the house and he responded that it was "taken care of." To be blunt, it was then that I believed that I was stuck with the lie and I did not believe that I could tell the truth. He also said he talked to Alex and everything is good but we needed to talk. I told him that I would call him when I get out and that I did not even know where my phone was at that time. I was released from the hospital and rode back to City Hall East with my brother.

DOZIER-COA
00277

# CONFIDENTIAL

While at the parking deck of City Hall East, both Tesler and JR called. JR said that he had called Alex and that Alex was good with everything and that he (Alex) was going to say he made the buy. JR also said everything was going to be ok if we just stick together on this. He told me to call Alex and be sure. I told him no that he needed to do it. He said he talked to Alex several times already and that he did not want to keep using his phone to call him. Tesler was just checking on me and said we will get together tomorrow.

The next day I was called by Sgt. Lacoss from homicide to make a statement. I hesitated at first, as I was still trying to process everything that had happened, was in pain, had not slept at all and was unsure about how to tell the truth and to whom. She said she did not think it would look good if I waited too long to come in and make the statement. Don English (PBA Atty) also called me to ask when I was going to make my statement to homicide. I agreed to come in that day. I went in around 12 or 1pm. Lt. Gibbs told me to call Alex because he was riding with Duncan in the bluff area looking for "Sam" and jumped out of the car and ran when they were bringing him to look at some possible pictures of "Sam" back at the office. Alex would not answer. Later Duncan came in and told me that he and Feliberty were riding Alex around the bluff looking for "Sam" and then he was told to bring Alex to the office to try to ID "Sam" from some pictures they pulled up. Duncan said that when they got to the intersection of Spring St. & North Alex jumped out and ran into the Varsity and could not be found. I made several attempts throughout the day to get in contact with Alex as Lt. Gibbs asked but I just kept getting his voice mail. At one point I did speak with Alex he said he was scared because he did not know Duncan and he thought Duncan was going to take him to jail. I reassured him that they only wanted to show him some pictures of somebody they thought might be "Sam" but he should not identify anyone unless he was sure it was "Sam". Alex agreed and said he would look at the pictures when he was asked to do so again. I later made my statement to homicide after waiting around for JR to finish his. Tesler and I went to make our statements at the same time. Tesler told me then that Sgt. Stallings asked him more than once point blank if Alex made the buy and he told him yes. I really did not feel comfortable making the statement but I did not want JR to get in trouble either. I was as vague as I could be and still cover for JR. Tesler told me later that he was relieved because he did not have to talk about the buy in his statement. I wished I was never asked anything about it either. In hind sight, I should have never even been there before getting my head cleared up. While I was making my statement JR kept coming by and standing around. He told me he got in touch with Alex and he was going to meet Alex at Burchfield's extra job and pay him for making the buy. JR said Alex told him that he was going to meet Burchfield to look at some pictures. JR called me later and said that Alex was not there yet and asked me to call him. I spoke to Alex a while later who said that he was going to meet with JR to get paid for making the buy from Neal St. JR called later and said Alex never showed up. Spoke to Alex late at night. He was saying he really needed some money for Thanksgiving. I told him he should have met with JR earlier so he could get paid for the buy form Neal St. I told him that I was going out of town and I would get with him when I got back.

CONFIDENTIAL

On November 23, 2007, I spoke to Alex who was begging for money. He asked me if there was any way I could get him some money because he was really broke and needed some money for Thanksgiving. He said he was going to meet with JR later. I told him I would try to get him 50.00 which he could pick up at the store on MLK. I then called Eddie and asked Eddie to give Alex 100.00 for me and we would settle up later. I was not worried about giving Alex extra as I had done this in the past and could justify it as a "thank you" around the holidays. In truth, though, I knew that the extra money would be viewed as a "thank you" for covering for us. JR was supposed to meet with Alex and get him to sign the voucher. Alex called me and said he was scared he was going to get in trouble. I tried to assure him he did nothing wrong. He asked if there was anyway we could just say somebody else made the buy. I told him "no" because he already told everybody he made the buy. I look back at this as another opportunity I had to come clean, yet failed to do so.

On November 24, 2007, Alex called me after I arrived home from Blue Ridge. He asked me again if JR couldn't just use another CI instead of him. I told him "no" and explained to him that he already told other people that he made the buy and it was not that easy anymore. I continued to speak to him as though he made the buy and I did not know differently as I had since I first talked with him after being shot. He always told me and acted that he made the buy from Neal St. when I spoke to him. He also told me he liked me and would do it for me but he did not like JR. Alex further said seemed frustrated and said JR was only talking about giving him a few bills and he needed more for this. I began to feel as though he was trying to get me to say something he could tape and use later so I told him I did not know what he was talking about. Alex has always been motivated by money so I also told him that we should be back to work next week and we were going to have to get up a bunch buys for warrants for the Zone 1 detail coming up and he could make plenty of money off that. He seemed to be high and said he thought he was just going to leave town because he didn't want to be part of this anymore.

I later saw Alex on the news saying he was asked to lie about making the buy.

**Meetings with JR and Tesler: (between November 24 and December 1, 2007)**

**1st meeting**
After speaking to JR and Tesler it was agreed to meet at My Cousin Vinney's Restaurant near Town Center Mall. Tesler picked the place and arranged the meeting with JR.

We met for lunch one day as agreed. I was first to arrive and then Tesler and then JR. Tesler and I were already inside when JR arrived. We really did not discuss the situation much before JR arrived but I do remember saying that he thought JR would be well prepared. JR was well prepared and even had a new appearance. He was clean shaven. His hair was neatly trimmed and he was wearing glasses. Tesler made fun of him about it. JR said it what his new look. He was also very prepared. He had copies of reports and had already prepared a statement which he had copies for Tesler and I. I told him I did not want to see it in case I was asked about something like that at a later time. I also reminded him that my part in this only concerned arranging for them to meet Alex and

DOZIER-COA
00279

# CONFIDENTIAL



then driving them to meet him. JR wanted to clarify the type of vehicle Alex was in and where we met with me included to be sure we were together on that. He and Tesler discussed specific details of the buy. I did not really pay a lot of attention but participated by pointing out inconsistencies or problems when I heard something that did not sound right.

1) Where they were positioned in the vehicle
2) What was in the vehicle (trashy)
3) How the vehicle smelled (moldy)
4) The route they took (were not sure because they were trying to hide)
5) Where they parked at 933 Neal St
6) What they saw Alex do
7) What they saw Sam do
8) Route back to meet with me
9) Where they were dropped off

We discussed together

1) Phone calls
2) Future meetings this place would be called Tesler's place but JR wanted to find a place closer to him.
3) Money I Eddie and JR paid Alex. JR told me he paid Alex 250.00 and that was all the cash he had. I told him I did not want or need to know what he paid him. I did not want to have to explain it later.
4) Lie detector - JR said he had already been looking up information on them and found that they were not admissible in court, they are only reliable 50% of the time. He said you have to put yourself in a zone and focus on your breathing.
5) Perception of Alex's and Fabian's reliability
6) Accidental thoroughness of the story
7) Timeline
8) JR said we could not discuss this with anyone, not even our wives.
9) JR wanted Tesler to sign the voucher form as though he witnessed JR paying Alex for the buy I told Tesler not to sign it. JR seemed to get mad about that but I told him he would just have to deal with that because Tesler was not with him then. JR brought it up another time with the same outcome.
10) JR and Tesler brought the fact that they turned in some drugs late
11) Tesler was concerned that Carson K9 had seen cocaine in the bag of drugs which was found at 1143 Simpson Rd. He said she called him to get weights of the drugs and he told her that he field tested the stuff that looked like cocaine and it was negative so he threw it in the trash dumpster in front of the store. I never saw him test it. I also don't remember him having an opportunity to test the drugs without me seeing him do so because I was with him the whole time.

## 2nd meeting

After news that the Rhodesia warrant was in question, I called for a meeting back at My Cousin Vinny's to discuss it. We discussed the following:

1) JR and Tesler attempting buy with Diamond and son.

DOZIER-COA
00280

CONFIDENTIAL 

2) Buy attempts with Alex
3) Pedestrian stop during detail of men leaving the house smelling of marijuana.
4) Info Alex provided about seeing suspect selling at the gas station nearby.
5) Where we picked up Alex
6) Another common meeting place downtown
7) Tesler wanted to clarify how he arrested Fabian. This is when I found out that Tesler had said that he conducted surveillance and saw Fabian selling drugs before stopping him in front of the store.

On December 1, 2007, I spoke with Rand Csehy, who was not my attorney at that time. I called Rand and advised that the FBI wanted me to give a statement, but that the PBA had said I should not say anything at this time. Rand advised me that I was represented by counsel and that he represented Cary Bond, but that he would give me the names of other lawyers if I wanted other counsel. We spoke about other matters for a few minutes. As we were hanging up, Rand said that I was a good cop and a good person and if he thought I was lying or covering up anything he wouldn't have offered any help in the beginning (Rand had offered to represent me pro bono when he heard about the investigation, but I declined. Cary Bond accepted his offer). After speaking with Rand, I told my wife everything and she told me to ask Rand to help me. I asked him to confer with Cary Bond about meeting with me and Cary agreed that Rand could inquire if there was a conflict. I told Rand I wanted him to approach the FBI in order for me to tell the truth. He advised that he was going to meet with Cary and the FBI the following week and that I needed to proceed with PBA until he could make a decision regarding representing me. He did tell me not to engage in any more conversations regarding a cover-up, but that if JR or Tesler spoke about anymore lies, I should pay attention. The following events occurred after the meeting with my attorney:

### 3rd meeting – Post December 1, 2007

This meeting was arranged by Tesler. He had apparently been talking with JR because he said JR wanted to ride through the area again with him. I agreed to meet with Tesler and ride together to meet with PBA and meet with JR at the Target on Moreland Ave. JR was late because he said he went to homicide to get a copy of his statement but he could not because it had already been turned over to the FBI. When JR arrived Tesler mentioned to him that we needed to ride out to Law St. and Neal St. I said if we were going to do that we should just retrace the whole route as things happened on 11/21. I suggested we drive in our separate vehicles but JR wanted to ride with Tesler and I and then return to the Target before going to PBA and that he would drive his own vehicle to PBA. JR's main focus seemed to be on where exactly I parked and where Alex parked at Law St. While there, I pointed out that there were no cameras facing the area where JR had chosen for the meeting. At one point JR said "So what's the worst case scenario?" "Let's say they find some dope that fell out of my raid pants in the house". Tesler wanted to clarify where he was when he was conducting surveillance of Fabian.

**Meeting with PBA** attorneys Grady Dukes and Don English and JR and Tesler: As I am unsure whether this would be attorney-client privilege, with regard to Tesler and JR, my attorney has a copy of this section available upon request..

DOZIER-COA
00281

CONFIDENTIAL

**Next meeting**
At the Mexican Restaurant parking lot on Wade Green Rd. This meeting was just with Tesler and I so I could pay Tesler money I owed him. JR was not at this meeting. Tesler told me he was going to make his statement to the FBI with Don English. He told me that I needed to go in and make a statement to the FBI to clarify things. He told me JR was going to make a statement and JR thought we all needed to stick together and make statements. He said he felt comfortable and that he was looking forward to getting his statement out of the way. I told him that I did not know what I was going to do. Tesler told me he would call me on his way home after meeting with the FBI so he could tell me how it went. I did not ask him or even suggest that he call me.

**Next meeting – Wade Green Rd**
Tesler called me after his meeting with the FBI and wanted to meet. He was very upbeat and said everything went well. He said the focus of the meeting seemed to be the timeline but he was able to explain it without any problem. He again told me that I should go in and make a statement.

**Next meeting - Wade Green Rd**
Tesler called and wanted to meet. It seemed urgent. All he really told me was that he talked to his sister in law who is a lawyer. He said she told him that I should stick with the PBA because it shows weakness if we start to split up. He also told me about benefit at restaurant downtown and asked me if I was going I told him no because I did not feel like talking to anyone about the situation. He told me that he and JR were going to attend.

**Meeting with Bond / JR phone call**
Met with Bond at Hardees at 92 & 75 to give him money from the benefit and pd collection on the same day Tesler went in and apparently began to tell the truth. While meeting with Bond (discussing family and Christmas) JR called and said PBA had just called him and told him that they would no longer represent him and that there was some kind of new evidence. JR said he was also told that he should have told the truth and that he needed to hire the best criminal attorney he could get. JR said he was given Ed Garlands name and that he had an appointment with him the next morning but he had heard that Garland was going to charge him 50,000.00. JR seemed very distraught. I asked him what happened he told me he did not know. He mentioned that Tesler had a follow up meeting with the FBI on the same day. I asked him if he thought Tesler had said something. He said he did not know and that he did not know what to do. He was obviously very distraught. He said he heard Rand was handling my case for free and wanted me to ask Rand to help him or find another attorney who might not be so high.

**The next morning,** I woke up concerned for Tesler and knowing what he was going through and the sorrow, worry, pain and relief I felt after being able to open up and tell the truth to the authorities so I called Tesler. He was apparently going to avoid my call

DOZIER-COA
00282

# CONFIDENTIAL

because he seemed surprised to hear my voice and later said my name showed up differently on his caller ID. When he answered, I told him he was doing the right thing. He was silent. I told him I was glad he told the truth. I also told him he picked up on the signals I was giving him to do so. He said he did and that he felt better. I told him about my conversation with JR. I told him that I'm sure he must be relieved to get all that weight off his chest. I asked him if he had told his wife what was going on he told me no and he was concerned about how she was going to take it so he was going to tell her after there visiting family came in. We also discussed our concern about the seriousness of the situation and the possible consequences and there effect on our families. Both of us were and still are very concerned. We also briefly discussed that JR should not of put us in this position and how we would come forward if the tables were turned so that so many others would not be involved. We also discussed concerns over what JR would do and how he was going to react. I asked Tesler how JR reacted when he found out I was no longer using PBA to represent me and he said that JR was concerned buthe did not elaborate on it. I asked him if he ever threatened to go after Alex. He said no but then told me the story of how JR squinted his eyes up, got in Alex's face and told him "look mother fucker you made that buy". This supposedly happened when JR met with Alex to pay him on Thanksgiving. Tesler acted like he was not there and that it was something JR told him. Tesler also suggested we get together to discuss the truth of the incident. I agreed but we did not meet to discuss the incident further. I did however call him to check on him and suggested we go to dinner with our wives because it might be good for them since they were going through the same thing. He agreed that would be a good idea but when I called him and invited him to dinner he said his wife was sick from her pregnancy and partially from hearing the truth that he could not make it that night. He said he would call to schedule it for another time but I have not spoken to him since. I did not call him because I figured his lawyer suggested to him we have no further contact and I did not want to interfere.

This 16th day of January, 2007.

_____

Gregg Junnier

DOZIER-COA
00283

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription     01/30/2007

     GREGG EDWARD JUNNIER was interviewed at the United States
Attorney's Office, Atlanta, Georgia on January 25, 2007.  His
attorney , Rand Csehy, (404) 688-1395 (office), ▆▆▆▆▆▆▆▆▆
(cell), was present for the interview.  Also present for the
interview were Assistant United States Attorneys Yonette Buchanan
and Jon Peter Kelly.   The interview was conducted pursuant to a
proffer agreement.  JUNNIER provided the following information:

     He explained that the affidavits for search warrants
generally would include language regarding the searching of the
confidential source (CI) prior to directing the source to make a
drug buy and after the source returns.   JUNNIER stated that as he
had previously advised the confidential sources were not always
searched; however, it was not uncommon to periodically search them
to keep them in line.   Usually once confidence was established with
the CI the searching became less routine.   The inclusion of the
searching of the CI in the affidavit was mainly to pacify Atlanta
Police Department (APD) policy, not to put anything over on the
court.

     JUNNIER stated that at APD it became the culture of the
environment where they would on occasion contact a CI, such as ALEX
WHITE, by telephone to go and make drug buys and to meet with him
later in the day to get the drugs and to settle up with the CI.
The locations where buys usually would be made came from lead
sheets that had come from other sources such as complaint calls
from people in the neighborhood.

     In regards to the various warrants that JUNNIER obtained
during his time in the narcotics unit he conducted a review and
provided a summary explanation.   This summary is being a made a
part herein.  There were no warrants/affidavits where JUNNIER was
the affiant where a buy was not made except for 161 Rhodesia Drive.
Drugs were found at this location, as well as the affidavit had
some accurate probable cause, but a buy was not made.   The people
in this case took a plea and are already out of jail.

     He was asked specifically about a warrant that was
obtained and served at 1271 Elizabeth Avenue.  JUNNIER explained
that this was a good warrant.  ALEX WHITE, the CI knew the subject
at this location.  There was a man and his wife at this location

Investigation on   01/25/2007   at  Atlanta, Georgia

File # ▆▆▆▆▆▆▆▆▆▆▆▆        Date dictated   01/30/2007

by   SA Michael L. Grant
     SA Andrew VanEpps

**DOZIER-COA
00251**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____GREGG JUNNIER_____, On 01/25/2007 , Page ___2___

    and they may have been in bed.  He would have allowed the woman to get dressed.  The subject may have still been in his boxer shorts. He stated that the people at this location were not mistreated.  He believes APD K-9 Officer Connie Carson was present when this warrant was served.  She as well as others at the scene would not have allowed anyone to be mistreated, especially a woman.

    Another warrant he was asked about was at 1155 Simpson. He explained that this is a BRUCE TESLER warrant.  JUNNIER stated he was told by TESLER that ALEX WHITE had made a buy from this address.  He recalled that when the warrant was served there was an elderly man, with a light complexion and black child.  They did not find any drugs at this location.  JUNNIER advised that he did not review this warrant.  He did recall that the property manager at this address had been complaining that drugs were being sold from this apartment.

    He was asked about a warrant that was served at 395 Woodlawn.  This involved a Federal prosecution.  JUNNIER stated he testified truthfully regarding this warrant.  The CI that was used on this warrant was ▆▆▆▆▆▆▆▆  He stated this was a good case.

    JUNNIER explained that he has testified at preliminary hearings and at suppression hearings.  He believes he testified truthfully at these hearings.  The preliminary hearings did not get into any specifics of the search warrant.  At the suppression hearings he was never specifically asked any questions on pat downs and or observing drug buys.  He stated that in his eighteen years in law enforcement he has had to testify about ten times in Superior Court.  He has testified numerous times in Municipal Court.  He believes he has testified truthfully.  Most of his cases have pled out.

    The area that he could provide the most assistance is when APD would do "details."  This would involve serving numerous warrants on the same night.  He explained that he and/or other narcotics officers would use various CIs to make numerous buys, and then in his case he would do get the drugs from the CI after the buys and he would do a property sheet.  He would provide the drugs and the property sheet to other officers who would prepare an affidavit to obtain a warrant.  He has not reviewed these warrants. It was how they did things at APD.

    He also recalls that in regards to making buys with ALEX WHITE, it was usually JUNNIER, JASON R. SMITH, BRUCE TESLER, and

DOZIER-COA
00249

CONFIDENTIAL 

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___GREGG JUNNIER_____ , On _01/25/2007_ , Page ___3___

sometimes CARY BOND.  MAURICE GEURIN and GARY SMITH did not use ALEX WHITE to make buys.  He may have given them drugs from a buy and a property sheet for them to do a warrant.  He did recall NATHAN LUCAS using ALEX to go make a buy and getting with ALEX at the end of the day to get the drugs to settle up.

As he has previously provided, vouchers are an area where there is padding.  He explained that this has been the culture of APD for years and that he believes Lieutenant Stacie Gibbs and Sergeant Stallings may have padded vouchers and/or are aware.  He recalled a retired Sergeant Brown made a statement one day to "just voucher it out."  This has been a method to get extra money to purchase things for department use.  He is not aware of anyone padding vouchers for personal use.  The money from padding vouchers was used to fix APD vehicles, get the windows tinted, and to purchase other equipment.

Sergeant Stallings and Holly Buchanan, another Team 1 member may have padded a voucher to get a non documented source paid for information and/or drug buys.  They had a source known as "KURT."

JUNNIER provided the names of the members APD Narcotics Team 2.  They are Sergeant Sparwath, Billy Smart, P.J. Roberson, Andy Griffith, Deaton, Keith Johnson, C. Henry, and Tim Honeycutt.  This team mainly works the buckhead area.  They have used ALEX WHITE to make buys.

The biggest area of concern was that APD was pushing for getting the numbers.  It was 9 and 2, arrest nine people and do two search warrants per officer, per month.  Major Findley the Zone 3 commander, who was a former Sergeant and Lieutenant in narcotics was someone that pushed for numbers.  One specific officer, Investigator GORYCA, felt so much pressure to have the numbers that he made up cases.  He recently resigned.

JUNNIER stated that other APD units operate similar to the Narcotics Unit.  Those units are Weed and Seed and Gangs.  The REDDOG Unit operates on a less structured basis than Narcotics and the other units.  JASON SMTIH got his idea of using INS drugs from when he was in REDDOG.   INS stands for insurance.  Major Sellers used to work/oversee REDDOG and may have knowledge of some obtaining warrants and the voucher system.

DOZIER-COA
00250

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    05/17/2007

        GREGG JUNNIER, who has been interviewed previously
provided the following information:

        JUNNIER had previously explained that it was a common
practice in the Narcotics Unit for JUNNIER and/or other detectives
that are working informants to make a number of drug buys and to
come back to the office and give buy information to other
detectives and allow them to draft up affidavits and search
warrants as if that particular detective had conducted the drug
buy.

**Incident Number 050890931**
**3775 Martin Luther King Jr Dr. Apt C-2**
**Atlanta, Georgia**

        JUNNIER stated that Investigator C.A. BOND was not
present at this drug buy, but allowed BOND to complete the incident
report as if BOND had directed the informant in making a drug
purchase at 3775 Martin Luther King Jr. Dr., apartment C-2,
Atlanta, Georgia, on March 30, 2005.  BOND later signed an
affidavit to the fact that he had observed this buy and received a
search warrant for the above mentioned address.

**Incident Number 050890958**
**387 Lanier St. #2,**
**Atlanta, Georgia**

        JUNNIER stated that Investigator C.A. BOND was not
present at this drug buy, but allowed BOND to complete the incident
report as if BOND had directed the informant in making a drug
purchase at 387 Lanier St, Apartment # 2, Atlanta, Georgia, on
March 30, 2005.  BOND later signed an affidavit to the fact that he
had observed this buy and received a search warrant for the above
mentioned address.

Investigation on    05/04/2007    at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

File # ▮▮▮▮▮▮▮▮▮▮                                    Date dictated _____

                                                                    **DOZIER-COA**
by    SA Brian P. Davis                                             **00256**
      SA Mile Brosas

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___GREGG JUNNIER_____ , On _05/03/2007_ , Page ___2___

**Incident Number 052171274**
**350 Lanier St. C-6**
**Atlanta, Georgia**

      JUNNIER stated that Investigator H. BUCHANAN was not
present at this drug buy, but allowed BUCHANAN to complete the
incident report as if BUCHANAN had directed the informant in making
a drug purchase at 350 Lanier St, Apartment # 6, Atlanta, Georgia,
on August 5, 2005.  This drug purchased lead to BUCHANAN receiving
a search warrant for the above mentioned residence, on 08/11/2005.

**Incident Number 052491926**
**1247 Simpson Road,**
**Atlanta, GA**

      JUNNIER stated that Investigator N.L. LUCAS was not
present at this drug buy, but allowed LUCAS to complete the
incident report as if LUCAS had directed the informant in making a
drug purchase at 1247 Simpson Road, Atlanta Georgia, on 09/06/2005.
LUCAS later signed an affidavit to the fact that he had observed
this buy and received a search warrant for the above mentioned
address.

**Incident Number 052491927**
**1247 Simpson Rd. #14,**
**Atlanta, GA**

      JUNNIER stated that Investigator N.L. LUCAS had seized 12
grams of cocaine from this search warrant and paid the informant a
total of $200.00 dollars.  JUNNIER stated this payment was above
the payment guidelines.  According to JUNNIER, LUCAS would often
pay his informants outside of the guidelines.  JUNNIER always
questioned if LUCAS was keeping part of the money, because the
informant would sign blank vouchers and never know the true amount
he was suppose to receive.  JUNNIER also stated that Atlanta Police
informant ALEXIS WHITE would complain that LUCAS had not paid him
the amount he should have for his work.

# CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___GREGG JUNNIER_____ , On _05/03/2007_ , Page ___3___

**Incident Number 060041863**
**940 Bolton Rd. A-5,**
**Atlanta, GA**

    JUNNIER stated that Investigator C.A. BOND was not present at this drug buy, but allowed BOND to complete the incident report as if BOND had directed the informant in making a drug purchase at 940 Bolton road, A-5, Atlanta, Georgia, on 01/04/2006. BOND later signed an affidavit to the fact that he had observed this buy and received a search warrant for the above mentioned address.

**Incident Number 051030927**
**31 Evelyn Way NW,**
**Atlanta, GA**

    JUNNIER stated that Sergeant STALLINGS was not present at this drug buy, but allowed his name to be included as having participated in directing the informant in making a drug purchase at 31 Evelyn Way NW, Atlanta, Georgia, on April 13, 2005.

**Incident Number 051031009**
**2532 Hollywood Ct,**
**Atlanta, GA**

    JUNNIER stated that Sergeant STALLINGS was not present at this drug buy, but allowed his name to be included as having participated in directing the informant in making a drug purchase at 2532 Hollywood Ct, Atlanta, Georgia, on April 13, 2005.

**Incident Number 050501046**
**1177 Simpson Rd, A-14**
**Atlanta, GA**

    JUNNIER stated that Sergeant STALLINGS was not present at this drug buy, but allowed his name to be included as having participated in directing the informant in making a drug purchase at 1177 Simpson Rd, A-14, Atlanta, Georgia, on February 19, 2005.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____GREGG JUNNIER_____ , On _05/03/2007_ , Page ___4___

**Incident Number 050501016**
**1595 North Ave,**
**Atlanta, GA**

      JUNNIER stated that Sergeant STALLINGS was not present at this drug buy, but allowed his name to be included as having participated in directing the informant in making a drug purchase at 1595 North Ave, Atlanta, Georgia, on February 19, 2005.

      JUNNIER reviewed other drug buy reports and stated that he would need to see the property log book, the actual property and on some occasions the affidavit to refresh his memory if another investigator had been involved.

      JUNNIER had previously explained that it was a common practice in the Narcotics Unit for JUNNIER and/or other detectives that are working informants to make a number of drug buys and to come back to the office and give buy information to other detectives and allow them to fill out the incident sheet as if they had directed the informant during the drug purchase which in some incidents lead to the detective obtaining a search warrant for a residence.  JUNNIER stated that other detectives he had given buys to were ALLAN ABERCROMIE, DEXTER DUMUS, and DOUG LITTLE.

**Incident Number 061451505**
**2479 Abner Terrace, #41,**
**Atlanta, Georgia**

      JUNNIER stated that Investigator HOLLY BUCHANAN was paying an individual under another sources code name.  BUCHANAN was paying the individual in this manner because she had not opened the individual as a source.  JUNNIER stated that Sergeant STALLINGS was aware of BUCHANAN'S activity and encouraged this type of behavior. Investigator JASON SMITH and Investigator ARTHUR TESLER would also conduct this same type activity.

**DOZIER-COA**
**00255**

## CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    05/24/2007

      GREGG JUNNIER, who has been interviewed previously provided the following information on May 3 and May 23, 2007:

      He explained that the pressure of making the statistical numbers for each detective in the narcotics unit and in other units, such as weed and seed, as well as the FIT Teams in the Zones come from pressures that departmental supervisors receive from the COBRA meetings.  The Narcotics unit quotas of 9 and 2 (Nine arrests and two search warrants per month/per officer) were initiated to build the numbers.  An evaluation process was conducted on the detectives which is known as "Q Pai." The detectives would be evaluated and could receive a performance bonus.

      JUNNIER stated that one Sergeant, Sergeant Fields, telephone number ███████████ (C) and ███████████ (H), quit the police department because he got tired of lying to make the numbers.  Fields felt the pressure of making the numbers was compromising the integrity of the officers.

      In addition, JUNNIER explained that he recalls Sergeant STALLINGS say on occasion that we, Narcotics Team 1, need to get the numbers up for or the unit would look like shit at the upcoming COBRA meeting.  Also, after COBRA meetings Sergeant STALLINGS and/or Lieutenant STACIE GIBBS would have a meeting with the Team and express the need to get the numbers.

      JUNNIER had previously explained that it was a common practice in the Narcotics Unit, as well as other APD units, for JUNNIER and/or other detectives that are working informants to make a number of drug buys and to come back to the office and give buy information to other detectives and allow them to draft up affidavits and search warrants as if that particular detective had conducted the drug buy.  He also added that Sergeant STALLINGS would also participate in allowing him (STALLINGS) to be included in incident report writeups, as well as, allowing his name to be included in affidavits to obtain search warrants.  STALLINGS would sign off as the supervisor on these incident reports, and other documents such as confidential source payment vouchers as a witness and as the supervisor stating he witnessed the payment to the source.  STALLINGS as the supervisor would read and review search warrant affidavits.  On occasion STALLINGS did participate on some

Investigation on    05/23/2007    at Atlanta, Georgia

File # ███████████

Date dictated    05/24/2007

    SA Michael L. Grant
by  SA Brian Davis

**DOZIER-COA
00264**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

## CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____GREGG JUNNIER_____ , On 05/23/2007 , Page __2__

of the drug buys with JUNNIER.  These incidents would have been
where STALLINGS would have been the passenger in the vehicle and he
would have handwritten the buy report while JUNNIER was driving.
Sergeant STALLINGS was aware that APD source ALEX WHITE also would
be allowed to make drug buys on his own, using his personal funds,
and would drive to the APD property unit to meet up with detectives
to turn over the drugs and to be reimbursed for having used his
personal funds.  Below are incidents that have been identified by
JUNNIER as incidents where Sergeant STALLINGS had specific
knowledge about sharing of drug buys, not participating in drug
buys, and/or was not out at the scene, but allowed his name to be
used as having witnessed the drug buys, to include being used as a
witness in affidavits for search warrants.

        JUNNIER reviewed the APD drug log book for January 4,
2005, which listed the following incident numbers: 050042068,
050042066, 050041905, and 050041901.  JUNNIER stated that the drug
log book list the detective turning in the drugs from buys as being
JUNNIER.  JUNNIER stated that it is not his handwriting and that it
appears to be STALLINGS handwriting.  He also stated that he did
not conduct those buys and did not touch or handle those drugs.
These buys were done by STALLINGS.

**Incident Number 050042068**
**1127 Fourth St.**
**Atlanta, Georgia**

        The date of the buy on this incident is January 4, 2005.
JUNNIER reviewed the incident reports, buy report, the affidavit,
and the drug log book.  He stated that STALLINGS conducted the buy
at this address, and that JUNNIER was not with STALLINGS.  He
recalled that STALLINGS asked him to write up the affidavit for the
search warrant.

**Incident Number 050671097**
**929 Neal St.**
**Atlanta, Georgia**

        After reviewing this incident, JUNNIER recalled that
STALLINGS was not present at the buy of drugs.  STALLINGS signed
off as reviewing the incident report, which included the writeup

**DOZIER-COA
00257**

## CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___GREGG JUNNIER_____ , On _05/23/2007_ , Page ___3___

that JUNNIER and STALLINGS directed a confidential and reliable
informant to the above address to make a purchase of drugs.
STALLINGS would have reviewed the affidavit and warrant prior to
the execution of the search warrant.  The affidavit stated that on
March 8, 2005, JUNNIER and STALLINGS directed a confidential and
reliable informant to the above address to purchase drugs.

**Incident Number 050831877**
**914 Bolton Rd. B-3**
**Atlanta, GA**

JUNNIER explained that STALLINGS was with JUNNIER when a
confidential and reliable informant made a drug purchase at this
address.  A review of the incident report, the affidavit, and the
drug log book assisted JUNNIER in recalling that He and STALLINGS
made three different buys on/or about March 24, 2005.  STALLINGS
filled out the drug log book listing buys associated to incident
numbers 050831881 for CARY BOND, 050831876 for JUNNIER, and
**050831877** for PAUL VIGNOLA.  The drug buy report was filled out by
JUNNIER who listed VIGNOLA as being the recovering officer.  The
affidavit is prepared by VIGNOLA.  JUNNIER reiterated that drug
buys are mostly conducted by two officers, and as rule they did not
ride three to make a buy.  He stated definitely not STALLINGS and
two other officers.

**Incident Number 050550855**
**1366 Elizabeth Ave**
**Atlanta, GA**

JUNNIER stated that Sergeant STALLINGS was not present at
this drug buy, but allowed his name to be included as having
participated in the directing the informant in making a drug
purchase at 1366 Elizabeth Avenue, Atlanta, Georgia, on February
24, 2005.  Subsequently, STALLINGS is included in the search
warrant affidavit as having witnessed and assisted in directing the
informant in making the drug purchase.  A search warrant was issued
on February 25, 2005, by Magistrate Judge Kim Warden.  The return
on the search warrant states that the inventory of narcotics found
was done in the presence of Sergeant STALLINGS on March 3, 2005.

**DOZIER-COA**
**00258**

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___GREGG JUNNIER___ , On 05/23/2007 , Page ___4___

**Incident Number 050550867**
**1271 Elizabeth Ave**
**Atlanta, GA**

JUNNIER stated that Sergeant STALLINGS was not present at
this drug buy, but allowed his name to be included as having
participated in the directing the informant in making a drug
purchase at 1271 Elizabeth Avenue, Atlanta, Georgia, on February
24, 2005.  Subsequently, STALLINGS is included in the search
warrant affidavit as having witnessed and assisted in directing the
informant in making the drug purchase.  A search warrant was issued
on February 25, 2005, by Magistrate Judge Kim Warden.  The return
on the search warrant states that the inventory of narcotics found
was done in the presence of Sergeant STALLINGS on March 2, 2005.

As stated previously, it was common practice to share
drug buys with other detectives wherein the other detective would
write up the incident report and draft a search warrant affidavit
as if they had directed the informant in making the drug buy.
Below is a summary of these particular incidents associated to
Detective PAUL A. VIGNOLA.  JUNNIER explained that VIGNOLA did go
with him occasionaly to direct an informant in making a drug
purchase, but this was not frequent.  VIGNOLA was burned out with
the APD Narcotics Unit in regards to the 9 and 2 policy and the way
the drug unit operated.

**Incident Number 040901643**
**3775 Martin Luther King Jr. Dr. B-9**
**Atlanta, GA**

JUNNIER reviewed the incident report, the drug log book,
and the affidavit.  He stated that the drug log for the above
incident on March 30, 2004 is in STALLINGS handwriting and also
lists incident number 040901641 for S. BELL.  Incident number
040901643 is listed for VIGNOLA.  STALLINGS turned in the drugs for
VIGNOLA and BELL.  The buy report appears to not have been written
by VIGNOLA.  JUNNIER believes the buy for made buy STALLINGS and
BELL.  VIGNOLA probably was not on this drug buy.

**DOZIER-COA**
**00259**

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    <u>GREGG JUNNIER</u>        , On <u>05/23/2007</u> , Page   <u>5</u>

**Incident Number 043151058**
**2970 Landrum Dr. #1**
**Atlanta, Ga**

        JUNNIER stated that he does not recall riding out to this location with VIGNOLA, and does not believe VIGNOLA was present at this drug buy. JUNNIER reviewed the drug buy incident report and explained that he had initially started handwriting the drug buy information and then gave it to VIGNOLA. He reviewed the drug log book and believes that the log book entries were written by STALLINGS.

**Incident Number 050831877**
**914 Bolton Road, B-3**
**Atlanta, Georgia**

        JUNNIER reviewed the handwritten drug buy report, the incident report associated to this case, and the affidavit that was prepared by VIGNOLA. The address for this incident was 914 Bolton Road, B-3, Atlanta, Georgia, He explained that this was a drug buy that he (JUNNIER) had made using ALEX WHITE. He brought the drug buy report back to the APD and gave the paperwork to VIGNOLA, who prepared an incident report and drafted a search warrant affidavit. JUNNIER stated that he recalls this incident because there were certain areas that VIGNOLA worked and there were certain areas of Atlanta that JUNNIER worked and this area was an area worked mainly by JUNNIER, not VIGNOLA. Upon further review of the reports and the drug log book, JUNNIER believes that he and STALLINGS were the two that conducted the drug buy, not VIGNOLA. The drug log book entries were in STALLINGS handwriting.

**Incident Number 051460936**
**2020 Allison Ct. B-10**
**Atlanta, Ga**

        JUNNIER stated that he and STALLINGS made the drug buy on this incident and he later provided the drugs and the drug buy report that was prepared by JUNNIER and put in VIGNOLA'S name, to VIGNOLA. This was a handoff buy.

DOZIER-COA
00260

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____GREGG JUNNIER_____ , On 05/23/2007 , Page ___6___

### Incident Number 040281449
### 2165 Martin Luther King, Jr. #10
### Atlanta, Ga

       JUNNIER reviewed the various incident reports and the drug log book regarding the above incident number. The drug log book entry for this incident on January 28, 2004 was in STALLINGS handwriting. JUNNIER was unsure who made the drug buy, but he did not believe it was VIGNOLA, for two reasons. The two reasons are: (1) This was not VIGNOLA's normal operating aream and (2) He usually did not work with STALLINGS on drug buys.

### Incident Number 040701350
### 2020 Alison Ct., B-8
### Atlanta, Ga

       JUNNIER reviewed the various reports and the drug log book. He explained that he recalled that the drug buy was conducted by he and STALLINGS, and then handed off the drug report to VIGNOLA. The drug log book entry was written by JUNNIER on March 10, 2004. The pertinent information that explains who were on this drug buy is that the incident report was in STALLINGS handwriting and the drugs were turned in by JUNNIER, as well as they never rode with three, especially if STALLINGS is involved in the drug buy.

### Incident Number 051460937
### 2020 Alison Ct., C-2
### Atlanta, Ga

       JUNNIER reviewed the incident reports and the drug log book. He stated that the buy report is in STALLINGS and JUNNIER's handwriting. STALLINGS and JUNNIER made the drug buy. This is a handoff to VIGNOLA. VIGNOLA turned in the drugs per the drug log book. Again, this was not an area that VIGNOLA would normally work.

DOZIER-COA
00261

## CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___GREGG JUNNIER_____ , On _05/23/2007_ , Page ___7___

**Incident Number 043221733**
**2150 Verbena St. #3**
**Atlanta, Ga**

        JUNNIER drafted the affidavit for the warrant.  The buy
report is in JUNNIER'S handwriting.  The drug log book entry is in
STALLINGS handwrting.  The drug buy was done by STALLINGS and
JUNNIER.  VIGNOLA did not make the buy.

**Incident Number 042441442**
**1247 Simpson Rd. #19**
**Atlanta, Ga**

        This was not the normal area that VIGNOLA would work or
frequent, but a review of the drug log book shows that he turned in
the drugs.

**Incident Number 042441443**
**1247 Simpson Rd. # 13**
**Atlanta, Ga**

        This was not a normal area for VIGNOLA to work.  JUNNIER
recalled that he wrote the case number on the incident report.
After JUNNIER made the drug buy he called in to get a case number.
JUNNIER turned in the drugs and it is JUNNIER'S handwriting on the
drug log book.  The documents available were not complete, but
JUNNIER stated the VIGNOLA did not make this drug buy.  This was a
handoff to VIGNOLA.

**Incident Number 051031073**
**2463 Joneboro Rd. #119**
**Atlanta, Ga**

        JUNNIER reviewed the incident reports and the drug log
book.  The drug log book is in JUNNIER'S handwriting and shows that
he had done five different drug buys on April 13, 2005.  The
following are the incident numbers: **051031073**, 051031067, 05101009,
051031070, and 051030921.  JUNNIER made the drug buy on the above
referenced incident, but this was an area that VIGNOLA would work.
He believed that VIGNOLA had asked him while he was out making buys

**DOZIER-COA**
**00262**

# CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___ GREGG JUNNIER ___ , On 05/23/2007 , Page ___ 8 ___

to stop off and get a buy from the above address.  This was a
handoff to VIGNOLA.  The drug buy report is in JUNNIER'S
handwriting.  VIGNOLA was not with JUNNIER on this buy.

DOZIER-COA
00263

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription   06/06/2007

     GREGG JUNNIER, who has been interviewed previously provided the following information:

     JUNNIER stated that Investigator DOUG LITTLE had explained that he was working with the District Attorney Office and the Federal Government to help clean up crime around stores and apartment complexes.  LITTLE said that the District Attorney office and the Federal Government would begin to close down the stores and apartments if they did not hire off duty police to help fix the situation.

     LITTLE was working at a convenience store across the street from 1575 Simpson road, Atlanta, Georgia.  LITTLE was working 4 hours a night every night.  LITTLE was making approximately $30.00 an hour.  LITTLE was suppose to wear a uniform to work off duty, but did not wear a uniform when he worked at this store.  JUNNIER began to work with LITTLE at this store. The above mentioned store could not pay the $30.00 dollars an hour for four hours every night so they began to split the cost with the convenience store located at 1575 Simpson road.  Investigator LUCAS, Investigator POSTEL and Sergeant STALLINGS also worked at the 1575 Simpson road store.

     LITTLE got promoted and turned over the off duty work to JUNNIER.  JUNNIER would give everybody hours at the store and pay them for their services.  STALLINGS, JUNNIER, LITTLE and LUCAS would work at the store while on duty.  The investigators would also check out a marked unit that was assigned to the narcotics unit and drive it to the store.  Using a marked unit while not in uniform and while stating you are only working at the store as a security consultant would have been against policy.  STALLING told JUNNIER and LUCAS if they got caught driving the marked unit to work at the store while on duty, they would be on their own. POSTEL would take an unmarked city unit to work at the store.

     JUNNIER stated that while he was working security at the store he was approached by management companies for apartment complexes.  The management companies asked JUNNIER if he could help clean up the crime problems at their apartment complexes.  JUNNIER told the management companies that he would charge them $120.00 a week for approximately four hours of work.  JUNNIER would explain

Investigation on   05/31/2007   at Atlanta, Georgia

File #

by   SA Brian P. Davis
     SA Andrew Van Epps

Date dictated

**DOZIER-COA
00270**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____Gregg Junnier_____, On 05/31/2007 , Page ___2___

that they could expect an narcotics investigator to stop by the complex before and after work everyday and the narcotics unit would also work hard in their complex to clean up crime. JUNNIER would also tell the managers to call him at anytime if they needed police response. JUNNIER advised that he would be able to get them a quicker response time than calling 911. If the complex requested an officer to work a third shift at the complex, JUNNIER would hire the officer and ask the complex to pay $30.00 an hour. JUNNIER stated he would pay the officer all of the money and not take a cut of the money.

JUNNIER would turn in his off duty request to the Atlanta Police Department. JUNNIER would write up the request as if he were a consultant. JUNNIER would do it this way so he could work more jobs and not have to be in uniform nor could anyone keep track of his hours.

When JUNNIER received calls from the apartment complex late at night after JUNNIER had finished working he would have different patrol officers that were on duty respond to the problems. If the officer responded to the problem, JUNNIER would pay the officer $50.00 for the quick response. Different officers that JUNNIER would call late at night were Officer BURCHFIELD, Officer JUHLS, Officer BRIAN MURPHY and Officer VAUGHN.

BURCHFIELD was working for an apartment complex at 3775 Martin Luther King Highway, and was trying to take apartment complex 1020 Bolton Road, Atlanta, Georgia, from JUNNIER. LUCAS also worked his own apartment complex located at West Lake Manor, Atlanta, Georgia.

JUNNIER stated that he also worked in the past with Officer FIELDS and DAVENPORT at the apartment complexes and stores.

JUNNIER stated that the narcotics unit would still respond to other apartment complexes that did not pay however, he stated he would not be over zealous to respond.

JUNNIER stated that on one occasion an apartment complex located at 377 Westchester Boulevard, Atlanta, Georgia, approached him to work security at their complex. The manager stated that District Attorney KATTS had called him and stated if he did not take care of the crime problem the District Attorney's Office would be forced to seize the apartment complex. KATTS then referred the apartment manager to JUNNIER. JUNNIER does know KATTS and does not

DOZIER-COA
00265

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    Gregg Junnier                                      , On 05/31/2007   , Page    3

remember ever having any conversations with KATTS.  JUNNIER also
got referred to other apartment complexes by another Assistant
District Attorney.  JUNNIER could not remember this Attorneys name.

JUNNIER stated that he, Investigator J.R. SMITH and
ARTHUR TESLER began working a lot of extra jobs together.  JUNNIER
stated that he would normally collect extra job money on Fridays.
JUNNIER would normally collect approximately $1,000.00 to $2,000.00
dollars a week.  This money would normally be split between
JUNNIER, J.R. SMITH, TESLER, and STALLINGS.  STALLINGS would
normally allow JUNNIER and the other officers to collect their
money while on duty.  STALLINGS would also order other
investigators to ride with JUNNIER for safety reasons while JUNNIER
would collect the money and do routine patrols of the apartments
and stores.  STALLINGS would not work at the complexes as much but
would receive a portion of the money by allowing JUNNIER and the
other investigators to work the extra jobs while on duty.  JUNNIER
stated that other Investigators that were not receiving money from
the apartment complexes, began to complain about putting their work
on hold to assist JUNNIER on his extra jobs.

JUNNIER stated a normal day in vice would consist of
arriving at work grabbing another investigator and begin to make
his rounds of his different extra jobs.  If JUNNIER found someone
selling drugs while making his rounds he would arrest them and then
spend most of his day dealing with that one arrest.  JUNNIER also
stated that if he arrested someone on one of his properties he
would write the citation and incident report as if he arrested them
at another location.  STALLINGS would also write people citations
on their off duty properties and ask JUNNIER what address to put on
the citation.  JUNNIER stated that they would change the arrest
location to make the District Attorney Office think the apartment
complex was no longer a crime haven.

JUNNIER stated on several occasion they would stop to
interview a potential drug dealer on the side of the road.  If the
team found the dealers drugs hidden in a location close to the
dealer, STALLINGS would ask JUNNIER to write the report to sound as
if they had seen the dealer with the drugs.  JUNNIER stated that on
a recent occasion Investigator HOLLY BUCHANON was interviewing a
potential drug dealer and found drugs hidden close to the suspect.
STALLINGS turned to JUNNIER and stated "she does not know how to
write this."  Investigator GARY SMITH then volunteered to write the
citation and the incident report as if the drugs had been seen by

DOZIER-COA
00266

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Junnier_____ , On _05/31/2007_ , Page ___4___

the officers in the suspects possession.  The incident took place
on Simpson road near the TASTY DOG.

JUNNIER stated that he originally met FABIO TAVARES at
the convenience store located at 1545 Simpson Road.  JUNNIER ran
into TAVARES approximately two years later at 533 Griffin Road,
Atlanta, Georgia.  JUNNIER stated that TAVARES owned the store at
533 Griffin and TAVARES' son JORGE TAVARES-CEPIN owned a store
located at 2185 Martin Luther King Drive, Atlanta, Georgia.
TAVARES told JUNNIER he could pay $100.00 a week for JUNNIER to
help clean up the crime problem around both stores.  JUNNIER
accepted this offer and began to patrol the stores. JUNNIER advised
that the father could not always pay for JUNNIER'S services but
JUNNIER would still patrol the store.

JUNNIER spoke to the son(CEPIN) about his father TAVARES
sending baby formula to New York.  JUNNIER discussed with TAVARES
that he had two stores that were his main competition.  The two
stores were referred to as the green store and the yellow store
located on Simpson Road.  TAVARES stated that these two stores were
receiving stolen baby formula and shipping it to New York for
resale.  JUNNIER watched these other stores and made at least one
bust of a baby formula shipment coming to the yellow store.

TAVARES was eventually arrested for possession of stolen
baby formula.  CEPIN told JUNNIER that the police had missed the
their main stash of stolen baby formula.  CEPIN stated that they
had moved it to a storage building in Douglasville.  JUNNIER stated
that he reported this information to Atlanta Police Department
Investigator CONDLAND, that had been working on this case.
Investigator CONDLAND told JUNNIER that they had gotten all of the
formula.

TAVARES also on one occasion asked JUNNIER to find out
what had happened to one on his truck drivers that had supposedly
gotten arrested in New York while transporting baby formula.
JUNNIER acted as if he had looked up the information and told
TAVARES that everything was good with the driver.

TAVARES told JUNNIER that he would pay him $500.00 a week
if he would protect TAVARES and one of his friends store from being
hit by the police again.  JUNNIER told him that he could not help
him.  JUNNIER witnessed large amounts of baby formula in the back
of CEPIN'S store after TAVARES was arrested.  JUNNIER stated that

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

<hr>

Continuation of FD-302 of ___ Gregg Junnier _____ , On 05/31/2007 , Page ___ 5

      TESLER, BOND and SMITH would have seen the large amounts also in the back of CEPIN'S store.

      JUNNIER stated that BOND would not do the extra jobs because he did not feel like it was ethical.

**Incident Number 043102090**
**779 Ralph D Abernathy Blvd. SW,**
**Atlanta, Georgia**

      JUNNIER stated that on November 6, 2004, STALLINGS had received information that one of the narcotic team fugitives was spotted by an Atlanta Police Department informant at 779 Ralph D Abernathy Boulevard. The informant told STALLINGS that the fugitive was carrying a concealed weapon. STALLINGS went to the above mentioned location and called for a marked unit to detain the suspect. The officers found the weapon. STALLINGS called Lieutenant DOUG LITTLE to the scene for assistance. Atlanta Police Department Officer R.E. JOHNSON took the report and arrested the subject.

      After this incident STALLINGS called JUNNIER and asked JUNNIER to be a witness to this case. STALLINGS showed JUNNIER where the incident took place and then told JUNNIER everything that happened in case JUNNIER was ever questioned about the matter. JUNNIER explained to STALLINGS that his time sheet would show that he had gotten off work before the arrest occurred. STALLINGS told JUNNIER he would fix his time sheet to reflect that JUNNIER was still at work when the incident occurred.

**Incident Number 052841021**
**1058 Dill Avenue,**
**Atlanta, Georgia**

      On 10/11/2005, Narcotics Team 1 made a buy at 1058 Dill Avenue, Atlanta, Georgia. On 10/19/2005, Narcotics Team 1 served a search warrant on the above mentioned address. JUNNIER advised 1058 is one side of a Duplex, the other address is 1056. JUNNIER stated that the people living in 1058 had a connection with 1056. STALLINGS told JUNNIER that they needed to get into 1056 and look

**DOZIER-COA**
**00268**

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Gregg Junnier_____ , On _05/31/2007_ , Page _6_

around.  STALLINGS told JUNNIER to kick in the back door of 1056.
JUNNIER stated that he did kick in the back door of 1056 and then
JUNNIER and STALLINGS searched the house.  When they were finished
searching the house.  STALLINGS told JUNNIER just to shut the back
door and the people that lived at 1056 would just think someone had
broke into their house.  JUNNIER also advised if the people from
1058 did own 1056 they would assume the police had a search warrant
for both sides.

DOZIER-COA
00269

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/21/2007

GREGG JUNNIER, who has been interviewed previously
provided the following information:

### STEVE KEEBLE

JUNNIER stated that Atlanta Police Department Sergeant
STEVE KEEBLE was aware that narcotics investigators were turning in
false vouchers.  JUNNIER explained that KEEBLE was aware the
investigators would use this money to buy vests, tint for the car
windows or get extra money to give to the informant.  JUNNIER has
asked KEEBLE in the past if he needed to get a receipt for an item
and KEEBLE would respond you could or you could "voucher it."

### ERNEST FINLEY

JUNNIER stated in 1997 through 1998 he was working in
background and recruitment.  JUNNIER advised after putting in a
full day he would join the narcotics unit which was run by Atlanta
Police Department Sergeant FINLEY.  FINLEY allowed JUNNIER to help
the narcotics unit with their detail "Street Heat."  The "Street
Heat" detail was mainly used to clean up high drug trafficking
areas.  FINLEY would tell the investigators once they had arrested
approximately twenty bodies everyone could go home.  JUNNIER stated
they were suppose to work from 4:00 pm through 4:00 am.  However,
FINLEY would send them home most nights by 12:00 am and then sign
the sheets as if they had worked a full twelve hour shift.

JUNNIER stated that eventually he was transferred to
narcotics.  FINLEY at this time was the Lieutenant over narcotics.
FINLEY at one point was mad that JUNNIER had taken almost four
weeks of vacation.  FINLEY did not want JUNNIER to take vacation
because JUNNIER was FINLEY'S biggest producer.  FINLEY punished
JUNNIER by putting him on a uniform patrol in Buckhead.

### RED DOG

According to JUNNIER, at the end of 2005 or the beginning
of 2006 he was invited to a party by two Atlanta Police Department
Officers that were assigned to the Red Dog.  JUNNIER believes the
two Red Dog officers were GUNTER and SCHMIDT but JUNNIER could not
be for certain.  JUNNIER spoke to the two officers while he was

Investigation on  06/13/2007  at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮         Date dictated   N/A

SA Brian P. Davis
by  SA Andrew Van Epps                                      **DOZIER-COA**
                                                            **00273**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____Gregg Junnier_____ , On 06/13/2007 , Page __2__

turning property into the Atlanta Police Departments Evidence room.
The officers stated that the party was going to be held in a
parking lot close to the Police Department.  The Red Dog officers
bragged that they had many cases of beer and liquor.  The Red Dog
officers stated they had just got the alcohol form a seizure.
JUNNIER stated that Zone 1 Fit Team Officer BRAD BURCHFIELD had
also spoken about the party and was possibly involved in the
seizure of the alcohol.

## Narcotics Teams 1 and 2

Both narcotics teams would use a technique called
"freezing the scene."  Freezing the scene meant the investigators
would enter a house and then detain everyone while one member would
attempt to obtain a search warrant.  JUNNIER stated normally they
would have Questionable probable cause to be in the house.

JUNNIER stated that both narcotics teams, and many other
Atlanta Police Department units would completely trash houses while
serving a search warrant.  JUNNIER stated if the people cooperated
they would normally not tear their house up during the search.
However, if the person would refuse to cooperate the officers would
destroy the house by breaking out windows, putting holes in wall,
breaking televisions and dumping the trash cans out on the floors
or on furniture.

DOZIER-COA
00271

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/20/2007

     GREGG EDWARD JUNNIER, having been previously interviewed, provided the following information:

     JUNNIER could not specifically remember any falsified drug buys or unlawful search warrant affidavits in which ATLANTA POLICE DEPARTMENT (APD) Sergeant PAUL SPARWATH was the reporting officer or affiant, respectively.

     SPARWATH and APD Lieutenant STACIE GIBBS wrote incident reports for Narcotics "detail" arrests and reverse buys, and distributed them to various investigators, even though the investigators did not actually do the buys.

     Regarding the "nine and two" policy at APD, JUNNIER advised that it was common knowledge to the investigators that if you did not pull your weight, there were other squads that you could go to.  JUNNIER could not recall any officer being transferred from Narcotics due to a failure to get nine arrests and two search warrants, but generally recalls officers choosing to leave Narcotics before they were forced to leave by management.

     GIBBS and APD Sergeant STALLINGS told officers that if they could not get the nine and two, then they were not getting their jobs done, and would not be able to work their second jobs. No one complained about the nine and two guideline because working in Narcotics was viewed as a great assignment due to the hours and working conditions.

     JUNNIER advised that after he retired from APD in the wake of the shooting at 933 Neal Street, Officer BRAD BURCHFIELD took over as the officer who collected money for second jobs. BURCHFIELD even paid JUNNIER his portion of the second job money for a short time after JUNNIER left APD.

---

Investigation on ▮▮▮▮▮▮▮▮▮ at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

File # 282A-AT-101406-302              Date dictated _____

SA Brian P. Davis

by SA Eulis Mile Brosas:emb

**DOZIER-COA 00272**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

Warrants +
Contacts

**DOZIER-COA**
**00284**

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   03/15/2007

    DURIE NATHANIEL BAKER, date of birth, ▆▆▆▆▆▆, social security account number ▆▆▆▆▆▆.  BAKER was interviewed at his residence located at ▆▆▆▆▆▆▆▆▆▆▆▆▆▆, cellular phone ▆▆▆▆▆▆.  After being advised of the identities of the interviewing agents and the nature of the interview, BAKER provided the following information.

    BAKER recently moved to ▆▆▆▆▆▆▆, within the last two weeks.  Previously BAKER had lived at 161 Rhodesia Avenue, Atlanta, Georgia, 30315, from approximately February 2006 through March 2007. BAKER stated that on one occasion he was returning home to 161 Rhodesia Avenue, when he noticed a black male standing in his front yard.  BAKER stated that his girl friend LATISHA MICHELLE COLBERT and his two children were also with BAKER.  The unknown male asked BAKER if they had weed.  COLBERT told the unknown male that they did not have weed.  The unknown male left BAKER's house. BAKER believes the unknown male may have got into a car but BAKER could not remember.

    BAKER stated the Atlanta Police Department (APD)Officers raided his house approximately a couple weeks after the above mentioned incident.  BAKER stated he had gone to sleep with COLBERT in their bedroom when he was awakened by someone yelling "let me see your hands."  BAKER advised he thought at first he was being robbed and then noticed the people were Police Officers.  BAKER stated that he was placed in handcuffs and the Police Officers began to search their house.

    The Officers asked BAKER for his name and identification. The Officers found and seized BAKER's marijuana and approximately $1,200.00 cash out of his bedroom.  BAKER stated the money was to be used to pay his bills.  BAKER advised the marijuana was for his personal use and it was only one bud.  BAKER stated he would usually buy approximately $20.00 worth of marijuana every weekend for his personal use.  BAKER stated neither he nor anyone else has ever sold drugs out of his residence.  BAKER stated the entire search lasted approximately 2 hours.

    COLBERT repeatedly asked the Officers to see the search warrant, but the Officers never produced a search warrant nor left a copy with BAKER.

---

Investigation on   03/14/2007   at  Atlanta, Georgia

File # ▆▆▆▆▆▆▆▆▆▆   Date dictated _____

by   SA Brian P. Davis:bpd
    SA Andrew J. Van Epps

**DOZIER-COA
00285**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    <u>DURIE NATHANIEL BAKER</u>            , On <u>03/14/2007</u> , Page    2

        The Officers escorted BAKER and COLBERT to TURNER FIELD after they were finished searching the residence.  While BAKER was at TURNER FIELD the Officers asked him if he would like to report any other crimes.

        BAKER stated that a house down the street from his was raided by the APD on the same day.

        BAKER stated if you were to face his house, the house to the right was almost an identical layout of his house, and the residence always had lots of traffic coming and going from the house.

        BAKER stated that he does not know anyone named "MARIO" or "FLORIDA."

        BAKER's previous landlord was PAUL DEFRANCIS, cellular phone number ▬▬▬▬▬▬▬ .