FD-302 (Rev. 10-6-95)

**CONFIDENTIAL**

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  01/22/2008

SCOTT ALLEN KIDDER, date of birth, ▬▬▬▬, Social Security Account Number ▬▬▬▬, was interviewed at his residence. KIDDER resides at ▬▬▬▬

After being advised of the identity of the interviewing agents and the nature of the interview, KIDDER provided the following information.

KIDDER stated he moved into 1056 Dill avenue, Atlanta, Georgia in approximately 2004. KIDDER originally moved into this duplex with a friend. However, soon after KIDDER moved into the duplex, his friend moved out. KIDDER stated that he lived at this residence by himself for approximately 1 ½ years. The landlords name was NAGI FRIDAY.

KIDDER stated two black males rented the duplex beside his at 1058 Dill avenue. One of the individuals went by the nickname "NUK". The other individual was possibly named DARREN SMITH. KIDDER believes the individuals used the space as a recording studio. KIDDER advised that people would come and go during the day but, does not believe anyone spent the night at the house.

KIDDER advised that he spoke to the individuals on several occasions because he would receive their mail and they would receive KIDDER'S. KIDDER stated that the mail would often be addressed incorrectly, showing KIDDER'S address as 1058 and SMITH'S as 1056.

KIDDER recalls on one occasion going to work at 3:00 pm and returning home at 9:00pm. KIDDER entered his house through the front door and soon noticed his back door had been knocked in. KIDDER described his back door as the frame being destroyed and he noticed a round circle on the outside of the door as if a ram had hit the door. KIDDER stated the door was not functional and he had to use boards and nails to secure his back door or someone could have easily push in his back door. KIDDER looked through his house to make sure nothing had been stolen. KIDDER advised that he had about $2,000.00 worth of "DJ" equipment in his house which had not been stolen. KIDDER stated that after he examined the house he did

---

Investigation on  01/22/2008  at  Atlanta, Georgia

File # ▬▬▬▬                                Date dictated  N/A

by  SA Brian P. Davis  SA Eulis Mile Brosas

**DOZIER-COA 00287**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)          **CONFIDENTIAL**          

---

Continuation of FD-302 of __SCOTT KIDDER__ , On __01/22/2008__ , Page __2__

not see anything out of place and he believes that no one had taken anything from his house.

    KIDDER walked next door and noticed a note attached to the front door and back door of 1058 stating that the Atlanta Police Department had seized items and had arrested individuals out of 1058. KIDDER advised that 1058's door had also been knocked in.

    KIDDER advised that he did not have any documents attached to his door or in his house explaining why his door had been knocked in. KIDDER assumed the police had made a mistake and knocked in his door at 1056 instead of 1058. KIDDER did not report the incident because he did not want to get involved or associate his name with the individuals next door. KIDDER assumed that someone from the Atlanta Police Department would eventually return and interview him about the individuals next door. KIDDER was never interviewed about this incident.

    KIDDER stated that he never saw his next door neighbors return to the house. KIDDER also got permission from FRIDAY to board up 1058 so homeless people would not move into the vacant house.

## CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription   01/26/2007

      ALPHONSO HOWARD, date of birth, ▬▬▬▬, social security account number ▬▬▬▬▬. HOWARD was interviewed at his Attorney's office located at the HEALEY BUILDING, suite 240-G BALCONY, 57 Forsyth Street N.W., Atlanta, Georgia, 30303. Also present during the meeting was Attorney RANDALL STROZIER, Attorney BRADLEY MCMILLIAN and paralegal JAMES MERCIER. After being advised of the identity of the interviewing agents and the nature of the interview, HOWARD provided the following information.

      HOWARD stated on approximately March 2, 2005, he and his girlfriend TIA CARTER had returned home from work. At this time HOWARD and CARTER had been living together at ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬, for approximately six months. HOWARD'S three children also lived at this residence. HOWARD stated that same night he heard a loud noise in his house. When HOWARD checked on the noise he was confronted by Sargent STALLINGS and other police officers in his hallway. The police officers ordered HOWARD to the ground and placed him in handcuffs. The police officers along with Sgt. STALLINGS then took HOWARD downstairs to his living room and began to question HOWARD and search the house.

      HOWARD was repeatedly asked where he hid his money and "KILOS". HOWARD advised the officers that he had a .45 caliber handgun which was located in the cabinet in the kitchen and an AK-47 in his bedroom closet. HOWARD also advised the officers that he did not have any felonies on his record and the guns were registered in his name.

      HOWARD advised the search took approximately four to five hours and the officers ran a K-9 unit through his house during the search. HOWARD remained in handcuffs through the entire search. The officers told HOWARD that they knew he had money and he needed to tell them where it was located.

      HOWARD was let out of his handcuffs when the officers were leaving the house. STALLINGS asked for HOWARD to help the police by giving him names of other people that had been dealing drugs in his neighborhood. HOWARD stated that he did not deal with drug dealers and he would be unable to assist the police officers.

---

Investigation on   01/25/2007   at   Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬   Date dictated _____

by   SA Brian P. Davis
    SA A. Brett Fears

**DOZIER-COA**
**00289**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Alphonso Howard__ , On __01/25/2007__ , Page __2__

    Sargent STALLINGS told HOWARD that he (HOWARD) would be responsible for repairing the damage to the house, which was caused by the police officers. The police officers also seized HOWARD'S guns and miscellaneous paper work. The police officers did not show or read the search warrant to HOWARD. HOWARD was never arrested over this incident.

    HOWARD reported this incident to the Atlanta Police Department's internal affairs unit. The internal affairs unit investigated this incident and explained to HOWARD that there was not enough information to sustain HOWARD'S allegations of police misconduct. HOWARD eventually received his weapons and miscellaneous paper work back from the Atlanta Police Department.

    HOWARD stated the police officers caused approximately $800.00 worth of damage to his doors and minor repairs to other pieces of furniture in his house.

DOZIER-COA
00290

FD-302 (Rev. 10-6-95)

**CONFIDENTIAL**

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  12/11/2006

      TONY TORRANCE was interviewed on the corner of Neal Street and Joseph Lowery Blvd, Atlanta, Georgia. Also present during the interview was TRACY BRUMFIELD, Investigator, Office of the Fulton County District Attorney. After being advised of the identity of the interviewing Agent and the nature of the interview, TORRANCE provided the following information:

      TORRANCE, a black male, provided his date of birth as ▬▬▬▬▬▬. TORRANCE currently resides at ▬▬▬▬▬▬▬▬▬▬, ▬▬▬▬▬▬▬▬▬▬. TORRANCE has a cellular telephone number of ▬▬▬▬▬▬▬▬. TORRANCE is the on-site builder for 435 Joseph Lowery Blvd, Atlanta, Georgia, 432 Joseph Lowery Blvd, Atlanta, Georgia, and 912 Neal Street, Atlanta, Georgia.

      On 11/21/2006, at approximately 6:55pm, TORRANCE walked out of the front door of 435 Joseph Lowery Blvd. As TORRANCE began to lock the front door, he heard the gears change on a black flat bed tow truck. The tow truck was traveling on Joseph Lowery Blvd towards Bankhead Highway. A marked white ATLANTA POLICE DEPARTMENT (APD) vehicle, with no top blue lights, was traveling in front of the tow truck. The marked APD vehicle and the tow truck made a left turn onto Neal Street. Both vehicles stopped in front of 929 Neal Street. TORRANCE, looking between two houses, observed three APD Officers jump out of the marked APD vehicle and run onto the front porch of 933 Neal Street, KATHRYN JOHNSTON's residence. The APD Officers began banging on JOHNSTON's front door. TORRANCE did not hear any of the APD Officers identify themselves as the police officers.

      The APD Officers could not get the front door burglar bars open, therefore one of the APD Officers went back to the patrol car and retrieved a crowbar. TORRANCE walked to the corner of Neal Street and Joseph Lowery Blvd so that he could get a better view of Neal Street and the front of JOHNSTON's residence. TORRANCE observed 8 - 9 additional APD Officers who were beginning to approach JOHNSTON's residence. The APD Officers pried open the burglar bars and entered the house. TORRANCE immediately heard gun fire which sounded like a machine gun. The shooting stopped for a couple of seconds before TORRANCE heard a second set of gunshots. Shortly afterwards, several of the APD Officers casually walked out

---

| | | |
|---|---|---|
| Investigation on | 12/06/2006 at Atlanta, Georgia | |
| File # ▬▬▬▬▬▬▬▬▬▬ | Date dictated | 12/11/2006 |
| by  SA A. Brett Fears:abf | | |

**DOZIER-COA 00291**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

**CONFIDENTIAL**

Continuation of FD-302 of ___TONY TORRANCE_____, On _12/06/2006_, Page __2__

of the house.  Other APD units also began arriving to the scene of the shooting.

One of the initial three APD Officers TORRANCE observed approach JOHNSTON's residence wore a mask.  The other two APD Officers did not have on a mask.  One of the APD Officers not wearing a mask was a white male.

While the APD Officers began to place crime scene tape around Neal Street, an APD Sargent (black male) approached TORRANCE and the other neighbors who were beginning to gather on the corner of Neal Street and Joseph Lowery Blvd.  The APD Sargent was rude and told everybody to get back.  TORRANCE tried to tell the APD Sargent that he was standing on the corner of Neal Street and Joseph Lowery Blvd when the shooting occurred but the APD Sargent seemed disinterested.

TORRANCE walked back to 435 Joseph Lowery Blvd and telephoned State Representative and Community Activist ABLE MABLE to inform her of the shooting.

CLARENCE WILLINGHAM who resides at ████████████████, was walking on Joseph Lowery Blvd at the same time of the shooting.

TORRANCE knows JOHNSTON and most of the other neighbors in the area because he has completed construction projects and other odd jobs for them.  JOHNSTON lives on the side of Neal Street that is quiet and not known for drug activity.  However, the other side of Neal Street (after crossing Joseph Lowery Blvd), is well known for drug activity.

Earlier in the day on 11/21/2006, between 11:00am and 12:00 noon, TORRANCE observed three APD Officers from the Zone 1 Drug Unit patrolling on Neal Street.

TORRANCE has given interviews regarding what he witnessed to news reporters from Channel 2, Channel 5, and Channel 11.

FD-302 (Rev. 10-6-95)

## CONFIDENTIAL

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  01/08/2007

   LATISHA MICHELLE COLBERT, date of birth, ▬▬▬▬,
social security account number ▬▬▬▬▬▬. COLBERT was
interviewed at her residence ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬, cellular telephone ▬▬▬▬▬▬▬, home telephone number ▬▬
▬▬▬▬▬. After being advised of the identity of the interviewing
agents and the nature of the interview, COLBERT, provided the
following information.

   COLBERT stated on 11/11/2006, after leaving her house to
run a few errands she and her boyfriend DURIC BAKER had returned to
their residence located at ▬▬▬▬▬▬▬▬▬▬▬▬▬, Atlanta, Georgia,
▬▬▬▬. When they arrived they noticed a black male wearing baggy
clothing standing in the front yard. The subject asked if "MARIO"
was home. COLBERT stated she did not know a "MARIO" and the
subject walked to a gray four door car with one passenger inside
and left the area.

   COLBERT advised on 11/16/2006, at approximately 8:45pm, a
group of police officers busted into her house. The officers
repeatedly asked for her boy friend's name. COLBERT repeatedly
told the officer her boy friend's name was DURIC BAKER and the
police officers repeatedly told COLBERT she was lying.

   COLBERT asked to see the search warrant for her house
but, the police officers refused to read the search warrant or
leave a copy at her house. COLBERT stated she had only recently
viewed the search warrant when she attended her court date.
COLBERT also advised her case has been classified as dead docket.

   COLBERT advised the police officers trashed her house
during the search and punched a hole in one of her walls. The
police officers found COLBERT'S marijuana on her night stand.
According to COLBERT it was enough marijuana to roll two joints.
COLBERT also stated that she had approximately $1,300.00 in her
other night stand. COLBERT advised that $800.00 was for her house
rent and the remaining $500.00 was for miscellaneous bills.
According to COLBERT the police officers seized the $1,300.00 and
gave COLBERT a receipt for approximately $489.00.

---

Investigation on  01/04/2007  at  Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬    Date dictated ▬▬▬▬

by  SA Brian P. Davis
   SA Andrew Van Epps

**DOZIER-COA**
**00293**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Latisha Michelle Colbert__ , On __01/04/2007__ , Page __2__

     COLBERT and BAKER were then transported to a police precinct near Turner field in Atlanta where they were questioned further and eventually transported to the jail.

     COLBERT stated news reporter TOM JONES came to her house and told her the Atlanta Police informant which had been on televison talking about the recent shooting on Neal street, Atlanta, Georgia, had also been involved in a bad search warrant which was served on COLBERT'S house. COLBERT recognized the police informant on the news as the same male that had asked for "MARIO" in her front yard on 11/11/2006.

     COLBERT gave the following description of the subject from the incident on 11/11/2006.

| | |
|---|---|
| Sex: | Male |
| Race: | Black |
| Height: | 5'10" |
| Build: | Medium |
| Complection: | Medium "brown skin" |
| Clothing: | Baggy and wearing a hat |
| Scars or tattoo: | Tattoo or scar on subject by his eye. |

DOZIER-COA
00294

## CONFIDENTIAL

FD-302 (Rev. 10-6-95)



-1-

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription  01/29/2007

    TIA CARTER, date of birth, ▬▬▬▬▬, social security account number ▬▬▬▬▬. CARTER was interviewed at her Attorney's office located at the HEALEY BUILDING, suite 240-G BALCONY, 57 Forsyth Street N.W., Atlanta, Georgia, 30303. Also present during the meeting was Attorney RANDALL STROZIER, Attorney BRADLEY MCMILLIAN and paralegal JAMES MERCIER. After being advised of the identity of the interviewing agents and the nature of the interview, CARTER provided the following information.

    On approximately March 2, 2005, CARTER had gone to sleep with her boyfriend AlPHONSO HOWARD at their residence located at ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. CARTER heard a loud noise in her house but, stayed in her bed while HOWARD went to investigate. CARTER stated that four police officers entered her room. CARTER stated one of the police officers that entered her room was named JUNNIER.

    The police officers at first told CARTER to get out of bed because she was going to jail. CARTER stated that she had been sleeping naked. CARTER stood up and quickly sat back down and told the officers that she had not done anything wrong. The officers then searched CARTER'S clothes and allowed her to put on her clothes.

    The police officers brought CARTER'S children into her room. JUNNIER told CARTER that he would have to take her to jail and place her kids in DFACS. JUNNIER kept asking CARTER how long she had known HOWARD.

    The police officers searched CARTER'S room and then eventually took her down stairs with HOWARD. HOWARD was still in handcuffs when CARTER came downstairs. The police officers search lasted approximately over three hours.

    CARTER recognized JUNNIER from seeing him on the news in reference to a police shooting in Atlanta.

---

Investigation on  01/25/2007  at  Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬▬▬     Date dictated _____

by   SA Brian P. Davis
    SA A Brett Fears

**DOZIER-COA 00295**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 10-6-95)

**CONFIDENTIAL** 

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   03/19/2007

     GREGORY DERRELL HOLLIDAY was interviewed at the ATLANTA DETENTION CENTER, 236 Peachtree Street, SW, Atlanta, Georgia, 30303, telephone number 404-865-8030. Also present during the interview were TIM SAVIELLO, Attorney, Federal Defender Program, telephone number 404-688-7530, and Dorian Murry, Attorney, Johnson & Freeman LLC, telephone number 404-873-0093. Prior to the interview, HOLLIDAY signed and dated a Proffer Agreement. After being advised of the identity of the interviewing Agents, HOLLIDAY provided the following information:

     HOLLIDAY, a black male, provided his permanant address as ▬▬▬▬▬▬▬▬▬▬▬▬▬, telephone number ▬▬▬▬▬. HOLLIDAY provided his date of birth (DOB) as ▬▬▬▬▬ and stated his social security account number (SSAN) as ▬▬▬▬▬.

     On 01/15/2005, at approximately 12:00 noon, HOLLIDAY was inside his townhouse located at 316 Atwood Street, Atlanta, Georgia. HOLLIDAY was upstairs (second floor) when he heard glass breaking downstairs. HOLLIDAY immediately went downstairs to see what was going on when he encountered several ATLANTA POLICE DEPARTMENT (APD) Officers carrying shields entering his residence. Some of the APD Officers were wearing standard APD uniforms while other APD Officers were wearing black APD Narcotics uniforms. There was a total of approximately 15 APD Officers. The APD Officers used a hand held Ram to bust through the front door. The APD Officers also threw bricks through two kitchen windows in the rear of the townhouse.

     The APD Officers ordered HOLLIDAY to the ground where he was handcuffed with flex cuffs, frisked, and placed on the sofa. Sergeant FIRST NAME UNKNOWN (FNU) STALLNGS informed HOLLIDAY that they were executing a search warrant on his apartment. When HOLLIDAY requested to see a copy of the search warrant, Officer GREGG JUNNIER showed him a document but covered most of it up with his hands. HOLLIDAY could only see "apartment 316" on the left side of the paper. When HOLLIDAY asked the APD Officers what they were searching for, Officer JUNNIER replied, "drugs". HOLLIDAY told Officer JUNNIER that he was not selling any drugs from his apartment. The APD Officers did not leave or give HOLLIDAY a copy of the search warrant. The APD Officers did not show or give

Investigation on  03/16/2007  at  Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬▬    Date dictated  03/19/2007

by  SA Brian Davis
    SA A. Brett Fears:abf

**DOZIER-COA**
**00296**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___GREGORY DERRELL HOLLIDAY___, On _03/16/2007_, Page __2__

HOLLIDAY a copy of the affidavit used to apply for the search warrant.

While HOLLIDAY sat on the sofa, SGT. STALLING told HOLLIDAY that DANTE YOUNG was the individual that said HOLLIDAY was selling large quantities of drugs from 316 Atwood Street. HOLLIDAY and YOUNG have been friends for several years. APD Officers executed a search warrant at YOUNG's house on Alta (phonetic) Road in Atlanta approximately 2 weeks prior the search of HOLLIDAY's apartment. YOUNG's nickname is "Big Boy" and "TAY".

Officer JUNNIER told HOLLIDAY that he observed an APD informant make a drug buy at 316 Atwood Street on 01/14/2005. HOLLIDAY informed Officer JUNNIER that he was not home on 01/14/2005. HOLLIDAY spent the entire day with his daughters' (█████████████) mother, █████████████.

During the search of HOLLIDAY's townhouse, APD Officers seized the following; 10 grams of marijuana (kitchen cabinet), 10 extasy pills (kitchen cabinet), 91 grams of cocaine (pantry), individual bags of marijuana (kitchen cabinet), and a highpoint 9mm handgun. The marijuana and pills seized were for HOLLIDAY's personal use. The 9mm handgun seized belonged to █████████. HOLLIDAY does not know how the 91 grams of cocaine got into his apartment. The cocaine does not belong to HOLLIDAY or his girlfriend, █████████████.

HOLLIDAY remained handcuffed during the entire search of his apartment, from approximately 12:30pm to 6:30pm. At approximately 6:30pm, an APD paddy wagon transported HOLLIDAY to the ATLANTA DETENTION CENTER. The APD Officers conducting the search did not leave HOLLIDAY's townhouse until approximately 10:00pm. The apartment maintenance man, FNU DAUPHIN (phonetic), repaired the windows and replaced the front door while the APD Officers executed their search warrant.

█████████████ was not home during the execution of the search warrant. However, HOLLIDAY did call ████ during the search to inform her that he was being arrested. SGT. STALLINGS told HOLLIDAY that ████ would also be arrested if she came back to the apartment. ████ did not come by the apartment during the search.

HOLLIDAY has sold drugs in the past. HOLLIDAY stopped selling drugs in 1998. HOLLIDAY was not selling nor has he ever

**DOZIER-COA**
**00297**

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __GREGORY DERRELL HOLLIDAY__ , On __03/16/2007__ , Page __3__

sold drugs from 316 Atwood Street, Atlanta, Georgia. APD did not make a drug buy from HOLLIDAY at his townhouse on 01/14/2005.

HOLLIDAY described himself as 6'2", 225 lbs. HOLLIDAY's nickname is "RED". HOLLIDAY is a music producer for MDC RECORDS. MDC RECORDS is owned by RODNEY GRESHAM. HOLLIDAY also does landscape work. HOLLIDAY drives a white Pontiac Grand Prix and a black Coverlet Impala. HOLLIDAY resided at 316 Atwood Street from October 2004 thru January 20, 2005.

During the search, APD Officers also seized jewelry, televisions, and cash. HOLLIDAY had $2,000.00 cash in his apartment which was seized during the search. However, HOLLIDAY only received a receipt from APD for $1,011.00. SGT. STALLINGS told HOLLIDAY that they would not take any of HOLLIDAY's personal belongings if he gave them information on drug dealers. HOLLIDAY did not give the APD Officers any information concerning any drug dealer.

HOLLIDAY recalled Officer JUNNIER handwriting the affidavit for the search of his residence, 316 Atwood Street, while the other officers were conducting the search.

APD Officer FNU DAVENPORT was one of the officers assisting in the search of HOLLIDAY's apartment. HOLLIDAY remembered Officer DAVENPORT from DAVENPORT working security at CLUB 112. HOLLIDAY was a club member of CLUB 112 in 2003 and 2004.

HOLLIDAY did not file any type of formal complaint against SGT. STALLINGS, Officer JUNNIER, Officer DAVENPORT, or any of the other APD Officers conducting the search of his residence with APD, Internal Affairs.

**DOZIER-COA**
**00298**

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

-1-

FEDERAL BUREAU OF INVESTIGATION

Date of transcription  02/08/2007

    MARY MCCOY, date of birth ▬▬▬▬, social security account number ▬▬▬▬. MCCOY was interviewed at her residence located at ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. After being advised of the identity of the interviewing Agents and the nature of the interview, MCCOY provided the following information.

    MCCOY stated that she use to be addicted to drugs and that she would purchase and use illegal drugs. MCCOY advised she had never sold illegal drugs. MCCOY also stated that she has never allowed anyone to sell illegal drugs out of her house or around her house.

    MCCOY stated that on May 15, 2003, while MCCOY was residing at ▬▬▬▬▬▬▬▬▬▬▬▬▬ Atlanta, Georgia, ▬▬▬, the Atlanta Police Department served a search warrant on her residence. According to MCCOY the police did not find anything in her house nor did the police arrest MCCOY. MCCOY was kicked in the leg by one of the Police Officers. The officers did not leave a copy of the search warrant for MCCOY. MCCOY stated the only person living with her at that time was her 15 year old daughter. MCCOY has three sons, however they were all in jail during this time period.

    On May 19, 2003, MCCOY filed a complained on the officers that raided her house with the Atlanta Police Department.

    On or about June 30, 2003, the same Atlanta Police Officers raided MCCOY'S house a second time. The Officers on this occasion stated they had found cocaine in MCCOY'S house. MCCOY was arrested during this raid and charged with possession of cocaine. MCCOY stated she did not have cocaine in her house and she felt the officers had planted the drugs in her house. MCCOY'S charges were reduced to disorderly conduct.

    MCCOY stated that drug dealers did sell drugs in an abandon lot beside her house but not out of her yard.

    MCCOY received a letter on August 28, 2003, from the Atlanta Police Department Office of Professional Standards stating the investigation on the officers did not develop sufficient

---

Investigation on  02/08/2007  at  Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬    Date dictated ▬▬▬▬

by  SA Brian P. Davis
    SA Andrew J. Van Epps

DOZIER-COA
00299

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.