standard

medium-high

mid

moderate

med

normal

regular

mild

balanced

reduced

lite

light

minimum

small

tiny

brief

quick

fast

CONFIDENTIAL

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of _____Mary McCoy_____ , On _02/08/2007_ , Page __2__

information to prove or disprove the allegation of Police misconduct.

MCCOY provided the Agents with the following documents:

1. Affidavit and Application for a search warrant, from May 9, 2003.

2. Affidavit and Application for a search warrant, from June 30, 2003.

3. Accusation Fulton Superior Court.

4. City of Atlanta, Arrest Citation for MARY MCCOY.

5. Letter from APD Major W. HARRIS, Office of Professional Standards.

6. Atlanta Police Department Citizen Statement.

7. Final Disposition for MCCOY's charges.

DOZIER-COA
00300

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/19/2006

    DEIRDRE ORANGE, Black female, Date of birth ▬▬▬▬▬▬,
Home address ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, Cell phone
number ▬▬▬▬▬▬▬▬, was located and interviewed.  After being
advised of the official identity of the interviewing agent and the
nature of the investigation, she advised as follows:

    ORANGE is employed by the FULTON COUNTY MARSHAL'S OFFICE
and has attained the rank of a Corporal.  She works at the FULTON
COUNTY COURTHOUSE and has been so employed for the past three
years.

    In approximately April or May of 2006, ORANGE was working
at the courthouse when she met a black male named ALEX WHITE.
WHITE advised her that a sheriff had been to his house with some
papers and he (WHITE) was now looking for the Sheriff's Department
to straighten out his affairs.  ORANGE told WHITE where he needed
to go and he left.  Later that same afternoon, she saw WHITE still
in the building and they talked briefly.

    Subsequent to this date, ORANGE was working at a part-
time job at the UNIVERSITY HOMES complex.  Someone drove by in a
white car and beeped at her.  ORANGE waved at the vehicle and the
driver got out and approached her.  The driver turned out to be
WHITE.  He asked her if she remembered him.  He reminded her that
she had helped him at the courthouse.  She then recalled who he was
and they talked.  She realized that they had a mutual friend in
common.  After this date, ORANGE and WHITE formed a casual
friendship.

    ORANGE has never dated WHITE and has never met him for
lunch, dinner or drinks.  She is older than him and they talk on
the phone occasionally.  WHITE has never gone to the courthouse to
visit with ORANGE while she has been on duty.

    ORANGE was not aware if WHITE was employed or not.  She
had no idea that he was an ATLANTA POLICE DEPARTMENT (APD)
informant until she heard as much from the news.

    On Tuesday, November 21, 2006, at approximately 7:00pm,
ORANGE was at work at her part-time job and did not have her phone
turned on.  She later realized that WHITE had called her, so she

---

Investigation on   12/18/2006   at  Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬                          Date dictated   12/19/2006

by   SA MARY J. MANGRUM

**DOZIER-COA
00301**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

2a (Rev. 10-6-95)

nuation of FD-302 of ____DEIRDRE ORANGE_____, On 12/18/2006 , Page __2__

called him back.  He asked her if she had heard anything about some
Atlanta police officers having just been shot.  She told him yes,
that three officers had been shot while serving a warrant.  WHITE
then tried to tell her that they (the police) were trying to put
him in it.  She told him that if he was involved in the shooting
incident, then she did not want to know about it.  She hung up on
him and he tried to call her back.  WHITE told ORANGE that he was
at his mother's house.  ORANGE did not want to hear any details
about WHITE'S knowledge of or involvement in the police shooting
incident.

    Approximately one week later, which was on or about
November 29, 2006, ORANGE was watching the news and saw WHITE'S
picture on tv pertaining to the APD shooting incident.  It was at
this time that she realized WHITE was an APD informant.  She called
WHITE a couple of times and finally spoke to him.  She told him she
saw his picture on tv and she asked him why he allowed his face to
be on tv.  He said, "At least if they kill me, I die knowing I was
telling the truth."

    WHITE told ORANGE that after the shooting incident, some
APD Internal Affairs officers came by to pick him up.  They wanted
him to look at some pictures.  He rode around with them for a bit
and then jumped out of their car and called 911.  He told ORANGE
that for some reason, the police department could not locate the
911 call he placed that evening.

    WHITE kept trying to tell ORANGE about how the police
were trying to involve him in the shooting incident, but she did
not want to hear about it.  They thereafter had a regular
conversation and WHITE talked about going out to a strip club later
that night.

    ORANGE advised that this is the last time she has spoken
to WHITE.

DOZIER-COA
00302

CONFIDENTIAL 

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/15/2006

RHETT RAY, black male, was contacted at his residence,
▓▓▓▓▓▓▓, Atlanta, Georgia.  After being advised of the
identity of the interviewing Agents and the nature of the
interview, RAY voluntarily provided the following information:

RAY has lived at ▓▓▓▓▓▓▓ for approximately four
years.  His next door neighbor was KATHRYN JOHNSTON who lived at
933 Neal Street.  JOHNSTON was a private person and mostly kept to
herself.  She did not tolerate anyone trespassing on her property
and called the police on occasion to have them removed.  RAY never
noticed anyone hanging out at the back of 933 Neal Street.  Some
people used to walk through the backyard of JOHNSTON's property to
cut through from Jett Street but that stopped when the house
directly behind 933 Neal Street built a fence.

RAY was not at home when the shooting occurred on
November 21, 2006, but his wife was home.  She heard the shooting
and laid down on the kitchen floor.  RAY advised that his only
contact with the Atlanta Police Department (APD) was when he came
back to his home shortly after the shooting.  An APD officer told
him he could not reenter his house at that time.  RAY further
advised that no one from APD has spoken with him or interviewed him
since then.

---

Investigation on    12/14/2006    at Atlanta, Georgia

File # ▓▓▓▓▓▓▓                                    Date dictated  N/A

by  SA Matthew J. Ross
    SA Jacqueline L. Smith

**DOZIER-COA
00303**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

Dealer
1155 Simpson

DOZIER-COA
00304

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/04/2006

     FABAIN SHEATS, Inmate, was interviewed at the FULTON
COUNTY JAIL, 901 Rice Street, Atlanta, Georgia, 30381.  Also
present during the interview were YONNETTE BUCHANAN, Assistant
United States Attorney (AUSA), JON-PETER KELLY, AUSA, SHUKURA
INGRAM, Senior Assistant District Attorney, Fulton County, TRACY
BRUMFIELD, Investigator, Office of the Fulton County District
Attorney, CAMERON CRANDALL, Investigator, Office of the Fulton
County District Attorney, and ELIZABETH MARKOWITZ, Attorney, Fulton
County Public Defenders Office.  Prior to the interview, SHEATS
signed and dated a Proffer Agreement.  After being advised of the
identities of the interviewing Agents and the nature of the
interview, SHEATS provided the following information:

     SHEATS, a black male, provided his date of birth (DOB) as
███████████.  SHEATS resides with his grandfather, ███████████, at
██████████████████████████████████, telephone number ███████████.
SHEATS dropped out of school after the 9th grade.

     On Tuesday, 11/21/2006, at approximately 4:00pm, SHEATS
was arrested by ATLANTA POLICE DEPARTMENT (APD) Narcotics Officers.
SHEATS was standing on the street near 1155 Simpson Road when three
APD Narcotics Officers drove up, jumped out of their marked APD
vehicle and approached him.  SHEATS immediately hid the estimated
two grams of crack cocaine he had with him underneath his tongue.
APD Officer TESLER grabbed SHEATS by the neck and told him to open
his mouth.  TESLER also banged SHEATS' head against the security
bars causing him to bleed.  SHEATS accidentally swallowed the crack
cocaine when TESLER grabbed his neck.  The other two APD Officers
with TESLER were Officer JUNNIER, and Officer SMITH.  All three APD
Officers are white males.

     SHEATS was alone on Simpson Road selling crack cocaine
for approximately 30 minutes prior to being arrested by the TESLER,
JUNNIER, and SMITH.  SHEATS had only made two sales of crack
cocaine prior to his arrest.  SHEATS was standing on the side of
the street when the APD Officers arrested him.  SHEATS was not
making a sale when the APD Officers approached him.  One APD
Officer was wearing a jumpsuit while the other two Officers were
wearing blue uniforms.  None of the three APD Officers drew their
weapons during the arrest.

Investigation on    11/30/2006    at  Atlanta, Georgia

File # ████████████████████                    Date dictated    12/04/2006

by    SA Mary Jo Mangrum
      SA A. Brett Fears:abf

**DOZIER-COA
00305**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___ **FABIAN SHEATS** _____ , On **11/30/2006** , Page ___ 2 ___

      SHEATS did not know the names of the three APD Officers at the time of his arrest.  However, SHEATS recognized their faces because the same three APD Officers arrested him on two previous occasions.  SHEATS learned the names of the three APD Officers when he identified their photographs to APD Internal Affairs Investigators on Monday, 11/27/2006.

      SHEATS was being detained by TESLER, JUNNIER, and SMITH when an APD K-9 unit arrived.  TESLER and JUNNIER stayed with SHEATS while the K-9 Officer and SMITH searched a wooded area 40 to 50 feet away.  SMITH came back from the wooded area holding a plastic sandwich bag of marijuana. SHEATS told SMITH that the marijuana was not his.  SMITH replied, "Today it is".  SMITH told SHEATS that he was going to be charged with the marijuana.  SMITH went back into the wooded area and again came out with another plastic sandwich bag of marijuana. The marijuana in this bag was divided into several smaller bags of marijuana.  SMITH also pulled a bag of marijuana from his pants pocket and told SHEATS that this was dope from the previous day.  SHEATS felt that SMITH was implying that he was going to also charge SHEATS with the marijuana SMITH had in his pocket.

      SMITH also stopped two males who were walking on the opposite side of Simpson Road.  SMITH checked their identification and let them go.

      At approximately 5:00pm, SHEATS was placed in the marked APD vehicle.  JUNNIER drove the APD vehicle with TESLER sitting in the front passenger seat.  SHEATS sat behind JUNNIER and SMITH sat behind TESLER.  JUNNIER proceeded to drive on Simpson Road for approximately 5 - 6 minutes.  TESLER asked JUNNIER and SMITH if either of them had a camera so that they could take photographs of the marijuana.  JUNNIER pulled into the parking lot of a gay club, THE MARQUETTE, where SMITH got out and searched the trunk of the vehicle for a camera.  SMITH returned to the car with no camera but stated that he could take the photographs with his cellular telephone.  SMITH took the small bags of marijuana out of the plastic sandwich bag and began to photograph them with his cellular telephone camera.

      While sitting in the club parking lot, TESLER told SHEATS that he needed medical attention for the cut on his face.  SHEATS told TESLER that he did not want any medical assistance.  JUNNIER was on his cellular telephone most of the time talking in code.

**DOZIER-COA**
**00306**

# CONFIDENTIAL



FD-302a (Rev. 10-6-95)

---

Continuation of FD-302 of ___FABIAN SHEATS_____ , On 11/30/2006 , Page ___3___

      As it was beginning to get dark outside, JUNNIER, TESLER, and SMITH drove SHEATS from the club parking lot the FULTON COUNTY JAIL (FCJ) on Rice Street.  JUNNIER drove to the back of the jail and parked along the side of the entry gate.  SMITH got out of the vehicle and went into the jail while JUNNIER and TESLER remained in the vehicle with SHEATS.  JUNNIER told SMITH that he would give him 10 minutes.  TESLER said that SMITH would be back at 6:18pm and JUNNIER said that SMITH would be back at 6:03pm.  TESLER and JUNNIER seemed to be making a friendly bet as to how long SMITH would be in the jail.  SMITH returned to the vehicle at approximately 6:07pm carrying a folder and/or documents.  When SMITH returned he told JUNNIER and TESLER, " I told you I would get it."  SMITH also stated, " a person popped up on the screen and after talking with them I got it".

      JUNNIER told SHEATS that he was being arrested for possession of marijuana.  JUNNIER stated that he observed SHEATS repeatedly go back and forth to a wooded area to retrieve dope.  Neither JUNNIER, TESLER nor SMITH read SHEATS his Miranda Rights after they arrested him.

      JUNNIER, TESLER, and SMITH left the jail with SHEATS and drove to the fire station on Flower Street.  The Flower Street fire station is approximately eight minutes from the FCJ.  By this time it was completely dark and the street lights were on (approximately 6:15pm).  JUNNIER drove to the back of the fire station and parked.  Shortly afterwards, a black van carrying four or five other APD Officers pulled into the parking lot.  The APD Officers from the black van were wearing masks.  An APD K-9 unit also arrived.

      JUNNIER, TESLER, SMITH and the other APD Officers huddled together (stood in a circle) in the parking lot and had a meeting.  SHEATS remained in the APD vehicle.  After the meeting, JUNNIER and one of the APD Officers from the black van took SHEATS out of the APD marked vehicle and placed him in the back of the black van.  While in the back of the van, SHEATS had his legs secured with plastic leg cuffs and was told to lay down.  The APD Officers took SHEATS' boots off in order to put the cuffs on his legs.  SHEATS advised that they were at the fire station for approximately 20 minutes.

      While sitting in the fire station parking lot, SHEATS heard JUNNIER tell someone on his cellular telephone that, "we were going to send him in to make a buy".  SHEATS does not know who was

DOZIER-COA
00307

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___FABIAN SHEATS_____ , On 11/30/2006 , Page ___4___

    going to make a buy or where the buy was to occur.  SHEATS also recalled SMITH going inside the fire station to use the restroom.

    The black van left the fire station parking lot with SHEATS laying on the floor and SMITH sitting in the back.  There were also four black APD Officers wearing masks in the black van. All of the APD Officers had handguns. The black van traveled approximately five minutes before stopping.  When the black van stopped, all of the APD Officers jumped out.  After approximately two minutes SHEATS heard a rapid group of gunshots.  SHEATS did not know where the gunshots were coming from so he began to pray.  As SHEATS began to pray he heard another rapid group of gunshots. SHEATS then heard two or three individual shots.

    Approximately 30 - 45 minutes after the gunshots stopped, SHEATS stood up in the van and looked through the front windshield and observed uniformed APD Officers displaying the yellow crime scene tape.  Finally, an APD Officer (white/male) carrying a long gun and a flashlight opened the backdoor of the van.  The APD Officer shined the flashlight on SHEATS to make sure SHEATS was still cuffed.  Once the APD Officer confirmed that SHEATS was secure, he closed the door leaving SHEATS in the van alone.

    Approximately 30 minutes later, APD Officers opened the van door, took SHEATS out, and searched him.  One APD Officer put SHEATS over his shoulder and carried SHEATS to a white mini-van. SHEATS was placed in the white mini-van with three white male APD Officers and one black male APD Officer.  SHEATS sat in the mini-van for approximately 2 - 3 hours.  While sitting in the mini-van SHEATS heard one of APD Officers ask their Chief, "What do we do with him?"  The Chief replied, "Don't let him leave until you get a statement from him."  SHEATS also heard one of the APD Officers radio for a paddy wagon.

    SHEATS did not know the name of the street he was on but he knew that he was near Joseph Lowery Blvd and Simpson Road.  The mini-van was parked approximately three houses, on the opposite side of the street, from the house with the crime scene tape.  The black van was parked two houses from the house with the crime scene tape.

    SHEATS was transferred to the paddy wagon once it arrived. SHEATS was originally transported to the ATLANTA DETENTION CENTER (ADC), downtown Atlanta.  However, it was determined that SHEATS

DOZIER-COA
00308

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    __FABIAN SHEATS_____ ,On __11/30/2006__ , Page __5__

was arrested for possession of marijuana, a felony, so he was transported from the ADC to the FCJ on Rice Street.

SHEATS has never made a drug buy for the APD.  SHEATS has never made a drug buy for APD Officers JUNNIER, TESLER, or SMITH. SHEATS does not like APD Officers JUNNIER, TESLER, or SMITH because they arrested him before. SHEATS has never done any type of informant work for APD Officers JUNNIER, TESLER, or SMITH.

SHEATS was not interviewed by APD Officers on the day or evening of his arrest, 11/21/2006.

APD Officers JUNNIER, TESLER, and SMITH did not ask SHEATS where he purchased the marijuana from because they knew the marijuana was not his. SHEATS never volunteered any information to APD Officers JUNNIER, TESLER, or SMITH regarding drugs being located in any house.

SHEATS knows where Neal Street is located.  SHEATS' grandfathers house on ▬▬▬▬▬▬▬▬ is close to Neal Street. SHEATS has never sold drugs on Neal Street.  SHEATS only sells drugs in known drug areas on Simpson Road.  Neal Street is not known to be a drug area.  SHEATS does not know anyone who lives on Neal Street.  SHEATS does not know anyone who has a stash of drugs on Neal Street.

SHEATS sells crack cocaine and smokes marijuana.  SHEATS does not smoke crack.  SHEATS purchases his crack in Dekalb County. SHEATS pays for the crack up front.  SHEATS does not purchase any dope from people in the Simpson Road area.

SHEATS did not smoke any marijuana on the day he was arrested, 11/21/2006.  After SHEATS swallowed the crack on 11/21/2006, he began to sweat and feel a little light headed. SHEATS did not loose consciousness.

SHEATS knows an older black male named SAM.  SAM is in his 60's and lives in the Simpson Road area.  SAM smokes crack.

SHEATS does not know of any drug stash house or drug weight house in the Simpson Road area.

SHEATS does not know any snitch or informant working for APD Officers JUNNIER, TESLER, or SMITH.

DOZIER-COA
00309

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)



---

Continuation of FD-302 of ___FABIAN SHEATS___ , On _11/30/2006_ , Page _6_

     SHEATS did not have any food while he was in APD's custody.  SHEATS did not use the restroom or make any telephone calls while he was in APD's custody.

     SHEATS was shown a copy of a photograph of a black male. After reviewing the photograph SHEATS advised that he does not know the individual in the photograph nor has he ever seen the individual in the photograph (see FD-340).

     SHEATS was transported to CITY HALL EAST and interviewed by Investigator WILSON (white/male), APD Homicide and another APD Investigator (black/male), on Sunday evening, 11/26/2006.  WILSON typed SHEATS' statement on a computer.  SHEATS signed the statement typed by WILSON.

     SHEATS was interviewed again on Monday afternoon, 11/27/2006, by APD Internal Affairs Investigators LESTER (black/male), and another Investigator (black/male/bald).  This interview was video recorded.  SHEATS also signed a typed statement.

DOZIER-COA
00310

CONFIDENTIAL

Feds

**DOZIER-COA**
**00141**

## CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription     11/28/2006

       AARON R. JOSEPH, White male, SPECIAL AGENT (SA), BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (ATF), Atlanta Division, ██████████████████████████████, Atlanta, Georgia ███████, Work number ████████████, Cell number ████████████, was contacted and interviewed.  After being advised of the official identities of the interviewing agents and the nature of the investigation, he advised as follows:

       SA JOSEPH has been an agent with the Atlanta Division of the ATF since August 2003.  Prior to his employment with the ATF, he was a police officer in Charleston, South Carolina.

       Upon his assignment to the Atlanta Division, SA JOSEPH was assigned a training agent named SA ERIC DEGREE. ██████████

Investigation on   11/28/2006   at  Atlanta, Georgia

File # ██████████████████████                    Date dictated  11/28/2006

by   SA MARY J. MANGRUM     SA A. BRETT FEARS        MJM:mjm

**DOZIER-COA
00142**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    SA AARON R. JOSEPH        , On 11/28/2006 , Page 2

             Later this same evening, SA JOSEPH heard about a police shooting in Atlanta whereby three officers were shot and wounded and an elderly female was shot and killed.

             The next day, which was Wednesday, November 22, 2006, SA JOSEPH received a phone call from SA DEGREE. SA DEGREE said that he had just received a phone call from WHITE. The call was received between 9:30 and 10:00 am. WHITE told SA DEGREE that he had some information pertaining to the APD shooting incident. SA DEGREE and SA JOSEPH met with WHITE at approximately 12 noon. They met him in the vicinity of his mother's house, located near the Atlanta Penitentiary.

             WHITE told SA JOSEPH and SA DEGREE that he had received a phone call from APD OFFICER GREG JUNNIER, aka, "OLD JUNNIER", the previous day at approximately 5:00pm. OFFICER JUNNIER asked him if he would be available that evening to make a drug buy. WHITE said he would be available, but he never heard the buy from OFFICER JUNNIER until approximately 10:30pm that night. At this time, OFFICER JUNNIER called WHITE and gave him a description of the house he was supposed to have made the buy from and a description of the person he allegedly bought the drugs from. OFFICER JUNNIER told WHITE to go along with the story, even though WHITE had no knowledge of or participation in the alleged drug deal. OFFICER JUNNIER asked WHITE to lie about a drug deal he did not make.

             WHITE seemed very scared of the ATLANTA POLICE DEPARTMENT. He advised that this was not the first time that OLD JUNNIER had used his identity as an informant in an affidavit for a narcotics search warrant. He said that OLD JUNNIER had used his name in the past for drug purchases that he did not make. He went along with this in the past. He advised that APD had now been "burned" because a lady had been shot and killed.

DOZIER-COA
00143

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

---

Continuation of FD-302 of ___SA AARON R. JOSEPH_____ , On _11/28/2006_ , Page ___3___

WHITE told SA JOSEPH and SA DEGREE that he was scared. He told them that he trusted the "Feds", which is why he called them. SA JOSEPH and SA DEGREE told WHITE not to talk to anyone about the case and they took him back to the vicinity of his mother's apartment.

SA JOSEPH and SA DEGREE then returned to their office and talked to another agent, SA DANIEL ARREGETTA, about the allegation WHITE had made to them. They then discussed the matter with their supervisor, ROBERT LEVINGSTON III.

A few hours later on this same date (November 22, 2006), possibly between 2:00pm and 3:00pm, SA DEGREE received a phone call from WHITE. WHITE told him that he was in an APD police vehicle with two officers. One of the officers was OFFICER DUNCAN. WHITE did not recall the other officers name, but advised that he was a white male. SA DEGREE was concerned about WHITE'S safety and the fact that he was in a vehicle with two APD officers.

SA DEGREE shortly thereafter received another phone call from WHITE. WHITE told him that he had jumped out of the APD vehicle and had fled from the police officers because he was scared. WHITE said that he was at a BP Gas Station located at the intersection of Spring Street and North Avenue. SA DEGREE and SA JOSEPH drove to the BP Gas Station and located WHITE. They did a pat down search of him prior to putting him in their vehicle. They then drove him to their office on West Peachtree Street.

SA JOSEPH and SA DEGREE placed WHITE in an interview room and contacted the Internal Affairs Department of the ATLANTA POLICE DEPARTMENT. WHITE stated that the APD officers were trying to take him to their office to do a photo line-up and he got scared. A detective arrived to interview WHITE. He was a black male. Once the interview was concluded (sometime between 7:00pm and 9:00pm), SA JOSEPH and SA DEGREE escorted WHITE out of their building and walked with him to the police vehicle. WHITE left with the detective and was taken to the police department located at City Hall East.

SA JOSEPH received a phone call from WHITE on Friday morning, November 24, 2006. SA JOSEPH asked WHITE if he was ok. He said he was. He then asked to speak with SA DEGREE.

SA JOSEPH was never contacted by anyone from the ATLANTA POLICE DEPARTMENT regarding his association with WHITE.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

▌▬▬▬▬▬▬▬▬

Continuation of FD-302 of _____ SA AARON R. JOSEPH _____ _____ , On 11/28/2006 , Page    4

       SA JOSEPH personally knows OFFICER GREG JUNNIER through work related matters.  He is also familiar with OFFICER STALLINGS.

       SA JOSEPH advised that he had typed out some initial notes pertaining to the events discussed in this interview.  He advised that he would provide a copy of these notes to the interviewing agent.

DOZIER-COA
00145

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/28/2006

       ERIC J. DEGREE, Special Agent (SA), BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (ATF), was interviewed at the ATF office, 2600 Century Parkway, 3rd Floor, Atlanta, Georgia, 30345. Also present during the interview was ROBERT LEVINGSTON III, Group Supervisor, ATF.  After being advised of the identity of the interviewing Agents and the nature of the interview, DEGREE provided the following information:

       DEGREE has been an ATF Agent since May, 2000.  DEGREE works out of the ATF office located at ███████████████████, ████████████ Atlanta, Georgia, ██████, telephone number ███████████████. DEGREE has a cellular telephone number of ███████████.

[text redacted]

       On Wednesday, 11/22/2006, between 9:00am - 10:00am, WHITE called DEGREE and told DEGREE that he needed to talk.  DEGREE informed WHITE that they could meet later that afternoon.  Between 1:00pm - 2:00pm, DEGREE and JOSEPH picked-up WHITE on Boulevard, near the ATLANTA PENITENTIARY.  DEGREE and JOSEPH drove WHITE to a side street off Boulevard where they sat and talked.

Investigation on    11/28/2006    at Atlanta, Georgia

File # ███████████████                              Date dictated   11/28/2006

by    SA Mary Jo Mangrum
      SA A. Brett Fears:abf

**DOZIER-COA
00146**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of     ERIC J. DEGREE                              , On  11/28/2006   , Page    2

          WHITE began to talk about the APD shooting which occurred
on Tuesday night, 11/21/2006.  WHITE stated that he received
several calls from two APD Officers beginning Tuesday night.  The
two APD Officers calling WHITE were JUNNIER and J.R. SMITH.  The
APD Officers told WHITE that they executed a search warrant on
Tuesday night.  The APD Officers began to feed WHITE the story that
WHITE purchased drugs at a residence in Atlanta.  The APD Officers
gave WHITE a physical description of the residence as well as a
physical description of the person WHITE supposedly purchased the
drugs from.  WHITE told the APD Officers that he had never
purchased drugs from that residence.  The APD Officers told WHITE
that they needed him to cover for them on this one.  The APD
Officers further told WHITE that they would pay him for backing
their story. WHITE was adamant about not doing a drug buy at the
location described by the APD Officers.

          Afterwards, DEGREE and JOSEPH dropped WHITE off back on
Boulevard.  DEGREE told WHITE that they would contact him later.
DEGREE instructed WHITE not to answer the telephone if any of the
APD officers tried to contact him.

          DEGREE and JOSEPH returned to their office to further
investigate WHITE's information.  DEGREE researched news reports
relating to the APD shooting which occurred on Tuesday evening,
11/21/2006.  DEGREE also discussed WHITE's information with
SA DANIEL (GOOCH) ARRUGETTA, and Supervisory Agent LEVINGSTON III.

          At approximately 4:00pm, DEGREE called WHITE and told him
that they wanted to pick him up and bring him back to their office.
WHITE agreed to going back to the ATF office.  Five minutes later,
WHITE called DEGREE and said that he was with two APD Officers.
WHITE stated that the APD Officers wanted to show him some pictures
relating to the Tuesday night shooting.  WHITE put APD Officer
FIRST NAME UNKNOWN (FNU) DUNCAN on the telephone with DEGREE.
DUNCAN told DEGREE that they needed to show WHITE pictures
referencing the shooting.  DEGREE asked DUNCAN to bring WHITE by
the ATF office to complete some paper work when they were finished
with WHITE.

          WHITE called DEGREE approximately five more times while
he was with APD.  WHITE was trying to talk in code.  DEGREE was
able to determine that what WHITE was still with the two APD
Officers and that WHITE was scared.  On the final telephone call,
WHITE said that he jumped out of the APD car and ran to the BP gas

DOZIER-COA
00147

CONFIDENTIAL                           CONFIDENTIAL

FD-302a (Rev. 10-6-95)

■■■■■■■■■■■

Continuation of FD-302 of   ERIC J. DEGREE                           , On 11/28/2006 , Page   3

station on Spring Street and North Ave.  DEGREE does not know the
name of the second APD Officer that was with WHITE.

        DEGREE and JOSEPH drove to the BP gas station to locate
WHITE.  When DEGREE and JOSEPH arrived at the BP gas station they
saw WHITE standing beside the soda machine.  WHITE told DEGREE that
he ran from the APD Officers because he was nervous and scared.
WHITE also called 911 after he jumped out of the APD vehicle.
DEGREE and JOSEPH performed a precautionary "patdown" of WHITE
before placing him in their car and driving back to the ATF office
on West Peachtree Street.  Once they got back to the ATF office,
WHITE was placed in an interview room while the ATF contacted APD
Internal Affairs.

        Shortly afterwards, APD Internal Affairs Investigator FNU
LESTER arrived and was briefed about the allegations made by WHITE.
WHITE was moved to a conference room where LESTER began to
interview him.  Approximately one hour later DEGREE walked LESTER
and WHITE outside to meet LESTER's partner.  LESTER was going to
take WHITE to the APD.

        WHITE called DEGREE later Wednesday night, 11/22/2006.
DEGREE did not answer WHITE's telephone call.

        WHITE also called DEGREE on Thursday, 11/23/2006.  WHITE
told DEGREE that APD Internal Affairs finished interviewing him on
Wednesday evening and took him home afterwards.

        On Friday, 11/24/2006, WHITE called DEGREE for a status
report.  DEGREE informed WHITE that he was at work and that he had
not followed up with APD, Internal Affairs.  WHITE told DEGREE that
he had received more calls form JUNNIER and other APD Officers.



        DEGREE has executed a few search warrants with JUNNIER in
the past.  DEGREE knows JUNNIER to be a "stand-up cop".  DEGREE can
recognize some of the other Officers on JUNNIER's team by face but
he does not recall their names.

DOZIER-COA
00148

## CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ERIC J. DEGREE_____ , On 11/28/2006 , Page __4__

        DEGREE advised that he would provided writer with a copy of his notes pertaining to his interview and contact with WHITE from 11/21/2006 to the present.

DOZIER-COA
00149

CONFIDENTIAL

Judge

**DOZIER-COA**
**00150**

## CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   <u>11/28/2006</u>

Kim Warden, Fulton County Magistrate, was interviewed on November 28, 2006, at her office. Her office is located in Room 1605, behind Court Room #1A, in the Fulton County Justice Center, 185 Central Avenue SW, Atlanta, Georgia. Her office telephone number is (404)730-5396. She can also be reached on her Blackberry at ▇▇▇▇▇▇▇▇ or her personal cellular telephone at ▇▇▇▇▇▇▇ ▇▇▇▇. She provided the following information:

The warrant applied for by Atlanta Police Department Officer Jason R. Smith on November 21, 2006, with Docket Number E001232, was applied for electronically. Officer Smith used a computer at the Fulton County Jail and filled out an electronic form. He then connected on-line to the Fulton County Magistrate Office and telephoned the Magistrate Office to let the office know that he was making application. Judge Warden arrived fifteen minutes early for her regular 6:00 p.m. shift and, because the duty Magistrate was busy, she went to the computer in the Magistrate Office to rule on Officer Smith's application. The electronic warrant system has the capability for an electronic conference between the applying officer and the magistrate. It is similar to a teleconference. The Magistrate can read the affidavit and application on-line and then can speak to and see the officer.

After Judge Warden read Officer Smith's affidavit and application, she swore him in and asked him a few preliminary questions like what was his name and who was he employed by. She always also asks if there is any other information that she needs to know in addition to what is in the affidavit. Typically, if an officer provides relevant additional information verbally, she will tell them to add the additional information to the written affidavit. She does not recall any additional information that Officer Smith provided verbally except some information that relates to the no-knock approval. She recalls asking Officer Smith if the no-knock was for officer safety and he said no that it was to protect the drug evidence.

Specifically, Officer Smith did not say that the confidential informant was actually observed while making the drug buy at 933 Neal St. It is police policy that the confidential *informant is under surveillance at least until the door of the residence where the drugs are purchased.* Judge Warden assumed,

---

Investigation on   <u>11/28/06</u>   at <u>Atlanta, GA</u>

File # ▇▇▇▇▇▇▇▇▇▇                              Date dictated   <u>11/28/06</u>

by   Andrew Van Epps
     F. Joseph Robuck

**DOZIER-COA 00151**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Kim Warden_____ , On 11/28/06 , Page    2

based on how the warrant was written, that police policy had been complied with.  Regarding the no-knock request in the application, Judge Warden did not inquire as to how the confidential informant would have been in a position, based on the facts set forth in the affidavit, to know that "Sam," the individual allegedly selling drugs at 933 Neal St., carefully monitored his surveillance cameras.  Judge Warden's opinion is that the request for no-knock is sufficient on its face without further inquiry.

Officer Smith and his teammates from the narcotics team have applied for many warrants from Judge Warden, probably more than twenty and possibly as many as fifty.  She has never seen a hint of any false information in an affidavit and has not heard any rumors to that effect.  There was nothing about the particular affidavit in question that made her suspicious when she was ruling on it.  She is aware that false affidavits are a possibility, because years ago the REDDOG team had a bad reputation regarding their affidavits.  None of the people on Officer Smith's team were on that REDDOG team.

When evaluating warrant affidavits and applications, Judge Warden considers things like: is the confidential informant reliable, how recent was the undercover drug buy, what was obtained through the undercover buy, what is the experience of the officer and why should she rely on him.  In her opinion, Officer Smith's warrant was textbook.

Judge Warden has only a professional relationship with Officer Smith and his teammates.  She does not know any of them socially.  She has been a Fulton County Magistrate, part-time and full-time, for about ten years.  She was appointed by the State Court Judges.

Judge Warden never saw a hard-copy of the affidavit, application and warrant until after the shooting at 933 Neal St. There should be a copy of the electronic application including the electronic hearing in the Court Administrators Office.  Stefani Searcy is the Court Administrator.

Judge Warden pointed out that she recently heard Paul Howard in the news media say that citizens from the neighborhood around 933 Neal St. had just complained at a neighborhood meeting before the shooting that something had to be done about the drug activity in the neighborhood.

**DOZIER-COA
00152**

CONFIDENTIAL

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   01/10/2007

      RICHARD JOHN SPERL, K-9 Officer, Atlanta Police
Department RED DOG unit, East City Hall, Atlanta, Georgia,
telephone ▬▬▬▬▬ was advised of the identity of the
interviewing Agents by a display of credentials. He was accompanied
by attorney DON ENGLISH.  SPERL then provided the following
information:

      SPERL has been assigned to the RED DOG unit for the last
three years and has been a K-9 officer for the last year.  On
November 21, 2006, he was working a four to twelve-shift from East
City Hall.  Shortly after roll call at 4:00 p.m., Officer CARSON
received a call to 1143 Simpson Avenue.  SPERL believed that this
was about 4:30 p.m.  He followed CARSON in his own vehicle with his
drug dog "Arna" to the address to observe CARSON conduct a drug
search.  SPERL stated that JR. SMITH did a quick briefing when he
and CARSON arrived informing them of the general area that he
wanted searched, which included a pathway located near a wooden
fence.  During the course of the search, CARSON's dog "Chad"
alerted on a rock/piece of concrete near the path.  SMITH checked
under the rock/concrete and recovered a plastic bag containing
several small blue bags of what appeared to be marijuana.  SMITH
walked back to the marked vehicle where Detectives TESLER and
JUNNIER waited.

      CARSON continued to search the general area and SPERL
returned to his truck.  He heard "Chad" bark and walked over to the
area where they were searching.  CARSON had located a second bag of
drugs  beneath a board or door.  She handed the drugs to SPERL to
take to SMITH.  SPERL observed that the second bag contained yellow
or orange bags of marijuana and a small quantity of crack.  SPERLE
could not recall whether the crack was in individual bags or loose.
JR. SMITH returned to the area and SPERL gave him the bag of drugs.
CARSON explained where they had been located.   CARSON continued to
search the area with negative results.

      When CARSON finished searching, she went over to a store
located nearby.  SPERL walked over to the marked white patrol car
to speak with officers JUNNIER and TESLER.   SPERL spoke with
JUNNIER who told him that the suspect in the back possibly knew of
a location with a large amount of drugs.  SPERL told him that he
would be on duty until midnight.  He understood that JUNNIER was

Investigation on   1/8/2007   at Atlanta, Georgia

File #  ▬▬▬▬▬▬▬▬▬▬▬       Date dictated  NA

by   SA Brian Davis/
   SA Bret C. Aitchison:bca

**DOZIER-COA
00153**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of   RICHARD JOHN SPERL   , On 1/8/2007   , Page   2

indicating that the narcotics officers may need him for a search.
CARSON returned from the store and SPERL told her about the
potential search.  SPERL left at about the same time as CARSON.

SPERL drove around the Zone 1 area until 6:00 p.m. when
he spoke with TESLER.  TESLER informed SPERL that they were getting
a warrant and that they would meet for a briefing at the fire
station located on Simpson and Tiger at 6:30 p.m.   SPERL stated
that he was in the vicinity of 1575 Simpson Road where the RED DOG
team was located.  He took his dog out to run in the area.

SPERL attended the briefing at the fire station which
took place near the narcotics van.   TESLER and JUNNIER were there
along with the suspect that had been in their car earlier.  JR.
SMITH gave the briefing, noting the address on Neal Street and that
there was a handicap ramp in front.  SMITH described the color of
the house and noted the presence of surveillance cameras.   SPERL
noted that SMITH briefed the team not to enter by the handicap
ramp, but to go up a side set of stairs.  He was concerned about
the noise that the team might generate walking up a wooden ramp.
SMITH stated that there was supposed to be a large amount of
cocaine in the house and that the target was a man named "Sam."
SPERL recalled nothing in the briefing concerning the back door.
After the briefing, Sergeant STALLINGS asked SPERL if he would stay
near the narcotics van while the team executed the warrant.  He
wanted SPERL to keep an eye on the subject.   They then formed a
small line of cars and drove to the search address.  SPERL was the
last in line.

SPERL stayed near the van waiting outside while the team
went to the front.  He did not ever speak with the subject in the
van.  He could see the handicap ramp, but could not see the front
or rear doors.  Shortly after the team went to the front door,
SPERL heard shots fired.  He took cover near a vehicle located in a
neighbor's yard and waited.  SPERL then moved to a position near
the driveway and saw investigators coming out.  He observed one
person jump from the porch.  He later learned that this was GUERIN.
He saw that BOND and JUNNIER were bleeding.  SPERL stated that an
officer, probably Sergeant STALLINGS, calling a C-3 (officer down)
on the radio.  SPERL then called in a 25 (shots fired) and
requested paramedics and a crime scene unit.

The RED DOG unit that was at 1575 Simpson Road responded
within a few minutes.  SPERL believed that officers HAMBURGER and
RIVERS were part of the team which included four or five officers.

DOZIER-COA
00154

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of     RICHARD JOHN SPERL                              , On 1/8/2007      , Page    3

Someone (identity unknown) asked whether anyone had cleared the basement. TESLER, GUERIN and SPERL, along with RED DOG officer HAMBURGER and other RED DOG team members created a "stack" to enter the back door.  SPERL had obtained the ram and HAMBURGER had the Halligan tool to force entry.  SPERL believed that these were the tools used on the initial entry.  There was a metal security door on the outside which was difficult to breach.  SPERL used the ram to help seat the Halligan tool and they made entry.  He also was called once the team had entered to breach an internal door.  The interior was cluttered and it was difficult to walk through the basement.  The team was able to clear the basement quickly.

Once the basement was cleared, SPERL went back to the front of the house.  He did not observe anything further in back. He saw that the wounded officers were walking to an ambulance that had arrived.  SPERL spoke with Homicide Detective WILSON and gave him his statement.  He also was photographed at the crime scene van.  He assisted with an ID tech who fell into a hole in the yard. She injured her leg and a ambulance was called to transport. SPERL never entered the main section of the house.  SPERL left the scene at about 8:45 p.m.  He handled another call for a K-9 unit. He then went to the hospital to check on the well-being of injured officers SMITH, BOND and JUNNIER, but did not discuss the facts of the shooting.  He has since seen officers BOND and SMITH and inquired about their injuries, but has not discussed the shooting itself with them.

DOZIER-COA
00155

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  <u>RICHARD JOHN SPERL</u>  , On <u>1/8/2007</u>  , Page  <u>4</u>

        The following is personal information that, due to the
nature of SPERL's position, he asked be kept confidential:

        Name:              RICHARD JOHN SPERL
        DOB:               ███████████
        Address:           ████████████████████████
                           ████████████████████
        Telephone:         ████████████████

DOZIER-COA
00156

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

-1-

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/11/2006

        ALLEN ABERCROMBIE, Atlanta Police Department, Fugitive
Unit Investigator, work telephone number (404) 853-7775, was
interviewed at the Atlanta Police Department, 675 Ponce De Leon
Avenue, N.E., Atlanta, Georgia, 30308.  After being advised of the
identity of the interviewing Agent and the nature of the interview,
ABERCROMBIE, provided the following information.

        On November 23, 2006, ABERCROMBIE was working a 4:00am
through 12:00pm, shift.  ABERCROMBIE advised it was still morning
hours when ABERCROMBIE noticed investigator J.R. SMITH on the third
floor of the parking deck at the Atlanta Police Department.  SMITH
was driving a white SUV.  ABERCROMBIE stated he notice a black male
sitting on the passenger side of SMITH's vehicle.  SMITH told
ABERCROMBIE he had to come into the office to look at some
pictures.  ABERCROMBIE advised that SMITH and his passenger were
leaving the parking deck.

---

Investigation on    12/06/2006    at  Atlanta, Georgia

File #  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                          Date dictated  _____

by    SA Brian P. Davis

**DOZIER-COA
00157**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   12/13/2006

GARY ANTHONY SMITH, a black male, Date of Birth, ▉▉▉▉▉
▉▉▉▉▉, an Atlanta Police Department (APD) Investigator, telephone
number ▉▉▉▉▉▉▉▉▉, currently assigned to Narcotics Unit Team 1,
was advised of the purpose of the interview and the identity of the
interviewing agent. He was interviewed at the Atlanta FBI office.
Also present for the interview was Pamela Johnson, a Staff Attorney
for the International Brotherhood of Police Officers, 581 Simpson
Street, NW, Atlanta, Georgia, telephone number (404) 521-9043, and
APD Investigator Bobby Render. SMITH voluntarily agreed to be
interviewed and signed a consent form regarding a statement that he
had given to APD. He provided the following information:

He advised he has been a APD Police Officer for fourteen
years and in the Narcotics Unit since 2001. His normal work
schedule is 12 to 8 pm. Team 1 consist of the following
Investigators; Sergeant STALLINGS, GREGG JUNNIER, CARY BOND, NATHAN
LUCAS, JASON SMITH (JR), BRUCE TESLER, HOLLY BUCHANAN, and SMITH.

SMITH explained that on November 21, 2006, he was out of
the office working on another case when he was called by Sergeant
STALLINGS at or about 4:30 or 5:00 pm, to come back to City Hall
East and meet up with some other team members to assist in serving
a search warrant that JR and TESLER had obtained. When he
returned to City Hall East he geared up and jumped in the APD black
van with STALLINGS and CARY BOND. All the other guys on Team 1 had
already left for the rally point, which was the firestation at
Simpson Road and Flowers Road.

When they arrived at the firestation JR, TESLER, and
GREGG JUNNIER were already there, and in addition he noticed that
they had a subject in custody. They arrived at about 6:00 pm, or
just after, and it was already dark. STALLINGS instructed that the
perp get in the APD van, and SMITH got in the van to watch him.

SMITH stated that he talked with the perp. The perp did
not seem nervous. They talked about how the perp can protect his
identity after cooperating with the police. SMITH never learned
the name of this person. Also at about this time GEURIN and LUCAS
arrived at the firestation.

---

Investigation on   12/08/2006   at Atlanta, Georgia

File # ▉▉▉▉▉▉▉▉▉▉▉▉   Date dictated   12/13/2006

by   SA Michael L. Grant

**DOZIER-COA
00158**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

## CONFIDENTIAL

FD-302a (Rev. 10-6-95)

CONFIDENTIAL

Continuation of FD-302 of ___GARY ANTHONY SMITH_____ , On _12/08/2006_ , Page ___2___

       The van's side door was opened and everyone stood around the doorway as JR gave the search warrant briefing. He recalled JR showed warrant to Sergeant STALLINGS, and then JR briefed the details of the warrant; however, SMITH does not specifics, other than that there was surveillance cameras and how the team was going to approach the house. JR gave the warrant location as being 933 Neal Street and gave specific descriptions of the house. JR was reading from the warrant as he gave the briefing, such as the background on how they got on the 933 Neal Street address. As well as, that a "kilo of cocaine" had been seen in the house at around 3:00 pm. SMITH assumed that this information had been obtained from the perp in the van. SMITH advised that he has never seen the search warrant affidavit.

       The briefing that JR gave also included the assignments for each team member. SMITH explained that JR is person that is somewhat detailed when he gives his briefings. JR would usually read from the warrant and was sharp on his operation plans. He characterized JR as being methodical and did not want to make any mistakes. JR's briefing also were detailed because he was looking out for the safety of the team.

       SMITH explained that it was not unusual to have the perp at the location of the briefing. In addition, during the time of the briefing the perp was in the van and in a position to overhear the briefing.

       At the time of the execution of the search warrant SMITH was not aware exactly who provided information for JR to obtain the warrant. He thought it was the perp that was put in the van at the time of the briefing.

       SMITH explained that he provided a statement to APD regarding the execution of the search warrant on 933 Neal Street. His assignment was to be the shield man. He stated that he recalled that it took the team a longer period of time to open the burglar bar door and due to that, before breaching the front door they were yelling "Police Search Warrant. " After breaching the front door they again were yelling "Police Search Warrant." He explained that his APD statement provides more specific details. SMITH added that he yelled subject down, and he is the one that kicked the weapon away from the subjects hand.

DOZIER-COA
00159

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____ <u>GARY ANTHONY SMITH</u> _____ , On <u>12/08/2006</u> , Page ___ 3 ___

He is familiar with ALEX WHITE.  He knows him to be a confidential source for APD.  When ALEX for first signed up as a source, SMITH went out with ALEX and some of the team members a few times, but SMITH did not have a good opinion of ALEX.  He felt that ALEX is shady.  ALEX primarily worked with JR, TESLER, and JUNNIER.

SMITH advised that he sometimes worked with JR, TESLER, and JUNNIER.  He would do some of the spotting, as well as operate as a undercover officer and make drug purchases.  After he would do sit on a location and spot a drug transaction or make a buy the other team members would come in to make the takedown.

DOZIER-COA
00160

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   05/25/2007

       Major STANLEY L. SAVAGE, Atlanta Police Department (APD), Communications Section Commander, office (404) 817-2370, mobile ▆▆▆▆▆▆▆▆▆▆▆▆, was contacted by Supervisory Special Agent (SSA) Michael McKinney via telephone on May 30, 2007, at approximately 3:15pm.

       SAVAGE was advised of the identity of the interviewing agent and the nature of the interview, which was to discuss SAVAGE's tenure as a Lieutenant in the Narcotics Unit. SAVAGE confirmed that his information would be voluntary and that he was not being compelled by APD to speak with the interviewing agent.

       SSA McKinney asked SAVAGE when he would be available to meet in person, and SAVAGE then suggested having an initial discussion via telephone. The interviewing agent advised SAVAGE that it was a preference to meet in person to conduct the interview, and SAVAGE responded by stating that he would provide an overview by telephone but he would be happy to meet in person to discuss additional details. SAVAGE then provided the following information:

       SAVAGE joined the APD in 1980 and was assigned as the Lieutenant in Narcotics from 1997 - 2000. He left Narcotics and worked in Larceny & Major Fraud and then in Accreditation until 2002, at which time he was promoted to Major. SAVAGE is currently in charge of the Communications Section, which includes the 911 Communications Center and the Validation Unit, among other units.

       SAVAGE stated that he has never worked with Arthur Tesler and Jason R. Smith, but Gregg Junnier was transferred to Narcotics during the period that SAVAGE was there. SAVAGE recalled that Junnier had a good reputation. Also assigned to Narcotics was Sergeant Pete Stallings.

       SAVAGE stated that "QPAI" was the evaluation system utilized during the period that he was in Narcotics, and the monthly "watch average" was the basis for determining the numbers that had to be met for each officer. This was not finite, because various circumstances caused the average to spike in one direction or another. For instance, if several officers were in training, the watch average for the month would be lower.

---

| Investigation on | 05/22/2007 | at | Atlanta, GA | |
|---|---|---|---|---|

| File # ▆▆▆▆▆▆▆▆ | | | Date dictated | 05/25/2007 |
|---|---|---|---|---|

by  SSA Michael McKinney

**DOZIER-COA
00161**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Lieutenant Stanley Savage_____ , On 05/30/2007 , Page    2

          While SAVAGE was in Narcotics, there were approximately
five teams in the unit, not including Weed & Seed, and a Sergeant
and six or seven detectives were assigned to each team.  SAVAGE had
the teams covering zones and this sometimes created conflicts with
the work of the Field Investigative Teams (FIT) assigned to each
zone.

          SAVAGE stated that he made sure the Narcotics teams
focused on community related issues in addition to conducting
traditional enforcement related issues.  This meant officers such
as Sergeant Stallings were involved in both enforcement and "Weed &
Seed" issues.  SAVAGE did things such as getting Narcotics
Investigators involved with children's groups and they initiated a
camp for kids.  SAVAGE advised that he believes that enforcement is
not the only way to get drugs off the street, and a presence within
the community is just as important.

          SAVAGE advised that they also conducted impact details
with the Traffic Unit and Fulton County Sheriff's Office in order
to demonstrate a visible presence.

          According to SAVAGE, the allegations that officers cut
corners in order to meet quotas is clearly an effort to deflect
blame and responsibility among the individuals who have been
involved in misconduct.  SAVAGE did not recall any instances of
corruption, misconduct, illegality, or complaints from the people
who worked for him that would justify blame against him.  He simply
was not aware of any wrongdoing.

          SAVAGE stated that his management style involved
providing updates to his personnel through staff meetings with the
Sergeants.  He also occasionally went out on the street with the
teams in order to observe their behavior.  SAVAGE believes the
officers acted differently when he was present, by following the
rules much more closely, but he had no reason to suspect they were
breaking the rules when he was gone.

          SAVAGE advised that it is also unfortunate that members
of Narcotics are using a supposed lack of experience as
justification for very bad decisions.  SAVAGE stated that Narcotics
has traditionally been a unit where people are sent in order to get
experience, an initial stop before moving to other investigative
units.  They arrive in Narcotics knowing the basics concerning
investigations and informant development.  If successful, they

DOZIER-COA
00162

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Lieutenant Stanley Savage___ , On _05/30/2007_ , Page ___3___

> develop street experience and an informant base that will help them
> in more difficult assignments, such as Homicide or Major Fraud.
> Most of the officers in Narcotics are well trained, but these
> particular officers apparently did not use ethics, common sense,
> and discretion in conducting their affairs.

> Therefore, SAVAGE advised that he disagrees with any
> officer who says pressure from management compelled them to break
> the rules.  SAVAGE was not aware nor did he condone any criminal
> misconduct involving officers under his command while he was
> assigned as the Lieutenant in Narcotics.  He is unaware of officers
> lying on reports and affidavits, padding vouchers, using
> unregistered sources, and/or other administrative violations.

> SAVAGE advised that he would be happy to meet in person
> to further discuss his tenure as the Lieutenant in Narcotics from
> 1997 - 2000.

DOZIER-COA
00163

CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/04/2006

SCOTT E. DUNCAN, Detective, Atlanta Police Department
Narcotics, City Hall East, Atlanta, Georgia, (8-4 shift), cell
phone ▬▬▬▬▬▬ was interviewed at the offices of the FBI
Atlanta.  He was advised of the identity of the interviewing Agent
by a display of credentials and informed of the nature of the
interview.  He then provided the following information:

DUNCAN was not involved in either the search, shooting or
associated investigation at 933 Neal Street on  November 21, 2006.
He reported to work on November 22, 2006 at about 10:00 a.m. or
10:30 a.m.  He was directed by Major DAVIS and Lieutenant GIBBS to
go with Sergeant KEEBLE to 933 Neal Street to re-search the house
for any relevant documents or other evidence.  He and KEEBLE went
to the house, arriving at about 11:30 a.m. There was a marked unit
from Zone 1 standing by at 933 Neal Street.  KEEBLE called the
Homicide investigators at about 11:40 a.m. to determine whether he
and DUNCAN could enter the premises.   The Homicide investigator
said it was OK to enter.  DUNCAN and KEEBLE searched the house,
including the attic and basement until leaving at 1:10 p.m.  They
had previously been told that Detectives GRIFFIN and SCHIFTBAUER
had found marijuana near the basement door.  DUNCAN and KEEBLE
found nothing of evidentiary value during their search.

Upon arriving at East City Hall, DUNCAN continued
investigation, conducting a search of police records for booking
photos of anyone using a Neal Street address.  He obtained three
pages of photos.

Lieutenant GIBBS then instructed DUNCAN to contact a
confidential informant of Officer JR. SMITH regarding the events
the previous day.  DUNCAN obtained the telephone number of the CI
(ALEX WHITE) from JR SMITH which was ▬▬▬▬▬▬.   DUNCAN
contacted the CI at about 3:00 p.m. and arranged to meet with him.
WHITE gave DUNCAN directions to SAWTELL and RICHARD street and a
description of what he was wearing (Blue Jeans, Black Shirt).
DUNCAN told WHITE that he had photos that he wanted him to look at.
Fugitive Unit Detective AURELIO FELEBRITY accompanied DUNCAN and
they met with WHITE sometime between 3:15 and 3:30 p.m.  When he
got into the area of SAWTELL, he called WHITE on his cell phone.
They picked him up and he got into the back seat.  They drove to
Lakewood and Margaret and went to the BUCKHEAD TAVERN parking lot.

---

Investigation on    12/01/2006    at  Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬▬▬▬▬                                Date dictated   NA

by   SA Bret C. Aitchison/bca

**DOZIER-COA
00164**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____Scott Duncan_____ , On 12/01/2006 , Page ___2___

DUNCAN asked WHITE to describe the circumstances regarding the controlled buy. DUNCAN took notes on the back of one of the photo sheets. WHITE provided the information which DUNCAN put into his report which he prepared on 11/22/2006. DUNCAN provided a copy of this report to the interviewing Agent which was reviewed with him. It is attached and made a part of this report.

DUNCAN did not show WHITE the photos which he had prepared at this point. He drove WHITE to 933 Neal Street in order to locate the individual known as "SAM." WHITE could not identify anyone as "SAM." During this time, DUNCAN received a call from Lieutenant GIBBS notifying him that a photo line-up was being created and that WHITE was to remain with DUNCAN until it was completed. WHITE was on the telephone during this time and said he was speaking with ATF Agent E. DEGREE with whom he had previously scheduled a meeting. DUNCAN knew DEGREE from a previous case, so called him and told him that WHITE was meeting with him and that he would contact DEGREE when finished so that WHITE could then meet with DEGREE.

DUNCAN was contacted by SERGEANT KREHER of the Atlanta Police Fugitive Unit and asked to meet him at 675 Ponce De Leon and have WHITE look at a line-up to identify the suspect from 933 Neal Street. He informed WHITE that they were going to look at some pictures and WHITE, who was on the phone with ATF Agent DEGREE relayed the information to DEGREE.

WHITE asked DUNCAN, in reference to Narcotics Team One "if they were OK," informing DUNCAN he had seen the news. DUNCAN told him they would be OK.

When DUNCAN stopped at a red light at North Avenue and Spring Street, WHITE fled from the car saying that "Eric was behind them and told him to get out." WHITE ran into the VARSITY restaurant and evaded DUNCAN and FELIBERTY. They searched for him, but were unable to locate WHITE. DUNCAN called WHITE several times and eventually contacted him. WHITE claimed he was scared. DUNCAN told him that he wanted him to look at some photos. WHITE agreed to return to the car, though he acted as if he didn't trust DUNCAN. He didn't return to the car and would not return DUNCAN's calls.

Note: DUNCAN advised that he had returned to the VARSITY and obtained the video of November 22, 2006. He had reviewed the video and identified himself and FELIBERTY entering at 4:21 p.m., but had not been able to identify WHITE entering the VARSITY. He

DOZIER-COA
00165

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    <u>Scott Duncan</u>    , On <u>12/01/2006</u> , Page   <u>3</u>

stated that he would provide the videos to the interviewing Agent
and would attempt to locate the segment with WHITE.

      DUNCAN contacted Sergeant KEEBLE and Lieutenant GIBBS
regarding the situation. He tried to contact ATF Agent DEGREE, but
was unable to reach him. DUNCAN was informed that Detective
JUNNIER also tried to contact WHITE, but hadn't been able to reach
him with his messages going unreturned.

      DUNCAN advised that no-knock warrants were common in drug
searches, particularly when there was evidence easily disposed of
or guns out on the table within easy access. DUNCAN advised that
he recalls burglar bars on the front and back doors of 933 Neal
Street. He did not recall if there was any alarm system or video
surveillance in place.

      DUNCAN provided copies of his police report, the photos
he had taken to show WHITE (which included notes he had taken when
speaking with WHITE), and a supplementary report regarding his
investigation. Copies of all these documents are attached and made
a part of this report.

**DOZIER-COA
00166**

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Scott Duncan_____ , On _12/01/2006_ , Page __4__

        The following is the home address of Detective DUNCAN
which he asked that, for professional purposes, remain highly
confidential.

        Name:                SCOTT E. DUNCAN
        Home Address:

        Telephone:

DOZIER-COA
00167

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   12/12/2006

SCOTT DUNCAN, Detective, Atlanta Police Department Narcotics Unit having previously been made aware of the identity of the interviewing Agent provided the following information:

DUNCAN had previously obtained the surveillance video from TERRY BROOKSHIRE at the VARSITY RESTAURANT on 12/01/2006 which depicts events on 11/22/2006.  DUNCAN had reviewed these videos and determined that he (DUNCAN) was depicted at 16:21.  He had reviewed the video before and after this time and was not able to identify ALEX SMITH in the video.

On 12/06/2006, DUNCAN had obtained the security camera surveillance CD-ROM from ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■ for review of events from 11/22/2006.  DUNCAN stated that he had reviewed the CD-ROM and identified his car, a gold Taurus, entering the parking lot at 3:18 p.m.  He stated that he had backed his car up after entering the lot, which had put it out of the camera surveillance range.  DUNCAN stated that he had identified his car leaving at 3:38 p.m.  DUNCAN stated that this was the period when he and AURELIO FELEBRITY had just picked up ALEX SMITH and had gone to ■■■■■■■■■■■■■ located at Lakewood and Margaret Streets and obtained the initial information regarding the buy at 133 Neal Street.  ■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■

DUNCAN stated that sometime during the week of 11/27/2006, he had gone to the BP station located across the street from the VARSITY restaurant to determine whether ALEX SMITH was depicted in their surveillance tape.  He had spoken with an employee at the BP station (name unrecalled) and determined that there was no surveillance tape showing ALEX SMITH.

*DUNCAN provided two silver MAXELL CD-R discs from the VARSITY dated 11/22/2006.* ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Investigation on   12/11/2006   at Atlanta, Georgia

File # ■■■■■■■■■■■■■■■■■■         Date dictated   NA

by   SA Bret C. Aitchison/bca

**DOZIER-COA 00168**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   06/14/2007

        IVANT TANNER FIELDS was interviewed at his current
residence, ████████████████████████████████████. After
being advised of the identity of the interviewing Agent and the
nature of the interview, FIELDS provided the following information:

        FIELDS, a black male, provided his date of birth (DOB) as
████████. FIELDS has a home telephone number of ████████████ and
a cellular telephone number of ████████████. FIELDS, an ordained
and licensed minister, is the Associate Minister at Greater
Travelers Rest Church located in Decatur, Georgia. FIELDS became a
born again Christian in 2001.

        FIELDS was hired as a Police Officer by the ATLANTA
POLICE DEPARTMENT (APD) in April, 1990. FIELDS was assigned to
Zone 3 as a Patrolman after completing APD's six month officer
training program. FIELDS worked in Zone 3 from 1991 thru 1998. In
1995, FIELDS was assigned to a plain clothes unit in Zone 3 called
the Field Investigative Team (FIT). In January, 1998 FIELDS was
promoted to Detective in the Narcotics Unit. In February, 2003
FIELDS was transferred from the Narcotics Unit to Zone 4. FIELDS
worked in Zone 4 for one month before being promoted to Sergeant.
In March, 2003 FIELDS transferred back to the FIT in Zone 3.
FIELDS retired from the APD in May, 2005.

        The Narcotics Unit supervisor when FIELDS joined the unit
in January, 1998 was Lieutenant STANLEY SAVAGE. SAVAGE was the
Narcotics Unit supervisor from 1998 thru 2000. Lieutenant ERNEST
FINLEY replaced SAVAGE in 2000 and remained the Narcotics Unit
supervisor thru 2003. FIELDS' direct supervisor in 1998 was
Sergeant VICK LAWSON. LAWSON was FIELDS' direct supervisor for 6 -
8 months before being replaced by Sergeant WILBERT STALLINGS.

        In 1998 the Narcotics Unit was comprised of four teams.
Each team consisted of one Sergeant (direct supervisor) and
approximately six Detectives. A Lieutenant was the overall
supervisor of the Narcotics Unit. From 1998 thru early 2002 FIELDS
worked on a Narcotics team which consisted of Detectives DOUG
LITTLE, J.D. STEVENS, JAMES POSTEL, D.R. DUMAS, and FIRST NAME
UNKNOWN (FNU) GILMORE. In 1999, STEVENS was transferred to
Homicide and was replaced with GREGG JUNNIER. In January, 2002
LITTLE left the unit and was replaced with ALLEN AMBERCROMBIE

---

Investigation on   06/13/2007   at Atlanta, Georgia

File # ████████████████████████                Date dictated   06/14/2007

by   SA A. Brett Fears:abf

**DOZIER-COA**
**00169**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___IVANT TANNER FIELDS_____ , On 06/13/2007 , Page ___2___

(phonetic).  In February, 2003 FIELDS transferred to Zone 4, POSTEL
transferred to the Burglary Unit, DUMAS transferred to the Homicide
Unit, AMBERCROMBIE transferred to the Fugitive Unit, and GILMORE
transferred to the AUTO THEFT Unit.

The 9 arrest and 2 searches (9 & 2) quota was implemented
by Lieutenant FINLEY.  Each Narcotics Unit Detective was required
to produce a minimum 9 arrest and execute 2 search warrants each
month.  FINLEY was all about having high numbers.  The 9 & 2 quota
was not a written policy but it was a communicated and understood
policy.  The 9 & 2 quota was only the minimum of what FINLEY
expected from each Detective.  FINLEY stressed that each Detective
should produce more than the 9 & 2 minimum.  FINLEY had the same
high numbers mentality when he was a Sergeant in the Narcotics
Unit.  Whereas most teams would have 50 arrest and execute 5 -10
search warrants per month, FINLEY'S team would have 100 arrest and
execute 13 - 15 search warrants per month.  The incentives for each
Detective to achieve the 9 & 2 include;  good ratings on
performance reviews, staying in good standing with FINLEY, not
being transferred, and just keeping your job.

FINLEY unsuccessfully tried to get STALLINGS transferred
off of the Narcotics Unit because STALLINGS had low arrest and
search numbers.  FINLEY's efforts to have STALLINGS transferred
were rejected by Deputy Chief BROOKS.  Another Narcotics Unit Team
Sergeant who is close to BROOKS, KERY MILLS, was also instrumental
with keeping STALLINGS in the Narcotics Unit.

Investigative Leads in the Narcotics Unit are distributed
to the Detectives by the Team Sergeant via a lead sheet.
Investigative Leads concerning suspected drug houses are normally
received from community citizens.  FIELDS primarily used a pick-off
and/or a confidential informant (CI) to verify the validity of
drugs being sold or stored in a house.  A pick-off is when FIELDS
would observe an individual leave a suspected drug house and have
that individual stopped by a uniformed APD Officer.  The uniformed
APD Officer then tries to determine of the individual has drugs on
their possession and if the drugs were purchased at the suspected
drug house.  FIELDS also utilized CI's to make drug buys from
suspected drug houses.  In some instances, FIELDS would accompany
the CI on the drug buy or make the drug purchase himself.
If FIELDS was not with the CI during the drug buy he would be close
enough to observe the CI.  FIELDS always searched the CI prior to
making a drug buy as well as after the CI made the drug buy.  When
FIELDS obtained probable cause that drugs were being sold from a

DOZIER-COA
00170

**CONFIDENTIAL**

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___IVANT TANNER FIELDS_____ , On 06/13/2007 , Page __3__

residence, FIELDS prepared and presented an affidavit before a
municipal court Judge to obtain a search and/or arrest warrant.

In order to request a no knock search warrant, FIELDS had
to have knowledge of a weapon being inside the suspected drug
house. A no knock search warrant could not be obtained from a
Judge strictly based on information that drugs are in a residence.

The APD Narcotics Unit did not have a written manual
describing how Detectives should obtain search or arrest warrants.
All new Detectives to the Narcotics Unit learned the process of
obtaining search and arrest warrants from senior/seasoned
Detectives. Newer Detectives also learned investigative techniques
from the senior Detectives.

All CI's used by the Narcotics Unit are approved by the
supervising Lieutenant. A CI can either be an official CI or an
unofficial CI. An official CI is a paid informant that has been
documented by APD. The official CI will normally be utilized to
make several drug buys over a long period of time. An unofficial
CI is an informant that is not paid and is used to make drug buys
or provide drug related information on a short term basis. The
unofficial CI is normally in the process of negotiating a plea
agreement with the District Attorneys Office. The unofficial CI is
generally trying to get their charges dropped, probation dropped or
receive a lessor charge.

FIELDS and other Narcotics Unit Detectives were provided
with $300.00 at any given time for the purchase of drugs. FIELDS
paid his CI's $30.00 for the purchase of crack and $20.00 for the
purchase of marijuana. The CI's had to sign a receipt for the
money given to them to purchase drugs and for the money they were
paid. A CI could get more money based on the quantity of drugs
found in a house after the execution of a search warrant.

After the Atlanta motorcycle shop shooting in December,
1995, FIELDS and other FIT officers received a one week tactical
training class at the Atlanta Police Academy. This is the only
advanced training FIELDS has received from APD.

The APD allowed Officers to work extra jobs. In order to
receive permission to work an extra job, each Officer had to
complete and extra job permit and have it approved by any
supervisor. The extra job permit needed to be updated annually.
APD Officers were not allowed to work over 20 hours per week on

**DOZIER-COA
00171**

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

---

Continuation of FD-302 of ____IVANT TANNER FIELDS_____ , On 06/13/2007 , Page ___4___

their extra job.  APD Officers were also not allowed to work extra
jobs at strip clubs.  FIELDS never worked any extra jobs.

Since the 11/21/2006 KATHRYN JOHNSTON shooting, FIELDS
has been providing spiritual counseling to STALLINGS.  FIELDS talks
to STALLINGS on a regular basis.  They rarely talk about the
shooting incident.  FIELDS has been helping STALLINGS strengthen
his relationship with Jesus.  FIELDS described STALLINGS as a good
supervisor and friend.

FIELDS has also provided spiritual counseling to JUNNIER
since the 11/21/2006 JOHNSTON shooting.  FIELDS does not talk to
JUNNIER as frequently as he does STALLINGS.  FIELDS only concern is
helping JUNNIER with his spiritual walk with Jesus.

FIELDS has never seen any APD Officer plant drugs on an
individual, in a residence, in a vehicle or any other location
whatsoever.

FIELDS has no knowledge of any APD Officer making false
statements on any affidavit in order to obtain a search warrant or
arrest warrant.

DOZIER-COA
00172



CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/22/2006

        CONSTANCE M. CARSON, a.k.a. Connie Carson was advised of
the identity of the interviewing Agents by a display of credentials
and informed of the nature of the interview.  She then provided the
following information:

        CARSON is an Atlanta Police Department K-9 officer and
has been employed by the department over twenty years.   She has
been a K-9 officer for the last twelve years.  CARSON was
interviewed at the RED DOG unit located at East City Hall, Atlanta,
Georgia where she is assigned.

        **933 NEAL STREET SEARCH**

        CARSON was on-duty at East City Hall on the four to 12
shift when she heard the "officer down" call at around 7:00 p.m. on
11/21/2006.   CARSON went with her dog "Chad" to 933 Neal Street.
There were many police officers already at the scene when she
arrived.  She recalled seeing Officer SMITH standing against a
police car and looking at his rights side where he had been
injured.  Officer GREG JUNNIER, who had also been wounded, was
standing in the yard talking to someone on the telephone.  BUNN and
Lieutenant MITCHELL had already arrived and the officers were
trying to get an ambulance close to the residence to pick up the
injured officers.  They were not able to get close, so a stretcher
was sent from the ambulance for SMITH.   The others walked down to
the ambulance and CARSON believed that all were loaded on the same
vehicle.  Once the injured were loaded, the area was roped off.

        CARSON went to the perimeter and waited to do the search.
K-9 Officer SPEARLE was also in the area near Joseph Lowery (J. Lo)
and Neal Street.   SPEARLE had been originally scheduled to do the
evidence search, but CARSON knew that she and her dog would be
called to eventually search.   She stated this was the procedure
when the original search team was involved in a shooting.

        CARSON recalled that the RED DOG team had already
arrived on scene and had breached the back door of 933 Neal Street.
CARSON was on stand-by.  She went to get some dinner between 10:00
p.m. and 11:00 p.m.  She came back and the search was not going to
be conducted yet.  SPEARLE, who would have been off-shift at 10:00

---

Investigation on    12/19/2006    at  Atlanta, Georgia

File #  ▬▬▬▬▬▬▬▬▬▬▬                    Date dictated  NA

        SA Brian Davis/                                           **DOZIER-COA**
by   SA Bret C. Aitchison:bca                                         **00173**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ CONSTANCE CARSON _____ , On 12/19/2006 , Page ___ 2 ___

p.m. went to get something to eat.  CARSON went back to East City
Hall around midnight.

Around 3:00 a.m. on 11/22/2006, CARSON received a call to
return to the scene and conduct the search.  She drove back, waited
around 30 minutes, then went to do the preliminary walkthrough with
Sergeant SPARWATH who told her they were looking for a box with a
kilo of cocaine.  She checked the area to identify broken glass or
things that might be dangerous or distracting (other animals) to
her dog.  She recalled turning off the television and doing a
cursory search of the victim's room, the upstairs area and the
basement.  She recalled observing some glass near an interior door.

CARSON then got "Chad" and began the search upstairs.
They were accompanied by Officer SCHIFFBAUER.  They searched the
victim's room, a second bedroom, the bathroom and the kitchen
thoroughly, with no results.  CARSON then went downstairs to the
basement and was still accompanied by SCHIFFBAUER.  "Chad" began
alerting "high" and climbing a little bit.  CARSON told
SCHIFFBAUER and the other officers present (she could not recall
exactly who else beside SCHIFFBAUER was present) to search up high
near the ductwork or vents.  Then, Chad alerted near the bottom
right side of the basement doors.  CARSON stated that he was
pawing and sniffing at what was determined to be three or four bags
of marijuana.  Officer SCHIFFBAUER or the other officer present
collected the evidence.

CARSON and "Chad" then went back upstairs and searched
the living room with negative results.  An officer weighed the
marijuana.  CARSON obtained the Case Number from one of the
officers present and at about 4:00 a.m., completed her shift.

### 1143 SIMPSON AVENUE SEARCH

CARSON stated that she had been the K-9 officer present
at 1143 Simpson Avenue, Atlanta, Georgia earlier in the day.  She
began her shift at 4:00 p.m. at East City Hall.  She received a
call to go to 1143 Simpson Avenue at about 4:30 p.m.  CARSON stated
that, based on traffic during that time period, she estimated that
it would take 10 to 15 minutes to travel to 1143 Simpson.  Officer
J.R. SMITH showed her an area near a small convenience store that
he wanted searched for drugs.  "Chad" did not immediately hit upon
any drugs and J.R. SMITH was on the phone with someone who was
providing direction.  CARSON searched an area near a pathway and
located a bundle of drugs near some pieces of broken concrete.  She

DOZIER-COA
00174

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____CONSTANCE CARSON_____ , On _12/19/2006_ , Page ___3___

described this bundle as a large, clear bag containing little blue bags of marijuana. She continued to search and "Chad" hit on an old white door which was located across the path. CARSON looked under the door and saw another bundle. This was a large, clear bag containing several smaller, orange bags of marijuana. Among the bags of marijuana was what appeared to be crack cocaine. Officer SPEARLE, who was also present, took this bundle to J.R. SMITH. SPEARLE advised CARSON that they (SMITH and TESLER) were going to try to flip the guy (referring to FABIAN SHEATS). CARSON had obtained TESLER's cell phone number prior to departing. CARSON estimated that she had spent 10 to 15 minutes at 1143 Simpson before departing at about 5:00 p.m.

On 11/22/2006, CARSON called TESLER to determine the amount of marijuana recovered. He stated that there had been 53 grams. She asked him how much crack cocaine and he told her that it had been "flex" which is fake crack cocaine.

CARSON stated that she has spoken to the injured officers to check on their well-being, but has not had any substantive conversations with the officers regarding the search or shooting.

DOZIER-COA
00175

FD-302 (Rev. 10-6-95)

CONFIDENTIAL



- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/22/2006

        DENNIS WILSON, Detective, Atlanta Police Department
Homicide Division, was interviewed at East City Hall, Atlanta,
Georgia.  He was advised of the identity of the interviewing Agents
by a display of credentials and informed of the nature of the
interview.  Also present during the interview was Jeff Holmes,
Investigator, Fulton County District Attorney's Office.  WILSON
then provided the following information:

        WILSON has been employed by the Atlanta Police Department
for 25 years.  He has been a Homicide Detective for two years and
four months.  Prior to that, he was a detective in the Assault Unit
and Sex Crimes Unit.

        On 11/21/2006, WILSON was working a three to eleven
shift or four to twelve shift from East City Hall.  He heard an
officer down call over the radio at about 6:53 p.m. and was called
out to the scene of a shooting at 933 Neal Street very shortly
thereafter.  He determined that a subject was down in connection
with the shooting.  WILSON stated that he knew that Homicide would
get the call, as any officer down call involving a shooting is
assigned to Homicide.  WILSON was assigned as lead investigator
on the case, which is assigned on a rotational basis.  When WILSON
arrived on-scene at about 7:06 p.m., there were already a large
number of officers and investigators present.  He recalled that
Detectives CHAMBERS and CAVALIER from Sex Crimes and Robbery were
already there.  Homicide Detective THOMAS AGAN also arrived at the
scene and assisted WILSON in handling the crime scene, producing
the crime scene sketch, including making measurements and
processing the scene.  Also on scene was Investigator SMITH who
went to the hospital with O'CONNOR to check on the three injured
officers.  WILSON stated that there was also a "lot of brass" at
the scene, including MAJOR WILLIAMS and various others.

        When WILSON arrived, the three injured officers were
already in the ambulance being treated.  WILSON went inside the
house and saw that a black female was still inside and the fire
department was still working on her.  Captain HOLCOMB said that she
was already dead, but that they were still getting electrical
impulses.  WILSON had already determined that she had been shot
in connection with the entry.  He began speaking to officers to
determine where the entry team had been, where the individual

Investigation on    12/20/2006    at Atlanta, Georgia

File #                                          Date dictated  NA        **DOZIER-COA**
    SA Brian Davis/                                                      **00176**
by  SA Bret C. Aitchison:bca

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

**CONFIDENTIAL**

CONFIDENTIAL

Continuation of FD-302 of ___DENNIS WILSON___ _____ , On 12/20/2006 , Page 2

officers were in relation to others in the stack and the assignment
of each officer.   WILSON had also determined that R. SPERLE had
been with his dog in the van when the initial entry was made.
After the initial entry, the officers had restacked and reentered
the house.   The Red Dog team had arrived shortly after the entry.
Detective TESLER and JR. SMITH, members of Red Dog and K-9 officer
SPERLE went to the back door and breached the door with a ram.
They then went inside from the back door.

      Inside the house, WILSON looked at the black female, then
looked around the house.   During this initial survey, he had
observed a revolver lying on the bed in a bedroom.   He later had
heard that G. SMITH had kicked the revolver away from the woman's
hand, sending it under the bed.   Detective BOND then picked up the
revolver and placed it on the bed.

      WILSON sent Detective CAVALIER to obtain a search warrant
for the house.   WILSON stated that, though a search warrant was
not always obtained after a shooting, he thought that the search
warrant was prudent as he believed that the woman who had been shot
was the home owner.   He discussed this with Detectives GUERICCI
and PEAK and made the decision to obtain the warrant.   WILSON
expanded the crime-scene to three blocks and identified the people
inside the house.   He stated that there had been many people inside
the house in the immediate aftermath of the shooting, so he had to
establish the crime-scene area.

      WILSON took each officer who had been involved in the
shooting to the crime-scene van where they were photographed and
the remaining live rounds in each of their magazines was counted.
The pistols of the injured officers were recovered from them at the
hospital and later provided to WILSON.   WILSON stated that each
officer had started with full magazines.   He determined that G.
SMITH had fired twelve shots, G. JUNNIER had fired six shots, C.
BOND had fired two shots, LUCAS had fires seven shots and JR SMITH
had fired twelve shots for a total of 39 shots fired.

      WILSON called Detective CAVALIER at about 7:57 p.m. and
confirmed that the warrant had been obtained.   They began executing
the warrant sometime between 8:05 p.m. and 8:10 p.m.   They began
processing the scene for evidence.   WILSON noted that someone from
the RED DOG team had decided that it would be helpful to put bricks
near the spent shell casings outside, so the photos had been taken
with the bricks in view.   Technician T. MARTIN had taken still
photos of the exterior and interior of the house.   Technician

DOZIER-COA
00177

FD-302a (Rev. 10-6-95)

# CONFIDENTIAL

Continuation of FD-302 of  __DENNIS WILSON__ _____ , On __12/20/2006__ , Page __3__

SASNET had video-taped the exterior and interior. Detective AGAN
had overseen the crime-scene processing.

WILSON left the revolver he had observed in place on the
bed until the end of the search at about 2:30 a.m. to 2:45 a.m.
He had Technician MARTIN photograph the 38-Special CHARTER ARMS
revolver, including close-up shots. WILSON stated that the gun was
perpendicular to the head of the bed with the muzzle pointing
toward the head. The gun was lying on its right side and WILSON
could observe three shells in the gun which appeared to be live and
one spent round. He opened the cylinder and observed one live
round under the hammer. WILSON noted that the cylinder rotated in
a clockwise direction. WILSON removed the rounds and test fired
the weapon against his thumb and noted that the gun operated
properly and that there appeared to be enough force from the hammer
to fire a round. WILSON also rotated the cylinder and determined
that it functioned properly. WILSON stated that he had expected
the fired round to be underneath the hammer, however, the spent
round was actually in the first position counterclockwise from the
hammer. WILSON noted that only one cylinder (that containing the
spent round) had gunpowder residue in it. Technician MARTIN
recovered the revolver and submitted it to evidence to perform
fingerprint, tool mark and similar tests. WILSON stated that no
additional rounds of .38 special ammunition were recovered in the
search.

Detective WILSON noted that the basement contained a
commercial grade lawnmower, an air compressor, and numerous tools.
He recalled that the basement door had been standing open and he
believed in opened inward. WILSON recalled that the burglar bars
on the front door would swing shut on their own and had to be
propped open.

WILSON stated that a neighborhood canvass was started
that night and conducted by Investigator DUMAS. The neighbors at
929 Neal Street, among others, had been interviewed.

Regarding unusual aspects of this case, WILSON advised
that the primary aspect he found unusual was the position of the
spent round in the cylinder. He also stated that one round had
gone into the victim's bedroom, through a box and into the wall
behind. WILSON noted that rounds had also gone into the southwest
corner of the room. A round had gone through the back of a cloth
chair and another round had gone behind a hutch.

DOZIER-COA
00178

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

CONFIDENTIAL

Continuation of FD-302 of    DENNIS WILSON                                    , On 12/20/2006  , Page    4

He stated that a black female who identified herself as KELLY HILL and claimed to be a granddaughter of the victim came to the door of 933 Neal during the search.  WILSON spoke with her and obtained the following identifying information:

Name:                    KELLY HILL
Address:                 ▬▬▬▬▬▬▬▬▬▬▬▬
                         ▬▬▬▬▬
                         ▬▬▬▬▬▬▬▬▬▬▬▬
DOB:                     ▬▬▬▬▬▬
GA DL#                   ▬▬▬▬▬▬

HILL later said that she was a friend of the victim KATHRYN JOHNSTON and had known JOHNSTON four or five years.  HILL stated that JOHNSTON was a professional lady who had worked in a factory in the North, possibly Philadelphia.  HILL stated that she had recently had the revolver cleaned and oiled for JOHNSTON.  HILL stated that JOHNSTON had told her that if anybody tried to break into her house, she would shoot them.

WILSON stated that there was a walking cane in the house and an easy-lift chair.  He did not recall any hearing aids on the premises.  He stated that there did not appear to be a lot of family photos, nor were they able to locate a purse containing identification for the victim.

Detectives GUERERRO and PEAK did a walkthrough of the crime-scene with Sergeant SPARWOTH prior to his beginning the drug search.  WILSON released the scene to him at 2:53 a.m.

WILSON stated that interviews were conducted of JR. SMITH, NATHAN LUCAS, MAURICE GUERIN, TESLER, SPERLE and    on 11/22/2006.    A statement was taken from CARY BOND on 11/24/2006. FABIAN SHEETS was interviewed on 11/26/2006 and G.A. SMITH on 11/27/2006.

WILSON stated that the .38 special round fired from JOHNSTON's revolver has not been recovered.  He stated that it may have been the round that hit GREG JUNNIER's badge case and ricocheted up into his neck.  WILSON believed that the other injuries to officers were probably caused by their own bullet fragments.

DOZIER-COA
00179

## CONFIDENTIAL



12 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription     01/11/2007

        PAUL ANDREW SPARWATH, Sergeant, Atlanta Police Department
(APD), 675 Ponce de Leon Avenue, N.E., Atlanta, Georgia 30308, was
interviewed at his place of employment.  Also present was his
attorney, DON ENGLISH.  After being advised of the identities of
the interviewing Agents and the nature of the interview, he
provided the following information:

        SPARWATH has been employed by APD for almost 18 years,
and has served as the sergeant of Narcotics Team 2 for
approximately the past five years.

        Sometime between 6:30 p.m. and 7:00 p.m. on November 21,
2006, while SPARWATH and the rest of Team 2 were getting ready to
go out to APD Zone 3, they heard an officer call for help on their
radio.  Once it was determined that the shooting involved Narcotics
Team 1, SPARWATH and his team drove immediately to the scene of the
shooting.

        Team 2 arrived near the scene approximately 20 minutes
after they heard the original radio transmission.  Due to the
ambulances and the number of other vehicles crowding Neal Street,
Team 2 parked their two vans on Ashby Street, and walked to Neal
Street.

        SPARWATH and Team 2 members immediately checked on the
Team 1 officers who were being treated at the ambulances.  After
offering the injured officers words of encouragement, SPARWATH
checked the status of the incident with either Lieutenant STACIE
GIBBS or DEPUTY CHIEF ANDRESEN, who then told him to take charge of
the injured officers' weapons.  SPARWATH used his team to obtain
the weapons and to secure them in one of their vans.

        SPARWATH learned that a male who was in the custody of
Team 1 was in one of the Team 1 vans.  SPARWATH assigned a couple
of his officers to take over custody of the man, and the rest of
Team 2 went to the hospital.  On the way to the hospital, SPARWATH
dropped off the weapons at City Hall East, and bought pizza for the
families of the injured officers who were at the hospital.  At the
hospital, SPARWATH was told by GIBBS to go back to the search
location, and that Team 2 would be conducting the search as
specified by Team 1's warrant.

Investigation on     01/10/2007     at Atlanta, Georgia

File #
                                              Date dictated   01/11/2007

      SA Brian P. Davis                                           **DOZIER-COA**
by    SA Eulis Mile Brosas:emb                                       **00180**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

## CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____PAUL SPARWATH_____ , On 01/10/2007 , Page __2__

       By the time Team 2 returned to Neal Street, it may have been the early morning of November 22. In addition to the media, among those who were at the scene were personnel from the Homicide, Red Dog, ID, and K-9 units. Investigator WILSON from Homicide took SPARWATH into the house to provide an overview, and then turned the search over to SPARWATH and his team.

       SPARWATH directed a K-9 team to go through the house and into the basement. During the search, while SPARWATH was on the front porch, Officer SCHIFFBAUER approached SPARWATH and told him he found three bags of marijuana. SCHIFFBAUER then brought SPARWATH to the basement to point out the location of the drugs. Although SPARWATH did not initially see the marijuana on the basement floor, he was able to spot them when he used his flashlight. SPARWATH advised that the bags of marijuana were photographed where they were, and were then processed by the ID squad. SPARWATH thinks that possibly SCHIFFBAUER or Officer GRIFFEN may have bagged the marijuana for submission to APD's Property Section.

       The evidence taken by SPARWATH's team and turned in to Property were the bags of marijuana, calendars with pictures of KATHRYN JOHNSON's family members, and an envelope with a male's name as the addressee.

DOZIER-COA
00181

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___ PAUL SPARWATH _____ , On 01/10/2007 , Page 3

       The following is personal and identifying information regarding PAUL SPARWATH, that, due to the nature of his job, SPARWATH asked remain confidential:

NAME:                     PAUL ANDREW SPARWATH
DATE OF BIRTH:         ▆▆▆▆▆▆▆▆
SOCIAL SECURITY NUMBER:  ▆▆▆▆▆▆▆▆
ADDRESS:              ▆▆▆▆▆▆▆▆▆▆
                       ▆▆▆▆▆▆▆▆▆▆

TELEPHONE (CELLULAR):   ▆▆▆▆▆▆▆▆

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/14/2006

      BRIAN JOSEPH SCHIFFBAUER, Atlanta Police Department
Narcotics Unit Detective, was interviewed at his place of
employment 675 Ponce De Leon Avenue, N.E., Atlanta, Georgia, 30308,
cellular phone number ████████████, work phone number (404) 853-
4250.  SCHIFFBAUER'S attorney DONALD ENGLISH was also present
during the interview.  After being advised of the identity of the
interviewing agent and the nature of the interview, SCHIFFBAUER
provided the following information.

      On December 21, 2006, SCHIFFBAUER was working at his desk
located at the Atlanta Police Department, when SCHIFFBAUER heard a
call over his radio from Sargent STALLINGS advising a perpetrator
and Investigators were "down."  SCHIFFBAUER drove an undercover van
to the crime scene.  Once at the crime scene SCHIFFBAUER stated the
injured officers were already in the ambulances.  Different
Detectives and Officers were putting up crime scene tape to secure
the crime scene.

      SCHIFFBAUER spoke to most of the narcotic's team 1
members to check on their well being.  SCHIFFBAUER also helped
secure the gun belts of the officers that were involved in the
shooting.

      Identification Technician ROBIN ANDERSON twisted her knee
in a hole in the front yard of 933 Neal street, Atlanta, Georgia.
SCHIFFBAUER stood by with ANDERSON until an ambulance was able to
pick ANDERSON up and transport her to a hospital.

      SCHIFFBAUER was then ordered by Lieutenant STACIE GIBBS
to watch a prisoner FABIAN SHEATS.  SHEATS was carried over to
SCHIFFBAUER'S van and placed in the back of the van.  SHEATS legs
and hands were cuffed.  SCHIFFBAUER was told not to speak to
SHEATS.  SCHIFFBAUER did not speak to SHEATS, nor did SHEATS
attempt to speak to SCHIFFBAUER.  SCHIFFBAUER watched SHEATS for
approximately 3 hours before he was allowed to call a transport
unit to take SHEATS to jail.

      Once SHEATS had left the crime scene, Sargent SPARWATH
told SCHIFFBAUER and Detective GRIFFIN to search the house with K-9
officer CARSON.  SCHIFFBAUER was advised to search for drugs in the
house.  The K-9 unit started from the front door of the residence

Investigation on    12/14/2006    at  Atlanta, Georgia

File #  ████████████                                  Date dictated  _____

    SA Bret Aitchison
by  SA Brian P. Davis

**DOZIER-COA
00183**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Brian Joseph Schiffbauer_____ . On _12/14/2006___ . Page __2__

and walked through the house.  SCHIFFBAUER and GRIFFIN would only
search the areas the K-9 dog would alert on.  The dog began to
alert once they had enter the basement of the house.  The basement
was accessed through a doorway in the kitchen.  The dog alerted
toward the ceiling of the basement.  SCHIFFBAUER and GRIFFIN began
to search the duct work in the basement but, were unable to find
any contraband.

        The dog alerted again near the back door of the basement.
SCHIFFBAUER and GRIFFIN noticed three small clear bags of marijuana
lying on the floor near the back door.  SCHIFFBAUER collected the
three bags of marijuana and later placed the bags into evidence.
The identification technicians photographed and filmed the
recovered marijuana.  GRIFFIN also climbed up toward the ceiling
near the back door and looked for contraband, because the dog kept
alerting toward the ceiling.

        SCHIFFBAUER advised there was one or two 2X10 or 2X12
boards wedged long ways between the door and the wall in the
basement.  The boards would have to be removed in order to open the
door.  SCHIFFBAUER removed the boards from the door during the
search of the basement.  SCHIFFBAUER left the residence through the
basement door and did not have to break any locks in the process.

        SCHIFFBAUER has seen a few members of Team 1 since the
shooting, however, SCHIFFBAUER has not discussed the case with any
of the members of Team 1.

DOZIER-COA
00184

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

████████████████

Continuation of FD-302 of ___Brian Joseph Schiffbauer___ , On _12/14/2006_ , Page __3__

     The following is the home address of Detective
SCHIFFBAUER.  SCHIFFBAUER requested his personal information stay
confidential.

     BRIAN JOSEPH SCHIFFBAUER, date of birth, ██████████, home
residence ████████████████████████████████████
cellular phone number ████████████.

DOZIER-COA
00185

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    02/12/2007

      CARL JUHLS, Atlanta Police Department (APD) Police Officer assigned to Zone 4 FIT Team, was interviewed at the APD Zone 4 precinct located at 3565 Martin Luther King Boulevard, Atlanta, Georgia, 30308. After being advised of the identity of the interviewing agents and the nature of the interview, JUHLS provided the following information:

      JUHLS has been employed by the APD for approximately 13 years. In approximately 2005, JUHLS was introduced to an APD informant ALEX WHITE. JUHLS was advised by Investigators JUNNIER and Investigator BOND, that WHITE was a very reliable informant.

      JUHLS stated that he used WHITE on a least two drug buys. JUHLS was able to receive a search warrant from one of WHITE'S drug buys which lead to the seizure of guns, drugs and money. ATF adopted the case and prosecuted the subject in a Federal court. On the second drug buy WHITE was able to buy drugs from a female in Zone 4 that was moving a lot of drugs.

      JUHLS paid WHITE for his work as an informant. WHITE'S information was very reliable and detailed.

      JUHLS quit using WHITE when he (JUHLS) received a call from Investigator BOND stating that WHITE had been arrested.

Investigation on   02/08/2007   at Atlanta, Georgia

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                                    Date dictated _____

    SA Brian P. Davis
by  SA Andrew J. Van Epps

**DOZIER-COA
00186**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___CARL JUHLS_____ , On _02/08/2007_ , Page __2__

           The following is biographical information regarding CARL
JUHLS.  JUHLS requested his personal information stay confidential.

           JUHLS, date of birth, ██████████ , Social Security Account
Number ██████████ .  JUHLS resides at ██████████ ,
██████████████████████ cellular number ██████████ .

DOZIER-COA
00187

# CONFIDENTIAL

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   03/02/2007

       TERRY A. ALMOND, date of birth, ▬▬▬▬▬, social security account number ▬▬▬▬▬.  ALMOND resides at ▬▬▬▬▬▬▬▬▬, Atlanta, Georgia, ▬▬▬, home telephone number ▬▬▬▬▬▬▬, and cellular telephone number ▬▬▬▬▬▬▬▬.  ALMOND was interviewed in a close proximity of his residence.  After being advised of the identities of the interviewing agents and the nature of the interview, ALMOND provided the following information.

       ALMOND advised that he had worked with Atlanta Police Department Investigators J.R. SMITH, Investigator TESLER, and Investigator JUNNIER on numerous occasions.  ALMOND has provided drug information and conducted undercover buys for these investigators.

       ALMOND stated that he has signed blank money vouchers for the investigators.  ALMOND also stated he had done work for the investigators and did not receive money for his assistance.

       ALMOND is willing to meet with the interviewing Agents at a later date to go over his past drug buys.  ALMOND believes that he will be able to identify any information that is not correct and verify the correct information concerning his work as an informant.

---

Investigation on   03/01/2007   at  Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬                   Date dictated     

    SA Brian P. Davis                          **DOZIER-COA**
by  SA Andrew J. Van Epps                        **00188**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/20/2006

MAURICE GEURIN, JR., born ▬▬▬▬▬▬▬, social
security number ▬▬▬▬▬, of ▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬ an Atlanta Police Department (APD)
Investigator assigned to Narcotics Team 1, was interviewed at the
Atlanta office of the FEDERAL BUREAU OF INVESTIGATION. GEURIN was
advised of the identities of the interviewing Agents and the
purpose of the interview. Also present was his attorney DON
ENGLISH, and ASSISTANT UNITED STATES ATTORNEY JON-PETER KELLY.
GEURIN signed a consent form regarding a statement he provided to
APD regarding the execution of a search warrant on November 21,
2006 at 933 Neal Street, Atlanta, Georgia. GEURIN voluntarily
agreed to the interview and provided the following information:

GEURIN has been an APD officer since 1999, and has been
with the narcotics division for approximately three years. Prior
to being assigned to Team 1, GEURIN was on Team 3 and on the Weed
and Seed team. GEURIN has been on Team 1 for one-and-a-half to two
years, under the supervision of SERGEANT STALLINGS.

Team 1 consists of nine members. The team members work
in smaller groups within the team, and although GEURIN usually
works with GARY SMITH, he also frequently works with NATHAN LUCAS
and HOLLY BUCHANAN. GEURIN, GARY SMITH, LUCAS and sometimes
BUCHANAN, do their work covertly and use confidential informants to
make drug buys. GREGG JUNNIER, J.R. SMITH (J.R.), BRUCE TESLER,
and occasionally CARY BOND, work together. JUNNIER, J.R., and
TESLER drive around in a patrol car and try to catch drug deals as
they occur. Team 1's entire team comes together when they execute
search warrants.

On November 21, 2006, GEURIN began work at about 9:00
a.m., when he took his informant to court. At about 12:00 or 12:30
p.m. GEURIN dropped off the informant at his house and headed back
to work. GEURIN arrived at his office at about 1:30 p.m. and began
working on a fugitive warrant. GEURIN then called STALLINGS, who
was coming back from the shooting range along with LUCAS and BOND.
STALLINGS told GEURIN that they needed to work on a kilo deal that
LUCAS had in progress.

Sometime later, STALLINGS told GEURIN that the team was
going to execute a search warrant, and that they would meet at the

---

Investigation on   12/19/2006   at  Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬                     Date dictated   12/20/2006

         SA Matthew J. Ross
by       SA Eulis Mile Brosas:emb                        **DOZIER-COA**
                                                          **00189**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___MAURICE GEURIN JR._____ , On __12/19/2006__ , Page ___2___

fire station for the briefing. GEURIN rode with LUCAS in an
undercover car to the briefing, and they were the last ones to
arrive. Already present was the team, the K-9 handlers, and an
unknown male, who was sitting in the team van and was in custody.
GEURIN later learned that the male's name was FABIAN SHEATS.

GEURIN was talking with his mother on his cellular phone
when J.R. began the briefing. During the briefing, it became clear
to GEURIN that SHEATS was the source of the information regarding
the search location. SHEATS could hear the entire briefing, since
he was sitting in the open van, and was right next to him and GARY
SMITH. At the end of the briefing, GEURIN asked SHEATS if there
were any guns in the house. SHEATS replied that there were no
guns, since the drug dealer, "SAM," was a convicted felon. GARY
SMITH asked SHEATS if there were any dogs at the house, and SHEATS
again replied no.

The team left the briefing area divided up in three
different vehicles: the team van, a marked patrol car, and the K-9
truck. GEURIN rode to the house in the van, while TESLER and
STALLINGS rode in the patrol car, and OFFICER SPERL (phonetic) rode
in the K-9 truck. GEURIN does not recall which of the three
vehicles the other team members were in.

The assignments for the entry were as follows: GEURIN
was the breacher with the ram, GARY SMITH had the shield, J.R.
SMITH had the halogen tool, JUNNIER had the first cover position,
and BOND was the second cover. LUCAS was in charge of making any
arrests, and STALLINGS and TESLER were assigned to cover the rear
perimeter of the house.

When they arrived at the house, J.R. and JUNNIER started
to work on opening the burglar door with the halogen tool. J.R.
and JUNNIER tried to pry the door at a couple of different spots,
but could not get enough leverage to open it. After they called
GEURIN up to seat the halogen with the ram, J.R. was able to pop
the burglar door open.

With the burglar door out of the way, JUNNIER checked the
handle to the front door and found that it was locked. GEURIN then
hit the door once or twice with the ram to breach it, and the door
opened approximately halfway. Immediately upon opening, GEURIN saw
a person dressed in blue standing in the opening. GEURIN could not
determine if the person was a male or a female, only that the
person was holding a black gun.

DOZIER-COA
00190

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___MAURICE GEURIN JR._____ . On _12/19/2006__ , Page ___3___

      GEURIN immediately dropped the ram and looked for cover. As GEURIN ran down the porch, he heard gun shots. GEURIN jumped over the railing of the wheelchair ramp, continued around the ramp, and found cover against the wall of the porch.

      GEURIN saw GARY SMITH enter the doorway using his shield for cover, and heard GARY SMITH call out "person down." The team then assumed their entry positions, entered the house, and cleared it.

      After they finished clearing the house, GEURIN heard someone say that the house had a basement that needed to be cleared. By this time, the APD REDDOG team was at the scene, and GEURIN went around the outside of the house with REDDOG to the back door. GEURIN does not specifically remember who breached the back burglar door or the back door, but does remember that both doors had to be breached. Upon entering the back room of the basement, they discovered another door that led to the rest of the basement. GEURIN thinks that he may have used the ram to breach either the outside (back) door or the inside basement door.

      Sometime during the clearing of the house and basement, GEURIN learned that his teammates had been shot. GARY SMITH, JUNNIER, and BOND were taken by an ambulance to the hospital, where GEURIN later visited them.

      GEURIN advised that he has used ALEX WHITE as an informant once or twice. On one of those occasions, GEURIN and GARY SMITH drove behind WHITE's car as he led them to a house. When WHITE parked in front of the house, GEURIN and GARY SMITH continued driving in order to avoid suspicion. By the time GEURIN turned the car around to observe the buy, WHITE was already walking back to his car with drugs. WHITE claimed that he made a drug buy at the house, but GEURIN was skeptical. GEURIN's skepticism was reinforced when he sent a female informant to the same house at a later time. The informant was unable to get anyone to answer the door, and told GEURIN that she thought the house was abandoned.

      GEURIN further advised that he rarely uses the computer at the FULTON COUNTY JAIL to type out his search warrant affidavits and applications. Instead, he, GARY SMITH, LUCAS, and BUCHANAN usually go back to their office to write their warrants. In contrast, J.R., TESLER, JUNNIER, and BOND usually type out their warrant applications on the computer at the jail. GEURIN advised

DOZIER-COA
00191

**CONFIDENTIAL**

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___MAURICE GEURIN JR._____ , On _12/19/2006_ , Page __4__

     that using the jail computer for warrant applications is necessary
when a search warrant is needed immediately.

**DOZIER-COA
00192**

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   02/07/2007

      PHILLIP J. ROBERSON, Atlanta Police Department (APD)Narcotics Investigator assigned to Team II, was interviewed at the Atlanta Police Department located at 675 Ponce De Leon Avenue, Atlanta, Georgia, 30308. After being advised of the identity of the interviewing agents and the nature of the interview, ROBERSON provided the following information.

      ROBERSON was hired by APD in 1989 and has been on the Narcotics Team II since 1995. On November 21, 2006, ROBERSON responded to 933 Neal Street, Atlanta, Georgia, for a possible police shooting. ROBERSON stated Narcotics Team II drove two vans to the shooting scene. Sergeant SPARWOTH and Lieutenant GIBBS also responded to the shooting scene.

      ROBERSON helped collect the weapons of the investigators that were involved in the shooting. ROBERSON secured the weapons in the Team II black van.

      ROBERSON helped, Narcotics Team I Investigators J.R. SMITH and Investigator ARTHUR TESLER, finish their paper work regarding their earlier arrest of FABIAN SHEATS. ROBERSON finished filling out the citation for possession of marijuana with intent to distribute. ROBERSON helped the investigators because they had just been involved in a shooting incident. ROBERSON stated that he saw the marijuana sitting on the hood of the car. ROBERSON described the marijuana being stored in bags containing approximately "$20.00" worth of marijuana. The small bags were contained in a larger clear bag. ROBERSON never saw any more drugs other than the marijuana contained in the clear bags. ROBERSON never heard anyone mention cocaine was seized from SHEATS.

      ROBERSON later saw SHEATS handcuffed in the back of the van of Team I. SHEATS was handcuffed and did not speak while ROBERSON sat in the van to make a phone call.

      ROBERSON went to the hospital to check on the wounded investigators and then returned to Neal street to assist in searching the house. ROBERSON collected paper work from inside the house to help show ownership but,did not find any drugs or drug paraphernalia.

---

Investigation on   02/07/2007   at Atlanta, Georgia

File #

Date dictated

by   SA Brian P. Davis
     SA Andrew J. Van Epps

DOZIER-COA
00193

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Phillip J. Roberson_____ , On _02/07/2007_ , Page __2__

       The following is biographical information regarding
investigator PHILLIP J. ROBERSON.  ROBERSON requested his personal
information stay confidential.

       ROBERSON'S date of birth, ██████████, social security
account number ██████████.  ROBERSON resides at ████████████
████████████████████████ cellular phone number ██████████
████ .

**DOZIER-COA
00194**

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   01/25/2007

      MICHAEL WISKEMANN, Atlanta Police Department narcotics investigator.  WISKEMANN was interviewed at the Atlanta Police Department located at 675 Ponce De Leon Avenue, Atlanta, Georgia, 30308, cellular phone number ██████████.  After being advised of the identity of the interviewing agents and the nature of the interview, WISKEMANN provided the following statement.

      WISKEMANN has been employed by the Atlanta Police Department for approximately nine years and has been assigned to narcotics team II for approximately one and a half years.

      WISKEMANN advised he has only used Atlanta Police Department's informant ALEX WHITE on one occasion.  WHITE'S information led WISKEMANN and investigator GRIFFIN to the arrest of at least two subjects possessing marijuana, methamphetamine and guns.  WISKEMANN had limited involvement with WHITE after this occasion.

      WISKEMANN stated WHITE was a reliable informant but, had a reputation for being money hungry.

---

Investigation on   01/23/2007   at  Atlanta, Georgia

File # ████████████████████                                          Date dictated ____

by    SA Andrew J. Van Epps
      SA Brian P. Davis

**DOZIER-COA
00195**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____MICHAEL WISKEMANN_____ , On _01/23/2007__ , Page ___2__

    The following is biographical information regarding
investigator WISKEMANN.  WISKEMANN requested his personal
information stay confidential.

    MICHAEL WISKEMANN, date of birth, ██████████, social
security account number ██████████.  WISKEMANN'S residence is ██
████████████████████████████████ cellular phone ██████████.

DOZIER-COA
00196

CONFIDENTIAL                    CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    01/11/2007

    AURELIO FELIBERTY, JR., Atlanta Police Department
investigator was interviewed at the Atlanta Police Department
located at 675 Ponce De Leon Avenue, Atlanta, Georgia, 30308, desk
phone number 404-853-4220 and cellular phone number ▬▬▬▬▬▬▬.
After being advised of the identity of the interviewing agents and
the nature of the interview, FELIBERTY provided the following
information.

    FELIBERTY has been employed by the Atlanta Police
Department for approximately 14 years.  FELIBERTY has worked as an
investigator on the fugitive unit for approximately 4 years.

    On 11/22/2006, FELIBERTY was contacted by Atlanta Police
Department narcotics investigator DUNCAN.  DUNCAN asked FELIBERTY
to assist in an interview of a Atlanta Police Department informant
ALEX WHITE.  FELIBERTY and DUNCAN drove to a location in zone 3 and
picked up WHITE.

    DUNCAN drove WHITE to ▬▬▬▬▬▬▬▬▬▬ and asked WHITE
what had occurred on 11/21/2006.  WHITE advised that on 11/21/2006,
he drove his personally owned vehicle to 933 Neal Street, Atlanta,
Georgia, to make a drug buy for the Atlanta Police Narcotics unit.
WHITE stated two of the narcotics investigators hid in the back
seat of his car.  When WHITE pulled up to the above mentioned house
a black male was standing in the door way.  The subject told WHITE
not to walk into the house and motioned for WHITE to walk toward
the back of the house.  The subject and WHITE walked to the back of
the house and the subject walked into an unlocked basement and sold
WHITE $50.00 worth of crack cocaine.  The subject identified
himself as "SAM".  WHITE quickly walked back to his car so "SAM"
would not be able to see the to police officers hiding in his back
seat.

    DUNCAN asked WHITE to give a description of "SAM" and a
*detailed lay out of the house and basement.*

    DUNCAN explained to WHITE that they were going to drive
around Neal street, Atlanta, Georgia, to allow WHITE a chance to
find "SAM".  DUNCAN also advised WHITE that he (DUNCAN) wanted
WHITE to look at a photo spread located at the Atlanta Police
Department.

---

Investigation on    01/09/2007    at Atlanta, Georgia

File # 282A-AT-101406-302                          Date dictated _____
        SA Bret C. Aitchison                                              **DOZIER-COA**
by      SA Brian P. Davis                                                 **00197**

---

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

282A-AT-101406-302

Continuation of FD-302 of __Aurelio Feliberty, Jr._____ , On _01/09/2007_ , Page __2__

        After driving around the Neal street area, DUNCAN began
to drive WHITE back to the Atlanta Police Department.  DUNCAN was
going to meet with another Atlanta Police Department officer at the
Police Headquarters to pick up the photo line up of subjects
fitting the description of "SAM".

        WHITE repeatedly stated he needed to meet with an ATF
Special Agent by a certain time.  DUNCAN repeatedly assured WHITE
that they would be finished on time for WHITE to make his meeting.
WHITE was acting as if he was talking on the phone with the ATF
agent and at one point was speaking on the phone with a female.
When DUNCAN was at the intersection of North Avenue and Spring
street, Atlanta, Georgia, WHITE stated the ATF agent was right
behind them and the agent had requested them to pull over and to
walk toward his car.  WHITE then got out of DUNCAN'S car and ran
toward the VARSITY restaurant.  FELIBERTY and DUNCAN quickly parked
the car and tried to find WHITE in the VARSITY, but were unable to
locate WHITE.

        DUNCAN repeatedly called WHITE'S cell phone and
eventually got in touch with WHITE.  DUNCAN told WHITE that he was
not in trouble and they just wanted to show WHITE a photo line up.
WHITE told DUNCAN he was scared but that he would come back to the
VARSITY.  FELIBERTY and DUNCAN waited in the VARSITY for about
thirty minutes and then drove back to the police department.

        DUNCAN advised FELIBERTY that WHITE was not a good
informant.

DOZIER-COA
00198

# CONFIDENTIAL

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

████████████████████

Continuation of FD-302 of ___Aurelio Feliberty, Jr.___ , On _01/09/2007_ , Page ___3___

    The following is biographical information regarding investigator FELIBERTY.  FELIBERTY requested his personal information stay confidential.

    FELIBERTY'S, date of birth, ████████, social security account number ████████.  Home address ███████████████ cellular phone ████████, and ███████████████

DOZIER-COA
00199

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/13/2006

ANDREW TODD GRIFFIN, a.k.a. Andy Griffin, was advised of the identities of the interviewing Agents and informed of the nature of the interview. Also present during the course of the interview was Sergeant KREHER, Atlanta Police Department Union Representative. GRIFFIN then provided the following information:

GRIFFIN has been a member of Narcotics Team 2 for one and one-half years. Prior to that, he had been a member of RED DOG for two and one-half years. He had been an officer in Zone 3 prior to that.

GRIFFIN was at East City Hall at 7:00 p.m. getting ready to go to work with Team 2. They heard over the police radio from STALLINGS that an officer was down. The team went to 933 Neal Street arriving at around 7:10 to 7:15 p.m. Many officers had already arrived and were roping off the scene. The wounded officers were already in the ambulances. GRIFFIN and his team worked on the perimeter. The Team 2 van was parked near the Team 1 van which had FABIAN SHEATS inside. At about 7:45 p.m. to 8:00 p.m., Lieutenant GIBBS asked GRIFFIN to sit with FABIAN SHEATS who was in the Team 1 van. They were told not to interrogate SHEATS, but that if he gave a spontaneous statement they were to record the information. They were also informed that once the homicide detectives were finished with the crime scene, Team 2 was to conduct a drug search in the house. A paddy wagon later arrived and took SHEATS to jail. Two RED DOG teams were posted in front of the address.

GRIFFIN recalled observing Team 1 members STALLINGS, JR. SMITH and TESLER down near a van giving statements to homicide investigators.

Several hours passed at the site, during which time an ID tech stepped in a hole near the water main of 933 Neal Street. She injured her knee and an ambulance was called. GRIFFIN stood by with her until the ambulance came and transported her from the scene. GRIFFIN spoke with Lieutenant ROBERTS, advising him that Team 2 was ready to conduct the search of the house. GRIFFIN did a "walk through" with Investigator WILSON and was shown the lay out of the house.

---

Investigation on   12/12/2006   at Atlanta, Georgia

File #  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉          Date dictated   NA

by   SA Brian Davis/
     SA Bret C. Aitchison:bca

**DOZIER-COA
00200**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302a (Rev. 10-6-95)

---

Continuation of FD-302 of     <u>ANDREW GRIFFIN</u>                         , On <u>12/12/2006</u>   , Page _2_

        GRIFFIN and SCHIFFBAUER and Sergeant SPARWOTH accompanied K-9 officer CARSON and her dog downstairs to the basement during the search.  GRIFFIN described the basement as a big basement filled with a "lot of stuff." He recalled a Jacuzzi, trash bags and lawn equipment among the items.   During the course of the search, GRIFFIN observed a large board (possibly a six to eight foot long 2X6) which was barricading the back door.  He stated that it wasn't nailed in, but was leaning up against the door, blocking it.  He removed the board so that they could continue the search, as the board also was in the way of the search.

        The drug dog seemed to be alerting up near the ceiling in the basement, so GRIFFIN looked near the ceiling.  The dog then alerted near the base of the back door.  GRIFFIN located one package of marijuana near the right lower corner of the doorway. It was packaged in a clear zip-lock bag.  SCHIFFBAUER located two additional packages of marijuana a little to the left of GRIFFIN's bag.   An ID tech had been making a video recording of the search. A second tech took photos of the marijuana in place.  GRIFFIN could not recall whether the back door was open or closed during this time.  GRIFFIN stated that during the search,  both he and SCHIFFBAUER wore purple evidence collection gloves provided by homicide.

        GRIFFIN and SCHIFFBAUER left about 45 minutes after locating the marijuana.  They went back to East City Hall and put the evidence into property.  SCHIFFBAUER then wrote up the report, using the original case number.   GRIFFIN got home at around 6:30 a.m.

        GRIFFIN stated that no Team 1 member was present during the search.  He was not directed in any way regarding locations which were to be searched, nor was he directed by anyone regarding what he was to tell investigators.  GRIFFIN has spoken to injured members of Team 1 regarding their well-being, but has had no substantive conversations regarding the incident.

DOZIER-COA
00201

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of   __ANDREW GRIFFIN_____ , On __12/12/2006__ , Page __3__

       The following is identifying and personal information regarding ANDREW GRIFFIN that, due to the nature of his job, GRIFFIN asked remain confidential:

      Name:           ANDREW TODD GRIFFIN
      DOB:
      Home Address:

      Telephone:

DOZIER-COA
00202

CONFIDENTIAL

Ofc's
Statements

DOZIER-COA
00205

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    02/06/2007

      ILKA V. TORRES, Atlanta Police Department Police Officer. TORRES was interviewed at her place of employment the Atlanta Police Department located at 675 Ponce De Leon Avenue, Atlanta, Georgia, 30308.  After being advised of the identity of the interviewing agents and the nature of the interview, TORRES provided the following information:

      TORRES has been working as a Police Officer with the Atlanta Police Department since September 24, 2002, and is currently assigned to the Auto Theft Task Force.

      TORRES stated that she had met ALEX WHITE an informant of the Atlanta Police Department on at least two occasions.  WHITE provided TORRES with information in reference to possible drug dealers in Zone 3.  However, White did not feel like he (WHITE) was able to buy drugs from these possible drug dealers.

      TORRES stated that the Zone 3 FIT team would watch the houses that WHITE had pointed out but, were never able to build enough probable cause to receive a search warrant for the houses.

      TORRES stated that she never fully trusted WHITE as an informant because, WHITE was not willing to buy drugs from the houses he (WHITE) had pointed out.

---

Investigation on    02/06/2007    at  Atlanta, Georgia

File #  ▬▬▬▬▬▬▬▬▬▬▬▬▬    Date dictated _____

by   SA A. Bret Fears
     SA Brian P. Davis

**DOZIER-COA
00206**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___ILKA V. TORRES_____ , On _02/06/2006_ , Page __2__

        The following is biographical information regarding Police Officer TORRES.  TORRES requested her personal information stay confidential.

        TORRES, date of birth, ████████, social security account number ████████.  TORRES' residence is located at ████ ████████████████████████████████████

cellular phone ██████████ .

DOZIER-COA
00207

CONFIDENTIAL

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    11/30/2007

      DANIEL JOSEPH BETTS, who has been interviewed previously
provided the following information:

BETTS set up a meeting with BURCHFIELD to pay him for the extra
jobs.

      BETTS continually during the meeting with the Agents
stated that he did not feel as if he had committed a crime and
stated his agreement with ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
was to be present during payroll.  BETTS also stated that he felt
as if something was not right about what he was doing at ▬▬▬▬
▬▬▬▬▬▬▬▬▬ but, felt like it would be handled by
administrative actions by the Atlanta Police Department and not
criminally by the Federal Bureau of Investigation.

Investigation on   11/07/2007   at Atlanta, Georgia

File # ▬▬▬▬▬▬▬▬▬▬                    Date dictated  N/A
   SA Brian P. Davis                                    **DOZIER-COA**
by   Eulis Mile Brosas                                    **00208**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL



FD-302 (Rev. 10-6-95)

-1-

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription   02/07/2008

       DANIEL BETTS, was interviewed at the United States Attorney's Office, Atlanta, Georgia. BETT'S attorney DON ENGLISH was present for the interview.  Also present at the interview was Assistant United States Attorneys JON PETER KELLY and KURT EURSKINE.  After being advised of the nature of the interview and the identity of the interviewing agents, BETTS provided the following information.

       BETTS advised Atlanta Police Officer BRAD BURCHFIELD began to pick up money from apartment complexes and convenience stores after Atlanta Police Officer GREGG JUNNIER was suspended. JUNNIER gave all these jobs to BURCHFIELD after JUNNIER'S suspension.  BETTS would ride with BURCHFIELD while on duty to help pickup the money.  BURCHFIELD had a list from JUNNIER of at least 6 different locations to pickup money.  One apartment owner named "JAY" paid one time and then quit paying.

       BETTS stated that most of the jobs quit paying BURCHFIELD soon after JUNNIER was suspended.

       BETTS advised he had spoken to ▆▆▆▆▆▆▆▆▆ after the agents had interviewed him about his second jobs.  BETTS advised ▆▆▆▆▆ that the FBI were looking into his extra jobs.  ▆▆▆▆▆ asked BETTS what she needed to say to the FBI.

       According to BETTS, BURCHFIELD did not work off duty at any of these above mentioned extra jobs.

---

Investigation on   11/15/2007   at Atlanta, Georgia

File # ▆▆▆▆▆▆▆▆▆▆▆▆▆                                  Date dictated   N/A

    SA Brian P. Davis

by   SA Eulis Mile Brosas

**DOZIER-COA
00209**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   02/25/2008

   DANIEL BETTS was interviewed pursuant to a plea agreement
at the office of the United States Attorney, Atlanta, Georgia.
Also present were Assistant United States Attorneys Jon Peter Kelly
and Kurt Erskine.  After being advised of identity of the
interviewing agent and the nature of the interview, BETTS provided
the following information:

   BETTS and ATLANTA POLICE DEPARTMENT (APD) Officer BRAD
BURCHFIELD were partners on the Zone 1 Field Investigation Team
(FIT).  During December, 2006, BURCHFIELD told BETTS that GREGG
JUNNIER gave him some extra jobs.  By the end of January, 2006,
they lost extra jobs at most of the businesses, but they kept
three:  a grocery store on Simpson Road, 1247 Simpson Road,
Atlanta, Georgia, and 377 Westchester Boulevard, Atlanta, Georgia.
BURCHFIELD handled almost everything about the extra jobs.
BURCHFIELD and BETTS stopped by the extra jobs while on duty.
Sometimes property owners or managers said there were problems at
certain times and asked for guidance.  When that occurred, if
BURCHFIELD or BETTS were on duty, then they would check it out, or
one of them would call narcotics or an officer on patrol for
assistance.  They received payment in cash, generally on Friday,
and both on and off duty.  BURCHFIELD gave some of the money to
JUNNIER.

   BETTS believes BURCHFIELD arranged for some APD officers
to work security when 377 Westchester had a festival.

   After BURCHFIELD was suspended, BETTS gave BURCHFIELD
half the money from the extra jobs to be kind.

   BETTS provided the following justification for the extra
jobs:  JUNNIER worked them for a long time; three supervisors
signed the extra-job request; and BURCHFIELD called the permit
division about the extra jobs.  BETTS's supervisor, RICK MASON,
told them it was questionable, but if permits approved it, then he
would approve it.

&rule;

| | | |
|---|---|---|

Investigation on   02/22/2008   at Atlanta, Georgia

File #  ██████████████████████   Date dictated  N/A  **DOZIER-COA**

by  Andrew Van Epps          **00210**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

Charged

DOZIER-COA
00211

CONFIDENTIAL

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    12/12/2006

WILBERT TRACY "PETE" STALLINGS, a black male, Date of
Birth, ██████████████, Sergeant in the Narcotics Unit of the Atlanta
Police Department, in charge of Team 1, voluntarily agreed to be
interviewed at his residence in ██████████████, telephone number
██████████████. Also present at this interview was Atlanta Police
Department (APD) Investigator Bobby Render. He was advised of the
purpose of the interview and the identity of the interviewing
agent. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████    ████████████████████████████
██████████████████████████████

STALLINGS advised that he is the sergeant for Team One,
which is one of the two narcotics units at APD. His team includes
the following police officers: GREGG JUNNIER, senior team leader;
NATHAN LUCAS; CARY BOND; GARY A. SMITH; MAURICE GEURIN; JASON R.
SMITH (JR), ARTHUR BRUCE TESLER; HOLLY BUCHANAN.

He also explained that he had not previously provided APD
with statement regarding the execution of the search warrant at 933
Neal Street, Atlanta, Georgia. However, he signed a consent form
regarding any statements regarding prior statements regarding the
incident at 933 Neal Street.

---

Investigation on    12/12/2006    at    Atlanta, Georgia

File # ██████████████████████████                        Date dictated    12/12/2006

by    SA Michael L. Grant                                **DOZIER-COA
                                                          00212**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/22/2006

████████████████████████████████████████████ born ████████
██████, social security number ████████████, ████████, ATLANTA POLICE
DEPARTMENT (APD), █████████████████████████████████████
cellular telephone number ████████████████, was interviewed at his
place of employment.  After being advised of the identities of the
interviewing Agents and the nature of the interview, he provided
the following information:

████████████ was promoted to ████████████ in March 2005, and is
assigned to APD's ███████ Between 2003 and 2005, ████████████ was
assigned to ██████████████████████████████████

████████████ knows ALEX WHITE from his duty on ████████.
████████████ has no specific recollection of using WHITE as an
informant, but thinks he may have used him once or twice.
████████████ advised that he did not have a need to use WHITE while he
was on ███████ since had his own informant that he relied upon.
████████████ has heard others say that WHITE is an effective
informant, and has not heard anything negative about WHITE.

While on ███████, ████████████ preferred to work covertly.
While ████████████ used informants, he liked to make the actual drug
buys himself.  ████████████ advised that many of the buys and search
warrants for narcotics were generated from "lead sheets" received
from various sources in the community.

On the few occasions that ████████████ met WHITE, he thinks
they met at bus stations.  ████████████ does not remember WHITE
driving a vehicle of his own.

Investigation on    12/22/2006   at  Atlanta, Georgia

File #  ████████████████                           Date dictated   12/22/2006
        SA BRIAN P. DAVIS
by   SA EULIS MILE BROSAS:emb                                DOZIER-COA
                                                             00213

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    09/20/2007

       WILBERT T. STALLINGS was interviewed under terms of a proffer agreement at the United States Attorney's Office, Atlanta, Georgia.  STALLINGS's attorney, Brad Gardner, and Assistant United States Attorney Jon-Peter Kelly were also present.  After being advised of the identities of the interviewing agents and the nature of the interview, STALLINGS provided the following information:

       There were times that STALLINGS heard people say that "Aloe" sold them drugs.

**Sources of information:  Curtis and Jermaine Rozier**

       CURTIS ROZIER (ROZIER) began working as an ATLANTA POLICE DEPARTMENT (APD) confidential informant (CI) in 2005 after being stopped.  ROZIER was not paid for his work by APD because he either had a pending case or was on probation, but the ATLANTA HOUSING AUTHORITY (AHA) did not charge ROZIER rent because of his work as an informant.  STALLINGS sometimes paid ROZIER with personal funds. ROZIER provided reliable information and purchased drugs, at the direction of APD officers, over 30 times.  STALLINGS obtained a search warrant as a result of ROZIER's work as a CI.  STALLINGS advised that there was a CI file on ROZIER at APD.

       STALLINGS knew about the arrest warrant for ROZIER and told ROZIER to resolve it, and ROZIER assured STALLINGS that he had resolved the warrant.  STALLINGS last spoke to ROZIER after FBI agents interviewed ROZIER at his job.

       JERMAINE ROZIER began working as an APD CI during September, 2006, after he moved to Atlanta.  JERMAINE ROZIER purchased drugs, at the direction of APD officers, alone and with his father.  There were times when ROZIER purchased drugs alone, and STALLINGS prepared the paperwork, so it appeared as though JERMAINE ROZIER had purchased the drugs.

**Arrest of Contrail Kitchens**

       STALLINGS reviewed APD Supplement Incident Report Number 043102090, and he confirmed there is untrue information in it.

---

Investigation on    09/13/2007    at Atlanta, Georgia

File #  ▌▬▬▬▬▬▬▬▬▬▬▬▬▬▌                    Date dictated    09/20/2007

by   Brian P. Davis
    Matthew J. Ross; Andrew Van Epps

**DOZIER-COA
00214**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**CONFIDENTIAL**

FD-302a (Rev. 10-6-95)

---

Continuation of FD-302 of ___**Wilbert T. Stallings**___ ___ ___ ___ ___ , On **09/13/2007** , Page ___**2**___

The first sentence reads, "On November 05, 2004 around 2130 hours, Investigator G. Junnier and I received information from a confidential source that he/she had observed Contrail Kitchens, A.K.A. Stacy Favors operating a vehicle on Simpson Road between Chappell Road and Ashby Street and believed he was distributing illegal narcotics to people in the area." It is untrue APD Investigator GREGG JUNNIER received the information.

The fourth sentence, which reads, "While checking the area in an unmarked vehicle, Investigator Junnier and I observed the described vehicle travelling on Simpson Road and later pull into the driveway of 1068 Simpson Road and park," includes information that is not true.

The sixth sentence, which reads, "As the vehicle backed out of the driveway, we followed the vehicle at a safe distance for approximately twenty minutes," includes information that is not true.

The eighth sentence, which reads, "As we circled the business and entered the parking lot, we observed the interior light of the vehicle to be on," includes information that is not true.

The tenth sentence, which reads, "As we parked in the parking lot, approximately two car lengths behind Mr. Kitchens, we observed Mr. Kitchens exit the vehicle and place what appeared to be a dark in color handgun in the front of his waist area," includes information that is not true.

The fourteenth and fifteenth sentences, which read, "We then exited the parking lot and requested assistance from Zone Four personnel via cell phone. To avoid being seen by Mr. Kitchens, I spoke to Lieutenant D. Little over the phone and provided him with the name I had on Mr. Kitchens and that we had observed him placing a handgun in his waist area," include information that is not true.

ROZIER was the source of the information about CONTRAIL KITCHENS's (KITCHENS) possession of a handgun. When STALLINGS received the first telephone call from ROZIER, STALLINGS was driving home from work. When STALLINGS received the second telephone call, he may have been at his home. STALLINGS called APD Lieutenant DOUG LITTLE to give him the information from ROZIER.

**DOZIER-COA
00215**

## CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    <u>Wilbert T. Stallings</u>                        , On <u>09/13/2007</u>   , Page  <u>3</u>

      On the day after KITCHENS's arrest, STALLINGS interviewed ROZIER and went with him to 779 Ralph David Abernathy Boulevard to get additional details about the incident.

      During a telephone call, STALLINGS told JUNNIER that he needed JUNNIER to cover him because he did not want to burn his source, ROZIER.  STALLINGS may have driven with JUNNIER to the location of the incident but may have only told him the details. STALLINGS does not recall modifying JUNNIER's and his own time cards to reflect that they were on duty at the time of the incident.

      STALLINGS does not recall talking to anyone at the FULTON COUNTY DISTRICT ATTORNEY's office about the KITCHENS case. STALLINGS spoke to APD Investigator PETERSON, who wanted the case prosecuted federally, but STALLINGS told him they would get KITCHENS another time.  STALLINGS does not recall being subpoenaed to testify in federal court about this incident.

**Investigator Holly Buchanan**

      STALLINGS was shown the paperwork for several search warrants obtained by APD Investigator HOLLY BUCHANAN.  He recalled executing search warrants at 1109 Lookout Avenue and 2479 Abner Terrace.  STALLINGS specifically remembered 2479 Abner Terrace because the subject had a snake in the apartment, and the search team found crack cocaine under the sofa in that apartment. STALLINGS did not recognize the witness signatures on the *Confidential Source Payment Vouchers for 2479 Abner and 350 Lanier.* It was common practice for APD officers to sign the witness line on vouchers without having actually witnessed a payment made to a CI. STALLINGS never observed BUCHANAN obtain ALEX WHITE's or any other CI's signature on a blank voucher.  JUNNIER did get WHITE to sign blank vouchers for convenience.

      STALLINGS recently spoke with BUCHANAN.  They spoke about ROZIER, and during the conversation, BUCHANAN said she believes she will return to work after the investigation is over.

DOZIER-COA
00216

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    07/18/2007

WILBERT TRACY "PETE" STALLINGS, was interviewed at the
United States Attorney's Office, Atlanta, Georgia on July 6 and
July 13, 2007.  His attorney Brad Gardner, (404) 758-1963
(offfice), ▀▀▀▀▀▀▀▀▀▀ (cell), was present for the interview.
Also present at the interview was Assistant United States Attorney
Jon Peter Kelly.   The interview was conducted pursuant to a proffer
agreement.  STALLINGS provided the following information:

STALLINGS advised that he was transferred on/or about
October 1998 from road patrol, where he was a sergeant to the
Narcotics Unit, where he was a sergeant for one of five narcotics
teams.  He explained that he did not receive any training to
supervise one of the narcotics teams.  He was told by one of his
superiors at the time, to have fun, it will work itself out, learn
as you go.  He stated that in the Narcotics Unit there was alot of
freedom, he was more accustomed to a structured environment when he
worked road patrol.  In 1998, there also were alot more veteran
investigators in Narcotics than in 2006.

He stated that in 1998 there was a numbers system in
place for arrests and search warrants per team.  They were over 100
arrests and per team per month, and that each investigator had to
do two search warrants per month.  He could not recall if these
numbers were written down on a memorandum or any other document,
but he did recall that meetings were held and statistics were kept
per investigator and per team.  The type of daily activities that
each team would conduct would include, buy/ bust, pick offs (this
activity involved an undercover officer monitoring a particular
drug area and calling in to have a traffic stop conducted after
witnessing illegal drug activity), arrest warrants, consent
searches, and search warrants.  The Narcotics Unit normally used
lead sheets to direct the teams to areas of concern.  At the time
STALLINGS came into the unit there were an overwhelming number of
lead sheets, and they were always playing catch-up.

The lead sheets came from various sources and were kept
in a database.  Lead sheet that came from the Atlanta City Council
took priority and would require an immediate response.  There may
be twenty or thirty different location on one of these lead sheets.
STALLINGS advised that these lead sheets generated pressure and
there had to be some type of response given back on these

---

Investigation on    07/18/2007    at    Atlanta, Georgia

File # ▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀          Date dictated    07/18/2007

by    SA Michael L. Grant, SA Brian Davis

**DOZIER-COA
00217**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___WILBERT TRACY STALLINGS___ , On 07/13/2007 , Page ___2___

particular lead sheets.   Lead sheets were initially received in by
a secretary, but later it became a supervisors job to receive,
distribute and track.

STALLINGS stated that in 1998 his Lieutenant in Narcotics
was S. SAVAGE, who was latter replaced by E. N. FINLEY, who had
been a Sergeant in the Narcotics Unit, and a team supervisor.
FINLEY was promoted to Major and is presently the Major over Zone
3.  His next Lieutenant was ROBERT BROWNING, and finally in 2006,
GIBBS, who had been a narcotics investigator on Sergeant BROWN'S
team on/or about 1998, when STALLINGS had come to narcotics.

Lieutenant SAVAGE held meetings once a month and the
meetings would be with all the Sergeants.  The meeting would be to
discuss lead sheets and the number of arrests per team.  SAVAGE was
a person that was more mild mannered who would give compliments to
the teams for getting the job done.

When FINLEY took over the Narcotics Unit sometime on/or
about September 2001, a majority of the veteran investigators
transferred out or were forced to transfer to other units.  Under
FINLEY the current numbers were not enough, the numbers had to
increase.  FINLEY changed periodic meetings to weekly meetings, and
he also wrote memorandums laying out the minimum numbers that would
be acceptable per investigator, one particular memorandum was the
"9 and 2", which involved each investigator being responsible for
nine arrests and two search warrants per month.  FINLEY also
started operating "details", which were to operate heavily in hot
drug spots.  These details were responsible for generating
"numbers."  Details could last one to two weeks, with the
cancellation of off days for numerous officers.  These details
would average three to four search warrants a day for the two
weeks.  The lead time to get the number of search warrants was
about two weeks, sometimes less.  There would be about six details
per month.  Approximately three to four hundred people were
arrested per detail.  STALLING added that he did not really feel
pressure until FINLEY took over as Lieutenant.  FINLEY also came up
with a plan to use specific investigators to make buys and then
distribute these buys to other investigators for them to obtain
search warrants.  The two particular investigators STALLINGS
recalled, were MASON and BURNS.  This also was the time that
veteran guys started leaving the narcotics unit and the number of
narcotics teams were reduced as well.  STALLINGS recalled that
FINLEY had a unit meeting to discuss instituting his plan to have a
two man buy team.  He was not sure if GIBBS was still in the

DOZIER-COA
00218

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of      **WILBERT TRACY STALLINGS**              , On 07/13/2007 , Page   3

narcotics unit at this time.   This meeting was held in a big open
cubicle area.  FINLEY operated this two man buy team for period of
time.  The buy team would come back to the unit and the buys would
be equally distributed among the unit so that everyone would get an
equal number of warrants.  In addition, the narcotics teams also
made buys.  Alot of the investigators were not happy with it
because they would be relying on the buy teams information.

STALLINGS also stated uniformed officers would attend
these meetings when they were doing details or "street heat."
Also, while FINLEY was the Lieutenant of narcotics he set up "hot
spot details", which would be conducted each month, after he
reviewed files to see where the hot drug areas were.  He had two
unit details monthly and required that each unit complete their
lead sheets each month.  STALLINGS stated that unit meetings became
redundant under FINLEY.

FINLEY pushed details everyday.  He constantly wanted the
teams to hit hot spots everyday no matter what other things you had
going.  FINLEY was only interested in number arrests, doing details
and hitting hot spots.  FINLEY also set up "Zero Tolerance
Details," which involved hitting locations and if there was only
one hit of crack cocaine, but there were twenty people at the
residence, all twenty people were going to jail.

At supervisor meetings conducted by FINLEY, he would have
a list of things that he had discussed with the Chain of Command
such as number of arrests, hot spots and areas of concern in
various zones.  They would talk about COBRA meetings which involved
all of the Zones.  No one wanted to attend COBRA meetings because
if a particular Zone did not have any drug unit work, FINLEY would
instruct his Sergeants to go into those Zones and get some arrests
and search warrants.  STALLINGS stated that FINLEY would tell the
Sergeants to get all this done before the next COBRA meeting;
however, there was not enough time to do a thorough investigation
to provide to the COBRA meeting.  Also, during these supervisor
meetings if an investigators numbers were low you would hear about
it from FINLEY.  FINLEY would tell the Sergeants that if the
numbers did not come up then the investigator may have his work
hours changed and/or a change of assignment on the team.  FINLEY
would say something about, do we need to find another area for
him/her to work.  STALLINGS recalled that Investigator KELTON HILL,
had his name called out about FINLEY going to send him to the
airport.  FINLEY also, did not want investigators to work
controlled deliveries, because they took more time to work and they

DOZIER-COA
00219

CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    WILBERT TRACY STALLINGS    , On 07/13/2007 , Page  4

did not generate the numbers.  FINLEY told the Sergeants that he
did not want that type of work done, he wanted quick turnaround
work done only.  STALLINGS advised the amount of narcotics seized
from controlled deliveries was more than from the quick turnaround
work FINLEY preferred, but FINLEY really only cared about the
number arrests and search warrants.

STALLINGS recalled that FINLEY was all about the numbers,
and one time he disciplined GREGG JUNNIER for taking a vacation.
FINLEY wanted you working, he did not like guys taking time off.
FINLEY directed that JUNNIER be put on uniform patrol for a period
of time to let him know FINLEY was not happy he was not bringing in
the numbers, because he was on vacation.  FINLEY frequently would
go directly to JUNNIER to cover leads and/or hot spots, instead of
talking to STALLINGS, JUNNIERS's Sergeant, because FINLEY knew
JUNNIER would get the job done.  JUNNIER would come to STALLINGS
after FINLEY directed him to work some area and was pushing numbers
to let STALLINGS know what FINLEY had ordered him to do.  STALLINGS
explained that he and other officer in the narcotics unit felt
direct pressure to get the numbers.  STALLINGS stated that he told
his team that he was feeling the pressure from FINLEY to get
numbers, and his team would go out and get the numbers they had to
do.

STALLINGS added that FINLEY may have operated the same
way when he was a Sergeant.  He believed that Sergeant SPARWATH
would have more specific information regarding FINLEY, because he
had been an investigator on FINLEY's team.

Sergeant CARRIE MILLS, now assigned to Zone 3, formerly a
Sergeant in the Narcotics under FINLEY expressed some of the same
concerns STALLINGS had about FINLEY's push for numbers.

Buy/Bust debriefing reports were developed under FINLEY.
This would be information received from the drug dealer that a buy
was made from.  FINLEY would say take the debriefing form
information and get a search warrant.  This information would be
from a "Non Documented Source."  The Narcotics Unit only had a
limited number of "Documented Reliable Sources."

STALLINGS stated that equipment in the Narcotics Unit
was limited, such as recorders and undercover vehicles.  STALLINGS
and some others would use their personal vehicles to make buys.
SAVAGE and FINLEY were aware of the use of personal vehicles.  But,
when Lieutenant BROWNING took over Narcotics, sometime on/or about

DOZIER-COA
00220

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___WILBERT TRACY STALLINGS_____, On 07/13/2007 , Page __5__

late 2003 and early 2004, the use of personal vehicles came to a stop.

BROWNING tried to get away from the number system, but numbers were still being worked, primarily due to the COBRA meetings. The number of details decreased. The Narcotics Unit was still getting lead sheets from the Atlanta City Council. STALLINGS heard that at the COBRA meetings the decrease in Narcotics numbers was discussed. BROWNING was a 9 to 5 kind of guy, that was very much by the book, and did not go out on search warrants, unlike FINLEY, who was always out on the streets during execution of search warrants. BROWNING also was cautious of how to use cooperating informants (CI). It was almost impossible to sign up a CI, that was why ALEX WHITE became more valuable as a CI. WHITE was almost the only CI available for Narcotics Team 1 to use.

Lieutenant GIBBS took over the Narcotics Unit on/or about January 2006. At this time there also was only two narcotics teams. GIBBS and Deputy Chief ANDRESEN wanted to do more large scale drug cases, but the numbers started to decrease. GIBBS cared for the officers, and would commend them on there job. In the later part of 2006, because the numbers had declined the Narcotics Unit started doing "details" more frequently again.

Initially there also was two officers set up to do controlled deliveries again. One of these officers for GREGG JUNNIER. GIBBS also tried to change lead sheets to get the Zones and REDDOG more accountable, because lead sheets were too numerous for narcotics. Sometime around the summer of 2006, details started kicking in again.

STALLINGS recalled meetings with ANDRESEN, Major DAVIS, GIBBS, and other SES supervisors, such as vice, safe neighborhoods, gang, gun, permits, intel, and the Zone units where it was advised that SES Details would be conducted on a more regular basis. SES Details were to assist in working cohesively together to get the numbers up.

He also recalled at Narcotics Unit supervisor meetings GIBBS would tell the Sergeants to get search warrants and do buy/bust details to prepare for the upcoming SES Details.

STALLINGS stated that he was pretty sure that GIBBS knew that the teams were doing shared buys, but he did not have any specific recall of him telling her. GIBBS had a very close

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of   __WILBERT TRACY STALLINGS_____ , On _07/13/2007_ , Page __6__

relationship with the investigators in the Narcotics Unit.  GIBBS
was a hands on Lieutenant.  She had an open door policy with the
investigators.  She frequently went on the execution of search
warrants.

STALLINGS also explained that many in the Narcotics unit
operate outside jobs, and some cases will do some of their second
jobs while on duty.  Extra job requests have to submitted annually.
It primarily only lists who the contact person is at the second
job.  He stated that he, JUNNIER and Investigator FIELDS operated
outside jobs with various apartment complexes in the Atlanta area
that they worked in the Narcotics Unit.  JUNNIER was contacted by
the apartment complexes before or after they got to work.  In some
cases they found themselves spending more time at the second job
location while on duty.  This was brought to FINLEY's attention and
he kind of blew it off.  FINLEY's response was to keep the numbers
going.  STALLINGS recalled that FINLEY said "I don't care about
it."  No one got disciplined or moved and STALLINGS assumed it was
alright to continue to operate the second jobs the way they had
been.  STALLINGS had felt like they were straddling the line, but
they worked this way for several years.

STALLINGS added that these second jobs were approved by
management, and they were not the first to set up second jobs like
this, other narcotics teams, as well as other units in the Zones
operate second jobs like this.

The pay they received from second jobs was about $200 a
week per officer, which was paid in cash.  JUNNIER primarily made
the collection of cash which was received in an envelope.
Sometimes he would go to the apartment management office.
STALLINGS sometime went with JUNNIER to pick up the money.

STALLINGS explained that there were a limited number of
informants being operated by the Narcotics Unit.  Team One
specifically was operating one main informant, and that was ALEX
WHITE.  WHITE primarily worked with JUNNIER, and occasionally with
CARY BOND.  STALLINGS explained further that he was aware that
WHITE was making drug buys where investigators were not observing.
He stated that the reasons were mainly that JUNNIER was a white
male and could not get in a position in the drug area to observe
the buy, and some of the locations the drug buys were occurring in
investigators could not keep eyesight on WHITE to observe the buy.

DOZIER-COA
00222

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of     __WILBERT TRACY STALLINGS__       , On __07/13/2007__ , Page   __7__

         He also was aware that WHITE did make buys on his own, without the assistance of investigators, but he believes this was done infrequently. The team had a good working relationship with WHITE. He does not believe that GIBBS was aware of this. J.R. SMITH tried to allow his informant, DIAMOND, to make buys on his own, but STALLINGS told SMITH not to do that. They had not built a strong working relationship with DIAMOND, and SMITH could be a little careless.

         STALLINGS advised that Team One also operated a non documented source by the name of CURT ROZIER, who lives in Bowen Homes. He has tried to get ROZIER opened as a documented source for some time, but has not be able to because he is on probation. ROZIER's son, JERMAINE ROZIER, is opened as a documented source. He sometimes paid CURT with his own money for making buys, but initially CURT did not get paid at all. To pay CURT they would prepare vouchers signed by JERMAINE, as well as they would increase buy amounts on reports. Instead of writing up a nickel bag, they would put down that a dime bag was purchased. STALLINGS does not believe that the Chain of Command was aware of this. ROZIER was used by Investigator HOLLY BUCHANAN to make buys, but BUCHANAN wrote up the reports that JERMAINE did the buys. On some occasions both the ROZIERS were together to make the drub buy, but they could not always get JERMAINE. STALLINGS signed off on these reports as the supervisor.

         STALLINGS did a report on a subject known as STACY KITCHENS regarding carrying a concealed gun. The information came from CURT who was with KITCHENS in a vehicle. STALLINGS contacted Lieutenant DOUG LITTLE to get his Zone patrol units try to do a traffic stop. The Zone did not to it as a traffic stop, but did arrest KITCHENS for gun charges. STALLINGS had written the report to include JUNNIER being with STALLINGS, stating they observed KITCHENS with the gun. JUNNIER was not actually with STALLINGS. The purpose was not burn CURT. STALLINGS told LITTLE to drop the charges, because it would have burned CURT as providing the information.

         He stated that pat downs did occur prior to and after sending in the informant, but not always. Padding of vouchers did occur on non warrant buys. He is aware of JUNNIER doing this to get equipment for the team, but does not recall others.

DOZIER-COA
00223

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    08/17/2007

   WILBERT TRACY "PETE" STALLINGS, was interviewed at the
United States Attorney's Office, Atlanta, Georgia.  STALLINGS'
attorney BRAD GARDNER was present during the interview.  Also
present at the interview was Assistant United States Attorney Jon
Peter Kelly.  The interview was conducted pursuant to a proffer
agreement.  STALLINGS provided the following information:

   STALLINGS stated the Atlanta Police Department Narcotics
Investigators would turn in a package to their secretary GAIL
TAYLOR when they had completed a drug buy or obtained a search
warrant in order to receive credit on  a monthly report.  The
package would possibly consist of a buy report, a search warrant
report, evidence log sheets, and seized property report.  TAYLOR
would prepare a stat sheet to display Teams 1 and 2 stats for the
month, which would include felony and misdemeanor arrest, cleared
lead sheets, search warrants served and consent searches.

   STALLINGS advised on a few occasions he heard Atlanta
Police Department narcotics investigator GREGG JUNNIER state his
confidential informant had made 4 or 5 buys.  JUNNIER would then
ask if one of the investigators could handle one or more of the
write ups.  This would mean the investigator would write up the buy
as if they had completed the buy and would normally claim the stat.
The investigator would possibly use this information to obtain a
search warrant and write the affidavit as if they had completed the
buy.  STALLINGS has witnessed the following Atlanta Police
Department narcotics investigators except the buys from JUNNIER and
claim the stat for themselves, GARY SMITH, NATHAN LUCAS, HOLLY
BUCHANAN, J.R. SMITH, and ARTHUR TESLER.  STALLINGS could not
remember if investigator CARY BOND had ever received one of
JUNNIER'S warrants.  STALLINGS had also asked JUNNIER to pass out
some of his buys to other investigators that were low on that
particular month.

   STALLINGS stated he would go out to help his
investigators on occasions.  STALLINGS has helped BOND, BUCHANAN,
MAURICE GEURIN, GARY SMITH, LUCAS, and JUNNIER make drug buys.

   STALLINGS stated that after his (STALLINGS) father died
he asked JUNNIER to step up and basically run the squad.  STALLINGS

---

Investigation on    07/24/2007    at Atlanta, Georgia

File #  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                        Date dictated   N/A

by   SA Brian P. Davis

**DOZIER-COA
00224**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

CONFIDENTIAL



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of   __WILBERT TRACY "PETE" STALLINGS__   , On 07/24/2007 , Page   2

asked JUNNIER to make sure everyone was producing enough stats each
month.

STALLINGS stated that he would look over buy reports and
search warrants and make suggestions.  However, STALLINGS did not
look over all of the search warrants before the investigators took
them to the magistrate.

STALLINGS knew that JUNNIER would use STALLINGS' name on
buy reports even if STALLINGS was not present during the drug buy.
STALLINGS believes that JUNNIER was the only investigator that
would use STALLINGS' name on a buy report when STALLINGS was not
present.

STALLINGS has taken Atlanta Police Department
confidential informant ALEXIS WHITE out to purchase drugs without
any other investigators involved.  STALLINGS would then turn over
all of the drugs and information to JUNNIER and allow JUNNIER to
write up the information as if JUNNIER had done the buy himself.
STALLINGS stated on some of these buys he would not follow WHITE to
the house and would just sit at another location and wait for WHITE
to return with the drugs.  STALLINGS was aware that JUNNIER would
write the report as if they were able to watch the drug buy.
JUNNIER has told STALLINGS in the past if we need to get our
numbers up then we need to trust WHITE.

STALLINGS stated that he has been with BUCHANAN, GARY
SMITH and LUCAS when they would sit at a location and allow their
informant to leave and bring the drugs back to their location.
STALLINGS was aware that these investigators would write the
reports as if they had witnessed the buys and on some occasions
obtain search warrants by using the falsified information.

### VOUCHERS

STALLINGS advised each investigator receives $300.00 to
make drug buys.  When the investigator had used their allotted
money they would turn in all of their vouchers and then have
another $300.00 re-issued.  STALLINGS stated Sergeant BROWN changed
the rules and made the investigators begin to turn their money in
at the end of the month regardless of how much money they had spent
and have the $300.00 re-issued each month.  STALLINGS had signed

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___WILBERT TRACY "PETE" STALLINGS___ , On 07/24/2007 , Page ___3___

vouchers as a witness for JUNNIER and BUCHANAN even when he did not
witness the payment to the informant.

STALLINGS had knowledge of JUNNIER using vouchers to pay
himself back if he ever spent money out of his own pocket for work
related expenses.  STALLINGS also remembers JUNNIER offering to
reimburse STALLINGS for gas that STALLINGS had spent by using his
own vehicle during a drug buy.  STALLINGS remembers telling JUNNIER
that he could reimburse him but, does not remember receiving money
from JUNNIER.  However, STALLINGS does recall JUNNIER giving money
back to STALLINGS when he (STALLINGS) used his own money to give to
ALEX WHITE to purchase drugs.

STALLINGS told J.R. SMITH that he could not tint his work
vehicles' windows and then voucher the money.

### JUNNIER

STALLINGS on one occasion witnessed JUNNIER confront a
subject on North Avenue and Simpson in 2005 or 2006 and threaten to
plant drugs on the subject.  JUNNIER was interviewing the subject
when JUNNIER held approximately a nickle bag of marijuana up and
said "These drugs are yours."  The subject became irrate and LUCAS
had to restrain the subject.  JUNNIER then pulled STALLINGS aside
and said the drugs were not off of the subject and that he (JUNNIER)
was just testing the subject.  STALLINGS did not know where the
drugs had come from and STALLINGS gave JUNNIER a verbal warning to
never use that technique on a subject.

STALLINGS stated in 2006, JUNNIER was serving a search
warrant located at Simpson road and Martin Luther King Boulevard.
The house is on top of a hill and there is a convenience store
located at the bottom of the hill across the street from the house.
JUNNIER had found some drugs in the house and threatened to arrest
the subjects wife and kids if he did not admit the drugs were his
drugs.  When the subjects mother walked into the house, JUNNIER
told J.R. SMITH or TESLER to place her in handcuffs.  STALLINGS
told the investigator to take the Mom out of handcuffs and then
gave JUNNIER another verbal warning about this incident.

DOZIER-COA
00226



# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___WILBERT TRACY "PETE" STALLINGS___ , On _07/24/2007_ , Page ___4___

## 933 Neal Street, Atlanta

STALLINGS stated on the evening of the shooting he had asked J.R. SMITH and JUNNIER to be on standby for a possible search warrant that LUCAS was trying to obtain. STALLINGS was with LUCAS at the District Attorney's office trying to obtain the warrant when JUNNIER called STALLINGS and told him that he had a search warrant they were trying to obtain for 933 Neal Street, Atlanta, Georgia. STALLINGS stated that he was mad at JUNNIER for not listening to his request.

STALLINGS advised that J.R. SMITH did not have an operational plan prepared for the search warrant that he had received for 933 Neal Street. STALLINGS was not certain if J.R. SMITH ever wrote a operational plan for the search warrant. STALLINGS stated after the shooting occurred, he ordered J.R. SMITH to place Mrs. JOHNSON in handcuffs. J.R. SMITH explained that JOHNSON had blood coming out of her back so J.R. SMITH handcuffed JOHNSON in the front. GARY SMITH had kicked the gun out of Mrs. JOHNSON'S hand and BOND later placed it on a bed.

STALLINGS later saw J.R. SMITH and TESLER behind the house speaking with some RED DOG Officers. STALLINGS never witnessed J.R. SMITH or TESLER entering the basement.

JUNNIER told STALLINGS that he was going to give WHITE approximately $150.00 to leave town. STALLINGS later received a call from WHITE explaining that he did not make a buy at 933 Neal Street, Atlanta. STALLINGS passed this information to Lieutenant GIBBS.

The day after the shooting STALLINGS received a call from TESLER stating that he still had drugs that needed to be turned into evidence. TESLER stated that it was five bags of marijuana that needed to be turned into evidence. STALLINGS told TESLER to call dispatch and get an incident number and turn the drugs into evidence. GEURIN and LUCAS were sitting with STALLINGS when he received this call. GEURIN and LUCAS both asked STALLINGS why TESLER called STALLING about placing drugs into evidence. STALLINGS thought TESLER should have turned the drugs in the night before while a few of the members of narcotics Team 1 were at the Hospital. STALLINGS informed Chief ANDRESEN that TESLER was turning his drugs in late and ANDRESEN explained to STALLINGS not to write TESLER up for being late. ANDRESEN stated that TESLER

DOZIER-COA
00227

# CONFIDENTIAL

FD-302a (Rev. 10-6-95)

━━━━━━━━━━━━━━━

Continuation of FD-302 of     WILBERT TRACY "PETE" STALLINGS     , On 07/24/2007  , Page   5

should turn in the drugs into evidence and write a detailed report.

STALLINGS asked JUNNIER if he knew that TESLER had not turned in the drugs from the day of the shooting.  JUNNIER asked STALLINGS how much was TESLER turning into evidence.  STALLINGS stated 5 bags of marijuana.  JUNNIER stated he thought it was more but he had not counted the bags.

STALLINGS was never informed by JUNNIER, TESLER or J.R. SMITH or any other members of the narcotics team that the search warrant contained falsified information.

DOZIER-COA
00228

# CONFIDENTIAL

FD-302 (Rev. 10-6-95)



- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    08/23/2007

WILBERT TRACY "PETE" STALLINGS, was interviewed at the
United States Attorney's Office, Atlanta, Georgia.  STALLINGS'
attorney BRAD GARDNER was present during the interview.  Also
present at the interview was Assistant United States Attorney Jon
Peter Kelly.  The interview was conducted pursuant to a proffer
agreement.  STALLINGS provided the following information:

### 1058 Dill Ave, Atlanta, Georgia

STALLING reviewed an incident report for 1058 Dill
Avenue, Atlanta, Georgia.  The date of the incident was October 19,
2005.  STALLINGS stated that narcotics investigator GREGG JUNNIER
had a search warrant for 1058 Dill Ave which was one side of a
duplex. .  During the search the investigators found some type of
documents showing the subjects in 1058 Dill Ave, may have some type
of ownership on 1056 Dill Ave.  STALLINGS, JUNNIER and narcotics
investigator HOLLY BUCHANAN, walked to the back door of 1056 Dill
Ave, and decided to enter the residence to conduct a search.
STALLINGS remembers discussing with JUNNIER the possibility of
obtaining a warrant for 1056 Dill Ave, and they decided not to get
a warrant. STALLINGS thinks that JUNNIER may have said they did not
need to get a warrant.  STALLINGS believes the door was forced open
by the investigators and then they conducted a search of the house.
The investigators did not find any contraband in 1056 Dill Ave.
STALLINGS told the investigators to shut the back door as best as
they could.  STALLINGS remembers someone stating "maybe they will
just think someone broke into the house."  STALLINGS remembers
thinking that he hoped no one would complain.  STALLINGS does not
remember anyone complaining about this incident.

### Second Jobs

STALLINGS stated that JUNNIER would spend a lot of time
patrolling the apartment complexes that he was suppose to be
working off duty.  When JUNNIER and other members of the narcotics
team to include STALLINGS began to work second jobs at different
apartment complexes, they initially patrolled the apartment
complexes before and after work.  However, the investigator began
to only patrol the apartment complexes while on duty.  STALLINGS
and the other members of the narcotics team began to feel like they
were working at the apartment complexes to much while on duty.

| Investigation on | 08/22/2007 | at | Atlanta, Georgia |
|---|---|---|---|

| File # | | Date dictated | N/A |
|---|---|---|---|

by  SA Eulis Mile Brosas
    SA Brian P. Davis

DOZIER-COA
00229

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

**CONFIDENTIAL**

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____ <u>Wilbert Tracy Stallings</u> ____, On <u>08/22/2007</u>, Page __2__

Most members of the narcotics team did not like to enforce "house rules." Enforcing "house rules" meant the narcotics team would patrol the apartment complexes and enforce non-criminal apartment rules, such as telling people they could not set up basketball goals in the parking lot or would tell residence living at the apartment complex to not hang out in the parking lot. The narcotics team would also make "DC" (disorderly conduct) arrest. STALLINGS stated that these arrest would be very weak arrest to help clean up the apartment complexes.

JUNNIER began to drive a marked unit while on duty. The other narcotics team members felt as if JUNNIER was driving the marked unit to help him patrol the apartment complexes.

STALLINGS stated that most of the members of the narcotics team had complained at different times about working the off duty jobs while on duty. According to STALLINGS, narcotics investigators ALLEN ABERCROMBIE and IVANT FIELDS were two officers that STALLINGS stated may have been moved out of narcotics because they were tired of assisting JUNNIER on his second jobs.

STALLINGS stated that FIELDS originally did work second jobs while on duty but stopped working the second jobs because he felt it was ethically wrong. ABERCROMBIE also started to complain about JUNNIER taking up so much time patrolling the apartment complexes while on duty. ABERCROMBIE would not work the second jobs, but would ride with JUNNIER to do his rounds through the apartment complexes. STALLINGS stated that JUNNIER wanted ABERCROMBIE moved off of the squad because he was not a producer. STALLINGS stated that ABERCROMBIE was a producer. However, FIELDS and ABERCROMBIE were both moved off of the squad without real cause by Lieutenant FINLEY.

**DOZIER-COA 00230**

CONFIDENTIAL

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   08/27/2007

      WILBERT TRACY "PETE" STALLINGS, who has been previously interviewed, was interviewed at the United States Attorney's Office, Atlanta, Georgia.  Also present was STALLINGS' attorney, BRAD GARDNER and Assistant United States Attorney JON-PETER KELLY. The interview was conducted pursuant to a proffer agreement. STALLINGS provided the following information:

      On the evening of November 21, 2006, after the execution of the search warrant and the shooting at 933 Neal Street, Lieutenant MITCHELL asked STALLINGS if the basement had been cleared.  When STALLINGS responded "no," MITCHELL advised that he would get REDDOG members to clear it.  When STALLINGS arrived at the rear of the house, he saw J.R. SMITH and BRUCE TESLER talking with each other at the rear of the house.  STALLINGS did not see either J.R. SMITH or TESLER enter the basement.

      On the following day, when TESLER called STALLINGS to inform him about having drugs that he did not turn in, STALLINGS became suspicious and asked TESLER if "they planted dope" at 933 Neal Street.  TESLER replied that he had not, and would not have done something like that.  STALLINGS could not specifically recall, but thought TESLER was with J.R. SMITH when he called.

      Afterward, when TESLER had submitted the drugs and returned to the squad area, STALLINGS again asked TESLER if he planted drugs at 933 Neal Street.  TESLER again replied that he had not.  STALLINGS thinks that TESLER walked in to the squad area with J.R. SMITH.

Investigation on   08/22/2007   at Atlanta, Georgia

File # ▆▆▆▆▆▆▆▆▆▆▆▆▆    Date dictated _____

by   SA Brian P. Davis
    SA Eulis Mile Brosas:emb

**DOZIER-COA
00231**

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.