IN THE UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SARAH C. DOZIER, as Administrator of )
the Estate of KATHRYN JOHNSTON, )
)
Plaintiff, )
)
v. )
)
CITY OF ATLANTA, et al. )   CIVIL ACTION FILE
)   NO.1:08CV00007-MHS
)
Defendants. )

## AFFIDAVIT OF JASON R. SMITH

THE UNDERSIGNED, being first duly sworn, deposes and says:

1.

I am 21 years of age or older and have the capacity to make this affidavit.

2.

I served as an Investigator  with the Atlanta Police Department from June 2005 to January 2007.  During this time I worked in what is know as the Narcotics Division.  I was hired by the Atlanta Police Department in December 1999.

3.

The work of the entire Atlanta Police Department was numbers driven. Within the Narcotics Division, the Atlanta Police Department law enforcement policy was numbers driven as well.  Supervisors focused on the number of arrests

and search warrants regardless of the legality or quality of the arrests and warrants, or the lack of investigation and outcome of disposition of the case. Detectives such as myself were evaluated on numbers and not the quality of our work. The numbers were the most important thing. Supervisors would have officers ignore subpoenas for court and cover for them if a failure to appear order was issued by the court. Supervisors would encourage investigators to call court and make up excuses not to attend court so that they could stay on the street and make additional arrests. Oftentimes the supervisors would call court and make up excuses for the investigators as well. This practice was encouraged by supervisors at least up to the rank of Major during "detail" (details are meetings of officers with supervisors and these meetings were strictly a numbers function). These details were conducted to boost the numbers in times when numbers were expected to drop due to officers or investigators taking off for holidays, summer vacations and the like. It is also important to note that during these operations called "detail," investigators in Narcotics were expected to produce at least 2 search warrants during the "detail" itself. This was in addition to the standard practice known as the "9 and 2 Rule" which will be discussed below.

4.

This quota system placed significant pressure on officers to achieve numbers regardless of the law or written department policies. The result was citizens being

illegally arrested, wrongfully convicted, and falsely imprisoned. These quotas also encouraged investigators to create probable cause when none existed and supervisors were aware of this and encouraged the creation of false probable cause.

5.

Supervisors high up the chain of command within the Atlanta Police Department promoted and approved this quota practice and this practice was the policy of the department. This policy was also discussed at unit meetings with command staff in the presence of deputy chiefs. The practice was widespread throughout the Atlanta Police Department and actively in place at the time of the shooting of Kathryn Johnston.

6.

The quota referred to required each officer in the Narcotics Division to make nine arrests and obtain two warrants every month. Everyone recognized the APD policy as the "9 and 2 Rule." The Rule was memorialized in flyers and memoranda posted in our division. It also was enforced by our superiors on a daily basis and as a part of our evaluation process. This "9 and 2 Rule" was reinforced by the policy know as "Pay for Performance" whereby those of us in the Narcotics Division received extra payments in the form of performance checks when we met or surpassed this "9 and 2 Rule."

7.

Officers were constantly reminded of the need to meet their numbers. The Department also created a policy known as "Pay for Performance," which rewarded officers with money bonuses when they met and exceeded the quota policy. This created a financial incentive both for investigators and supervisors to meet their quota no matter what the cost because they stood to personally benefit from high arrest numbers. This fact was understood and aided by our supervisors, who would also benefit from this "Pay for Performance" policy by seeing to it that the arrest numbers were high. Supervisors would conduct what they called "body days" where they would get their whole team together for the sole purpose of making as many arrests in as short a time as possible to satisfy the quota requirements. These "body days" were normally conducted toward the end of the month if the numbers for that particular month were looking low. The entire narcotics team along with a supervisor would ride around the city in a black van known as the "jump out van." Using the "jump out van" we would stop it in the street and the whole narcotics team would jump out of the van and physically detain everyone on the street near the van. Then, without probable cause, each "suspect" would be searched for narcotics. If narcotics were found, the officer involved would create false probable cause and make an arrest in violation of the "suspects" civil rights. Some of the people living in the area where the "jump out

van" generally operated even had tee shirts made up with the words "jump out boys" on the tee shirts.   Sgt. Stallings, Lt. Gibbs and the Assistant District Attorney for Narcotics all had one of these "jump out boys" tee shirts.

8.

Due to the pressures of the quota policy, coupled with the lack of training and equipment, officers within the Narcotics Division routinely were unable to properly develop and investigate leads relating to illegal drugs and narcotics. We simply did not have the time, training or equipment to do so. Due to the pressures of the quota policy, officers, with the guidance and approval of their supervisors, would often cut corners by obtaining warrants based upon false information to support wrongful arrests. Due to the lack of training, investigators did not know how to legally develop probable cause for search warrants.

9.

The quota policy, and specifically the "9 and 2 Rule," placed significant pressure on the officers to meet their numbers and had a significant negative impact on the way in which undercover drug-buys involving confidential informants were conducted.

10

The lack of surveillance equipment and training made it impossible for investigators to operate within the written policies, which seemed to be designed

solely to protect the City if something went wrong as it did in the instance of the Kathryn Johnston shooting.

11.

For example, in order to get a search warrant, it was often necessary to perform a supervised undercover buy to show that drugs were at the subject premises.  The officers would rely on a confidential informant to arrange and make the drug purchase.  While there were written policies on how the process would work, with the approval of our supervisors, we routinely did not follow these due to the pressure to make our quota numbers.  Rather, we would use short cuts which many times involved false swearing on warrants.  The policies existed just to cover for the City of Atlanta in the event things went bad, because many of the written policies were knowingly ignored or violated regularly by superiors and investigators.   It was the normal practice of the department for confidential informants to make unsupervised, unmonitored buys, regardless of what the written policies and procedures said.  Even though the confidential informants would make a buy at any location they desired, the assigned investigator would routinely swear out a warrant testifying that he or she witnessed the narcotics buy, and did the required search of the confidential informant prior to making the buy. The truth however is that the investigators would oftentimes not have witnessed the narcotics buy by the confidential informant nor would they conduct the

required search of the confidential informant prior to the buy.    Thus the
investigator would be lying about what transpired and these lies were recorded on
search warrants as a matter of common practice.

12.

We also would attempt to meet the quota system by manipulating
investigations.  For example, one officer would do all the legwork in terms of
organizing the undercover buy and monitoring the confidential informant.
However, with the supervisor's knowledge and encouragement,  this information
would be passed on to an officer who needed a bump in his numbers to meet his
quota.  Essentially, the documents used in support of the search warrant were not
prepared by the officer purporting to write them.  Obviously, in such a situation the
warrant application is completely unreliable because the officer submitting the
application cannot attest to the truth of the facts asserted.

13.

Another example of manipulating investigations in order to meet the quota
system deals with the way in which controlled buys were handled.  Investigators
such as myself were encouraged by superiors to write the required paperwork as
though we controlled or witnessed these controlled purchases even though we may
not have.  The purpose of this practice was to limit the number of investigators
which may have to testify if the case went to court.  The reason for this practice

was to keep investigators out of court and on the streets to make more poor quality arrests in order to meet the quotas.

14.

All of this illegal activity was the result of the quota policy, coupled with the lack of training and equipment. We followed this policy because we had no choice. Also, we were punished for failing to make our numbers. That punishment would take the form of unfavorable assignments, threats of transfer, change of off days and/or work hours and more details, among other things. We were financially rewarded for meeting the quota numbers. In our unit meetings Lt. Gibbs told the unit that when numbers were low they must come up. She would tell the unit that she knew people in high places and would have investigators moved who did not do their part to raise the numbers. It is my understanding that Chief Pennington was the driving force behind these quotas, and re-enforced the push for numbers during his weekly "COBRA" meetings, held for officers, supervisors and community members. During these "COBRA" meetings, supervisors were held accountable for low arrest and search warrant numbers by the people who worked underneath them.

15.

Sgt. Stallings knew that the officers were falsely creating evidence and obtaining fraudulent warrants as well as regularly violating policies to achieve the

quota numbers. Lt. Gibbs would routinely state to us "I just don't want to hear it." In spite of this knowledge, the supervisors did nothing about it, and in fact, routinely encouraged the officers to increase their numbers regardless of the means employed. While supervisors and command staff may claim a lack of knowledge about the matters addressed above, anyone who reviewed the numbers of warrants and arrests can conclude that there is simply not enough time to correctly investigate cases to achieve the numbers recorded, without taking shortcuts.

16.

The Kathryn Johnston shooting on November 21, 2006, was a direct result of the quota policy, coupled with a lack of supervision, lack of enforcement of written policies, and lack of equipment and training. Investigator J. R. Smith falsely swore out a warrant on Mrs. Johnston's home in an effort to arrest a kilo drug dealer and satisfy his quota numbers. Investigator Smith wanted to reach his quota numbers for the month of November, which was soon coming to a close. Mrs. Johnston's death is a direct result of the action taken trying to comply with this quota policy, coupled with the lack of supervisor, lack of enforcement of written policies and lack of equipment and training. Further, most of those actions were accepted as routine operations by supervisors in the Narcotics Division in the Atlanta Police Department.

17.

In addition to everything set forth in this Affidavit, there was also an absolute lack of training and supervision as well as a lack of equipment and enforcement of written policies which hampered the quality and legality of investigations conducted by the Atlanta Police Department which contributed directly to Mrs. Johnston's death.

18.

In the summer before November 21, 2006 in the shooting of Kathryn Johnston,  Lt. Gibbs because of concern over the fact that numbers of search warrants and arrests were low, conducted a PowerPoint presentation to both narcotics teams instructing how to increase the number of search warrants and arrests.

19.

With respect to the report of the Neal Street incident itself, I prepared the original report on the Neal Street incident.  I turned in the report to Sgt. Stallings who was involved in the incident.  He passed the report on to Lt. Gibbs.  Lt. Gibbs called me at home shortly thereafter to come to City Hall.   There at City Hall Lt. Gibbs redid the entire report while I sat in her presence.  Lt. Gibbs suggested during the preparation of the report specifics that she believed needed to be included in the report.  The original report that I had prepared was shredded.  After

Lt. Gibbs prepared the new report she and I went to see Maj. Davis who I did not personally know up until that point.   Maj. Davis reviewed the report in our presence and approved it while Lt. Gibbs and I were there.   These procedure had never occurred before and was an unusual event.

20.

Prior to the Neal Street shooting took place, another incident occurred which was unusual and potentially dangerous.   This particular event took place on Simpson Street at the home of a lady that I remember as Frances Thompson.   The warrant for a drug arrest at this location was taken out by Investigator Holly Buchanan who also worked under Sgt. Stallings.     Officer Buchanan used an unregistered confidential informant and then later a registered confidential informant to assist in getting the necessary warrant.   Investigator Holly Buchanan got the warrant, the door was broken down and the investigators invaded the home by busting the door down, much as we did in the Neal Street incident.   We woke an elderly woman who was standing inside with a toy gun and she came very close to being injured by Atlanta Police Department gunfire.     In this particular arrest, Holly Buchanan did not supervise the buy and in fact there were no drugs in this lady's apartment.   This happened approximately one month to six weeks before the Neal Street incident and after it occurred a number of us discussed with Sgt.

Stallings the fact that we needed to slow these arrests down because they were becoming dangerous.

   FURTHER AFFIDANT SYAETH NOT

Sworn to and subscribed before
me this _18_ day of _June_ ,
2009.

Notary Public, State of Georgia

My Commission Expires:

   Notary Public, Paulding County, Georgia
   My Commission Expires May 30, 2011

JASON R. SMITH