IN THE UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 2 3 2009

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

SARAH C. DOZIER, as Administrator of    )
the Estate of KATHRYN JOHNSTON,    )
   )
Plaintiff,    )
   )
v.    )
   )
CITY OF ATLANTA, et al.    )   CIVIL ACTION FILE
   )   NO.1:08CV00007-MHS
   )
Defendants.    )

## AFFIDAVIT OF GREGG JUNNIER

THE UNDERSIGNED, being first duly sworn, deposes and says:

1.

I am 21 years of age or older and have the capacity to make this affidavit.

2.

I served as an Investigator with the Atlanta Police Department from October
1998 to January 2007. During this time I worked in what is know as the Narcotics
Division. I was hired by the Atlanta Police Department on September 9, 1988.

3.

The work of the entire Atlanta Police Department is numbers driven. Even
beat officers are required to have a certain number of tickets and arrests. Within
the Narcotics Division, the Atlanta Police Department law enforcement policy was

numbers driven as well. Supervisors focused on the number of arrests and warrants regardless of the legality or quality of the arrests and warrants, or the lack of investigation and outcome of disposition of the case. Detectives such as myself were evaluated on numbers and not the quality of our work. The numbers were the most important thing. Supervisors would have officers ignore subpoenas for court and cover for them if a failure to appear order was issued by the court. Supervisors would encourage investigators to call court and make up excuses not to attend court so that they could stay on the street and make additional arrests. Oftentimes the supervisors would call court and make up excuses for the investigators as well. This practice was encouraged by supervisors at least up to the rank of Major during "detail" (details are meetings of officers with supervisors and these meetings were strictly a numbers function). These details were conducted to boost the numbers in times when numbers were expected to drop due to officers or investigators taking off for holidays, summer vacations and the like.

4.

This quota system placed significant pressure on officers to achieve numbers regardless of the law or written department policies. The result was citizens being illegally arrested, wrongfully convicted, and falsely imprisoned. Supervisors did not care what the arrest was for. In our division, an arrest rate for a person publicly drunk on the street was as significant in the numbers process as the arrest of a large

drug dealer. Oftentimes investigators were told once they obtained a specific number of arrests they could take a day off as an "administrative day" since they had reached their numbers, and still get paid for that day off.

5.

Supervisors high up the chain of command within the Atlanta Police Department promoted and approved this quota practice and this practice was the policy of the department. This policy was also discussed at unit meetings with command staff in the presence of deputy chiefs. The practice was widespread throughout the Atlanta Police Department and actively in place at the time of the shooting of Kathryn Johnston.

6.

The quota referred to required each investigator in the Narcotics Division to make nine arrests and obtain two warrants every month. At one point while I was an investigator in the Narcotics Division, investigators were directed that they had to get 20 "bodies", meaning arrests per month to keep from being hassled by supervisors or threatened with a transfer. Everyone recognized the APD policy as the "9 and 2 Rule." The Rule was memorialized in flyers and memoranda posted in our division. It also was enforced by our superiors on a daily basis and as a part of our evaluation process.

Officers were constantly reminded of the need to meet their numbers. The Department also created a policy known as "Pay for Performance," which rewarded officers with money bonuses when they met the quota policy. This created a financial incentive both for investigators and supervisors to meet their quota no matter what the cost because they stood to personally benefit from high arrest numbers. This fact was understood and aided by our supervisors, who would also benefit from this "Pay for Performance" policy by seeing to it that the arrest numbers were high. Supervisors would conduct what they called "body days" where they would get their whole team together for the sole purpose of making as many arrests in as short a time as possible to satisfy the quota requirements. These "body days" were normally conducted toward the end of the month if the numbers for that particular month were looking low.

8.

Due to the pressures of the quota policy, coupled with the lack of training and equipment, officers within the Narcotics Division routinely were unable to properly develop and investigate leads relating to illegal drugs and narcotics. We simply did not have the time, training or equipment to do so. Due to the pressures of the quota policy, officers, with the guidance and approval of their supervisors,

would often cut corners by obtaining warrants based upon false information to support wrongful arrests.

9.

The quota policy, and specifically the "9 and 2 Rule," placed significant pressure on the officers to meet their numbers and had a significant negative impact on the way in which undercover drug-buys involving confidential informants were conducted.

10

The lack of surveillance equipment and training made it impossible for investigators to operate within the written policies, which seemed to be designed solely to protect the City if something went wrong as it did in the instance of the Kathryn Johnston shooting.

11.

For example, in order to get a search warrant, it was often necessary to perform a supervised undercover buy to show that drugs were at the subject premises. The officers would rely on a confidential informant to arrange and make the drug purchase. While there were written policies on how the process would work, with the approval of our supervisors, we routinely did not follow these due to the pressure to make our quota numbers. Rather, we would use short cuts which many times involved false swearing on warrants. The policies existed just to cover

for the City of Atlanta in the event things went bad, because many of the written policies were knowingly ignored or violated regularly by superiors and investigators.

12.

We also would attempt to meet the quota system by manipulating investigations. For example, one officer would do all the legwork in terms of organizing the undercover buy and monitoring the confidential informant. However, with the supervisor's knowledge and encouragement, this information would be passed on to an officer who needed a bump in his numbers to meet his quota. Essentially, the documents used in support of the search warrant were not prepared by the officer purporting to write them. Similarly, Lt. Finley (who is now a Major) developed a "Buy Team," which would make the buys for the officers who were short on their numbers. Obviously, in such a situation the warrant application is completely unreliable because the officer submitting the application cannot attest to the truth of the facts asserted.

13.

Another example of manipulating investigations in order to meet the quota system deals with the way in which controlled buys were handled. Investigators such as myself were encouraged by superiors to write the required paperwork as though we controlled or witnessed these controlled purchases even though we may

not have. The purpose of this practice was to limit the number of investigators which may have to testify if the case went to court. The reason for this practice was to keep investigators out of court and on the streets to make more poor quality arrests in order to meet the quotas.

14.

All of this illegal activity was the result of the quota policy, coupled with the lack of training and equipment. We followed this policy because we had no choice. Also, we were punished for failing to make our numbers. That punishment would take the form of unfavorable assignments, threats of transfer, change of off days and/or work hours and more details, among other things. We were financially rewarded for meeting the quota numbers. In our unit meetings Lt. Gibbs told the unit that when numbers were low they must come up. She would tell the unit that she knew people in high places and would have investigators moved who did not do their part to raise the numbers. It is my understanding that Chief Pennington was the driving force behind these quotas, and re-enforced the push for numbers during his weekly "COBRA" meetings, held for officers, supervisors and community members.

15.

The supervisors working within the Narcotics Division, including Sgt. Stallings, Maj. Finley, Lt. Gibbs, Sgt. G. Sanchez, Sgt. T. Quiller, Sgt. Sparwath,

Maj. Finley and Sgt. Mason knew that the officers were falsely creating evidence and obtaining fraudulent warrants as well as regularly violating policies to achieve the quota numbers. Lt. Gibbs would routinely state to us "I just don't want to hear it." In spite of this knowledge, the supervisors did nothing about it, and in fact, routinely encouraged the officers to increase their numbers regardless of the means employed. While supervisors and command staff may claim a lack of knowledge about the matters addressed above, anyone who reviewed the numbers of warrants and arrests can conclude that there is simply not enough time to correctly investigate cases to achieve the numbers recorded, without taking shortcuts.

16.

The Kathryn Johnston shooting on November 21, 2006, was a direct result of the quota policy, coupled with a lack of supervision, lack of enforcement of written policies, and lack of equipment and training. Investigator J. R. Smith falsely swore out a warrant on Mrs. Johnston's home in an effort to arrest a kilo drug dealer and satisfy his quota numbers. Investigator Smith wanted to reach his quota numbers for the month of November, which was soon coming to a close. Mrs. Johnston's death is a direct result of the action taken trying to comply with this quota policy, coupled with the lack of supervisor, lack of enforcement of written policies and lack of equipment and training. Further, most of those actions

were accepted as routine operations by supervisors in the Narcotics Division in the Atlanta Police Department.

17.

In addition to everything set forth in this Affidavit, there was also an absolute lack of training and supervision as well as a lack of equipment and enforcement of written policies which hampered the quality and legality of investigations conducted by the Atlanta Police Department which contributed directly to Mrs. Johnston's death.

FURTHER AFFIDANT SYAETH NOT

Sworn to and subscribed before
me this _3_ day of _June_,
2009.

GREGG JUNNIER

Notary Public, State of Georgia

My Commission Expires: