**ORIGINAL**

FILED IN CLERK'S OFFICE

FEB 0 1 2010

JA...
By, _____ CLERK
           Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| SARAH DOZIER, as Administrator of the Estate of KATHRYN JOHNSTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **CIVIL ACTION CASE NO. 1:08-CV-00007-MHS** |
| CITY OF ATLANTA, et al., | ) ) | |
| Defendants. | ) | |

## CITY DEFENDANTS' REPLY TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS NO GENUINE ISSUES TO BE TRIED

1.

**Plaintiff's Statement**:

On November 21, 2006, at approximately 2:00 p.m., Officers Gregg Junnier, Jason R. Smith, and Arthur Tesler, in their capacities as sworn police officers of the City of Atlanta and the Atlanta Police Department ("APD"), drove in a marked APD patrol car to an apartment complex located at 350 Lanier Street in Atlanta. (See United States v. Gregg Junnier, et al., 1:07-CR-129-JEC (N.D. Ga.), DE-6, Junnier's Guilty Plea and Plea Agreement ("Junnier plea"), Statement of Facts, ¶ 14, attached hereto as Exhibit 1; United States v. Jason R. Smith, 1:07-CR-129-JEC (N.D. Ga.), DE-9, Smith's Guilty Plea and Plea Agreement ("Smith plea"), Statement of Facts ¶ 7, attached hereto as Exhibit 2; United States v. Arthur B.

449555-1

1

Tesler, 1:08-CR-424-JEC (N.D. Ga.), DE-4, Tesler's Guilty Plea and Plea Agreement ("Tesler plea"), Statement of Facts attached hereto as Exhibit 3).

**Defendants' Response:**

    **Undisputed.**

<div align="center">2.</div>

**Plaintiff's Statement**:

    Upon arrival, Officers Junnier and Tesler entered the apartments while Officer Smith checked the wooded area behind the apartments (Junnier plea, Statement of Facts, ¶ 14; Smith plea, Statement of Facts, ¶ 7).

**Defendants' Response:**

    **Undisputed.**

<div align="center">3.</div>

**Plaintiff's Statement**:

    Officer Smith recovered three plastic sandwich bags in the wooded area, each of which contained marijuana (Junnier plea, Statement of Facts, ¶ 14; Smith plea, Statement of Facts, ¶ 7).

**Defendants' Response:**

    **Undisputed.**

4.

**Plaintiff's Statement**:

Officer Smith then placed all three sandwich bags in the trunk of the patrol car (Junnier plea, Statement of Facts, ¶ 13; Smith plea, Statement of Facts, ¶ 7; Tesler plea, Statement of Facts, ¶ 28).

**Defendants' Response:**

**Movant's Citation to Junnier Plea does not support Movant's Fact. As to Smith and Tesler Citation: Undisputed.**

5.

**Plaintiff's Statement**:

Later that day, around 3:30 p.m., Officer Smith received a phone call from a Confidential Informant ("CI") who informed Officer Smith that a man wearing a gold-colored jacket was dealing drugs in front of a store located on Simpson Road. (Junnier plea, Statement of Facts, ¶ 15; Smith plea, Statement of Facts, ¶ 8; Tesler plea, Statement of Facts, ¶ 29).

**Defendants' Response:**

**Undisputed.**

449555-1

6.

**Plaintiff's Statement**:

Defendants Junnier, Smith and Tesler then proceeded to Simpson Road in their APD patrol car (Id.).

**Defendants' Response:**

**Undisputed.**

7.

**Plaintiff's Statement**:

Upon arrival, the officers saw Fabian Sheets in a gold-colored jacket (Id.).

**Defendants' Response:**

**Undisputed.**

8.

**Plaintiff's Statement**:

When Sheets first observed the patrol car, he appeared to put something in his mouth (Id.).

**Defendants' Response:**

**Undisputed.**

9.

**Plaintiff's Statement**:

Officer Tesler jumped from the car and grabbed Sheets by the throat, forcibly detaining him (Id.).

**Defendants' Response:**

**Undisputed.**

10.

**Plaintiff's Statement**:

Officer Tesler placed Sheets in the patrol car and then called dispatch to request "K-9" officers and a drug-sniffing dog (Junnier plea, Statement of Facts, ¶ 16; Smith plea, Statement of Facts, ¶ 9).

**Defendants' Response:**

**Undisputed.**

11.

**Plaintiff's Statement**:

Officer Smith then planted drugs at the scene by placing some of the marijuana found earlier at 350 Lanier Street under a nearby rock. (Id.). After the K-9 officers arrived, they discovered the marijuana under the rock along with another plastic bag containing ten yellow baggies of marijuana and at least two baggies of crack cocaine (Id.).

449555-1

**Defendants' Response:**

    **Undisputed.**

<div align="center">12.</div>

**Plaintiff's Statement**:

    Officer Smith gathered both plastic bags and returned to the patrol car. (Id.).

**Defendants' Response:**

    **Undisputed.**

<div align="center">13.</div>

**Plaintiff's Statement**:

    After Officers Junnier, Smith and Tesler advised Sheets that he would be charged for the recovered drugs, Sheets told the officers that he could direct them to a house where he had observed illegal drugs—specifically a kilogram of cocaine—earlier that day (Junnier plea, Statement of Facts, ¶ 17; Smith plea, Statement of Facts, ¶ 10; Tesler plea, Statement of Facts, ¶ 31).

**Defendants' Response:**

    **Undisputed.**

<div align="center">14.</div>

**Plaintiff's Statement**:

    Sheets directed the officers to the house and pointed out the residence located at 933 Neal Street (Id.).

449555-1

**Defendants' Response:**

**Undisputed.**

15.

**Plaintiff's Statement**:

Sheets claimed that he had bought crack cocaine in the house from a black male named "Sam," and he provided a physical description of "Sam" (Id.).

**Defendants' Response:**

**Undisputed.**

16.

**Plaintiff's Statement**:

The officers drove by the residence but observed no evidence of drug dealing at 933 Neal Street (Tesler plea, Statement of Facts, ¶ 32).

**Defendants' Response:**

**Undisputed.**

17.

**Plaintiff's Statement**:

The officers did not utilize a CI to make an undercover purchase of drugs at 933 Neal Street (Junnier plea, Statement of Facts, ¶ 18; Smith plea, Statement of Facts, ¶ 11; Tesler's plea, Statement of Facts, ¶ 32).

449555-1

**Defendants' Response:**

    **Undisputed.**

<div align="center">18.</div>

**Plaintiff's Statement**:

    The officers did nothing else to verify Sheets' credibility or corroborate his story, such as by engaging in any further investigation or conducting surveillance to verify the identity of the occupants in the house at 933 Neal Street (Id.).

**Defendants' Response:**

    **Undisputed.**

<div align="center">19.</div>

**Plaintiff's Statement**:

    Instead, Officers Junnier, Smith and Tesler falsely swore an affidavit in order to obtain a search warrant from a state magistrate judge without making a controlled buy (Id.).

**Defendants' Response:**

    **Objection: Movant's Citation does not support Movant's Fact.**

449555-1

20.

**Plaintiff's Statement**:

Before driving to the Fulton County Jail to submit the false affidavit in support of the warrant, Officer Junnier telephoned another CI, Alex White, at approximately 5:05 p.m. (Junnier plea, Statement of Facts, ¶ 19).

**Defendants' Response:**

**Undisputed.**

21.

**Plaintiff's Statement**:

Officer Junnier called CI White to find out whether CI White was available to make a drug purchase, but CI White advised Officer Junnier that he did not have any transportation (Id.).

**Defendants' Response:**

**Undisputed.**

22.

**Plaintiff's Statement**:

The officers had made false attributions of drug purchases to CI White in the past (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

449555-1

23.

**Plaintiff's Statement**:

When Officers Smith, Junnier and Tesler arrived at the Fulton County Jail, Officer Smith went inside and drafted an affidavit in support of a search warrant for the residence located at 933 Neal Street (Junnier plea, Statement of Facts, ¶ 21; Smith plea, Statement of Facts, ¶ 13; Tesler plea, Statement of Facts, ¶ 33).

**Defendants' Response:**

    **Undisputed.**

24.

**Plaintiff's Statement**:

When the officers arrived at the Jail, they did not book Sheets on drug charges (Junnier plea, Statement of Facts, ¶ 20).

**Defendants' Response:**

    **Undisputed.**

25.

**Plaintiff's Statement**:

Instead, they kept Sheets in the patrol car because they intended on releasing him and making no record of his arrest if they found drugs at 933 Neal Street (Id.).

**Defendants' Response:**

    **Undisputed.**

449555-1

26.

**Plaintiff's Statement**:

Officer Smith included in the affidavit several material false statements including: (1) that Officers Smith and Tesler directed the CI to the residence at 933 Neal Street for the purpose of buying illegal drugs; (2) that the CI was searched to ensure that he did not have any drugs on his person before proceeding to the residence; (3) that the CI was provided $50 in APD funds to purchase drugs; (4) that the CI went to the residence and was met there by an individual on the front porch who identified himself as "Sam;" (5) that "Sam" briefly went into the house, then returned with an object and gave the CI the object in exchange for the money; (6) that the CI returned immediately to Officer Smith and handed him two bags of crack cocaine; (7) that the CI was searched again; (8) that the CI told Officer Smith that he bought the crack cocaine from a black male called named "Sam" for $50; (9) that the CI gave a physical description of "Sam;" and (10) that a "no-knock" warrant should be issued because the CI stated that "Sam" possessed electronic surveillance equipment in the house which "Sam" monitored carefully (Id.).

**Defendants' Response:**

**Undisputed.**

27.

**Plaintiff's Statement**:

Officer Smith presented the fabricated affidavit to a magistrate judge and falsely swore to the truth of the statements contained in the affidavit (Junnier plea, Statement of Facts, ¶ 22; Smith plea, Statement of Facts, ¶ 14; Tesler plea, Statement of Facts, ¶ 34).

**Defendants' Response:**

**Undisputed.**

28.

**Plaintiff's Statement**:

Based upon this false information, a state magistrate judge issued a "no knock" search warrant for 933 Neal Street at 5:33 p.m. (Id.).

**Defendants' Response:**

**Undisputed.**

29.

**Plaintiff's Statement**:

The search warrant authorized the narcotics officers to enter the residence by force and with no prior identification of themselves as law enforcement officers (Junnier plea, Statement of Facts, ¶ 22; Smith plea, Statement of Facts, ¶ 14).

**Defendants' Response:**

    **Undisputed.**

<div align="center">30.</div>

**Plaintiff's Statement**:

At approximately 6:00 p.m., after the warrant already had been issued, CI White called the officers and inquired as to whether he had to make an undercover drug purchase (Junnier's plea, Statement of Facts, ¶ 23).

**Defendants' Response:**

    **Undisputed.**

<div align="center">31.</div>

**Plaintiff's Statement**:

The officers informed CI White that they did not need him (Id.).

**Defendants' Response:**

    **Undisputed.**

<div align="center">32.</div>

**Plaintiff's Statement**:

If the magistrate judge had known the officers falsified the affidavit, the search warrant would not have been issued (Id.).

**Defendants' Response:**

    **Undisputed.**

449555-1

33.

**Plaintiff's Statement**:

Officers Junnier, Smith and Tesler then traveled to the staging at an Atlanta Fire Station located at 1048 Simpson Road area where they were met by other APD narcotics officers (Junnier's plea, Statement of Facts, ¶ 24; Smith's plea, Statement of Facts, ¶ 15; Tesler plea, Statement of Facts, ¶ 35; FBI Report, p. DOZIER-COA00003, filed under seal with the Court).

**Defendants' Response:**

**Undisputed.**

34.

**Plaintiff's Statement**:

At this time, Defendants Junnier, Smith and Tesler still had Sheets in their custody (Tesler plea, Statement of Facts, ¶ 38).

**Defendants' Response:**

**Objection: Movant's citation does not support the Movant's fact.**

35.

**Plaintiff's Statement**:

The assembled team consisted of APD officers Junnier, Tesler, Jason R. Smith, Cary Bond, Nathan Lucas, Maurice Guerin, Gary Smith, and Sgt. Wilbert Stallings (FBI Report, p. DOZIER-COA00003).

**Defendants' Response:**

    **Undisputed.**

<div align="center">36.</div>

**Plaintiff's Statement**:

Narcotics Team 1 member Holly Buchanan was on leave and not present (FBI Report, p. DOZIER-COA00003).

**Defendants' Response:**

    **Undisputed.**

<div align="center">37.</div>

**Plaintiff's Statement**:

Officer Smith then briefed the narcotics officers by recounting as true the false statements contained in the affidavit (Junnier plea, Statement of Facts, ¶ 24; Smith plea, Statement of Facts, ¶ 15; Tesler plea, Statement of Facts, ¶ 35).

**Defendants' Response:**

    **Undisputed.**

<div align="center">38.</div>

**Plaintiff's Statement**:

Officers Junnier and Tesler were present for this briefing and they were aware that Officer Smith's briefing was false but they did not convey that fact to any of the other officers (Id.).

449555-1

**Defendants' Response:**

    **Undisputed.**

<div align="center">39.</div>

**Plaintiff's Statement**:

Officer Smith specifically claimed, falsely, that a controlled buy had been made at the residence (Tesler plea, Statement of Facts, ¶ 35).

**Defendants' Response:**

    **Undisputed.**

<div align="center">40.</div>

**Plaintiff's Statement**:

At approximately 6:40 p.m., Officers Junnier, Smith and Tesler, along with other APD narcotics officers, executed the "no-knock" search warrant at 933 Neal Street in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution (Junnier plea, Statement of Facts, ¶ 25; Smith plea, Statement of Facts, ¶ 16; Tesler's plea, Statement of Facts, ¶ 36).

**Defendants' Response:**

    **Objection: Movant's Citation does not support Movant's Fact.**

449555-1

41.

**Plaintiff's Statement**:

All of the officers were armed with service weapons and Officers Junnier and Smith approached the front door of the residence (Junnier plea, Statement of Facts, ¶ 25; Smith plea, Statement of Facts, ¶ 16).

**Defendants' Response:**

**Undisputed.**

42.

**Plaintiff's Statement**:

Officer Smith and another officer were responsible for breaching the front door, but they first had to pry metal burglar bars off the screen door, which took more than a minute (Id.).

**Defendants' Response:**

**Undisputed.**

43.

**Plaintiff's Statement**:

At the same time, Officer Tesler positioned himself at the back door of the residence (Id.).

**Defendants' Response:**

**Undisputed.**

449555-1

44.

**Plaintiff's Statement**:

Kathryn Johnston, a 92-year old female, was the lone occupant of the residence at 933 Neal Street (Junnier plea, Statement of Facts, ¶ 25; Smith plea, Statement of Facts, ¶ 16; Tesler plea, Statement of Facts, ¶ 36).

**Defendants' Response:**

**Undisputed.**

45.

**Plaintiff's Statement**:

As the officers busted the front door open, Ms. Johnston fired a single shot from a .38-caliber revolver towards the front door (Id.).

**Defendants' Response:**

**Undisputed.**

46.

**Plaintiff's Statement**:

The shot fired by Ms. Johnston did not injure any of the officers (Id.).

**Defendants' Response:**

**Undisputed.**

47.

**Plaintiff's Statement**:

In an overwhelming and excessive show of force, Officers Junnier and Smith, along with four other officers, returned fire and fired approximately 39 shots (Junnier plea, Statement of Facts, ¶¶ 25-26; Smith's plea, Statement of Facts, ¶ 16-17; Tesler plea, Statement of Facts, ¶ 36).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

48.

**Plaintiff's Statement**:

The initial shots traveled through the wooden front door as it opened (Junnier plea, Statement of Facts, ¶ 25).

**Defendants' Response:**

**Undisputed.**

49.

**Plaintiff's Statement**:

Five or six shots struck Ms. Johnston (Junnier plea, Statement of Facts, ¶ 25; Smith plea, Statement of Facts, ¶ 16).

449555-1

**Defendants' Response:**

**Undisputed.**

<div align="center">50.</div>

**Plaintiff's Statement**:

One shot struck Ms. Johnston in the chest and was fatal (**Id.**).

**Defendants' Response:**

**Undisputed.**

<div align="center">51.</div>

**Plaintiff's Statement**:

Unfortunately, forensic analysis was unable to establish which of the six officers fired the fatal shot or the four or five other shots that struck Ms. Johnston (Junnier plea, Statement of Facts, ¶ 26).

**Defendants' Response:**

**Objection: Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

<div align="center">52.</div>

**Plaintiff's Statement**:

While she was lying in a pool of her own blood, Officer Smith handcuffed Ms. Johnston and the officers then searched the house but did not find any drugs or

other occupants (Junnier plea, Statement of Facts, ¶ 27; Smith plea, Statement of Facts, ¶ 18).

**Defendants' Response:**

> **Objection: Movant's Citation does not support Movant's Fact.**

53.

**Plaintiff's Statement**:

Immediately after the fatal shooting, Officers Smith, Junnier and Tesler took steps to cover up the fact that they had obtained a search warrant based on fabricated evidence (FBI Report, p. DOZIER-COA00004).

**Defendants' Response:**

> **Undisputed.**

54.

**Plaintiff's Statement**:

Once the rest of the team had cleared the house after the shooting, Officer Smith, in the presence of Officer Tesler, planted three baggies of marijuana that he had recovered from 350 Lanier Street in the basement of the residence at 933 Neal Street (Junnier plea, Statement of Facts, ¶ 28; Smith plea, Statement of Facts, ¶ 19; Tesler plea, Statement of Facts, ¶ 37; FBI Report, p. DOZIER-COA00004).

**Defendants' Response:**

> **Undisputed.**

55.

**Plaintiff's Statement**:

Officers Smith and Tesler eventually destroyed the remaining baggies containing marijuana that had been seized at 350 Lanier Street by throwing them in a storm sewer (FBI Report, p. DOZIER-COA00004).

**Defendants' Response:**

**Undisputed.**

56.

**Plaintiff's Statement**:

They destroyed the baggies so that no could match them to the baggies planted at 933 Neal Street (Id.).

**Defendants' Response:**

**Undisputed.**

57.

**Plaintiff's Statement**:

Later that evening, Officer Smith called CI White and instructed him to pretend that the three officers had sent him to purchase drugs at 933 Neal Street before the shooting and that he successfully had bought some crack cocaine (Junnier plea, Statement of Facts, ¶ 29; Smith plea, Statement of Facts, ¶ 20; Tesler plea, Statement of Facts, ¶ 38).

449555-1

**Defendants' Response:**

    **Undisputed.**

<div align="center">58.</div>

**Plaintiff's Statement**:

Officer Smith provided White with a description of the house at 933 Neal Street, a description of "Sam," the alleged drug dealer described in Officer Smith's false affidavit, and the details of the alleged buy (Id.).

**Defendants' Response:**

    **Undisputed.**

<div align="center">59.</div>

**Plaintiff's Statement**:

As a further part of the cover up, Officer Tesler drafted and filed an APD Incident Report on November 21 that falsely stated that a purchase of crack cocaine had been made at 933 Neal Street earlier that day (Junnier plea, Statement of Facts, ¶ 30; Tesler plea, Statement of Facts, ¶ 39).

**Defendants' Response:**

    **Undisputed.**

60.

**Plaintiff's Statement**:

Officer Smith turned the report in to Sgt. Stallings but it eventually was forwarded to Lt. Gibbs because the report was incomplete and contained blanks (Affidavit of Jason R. Smith ("Smith Aff."), ¶ 19, attached hereto as Exhibit 4; Deposition of Lt. Stacie Gibbs ("Gibbs depo."), pp. 274-75).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

61.

**Plaintiff's Statement**:

Lt. Gibbs then helped Officer Smith draft a revised report and destroyed the original report that Officer Smith had prepared (Gibbs depo., pp. 277-78; Deposition of Deputy Chief Peter Andreson ("Andreson depo."), pp. 104-06).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

62.

**Plaintiff's Statement**:

Lt. Gibbs then presented the new report to Major Davis, who reviewed and approved it (Smith Aff., ¶ 19).

**Defendants' Response:**

**Objection: Defendant refutes the Movant's Fact.** Lt. Gibbs testified that she forwarded the completed report to Homicide Unit (Gibbs depo., p. 277).

<div align="center">63.</div>

**Plaintiff's Statement**:

Officer Smith informed Officer Junnier that he had told his supervisors that Officers Junnier and Tesler had watched CI White make the controlled buy from a patrol car (Junnier plea, Statement of Facts, ¶ 31; Smith plea, Statement of Facts, ¶ 21).

**Defendants' Response:**

**Undisputed.**

<div align="center">64.</div>

**Plaintiff's Statement**:

Officer Junnier told Officer Smith to change his story and instead say that Officer Smith and Officer Tesler witnessed the buy at 933 Neal Street from CI White's car (Id.).

**Defendants' Response:**

**Undisputed.**

65.

**Plaintiff's Statement**:

On or about November 22, Officer Smith submitted two baggies containing crack cocaine to APD Property Management, falsely asserting that the drugs had been purchased by an informant at 933 Neal Street on November 21, 2006 (Junnier plea, Statement of Facts, ¶ 32; Smith plea, Statement of Facts, ¶ 23; Tesler plea, Statement of Facts, ¶ 40).

**Defendants' Response:**

**Undisputed.**

66.

**Plaintiff's Statement**:

Actually, the officers had seized the cocaine during the prior incident involving Fabian Sheets (FBI Report, p. DOZIER-COA00004).

**Defendants' Response:**

**Undisputed.**

67.

**Plaintiff's Statement**:

On or about November 22, Officers Junnier, Smith and Tesler, before meeting with APD homicide detectives who were investigating the shooting, met with each other and devised a fabricated story explaining the events leading up to

the shooting of Ms. Johnston at 933 Neal Street (Junnier plea, Statement of Facts, ¶ 34; Smith plea, Statement of Facts, ¶ 24; Tesler plea, Statement of Facts, ¶ 41).

**Defendants' Response:**

    **Undisputed.**

<div align="center">68.</div>

**Plaintiff's Statement**:

As part of this cover-up story, Officers Smith and Tesler agreed that they would falsely claim that the following facts were true: (1) that Officers Smith, Junnier and Tesler met with CI White on November 21, 2006 at an abandoned car wash for the purpose of arranging a controlled undercover purchase of drugs; (2) that Officers Smith and Tesler rode with CI White in White's car from the car wash to 933 Neal Street; and (3) that Officers Smith and Tesler observed CI White approach the house at 933 Neal Street and then return with two pieces of crack cocaine (Junnier plea, Statement of Facts, ¶ 34; Tesler plea, Statement of Facts, ¶ 41).

**Defendants' Response:**

    **Undisputed.**

449555-1

69.

**Plaintiff's Statement**:

As agreed, Officer Smith gave a statement to APD Homicide detectives that contained several false statements, including: (1) that after a suspect identified 933 Neal Street as a location where a kilogram of cocaine could be found, Officer Smith contacted a CI and instructed him to make a controlled purchase at that address; (2) that Officer Smith witnessed the CI approach the house; (3) that the CI successfully completed the transaction and reported back to Officer Smith with two pieces of crack cocaine, which had cost $50 of the city's funds; (4) that Officer Smith debriefed the CI, at which time the CI advised that the dealer had entered the house and returned a short time later with the crack cocaine; and (5) that the CI provided a description of the supplier, which matched the description given of "Sam" by Sheets (Junnier plea, Statement of Facts, ¶ 35).

**Defendants' Response:**

> **Undisputed.**

70.

**Plaintiff's Statement:**

On November 22, Officer Tesler also gave a statement to APD Homicide detectives that addressed only the shooting at 933 Neal Street but not the illegal procurement of the warrant (Id., ¶ 36).

449555-1

**Defendants' Response:**

   **Undisputed.**

<div align="center">71.</div>

**Plaintiff's Statement**:

   Officer Junnier also gave a statement the same day that contained several false assertions, including: (1) that after a suspect identified 933 Neal Street as a location where a kilogram of cocaine could be found, Officer Junnier contacted a CI and instructed him to make a controlled purchase at that address; (2) that Officers Smith and Tesler met with the CI to complete the transaction; and (3) that the transaction was completed (Id., ¶ 37).

**Defendants' Response:**

   **Undisputed.**

<div align="center">72.</div>

**Plaintiff's Statement**:

   On or about November 23, Officer Smith met CI White and paid him $30 in APD funds (Junnier plea, Statement of Facts, ¶ 38; Tesler plea, Statement of Facts, ¶ 44).

**Defendants' Response:**

   **Undisputed.**

73.

**Plaintiff's Statement**:

Officer Smith drafted an APD payment voucher as a record of the payment in order to create the false impression that CI White was being paid for purchasing drugs at 933 Neal Street on November 21 – a purchase which never occurred (Id.).

**Defendants' Response:**

   **Undisputed.**

74.

**Plaintiff's Statement**:

On several occasions following the shooting, Officers Smith, Junnier and Tesler met at various locations to discuss and perfect their cover story and they each agreed that they would make false statements when they were questioned by law enforcement officers in order to conceal their criminal conduct (Junnier plea, Statement of Facts, ¶ 39; Smith plea, Statement of Facts, ¶ 27; Tesler plea, Statement of Facts, ¶¶ 45-48).

**Defendants' Response:**

   **Undisputed.**

75.

**Plaintiff's Statement**:

Officers Junnier, Smith and Tesler also obtained and reviewed their own cell phone records of calls to CI White in order to try to make their story consistent with those records (Junnier plea, Statement of Facts, ¶ 39; Smith plea, Statement of Facts, ¶ 27).

**Defendants' Response:**

**Undisputed.**

76.

**Plaintiff's Statement**:

The FBI began investigating the shooting after receiving a complaint from CI White, the informant who allegedly provided the probable cause to obtain the search warrant for 933 Neal Street (FBI Report, p. DOZIER-COA00001).

**Defendants' Response:**

**Defendants refute Movant's Fact.** APD Chief Richard Pennington also requested the FBI to investigate the shooting (Deposition of Chief Richard Pennington, p. 370).

77.

**Plaintiff's Statement**:

At first, CI White had agreed to cover for the officers. Eventually, however, he realized that the officers would blame him for the false information in the warrant so he told the Bureau of Alcohol, Tobacco, Firearms, and Explosives the truth (Id., p. DOZIER-COA00004).

**Defendants' Response:**

   **Undisputed.**

78.

**Plaintiff's Statement**:

As a result of the investigation, Officers Junnier, Smith and Tesler subsequently plead guilty to violating 18 U.S.C. 241, conspiracy against civil rights resulting in death. See United States v. Junnier, et al., 1:07-CR-129-JEC (N.D. Ga.); United States v. Jason R. Smith, 1:07-CR-129-JEC (N.D. Ga.); United States v. Arthur B. Tesler, 1:08-CR-424-JEC (N.D. Ga.).

**Defendants' Response:**

   **Undisputed.**

79.

**Plaintiff's Statement**:

Officer Junnier was sentenced to 150-months' imprisonment, Officer Smith was sentenced to 150-months' imprisonment, and Officer Tesler was sentenced to 60-months' imprisonment. See Id.

**Defendants' Response:**

**Undisputed.**

80.

**Plaintiff's Statement**:

In addition to these charges, Junnier Smith plead guilty to the reduced state charges of voluntary manslaughter, violation of oath by public officer, criminal solicitation, and making false statements on a public document.

**Defendants' Response:**

**Objection: Fact not supported by a citation to evidence.**

81.

**Plaintiff's Statement**:

Smith plead guilty to the reduced state charges of voluntary manslaughter, violation of oath by public officer, criminal solicitation, making false statements on a public document, and perjury.

**Defendants' Response:**

> **Objection: Fact not supported by a citation to evidence.**

<div align="center">82.</div>

**Plaintiff's Statement**:

Tesler was found guilty of making false statements in violation of O.C.G.A. § 16-1-20 and sentenced to four-years' imprisonment, but the Georgia Court of Appeals overturned his conviction because the state failed to prove proper venue. See Tesler v. State, 295 Ga.App. 569 (2009).

**Defendants' Response:**

> **Undisputed.**

<div align="center">83.</div>

**Plaintiff's Statement**:

Richard Pennington became of the Chief of the Atlanta Police Department in 2002 and he is the official policymaker for the APD (Deposition of Chief Richard Pennington (Pennington depo., pp. 7, 19, 28).

**Defendants' Response:**

> **Undisputed.**

84.

**Plaintiff's Statement**:

In 2006, Defendant Dreher was the Assistant Chief and he reported directly to Chief Pennington (Andreson depo., pp. 10-11; APD Organizational Chart 2005/2006, attached hereto as Exhibit 5).

**Defendants' Response:**

    **Undisputed.**

85.

**Plaintiff's Statement**:

Deputy Chief Andreson oversaw the Criminal Investigations Division, which included the APD's Special Enforcement Section, and he reported directly to Assistant Chief Dreher (Id.; Andreson depo., p. 9).

**Defendants' Response:**

    **Undisputed.**

86.

**Plaintiff's Statement**:

Major C.J. Davis was in charge of the APD's Special Enforcement Section, which included the Narcotics Unit, and she reported directly to Deputy Chief Andreson (Organizational Chart 2006/2006; Andreson depo., p. 12).

**Defendants' Response:**

> **Undisputed.**

<div align="center">87.</div>

**Plaintiff's Statement**:

Lt. Stacie Gibbs was in charge of the Narcotics Unit and she reported to

Major C.J. Davis (Id.).

**Defendants' Response:**

> **Objection: Movant's Citation does not support Movant's Fact.**

<div align="center">88.</div>

**Plaintiff's Statement**:

Sgt. Stallings, the day-to-day supervisor of Narcotics Team 1, reported to Lt.

Gibbs (Id.).

**Defendants' Response:**

> **Objection: Movant's Citation does not support Movant's Fact.**

<div align="center">89.</div>

**Plaintiff's Statement**:

There were 21 officers assigned to the APD's Narcotics Unit in November

2006 and Narcotics Team 1 included Officers Junnier, Jason R. Smith, Arthur

Tesler, Cary Bond, Holly Buchanan, Gary Smith, Nathan Lucas and Maurice

Guerin (FBI Report, p. DOZIER-COA00003).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

90.

**Plaintiff's Statement**:

Sgt. Wilbert Stallings was the day-to-day supervisor over Narcotics Team 1 (Andreson depo., p. 33).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

91.

**Plaintiff's Statement**:

Officer Junnier was the senior member of the team (Deposition of Officer Carey Bond ("Bond depo."), p. 104).

**Defendants' Response:**

**Undisputed.**

92.

**Plaintiff's Statement**:

Unfortunately, the Kathryn Johnston incident was not an isolated event. The FBI investigation revealed that several members of Narcotics Team 1 and officers from other APD units falsified information on numerous search warrant applications (FBI Report, p. DOZIER-COA00005).

449555-1

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

93.

**Plaintiff's Statement**:

On many occasions, APD narcotics officers had made false statements, in the form of sworn affidavits, to state magistrate judges in order to procure illegal search warrants for residences and other locations where the officers believed illegal drugs would be found (Junnier plea, Statement of Facts, ¶ 3; Smith plea, Statement of Facts, ¶ 3; Tesler plea, Statement of Facts, ¶ 8).

**Defendants' Response:**

**Objection: Defendants refute Movant's Fact.** Junnier only admitted to the FBI that he fabricated the probable cause on two warrants: 161 Rhodesia Avenue and another location whose address he could not remember (FBI Report, pp. DOZIER-COA00005, 00365).   Smith only admitted to the FBI that he fabricated the probable cause on two warrants: 161 Rhodesia Avenue and Neal Street (FBI Report, p. DOZIER-COA00006).   Tesler only admitted to the FBI that prior to Neal Street, he obtained search warrants for 2139 Martin Luther King, Jr. Drive, N.W., 1370 Graymont Drive, S.W., and 1981 Martin Luther King, Jr. Drive, and

449555-1

falsely swore before a state magistrate judge that he witnessed a controlled drug purchase at each of these locations when in fact he did not (FBI Report, p. DOZIER-COA00006). Officers Junnier, Smith, and other APD officers confirmed that these warrants were "handoffs" (Id.).

<p style="text-align:center">94.</p>

**Plaintiff's Statement**:

APD officers would make false statements: (1) about purchases of drugs by CIs that, in fact, never took place; (2) representing that information was provided by CIs when, in fact, the information was provided by non-certified, unreliable informants – sometimes after officers threatened to attribute, falsely, illegal drugs to such informants; (3) that the officers personally had observed a purchase by a CI when, in fact, they had not observed the events described in the submitted affidavit (a "hand-off"); (4) representing that CIs were searched before and after drug purchases when, in fact, CIs were not searched; (5) overstating the cost of drugs purchased by CIs; and (6) representing that the occupants of the residence had surveillance cameras, were armed with firearms, or were dangerous in order to obtain "no-knock" warrants (Junnier plea, Statement of Facts, ¶ 6; Smith plea, Statement of Facts, ¶¶ 8-14; FBI Report, pp. DOZIER-COA00005-00006).

**Defendants' Response:**

**Undisputed only as to Officers Junnier, J.R. Smith, and Tesler.**

449555-1

95.

**Plaintiff's Statement**:

One common practice within the Narcotics Unit was known as a "hand-off." (FBI Report, p. DOZIER-COA00006).

**Defendants' Response:**

**Undisputed only as to Officers Junnier, J.R. Smith, and Tesler.**

96.

**Plaintiff's Statement**:

During a "hand-off," one officer would provide another officer with information that would establish probable cause (Id.).

**Defendants' Response:**

**Undisputed.**

97.

**Plaintiff's Statement**:

This information would then be passed on to an officer who needed a bump in his numbers in order to meet his quota and included within the affidavit for the search warrant (Id., Smith Aff., ¶ 12).

**Defendants' Response:**

**Objection: Defendants refute the Movant's Fact.** Chief Pennington and other officers testified that APD did not utilize quotas (Pennington depo., pp. 178-

181, 191-192, 196, 206, 255; Buchanan depo., p. 127; Vignola depo., p. 55-56). APD utilized performance goals that several witnesses testified there were no adverse consequences for failing to achieve (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Numerous APD Officers also testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114).

<div align="center">98.</div>

**Plaintiff's Statement**:

The second officer would write the affidavit as if the second officer actually had first-hand knowledge of the information (FBI Report, p. DOZIER-COA00006).

**Defendants' Response:**

**Undisputed.**

<div align="center">99.</div>

**Plaintiff's Statement**:

Obviously, in this situation, the warrant is completely unreliable because the officer submitting the affidavit cannot attest to the truth of the facts asserted therein (Smith Aff., ¶ 12).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

<div align="center">100.</div>

**Plaintiff's Statement**:

For instance, Officer Junnier admitted that he made several controlled buys with CI White and he then turned the purchase information to other officers, and these other officers then included that information in an affidavit by swearing that they actually had witnessed CI White make the buy (FBI Report, p. DOZIER-COA00006).

**Defendants' Response:**

**Undisputed.**

<div align="center">101.</div>

**Plaintiff's Statement**:

The FBI discovered that one of the reasons the Narcotics Unit utilized "hand-offs" was so that the officers did not have to spend all of their time in court testifying about drug purchases and could instead work more cases (Id.).

449555-1

**Defendants' Response:**

**Objection: Defendants refute Movant's Fact.** The FBI investigation determined that one of the main reasons "hand-offs" were done was so Junnier and the other officers who worked the illegal side jobs collecting money for police protection (that should have been free) "would not spend all their time in court testifying about drug purchases" and "[t]his freed up time for officers to work more cases and work unauthorized 'extra jobs' while on duty." (FBI Report, p. DOZIER-COA00006).

<div align="center">102.</div>

**Plaintiff's Statement**:

In addition to false statements made to procure search warrants, APD officers would also generate false documentation such as payment vouchers for CIs which would: (1) reflect drug purchases that never occurred; (2) indicate payment to CIs for work they had not performed; or (3) indicate that CIs had purchased more drugs than they had in fact purchased (Junnier plea, Statement of Facts, ¶ 7; FBI Report, pp. DOZIER-COA 00005-00006).

**Defendants' Response:**

**Undisputed only as to Stallings, Junnier, J.R. Smith, Tesler, and Bond.**

103.

**Plaintiff's Statement**:

Once a search warrant was unlawfully procured though false statements, the officers would execute the warrant (Junnier plea, Statement of Facts, ¶ 8; Smith plea, Statement of Facts, ¶ 4; Tesler plea, Statement of Facts, ¶ 14).

**Defendants' Response:**

**Undisputed only as to Stallings, Junnier, J.R. Smith, Tesler, and Bond.**

104.

**Plaintiff's Statement**:

The officers would enter the location armed and would detain, sometimes by force or physical restraint, any occupants (Id.).

**Defendants' Response:**

**Undisputed only as to Stallings, Junnier, J.R. Smith, Tesler, and Bond.**

105.

**Plaintiff's Statement**:

Because they obtained search warrants based on unreliable and false information, the officers had on occasions searched residences where there were no drugs and the occupants were not drug dealers (Smith plea, Statement of Facts, ¶ 5).

**Defendants' Response:**

**Objection: Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

106.

**Plaintiff's Statement**:

In 2003, Major Finley, who at that time was the commanding officer of the Narcotics Unit, created and implemented a policy whereby narcotics officers were required to make at least nine arrests and obtain two warrants each month (Deposition of Major E.R. Finley ("Finley's depo."), pp. 68-69).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

107.

**Plaintiff's Statement**:

As part of their duties, lieutenants were authorized to set standards for their officers and create performance goals (Pennington depo., p. 80; Andreson depo., p. 59).

**Defendants' Response:**

**Objection: Movant's Citation to Pennington deposition does not support Movant's Fact, Undisputed as to Andreson Citation.**

108.

**Plaintiff's Statement**:

These goals were often set forth in memorandums and the officers were expected to comply with the memorandums as the policies and practices of the APD when carrying out their job duties (Andreson depo., pp. 60, 76-77).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

109.

**Plaintiff's Statement**:

This policy was well known among the officers in the Narcotics Unit and was referred to as the "9 and 2" Rule (Finley depo., p. 69; Bond depo., pp. 34-36, 42; Deposition of Holly Buchanan ("Buchanan depo."), pp. 113-14).

**Defendants' Response:**

**Objection: Movant's Citations does not support Movant's Fact, and Defendants refute Movant's Fact.** Major Finley proposed establishing a performance standard or goal of 9 arrests and 2 search warrants per month per narcotics unit investigator (Finley depo., p. 69). The standard of 9 arrests and 2 warrants was based on the previous average arrest numbers in the narcotics unit from 2002 (Id.). Finely discussed these proposed numbers with the supervisors who worked for him and they agreed this would be a fluid type of measuring mark

449555-1

that would be one of three parts of the performance evaluation for narcotics officers (Id.). Major Finley's original proposal to implement this standard was suspended before it was put into effect (Id., pp. 30-31). Major Finley drafted another proposal which amended the evaluation criteria, but it was rescinded by Major Brooks before it was implemented (Id. pp. 36-37, 40). Despite Plaintiff's contention that the perceived "9 and 2 Rule" was imposed by Major Finley, the investigators from Narcotics Team 1 who were willing to testify said that they learned of the so-called "9 and 2 Rule" from Junnier and/or Stallings (Bond depo., pp. 36, 42; Buchanan depo., pp. 113, 115, 144).

<center>110.</center>

**Plaintiff's Statement**:

As the FBI noted, "[a]lmost all [of] the APD officers interviewed by the FBI acknowledged the existence of a rule that required narcotics officers to obtain at least two narcotics search warrants and make nine narcotics related arrests per month." (FBI Report, p. DOZIER-COA00008).

**Defendants' Response**:

**Objection: Movant's Fact is inadmissible hearsay, and Defendants refute Movant's Fact.** With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, **not one** active Narcotics Team 1 investigator testified that they were told by any supervisor (other than Stallings)

449555-1

that they were required to get 9 arrests and 2 warrants per month, nor did they see anything in writing to that affect (Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126).

<div align="center">111.</div>

**Plaintiff's Statement**:

At least one high ranking officer within the APD admitted to the FBI that many officers do in fact believe that an unwritten quota system is in effect (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

<div align="center">112.</div>

**Plaintiff's Statement**:

Major Finley also drafted a memorandum, dated August 5, 2003, that required each supervisor to "ensure his/her unit proactively make a minimum of 20 arrests per week and execute a minimum of 2 to 4 search warrants per week (See August 5, 2003 Memorandum, attached hereto as 6).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

113.

**Plaintiff's Statement**:

As Deputy Chief Andreson explained, this memorandum undoubtedly established an arrest quota (Andreson depo., pp. 74-75).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

114.

**Plaintiff's Statement**:

Although Finley claims that this memorandum never was implemented because it was rescinded by Major Brooks this alleged "rescission" is doubtful given that a copy of the allegedly "rescinded" version of the August 5 memorandum never been produced by defendants despite plaintiff's requests and Major Brooks never recalled seeing the August 5 memorandum prior to his deposition, let alone that he rescinded it (Deposition of Ex-Deputy Chief Marion Brooks ("Brooks depo."), p. 74).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

115.

**Plaintiff's Statement**:

The "9 and 2" Rule was reinforced by the "pay for performance" policy created by Chief Pennington, which rewarded officers with monetary bonuses when they satisfied quota requirements (Affidavit of Gregg Junnier ("Junnier Aff."), ¶ 7, attached hereto as Exhibit 7; Smith Aff., ¶¶ 6, 7; Gibbs depo., p. 190-91).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

116.

**Plaintiff's Statement**:

This "pay for performance" policy created financial incentives for both investigators and supervisors to meet the number requirements because they stood to benefit personally from a high number of arrests (Junnier Aff., ¶ 7).

**Defendants' Response:**

**Objection: Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion. Defendants refute Movant's Fact.** Although there was a pay for performance program in effect in 2006, the record is

clear that the pay for performance program was initiated by the City of Atlanta, not by Chief Pennington (Id., p. 265). Benita Ransom from personnel with the City of Atlanta approved the pay-for-performance program as an incentive for City of Atlanta employees to achieve higher marks on their yearly performance evaluations (Id., p. 283). Although police officers were eligible for the program because they were City of Atlanta employees, Chief Pennington testified the he was never in favor of the pay for performance program and did not want it approved (Id., p. 281). The pay for performance program was short-lived because of budgetary restraints and was discontinued in 2006 well before the Johnston shooting (Id., p. 263).

<div align="center">117.</div>

**Plaintiff's Statement**:

Lt. Gibbs nominated the entire Narcotics Unit for the bonuses, including Sgt. Stallings and Officers Junnier, Smith Tesler, Bond, and Buchanan, based on the number of arrests and warrants they obtained (Gibbs depo., p. 191-92).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

118.

**Plaintiff's Statement**:

Supervisors high up the chain of command within the APD promoted and approved the quota requirements and they became the policy and practice of the APD (Junnier Aff., ¶ 5).

**Defendants' Response:**

**Objection: Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Chief Pennington and other officers testified that APD did not utilize quotas (Pennington depo., pp. 178 – 181, 191-192, 196, 206, 255, Buchanan depo., p. 127; Vignola depo., p. 55-56). APD utilized performance goals that several witnesses testified there were no adverse consequences for failing to achieve (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Numerous APD Officers also testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114). With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, no active Team 1 investigator testified that they were told by any supervisor (other than Stallings) that they were required to get 9 arrests and 2 warrants per month, nor did they see

anything in writing to that affect (Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126).

<center>119.</center>

**Plaintiff's Statement**:

These policies also were discussed at unit meetings with command staff in the presence of deputy chiefs (Id.).

**Defendants' Response:**

**Objection: Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion. Defendants refute Movant's Fact.** Chief Pennington and other officers testified that APD did not utilize quotas (Pennington depo., pp. 178 – 181, 191-192, 196, 206, 255, Buchanan depo., p. 127; Vignola depo., p. 55-56). APD utilized performance goals that several witnesses testified there were no adverse consequences for failing to achieve (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Numerous APD Officers also testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114). With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, no active Team #1 investigator testified that they were told by any supervisor (other than Stallings) that they were required to get 9 arrests and 2 warrants per month, nor did they see

anything in writing to that affect (Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126).

<div align="center">120.</div>

**Plaintiff's Statement**:

The quota policies were widespread throughout the APD and actively in place at the time of the Johnston shooting (Id.).

**Defendants' Response:**

**Objection: Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Chief Pennington and other officers testified that APD did not utilize quotas (Pennington depo., pp. 178 – 181, 191-192, 196, 206, 255, Buchanan depo., p. 127; Vignola depo., p. 55-56). APD utilized performance goals that several witnesses testified there were no adverse consequences for failing to achieve (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Numerous APD Officers also testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114). With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, no active Team # 1 investigator testified that they were told by any supervisor (other than Stallings) that they were required to get 9 arrests and 2 warrants per month, nor did

they see anything in writing to that affect (Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126).

<div align="center">121.</div>

**Plaintiff's Statement**:

In fact, the "9 and 2" Rule was memorialized in memoranda posted in the Narcotics Unit and was enforced by supervisors on a daily basis (Andreson depo., pp. 56, 63-64; Junnier Aff., ¶ 6; Affidavit of Wilbert Stallings ("Stallings Aff."), ¶ 5, attached hereto as Exhibit 8; Buchanan's depo., p. 125).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, no active Narcotics Team 1 investigator testified that they were told by any supervisor (other than Stallings) that they were required to get 9 arrests and 2 warrants per month, nor did they see anything in writing to that affect (Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126).

<div align="center">122.</div>

**Plaintiff's Statement**:

Chief Pennington knew about the "9 and 2" Rule before Kathryn Johnston

was shot and killed by APD officers (Pennington's depo., p. 177).

**Defendants' Response:**

**Defendants refute Movant's Fact.** Chief Pennington and Deputy Chief Andreson both testified that the "9 and 2 Rule" was only brought to their attention *after* Major Williams had written a memo rescinding it (Pennington depo., p. 177; Andreson depo., pp. 70-71).

<div align="center">123.</div>

**Plaintiff's Statement**:

Likewise, Deputy Chief Andreson was familiar with the "9 and 2" Rule prior to the Johnston shooting (Andreson depo., p. 64).

**Defendants' Response:**

**Defendants refute Movant's Fact.** Chief Pennington and Deputy Chief Andreson both testified that the "9 and 2 Rule" was only brought to their attention *after* Major Williams had written a memo rescinding it (Pennington depo., p. 177; Andreson depo., pp. 70-71).

<div align="center">124.</div>

**Plaintiff's Statement**:

Everyone within the Narcotics Unit understood that a hard number of arrests and search warrants was mandated, and these policies were in place within the

449555-1

Narcotics Unit before Lt. Gibbs joined the Unit—and they remained in effect after she took over as a supervisor (Buchanan depo., 120).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** Chief Pennington and other officers testified that APD did not utilize quotas (Pennington depo., pp. 178 – 181, 191-192, 196, 206, 255, Buchanan depo., p. 127; Vignola depo., p. 55-56). APD utilized performance goals that several witnesses testified there were no adverse consequences for failing to achieve (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Numerous APD Officers also testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114). With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, no active Narcotics Team 1 investigator testified that they were told by any supervisor (other than Stallings) that they were required to get 9 arrests and 2 warrants per month, nor did they see anything in writing to that affect (Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126).

125.

**Plaintiff's Statement**:

At the time of the Kathryn Johnston shooting, the "9 and 2" policy was tied directly to the officers' annual performance evaluation such that the officers were required to satisfy this minimum requirement in order to obtain a satisfactory performance appraisal (Finley depo., p. 70; Bond depo. at pp. 34-35; Junnier Aff., ¶ 6; FBI Report, p. DOZIER-COA 00008).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, no active Narcotic Team 1 investigator testified that they were told by any supervisor (other than Stallings) that they were required to get 9 arrests and 2 warrants per month, nor did they see anything in writing to that affect (Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126).

126.

**Plaintiff's Statement**:

Narcotics officers who failed to satisfy the "9 and 2" requirement would be replaced or reassigned if they did not satisfy their number requirements (Bond depo., p. 43).

449555-1

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** Several APD officers testified that not a single investigator was ever adversely impacted by failing to meet the narcotics unit performance standards (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111).

<div align="center">127.</div>

**Plaintiff's Statement**:

Thus, there is no question that the "9 and 2" Rule established an impermissible arrest quota within the Narcotics Unit (Anderson depo., p. 70).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion**

<div align="center">128.</div>

**Plaintiff's Statement**:

Even those officers who tried to downplay the significance of the "9 and 2" Rule acknowledged that if an officer's performance was poor than the officer risked being sent to another unit (FBI Report, p. DOZIER-COA00008).

449555-1

**Defendants' Response:**

**Defendants refute Movant's Fact.** Several APD officers testified that not a single investigator was ever adversely impacted by failing to meet the narcotics unit performance standards (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111).

<div align="center">129.</div>

**Plaintiff's Statement:**

The officers viewed this as punishment because the flexibility of a Narcotics Unit assignment normally allowed them to work better and higher paying off-duty jobs (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** Numerous APD Officers testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114). Several APD officers testified that not a single investigator was ever adversely impacted by failing to meet the narcotics unit performance standards (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Investigators from Narcotics Team 1 said that they learned of the "9 and 2

Rule" from Junnier and/or Stallings (Bond depo., pp. 36, 42; Buchanan depo., pp. 113, 115, 144).

<div align="center">130.</div>

**Plaintiff's Statement**:

In addition to the standard "9 and 2" policy, and as further evidence of APD policies establishing arrest and warrant requirements within the Narcotics Unit at the time of the shooting, plaintiff notes that an APD memorandum regarding performance evaluations, dated August 19, 2006, states: "The officer will be rated on the weekly totals of arrest of one calendar month." (August 19, 2006 memorandum, attached hereto as Exhibit 9).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Movant's Fact/Exhibit is inadmissible as Exhibit 9 does not indicate who authored the memorandum, thus it cannot be properly authenticated.**

<div align="center">131.</div>

**Plaintiff's Statement**:

This APD memorandum further provided:

**Outstanding**: Officer receives an outstanding rating when their monthly arrest totals are 20 or more, and serves 1 drug warrant monthly or 12 yearly.

**Highly Effective**: Officer receives a highly effective rating when their monthly arrest totals are 15, and serves 8 warrants yearly.

**Effective**: Officer receives an effective rating when their monthly arrest totals are 10 and serves 5 drug warrants yearly.

**Needs improvement**: Officer falls below 10 arrests monthly and has less than 5 warrants yearly.

(Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact/Exhibit is inadmissible as Exhibit 9 does not indicate who authored the memorandum, thus it cannot be properly authenticated.**

132.

**Plaintiff's Statement**:

Another Narcotics Unit memorandum, dated January 12, 2006, stated:

I will need your report in memo form on all of your Investigators or Officers who turned in Zeros on their Arrests & Warrants for the COBRA week . . . . The memo should list action that you are taking if an explanation cannot be given for the person generating the zero. Action should start with an oral counseling then progress upward if there are any additional zeros.

(January 12, 2006, memorandum, attached hereto as Exhibit 10).

**Defendants' Response:**

**Objection: Movant's Fact is inadmissible hearsay as Movant's Exhibit 10 has not been properly authenticated.**

<div align="center">133.</div>

**Plaintiff's Statement**:

This particular memorandum was generated so that Lt. Carlino could explain to his direct superior, Major Finley, why the narcotic unit officers were not making enough arrests (Deposition of Sgt. Scott Kreher ("Kreher depo."), p. 57).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, Movant's Fact is inadmissible as the testimony of Sgt. Kreher is speculation, and Movant's Fact is inadmissible hearsay as Movant's Exhibit 10 has not been properly authenticated.**

<div align="center">134.</div>

**Plaintiff's Statement**:

Sgt. Kreher explained, "what he [Lt. Carlino] means in that is, for that COBRA week, meaning that week, if they [the officers] do not have either an arrest or a warrant, meaning that they will have a zero on their stat sheet for the week" (Kreher's depo., p. 55).

**Defendants' Response:**

**Objection: Movant's Fact is inadmissible as the testimony of Sgt. Kreher is speculation, and Movant's Fact is inadmissible hearsay as Movant's Exhibit 10 has not been properly authenticated.**

<div align="center">135.</div>

**Plaintiff's Statement:**

COBRA refers to the weekly statistical meetings that were held by Chief Pennington (Kreher's Depo. at pp. 55-56).

**Defendants' Response:**

**Objection: Movant's Fact is inadmissible as the testimony of Sgt. Kreher is speculation.**

<div align="center">136.</div>

**Plaintiff's Statement:**

During the meeting, unit supervisors would make a presentation to Chief Pennington that would include a statistical breakdown of arrests within a particular geographic zone (Id.).

**Defendants' Response:**

**Objection: Movant's Fact is inadmissible as the testimony of Sgt. Kreher is speculation.**

137.

**Plaintiff's Statement**:

Sgt. Kreher further explained that if a certain percentage of a unit's officers did not make an arrest during a week, the zone commander—in this case Lt. Carlino—would be chastised by his superior—in this case Major Finley (Id., p. 57).

**Defendants' Response:**

**Objection: Movant's Fact is inadmissible as the testimony of Sgt. Kreher is speculation, and Movant's Fact is inadmissible hearsay as Movant's Exhibit 10 has not been properly authenticated.**

138.

**Plaintiff's Statement**:

Thus, Lt. Carlino generated the January 12 memorandum to motivate his officers to make a certain number of arrests—a quota—so that he could avoid being chastised by Major Finley at the weekly COBRA meeting.

**Defendants' Response:**

**Objection. Movant fails to support fact by a citation to evidence, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Movant's Fact is inadmissible hearsay as Movant's Exhibit 10 has not been properly authenticated.**

449555-1

139.

**Plaintiff's Statement**:

In August 2006, under Lt. Gibb's command, the Narcotics Unit revised its quota policy by adjusting the quota numbers as reflected in a new Performance Evaluation (Gibbs depo., p 30).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

140.

**Plaintiff's Statement:**

The Performance Evaluation graded its officers based on their number of arrests, number of warrants, and percentage of clearing lead sheets by arrest (Id., pp. 18, 30; see also Gregg Junnier's 2006 Performance Evaluation, attached hereto as Exhibit 11).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** Movant's citation – the APD Performance Evaluation Form – lists three critical job elements upon which an officer's performance is measured. The third element of the APD's Performance Evaluation is entitled "enforcement operations" which includes among other items the number of search warrants investigated and served, community-referred lead sheets

449555-1

investigated and the officer's performance in relation to the yearly watch average (Gregg Junnier's 2006 Performance Evaluation, attached to Plaintiff's Statement of Undisputed Facts as Exhibit 11).

<div align="center">141.</div>

**Plaintiff's Statement**:

The Chain of Command reviewed the Performance Evaluation form for Narcotics Unit and approved it, which meant it was the official policy of the APD (Deposition of Assistant Chief Alan Dreher ("Dreher depo."), pp. 106-11).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

<div align="center">142.</div>

**Plaintiff's Statement**:

The APD then used these Personnel Evaluations to determine if an officer would be punished and receive an adverse employment consequence (e.g. demotion, pay cut, transfer, etc.) or some type of reward (e.g. raise, promotion, etc.) (Id., pp. 104-06, 123, 128).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

449555-1

143.

**Plaintiff's Statement**:

During unit meetings, Lt. Gibbs told her officers that they needed to keep their numbers up and that she would have officers reassigned if they did not satisfy their number requirements (Smith Aff., ¶ 14).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, no active narcotics unit investigator testified that they were told by any supervisor (other than Stallings) that they were required to get 9 arrests and 2 warrants per month, nor did they see anything in writing to that affect (Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126). Several APD officers testified that not a single investigator was ever adversely impacted by failing to meet the narcotics unit performance standards (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111).

144.

**Plaintiff's Statement**:

Lt. Gibbs' revised quota policy, which was in effect at the time of the shooting of Ms. Johnston, specifically graded narcotics officers as follows:

449555-1

**Effective**: Employee averages at least 2 search warrants per month, clears 50% of their assigned leads sheets by arrest, and is within 30% of the yearly watch average in arrests.

**Highly Effective**: Employee averages at least 3 search warrants per month, clears 60% of their assigned lead sheets by arrest, and exceeds the yearly watch average by 5%.

**Outstanding**: Employee averages at least 4 search warrants per month, clears 70% of their lead sheets by arrest, and exceeds the yearly watch average by 10%.

**Needs improvement**: Employee averages 1 search warrant per month, clears between 30 and 49% of their lead sheets by arrest and fails to meet the watch average in arrests by 5%.

**Unacceptable**: No search warrants, clears less than 30% of lead sheets by arrests and fails to meet the watch average by 6% or greater.

(See Exhibit 11, Junnier's Performance Evaluation).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

145.

**Plaintiff's Statement:**

Once the APD evaluated the officer pursuant to the evaluation form, the chain of command, including Chief Pennington, would then review, approve, and sign off on the evaluations (Pennington depo., pp. 219, 226-27; Andreson depo., pp. 53-55).

**Defendants' Response:**

**Undisputed.**

146.

**Plaintiff's Statement**:

Assistant Chief Dreher testified about this policy as follows:

**Question:** On its face, chief, when you read job element number three [numbers requirements] on its face, it is a quota, correct?

**Answer:** If they are negatively sanctioned for not achieving that. . .If they are negatively sanctioned, then that's going to be—I would say that would be a quota (Dreher depo., pp. 125-126).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

147.

**Plaintiff's Statement**:

He also testified that this quota requirement was the policy of the APD and that the narcotics officers were required to comply with this policy (Id., pp. 105, 111-12, 115-16, 133).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

148.

**Plaintiff's Statement**:

Lead sheets are developed through anonymous tips, complaints to city council members and other illegal activity at a particular address (Finley depo., p. 15, Gibbs depo., p. 37).

**Defendants' Response:**

**Undisputed.**

149.

**Plaintiff's Statement**:

These "leads" are not vetted by APD and can be incredibly unreliable (Finley depo., p. 15).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

150.

**Plaintiff's Statement**:

Amazingly, prior to implementing a policy using lead sheets, the APD never evaluated what percentage of lead sheets resulted in a lawful arrest supported by probable cause (Id., pp. 18, 52).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

<div align="center">151.</div>

**Plaintiff's Statement**:

Major Finley testified that, in his opinion, only 25% of all lead sheets provided credible and reliable information regarding drug activity (Id., pp. 15, 50).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

<div align="center">152.</div>

**Plaintiff's Statement**:

Major Finley also testified that officers, when following up on a lead sheet tip, often found no drug activity at the particular address (Id., p. 53).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

449555-1

153.

**Plaintiff's Statement**:

As a direct result of the illegal quota policies implemented by the APD and Chief Pennington, there was widespread abuse by the Narcotics Unit (FBI Report, p. DOZIER-COA00005).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

154.

**Plaintiff's Statement**:

In addition to the 933 Neal Street shooting, Officer Junnier also fabricated statements in an affidavit for a search warrant obtained on or about November 14, 2006, at 161 Rhodesia Avenue, Atlanta, Georgia, only a week before the Johnston shooting (FBI Report, p. DOZIER-COA00005).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

449555-1

155.

**Plaintiff's Statement**:

Officer Junnier was the affiant on that search warrant and he falsely swore in an affidavit presented to a state court magistrate judge that: (1) he and Officer Smith had directed a CI to an apartment to purchase drugs; (2) the CI was searched before making the buy; and (3) after making the buy the CI handed Officer Junnier five bags of marijuana (Tesler plea, Statement of Facts, ¶ 26).

**Defendants' Response:**

**Undisputed.**

156.

**Plaintiff's Statement**:

Officer Junnier had not been present for any of the events sworn to in the affidavit submitted in support of the warrant application (Id.).

**Defendants' Response:**

**Undisputed.**

157.

**Plaintiff's Statement**:

Officer Junnier also admitted that he obtained another warrant based on a fabricated affidavit, but the FBI could not verify the location of this warrant (Id.).

449555-1

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

158.

**Plaintiff's Statement**:

Like Officer Junnier, Officer Smith also participated in the fabricated search warrant affidavit at 161 Rhodesia Avenue (FBI Report, p. DOZIER-COA00006).

**Defendants' Response:**

**Undisputed.**

159.

**Plaintiff's Statement**:

Officer Smith also admitted that he participated in "hand-offs," padded vouchers, and that he failed to supervise informants properly (Id.).

**Defendants' Response:**

**Undisputed.**

160.

**Plaintiff's Statement**:

Officer Smith further admitted that he used "INS" or insurance drugs (Id.).

**Defendants' Response:**

**Undisputed.**

161.

**Plaintiff's Statement**:

"INS" drugs were used by Officer Smith to plant on suspected drug dealers to coerce them into cooperating with the police (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

162.

**Plaintiff's Statement**:

Officer Smith also participated in "thunder runs" or "jump outs" (Id.).

**Defendants' Response:**

**Objection: Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

163.

**Plaintiff's Statement**:

During a "jump out," Officer Smith and other members of narcotics Team 1 would stop a person on the street without any probable cause or reasonable suspicion and search that person for weapons and drugs (Id., pp. DOZIER-COA00006-00007; Smith Aff., ¶ 7).

449555-1

**Defendants' Response:**

**Objection: Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

164.

**Plaintiff's Statement:**

On at least three separate occasions prior to the shooting involving Ms. Johnston, Officer Tesler falsely swore search warrant affidavits that were presented to a state court magistrate judge (Tesler plea, Statement of Facts, ¶¶ 23, 24, 25).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

165.

**Plaintiff's Statement:**

In these fabricated affidavits, Officer Tesler falsely stated that: (1) he and Officer Junnier had directed a CI to an apartment to purchase drugs; (2) the CI was searched before making the buy; (3) after making the buy the CI handed Officer Tesler drugs; and (4) the CI gave Officer Tesler a description of the dealer (Id.).

**Defendants' Response:**

**Undisputed.**

449555-1

<div align="center">166.</div>

**Plaintiff's Statement**:

In fact, Officer Tesler had not been present for any of the events sworn to in the affidavits and he did not witness the controlled purchases (Id.).

**Defendants' Response:**

**Undisputed.**

<div align="center">167.</div>

**Plaintiff's Statement**:

Moreover, several of the warrants obtained by Officer Tesler were predicated on "hand-offs." (FBI Report, p. DOZIER-COA00007).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

<div align="center">168.</div>

**Plaintiff's Statement**:

Two months before the botched drug raid and shooting involving Ms. Johnston, Officer Buchanan wrote an affidavit for a search warrant that almost led to an elderly woman's death (Buchanan depo., pp. 155-57).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact and Movant's Fact is not material. Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

169.

**Plaintiff's Statement**:

The incident began when Officer Buchanan met with an unregistered CI regarding the sale of drugs at a particular location in Zone 1 (Id., pp. 60-61, 64-65).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact and Movant's Fact is not material.**

170.

**Plaintiff's Statement**:

Prior to her meeting with the CI, Officer Buchanan did not perform an independent investigation to verify who was living at the address (Id., p. 63-65).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact and Movant's Fact is not material.**

171.

**Plaintiff's Statement**:

After meeting and discussing the situation, Officer Buchanan frisked the CI and then gave him buy-money to purchase drugs from a residence located in an apartment complex on Simpson Road (Id., p. 61, 65).

**Defendants' Response:**

**Objection: Movant's Fact is not material.**

172.

**Plaintiff's Statement**:

Officer Buchanan dropped off the CI at the back of the apartment complex, but from where Officer Buchanan had parked her car, she could not see the CI enter the residence (Id., p. 69).

**Defendants' Response:**

**Objection: Movant's Fact is not material.**

173.

**Plaintiff's Statement**:

Officer Buchanan did not see CI again until he came back from the purported buy carrying drugs that he did not have when he originally got out of the car (Id., pp. 70-71).

**Defendants' Response:**

**Objection: Movant's Fact is not material.**

174.

**Plaintiff's Statement**:

Officer Buchanan did not witness the buy and she did not have personal knowledge of the transaction and instead took the word of the CI that drugs had been purchased at the location (Id., pp. 71-72).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is not material.**

175.

**Plaintiff's Statement**:

In fact, in Officer Buchanan's own words, whether a buy actually took place at the Simpson Road location is "questionable" (Id., p. 109).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is not material.**

176.

**Plaintiff's Statement**:

Although Officer Buchanan agreed that it would have been a good idea to perform a follow-up investigation and conduct more surveillance to determine whether the alleged drug dealer actually lived at that location, she did not perform further surveillance at the location or gather any more intelligence (Id., p. 72-75).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is not material.**

177.

**Plaintiff's Statement**:

Instead, as she was leaving the apartment complex, Officer Buchanan merely drove by the front of the apartment to monitor the activity on the exterior of the location (Id., pp. 73-74).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is not material.**

178.

**Plaintiff's Statement**:

When asked if she had been trained to perform a more thorough investigation, Officer Buchanan responded, "I can't really say that I've had training, formal training" related to narcotics enforcement (Id., p. 75).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is not material.**

179.

**Plaintiff's Statement**:

Rather, Officer Buchanan explained that she had witnessed other officers in the Narcotics Unit make similar undercover buys using confidential informants and that, in learning how to perform her job as a narcotics officer on a day-to-day basis, the training she received came from on-the-job training provided by senior investigators, including Officer Junnier among others (Id., pp. 74-75, 79).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is not material.**

180.

**Plaintiff's Statement**:

Officer Buchanan felt that the Narcotics Unit did need additional training and supervision from Sgt. Stallings (Id., pp. 112-13).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is not material.**

181.

**Plaintiff's Statement**:

Officer Buchanan took the unverified information provided by the CI and filled out an affidavit in support of a search warrant (Id., pp. 81-83).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is not material.**

182.

**Plaintiff's Statement**:

Officer Buchanan drafted the narrative portion of the affidavit falsely stating that she actually had witnessed the transaction (Id., pp. 158).

449555-1

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is not material.**

<div align="center">183.</div>

**Plaintiff's Statement**:

Officer Buchanan acknowledged that she should have included in the affidavit the fact that she did not witness the CI make the buy (Id., p. 160).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is not material.**

<div align="center">184.</div>

**Plaintiff's Statement**:

Once she obtained the warrant, Officer Buchanan met with her team composed of narcotics officers, they briefed the situation and developed a tactical plan (Id., pp. 90-91).

**Defendants' Response:**

**Objection: Movant's Fact is not material.**

<div align="center">185.</div>

**Plaintiff's Statement**:

The team then traveled to the location to execute the warrant (Id., p. 91).

**Defendants' Response:**

    **Objection: Movant's Fact is not material.**

<div align="center">186.</div>

**Plaintiff's Statement**:

Officer Buchanan and her team announced "Police" and then busted open the front door (Id.).

**Defendants' Response:**

    **Objection: Movant's Fact is not material.**

<div align="center">187.</div>

**Plaintiff's Statement**:

As the officers cleared the corner of a bedroom, they encountered a startled Francine Thompson, who was 79-years old, standing next to her bed holding a toy gun and they almost shot her (Id., pp. 91-92, 156; Tesler plea, Statement of Facts, ¶ 22; Gibbs depo. p. 216).

**Defendants' Response:**

    **Objection: Movant's Citation does not support Movant's Fact, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Movant's Fact is not material.**

188.

**Plaintiff's Statement**:

Upon a search of the residence, the officers did not discover any drugs and never found any evidence indicating that the alleged drug dealer lived at that location (Buchanan depo., pp. 92-93, 101).

**Defendants' Response:**

**Objection: Movant's Fact is not material.**

189.

**Plaintiff's Statement**:

Because several days passed between the time when the warrant was obtained and the time that it was executed at the Simpson Road location, Officer Buchanan had time to investigate the matter further but she did not do so (Id., pp. 88-89).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Movant's Fact is not material.**

190.

**Plaintiff's Statement**:

Officer Buchanan acknowledged that in terms of performing a more thorough investigation, she "needed to have done more. And I didn't do it." (Id., p. 97).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact and Movant's Fact is not material.**

191.

**Plaintiff's Statement**:

Officer Buchanan testified that following the incident involving Francine Thompson, she always makes a confirmation buy and verifies the identity of the individuals living at the particular location to make sure that the warrant is correct and executed properly (Buchanan depo., pp. 96-97).

**Defendants' Response:**

**Objection: Movant's Fact is not material.**

192.

**Plaintiff's Statement**:

That way, according to Officer Buchanan, citizens' constitutional rights are not violated (Id., p. 97).

449555-1

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact and Movant's Fact is not material.**

<div align="center">193.</div>

**Plaintiff's Statement**:

Following the incident, Officer Buchanan and others advised Sgt. Stallings that in order to prevent similar incidents in the future, they needed to slow down because the officers in the Narcotics Unit needed more time to conduct thorough investigations (Id., pp. 100; Smith Aff., ¶ 20).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact and Buchanan's testimony about hearing another officer speak to Sgt. Stallings is inadmissible hearsay.**

<div align="center">194.</div>

**Plaintiff's Statement**:

At the time, Officer Buchanan acknowledged that she was operating under the "9 and 2 Rule," and she had to make sure she had "nine bodies and two search warrants, or two warrants, per month" (Buchanan depo., pp. 114-15).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** Buchanan testified that she was told by only Junnier that narcotics unit investigators were required to get 9 arrests and 2 warrants per month (Buchanan depo., pp. 115, 125, 126).

<div align="center">195.</div>

**Plaintiff's Statement**:

Officer Buchanan met with Lt. Gibbs shortly after the Thompson incident—and before the Kathryn Johnston shooting—to review and discuss the warrant (Id., pp. 83-95; Gibbs depo., pp. 213-14).

**Defendants' Response:**

**Undisputed.**

<div align="center">196.</div>

**Plaintiff's Statement**:

In addition to the Francine Thompson incident, Officer Buchanan took "hand-offs" from Officer Junnier and then submitted false affidavits stating that she in fact had witnessed the buy (FBI Report, p. DOZIER-COA00007; Buchanan depo., pp. 129-30).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** Although Junnier stated that Buchanan took "hand-offs," there has been no official confirmation that she did. Buchanan admitted in her deposition that when she first arrived at Narcotics, her first few warrants were probably done incorrectly because she followed Junnier's instructions to the letter (Buchanan depo., p. 131).

<div align="center">197.</div>

**Plaintiff's Statement**:

With respect to one particular search warrant obtained for 2479 Abner Terrace, Officer Buchanan obtained a search warrant based on a drug purchase made by CI on behalf of Officer Junnier (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** Although Junnier stated that Buchanan took "hand-offs," there has been no official confirmation that she did. Buchanan admitted in her deposition that when she first arrived at Narcotics, her first few warrants were probably done incorrectly because she followed Junnier's instructions to the letter (Buchanan depo., p. 131).

449555-1

198.

**Plaintiff's Statement**:

CI White, however, claimed that he attempted to make a purchase at that location for Officer Buchanan, although he was unsuccessful (Id.).

**Defendants' Response:**

**Undisputed.**

199.

**Plaintiff's Statement**:

The FBI also believes that Officer Buchanan used an unregistered CI several times to obtain search warrants (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

200.

**Plaintiff's Statement**:

Officer Cary Bond admitted to the FBI that he padded vouchers and had CIs sign blank vouchers (FBI Report, p. DOZIER-COA00007).

**Defendants' Response:**

**Undisputed.**

201.

**Plaintiff's Statement**:

In addition, the FBI's investigation revealed that CI White never made a controlled purchase from 674 Alta Place, but Officer Bond submitted a search warrant based on a drug purchase made by CI White at that location. (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

202.

**Plaintiff's Statement**:

It also was suspected that Officer Bond received several hand-offs from Officer Junnier (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

203.

**Plaintiff's Statement**:

Officer Burchfield was assigned to the APD's Zone 1 Field Investigation Team and occasionally used a CI to make controlled drug purchases (FBI Report, p. DOZIER-COA00007).

**Defendants' Response:**

**Undisputed.**

204.

**Plaintiff's Statement**:

CI White informed the FBI that in November 2006, Officer Burchfield split a rock of crack cocaine that CI had purchased earlier that day (Id.).

**Defendants' Response:**

**Undisputed.**

205.

**Plaintiff's Statement**:

Officer Burchfield told CI White that he was going to use one of the pieces of crack as evidence of a drug purchase for a residence located at 826 Wood Street (Id., pp. DOZIER-COA00007-00008).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and White's testimony is inadmissible hearsay.**

206.

**Plaintiff's Statement**:

CI White had unsuccessfully tried to purchase drugs at 826 Wood Street earlier that day (Id., p. DOZIER-COA00008).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

449555-1

207.

**Plaintiff's Statement**:

Officer Burchfield then filled out a voucher falsely stating that CI White had in fact purchased the crack from 826 Wood Street (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

208.

**Plaintiff's Statement**:

While Officer Vignola was assigned to the Narcotics Unit, he accepted several "hand-offs" from Officer Junnier (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

209.

**Plaintiff's Statement**:

Allegedly, Officer Junnier learned to do "hand-offs" from Officer Vignola (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and the unknown officer's testimony is inadmissible hearsay.**

449555-1

210.

**Plaintiff's Statement**:

Sgt. Wilbert Stallings was the immediate supervisor over Narcotics Team 1 and he also directly participated in these illegal activities (FBI Report, p. DOZIER-COA00011).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

211.

**Plaintiff's Statement**:

In October 2005, Sgt. Stallings, along with Officer Junnier, searched a duplex apartment located at 1056 Dill Avenue without a valid warrant (Id.).

**Defendants' Response:**

**Undisputed.**

212.

**Plaintiff's Statement**:

Officer Junnier had obtained a search warrant for only one side of the duplex—1058 Dill Avenue (Id.).

**Defendants' Response:**

**Undisputed.**

213.

**Plaintiff's Statement**:

After executing the warrant and finding no drugs, Sgt. Stallings and Officer Junnier decided to search 1056 Dill Avenue even though they did not have a warrant (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact consists of testimony that is inadmissible hearsay.**

214.

**Plaintiff's Statement**:

Sgt. Stallings and other members of the narcotics team used a ram to break down the door (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

215.

**Plaintiff's Statement**:

No one was home at the time and no evidence of drugs was found (Id.).

**Defendants' Response:**

**Undisputed.**

449555-1

216.

**Plaintiff's Statement**:

Sgt. Stallings directed his team to leave the apartment and shut the door (Id.).

**Defendants' Response:**

**Undisputed.**

217.

**Plaintiff's Statement**:

Sgt. Stallings then made the statement, "Just shut the door. They'll just think it was a break-in" (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

218.

**Plaintiff's Statement**:

As a result of this incident, Sgt. Stallings plead guilty to conspiracy to violate civil rights, in violation of 18 U.S.C. § 241, and he has been sentenced to 18-months' imprisonment in federal prison (See United States v. Stallings, 1:08-CR-111-JEC (N.D. Ga.)).

**Defendants' Response:**

**Undisputed.**

219.

**Plaintiff's Statement**:

Sgt. Stallings also encouraged and participated in falsifying search warrant affidavits (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact consists of testimony that is inadmissible hearsay.**

220.

**Plaintiff's Statement**:

During the course of the investigation, the FBI learned that Sgt. Stallings knew that Officer Junnier and other officers on his team participated in "hand-off" affidavits (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

221.

**Plaintiff's Statement**:

Sgt. Stallings encouraged Officer Junnier to utilize "hand-offs" so that everyone on the team would satisfy their arrest quotas (Id.).

449555-1

**Defendants' Response:**

**Objection: Objection: Movant's Citation does not support Movant's Fact, Movant's Fact consists of testimony that is inadmissible hearsay, and Defendants refute Movant's Fact.** Investigators from Narcotics Team 1 said that they learned of the "9 and 2 Rule" from Junnier and/or Stallings (Bond depo., pp. 36, 42; Buchanan depo., pp. 113, 115, 144). Numerous APD Officers testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114). Several APD officers testified that not a single investigator was ever adversely impacted by failing to meet the narcotics unit performance standards (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111).

<div align="center">222.</div>

**Plaintiff's Statement**:

Sgt. Stallings also permitted Officer Junnier and other officers to rely on purchases that were not witnessed by the officers (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

223.

**Plaintiff's Statement**:

Sgt. Stallings and other team members "padded" payment vouchers for CIs who made undercover drug purchases and he signed-off on many vouchers even though he knew they were inaccurate (Id., pp. DOZIER-COA00011-00012).

**Defendants' Response:**

> **Undisputed.**

224.

**Plaintiff's Statement**:

As another example of Sgt. Stallings illegal conduct, he and his team relied on one particular unregistered informant as a source of information (Id., p. DOZIER-COA00012).

**Defendants' Response:**

> **Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

225.

**Plaintiff's Statement**:

Sgt. Stallings and his officers would falsely identify that informant as a registered, confidential and reliable informant in order to obtain numerous search warrants (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

226.

**Plaintiff's Statement**:

Sgt. Stallings never attempted to register this informant because he was on active probation for another offense and had an outstanding warrant for his arrest (Id.).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

227.

**Plaintiff's Statement**:

During the investigation, the FBI learned that other officers were falsifying search warrant affidavits, particularly as related to "hand-offs" (Id.).

449555-1

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact consists of testimony that is inadmissible hearsay.**

228.

**Plaintiff's Statement**:

Narcotics officers and APD supervisors consistently testified that narcotics officers did not receive any formal narcotics training upon being assigned to the Narcotics Unit (Andreson depo., p. 23-26; Gibbs depo., pp. 117-20; Deposition of Lt. John Mathis ("Mathis depo."), pp. 30, 32).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.**    APD Officer Gregg Junnier received a total of 1073 hours of training, including 82 hours related to narcotics enforcement and warrants (See Gibbs Affidavit attached to Defendants' Motion for Summary Judgment as Exhibit "A", Attachment "3").    APD Officer J.R. Smith received a total 1359 hours of training, including 122 hours related to narcotics enforcement and warrants (Id., Attachment "4").    APD Officer Arthur Tesler received a total of 1500 hours of training, including 102 hours related to narcotics enforcement and warrants (Id., Attachment "5").    APD Officer Sgt. Wilbert Stallings received a total

449555-1

of 1020 hours of training, including 125 hours in supervision and 104 hours related to narcotics enforcement (Id., Attachment "6").

<div align="center">229.</div>

**Plaintiff's Statement**:

This lack of training extended to other units in the APD and Sgt. Kreher testified that he did not receive any special training regarding affidavit and warrant applications before he was assigned to the REDDOG Unit (Kreher depo., p. 18).

**Defendants' Response:**

**Objection: Movant's Fact is not Material, and Defendants refute Movant's Fact.** Kreher testified that he attended APD's Basic Investigators Course which covered "the whole gamut of what a detective does" including training on how to write a search warrant, warrant training, affidavit training, with officers practicing entries on a warrant (Kreher Depo., p. 28).

<div align="center">230.</div>

**Plaintiff's Statement**:

The REDDOG Unit was responsible for street level narcotic interdiction (Id., p. 15).

**Defendants' Response:**

**Undisputed.**

231.

**Plaintiff's Statement**:

Officer Bond also testified that he did not receive any specialized training to become a narcotics officer (Bond depo., p. 49-50).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

232.

**Plaintiff's Statement**:

Officer Buchanan stated, "I can't really say that I've had training, formal training" related to narcotics investigations (Buchanan depo., p. 75).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact. Defendants refute Movant's Fact.** Officer Buchanan testified, "I can't really say that I've had training, formal training. I've had on-the-job training." (Buchanan depo., p. 75). All Narcotics Unit Investigators attended an 80 hours Basic Investigators Course before being assigned to the Narcotics Unit, which covered "the whole gamut of what a detective does" including training on how to write a search warrant, warrant training, affidavit training, with officers practicing entries on a warrant (Kreher Depo., p. 28).

233.

**Plaintiff's Statement**:

Sgt. Stallings, the day-to-day supervisor of the Narcotics Unit, did not receive any specialized narcotics training when he joined the Narcotics Unit (Stallings Aff., ¶ 2).

**Defendants' Response:**

**Defendants refute Movant's Fact.** APD Officer Sgt. Wilbert Stallings received a total of 1020 hours of training, including 125 hours in supervision and 104 hours related to narcotics enforcement (See Gibbs Affidavit attached to Defendants' Motion for Summary Judgment as Exhibit "A", Attachment "6").

234.

**Plaintiff's Statement**:

Instead, upon being assigned to the Narcotics Unit, the only training the officers received was on-the-job training from veteran officers, including Officer Junnier (Id., Bond depo., pp. 49-50; Buchanan depo. p. 75-79; Gibbs depo., p. 120).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** All Narcotics Unit Investigators attended an 80 hours Basic Investigators Course before being assigned to the Narcotics Unit,

which covered "the whole gamut of what a detective does" including training on how to write a search warrant, warrant training, affidavit training, with officers practicing entries on a warrant (Kreher Depo., p. 28).

235.

**Plaintiff's Statement**:

Shortly after Chief Pennington became police chief, he commissioned a study of the department to determine if the APD could improve its crime-fighting capabilities (Pennington depo., p. 94).

**Defendants' Response**:

**Undisputed.**

236.

**Plaintiff's Statement**:

This study was known as the Linder Report and was released in 2004 (Id.).

**Defendants' Response**:

**Undisputed.**

237.

**Plaintiff's Statement**:

The Linder Report concluded that "present training for personnel assigned to Narcotics Enforcement is insufficient compared to training in other large city police departments" (Id., p. 99).

449555-1

**Defendants' Response:**

**Undisputed.**

238.

**Plaintiff's Statement**:

Additionally, the Linder Report revealed that there was "low to no training to prepare them for work in the highly specialized investigative units, work like Narcotics Enforcement that is often dangerous" (Id., p. 118).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** An investigation was conducted when command staff learned the Linder Report indicated that narcotics unit investigators reported they received "no to low training" and it was determined that many of the investigators had received significant training even though they filled out the Linder surveys indicating that they had not (Pennington depo., p. 126).

239.

**Plaintiff's Statement**:

Chief Pennington, as the ultimate policy maker, was in charge of making sure that appropriate training was in place and the supervisors—lieutenants and sergeants—were in charge of making sure Chief Pennington's training policies

were implemented and followed (Deposition of Major Pearlene Williams ("Williams depo."), p. 56).

**Defendants' Response:**

    **Undisputed.**

<div align="center">240.</div>

**Plaintiff's Statement**:

After the Linder Report was published, however, Chief Pennington did not develop a revised training regimen to address the training deficiencies in the Narcotics Unit noted in the study (Pennington depo., pp. 99-100, 118-19).

**Defendants' Response:**

**Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** An investigation was conducted when command staff learned the Linder Report indicated that narcotics unit investigators reported they received "no to low training" and it was determined that many of the investigators had received significant training even though they filled out the Linder surveys indicating that they had not (Pennington depo., p. 126). After researching how to best address the array of challenging issues faced by the Atlanta Police Department, Chief Pennington opted to retain the services of the Commission on Accreditation for Law Enforcement Agencies (CALEA) in order to have the entire Atlanta Police Department accredited. The entire Narcotics Unit was re-evaluated

449555-1

to insure compliance with CALEA's 464 requirements. All training was evaluated and brought into compliance with CALEA's national standards. Chief Pennington knew that if the APD applied for accreditation, CALEA would evaluate the entire department and let him know specifically what was wrong in every unit (Pennington depo., p. 119). The Atlanta Police Department was accredited by CALEA in 2005 (See City Defendants' Response to Plaintiff's Motion for Summary Judgment - Exhibit A). In order to be accredited the entire department must meet CALEA's exacting standards (Id.)

<div align="center">241.</div>

**Plaintiff's Statement**:

Of course, narcotics investigations require a special skill set and involve specific legal issues that are unique to undercover drug investigations (Id., p. 103; Bond depo., pp. 50-51; Gibbs depo., p. 200).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

449555-1

242.

**Plaintiff's Statement**:

The officers needed specialized narcotics training regarding surveillance and warrant writing (Bond depo., pp. 50-51; Buchanan depo., p. 112).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

243.

**Plaintiff's Statement**:

Chief Pennington acknowledged how important training is as related to the preservation of citizens' rights when he testified that insufficient narcotics training as related to preparing search warrant affidavits could lead to the violation of civil rights (Pennington depo., pp. 105-06; Williams depo., pp. 75-76).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

244.

**Plaintiff's Statement**:

Chief Pennington explained that those under his chain of command are responsible for making sure that the APD's policies and procedures are carried out properly by the narcotics officers (Pennington depo., pp. 76-77).

**Defendants' Response:**

**Undisputed.**

245.

**Plaintiff's Statement**:

In this case, Sgt. Stallings, Lt. Gibbs, Major Davis, Deputy Chief Andreson, and Assistant Chief Dreher, who each occupied a position within Chief Pennington's chain of command, were responsible for knowing what their officers were doing and making sure that they were not lying on affidavits or falsifying records (Id.; Gibbs' depo., p. 34).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

246.

**Plaintiff's Statement**:

Chief Pennington relied on his chain of command to monitor the Narcotics Unit and make sure the warrants were obtained correctly, but Chief Pennington readily acknowledged that "there were problems with the narcotics management and supervision of the Narcotics Unit" in 2006 (Pennington depo., p. 116).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** Chief Pennington testified that he was unaware of the illegal activity of Stallings, Junnier, Smith, and Tesler and wouldn't know whether or not they were complying with all the rules and regulations unless they were caught doing something inappropriate (Pennington depo., p. 78). Chief Pennington also testified that at times the supervision in place doesn't turn out to be good supervision (Pennington depo., p. 106). Chief Pennington also testified that one sergeant (Stallings) was implicated and wasn't properly supervising his subordinates because he was a part of this whole scenario (Pennington depo., p. 106).

449555-1

247.

**Plaintiff's Statement**:

In fact, these problems had been brought to Chief Pennington's attention by the Linder Report in 2004 (Id., p. 154-55).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

248.

**Plaintiff's Statement**:

Despite these deficiencies, however, Chief Pennington and the supervisory defendants did not implement any policies or procedures designed specifically to ensure that narcotics officers were complying with the law and not falsifying affidavits (Pennington depo., pp. 83-90; Gibbs depo., p. 92).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** See Defendant's response to Plaintiff's #240. CALEA Accreditation in 2005 was one of Chief Pennington's responses to the Linder Report of 2004.

449555-1

249.

**Plaintiff's Statement**:

The supervisors did not even have to review and sign off on the affidavit or search warrant (Gibbs depo., p. 65).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

250.

**Plaintiff's Statement**:

The level of supervision within the Narcotics Unit was not increased to ensure that the similar incidents - such as the incident giving rise to this lawsuit - did not occur in the future (Andreson depo., p. 38).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

251.

**Plaintiff's Statement**:

Chief Pennington recognized that supervision within the Narcotics Unit was inadequate, specifically testifying that the Kathryn Johnston incident occurred

because of poor supervision within the Narcotics Unit (Pennington depo., p. 155).

**Defendants' Response:**

**Objection: Movant's Citations does not Support Movant's Fact, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

<div align="center">252.</div>

**Plaintiff's Statement**:

The supervisors working within the Narcotics Unit, including Sgt. Stallings, Major Finley, and Lt. Gibbs knew that the narcotics officers were falsely creating evidence and obtaining fraudulent warrants as well as regularly violating policies to achieve quota requirements (Junnier Aff., ¶ 15).

**Defendants' Response:**

**Objection: Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Both Lt. Gibbs and Major Finley denied they were aware of Junnier and his cohorts' illegal activities (See City Defendants' Motion for Summary Judgment, Exhibit "A" - Gibbs Affidavit and Exhibit "E" - Finley Affidavit). Additionally, Stallings admitted to the FBI that he never informed any of his superiors, including Lt. Gibbs, about any of his illegal activities (FBI Report, p. DOZIER-COA000221).

449555-1

253.

**Plaintiff's Statement**:

In spite of this knowledge, the supervisors did nothing about it and in fact encouraged the officers to increase their numbers (Id.).

**Defendants' Response:**

**Objection: Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Both Lt. Gibbs and Major Finley denied they were aware of Junnier and his cohorts' illegal activities (See City Defendants' Motion for Summary Judgment, Exhibit "A" - Gibbs Affidavit and Exhibit "E" - Finley Affidavit). Additionally, Stallings admitted to the FBI that he never informed any of his superiors, including Lt. Gibbs, about any of his illegal activities (FBI Report, p. DOZIER-COA000221). A review of OPS complaint history from 2001 through 2006 did not reveal any prior similar incidents of misconduct of the type that occurred in the Neal Street incident or the facts leading up to that incident (Defendants' Motion for Summary Judgment, Exhibit "G" - Affidavit of Maj. Lane Hagin).

254.

**Plaintiff's Statement**:

Even the FBI recognized that based on the widespread pattern of violations, it appeared likely that the lack of oversight and supervision was an issue in this case (FBI Report, p. DOZIER-COA00012).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

255.

**Plaintiff's Statement**:

Chief Pennington testified that "[q]uotas are against the law" and lead to "bad policing" (i.e., the violation of civil rights) (Pennington depo., pp. 70-71).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Admittedly, Chief Pennington did testify that "quotas are against the law, as far as I'm concerned" and "I just don't think that any police department should have a quota system" ... "[b]ecause it's against the law, I think." (Pennington Depo., p. 70). Although Chief Pennington's beliefs regarding the legality of quotas are understandable given his perception that "police departments that have traditionally given quotas to go out

and make arrests have led to bad policing" (Pennington Depo., p. 70-71), Chief Pennington's beliefs are not correct. Defendants are unaware of even a single statute, case or administrative code holding that arrest and/or warrant quotas of any kind being utilized by a law enforcement agency are illegal or unconstitutional.

256.

**Plaintiff's Statement**:

Major Finley agreed with Chief Pennington and testified that arrest and warrant quotas would be illegal because they cause officers to make wrongful arrests in violation of the U.S. Constitution (Finley depo., pp. 25-26).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Lt. Finely only agreed with Plaintiff counsel's contentions regarding to the illegality of arrest or warrant quotas (Finley Depo., p. 25-26). Defendants are unaware of even a single statute, case or administrative code holding that arrest and/or warrant quotas of any kind being utilized by a law enforcement agency are illegal or unconstitutional.

257.

**Plaintiff's Statement**:

Deputy Chief Andreson testified that quotas are inappropriate in the police context because it "mandates performance that might possibly cause someone to fabricate what they are doing to meet a level" (Andreson depo., p. 46).

**Defendants' Response:**

**Undisputed.**

258.

**Plaintiff's Statement**:

Deputy Chief Andreson further explained that quotas "could lead to fabricating cases, making cases when they otherwise shouldn't have been made. It takes – It could take the discretion out of policing" and could lead to the violation of people's civil rights (Id., p. 48; see also Brooks depo., pp. 44-45).

**Defendants' Response:**

**Undisputed as to testimony of Andreson.  Movant's Citation does not support Movant's Fact as to testimony of Brooks.**

<div align="center">259.</div>

**Plaintiff's Statement**:

Deputy Chief Brooks testified that in his over 30 years in law enforcement, he was unaware of any department permitting quotas or any certification entity approving or recommending quotas (Brooks depo., p. 56).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

<div align="center">260.</div>

**Plaintiff's Statement**:

The APD, and the Narcotics Unit in particular, were numbers driven (Smith Aff., ¶ 3).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

<div align="center">261.</div>

**Plaintiff's Statement**:

The entire strategy behind Narcotics Unit operations was to generate numbers (i.e. arrests and warrants) rather than perform detailed and long-term investigations (Bond depo., p. 24).

449555-1

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Movant's Fact is inadmissible speculation.**

<div align="center">262.</div>

**Plaintiff's Statement**:

As Major Finley succinctly stated, the APD was "lead sheet driven (Finley depo., pp. 18, 52).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, and Defendants refute Movant's Fact.** The deposition testimony cited by Plaintiff makes no mention of APD being lead sheet driven. In another section of his deposition Major Finley did testify that back in 1998 when he was a sergeant assigned to narcotics by Chief Shannon that "we were lead sheet driven, that was one of the ways we really was connected to the community" (Finely depo., p. 15).

<div align="center">263.</div>

**Plaintiff's Statement**:

These numbers were then used to evaluate the performance of officers and units during weekly COBRA meetings and for purposes of yearly employee evaluations (Id., pp. 28-29).

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact.**

264.

**Plaintiff's Statement**:

COBRA refers to the weekly statistical meetings that were required and held by Chief Pennington (Kreher's depo. at pp. 55-56).

**Defendants' Response:**

**Objection.  Movant's Citation does not support Movant's Fact, and Movant's fact is inadmissible speculation.**

265.

**Plaintiff's Statement**:

During the meeting, majors and unit supervisors, including lieutenants and sergeants, would make a presentation to Chief Pennington that would include a statistical breakdown of arrests within a particular geographic zone (Id.).

**Defendants' Response:**

**Objection.  Movant's Citation does not support Monvant's Fact, and Movant's fact is inadmissible speculation.**

449555-1

266.

**Plaintiff's Statement**:

The majors were in charge of their zones and the supervisors were in charge of keeping up with their officers' productivity (Bond depo., pp. 28-30).

**Defendants' Response:**

**Objection. Movant's fact is inadmissible speculation.**

267.

**Plaintiff's Statement**:

COBRA was devised as a means to make supervisors accountable for the performance of their officers within a particular area and this system came from Chief Pennington and Assistant Chief Dreher, the top of the chain of command (Id., pp. 32-34).

**Defendants' Response:**

**Objection.  Movant's Citation does not support Movant's Fact, and Movant's fact is inadmissible speculation.**

268.

**Plaintiff's Statement**:

Supervisors focused on the number of arrests and warrants regardless of the legality or quality of the arrests and warrants, and this placed considerable pressure on the officers to meet their numbers no matter the cost in order to obtain positive

performance evaluations and avoid punishment (Smith Aff., ¶¶ 3, 4; Junnier Aff., ¶¶ 3, 4, 9).

**Defendants' Response:**

**Objection: Movant's Citation is inadmissible speculation, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Chief Pennington and other officers testified that APD did not utilize quotas (Pennington depo., pp. 178 – 181, 191-192, 196, 206, 255, Buchanan depo., p. 127; Vignola depo., pp. 55-56). APD utilized performance goals that several witnesses testified there were no adverse consequences for failing to achieve (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Numerous APD Officers also testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114).

269.

**Plaintiff's Statement**:

As a result of the pressures imposed by these quota policies, coupled with a lack of training and supervision, officers within the Narcotics Unit routinely were unable to properly develop and investigate leads relating to illegal drugs and narcotics (Junnier Aff, ¶ 8).

449555-1

**Defendants' Response:**

**Objection: Movant's Citation does not support Movant's Fact, Movant's Citation is inadmissible speculation, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Chief Pennington and other officers testified that APD did not utilize quotas (Pennington depo., pp. 178 – 181, 191-192, 196, 206, 255, Buchanan depo., p. 127; Vignola depo., p. 55-56). APD utilized performance goals that several witnesses testified there were no adverse consequences for failing to achieve (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Numerous APD Officers also testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114).

<div align="center">270.</div>

**Plaintiff's Statement**:

Because the officers had to meet their numbers, they simply did not have time to engage in detailed drug investigations (Smith Aff., ¶ 8).

**Defendants' Response:**

**Objection: Movant's Citation is inadmissible speculation, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Chief Pennington and other

officers testified that APD did not utilize quotas (Pennington depo., pp. 178 – 181, 191-192, 196, 206, 255, Buchanan depo., p. 127; Vignola depo., pp. 55-56). APD utilized performance goals that several witnesses testified there were no adverse consequences for failing to achieve (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Numerous APD Officers also testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114). The FBI investigation determined that these shortcuts were taken so Junnier and the other officers who worked the illegal side jobs collecting money for police protection (that should have been free) "would not spend all their time in court testifying about drug purchases" and "[t]his freed up time for officers to work more cases and work unauthorized 'extra jobs' while on duty" (FBI Report, p. DOZIER-COA00006).

<div align="center">271.</div>

**Plaintiff's Statement**:

Major Finley actively discouraged Narcotics Teams from utilizing investigative methods such as controlled deliveries because they took too much time and did not generate numbers (Stallings Aff., ¶ 11).

**Defendants' Response:**

**Objection: Movant's Citation is inadmissible speculation and/or hearsay, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

272.

**Plaintiff's Statement**:

As a result, narcotics officers, with the guidance and approval of their supervisors, would often cut investigative corners by obtaining warrants based upon false information (Junnier Aff., at ¶ 8, 11; Smith Aff., ¶¶ 8, 11).

**Defendants' Response:**

**Undisputed as to the illegal activities of Officers Junnier and Smith being performed with the complicity of Sgt. Stallings. As to any other supervisors' alleged complicity, Movant's Citation does not support Movant's Fact, Movant's Citation is inadmissible speculation, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Both Lt. Gibbs and Major Finley denied they were aware of Junnier and his cohorts' illegal activities (See Defendants' Motion for Summary Judgment, Exhibit "A" - Gibbs Affidavit and Exhibit "E" - Finley Affidavit). Additionally, Stallings admitted to the FBI that he never

informed any of his superiors, including Lt. Gibbs, about any of his illegal activities (FBI Report, p. DOZIER-COA000221).

273.

**Plaintiff's Statement**:

The quota policies also affected the type of police work performed by the Narcotics Unit and the Unit effectively worked as street interdiction Unit making small drug busts instead of focusing on longer-term narcotics investigations (FBI Report, p. DOZIER-COA00009).

**Defendants' Response:**

**Objection: Movant's Citation is inadmissible speculation, and Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

274.

**Plaintiff's Statement**:

The APD's quota policies, especially the "9 and 2" Rule, negatively impacted the way in which undercover drug-buys involving confidential informants were conducted (Smith Aff., ¶ 9).

**Defendants' Response:**

**Objection: Movant's Citation is inadmissible speculation, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal**

449555-1

**conclusion, and Defendants refute Movant's Fact.** Chief Pennington and other officers testified that APD did not utilize quotas (Pennington depo., pp. 178 – 181, 191-192, 196, 206, 255, Buchanan depo., p. 127; Vignola depo., pp. 55-56). The investigators from Narcotics Team 1 who were willing to testify said that they learned of the "9 and 2 Rule" from Junnier and/or Stallings (Bond depo., pp. 36, 42; Buchanan depo., pp. 113, 115, 144). With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, no active Narcotics Team 1 investigator testified that they were told by any supervisor (other than Stallings) that they were required to get 9 arrests and 2 warrants per month, nor did they see anything in writing to that affect (Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126). In fact, the officers who testified about other illegal activities that occurred at the narcotics unit, such as padding vouchers or hand-offs, said they were instructed to do so by either Junnier or Stallings (Bond depo., pp. 85-86; Buchanan depo., pp. 129, 193). APD utilized performance goals that several witnesses testified there were no adverse consequences for failing to achieve (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Numerous APD Officers also testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114). The FBI investigation determined that these shortcuts were taken so Junnier and the other officers who worked the

449555-1

illegal side jobs collecting money for police protection (that should have been free) "would not spend all their time in court testifying about drug purchases" and "[t]his freed up time for officers to work more cases and work unauthorized 'extra jobs' while on duty." (FBI Report, p. DOZIER-COA00006).

<div align="center">275.</div>

**Plaintiff's Statement**:

Officers were incentivized to fabricate search warrant affidavits in order to establish probable cause, and this practice was encouraged by the supervisors so that officers could meet their numbers (Smith Aff., ¶ 4).

**Defendants' Response:**

**Objection. Movant's Citation does not support Movant's Fact, Movant's Citation is inadmissible speculation, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** Chief Pennington and other officers testified that APD did not utilize quota (Pennington depo., pp. 178 – 181, 191-192, 196, 206, 255, Buchanan depo., p. 127; Vignola depo., pp. 55-56). The investigators from Narcotics Team 1 who were willing to testify said that they learned of the "9 and 2 Rule" from Junnier and/or Stallings (Bond depo., pp. 36, 42; Buchanan depo., pp. 113, 115, 144). With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, no active Narcotics Team 1 investigator

449555-1

testified that they were told by any supervisor (other than Stallings) that they were required to get 9 arrests and 2 warrants per month, nor did they see anything in writing to that affect (Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126). In fact, the officers who testified about other illegal activities that occurred at the narcotics unit, such as padding vouchers or hand-offs, said they were instructed to do so by either Junnier or Stallings (Bond depo., pp. 85-86; Buchanan depo., pp. 129, 193). APD utilized performance goals that several witnesses testified there were no adverse consequences for failing to achieve (Kreher depo., pp. 66, 80; Finley depo. p. 70; Bond depo. p. 43; Mathis depo., p. 111). Numerous APD Officers also testified that officers did not have any difficulty achieving their performance goals (Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114).

<div align="center">276.</div>

**Plaintiff's Statement**:

It was the normal practice within the Narcotics Unit that informants made unsupervised, unmonitored drug buys and that the officers would then create a false search warrant affidavit stating that the officer had in fact witnessed the buy (Id., ¶ 11).

**Defendants' Response:**

**Objection: Movant's Citation is inadmissible speculation, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion, and Defendants refute Movant's Fact.** J.R. Smith informed the FBI that he and Cary Bond wanted to do the warrants right but Junnier insisted that they do them his way most of the time (FBI Report, p. DOZIER-COA00125).

<div align="center">277.</div>

**Plaintiff's Statement**:

The supervisors working within the Narcotics Unit, including Sgt. Stallings, Maj. Finley, and Lt. Gibbs knew that officers were submitting falsified affidavits and obtaining fraudulent warrants but they did nothing to stop or prevent the illegal practices occurring within the Narcotics Unit (Junnier Aff., ¶ 15).

**Defendants' Response:**

**Objection: Defendants refute Movant's Fact.** Both Lt. Gibbs and Major Finley denied they were aware of Junnier and his cohorts' illegal activities (See City Defendants' Motion for Summary Judgment, Exhibit "A" - Gibbs Affidavit and Exhibit "E" - Finley Affidavit). Additionally, Stallings admitted to the FBI that he never informed any of his superiors, including Lt. Gibbs, about any of his illegal activities (FBI Report, p. DOZIER-COA 000221).

278.

**Plaintiff's Statement**:

When confronted with this reality, Lt. Gibbs, routinely stated, "I just don't want to hear it." (Junnier Aff., ¶ 15; Smith Aff., ¶ 15).

**Defendants' Response:**

**Objection: Movant's Fact is inadmissible hearsay. See Defendants' Response above # 278.**

279.

**Plaintiff's Statement**:

The result was that citizens were illegally arrested, wrongfully convicted, and falsely imprisoned in direct violation of their clearly established federal rights (Junnier Affidavit, ¶ 4; Smith Aff., ¶ 4).

**Defendants' Response:**

**Objection. Movant's Citation does not support Movant's Fact, Movant's Citation is inadmissible speculation, Movant's Fact fails to comply with LR 56.1 (B)1 in that it is stated as an issue or legal conclusion.**

449555-1

Respectfully submitted this 1st day of February, 2010.

**R. ROGER BHANDARI**
Interim City Attorney
Georgia Bar No. 056340

BY: _____

**DENNIS M. YOUNG**
Senior Assistant City Attorney
Georgia Bar No. 781744

**STEPHEN A. POWER**
Associate City Attorney
Georgia Bar No. 600565

Attorneys for City Defendants

**CITY OF ATLANTA LAW DEPARTMENT**
68 Mitchell Street, SW, Suite 4100
Atlanta, GA 30303
(404) 330-6567 (telephone)
(404) 546-8581 (facsimile)
dmyoung@atlantaga.gov

449555-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SARAH DOZIER, as Administrator of )
the Estate of KATHRYN JOHNSTON, )
                           )
       Plaintiff,             )
                           )
v.                           )     **CIVIL ACTION CASE NO.**
                           )     **1:08-CV-00007-MHS**
CITY OF ATLANTA, et al.,     )
                           )
       Defendants.       )

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2010, I filed under seal the foregoing

**CITY DEFENDANTS' REPLY TO PLAINTIFF'S STATEMENT OF**

**MATERIAL FACTS AS TO WHICH THERE EXISTS NO GENUINE ISSUES**

**TO BE TRIED** with the Clerk of Court via hand delivery.  I have also this day

served counsel for the opposing parties with a copy of the within and foregoing by

depositing it in the U.S. Mail with proper postage, addressed to Plaintiff's

attorneys of record as follows:

Hezekiah Sistrunk, Jr., Esq.
Jane Lamberti Sams, Esq.
Shean Williams, Esq.
**COCHRAN, CHERRY, GIVENS, SMITH, SISTRUNK & SAMS, P.C.**
800 The Candler Building
127 Peachtree Street, N.E.
Atlanta, GA 30303

William Mitchell, Esq.
**CRUSER & MITCHELL, LLP**
Meridian II, Suite 2000
275 Scientific Drive
Norcross, GA 30092

Nicholas C. Moraitakis, Esq.
**MORAITAKIS, KISHEL, PEARSON & GARDNER, LLP**
3445 Peachtree Road, N.E., Suite 425
Atlanta, GA 30326

Additionally, a true and correct copy of the foregoing **CITY DEFENDANTS' REPLY TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS NO GENUINE ISSUES TO BE TRIED** was placed in an envelope with adequate postage affixed thereto and mailed to:

Arthur Tesler, *pro se*
4014 Caddie Drive
Acworth, Georgia 30101

Gregg Junnier (59088-019)
FCI Coleman Medium
Federal Correction Institution
Post Office Box 1032
Coleman, FL  33521

Jason R. Smith (59089-019)
FCI Fairton
Federal Correctional Institution
Post Office Box 420
Fairton, NJ  08320

*[continued on next page]*

449555-1

137

Wilbert Stallings (05587-019)
FMC Devens
Federal Medical Center
Post Office Box 879
Ayer, MA  01432

**DENNIS M. YOUNG**
Senior Assistant City Attorney
Georgia Bar No. 781744

**CITY OF ATLANTA LAW DEPARTMENT**
68 Mitchell Street, SW, Suite 4100
Atlanta, GA  30303
(404) 330-6567 (telephone)
(404) 546-8581 (facsimile)
dmyoung@atlantaga.gov

449555-1

138