ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| SARAH DOZIER, as Administrator of the Estate of KATHRYN JOHNSTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **CIVIL ACTION FILE NO.** **1:08-CV-00007-MHS** |
| CITY OF ATLANTA, et al., | ) ) | |
| Defendants. | ) ) | |

## CITY DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants the City of Atlanta, Richard Pennington, Lt. Stacie Gibbs, Maj. Pearlene Williams, Asst. Chief Alan Dreher, Maj. E.R. Finley, Maj. (sic) Mathis, Maj. Brooks, Deputy Chief Peter Andresen and Maj. C.J. Davis (hereinafter "City Defendants"), and pursuant to Rule 56 of the Federal Rules of Civil Procedure, file their REPLY to Plaintiff's Response to City Defendants' Motion for Summary Judgment. Co-Defendants and former Atlanta Police Officers Gregg Junnier, J.R. Smith, Arthur Tesler and Sgt. W.T. Stallings have separate counsel and are not represented by the Atlanta City Attorney.

In Plaintiff's haste to distort the record, Plaintiff fails to prove an essential element of her case. Plaintiff's Response to City Defendants' Motion for Summary Judgment is legally deficient. Plaintiff's primary theory of liability as set forth in

1

Counts 2 ("*Monell* Liability") and 6 ("*Respondeat Superior*") of her Complaint is that the APD's unconstitutional and illegal quotas were the moving force behind the death of Ms. Kathryn Johnston on November 21, 2006. Plaintiff is attempting to manipulate a prohibited *respondeat superior* theory to fit into a *Monell* cause of action in order to impute liability to the City of Atlanta for the illegal practices and criminal acts of former APD officers Gregg Junnier, J.R. Smith, Arthur Tesler and Wilbert Stallings. Plaintiff's theory that arrest quotas and performance targets are illegal and unconstitutional is flawed. Performance targets and arrest quotas are not inherently illegal or unconstitutional. The party opposing the summary judgment must come forward with specific evidence of *every* element essential to his case with respect to which (1) she has the burden of proof, and (2) the summary judgment movant has made a plausible showing of the absence of evidence of the necessary element.[1] Plaintiff has presented insufficient evidence to support her *Monell* theory of liability. Further, Plaintiff's Response continues her pattern of misquotes and/or mischaracterizations of deposition testimony in order to support an "illegal or unconstitutional quota" theory of liability that has no basis in law. In rebuttal, City Defendants will address Plaintiff's evidentiary flaws, mischaracterizations and misquotes below.[2]

---

[1] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
[2] City Defendants incorrectly cited a case on page 45 of its Brief in Support of its Motion for Summary Judgment. On page 45, *County of Sacramento v. Lewis* was cited for the quoted reference to the "traffic ticket quota policy." The correct case citation is *Hendriks v. City of Muscatine*, 94 Fed. Appx. 403, 405, 2004 WL 538859 (C.A. 8

# LAW AND ANALYSIS

## I.  THE CITY OF ATLANTA POLICE DEPARTMENT DOES NOT HAVE AN ILLEGAL OR UNCONSTITUTIONAL ARREST QUOTA POLICY

### A.  No Official Policy.

Local governments such as the City of Atlanta may be held liable under §1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict the injury..."[3] "A local government may not be sued under §1983 for an injury inflicted solely by its employees or agents.[4] Nor can a municipality be held liable solely because it employs a tortfeasor.[5] The Supreme Court requires "a plaintiff seeking to impose liability on a municipality under §1983 to identify a municipal 'policy' or 'custom' that caused plaintiff's injury."[6] "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality."[7] A custom is a practice that is so settled and permanent that it takes on the force of law.[8] The policy, custom or practice must be "the moving force

---

(Iowa)). The quote is located on page 405 of the *Hendriks* case. *Hendriks* appears to reference *County of Sacramento*, using the term "See *Id.*" The mis-cite was unintentional. My apologies to the Court and opposing counsel.

[3] *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978).

[4] *Id.*

[5] *Wallace v. City of Montgomery*, 956 F. Supp. 965, 977 (M.D. Ala. 1996) (citing *Busby v. City of Orlando*, 931 F.2d 764, 766 (11th Cir. 1991)).

[6] *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

[7] *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).

[8] *Monell*, 436 U.S. at 690-91.

behind the constitutional violation."[9]  For liability to attach, at minimum "there must be an affirmative link between the policy and the particular constitutional violation alleged.[10]  In other words, the city's policy must be the "moving force" behind the constitutional violation.[11]  "Further, where a plaintiff seeks to establish that a [city] policy worked a constitutional deprivation through 'custom or practice' in which the [city] was deliberately indifferent to constitutional violations, a plaintiff must show that the [city] had subjective knowledge of a risk of serious harm and consciously disregarded that risk."[12]  "This 'official policy' requirement [is] intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action *for which the municipality is actually responsible.*'" [13]

As previously argued, the Supreme Court has covered this ground before on a case in point. In *Oklahoma City v. Tuttle*, the Court held that an "unjustified shooting by a police officer cannot, without more, be thought to result from official policy."[14]  Plaintiff admittedly has not identified any written official policy promulgated by the City of Atlanta.  This is not a case of an overtly or facially

---

[9] *Grech v. Clayton*, 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*) (internal quotations omitted).
[10] *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).
[11] *Monell*, 436 U.S. at 694.
[12] *Moore v. Miami-Dade County*, 502 F.Supp.2d 1224, 1231 (S.D.Fla. 2007) (citing *Cagle v. Sutherland*, 334 F.3d 1248, 1255 (11th Cir. 2003).
[13] *Grech*, 335 F.3d at 1329 n. 5 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)) (third emphasis added by Eleventh Circuit).
[14] *Oklahoma City v. Tuttle*, 471 U.S. 808, 821, and n. 5, 105 S.Ct. 2427, 2435, (plurality opinion); *Id.*, at 830-831, and n. 5105 S.Ct. , at 2439-2440, n. 5  (BRENNEN, L., concurring in part and concurring in judgment).

unconstitutional government policy. Instead, Plaintiff focuses on a memorandum drafted by Lt. Ernest Finley dated August 5, 2003. The memorandum, entitled "Narcotics Unit Expectations," purportedly required each supervisor to "ensure his/her unit proactively make a minimum of 20 arrests per week and execute a minimum of 2 to 4 search warrants per week." According to Plaintiff, "this memorandum established an arrest quota."

First, the Atlanta Police Department is a creature of statute. The Atlanta City Charter designates the Chief of Police as the official policymaker for the Atlanta Police Department [City of Atlanta Municipal Code, § 98-26]. Only the Chief of Police can set or establish policies for the Atlanta Police Department. In August 2003, Chief Richard Pennington was the Chief of Police. Lieutenants cannot set or establish official policies for the police department.

Second, Lt. Finley's August 5, 2003 memorandum was immediately "rescinded" by his commanding officer, Major Marion Brooks [See Exhibits 12 and 13A attached (Lt. Finley initially submitted the memorandum on August 1, 2003); See also Depo. of Lt. Ernest Finley, pp. 36-37, 40; Depo. of Maj. Pearlene Williams, pp. 109-114; Depo. of Deputy Chief Andresen, pp. 64-72; and Depo. of Chief Richard Pennington, pp. 175-179]. Although Plaintiff claims in her Response that "this quota was long-standing as it was implemented in 2003," the evidence shows that Finley's memorandum was rescinded by Major Williams on

the orders of Major Marion Brooks. Finley's memorandum was not APD policy.

Lt. Finley was transferred out of Narcotics in August of 2003. Lt. Robert

Browning became Commander of the Narcotics Unit in August of 2003 and

reiterated the decision by Major Brooks and Major Williams to rescind Finley's

August 2003 memorandum. In his first meetings with the narcotics staff in August

and September of 2003, Browning specifically told the Narcotics Unit that Finley's

proposed expectations outlined in the August 2003 memorandum would not be

followed on his watch. Browning was commander of the Narcotics Unit from

August 2003 to January 2006. Lt. Browning did not require narcotics officers to

make a certain number of arrests and warrants on a weekly or monthly basis. [See

Affidavit of Major Robert Browning attached to City Defendants' Motion for

Summary Judgment.] Again, Plaintiff is attempting to manipulate a prohibited

*respondeat superior* theory to fit into a *Monell* cause of action in order to impute

liability to the City of Atlanta for the illegal practices and criminal acts of four

members of Narcotics Team #1 -- Junnier, J.R. Smith Arthur Tesler and Wilbert

Stallings.

### B.    The Unwritten "9 and 2 Rule."

Next, Plaintiff extrapolates from the rescinded 2003 memorandum to an

unwritten "9 and 2 Rule." Plaintiff states "this policy, which was incorporated in a

memorandum issued by Lt. Finley, was well known among officers in the

Narcotics Unit and referred to as the 9 and 2 Rule." In other words, from a rescinded memorandum, Plaintiff creates an unwritten rule that somehow becomes an official policy. The case law, especially *Grech* in this circuit and *Pembaur*, reject this kind of bootstrapping. "This 'official policy' requirement [is] intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action *for which the municipality is actually responsible" [Id. Grech].*

The perceived and unwritten "9 and 2" rule was not sanctioned, ratified or approved by any policy maker. Chief Pennington repeatedly testified that he never authorized any quota system in the Atlanta Police Department.[15]    Despite Plaintiff's contention that the perceived "9 and 2 Rule" was *imposed* by Major Finley, the investigators from Narcotics Team #1 who were willing to testify said that they learned of the "9 and 2 Rule" from Junnier and/or Stallings.[16] With the exception of the imprisoned officers who submitted affidavits on behalf of Plaintiff, no active Team #1 investigator testified that they were told by any supervisor (other than Stallings) that they were required to get 9 arrests and 2 warrants per month, nor did they see anything in writing to that affect.[17] In fact, the officers who testified about other illegal activities that occurred at the Narcotics

---

[15] Pennington depo, pp. 178 -- 181, 191-192, 196, 206, 255.
[16] Bond depo., pp. 36, 42; Buchanan depo., pp. 113, 115, 144.
[17] Bond depo., p. 36; Buchanan depo., pp. 115, 125, 126.

Unit, such as padding vouchers or hand-offs, said they were instructed to do so by either Junnier or Stallings.[18]

The Narcotics Unit had two teams in 2006. Team #1 was supervised by Sgt. Stallings. Sgt. Paul Sparwath was the day-to-day supervisor of Team #2. Sparwath never required investigators who reported to him to meet weekly or monthly arrest quotas, nor did he require his investigators to meet weekly or monthly arrest quotas [See Affidavits of Sgt. Paul Sparwath, Sgt. Kelly Lambert Investigator Scott Duncan, and Investigator Phillip Roberson attached hereto as Exhibits "1", "2", "3", and "4" respectively]. Although the FBI interviewed all the narcotics officers from Team #1 and #2, it concluded that for the most part, all the illegal practices were confined to APD Narcotics Team #1. The FBI investigation revealed that a majority of the officers assigned to Narcotics Team One (six of the nine assigned officers) participated at some level in falsifying search warrant affidavits, falsifying APD paperwork, improperly using informants and/or working "extra jobs" that violated APD policy [FBI Report, p. DOZIER-COA00011]. Of the nine (9) officers, including Sgt. Stallings, assigned to Team #1, the FBI investigation found "*no credible evidence*" that "implicated Officers Gary Smith, Lucas or Guerin in any wrongdoing ..." [FBI Report, p. DOZIER-COA00007]. Based on the FBI investigation, the only APD narcotics officers from Team #1 who

---

[18] Bond depo., pp. 85-86; Buchanan depo., pp. 129, 193.

were involved in some form of falsifying affidavits or search warrants were Junnier, Smith, Tesler and Stallings. The FBI investigation revealed that "these officers were able to freely engage in such activity, in part, because their direct supervisor, Sgt. Wilbert Stallings, participated in these illegal activities as well" [*Id.*].

Plaintiff next contends that both Chief Pennington and Deputy Chief Andresen knew about the "9 and 2 Rule" before Kathryn Johnston was shot and killed.[19]  Plaintiff again is blatantly distorting the record to make the facts fit her theory. Chief Pennington and Deputy Chief Andresen both testified that the "9 and 2 Rule" was only brought to their attention *after* Major Williams had written a memo rescinding it.[20]

Plaintiff next contends that the "9 and 2 Rule" was reinforced by a 'pay for performance' policy created by Chief Pennington, which rewarded officers with monetary bonuses when they satisfied quota requirements."[21]  Although there was a pay for performance program in effect in 2006,[22] the record is clear that the pay for performance program was initiated by the City of Atlanta, not by Chief Pennington.[23]  Benita Ransom from Personnel with the City of Atlanta approved the pay-for-performance program as an incentive for City of Atlanta employees to

---

[19] *Id.*
[20] Pennington depo., p. 177; Andreson depo., pp. 70-71.
[21] Plaintiff's Motion for Summary Judgment, p. 18.
[22] Pennington depo., p. 264.
[23] *Id.*, p. 265.

achieve higher marks on their yearly performance evaluations.[24]   Police officers were eligible for the program because they were City of Atlanta employees.  Chief Pennington testified the he was never in favor of the pay for performance program and did not want it approved.[25]   The pay for performance program was short-lived because of budgetary problems and was discontinued in 2006, well before the Johnston shooting.[26]

In Plaintiff's Response on page 6, she attempts to introduce into the record a "Memorandum dated August 19, 2006" and attached Plaintiff's Response as "Exhibit 9." The Memorandum purportedly was drafted on City of Atlanta stationery, but it has no author and no recipient.  City Defendants object to this document. No foundation has been laid for its introduction.  Plaintiff seeks to introduce the document as "further evidence of APD arrest and warrant requirements within the narcotics unit…"  As indicated *supra* and throughout City Defendants' motion, police officers and anonymous employees do not make policy for the Atlanta Police Department.   A memorandum without an author or a recipient can scarcely be said to represent the official policy of the Atlanta Police Department.   As more fully discussed below, Chief Pennington, the official policymaker for the Atlanta Police Department, has never authorized or sanctioned any arrest or warrant quota policy within the ranks of the APD.

---

[24] *Id.*, p. 283.
[25] *Id.*, p. 281.
[26] *Id.*, p. 263.

### C.    The City's Performance Appraisal System.

Next, Plaintiff claims in her Response that the alleged "... 9 and 2 rule was implemented and enforced by supervisors within the Narcotics Unit and tied directly to the officers' annual performance evaluation such that officers were required to satisfy the minimum requirement in order to obtain satisfactory performance appraisal..." [Plaintiff's Response, p. 4].    There is no evidence to support Plaintiff's assertion that narcotics officers or any other officers were required to make a minimum number of arrests or obtain a minimum number of search warrants on a weekly or monthly basis.[27]

As previously addressed in City's Defendants' Motion for Summary Judgment, the Atlanta Police Department, as well as the entire City of Atlanta, does have in place an employee evaluation system - QPAI (Quality Performance Appraisal Initiatives) - that evaluates and measures each City employee's performance on a yearly basis.

Under the QPAI, there are different criteria for measuring performance, depending on the employees' unit or area of assignment.    The criteria for measuring the performance of narcotics officers in 2006 included three "Critical Job Elements" or components:    1) Departmental Policies and Procedures; 2)

---

[27] City Defendants' Motion for Summary Judgment, p. 42-43; Affidavits of Majors Finley, Gibbs, Browning and Brooks attached to City Defendants' Motion for Summary Judgment; also the Affidavits of Narcotics Team #2 supervisor Sgt. Paul Sparwath, Sgt. Kelly Lambert, Investigator Scott Duncan and Investigator Phillip Roberson.

11

Operational Procedures; and 3) Law Enforcement.[28]  Lt. Stacie Gibbs became the

Commander of the Narcotics Unit in January 2006.  Lt. Gibbs drafted her *first*

Performance Evaluation in October of 2006, one month before the Kathryn

Johnston incident.  As she told the FBI, she actually prepared the Performance

Evaluation Plans in October 2006, but was instructed to have each employee list

August 1, 2006 as the signing date because the formal evaluation period began on

August 1, 2006 [FBI Report, pp. COA-DOZIER00105].  Starting in October of

2006 but dated August 1, 2006, the performance appraisals for the Narcotics Unit

contained the following "Critical Job Elements":

Critical Job Element#1: DEPARTMENT POLICIES AND PROCEDURES

> Effective - no more than three incidents of not properly conforming to
> directives, policies and procedures...

Critical Job Element #2: OPERATIONAL PROCEDURES

> No more than three incidents during the annual evaluation period
> wherein an employee: (1) fails to turn in a complete and legible
> written correspondence when required; (2) fails to swipe/sign in and
> out for his or her tour of duty and notify a supervisor or designated
> person when he/she is going to be late/absent; (3) does not have all
> his/her equipment present, clean and updated during a monthly
> inspection; (4) fails to complete an assigned task within a prescribed
> deadline.

> Effective - two indicators must be met.

Critical Job Element #3: ENFORCEMENT OPERATIONS

---

[28] City Defendants' Motion for Summary Judgment, Exhibit "A" - Gibbs Affidavit, ¶ 11.

Effective - employee **averages** at least two search warrants per month, clears 50% of their assigned lead sheets by arrest, and is within 30% of the yearly watch average in arrests.

Highly Effective - **averages** at least three search warrants per month, clears 60% of their assigned lead sheets by arrest, and exceeds the yearly watch average by 5%.

Outstanding - **averages** at least 4 search warrants per month, clears 70% of their lead sheets by arrest, and exceeds the yearly watch average by 10%.

Needs Improvement - **averages** 1 search warrant per month, clears between 30% and 49% of their lead sheets by arrest and fails to meet the watch average in arrests by 5%.

Unacceptable - no search warrants, clears less than 30% of lead sheets by arrests and fails to meet the watch average by 6% or greater.[29]

Plaintiff focuses on the performance goals in Critical Job Element #3, and continually insists, in the face overwhelming evidence to the contrary, that these goals are, in fact, mandatory quotas that if not met will result in Narcotics Unit officers being transferred out of the Narcotics Division, or worse. The record is clear that these performance standards were considered goals only, and **these goals were formulated by looking at the performance averages of Narcotics Unit officers during the previous evaluation period.**[30] As the goals were based upon prior *averages* of performance, the goals were fluid and changing from year to year

---

[29] FBI Report, pp. DOZIER-COA00104-00107.
[30] City Defendants' Motion for Summary Judgment, Exhibit "A" - Gibbs Affidavit, ¶¶ 11-12; Exhibit "E" - Finley Affidavit, ¶ 8.

to reflect the ever changing amount of drug activity.[31]   These goals are not arbitrary. As stated in City Defendants' Motion for Summary Judgment, case law supports these types of employee evaluation systems.[32]   Supervisors would discuss the proposed performance standards each year with the employees and would come to an agreement regarding the reasonableness of the expectations.[33]   Several witnesses testified that these were not "hard" numbers, and that any officer who had difficulty meeting their goals would not be punished.[34]  In fact, the program was designed to provide officers who were not meeting their goals with assistance and guidance to help them get back on track.[35]  Several witnesses testified that the Narcotics Unit's performance expectations were not difficult to achieve.[36]  In fact, Junnier was rated as outstanding in his last performance evaluation despite the fact that he claims he was under tremendous pressure to meet his performance goals.[37]  In spite of Junnier and Smith's assertions that they were "under pressure" to meet

---

[31] *Id.*, Exhibit "A" - Gibbs Affidavit, ¶ 11, Finley depo., p. 69; Mathis depo., pp. 58-59.

[32] City Defendants incorrectly cited a case on page 45 in its Brief in Support of its Motion for Summary Judgment. On page 45, *County of Sacramento v. Lewis* was cited for the quoted reference to the "traffic ticket quota policy." The correct case citation is *Hendriks v. City of Muscatine*, 94 Fed. Appx. 403, 405, 2004 WL 538859 (C.A. 8 (Iowa)). The quote is located on page 405 of the *Hendriks* case. *Hendriks* appears to reference *County of Sacramento*, using the term "See *Id.*" The mis-cite was unintentional. My apologies to the Court and opposing counsel. The correction is as follows: **In *Hendriks v. City of Muscatine*, the Eighth Circuit examined a similar system, a so-called "ticket quota system." The Court held that "[C]ontrary to Hendriks's assertion , he was not required to violate state law as part of his police duties. There is no evidence that the City required Hendriks to perform an illegal act.** The police department simply implemented an employment policy for evaluating one component of an officer's performance based on the number of tickets the officer has written versus the shift average. The police department's implementation and application of this policy does not amount to egregious or outrageous executive action necessary to state a substantive due process claim."

[33] Mathis depo., pp. 51-59.

[34] City Defendants' Motion for Summary Judgment, Exhibit "A" - Gibbs Affidavit, ¶ 8; Exhibit "E" - Finley Affidavit, ¶ 8; Finley depo. p. 70; Bond depo., p. 43; Dreher depo. pp. 122-123; Buchanan depo., p. 127.

[35] Dreher depo. pp. 122-123, 128.

[36] Bond depo., p. 43; Vignola depo., p. 57; Buchanan depo., pp. 147-148, 184; Fields depo., pp. 14, 34-35, 114.

[37] Mathis depo., pp. 53-54.

14

these goals, the plans were only in effect for *one month* before the actual incident.

Junnier, Smith, Tesler and Stallings, according to the FBI Report,  had been

operating their extortion enterprise for much longer than one month.

## II.   THE UNWRITTEN AND UNSANCTIONED QUOTA POLICIES WERE NOT *THE* MOVING FORCE BEHIND MS. JOHNSTON'S DEATH

Plaintiff revises her theory of *Monell* liability in her Response.  Instead of

alleging that the alleged quotas were "THE" driving force behind Ms. Johnston's

death as she alleged in Count 2 of her original Complaint, Plaintiff alleges in her

Response that the alleged quotas were "A" driving force behind Ms. Johnson's

death [Plaintiff's Response, p. 9].   In Plaintiff's Motion for Partial Summary

Judgment, Plaintiff also hints that this "unconstitutional or illegal quota" theory of

liability is without precedent.[38]

It is undisputed that the entire Atlanta Police Department is shorthanded,

including the Narcotics Unit, and it is equally undisputed that the City of Atlanta

has a severe illicit drug problem that is often referred to as an epidemic.  Narcotics

Unit investigators recognize that drug infested areas provided officers with plenty

of opportunities to perform their duties.[39]   Yet in the world as described by

Plaintiff, Narcotics Unit investigators were so desperate to avoid getting an

---

[38] Plaintiff's Motion for Summary Judgment, p. 7 - "In any event, even if APD's quota policies are not facially unconstitutional, the undisputed evidence shows clearly that these quota policies, in conjunction with the lack of training and supervision in the Narcotics Unit, reflected a deliberate indifference to Ms. Johnston's rights and the obvious risk that officers would ignore the Fourth Amendment and obtain warrants and arrests absent probable cause in order to meet their number requirements."
[39] Bond depo., pp. 62, 110-111; Buchanan depo., pp. 176, 182; Fields depo., p. 93.

unfavorable yearly performance evaluation that they were willing to risk their jobs and possible imprisonment by fabricating probable cause on search warrant affidavits. As illogical as that premise is, Plaintiff doesn't stop there. In Plaintiff's world, not only do we have officers lying on affidavits to avoid a less than stellar performance evaluation, of which there is no adverse consequence for failing to achieve, we also have their supervisors participating and encouraging the officers' illegal actions (also risking termination and imprisonment) so they won't be chastised by their superiors during a weekly COBRA meeting. The very idea is patently absurd. Despite the imprisoned officers' affidavits to the contrary, when asked why these officers committed these heinous acts, neither Sgt. Kreher nor the other investigators on Team #1 even *theorized* that Junnier, Smith, and Tesler committed their criminal acts because they felt pressured to meet the department's performance standards.[40] The law and the facts clearly indicate that performance standards, such as those used by the Atlanta Police Department, are not unconstitutional and could not be said to "force" any officer to violate the law or their oath of office.[41] Even Sgt. Kreher, President of the International Brotherhood of Police Officers (IBPO), the police officer's union, testified as such:

> "I want to be very clear ... I also was very adamant that in no way did I feel that any quota put on anybody in the police department is an excuse for breaking the law or doing what these officers did."[42]

---

[40] Bond depo., p. 108; Kreher depo., pp. 107-108.
[41] City Defendants' Motion for Summary Judgment, pp. 42-46.
[42] Kreher depo., pp. 64-65.

"My personal opinion about that is that there's no excuse for being corrupt. You take an oath of office. And I don't care if the chief comes to you directly and says, You will lock up ten people a day. I don't think that gives anybody a right to violate the law, or their oath."[43]

Plaintiff's theory that the officers responsible for the death of Kathryn Johnston were motivated to break the law in order to achieve better performance evaluations is simply not logical. A more logical explanation is set forth in the revelations and conclusions of the FBI investigation: Junnier, Smith and Tesler were engaged in an extortion scheme that sold "extra security and protection" to local businesses and apartment complexes in the high-crime, drug-infested zones they patrolled. Junnier, Smith and Tesler extracted illegal payments for providing security to local businesses while on duty [FBI Report, p. DOZIER-COA00009]. According to the FBI investigation, "The conspirators spent significant time performing these [extra security] services and collecting payment while on-duty, detracting from time available to perform the work needed to follow the Constitution, laws, and proper police procedures to gather and truthfully present the evidence needed for lawful search warrants" [*Id.*].

---

[43] Kreher depo., p. 79.

A.   **Chief Pennington Has Never Sanctioned, Authorized or Ratified the Use of Any Kind of Quota in the Atlanta Police Department.**

Chief Pennington has repeatedly testified that he never authorized any quota system in the Atlanta Police Department.[44]   Plaintiff again distorts the record saying "Pennington acknowledged that the policies establishing quotas had to be reviewed and approved by the chain of command."   Although Plaintiff cites Pennington's deposition at pages 177, 219, and 226-27, the cited references do not support Plaintiff's allegations. In fact, they specifically reject those allegations. Pennington specifically states in pages 178-181, 191-192, 196, 206 and 255 that he rejects the notion of quotas and believes (erroneously) that quotas are illegal.[45]

On page 7 of Plaintiff's Response, Plaintiff presents the Court with Junnier's 2006 Evaluation *Plan*.   Plaintiff distorts the evidence by falsely asserting that "Pennington reviewed and approved Gregg Junnier's 2006 Performance Evaluation *Form*. Notice how Plaintiff substitutes the word "Form" for "Plan."   Plaintiff cites the deposition of Deputy Chief Dreher as proof of this inference.   City Defendants ask the Court to carefully review Plaintiff's counsels' clever questioning of Deputy Chief Dreher (pages 106 -118) and how counsel now substitutes the raw *Form* without any specific and individualized requirements in it to the *Plan* that now includes what Plaintiff is alleging to be illegal and unconstitutional quotas.   It is

---

[44] Pennington depo., pp. 178 – 181, 191-192, 196, 206, 255.
[45] *Id.*

sad to say that Plaintiff plays these juvenile tricks distorting the evidence throughout this record.  The Court should not be persuaded by these distortions and mischaracterizations.  Chief Pennington specifically states that he did not review and approve Junnier's August 2006 Performance *Plan*.  Assistant Chief Dreher said he believed the raw *Form*, <u>before</u> it had Junnier's individual plan requirements in it, was reviewed and approved by the Chief. On page 7 of her Response, Plaintiff misleads the Court by referring to Junnier's Performance Plan as the Performance Form by which narcotics officers were graded.  That's sad.  Pennington specifically states on page 219 of his deposition that he never approved Junnier's August 2006 Plan.  According to Dreher, Pennington may have reviewed the blank forms when they were being drafted back in 2004, but Pennington states that he never signed Junnier's Evaluation Plan.  It is this Plan, not the "Form" that Plaintiff claims contains "illegal and unconstitutional arrest quotas."

### B. Performance Targets and Arrest Quotas Are Not Inherently Illegal or Unconstitutional.

Although Plaintiff states that the "APD's quota policies mandated illegal arrests," Plaintiff fails to support this assertion with any evidence.  Plaintiff has not produced one shred of evidence showing that police officers were instructed to make arrests without probable cause or falsify affidavits to obtain search warrants.  The CALEA accreditation team did not identify any supervisor or policy that instructed narcotics officers to make arrests without probable cause or falsify

19

affidavits to obtain a warrant. The FBI investigation did not identify any supervisor, let alone any policymaker, that instructed any police officer at any time to violate the law or APD policy in order to meet a quota. There is no evidence in any of the deposition testimony that any supervisor, let alone any policymaker, instructed Junnier, Smith, Tesler or Stallings to make arrests without probable cause or falsify an affidavit to obtain a search warrant. Junnier, Smith and Stallings recently submitted affidavits from prison in support of Plaintiff's Motion for Partial Summary Judgment. Surprisingly, there is no evidence in the affidavits that any supervisor, let alone any policymaker instructed Junnier, Smith or Stallings to make arrests without probable cause or falsify an affidavit to obtain a search warrant in order to meet some putative quota. Junnier's newest affidavit belies his admissions to the FBI. Junnier admitted to the FBI that he fabricated the probable cause on *only* two warrants: 161 Rhodesia Avenue and another location whose address he could not remember [FBI Report, pp. DOZIER-COA00005, 00365].

The undisputed evidence shows that the APD has a specific written policy -- SOP 3020: Search and Seizure, § 4.2.5 -- that requires all arrests to be made with probable cause. The specific policy sets forth the requirements for making a lawful arrest and the procedures for submitting a truthful and lawful affidavit when seeking a search warrant. Junnier, Smith, and Tesler admitted to violating these

20

specific City policies and their oath of office. Junnier, Smith and Tesler admitted to violating the APD policy on "Truthfulness" -- APD Policy Manual, Work Rule 4.1.03. In short, they admitted that they lied to the APD and they lied on the affidavit they submitted to the Magistrate to obtain the search warrant for Ms. Johnston's residence. Now these former officers submit affidavits to this Court and ask this Court to accept their latest spin on APD policy.

Finally, this is not a case of an overtly or facially unconstitutional government policy like *Monell*. Plaintiff has failed to produce any evidence that a specific arrest quota policy or performance target is unconstitutional on its face. Raw numbers do not make a quota unconstitutional, whether it is "9 and 2" or "10 and 3." In order to be unconstitutional, there must be some indicia of unconstitutionality. Even if some officers believe there is or was an arrest quota, Plaintiff has failed to produce any evidence showing that the specific arrest quota in question was illegal or unconstitutional and what specific elements made it so. There is certainly nothing in the Performance Evaluation Plans that requires the officers to achieve these goals or targets at the expense of the constitutional rights of citizens. In another case on point, *Jackson v. District of Columbia*, the court held that the police chief and a sergeant were not liable under § 1983 for violating an arrestee's civil rights by promulgating and promoting an arrest quota policy for

the police department, absent evidence demonstrating that police officers were encouraged to initiate arrests absent probable cause to do so.[46]

The facts speak for themselves, and the facts clearly show that all of the "nefarious" activities that occurred in the Narcotics Unit prior to Kathryn Johnston's death had a common link – Investigator Gregg Junnier, Investigator J.R. Smith, Investigator Arthur Tessler, and Sgt. Wilbert Stallings – four members of Team #1. The driving force behind Ms. Johnston's death according to the FBI investigation was greed. Junnier, Smith, and Tesler were so busy collecting weekly cash payments for their "extra services" that they simply did not have the time to follow all the federal, state and APD policies.[47] For them, their oath of office had become secondary to their pecuniary gain.[48] The record is equally clear that there was no official or unofficial APD custom or policy that caused Junnier, Smith, and Tesler to violate the law, APD policy, their oath of office and cause harm to Ms. Johnston. City Defendants are entitled to summary judgment on Counts 2 (*Monell* liability) and 6 (*Respondeat Superior*) of Plaintiff's Complaint.

## III.  THE CITY DID NOT FAIL TO ADEQUATELY TRAIN AND SUPERVISE OFFICERS WITHIN THE NARCOTICS UNIT

Plaintiff contends that it is "well established that illegal practices were widespread within the Narcotics Unit and that there was a long history of falsifying

---

[46] *Jackson v. District of Columbia*, 672 F.Supp. 22 (DDC, October 1987).
[47] City Defendants' Motion for Summary Judgment, p. 32.
[48] *Id.*

22

search warrant affidavits and fabricating documentary evidence in order to establish probable cause to obtain search warrants." Plaintiff further contends that "the FBI found a significant portion of the Narcotics Unit was involved in these nefarious activities." Plaintiff does not specify which officers were involved, what they did and when they did it. Other than Junnier, Smith, Tesler and Stallings, Plaintiff has not identified any other wrong doers. Plaintiff again curiously fails to cite to the relevant portions of her Statement of Disputed Material Facts or the record that support these contentions, again leaving it up to the Court and City Defendants to locate Plaintiff's evidence.

As thoroughly addressed in City Defendants' Motion for Summary Judgment, the Plaintiff's inadequate training claim has no basis in fact or law, and City Defendants would respectfully direct this Court's attention to the relevant sections of their motion.[49] City Defendants would be remiss, however, if they failed to directly address the Plaintiff's recitation of the record and contentions regarding the Atlanta Police Department's alleged failure to address the recommendations of the Linder Report.

### A.    APD Adequately Trained the Officers Within the Narcotics Unit.

Plaintiff contends that Narcotics Unit officers did not receive any training related to undercover drug operations. Plaintiff also contends that the only training

---

[49] *Id.*, pp. 47-60.

provided to Narcotics Unit officers was on-the-job training provided by "corrupt veteran officers." Additionally, Plaintiff contends that the study commissioned by the Atlanta Police Department known as the "Linder Report" put the City on notice of the need to provide training to its Narcotics Unit's investigators.

            1.     *Investigators were adequately trained.*

The detailed training records of Junnier, Smith, Tesler, and Stallings attached to City Defendants' Motion for Summary Judgment clearly refute the Plaintiff's contentions regarding the failure to adequately train Narcotics Unit investigators.[50] Additionally, the record is clear that all Team #1 investigators attended the Basic Investigators Course before being assigned to the Narcotics Unit. The Basic Investigators Course covered "the whole gamut of what a detective does" including training on how to write a search warrant, warrant training, and affidavit training, with officers practicing entries on a warrant.[51] Other specific narcotics enforcement training classes, including high risk warrant entry training and classes on the handling of informants, were also provided to Narcotics Unit investigators.[52]

While it is correct that many of the day-to-day duties of a narcotics investigator were taught on-the-job, the evidence is clear that the only "corrupt veteran officers" providing this training were Junnier and Stallings on Team #1...the same officers whose affidavit testimony Plaintiff is relying upon to

---

[50] *Id.*, Exhibit "A" - Gibbs Affidavit, Attachments 3, 4, 5, and 6.
[51] Kreher depo., p. 28.
[52] *Id.*; see also Vignola depo., pp. 61, 63, 64.

support her Motion for Summary Judgment. Plaintiff does not cite to a single instance in which a team leader or supervisor, other than Junnier or Stallings, instructed a Narcotics Unit investigator to "hand-off" a buy or pad a voucher. The record is also clear that there were significant amounts of training provided to Narcotics Unit investigators other than the on-the-job training.[53]

   2.    *The Linder Report and APD's subsequent accreditation.*

An investigation was conducted when command staff learned the Linder Report indicated that Narcotics Unit investigators reported they received "no to low training." It was determined that many of the investigators had received significant training even though they filled out the Linder surveys indicating that they had not.[54]

Although the 2004 Linder Report made numerous recommendations for the entire Atlanta Police department, the recommendations made for the Narcotics Unit can be summarized as follows: (1) narcotics enforcement be strengthened and refocus its activities on proactive enforcement, targeting mid- and upper-level narcotics organizations; and (2) that APD narcotics efforts be fully supported with appropriate levels of personnel, training, equipment, information and other tools in an effort to address Atlanta's illegal narcotics activity, particularly in those areas prone to violence.

---

[53] City Defendants' Motion for Summary Judgment, p. 58.
[54] Pennington depo., p. 126.

Chief Pennington and his command staff were challenged with numerous suggested improvements addressed in the Linder Report besides the possible erroneous recommendation for more training of Narcotics Unit officers. In addition to the several recommendations for the Narcotics Unit (that constituted only one area of recommendations) there were also ninety-six (96) other similarly detailed areas of recommendations made for the entire Atlanta Police Department. The Linder Report recommendations were categorized into five overarching areas of improvement necessary for change: (1) re-engineering crime fighting operations, (2) reforming crime fighting practices, (3) rebuilding broken systems, (4) resourcing APD, and (5) restoring police community accountability.

After researching how to best address the gambit of challenging issues faced by the Atlanta Police Department, Chief Pennington opted to retain the services of the Commission on Accreditation for Law Enforcement Agencies (CALEA) in order to have the entire Atlanta Police Department accredited. Major law enforcement associations, leading educational and training institutions, governmental agencies, as well as law enforcement executives internationally, acknowledge CALEA's Standards for Law Enforcement Agencies and its Accreditation Program as benchmarks for modern law enforcement agencies.[55]

---

[55] See http://www.calea.org.

Chief Pennington determined that CALEA Accreditation could provide the following for the Atlanta Police Department:

- CALEA Accreditation requires a Police Department to develop a comprehensive, well thought out, uniform set of written directives – one of the most successful methods for reaching administrative and operational goals, while also providing direction to personnel;

- CALEA Accreditation standards provide the necessary reports and analyses a Chief of Police needs to make fact-based, informed management decisions;

- CALEA Accreditation requires a preparedness program be put in place – so a Police Department is ready to address natural or man-made unusual occurrences;

- CALEA Accreditation is a means for developing or improving upon an Police Department's relationship with the community;

- CALEA Accreditation strengthens a Police Department's accountability, both within the Police Department and the community, through a continuum of standards that clearly define authority, performance, and responsibilities;

- CALEA Accreditation demonstrates that internationally recognized standards for law enforcement have been met, as verified by a team of independent outside CALEA-trained assessors; and

- CALEA Accreditation facilitates a Police Department's pursuit of professional excellence.

In order for the Atlanta Police Department to get accredited there were 463 standards in the Law Enforcement Accreditation Program that had to be met. The Atlanta Police Department began the accreditation process in 2004 and an extensive on-site evaluation was conducted in late 2004/early 2005.[56] The CALEA Assessors evaluated the Atlanta Police Department on all 463 standards and found

---

[56] On-Site Assessment Report for the Atlanta Police Department, attached hereto as Exhibit "5."

APD to be 100% compliant.[57]  As part of the accreditation process, the CALEA
Assessors evaluated APD's performance evaluation system and did not indicate in
the reports that the program was in any way inappropriate.[58]  The CALEA
Assessors also determined that APD implemented numerous and detailed
comprehensive policies which identify the boundaries within which APD personnel
must operate, including the expectations of compliance with the United States and
Georgia constitutions, related and applicable laws, court decisions, and city and
APD policies and directives.[59]  The audit also determined that issues of legally
mandated authority, search and seizure, arrest, and discretion are all clearly
delineated in APD directives.[60]  The Assessors concluded that "it is apparent that
Atlanta PD is extremely aware of its role, responsibilities, authority, and the
constitutional mandates to operate within a narrow range while performing its
mission."[61]  The CALEA Accreditation process also included audits of APD's
allocation and distribution of personnel, disciplinary procedures, training and
career development, as well as an audit of the Criminal Investigation Division (of
which the Narcotics Unit is a part) and the Assessors found APD to be in
compliance with all applicable standards.[62]

---

[57] *Id.*, p. 50.
[58] *Id.*, p. 36-37.
[59] *Id.*, p. 27.
[60] *Id.*
[61] *Id.*
[62] *Id.*

APD has maintained its accreditation from year to year since it first became accredited in the spring of 2005. In December 2007, an assessment report provided by CALEA indicated that in 2006 not a single officer in the entire Atlanta Police Department was rated as "unacceptable," and that there were very few incidents of officers being rated as "unacceptable" in the other years that were reviewed.[63] This is a clear indication that the established performance standards in place during these years were reasonable and unlikely to result in excessive pressures being placed upon officers to meet the performance standards.

As previously addressed in City Defendants' Motion for Summary Judgment, to establish a "deliberate indifference" claim, the plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take action.[64] The record shows that the issue as to the need for additional training is not as "cut and dried" as Plaintiff would have this Court believe. The record also shows that the Atlanta Police Department did not make a deliberate choice to not take action – in fact, the record shows the exact opposite. The command staff of the Atlanta Police Department faced multiple issues with limited resources and embarked on a course of action that was designed to globally address *all* of the issues that existed

---

[63] See Assessment Report for the Atlanta Police Department – December 2007, p. 13, attached hereto as Exhibit "6."
[64] *Brown*, 520 U.S. at 397, 117 S.Ct. at 1390-91, 137 L.Ed.2d 626 (1997); *Young v. City of Augusta, Georgia*, 59 F.3d 1160, 1171-72 (11th Cir. 1995); *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990); *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1556-57 (11th Cir. 1989).

in the entire police department. The subsequent accreditation efforts of the Atlanta Police Department clearly show that City Defendants did *not* make a deliberate choice to not take action.

**B.      The Investigators Within the Narcotics Unit Were Adequately Supervised.**

Plaintiff contends that Sgt. Stallings, Lt. Gibbs, and Major Finley knew that narcotics officers were falsely creating evidence and obtaining fraudulent warrants as well to achieve quota requirements, but they did nothing about it.[65] Plaintiff's sole source of this contention is the affidavit of Junnier. Not only are there several reasons discussed *supra* and in City Defendants' Motion for Summary Judgment why this Court should doubt the veracity of Junnier, but both Lt. Gibbs and Major Finley denied they were aware of Junnier's and his cohorts' illegal activities.[66] The FBI thoroughly investigated the criminal actions of Junnier and had ample opportunity investigate Junnier's allegations of supervisor complicity, and Finley and Gibbs were not charged for any wrongdoing. Additionally, Stallings admitted to the FBI that he never informed any of his superiors, including Lt. Gibbs, about any of his illegal activities.[67]

Plaintiff contends that Chief Pennington's admission that there were problems with the Narcotics Unit's management and supervision, and Chief

---

[65] Plaintiff's Motion for Summary Judgment, p. 12.
[66] City Defendants' Motion for Summary Judgment, Exhibit "A" - Gibbs Affidavit, ¶ 5; Exhibit "E" - Finley Affidavit, ¶ 4.
[67] FBI Report, p. DOZIER-COA000319.

Pennington's awareness that the Linder Report indicated a problem with a lack of supervision, proves that Chief Pennington knew his subordinates would act unlawfully and failed to stop them from doing so. Plaintiff also contends that the falsifying of affidavits in the Narcotics Unit was widespread and ongoing.    The record is clear that there no widespread abuse or pattern of prior similar incidents on record to give any of the supervisors notice or fair warning.[68] A review of the Office of Professional Standards (OPS) complaint history from 2001 through 2006 did not reveal any prior similar incidents of misconduct of the type that occurred in the Neal Street incident or the facts leading up to that incident.[69]

The record is also clear that Junnier, Smith and Tesler all had a vested interest to keep their activities secret.[70] As thoroughly briefed in City Defendants' Motion for Summary Judgment, a secret enterprise, only known to a few, is by no means a widespread policy, custom or practice.

## IV.    PLAINTIFF FAILS ON HER SUPERVISORY CLAIMS AS THERE IS NO DIRECT CAUSAL CONNECTION BETWEEN THE ACTIONS OF APD COMMAND STAFF AND THE CONSTITUTIONAL DEPRIVATION

### A.    The Chief and Supervisory Defendants Were Not Put on Notice of Illegal Conduct Within the Narcotics Unit.

Plaintiff contends that the undisputed evidence shows there is at least a three year history of widespread abuse in the form of falsifying affidavits to obtain

---

[68] City Defendants' Motion for Summary Judgment, pp. 60-65.
[69] City Defendants' Motion for Summary Judgment, Exhibit "G"- Affidavit of Maj. Lane Hagin.
[70] *Id.* pp. 31-34.

warrants with the APD's Narcotics Unit. Plaintiff does not specify which officers were involved, what they did and when they did it. Other than Junnier, Smith, Tesler and Stallings Plaintiff has not identified any other wrong doers. Once again, Plaintiff fails to cite to the evidence in her Statement of Disputed Material Facts or the record in support of this contention, expecting the Court and City Defendants to either take Plaintiff's word as gospel or to locate such supporting evidence themselves.

Plaintiff also makes reference to the Narcotics Unit "almost killing" an elderly woman during a botched drug raid two months before the Johnston incident. Plaintiff claims that the warrant was obtained through unverified or uncorroborated information. Plaintiff's counsel was present when Officer Buchanan testified at length about the circumstance surrounding this incident.[71] The record is clear that there were few similarities between the Francine Thompson case and the Kathryn Johnston case. Officer Buchanan testified that a warrant was obtained after a certified reliable informant purchased drugs at the apartment complex where Ms. Thompson lived.[72] Although Officer Buchanan testified she was not in a position to view the transaction, she also testified that she searched the CRI before the buy and then gave him money to make the buy.[73] Officer Buchanan then testified that the CRI returned with the drugs he had purchased, described the

---

[71]Buchanan depo., pp. 74-97.
[72] Id.
[73] Id.

person who has sold the drugs to him, and gave her a description of the apartment where he had made the purchase.[74] The CRI's father was with the CRI when he made the purchase and listened to the CRI debrief the details of the transaction to Officer Buchanan.[75] The CRI's father did not indicate that the CRI's description of the apartment was incorrect.[76] After Officer Buchanan released the CRI, she conducted surveillance of the apartment from across the street and saw two men in front of the apartment that the CRI described as being the apartment from which he made the purchase.[77] One of the men matched the description that the CRI gave of the person who sold him the drugs.[78] Officer Buchanan then followed proper procedures in turning in the necessary paperwork, drafting a truthful affidavit and obtaining the warrant from the magistrate.[79] Officer Buchanan and other members of Team #1 subsequently executed the warrant on the same apartment.[80] When Team #1 entered the residence, Ms. Thompson was in a bedroom holding what appeared to be a gun and was obviously terrified.[81] The lead officer who was manning the shield told Ms. Thompson to set the gun down and she did (it turned out to be a toy gun).[82] Ms. Thompson was then gently escorted out of the room by

---

[74] Id.
[75] Id.
[76] Id.
[77] Id.
[78] Id.
[79] Id.
[80] Id
[81] Id.
[82] Id.

Officer Buchanan as she recognized that it was not the person described to her by the CRI.[83] No drugs were located at the residence.[84] Officer Buchanan testified that she wasn't sure if the CRI described the wrong apartment, or if Ms. Thompson's apartment was being used to sell drugs when she wasn't there.[85]

The above facts are substantially different from the Kathryn Johnston case, which involved police officers wrongfully arresting a drug-dealer after they planted drugs on him, then in exchange for his release, the drug-dealer agreed to direct the officers to a house containing a large amount of cocaine. Based on this limited information, the officers obtained a fraudulent warrant and conducted a raid on the residence and ended up killing Ms. Johnston in the process.    The officers in the Johnston case relied on information from an uncertified informant who was under duress and had an axe to grind as he had just been blackmailed by the offending officers. Whereas Officer Buchanan relied on a certified reliable informant and obtained a lawful warrant to search Ms. Thompson's residence. The circumstances of the Thompson case were not such that command staff should be imputed with having notice of the nefarious activities occurring at the Narcotics Unit. Plaintiff's attempt to characterize the Thompson case as a clear indication that the "Chief and his supervisors had effectively lost control of the Narcotics Unit" borders on intentional fraud.

---

[83] Id.
[84] Id.
[85] Id.

The record is clear that according to the FBI investigation, the illegal practices in the Narcotics Unit were not as widespread as Plaintiff contends.[86]  The "widespread practice" described by Plaintiff, according to the FBI investigation, involved primarily Junnier, Stallings, J.R. Smith and Tesler, who are all currently serving time in federal prison for the criminal acts that Plaintiff contends should be imputed to the City of Atlanta.  Based on the FBI report and investigation, the other officers even in Team #1 – Cary Bond, Holly Buchanan and Brad Burchfield (all currently under investigation by the Office of Professional Standards) – had minimal involvement with Junnier's crew.  Although City Defendants acknowledge that that one bad officer is too many, four narcotics officers out of twenty-one assigned to the unit does not a "widespread practice" make.

Plaintiff admits in her response to City Defendants' Statement of Undisputed Material Facts that none of the supervisory defendants personally participated in the illegal acts of Junnier, J.R. Smith, Tesler and Stallings.  Because Junnier, Smith, Tesler and Stallings kept their nefarious enterprises secret, none of the supervisory defendants had notice of their illegal activity.  And the evidence shows that there were no prior similar incidents that would have put a reasonable supervisor on notice.  The APD Supervisor Defendants -- Chief of Police Richard Pennington, Asst. Chief Alan Dreher, Deputy Chief Peter Andresen, Maj. Pearlene

---

[86] City Defendants' Motion for Summary Judgment, pp. 35 – 40.

Williams, Maj. Marion L. Brooks (ret.), Maj. E.R. Finley, Maj. John Mathis, Maj. C.J. Davis and Lt. Stacie Gibbs -- are entitled to summary judgment on Plaintiff's federal claims.

## V.   PLAINTIFF FAILS ON HER STATE LAW CLAIMS

Plaintiff appears to have abandoned **Count 3** of her Complaint which lists the following state law claims against all Defendants: Trespass, Assault and Battery, False Arrest, False Imprisonment and Intentional Infliction of Emotional Distress [Amended Complaint, ¶ 65]. Instead, Plaintiff seems to refocus on **Count 4**, wherein she asserts a negligence claim against the supervisory defendants in their personal capacity because they "willfully failed to provide adequate training and supervision within the Narcotics Unit despite being on notice that training and supervision within the Unit was inadequate." As to the remaining allegations in **Count 4** -- alleging that Defendants "negligently performed ministerial duties as required by Georgia law when they unlawfully obtained a search warrant and/or no-knock warrant with false statements and executed said illegal warrant..." -- Plaintiff appears to have been abandoned those claims as well.

Supervisor Defendants reassert their arguments above in this Reply to Plaintiffs claims regarding the adequacy of training and supervision of the Narcotics Unit and all arguments regarding official immunity. Supervisor Defendants also reassert City Defendants' arguments and evidence on the adequacy

of training in City Defendants' Motion for Summary Judgment filed herein. Since Plaintiff offers no new evidence in her Response to support those claims, City Defendants contend that the APD Supervisor Defendants -- Chief of Police Richard Pennington, Asst. Chief Alan Dreher, Deputy Chief Peter Andresen, Maj. Pearlene Williams, Maj. Marion L. Brooks (ret.), Maj. E.R. Finley, Maj. John Mathis, Maj. C.J. Davis and Lt. Stacie Gibbs -- are entitled to summary judgment on Plaintiff's state law claims and/or official immunity.

## VI.    RICO CLAIMS

Plaintiff appears to have abandoned **Count 5** of her Amended Complaint wherein she asserted several claims under Georgia's RICO statute against all Defendants.    City Defendants assert their arguments and evidence regarding the RICO claims as set forth in City Defendants' Motion for Summary Judgment.

City Defendants contend that they are entitled to summary judgment on Count 5 of Plaintiff's Amended Complaint.

## CONCLUSION

For all the reasons set forth above and as presented in their Motion for Summary Judgment, City Defendants respectfully submit that they are entitled to summary judgment as a matter of law.

Respectfully submitted this 10th day of February, 2010.

R. ROGER BHANDARI
Acting City Attorney
Georgia Bar No. 056340

BY: _____
DENNIS M. YOUNG
Senior Assistant City Attorney
Georgia Bar No. 781744

STEPHEN A. POWER
Associate City Attorney
Georgia Bar No. 600565

Attorneys for City Defendants
Chief of Police Richard Pennington,
Asst. Chief Alan Dreher, Deputy
Chief Peter Andresen, Maj. Pearlene
Williams, Maj. Marion L. Brooks
(ret.), Maj. E.R. Finley, Maj. John
Mathis, Maj. C.J. Davis and Lt. Stacie
Gibbs

CITY OF ATLANTA LAW DEPARTMENT
68 Mitchell Street, SW, Suite 4100
Atlanta, GA 30303
(404) 330-6567 (telephone)
(404) 546-8581 (facsimile)
dmyoung@atlantaga.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SARAH DOZIER, as Administrator of           )
the Estate of KATHRYN JOHNSTON,             )
                                             )
      Plaintiff,                          )
                                             )
v.                                           )    **CIVIL ACTION CASE NO.**
                                             )    **1:08-CV-00007-MHS**
CITY OF ATLANTA, et al.,                     )
                                             )
      Defendants.                         )

### CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2010, I filed the foregoing CITY

DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION

FOR SUMMARY JUDGMENT with the Clerk of Court via hand delivery. I have also

this day served counsel for the opposing parties with a copy of the within and

foregoing by depositing it in the U.S. Mail with proper postage, addressed to

Plaintiff's attorneys of record as follows:

Hezekiah Sistrunk, Jr., Esq.
Jane Lamberti Sams, Esq.
Shean Williams, Esq.
COCHRAN, CHERRY, GIVENS, SMITH, SISTRUNK & SAMS, P.C.
800 The Candler Building
127 Peachtree Street, N.E.
Atlanta, GA 30303

*[continued on next page]*

William Mitchell, Esq.
**CRUSER & MITCHELL, LLP**
Meridian II, Suite 2000
275 Scientific Drive
Norcross, GA 30092

Nicholas C. Moraitakis, Esq.
**MORAITAKIS, KISHEL, PEARSON & GARDNER, LLP**
3445 Peachtree Road, N.E., Suite 425
Atlanta, GA 30326

Additionally, a true and correct copy of the foregoing **CITY DEFENDANTS'**
**REPLY TO PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT** was placed in an envelope with adequate postage affixed
thereto and mailed to:

Arthur B. Tesler (59739-019)
FCI Petersburg Low
Federal Correctional Institution
Post Office Box 1000
Petersburg, VA 23804

Gregg Junnier (59088-019)
FCI Coleman Medium
Federal Correctional Institution
Post Office Box 1032
Coleman, FL 33521

Jason R. Smith (59089-019)
FCI Fairton
Federal Correctional Institution
Post Office Box 420
Fairton, NJ 08320

*[continued on next page]*

Wilbert Stallings (05587-019)
FMC Devens
Federal Medical Center
Post Office Box 879
Ayer, MA  01432


**DENNIS M. YOUNG**
Senior Assistant City Attorney
Georgia Bar No. 781744

**CITY OF ATLANTA LAW DEPARTMENT**
68 Mitchell Street, SW, Suite 4100
Atlanta, GA  30303
(404) 330-6567 (telephone)
(404) 546-8581 (facsimile)
dmyoung@atlantaga.gov

41